No. 19-10604

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ROBERT W. OTTO, PH.D. LMFT, individually and on behalf of his patients, and
JULIE H. HAMILTON, PH.D., LMFT, individually and on behalf of her patients,
Plaintiffs–Appellants

*v.*

CITY OF BOCA RATON, FLORIDA, and
COUNTY OF PALM BEACH, FLORIDA
Defendants–Appellees

On Appeal from the United States District Court
for the Southern District of Florida
In Case No. 9:18-cv-80771-RLR before the Honorable Robin L. Rosenberg

## BRIEF OF PLAINTIFFS-APPELLANTS

<div style="margin-left:40%">

Mathew D. Staver (Fla. 0701092)
Horatio G. Mihet (Fla. 026581)
Roger K. Gannam (Fla. 240450)
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
E-mail: court@lc.org

*Attorneys for Plaintiffs–Appellants*

</div>

OTTO, *etc., et al.* v. CITY OF BOCA RATON, *etc., et al.*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

Plaintiffs-Appellants hereby certify that the following individuals and entities are known to have an interest in the outcome of this case:

Abbott, Daniel L.

Carlton Fields Jorden Burt, P.A.

City of Boca Raton, Florida

Cole, Jamie A.

Dreier, Douglas C.

Dunlap, Aaron C.

Equality Florida Institute, Inc.,

Fahey, Rachel Marie

Flanigan, Anne R.

Gannam, Roger K.

Gibson, Dunn & Crutcher LLP

Hamilton, Julie H., Ph.D., LMFT

Hoch, Rand

Hvizd, Helene C.

Liberty Counsel, Inc.

Mihet, Horatio G.

OTTO, *etc., et al.* v. CITY OF BOCA RATON, *etc., et al.*

Otto, Robert W., Ph.D. LMFT

Palm Beach County, Florida

Palm Beach County Human Rights Council

Phan, Kim

Reinhart, Hon. Bruce E.

Rosenberg, Hon. Robin L.

SDG Counseling, LLC

Staver, Mathew D.

Sutton, Stacey K.

The Trevor Project

Walbolt, Sylvia H.

Weiss Serota Helfman Cole & Bierman, P.L.

Yasko, Jennifer A.

No publicly traded company or corporation has an interest in the outcome of this case.

/s/ Horatio G. Mihet
Horatio G. Mihet
*Attorney for Plaintiffs–Appellants*

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

Pursuant to Fed. R. App. P. 34(a), Appellants respectfully request that oral argument be permitted in this appeal because it would assist the Court in understanding and deciding the weighty constitutional issues presented by Appellees' ordinances which ban constitutionally protected speech.

## TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT ................................................................1

STATEMENT IN SUPPORT OF ORAL ARGUMENT ...........................................i

TABLE OF CONTENTS............................................................................i

TABLE OF AUTHORITIES ...................................................................v

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES PRESENTED FOR REVIEW ............................1

STATEMENT OF THE CASE..............................................................3

I.     INTRODUCTION ...........................................................................3

II.    FACTUAL BACKGROUND...........................................................4

     A.     Counselors and Their Talk Therapy......................................4

          1.     Dr. Otto Would Practice Voluntary, Non-Aversive SOCE Talk Therapy in Boca Raton and Palm Beach County but for the Ordinances.................................................4

          2.     Dr. Hamilton Would Practice Voluntary, Non-Aversive SOCE Talk Therapy in Boca Raton and Palm Beach County but for the Ordinances.................................................7

     B.     The Ordinances Banning "Conversion Therapy." ................9

C.     The Ordinances are Not Justified by "Overwhelming Research." .....12

    1.    The Localities Agree No Empirical Evidence of Harm Justifies the Ordinances. ..........................................................12

    2.    The APA Report Discloses Anecdotal Evidence of Benefits from SOCE at Least Equivalent to Anecdotal Evidence of Harm, and More Benefits Perceived by Religious Individuals. ...................................................................................................15

    3.    The APA Report Excludes Gender Identity Change Efforts, Which Similarly Lack Empirical Research. ............................17

    4.    The APA Report Commends a Client-Directed Approach to Therapy for Clients with Unwanted Same-Sex Attractions, Commends More Research on Voluntary SOCE, and Condemns Only Coercive Therapies. ......................................19

    5.    The APA Report Specifically Calls for Therapists to Respect and Consider the Religious Values of Individuals Desiring Therapy. ...................................................................................25

D.     The Localities Received No Complaints or Evidence of Harm from SOCE When Considering Their Ordinances. ....................................25

E.     The Localities Did Not Consider Any Less Restrictive Alternatives to Their Outright Therapy Bans. ..........................................................27

F.     The Localities Knew Their Ordinances Were Not Enforceable by Their Code Enforcement Officials. ......................................................28

G.     The Localities' Knew Their Ordinances Regulated a Field Preempted to the State. .......................................................................31

H.     The Order on Appeal. .......................................................................32

ARGUMENT ...............................................................................................34

I.     THE DISTRICT COURT'S ORDER SHOULD BE REVERSED BECAUSE COUNSELORS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS THAT THE ORDINANCES ARE UNCONSTITUTIONAL CONTENT-BASED RESTRICTIONS ON COUNSELORS' SPEECH.......................................34

A.    The District Court Erred in Creating a New "Treatment" Speech Category and Failing to Apply Strict Scrutiny....................................34

    1.    Speech Is Still Speech After *Wollschlaeger* and *NIFLA*. .........34

    2.    The Ordinances are Content-Based Restrictions on Speech Subject to Strict Scrutiny. .........................................................36

    3.    There Is No Carve-Out or Other Warrant in *NIFLA* for the District Court's Novel "Treatment" Speech Category. ............42

B.    The District Court Erred in Concluding Counselors Have the Burden of Proof on the Localities' Narrow Tailoring of Their Ordinances. ...45

    1.    Though Counselors Must Show the Preliminary Injunction Prerequisites, the Localities Have the Burden of Proof on the Constitutionality of Their Ordinances Under Strict Scrutiny...45

        a.    Counselors' Likelihood of Success Showing Requires Only a Probability That They Will Prevail....................45

        b.    The Localities Have the Burden of Proving the Constitutionality of Their Ordinances Under Strict Scrutiny........................................................................45

    2.    Localities Must Show Empirical or Concrete Evidence of Harm.......................................................................................46

    3.    The Localities Must Show That the ordinances Were the Least Restrictive Means Available at the Time of Enactment. ...................................................................................49

    4.    The District Court Should Have Granted the Preliminary Injunction Upon Finding the Localities Had Failed to Carry Their Narrow Tailoring Burden...............................................51

C.    The District Court Erred in Failing to Hold Counselors Are Likely to Succeed on the Merits of Their Claim That the ordinances are Unconstitutional Content-Based Restrictions on Counselors' Speech................................................................................................53

1. Localities Have No Compelling or Other Sufficient Governmental Interest to Ban Voluntary SOCE Talk Therapy. ...................................................................53

2. Localities' Ordinances Are Not the Least Restrictive Means or Otherwise Narrowly Tailored. ..............................................54

D. The District Court Erred in Failing to Hold Counselors Satisfy Irreparable Harm and the Remaining Preliminary Injunction Factors. ...............................................................................57

1. Irreparable Harm Is Presumed from the Localities' Denial of Counselors' First Amendment Freedoms. .................................57

2. The Balance of Equities and Public Interest Favor the Preliminary Injunction. ..........................................................58

II. COUNSELORS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIM THAT THE ORDINANCES ARE UNCONSTITUTIONAL VIEWPOINT-BASED RESTRICTIONS ON COUNSELORS' SPEECH. ...................................................................59

III. COUNSELORS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR PRIOR RESTRAINT AND VAGUENESS CLAIMS UNDER THE FIRST AMENDMENT. .......................................................................64

A. The ordinances Are Unconstitutional Prior Restraints. ......................64

B. The ordinances Are Unconstitutionally Vague. ...................................65

IV. THE DISTRICT COURT'S ORDER DENYING PRELIMINARY INJUNCTION SHOULD BE REVERSED BECAUSE PLAINTIFFS ARE SUFFERING IRREPARABLE INJURY FROM THE LOCALITIES' *ULTRA VIRES* ORDINANCES WHICH REGULATE A FIELD PREEMPTED TO THE STATE. ......................................................67

CONCLUSION .........................................................................................68

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS..........69

CERTIFICATE OF SERVICE ..............................................................70

# TABLE OF AUTHORITIES

## Cases

*ACLU of Fla., Inc. v. The Florida Bar*,
744 F. Supp. 1094 (N.D. Fla. 1990) ...................................................58

*Alford v. Walton County*, No. 3:16cv362/MCR/CJK,
2017 WL 8785115 (N.D. Fla. Nov. 22, 2017)....................................51

*ASF, Inc. v. City of Seattle*, 408 F. Supp. 2d 1102 (W.D. Wash. 2005)..................64

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ........................................46,49,53

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012)........................................58

*Bantham Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ............................................64

*Barrett v. Walker Cnty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017) ......................65

*Boos v. Berry*, 485 U.S. 312 (1988)..........................................................49

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973).........................................................66

*Brown v. Entertainment Merchants Assn.*, 564 U.S. 786 (2011) ...........................56

*Bruni v. City of Pittsburgh*, 824 F.3d 353 (3d Cir. 2016)........................................50

*Comcast Cablevision of Broward Cnty., Inc. v. Broward Cnty.*,
124 F. Supp. 2d 685 (S.D. Fla. 2000)...........................................53,54

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ...................................61

*Connally v. Gen. Const. Co.*, 269 U.S. 385 (1926) ...........................................65,66

*D'Ambra v. City of Providence*, 21 F. Supp. 2d 106 (D.R.I. 1998) .......................64

*Edenfield v. Fane*, 507 U.S. 761 (1993) ......................................47,48,53

*Elrod v. Burns*, 427 U.S. 347 (1976) ................................................................57,58

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) ...............................64

*Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal,*
    546 U.S. 418 (2006).........................................................................46

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) ................................66

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) .................35,39,40,41,42

*Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360 (M.D. Fla. 2000) ..............64

*Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31,*
    138 S. Ct. 2448 (2018)...............................................................46,47

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006) ..............59

*King v. Governor of New Jersey*, 767 F.3d 216 (3d Cir. 2014)...............36,37,38,42

*Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829 (1978)................................47

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001)......................................35,61

*Mason v. Florida Bar*, 208 F.3d 952 (11th Cir. 2000) .................................48,49,53

*McCullen v. Coakley*, 134 S. Ct. 2518 (2014) ..............................46,49,50,51,55,56

*NAACP v. Button*, 371 U.S. 415 (1963)...........................................................35,66

*Nat'l Inst. for Family & Life Advocates v. Becerra,*
    138 S. Ct. 2361 (2018) ("*NIFLA*") ...................... 35,37,38,42,43,44,56

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014)...............................................38,42

*Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action,*
    558 F.2d 861 (8th Cir. 1977) ............................................................68

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ...............................................63,64

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) .........................................35,37,38

*Reilly v. City of Harrisburg*, 858 F.3d 173 (3d Cir. 2017) .....................................52

*Reynolds v. Middleton*, 779 F.3d 222 (4th Cir. 2015) ...........................................50

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)................59

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989)...................48

*Scott v. Roberts*, 612 F.3d 1279 (11th Cir. 2010) ...................58

*Searcy v. Harris*, 888 F.2d 1314 (11th Cir. 1989)...........................59,60

*Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*,
    697 F.2d 1352 (11th Cir. 1983) ........................45

*Sorrell v. IMS Health*, 131 S. Ct. 2653 (2011) ...................59,61

*Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622 (1994) ..........................47

*United States v. Frandsen*, 212 F.3d 1231 (11th Cir. 2000)...........................64,65

*United States v. O'Brien*, 391 U.S. 367 (1968) .......................39

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)..........................46

*United States v. Stevens*, 559 U.S. 460 (2010) ......................63

*Vazzo v. City of Tampa*, No. 8:17-cv-2896-T-02AAS
    (M.D. Fla. Jan. 30, 2019)....................42

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
    455 U.S. 489 (1982)........................66,67

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)...........................49

*Wollschlaeger v. Florida*, 848 F.3d 1293 (11th Cir. 2017) ....................36,38,42,43

## Statutes

28 U.S.C. § 1292 ................................................................1

28 U.S.C. § 1331 ................................................................1

28 U.S.C. § 1343 ................................................................1

28 U.S.C. § 1367 ................................................................1

## Constitutional Provisions

U.S. Const. amend. I ...........................................................................*passim*

## Other Authorities

11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane, *Federal Practice & Procedure* § 2948.1 (2d ed. 1995) ...................................................58

Boca Raton City Ordinance 5407 ...................................................................*passim*

Palm Beach County Ordinance 2017-046 ........................................................*passim*

## JURISDICTIONAL STATEMENT

This Court has jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) because the district court refused to grant Appellants' requested preliminary injunction. The district court had jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

## STATEMENT OF THE ISSUES PRESENTED FOR REVIEW

1.    Whether the district court erred in denying Plaintiffs-Appellants' Motion for Preliminary Injunction;

2.    Whether the district court erred in holding Plaintiffs-Appellants are not likely to succeed on the merits of their constitutional free speech challenge to the City and County ordinances under the First Amendment;

3.    Whether the district court erred in holding that the City and County ordinances do not discriminate against Plaintiffs-Appellants' speech on the basis of viewpoint;

4.    Whether the district court erred in failing to apply strict scrutiny review to the City and County ordinances' content-based restrictions on Plaintiffs-Appellants' speech;

5.    Whether the district court erred in holding Plaintiffs-Appellants have the burden to prove that the City and Country ordinances do not satisfy narrow tailoring under strict or intermediate scrutiny;

6.      Whether the district court erred in holding Plaintiffs-Appellants are not likely to succeed on the merits of their constitutional prior restraint challenge to the City and County ordinances under the First Amendment;

7.      Whether the district court erred in holding Plaintiffs-Appellants are not likely to succeed on the merits of their constitutional vagueness challenge to the City and County ordinances under the First Amendment; and

8.      Whether the district court erred in holding Plaintiffs-Appellants did not show sufficient irreparable injury for a preliminary injunction to issue on their preemption challenge to the City and County ordinances under Florida law.

## STATEMENT OF THE CASE

## I.   INTRODUCTION

>**As I will show you in the . . . APA report, your Honor,**
>***there have been no factors discovered about what types***
>***of therapy cause harm* and what types of therapies are**
>**going to lead to a benefit.**
>
>***Because we don't know* the identifying factors of what**
>**about this person makes the therapy beneficial, *we***
>***don't know*.[1]**

Plaintiffs-Appellants, Drs. Rob Otto and Julie Hamilton (collectively,
"Counselors"), sued the Defendants-Appellees City and County (collectively, the
"Localities"), to challenge the constitutionality of their respective ordinances which
ban derisively labeled "conversion therapy" for minors, ostensibly to prohibit shock
treatments, involuntary camps, and other chimerical or long-abandoned practices. In
reality, the ordinances' unjustified, blanket speech bans completely foreclose
Counselors' provision of non-aversive, purely voluntary, **speech-only** counseling to
clients who desire help to reduce or eliminate unwanted same-sex attractions or
gender confusion. The ordinances violate Counselors' First Amendment rights by
chilling and abridging their free speech and work ongoing and irreparable harm each

---

[1]     A-129 at 124:3-8 (emphasis added) (argument of counsel for Palm Beach
County). (Record materials in the Appendix will be referenced by "A-[district court
docket number]" followed by the Appendix page number.)

day they remain in effect. The ordinances are also *ultra vires*, purporting to regulate in a field preempted to the State of Florida.

Counselors seek a preliminary injunction against enforcement of the speech-banning ordinances. Although the district court below should have ruled for Counselors immediately upon the above admission by Palm Beach County, that "we don't know" what kind of "conversion therapy" causes harm, the district court denied Counselors' motion. As more fully explained below, this Court should reverse the district court's denial.

## II. FACTUAL BACKGROUND[2]

### A. Counselors and Their Talk Therapy.

#### 1. Dr. Otto Would Practice Voluntary, Non-Aversive SOCE Talk Therapy in Boca Raton and Palm Beach County but for the Ordinances.

Plaintiff-Appellant Robert W. Otto, Ph.D, LMFT, is a licensed marriage and family therapist practicing in Boca Raton and Palm Beach County. (A-1 at ¶¶ 122,

---

[2] The factual record developed in this case merits more exposition than is possible in this brief. Counselors commend to the Court the complete "Findings of Fact" section in [Plaintiffs' Proposed Post-Hearing] Findings of Fact and Conclusions of Law on Plaintiffs' Motion for Preliminary Injunction, filed by Counselors in the district court. (A-134 at 2-33.)

125, 127[3]; A-121-7 at 19:21-20:5, 143:23-144:2.) Prior to the ordinances, Dr. Otto's counseling clients included minors voluntarily seeking counseling to reduce or eliminate unwanted same-sex attractions, behaviors, and identity, which counseling is within a more general therapeutic category known as sexual orientation change efforts (SOCE). (A-121-7 at 143:2-15; A-1 at ¶¶ 3, 4, 126, 128, 129, 131.) Dr. Otto does not call his SOCE counseling "conversion therapy," and does not know anyone who does. (A-121-7 176:4-22, 190:17-191:9; A-121-28 at 4.)

Dr. Otto practices exclusively talk therapy, consisting only of client-centered and client-directed conversations with his clients, concerning the clients' goals. (A-121-7 at 20:23-21:22, 22:12-21, 43:25-44:20, 146:8-11; A-121-28 at 4-6.)

Dr. Otto also does not believe he can change any person's sexual orientation or gender identity or expression, and therefore does not himself seek to change any client in those areas. (A-121-7 at 43:25-44:20, 54:21-24, 56:10-18; A-121-24 at 5.) Dr. Otto does believe, however, that through talk therapy people can make their own changes to reduce or eliminate unwanted same-sex attractions, behaviors, or identity, or gender confusion, and Dr. Otto assists minor clients with their own goals. (A-121-7 at 43:25-44:20, 51:21-24, 56:10-18, 63:21-64:10; A-121-28 at 2, 5-6.

---

[3]    The City expressly **accepts as true** the allegations of Plaintiffs' Verified Complaint for preliminary injunction purposes (City Opp'n Pls. Mot. Prelim. Inj., Doc. no. 83, at 2 n.2), and the County offers no evidence to contradict the verified allegations.

Dr. Otto's talk therapy practice does not include any form of aversion treatment, which is treatment involving reprimand, punishment, or shame to turn a person away from certain thoughts or behaviors. (A-1 ¶ 72; A-121-7 at 121:22-23; A-126-22 at 22.) Dr. Otto's practice also does not include any form of coercive or involuntary treatment, nor could Dr. Otto engage in talk therapy with any minor client without the client's assenting to it. (A-121-7 at 46:15-48:3, 52:22-56:18.)

In addition, Dr. Otto provides an extensive informed consent form and requires the client to review and sign it prior to commencing any SOCE counseling. (A-1 ¶ 128; A-121-7 at 46:15-48:3, 139:18-49:9; A-121-33 at 7-8.) Dr. Otto's informed consent form outlines the nature of SOCE counseling, explains the controversial nature of SOCE counseling, including the fact that some therapists do not believe sexual orientation can or should be changed, and informs the client of the potential benefits and risks associated with SOCE counseling. (A-1 at ¶ 128).)

Many of Dr. Otto's clients who desire SOCE counseling profess to be Christians with sincerely held religious beliefs conflicting with homosexuality, and voluntarily seek SOCE counseling in order to live in congruence with their faith and to conform their identity, concept of self, attractions, and behaviors to their sincerely held religious beliefs. (A-1 ¶ 129; A-121-7 at 155:9-156:20; A-121-28 at 2.) Dr. Otto shares those beliefs, and therapy sessions sometimes include discussion of Biblical viewpoints. (A-121-28 at 7; A-121-7 at 158:7-159:8.)

Some of Dr. Otto's minor clients have experienced anxiety, confusion, depression, and even suicidal ideation and attempts as a result unwanted same-sex attractions, behaviors, and identity. (A-1 ¶¶ 132-35.) Those clients seek to engage in SOCE counseling with Dr. Otto but are unable to engage in such counseling because of the ordinances. (A-1 ¶ 137). Dr. Otto understands the ordinances to prohibit him from engaging in any SOCE counseling with his minor clients, resulting in his discontinuing any ongoing SOCE counseling despite the clients' and parents' consent and requests to continue, and his declining any new requests for SOCE counseling. (A-1 at ¶ 139; A-121-7 at 77:6-18, at 78:13-21, at 79:22-80:14.)

Dr. Otto has never received any complaint or report of harm from any of his clients seeking and receiving SOCE counseling, including the many minors whom he has counseled. (A-1 at ¶ 130).

Because Dr. Otto's talk therapy practice consists of client-centered and client-directed conversations about clients' goals, every therapy session is unique, and Dr. Otto does not perform any set procedure or apply any treatment formula. (A-121-28 at 5; A-121-7 at 27:23-28:10, 52:10-21, 66:1-2, 160:2-3.)

**2. Dr. Hamilton Would Practice Voluntary, Non-Aversive SOCE Talk Therapy in Boca Raton and Palm Beach County but for the Ordinances.**

Plaintiff-Appellant Julie H. Hamilton, Ph.D., LMFT, is a licensed marriage and family therapist practicing in Boca Raton and Palm Beach County. (A-1 ¶ 140;

A-121-8 at 329:3-335:15; A-96-1.) In her current practice, Dr. Hamilton provides individual, marital, and family therapy for a wide variety of issues, including the issues of unwanted same-sex attractions and gender identity confusion. (A-1 ¶ 142.)

Dr. Hamilton is a client-centered family therapist, and her practice consists only of talk therapy conversations with her clients, honoring her clients' goals without any preconceived notions of what changes or outcomes clients should seek. (A-121-24 at 7; A-121-8 at 71:2-6; A-121-24 at 2.) Dr. Hamilton believes she cannot change any person's sexual orientation, but that clients can experience a reduction in unwanted same-sex attractions through talk therapy. (A-121-8 at 231:1-17.)

Dr. Hamilton does not engage in aversive or coercive techniques, and she is not aware of any practitioner who engages in such practices with clients seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity. (A-1 at ¶ 72.) Dr. Hamilton does not coerce her clients into any form of counseling, only engages in SOCE counseling with those clients who desire and consent to it, and always permits her clients to set the goals of any counseling she offers. (A-1 at ¶¶ 77, 131, 144.)

Dr. Hamilton provides all of her clients with informed consent, in which she explains that there is no guarantee that by pursuing therapy clients will be happier; no particular treatment method can be guaranteed to be effective; and therapy can be uncomfortable as clients talk about unresolved life experiences. (A-1 at ¶ 143.)

Many of Dr. Hamilton's clients identify as Christians and have sincerely held religious beliefs that the Bible is the only source of truth, which truths are sometimes discussed. (A-121-24 at 7; A-121-8 at 143:15-147:8, 154:22-157:1.) Dr. Hamilton's clients with same-sex attractions, behaviors, or identity or gender identity confusion who adhere to a Biblical worldview seek out therapy to clear up gender identity confusion, reduce same-sex attractions, change same-sex behaviors, and/or simply live a life consistent with their faith. (A-1 at ¶¶ 145, 146.) Clients who have been living lives inconsistent with their faith often present with internal conflicts, depression, anxiety, or substance abuse, and are seeking to resolve these distresses. (*Id.*). Dr. Hamilton currently has clients seeking to engage in what would be considered SOCE counseling, but she is prohibited from engaging in such counseling because of the ordinances. (A-1 at ¶¶ 148-161.)

Dr. Hamilton has never received any complaint or report of harm from any of her clients seeking and receiving therapy for any issue, including the many minors that she has counseled. (A-1 at ¶ 147.)

Every therapy session with every minor client is different for Dr. Hamilton. (A-121-8 at 81:6-7; A-121-24 at 6.)

## B. The Ordinances Banning "Conversion Therapy."

The County began considering its ordinance at the prompting of Rand Hoch, the President and Co-Founder of the Palm Beach County Human Rights Council

(PBCHRC). (A-121-9 at 21:22-23:19, at 94:9-98:9; A-126-6 (Pls.' Ex. 6).) Hoch also prompted the City's consideration of its ordinance. (A-126-41 at 12:24-13:24.) The Localities enacted their respective ordinances in the Fall of 2017. (A-126-27 (Boca Raton, Oct. 10, 2017)); A-126-20 (Palm Beach County, Dec. 19, 2017)).)

The operative language of the ordinances is identical, providing, "[i]t shall be unlawful for any provider to practice conversion therapy on any individual who is a minor regardless of whether the provider receives monetary compensation . . . ." (A-126-27 (City Ord.) Sec. 1 (9-106); A-126-20 (Cnty. Ord.) Sec. 5.) The ordinances' prohibitions are only applicable to licensed practitioners, including licensed marriage and family therapists. (A-126-27 Sec. 1 (9-105(c)); A-126-20 Sec. 4.)

The ordinances define "conversion therapy" in nearly identical terms:

> "Conversion therapy" . . . means . . . any counseling, practice, or treatment performed with the goal of changing an individual's sexual orientation or gender identity, including but not limited to, efforts to change behaviors, gender identity, or gender expression, or to eliminate or reduce sexual or romantic attractions towards individuals of the same gender or sex.

(A-126-27 Sec. 1 (9-105(a)); A-126-20 Sec. 4 ("the practice of seeking to change").)

Both ordinances exclude from their definitions of "conversion therapy":

> counseling that provides support and assistance to a person undergoing gender transition or counseling that provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation-neutral interventions to prevent or address unlawful conduct or

10

unsafe sexual practices, **as long as such counseling does not seek to change sexual orientation or gender identity**.

(A-126-27 Sec. 1 (9-105(a)) (emphasis added); A-126-20 Sec. 4 (substituting "identity exploration and development" for "development" and other minor variations).)

Licensed practitioners who violate the ordinances are subject to financial penalties. (A-126-27 Sec. 1 (9-107); A-126-20 Sec. 6.) Neither ordinance defines "sexual orientation," "gender identity," "gender expression," or "gender transition."

According to the County's 30(b)(6) witness, the same therapy content can be both allowed and prohibited by the County's ordinance, depending on whether the **intent** is to change a minor's sexual orientation or gender identity. (A-121-9 at 260:11-262:12, at 266:14-267:18.) If an adolescent born female, but who identifies as a male for a time, seeks therapeutic help to change her gender identity back to female to align with her biological body, the County ordinance prohibits licensed therapists from helping her. (A-121-9 at 268:15-25.) Indeed, according to the County, if a minor desires and intends to change gender identity and presents that goal to a licensed therapist, the therapist is prohibited by the ordinance from assisting with the minor's goal, **regardless of whether the therapist also intends to change the minor's gender identity**. (A-121-9 at 269:2-270:2.) The City interprets its

ordinance the same way, as explained by its 30(b)(6) witness. (A-126-41 at 154:23-158:13.)

### C. The Ordinances are Not Justified by "Overwhelming Research."

#### 1. The Localities Agree No Empirical Evidence of Harm Justifies the Ordinances.

The ordinances identically claim justification in "overwhelming research," which refers exclusively to ten sources appearing in the ordinances' respective recitals. (A-126-27 at 1-5; A-126-20 at ECF 9-12; A-121-11; A-121-1; A-121-12 to A-121-22; A-121-9 at 253:16-254:21; A-126-41 at 146:12-24.) Neither the "overwhelming research" language nor the cited sources were original to Localities, however, having been copied from Rand Hoch's model ordinance proposal. (A-121-9 at 247:14-249:23; A-126-41 at 12:24-13:24.)

The ten sources cited in the ordinances (the "Sources," A-85-2 to A-85-13) comprise various reports, statements, and position papers, centering on the 2009 Report of American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation (A-85-5, the "APA Report"). All of the other Sources either cite to the APA Report, or cite to no authorities at all for their positions. (*See, e.g.,* A-85-12, Substance Abuse and Mental Health Services Administration (SAMHSA), *Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth* (2015); A-85-13 American College of Physicians Position Paper,

*Lesbian, Gay, Bisexual, and Transgender Health Disparities* (2015); A-85-11, American School Counselor Association Position Paper (2014).)

The APA Report does not use the term "conversion therapy." Rather, the APA Report uses "the term sexual orientation change efforts (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved." (A-126-22 at 2 n.**.)

The APA Report discloses up front, and repeatedly throughout, that there is no empirical or other research supporting **any conclusions** regarding either efficacy **or harm** from SOCE, especially in children and adolescents. (A-126-22 at 3 ("[T]he recent SOCE research **cannot provide conclusions** regarding efficacy or safety . . . ."), at 7 ("The research on SOCE **has not adequately assessed** efficacy and safety."), at 37 ("These [recent] studies all use designs that **do not permit cause-and-effect attributions to be made**."), at 42 ("[T]he recent studies **do not provide valid causal evidence** of the efficacy of SOCE **or of its harm** . . . ."), at 42 ("[T]he nature of these studies **precludes causal attributions** for harm or benefit to SOCE . . . ."), at 42 ("We conclude that there is a **dearth of scientifically sound research** on the safety of SOCE. . . . Thus, **we cannot conclude how likely it is that harm**

will occur from SOCE."), at 72 ("**There is a lack of published research on SOCE among children**."), at 73 ("**We found no empirical research on adolescents who request SOCE . . . .**"), at 91 ("**We concluded that research on SOCE . . . has not answered basic questions of whether it is safe or effective and for whom**."), at 91 ("**[S]exual orientation issues in children are virtually unexamined**.") (all emphases added).) None of the other Sources adds anything to the empirical record unequivocally found to be lacking in the APA Report.

Despite the "overwhelming research" language in the ordinances, **both Localities confirmed through their Rule 30(b)(6) witnesses that the ordinances are not justified by any empirical research**. The County could not identify a single empirical study since the APA Report making a causal attribution of harm to SOCE. (A-121-10 at 40:11-21.) The City agreed its ordinance relied on no empirical studies, and that the City does not know whether or how much more likely it is that an LGBT-identifying minor who receives SOCE counseling will experience depression, fear, loneliness, rejection, anger, or suicidal thoughts as compared to a minor who does not receive such counseling. (A-126-41 at 26:13-28:13 ("If you're asking are we relying on any empirical studies, the answer is no.").)

### 2. The APA Report Discloses Anecdotal Evidence of Benefits from SOCE at Least Equivalent to Anecdotal Evidence of Harm, and More Benefits Perceived by Religious Individuals.

Given the lack of empirical research on SOCE outcomes, the Task Force looked to participants' perceptions of SOCE, "distinct from a scientific evaluation of the efficacy or harm." (A-126-22 at 49.) The review did not show evidence of one outcome over the other. "[S]ome recent studies document that there are people who perceive that they have been harmed through SOCE, just as other recent studies document that there are people who perceive that they have benefited from it." (A-126-22 at 42 (citations omitted).)

Nonetheless, the Task Force found several reported benefits of SOCE perceived by participants: "(a) a place to discuss their conflicts; (b) cognitive frameworks that **permitted them to reevaluate their sexual orientation identity, attractions, and selves in ways that lessened shame and distress and increased self-esteem**; (c) social support and role models; and (d) **strategies for living consistently with their religious faith and community**." (A-126-22 at 49 (emphasis added) (citations omitted).) "Participants described the social support aspects of SOCE positively." (*Id.*)

The Task Force also observed that perceptions of harm may correlate specifically to "aversion techniques." (A-126-22 at 41.) To illustrate, the Report gives some examples of aversion treatments:

> Behavior therapists tried a variety of aversion treatments,
> such as inducing nausea, vomiting, or paralysis; providing
> electric shocks; or having the individual snap an elastic
> band around the wrist when the individual became aroused
> to same-sex erotic images or thoughts. Other examples of
> aversive behavioral treatments included . . . shame
> aversion . . . .

(A-126-22 at 22.)

The Task Force also found that individuals' religious beliefs shape their experiences and outcomes:

> [P]eople whose motivation to change was strongly
> influenced by their Christian beliefs and convictions were
> **more likely to perceive themselves as having a**
> **heterosexual sexual orientation after their efforts.**
> [T]hose who were less religious were more likely to
> perceive themselves as having an LGB sexual orientation
> after the intervention. **Some . . . concluded that they had**
> **altered their sexual orientation, although they**
> **continued to have same-sex sexual attractions.**

(A-126-22 at 50 (emphasis added) (citations omitted).) "The participants had multiple endpoints, including LGB identity, 'ex-gay' identity, no sexual orientation identity, and a unique self-identity." (*Id.*) "Further, the findings suggest that some participants may have reconceptualized their *sexual orientation identity* as heterosexual . . . ."[4] (*Id.* at 50.)

---

[4]     In connection with its SOCE review and recommendations, the APA Report highlighted a problem with terminology in the academic research:

### 3. The APA Report Excludes Gender Identity Change Efforts, Which Similarly Lack Empirical Research.

The APA Report addressed only sexual orientation, expressly excluding gender identity from its review. (A-126-22 at 9.) But another Source cited by the ordinances points to the same lack of empirical research on the outcomes of gender identity change efforts: "**Proposed goals of treatment include reducing the desire to be the other sex**, decreasing social ostracism, and reducing psychiatric comorbidity. **There have been no randomized controlled trials of any treatment**. . . ." (A-121-17 at ECF 1 (emphasis added) (footnote omitted).) Also:

> Recent studies of participants who have sought SOCE **do not adequately distinguish between sexual orientation and sexual orientation identity**. We concluded that the failure to distinguish these aspects of human sexuality has led SOCE research to obscure what actually can or cannot change in human sexuality. . . . **[S]ome individuals modified their sexual orientation identity** (e.g., individual or group membership and affiliation, self-labeling) **and other aspects of sexuality** (e.g., values and behavior). . . . **[I]ndividuals, through participating in SOCE, became skilled in ignoring or tolerating their same-sex attractions. Some individuals reported that they went on to lead outwardly heterosexual lives, developing a sexual relationship with an other-sex partner, and adopting a heterosexual identity**.

(A-126-22 at 3-4 (emphasis added).) The ordinances suffer from the same ambiguity in that they do not differentiate between "sexual orientation" and "sexual orientation *identity*."

> **Given the lack of empirical evidence** from randomized, controlled trials of the efficacy of treatment aimed at eliminating gender discordance, the potential risks of treatment, and longitudinal evidence that gender discordance persists in only a small minority of untreated cases arising in childhood, **further research is needed** on predictors of persistence and desistence of childhood gender discordance as well as the long-term risks and benefits of intervention . . . .

(*Id.* at ECF 13 (emphasis added).)

As with the APA Report, the AACAP Statement leaves discretion with licensed professionals to make an informed decision, with the patient, about the most appropriate treatment. (A-121-17 at ECF 13, 15 ("The ultimate judgment regarding the care of a particular patient must be made by the clinician in light of all of the circumstances presented by the patient and that patient's family, the diagnostic and treatment options available, and other available resources.").)

The APA itself more recently addressed issues of gender identity and minors which were not included in the APA Report. (A-126-30 (*Guidelines for Psychological Practice with Transgender and Gender Nonconforming People* (hereinafter, "APA TGNC Guidelines")).) The APA recognized the same absence of research on gender identity change in children: "Due to the evidence that not all children persist in a TGNC identity into adolescence or adulthood, and because **no approach to working with TGNC children has been adequately, empirically validated**, consensus does not exist regarding best practice with prepubertal

children." (*Id.* at ECF 11 (emphasis added).) One distinct approach recognized by the APA is an approach where "children are encouraged to embrace their given bodies and to align with their assigned gender roles." (*Id.*) The APA concludes, "**It is hoped that future research** will offer improved guidance in this area of practice." (*Id.* (emphasis added) (citation omitted).)

Notwithstanding the APA's call for future research, however, the APA expressly sanctioned as **imperative** allowing a minor who has selected a gender identity different from his or her biological sex to choose to return:

> Emphasizing to parents the importance of allowing their child the freedom **to return to a gender identity that aligns with sex assigned at birth** or another gender identity at any point **cannot be overstated**, particularly given the research that suggests that not all young gender nonconforming children will ultimately express a gender identity different from that assigned at birth.

(A-126-30 at ECF 12 (emphasis added).)

> **4.** **The APA Report Commends a Client-Directed Approach to Therapy for Clients with Unwanted Same-Sex Attractions, Commends More Research on Voluntary SOCE, and Condemns Only Coercive Therapies.**

For adults desiring "**to change their sexual orientation** or their behavioral expression of their sexual orientation, or both," the APA reported that "adults perceive a benefit when they are provided with **client-centered** . . . approaches" involving "identity exploration and development," "**respect for the client's values,**

**beliefs, and needs**," and "permission and opportunity to explore a wide range of options . . . **without prioritizing a particular outcome**." (A-126-22 at 4.) The Task Force elaborated:

> Given that there is diversity in how individuals define and express their sexual orientation identity, an affirmative approach is supportive of clients' identity development without an a priori treatment goal concerning how clients identify or live out their sexual orientation or spiritual beliefs. This type of therapy . . . can be helpful to those who accept, reject, or are ambivalent about their same-sex attractions. The treatment does not differ, although the outcome of the client's pathway to a sexual orientation identity does.

(A-126-22 at 5.) "For instance, the existing research indicates that possible outcomes of sexual orientation identity exploration **for those distressed by their sexual orientation** may be: LGB identities[,] **Heterosexual sexual orientation identity**[,] Disidentifying from LGB identities[, or] Not specifying an identity." (*Id.* at 60 (emphasis added) (citations omitted).)

A key finding from the Task Force's review "is that those who participate in SOCE, **regardless of the intentions of these treatments**, and those who resolve their distress through other means, **may evolve during the course of their treatment in such areas as self awareness, self-concept, and identity**." (A-126-22 at 66 (emphasis added); *id.* at 61 ("Given . . . that many scholars have found that **both religious identity and sexual orientation identity evolve**, it is important for

20

LMHP to explore the development of religious identity and sexual orientation identity." (emphasis added) (citations omitted)).)

The Task Force identifies the **same essential framework "for children and adolescents** who present a desire to change either their sexual orientation or the behavioral expression of their sexual orientation, or both, or whose parent or guardian expresses a desire for the minor to change."[5] (A-126-22 at 5 (emphasis added).) "Services…should support and respect age-appropriate issues of **self-determination**; services should also be provided in the least restrictive setting that is clinically possible and should maximize self-determination. At a minimum, **the assent of the youth should be obtained, including whenever possible a developmentally appropriate informed consent to treatment**." (*Id.* (emphasis added).)

The Task Force also highlighted the ethical importance of client self-determination, encompassing "the ability to seek treatment, consent to treatment, and refuse treatment. **The informed consent process is one of the ways by which self-determination is maximized in psychotherapy**." (A-126-22 at 68 (emphasis added); *see also id.* at 6 ("LMHP **maximize self-determination** by . . . providing effective psychotherapy that explores the client's assumptions and goals, without

---

[5]      The APA Report defines "*adolescents* as individuals between the ages of 12 and 18 and children as individuals under age 12." (A-126-22 at 71 n.58.)

preconditions on the outcome [and] **permitting the client to decide the ultimate goal of how to self-identify and live out her or his sexual orientation**. . . . [T]herapy that increases the client's ability to cope, understand, acknowledge, and integrate sexual orientation concerns into **a self-chosen life** is the measured approach.").)

The Task Force viewed the concept of self-determination as equally important for minors: "It is now recognized that **adolescents are cognitively able to participate in some health care treatment decisions**, and such participation is helpful. [The APA] encourage[s] professionals to seek the assent of minor clients for treatment." (A-126-22 at 74 (emphasis added) (citations omitted); *see also id.* at 77 ("The ethical issues outlined [for adults] are also relevant to children and adolescents . . . .").)

In light of this strong self-determination ethic regarding youth, the Task Force "recommend[ed] that when it comes to treatment that purports to have an impact on sexual orientation, LMHP assess the adolescent's ability to understand treatment options, provide developmentally appropriate informed consent to treatment, and, at a minimum, obtain the youth's assent to treatment." (*Id.* at 79.) "[F]or children and adolescents who present a desire to change their sexual orientation or their behavioral expression of their sexual orientation, or both, or whose guardian expresses a desire for the minor to change," the Task Force recommended

"approaches [that] support children and youth in identity exploration and development without seeking predetermined outcomes." (*Id.* at 79-80.)

"LMHP should strive to maximize autonomous decision making and self-determination and avoid coercive and involuntary treatments."[6] (*Id.* at 76.) "The use of inpatient and residential treatments for SOCE is inconsistent with the recommendations of the field." (*Id.* at 74-75.)

Apart from recommending against coercive, involuntary, and residential treatments, the Task Force **did not recommend the end of SOCE**. Rather, without empirical evidence of SOCE efficacy or harm, the Task Force merely recommended that clients not be lead to **expect** a change in sexual orientation through SOCE. (A-126-22 at 66.) Indeed, The Task Force cited literature expressly cautioning **against declining SOCE** therapy for a client who requests it.

> LMHP who turn down a client's request for SOCE at the onset of treatment without exploring and understanding the many reasons why the client may wish to change may instill hopelessness in the client, who already may feel at a loss about viable options. . . . **[B]efore coming to a conclusion regarding treatment goals, LMHP should seek to validate the client's wish to reduce suffering and normalize the conflicts at the root of distress**, as

---

[6]  The APA Report defines "*coercive treatments* as practices that compel or manipulate a child or adolescent to submit to treatment through the use of threats, intimidation, trickery, or some other form of pressure or force." (A-126-22 at 71 n.59.) It defines "*involuntary treatment* as that which is performed without the individual's consent or assent and which may be contrary to his or her expressed wishes." (*Id.* at 71 n.60.)

well as create a therapeutic alliance that recognizes the
issues important to the client.

(A-126-22 at 56 (emphasis added) (citation omitted).)

The Task Force also called for more research on SOCE. (A-126-22 at 91

("**[R]esearch into harm and safety is essential**."), *id.* ("**This line of research

should be continued and expanded** . . . .") (all emphases added).) The Task Force

also noted, "The debate surrounding SOCE has become mired in ideological disputes

and competing political agendas." (A-126-22 at 92 (citation omitted).) The call for

future research, however, implicitly rejected the suggestion by some that SOCE

should end. (A-126-22 at 91.)

Given the absence of empirical evidence on SOCE outcomes, and the

emphasis on client-centered approaches, the Task Force recommended that choosing

SOCE counseling be given to the discretion of licensed mental health providers

(LMHP):

> [The APA Ethics Code] establishes that psychologists
> aspire to provide services that maximize benefit and
> minimize harm. . . . When applying this principle in the
> context of providing interventions, **LMHP assess the risk
> of harm, weigh that risk with the potential benefits,
> and communicate this to clients through informed
> consent procedures** that aspire to provide the client with
> an understanding of potential risks and benefits that are
> accurate and unbiased. . . .
>
> In weighing the harm and benefit of SOCE, LMHP can
> review with clients the evidence presented in this report.
> Research on harm from SOCE is limited, and some of the

research that exists suffers from methodological limitations that make broad and definitive conclusions difficult. . . .

(A-126-22 at 67 (emphasis added) (citations omitted).

> ### 5. The APA Report Specifically Calls for Therapists to Respect and Consider the Religious Values of Individuals Desiring Therapy.

The Task Force highlighted the particular stress experienced by individuals of conservative religious faiths who "struggle to live life congruently with their religious beliefs," and that this stress "had mental health consequences." (A-126-22 at 46-47.) Thus, it "proposed an approach that respects religious values and welcomes all of the client's actual and potential identities by exploring conflicts and identities without preconceived outcomes. This approach does not prioritize one identity over another and may aide a client in creating a sexual orientation identity consistent with religious values." (A-126-22 at 67 (citation omitted).)

> ### D. The Localities Received No Complaints or Evidence of Harm from SOCE When Considering Their Ordinances.

In prompting the County's ordinance, Hoch represented that "'[c]onversion therapy'. . . is counseling based on the erroneous assumption that [LGBT] identities are mental disorders that can be cured through **aversion treatment**." (A-126-6 at 2) (emphasis added).) Hoch also represented that "conversion therapy . . . **is most often forced upon minors** by their parents or guardians [and] is extremely harmful." (A-

126-6 at 4 (emphasis added).) The County did not, however, investigate whether anyone in the County had been harmed by "conversion therapy," voluntary, aversive, or otherwise. (A-121-9 at 26:21-27:19.) Nonetheless, Assistant County Attorney Hvizd was tasked to draft Hoch's ordinance, and she informally investigated. (A-121-9 at 27:20-28:3, 31:1-33:25.) Hvizd found no report of any person harmed by "conversion therapy" in the County or Florida. (*Id.*; A-121-1 at 12:5-25.)

At the first County Commission meeting on the ordinance, Hoch represented, "we've heard from two individuals, minors who have been **required** to go to conversion therapy by their parents." (A-121-9 at 34:1-13, 36:9-37:18; A-126-2 at 1:10-17 (emphasis added).) But Hoch gave no description, including whether the "conversion therapy" was aversive or non-aversive, voluntary, or forced. (*Id.*) No Commissioner asked. (A-121-9 at 50:5-51:20.) At the second Commission meeting on the ordinance, Hoch clarified the complaints were "from the mothers of gay people because their friends, the gay children's friends who also identified as gay, were being subjected to conversion therapy." (A-121-9 at 55:2-58:21; A-126-3 at 3:10-13.) According to Hoch, the friends of the complainants' children were being **forced** to go. (A-121-9 at 61:20-62:12; A-126-3 at 3:15-18.) But the Commissioners did not try to discern the type of therapy or the nature of harm allegedly experienced by the unnamed friends of the children of the mothers who complained to Hoch. (A-121-9 at 65:2-66:7.)

In sum, the County received no evidence of harm suffered by any minor in its jurisdiction as a result of voluntary SOCE or "conversion therapy." (A-121-10 at 15:11-22.) The only "evidence" of harm attributed to SOCE was the anecdotal, multi-layered hearsay communicated by Hoch, which he claims to have heard from the mothers of friends of the supposed victims. (A-121-10 at 10:9-12:4.)

Hoch also prompted the City's ordinance, and made the same unsubstantiated representations to the City Council. (A-126-41 at 12:24-14:10.) The City had never received a complaint about harm from "conversion therapy," and the City never investigated whether any of its citizens had been harmed. (A-126-41 at 16:19-18:9.) The City based its determination of need entirely on Hoch's request. (A-126-41 at 16:19-20:11; A-126-23.) Thus, the City considered no evidence of harm in its jurisdiction before enacting its ordinance, and considered no empirical evidence of harm elsewhere. (A-126-41 at 26:13-28:13.)

E.     The Localities Did Not Consider Any Less Restrictive Alternatives to Their Outright Therapy Bans.

There is no evidence the County considered any alternative to the outright therapy ban in its ordinance, such as banning only the "aversion treatment" or "therapy…forced upon minors" complained of by Hoch, or only coercive counseling as suggested by Dr. Hamilton, or only shock therapy as suggested during public comment. (A-126-6 at 2-3; A-121-9 at 39:20-30:11, 273:2-279:23; A-126-21 at 1-2.)

The City likewise did not consider any alternative to its blanket ban, such as banning only aversive therapy, or only coercive or forced therapy. (A-126-41 at 28:16-32:10. During the three City Council meetings covering the ordinance's conception, introduction, and enactment, the Council spent **less than five minutes** considering it. (A-126-41 at 52:12-63:20; A-126-24.)

### F. The Localities Knew Their Ordinances Were Not Enforceable by Their Code Enforcement Officials.

Palm Beach County Attorney, Denise Marie Nieman, expressed to Commissioners her legal reservations about tailoring the proposed County ordinance to the supposed problems to be remedied, namely religious "conversion therapy" that the ordinance would not cover, and the inability of the County to enforce the ordinance in any event. (A-126-16 at 1 ("**It's difficult to imagine how a County Code Enforcement Officer would be able to issue a citation for a violation**." (emphasis added).)

Deputy City Manager George Brown, the direct supervisor of code compliance, cautioned City Attorney Diana Grub Frieser that "**a local ordinance banning such practice would be extremely difficult, if not impossible, to enforce**.…**The City has not adopted ordinances limiting or regulating professions otherwise regulated by the state**." (A-126-41 at 104:7-107:16; A-126-25 (emphasis added).)

Brown's concerns about enforceability caused him to inquire with city managers of other cities where similar therapy ban ordinances had been adopted. (A-126-41 at 112:17-114:18; A-126-26 at 3.) The Village of Wellington Village Manager responded, "[W]e do not have a specific enforcement mechanism and I don't have any clear idea how we could train either our Code Enforcement staff of [sic] law enforcement staff to actually enforce it." (A-126-26 at 1.) In a follow up to the Boynton Beach City Manager, Brown wrote, "**I consider it a more or less unenforceable ordinance and a matter that is not something our local government should take up**." (A-126-41 at 119:5-21; A-126-26 at 2 (emphasis added).) In a subsequent exchange the Boynton Beach official wrote, "**Electeds received a lot of pressure from Rand Hoch**," to which Brown replied, "**As are ours**." (A-126-26 at 2 (emphasis added).) The is no evidence Brown's unenforceability concerns or the other officials' concurrences were shared with the City Council. (A-126-41 at 120:15-121:5, 122:8-123:3, 135:5-9.)

Council Member Rodgers also had doubts about enforcement, which he raised with the Council and City staff at the meeting where the ordinance was enacted, prompting responses from both the City Manager ("**I'm not sure how we would enforce it**.") and City Attorney Frieser ("**I concede that it's—there may be difficulties in actual practical enforcement issue**."). (A-126-41 at 59:12-18, 61:5-

21, 62:23-63:3 (emphasis added).) Enforcement had not been clearly delineated or even thought out at the time of enactment. (A-126-41 at 65:5-16.)

The practical inability of the City to enforce its ordinance was confirmed by the City's Rule 30(b)(6) witness on enforcement, who struggled (understandably) to grasp the "gender identity" concepts on which enforcement would depend:

> **[C]learly, I'm not a clinician** . . . . But what you just explained to me sounds like someone who is identifying with—as a female. **But, again, I am not the best person to make that call. Perhaps someone, you know, who's a therapist could do so**.
>
> . . . .
>
> **I would guess that, whether or not the child declares that they have a different—or are identifying as one or the other, their actions would really put them in the category of one or the other or both** . . . .

(A-126-41 at 163:17-165:18 (emphasis added).)

Complaints of violations of the therapy ban ordinances would be investigated by untrained code enforcement officials and decided by unqualified special masters. (A-121-9 at 208:3-15, 214:18-215:8; A-126-41 at 67:10-69:12.) The code official would initially determine whether a professional's speech violates the applicable ordinance, and then issue a notice of violation if so. (A-126-41 at 90:12-91:1.) The special master would act as the finder of fact in any prosecution, questioning witnesses, including children in therapy and their therapists. (A-121-9 at 264:13-266:13.)

According to an unwritten, internal policy, the County's ordinance will be enforced by any of five senior code enforcement officers, for whom the only educational requirement is a high school diploma or equivalent. (A-121-9 at 219:20-221:18, 223:21-225:14; A-126-18.) They would both determine whether to issue a notice of violation and prosecute any violation before the special master. (A-126-18.) None of the officers has been trained on enforcing the ordinance; no training materials have been developed; there is no plan for training materials; and there is no procedure for handling a complaint. (A-121-9 at 225:15-228:9; A-129 at 184:13-20.)

City Code officials likewise only need a high school diploma or equivalent. (A-126-41 at 72:3-73:4.) The City likewise has no written policies or procedures for enforcing its ordinance, and no plans for any. (A-126-41 at 74:19-75:9, 78:2-5.)

### G. The Localities' Knew Their Ordinances Regulated a Field Preempted to the State.

County Attorney Nieman stated unequivocally to Hoch that the State of Florida had preempted the entire field of therapy regulation. (A-121-9 at 111:25-115:6; DE. 126-9 at 1 ("On a very basic level, how can we say ["conversion therapy"] is a local issue?").) Hvizd subsequently endorsed Nieman's preemption position with a more formal analysis:

> The Florida Legislature's scheme of licensing and regulating businesses and professions is pervasive…evidencing an intent that this area be

> preserved to the Legislature. Neither county nor municipal governments license counselors, and there is no support in the law for a conclusion that regulating counselors is a "local issue" as addressed in *Browning*. To the contrary, every indication is that regulation of businesses and professions, including counselors, is a state issue.

(A-121-9 at 126:4-127:12; A-126-11 at 1.) Nieman adopted Hvizd's analysis without reservation. (A-126-11 at 1.)

Nieman subsequently brought her preemption concerns to the County Commissioners: "**We strongly believe that this area should be regulated by the state since it is the state who licenses and otherwise governs therapists**." (A-121-9 at 177:16-178:19; A-126-16 at 1 (emphasis added).) "[W]e still have legal concerns including, but not limited to, implied preemption . . . ." (A-126-16 at 1.) Boca Raton's City Attorney likewise raised preemption concerns with the City Council. (A-126-23 at 2.)

### H.     The Order on Appeal.

Counselors filed suit on June 13, 2018, challenging the constitutionality of the ordinances, and seeking preliminary and permanent injunctive relief, along with declaratory relief and nominal damages. (A-1 at 2-5, 55-58.) Counselors' motion for preliminary injunction sought to enjoin enforcement of the ordinances because they unconstitutionally discriminate on the basis of content and viewpoint, are unconstitutional prior restraints, are unconstitutionally vague, and are *ultra vires* and *void ab initio* under Florida law. (A-8.)

Following limited discovery, the district court held a hearing on Counselors'

preliminary injunction motion on October 18, 2018. On February 13, 2019, the

district court entered an order denying the motion. (A-141.) In the district court's

order, it recognized that the ordinances both regulate counseling "effectuated

**entirely through speech**" and "arguably are content-based." (A-141 at 3-4

(emphasis added).) Nonetheless, the district court decided it "need not resolve"

which level of constitutional scrutiny to apply to the ordinances, and held Counselors

had not met their burden to prove a substantial likelihood of success on the merits of

their constitutional content, viewpoint, prior restraint, and vagueness claims, and had

not demonstrated irreparable injury for purposes of their Florida law *ultra vires*

claims.[7] (A-141 at 4-5.)

Counselors filed their notice of appeal of the district court's order on the same

day, February 12, 2019. (A-142.)

---

[7] Counselors dispute the district court's third-party standing conclusion (A-141 at 10-13), and do not abandon their third-party standing on behalf of their minor clients for merits purposes, but do not press the third-party standing issue in this appeal from the denial of preliminary relief.

# ARGUMENT

I. **THE DISTRICT COURT'S ORDER SHOULD BE REVERSED BECAUSE COUNSELORS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIMS THAT THE ORDINANCES ARE UNCONSTITUTIONAL CONTENT-BASED RESTRICTIONS ON COUNSELORS' SPEECH.**

## A. The District Court Erred in Creating a New "Treatment" Speech Category and Failing to Apply Strict Scrutiny.

### 1. Speech Is Still Speech After *Wollschlaeger* and *NIFLA*.

Although the district court acknowledged that Counselors' talk therapy is "entirely speech" (A-141 at 21), the court nonetheless repeatedly invoked the term "treatment" to abstract Counselors' talk therapy from its speech bedrock and recast it as a form of conduct or lesser speech, unworthy of full constitutional protection. (A-141 at 30 ("The regulated **treatment** is both speech and **conduct** . . . ."), 55 ("[T]he ordinances apply to a licensed provider's **treatment** of a minor patient.") (bold emphases added); *cf.* A-141 at 17, 21, 25, 29, 33, 52.) The court then purported to classify the ordinances outside of the recognized categories of content-based speech regulations subject to strict constitutional scrutiny, designating them instead for intermediate scrutiny as regulating only "treatments effectuated through speech." (A-141 at 25, 29-30.) This Court should correct the district court's error and restore the speech protections the district court diminished through its labelling fallacy.

The government cannot simply relabel the "treatment" speech of health professionals in order to restrain it with less scrutiny. *See, e.g.*, *Nat'l Inst. for Family & Life Advocates v. Becerra*, 138 S. Ct. 2361, 2371-72 (2018) (hereinafter, "*NIFLA*") ("[T]his Court has not recognized 'professional speech' as a separate category of speech. Speech is not unprotected merely because it is uttered by professionals."); *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2229 (2015) (same); *Holder v. Humanitarian Law Project*, 561 U.S. 1, 27 (2010) (holding government may not apply alternative label to protected speech to evade First Amendment review, when only "conduct" at issue is speech); *Legal Servs. Corp. v. Velazquez*, 531 U.S. 533 (2001) (same); *NAACP v. Button*, 371 U.S. 415, 438 (1963) ("[A] state may not, under the guise of prohibiting professional misconduct, ignore constitutional rights.").

The *NIFLA* Court admonished that allowing the government to lessen First Amendment protections for professionals by reclassifying their speech would eviscerate the protections afforded to doctors, lawyers, nurses, mental health professionals, and many others: "[T]hat gives the States unfettered power to reduce a group's First Amendment rights by simply imposing a licensing requirement. **States cannot choose the protection that speech receives under the First Amendment**, as that would give them a powerful tool to impose invidious discrimination on disfavored subjects." 138 S. Ct. at 2372.

Even before *NIFLA*, this Court's en banc decision in *Wollschlaeger v. Florida* rejected the approach employed by the district court here because "**characterizing speech as conduct is a dubious constitutional enterprise**." 848 F.3d 1293, 1309 (11th Cir. 2017) (emphasis added). "Speech is speech, and it must be analyzed as such for purposes of the First Amendment." *Id.* at 1307 (citation and internal quotation marks omitted).

### 2. The Ordinances are Content-Based Restrictions on Speech Subject to Strict Scrutiny.

Even having labored to recast Counselors' speech as "treatment" speech (*i.e.*, not really speech) with diminished First Amendment protection, the district court nonetheless reasoned (albeit ambiguously) that the ordinances "**arguably are content-based**, as they apply 'to particular speech because of the topics discussed or the idea or message expressed.'" (A-141 at 4 (emphasis added); *cf.* A-141 at 24 ("The ordinances target *what* Plaintiffs say to their minor patients.").) Contra the district court's equivocation, this Court should have "little doubt" in concluding that the ordinances ban speech on the basis of content. *See King v. Governor of New Jersey*, 767 F.3d 216, 236 n.20 (3d Cir. 2014), *abrogated by NIFLA*, 138 S. Ct. at 2371-72. Indeed, like the SOCE ban statute in *King*, the ordinances "on [their] face, prohibit[] licensed counselors from speaking words with a particular content; *i.e.* words that 'seek[] to change a person's sexual orientation.'" *Id.* (final alteration in original). "Thus . . . 'Plaintiffs want to speak to [minor clients], and whether they

may do so under [the ordinances] depends on what they say.'" *Id.* (first alteration in original). There is no "arguably" about it—the ordinances are content-based regulations on Counselors' speech.

Because the ordinances ban speech on the basis of content, unequivocal Supreme Court precedent requires the ordinances to survive strict scrutiny to be upheld. Indeed, in *Reed*, the Supreme Court issued its firm rule: all content-based restrictions on speech must receive strict scrutiny. 135 S. Ct. at 227 ("[A] law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus towards the ideas contained in the regulated speech."). In handing down that firm rule, the Supreme Court clarified that it applied equally to any content-based regulation of the speech of licensed professionals. *Id.* at 2229 ("[I]t is no answer to say that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression." (internal quotation marks omitted)).

More recently in *NIFLA*, the Court confirmed that regulation of the speech of licensed professionals is no exception to this rule. The Court affirmed *Reed*'s "stringent standard" mandating strict scrutiny for all content-based restrictions on speech and condemned the invidious discrimination inherent in bans on the speech of licensed professionals. 138 S. Ct. at 2371 ("As a general matter, such laws 'are presumptively unconstitutional and may be justified only if the government proves

that they are narrowly tailored to serve compelling state interests.'"). Moreover, the Court expressly rejected the erroneous conclusion that content-based regulations of so-called "professional speech" do not receive strict scrutiny, **abrogating by name the two principal authorities upon which the ordinances at issue in this case had been expressly based** - *King*, and *Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014):

> Some Courts of Appeals have recognized "professional speech" as a separate category of speech that is subject to different rules. *See, e.g.*, [*King*; *Pickup*] . . . . So defined, these courts except professional speech from the rule that content-based regulations of speech are subject to strict scrutiny.
>
> **But this Court has not recognized "professional speech" as a separate category of speech. Speech is not unprotected merely because it is uttered by "professionals."**

*NIFLA*, 138 S. Ct. at 2371-72 (emphasis added). This Court, too, sitting en banc in *Wollschlaeger*, applied *Reed* and held that "[c]ontent-based restrictions on speech normally trigger strict scrutiny." 848 F.3d at 1308 (citing *Reed*, 135 S. Ct. at 2231). Thus, binding precedent required the district court to subject the ordinances to strict scrutiny.[8]

---

[8] While the district court was technically correct that the constitutionality of a SOCE counseling ban is a question of first impression in the Southern District of Florida and the Eleventh Circuit (A-141 at 16), **whether strict scrutiny applies** was resolved by the Supreme Court in *NIFLA* where it expressly abrogated *King's* application of intermediate scrutiny to New Jersey's ban, and *Pickup's* application of rational basis review to California's ban. *See NIFLA*, 138 S. Ct. at 2371-72.

The district court, however, disregarded the content-based reality of the ordinances, and purported to demote Counselors' speech based on its function:

> This case presents facts in which speech is not always expressive, and thus warrants less scrutiny. *Cf. [United States v.] O'Brien*, 391 U.S. 367 (1968). Plaintiffs' words serve a function; their words constitute an act of therapy with their minor clients, which makes Plaintiffs' speech different from the protected dialogues in *Wollschlaeger* and *NIFLA*, and from highly protected, political speech in the metaphoric or literal "public square."

(A-141 at 32.) In *Holder*, however, the Supreme Court rejected the same argument, holding, "*O'Brien* does not provide the applicable standard for reviewing a content-based regulation of speech." 561 U.S. at 28. The *Holder* analysis exposes the district court's error.

The *Holder* plaintiffs brought a First Amendment challenge to a federal statute prohibiting the provision of "'material support or resources'" to foreign terrorist organizations. 561 U.S. at 7-8. The plaintiffs wanted to provide support for the non-terroristic activities of two such organizations, "the PKK and LTTE, in the form of . . . legal training, and political advocacy . . . ." 561 U.S. at 10. The Court rejected the plaintiffs' claim that the statute banned pure political speech because plaintiffs remained free to speak and write about the PKK and LTTE, and to advocate for them. *Id.* at 25-26. The Court also rejected, however, the government's argument that the statute prohibited only "conduct, not speech," "and only incidentally burdens expression." 561 U.S. at 26. The Court reasoned,

> [the statute] regulates speech on the basis of its content. Plaintiffs want to speak to the PKK and LTTE, and whether they may do so under [the statute] depends on what they say. If plaintiffs' speech to those groups imparts a "specific skill" or communicates advice derived from "specialized knowledge" … then it is barred.

*Id.* at 27.

The government in *Holder* (evocative of the district court here) nevertheless argued that intermediate scrutiny should apply to the Court's First Amendment review of the statute "because it *generally* functions as a regulation of conduct." *Id* at 27. The Supreme Court rejected that argument, too, because even though the statute "may be described as directed at conduct, … as applied to plaintiffs the conduct triggering coverage under the statute consists of communicating a message." *Id.* at 28. In concluding that strict scrutiny applied, the Court reasoned,

> The First Amendment issue before us is more refined than either plaintiffs or the Government would have it. It is not whether the Government may prohibit pure political speech, or may prohibit material support in the form of conduct. It is instead **whether the Government may prohibit what plaintiffs want to do**—provide material support to the PKK and LTTE **in the form of speech**.

*Id.* at 28.

On the issue of whether strict scrutiny applies, the *Holder* Court's analysis is controlling because the facts are analogous.[9] First, the issue here can be framed nearly identically to the issue in *Holder*: whether the Localities may prohibit what Counselors want to do—provide SOCE counseling "in the form of speech." Second, as in *Holder*, Counselors here want to use their speech to impart skills to their minor clients (reducing or eliminating unwanted same-sex attractions or gender confusion) or communicate advice derived from Counselors' specialized knowledge. Third, as in *Holder*, the ordinances ostensibly allow Counselors to write and speak about SOCE, and to advocate its benefits; but that is irrelevant, as in *Holder*, to the question before the Court (whether the Localities may prohibit what Counselors want to do).

---

[9] On the issue of whether the content-based regulation **satisfied** strict scrutiny, the *Holder* analysis is not controlling here because, unlike the Localities, the government in *Holder* narrowly tailored its statute based on **empirical** consideration of the harms sought to be avoided by enacting the statute. *See* 561 U.S. at 29 ("Whether foreign terrorist organizations meaningfully segregate support of their legitimate activities from support of terrorism is an empirical question."). (*See infra* Pt. I.C.)

Thus, under the binding precedent of *Holder*, the district court's avoidance of strict scrutiny was in error.[10]

### 3. There Is No Carve-Out or Other Warrant in *NIFLA* for the District Court's Novel "Treatment" Speech Category.

*NIFLA* carved out two possible categories of speech with less protection, neither of which applies here:

> This Court has afforded less protection for professional speech **in two circumstances—neither of which turned on the fact that professionals were speaking**. First, our precedents have applied more deferential review to some laws that require professionals to disclose factual, noncontroversial information in their "commercial speech." Second, under our precedents, States may regulate professional conduct, even though that conduct incidentally involves speech.

*NIFLA*, 138 S. Ct. at 2372 (emphasis added) (citations omitted).

---

[10] In a Middle District of Florida case challenging the City of Tampa's counseling ban ordinance, substantively identical to the Localities' ordinances at issue here, Magistrate Judge Amanda Arnold Sansone issued a Report and Recommendation properly concluding that, in light of *NIFLA* and *Wollschlaeger* (and *NIFLA*'s abrogation of *King* and *Pickup*), **Tampa's ordinance is a content-based restriction on speech subject to strict scrutiny**. Report and Recommendation, *Vazzo v. City of Tampa*, No. 8:17-cv-2896-T-02AAS (M.D. Fla. Jan. 30, 2019) at 19-25. (A-138-2.) **Judge Sansone also correctly concluded that the Tampa ordinance failed the strict scrutiny analysis, and recommended that it be enjoined**. *Id.* at 26-29. The magistrate's order remains subject to the district judge's review.

The district court correctly concluded, "the ordinances, as applied to Plaintiffs, likely cannot be construed as regulating conduct only or as mere incidental burdens on speech in light of *Wollschlaeger*." (A-141 at 22.) The district court also discussed the "commercial speech" category, but without rejecting its application to Counselors' speech. The district court should have looked to *Wollschlaeger* to resolve this point, too:

> Although a professional may be viewed as engaged in the transaction of selling his professional advice, **one must, of course, distinguish between the offer and the actual presentation of the professional advice, which is no more a commercial transaction than is the actual writing or reading of a book or newspaper that is available for sale**.

848 F.3d at 1309 n.4 (emphasis added) (internal quotation marks omitted). Thus, the talk therapy prohibited by the ordinances cannot be excepted from First Amendment protection as either conduct or commercial speech under *NIFLA*.

Finally, the district court was wrong to posit that *NIFLA* left the door open for regulation of professionals' speech under less than strict scrutiny. (A-141 at 29.) The district court no doubt was referring to this passage of the *NIFLA* opinion: "In sum, neither California nor the Ninth Circuit has identified a persuasive reason for treating professional speech as a unique category that is exempt from ordinary First Amendment principles. We do not foreclose the possibility that some such reason

exists." 138 S. Ct. at 2375. This statement, however, must be read in the context of

the opinion's earlier admonishment:

> This Court has been reluctant to mark off new categories of speech for diminished constitutional protection. And it has been especially reluctant to exempt a category of speech from the normal prohibition on content-based restrictions. **This Court's precedents do not permit governments to impose content-based restrictions on speech without persuasive evidence of a long (if heretofore unrecognized) tradition to that effect.**
>
> **This Court's precedents do not recognize such a tradition for a category called "professional speech."**

*Id.* at 2372 (emphasis added) (citations and internal quotation marks omitted). Thus,

the *NIFLA* Court was not inviting district courts to create novel categories or labels

for professionals' speech to "exempt [it] from ordinary First Amendment

principles." *Id.* at 2375. Rather, the Court warned that in the absence of "persuasive

evidence . . . of a long (if heretofore unrecognized) tradition to that effect" there will

be no exemption from First Amendment rules for creatively labelled professional

speech, such as the "treatment" speech label innovated by the district court.

**B.     The District Court Erred in Concluding Counselors Have the Burden of Proof on the Localities' Narrow Tailoring of Their Ordinances.**

**1.     Though Counselors Must Show the Preliminary Injunction Prerequisites, the Localities Have the Burden of Proof on the Constitutionality of Their Ordinances Under Strict Scrutiny.**

**a.     Counselors' Likelihood of Success Showing Requires Only a Probability That They Will Prevail.**

The four prerequisites for preliminary injunctive relief are well known:

> (1) a substantial likelihood that the movant will ultimately prevail on the merits; (2) a showing that the movant will suffer irreparable injury unless the injunction issues; (3) proof that the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) a showing that the injunction, if issued, would not be adverse to the public interest.

*Shatel Corp. v. Mao Ta Lumber & Yacht Corp.*, 697 F.2d 1352, 1354-55 (11th Cir. 1983). Counselors' "substantial likelihood" showing requires only that Plaintiffs show a probability of prevailing. *Id.* at 1355 n.2 ("The word likelihood is synonymous with probability.")

**b.     The Localities Have the Burden of Proving the Constitutionality of Their Ordinances Under Strict Scrutiny.**

The Localities face the much higher burden of demonstrating the constitutionality of their ordinances under strict scrutiny. As the Supreme Court has

held: "the burdens at the preliminary injunction stage track the burdens at trial." *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 429 (2006). As such, on a preliminary injunction motion, **the government**—not the movant—bears the burden of proof on narrow tailoring, because **the government** bears that burden at trial. *Ashcroft v. ACLU*, 542 U.S. 656, 665 (2004) (holding, on preliminary injunction motion, "**the burden is on the government** to prove that the proposed alternatives will not be as effective as the challenged statute." (emphasis added)). Defendants indisputably bear the burden of proving narrow tailoring at trial. *See, e.g.*, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 816 (2000) ("When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions."); *McCullen v. Coakley*, 134 S. Ct. 2518, 2540 (2014) ("To meet the requirement of narrow tailoring, **the government must demonstrate** that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier" (emphasis added)). Thus, the Localities also bear—and fall woefully short of meeting (*see infra* Pt. I.C.2)—the burden of proving narrow tailoring here.

### 2. Localities Must Show Empirical or Concrete Evidence of Harm.

In this First Amendment context, the government is not entitled to deference in making speech-restrictive determinations. When "[a] speech-restrictive law with widespread impact" is at issue, "the government must shoulder a correspondingly

46

heavier burden and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights." *Janus v. Am. Fed'n of State, Cnty. & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2472 (2018). Here, because the ordinances infringe upon the free speech rights of licensed professionals, the government "must do more than simply posit the existence of the disease sought to be cured. It must demonstrate that the recited harms are real, not merely conjectural." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 664 (1994); *see also Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (explaining regulation of professional speech not justified by "mere speculation or conjecture"). "Deference to legislative findings cannot limit judicial inquiry when First Amendment rights are at stake." *Landmark Commc'ns, Inc. v. Virginia*, 435 U.S. 829, 843 (1978).

Courts have not hesitated to invalidate ordinances that impose restrictions on speech based on supposition and conjecture, rather than empirical evidence. In *Edenfield*, where the government sought to restrict the speech of licensed accountants, the government "presented no studies" and relied upon a record that "contain[ed] nothing more than a series of conclusory statements that add little if anything" to the government's effort to regulate certain speech. 507 U.S. at 771. Also, the government relied upon a report of an independent organization to bolster its claims of harm, but—exactly as the APA Report does in this case—the report there admitted that it was "unaware of the existence of **any empirical data**

**supporting the theories**" of alleged harm. *Id.* at 772 (emphasis added). Because of the lack of evidence of harm, the Supreme Court invalidated the restriction as a violation of the accountants' First Amendment rights.

In *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989), the Supreme Court confronted a record (like here) where there was nothing more than anecdote and suspicion of harm behind a total prohibition on the targeted speech. *Id.* at 129. There was no record evidence "aside from conclusory statements during the debates by proponents of the bill" and the record "contain[ed] no evidence" concerning the alleged effectiveness of other alternatives. *Id.* Because of that failure, the Supreme Court invalidated the ban. *Id.*

This Court, too, has invalidated laws regulating professional speech when the alleged harm purportedly being addressed was unsupported by concrete evidence. In *Mason v. Florida Bar*, 208 F.3d 952 (11th Cir. 2000), the government attempted to regulate the speech of attorneys, but "presented no studies, nor empirical evidence of any sort to suggest" that the harm they were positing was real, rather than merely conjectural. *Id.* at 957. The Court held that, to survive scrutiny, the government "has the burden…of producing **concrete evidence**" of the alleged harm prior to restricting the protected speech of licensed professionals. *Id.* at 958 (emphasis added). Indeed, it held that when there are "**glaring omissions in the record of**

**identifiable harm**," the government has not satisfied "its burden to identify a genuine threat of danger." *Id.* (emphasis added)

> **3.      The Localities Must Show That the ordinances Were the Least Restrictive Means Available at the Time of Enactment.**

Under strict scrutiny, the Localities must also demonstrate that the ordinances are the least restrictive means of remedying their claimed governmental interests. *See Boos v. Berry*, 485 U.S. 312, 329 (1988); *Ward v. Rock Against Racism*, 491 U.S. 781, 798 n.6 (1989) (noting under "most exacting scrutiny" applicable to content-based restrictions on speech government must employ least restrictive alternative to pass narrow tailoring). Counselors "must be deemed likely to prevail unless the government has shown that [Counselors'] proposed less restrictive alternatives are less effective than enforcing the act." *Ashcroft*, 542 U.S. at 666.

The government must demonstrate it "seriously undertook" efforts to address the problem "with less intrusive tools available to it." *McCullen*, 134 S. Ct. at 2539. In *McCullen*, the government argued that other relevant statutes on the books were ineffective to accomplish the government's objective. *Id.* at 2540. But the Supreme Court said merely identifying and considering existing laws was insufficient to satisfy even intermediate scrutiny because the government had not identified "a single prosecution brought under those laws" and could not identify any attempted

use of those statutes to accomplish the objective without unnecessarily restricting speech. *Id.* at 2539.

In *Bruni v. City of Pittsburgh*, the Third Circuit explained that to meet *McCullen*'s requirement of showing it seriously considered less restrictive alternatives, the government must put forward "**a meaningful record** demonstrating that those options would fail to alleviate the problems meant to be addressed." 824 F.3d 353, 371 (3d Cir. 2016) (emphasis added). The concurrence magnifies the majority's application of *McCullen*: "The majority opinion [requires that] a municipality **must now also prove that, *before adopting a regulation that significantly burdens speech*, it either attempted or seriously considered and reasonably rejected less intrusive alternatives**." *Id.* at 379 (Fuentes, J., concurring) (emphasis added); *see also Reynolds v. Middleton*, 779 F.3d 222, 231 (4th Cir. 2015) ("As the Court explained in *McCullen,* however, the burden of proving narrow tailoring requires the County to *prove* that it actually *tried* other methods to address the problem.")

The *McCullen* Court expressly rejected the government's convenience as a justification for skipping the narrow tailoring step: "[B]y demanding a close fit between ends and means, the tailoring requirement prevents the government from too readily 'sacrific[ing] speech for efficiency.'" 134 S. Ct. at 2534 (modification in original). "To meet the requirement of narrow tailoring, the government must

demonstrate that alternative measures that burden substantially less speech would fail to achieve the government's interests, not simply that the chosen route is easier." *Id.* at 2540. In *Alford v. Walton County*, No. 3:16cv362/MCR/CJK, 2017 WL 8785115 (N.D. Fla. Nov. 22, 2017), the district court held that the government cannot satisfy *McCullen* when the "record reflects that the County admittedly failed to consider any less restrictive alternatives" and favored a total ban because it was "cleaner and easier." *Id.* at *8.

      **4.**    **The District Court Should Have Granted the Preliminary Injunction Upon Finding the Localities Had Failed to Carry Their Narrow Tailoring Burden.**

Despite the clear, binding authority cited above, requiring the Localities to prove the constitutionality of their ordinances under strict scrutiny at the preliminary injunction stage, the district court improperly reversed the burdens for Counselors: "While at trial Defendants will have the burden of demonstrating the constitutionality of their ordinances, at the preliminary injunction state, the burden is **on the Plaintiffs** to establish that they have a substantial likelihood of success on the merits at trial." (A-141 at 5 (emphasis added).) Thus, the district court improperly yoked Counselors with the government's narrow tailoring burden, and counted **the government's** failure to convince the court on narrow tailoring as **Counselors'** failure:

> **It is not clear from the record at this stage that the ordinances are the 'least restrictive means' to protect minors** . . . . Regardless, the Court need not probe the depths of the least restrictive means requirement at this stage. For now, it is sufficient to conclude that whether one or both of the ordinances survive the least restrictive means analysis is a close question, **and Plaintiffs have not met their burden of demonstrating substantial likelihood of success on this point.**"

(A-141 at 50 (emphasis added).)

The Third Circuit recently reversed the denial of preliminary injunctive relief on the same grounds:

> In considering whether to grant preliminary injunctive relief, the District Court observed that Defendants failed to produce evidence that "made a clear showing" the ordinance was narrowly tailored. Yet it determined that Plaintiffs bore the burden of demonstrating their likelihood of success on the merits, and they failed to do so on the scant record before it. **Plaintiffs contend that the District Court erred in placing this burden on them. We agree**.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 179-80 (3d Cir. 2017) (emphasis added) (citation omitted), *as amended* (June 26, 2017).

Moreover, the district court was well aware that each of the Localities admitted that it did not attempt or seriously consider any less restrictive regulation of Counselors' speech, which admissions cut off any possibility of the Localities' carrying their respective narrow tailoring burdens. (*See supra* Factual Background

Pt. E.) Thus, contrary to the district court's conclusion, Counselors "**must be deemed likely to prevail.**" *Ashcroft*, 542 U.S. at 666 (emphasis added).

## C. The District Court Erred in Failing to Hold Counselors Are Likely to Succeed on the Merits of Their Claim That the ordinances are Unconstitutional Content-Based Restrictions on Counselors' Speech.

### 1. Localities Have No Compelling or Other Sufficient Governmental Interest to Ban Voluntary SOCE Talk Therapy.

As shown above (Factual Background Pt. D), the Localities never received or considered any evidence or complaint of harm from any SOCE counseling in the Localities, let alone from voluntary SOCE counseling that minors request and want to receive. Moreover, despite claiming "overwhelming research" justifying their ordinances, the "research" cited by the Localities justifies no conclusions regarding harmful outcomes from SOCE. (Factual Background, *supra*, Pt. C.[11]) Thus, like in *Mason* and *Edenfield*, the Localities have conducted no independent inquiry into the alleged harm and have proffered no substantial or concrete evidence demonstrating that the actual harm exists. Because of their failures, the ordinances fail strict scrutiny. *See, e.g.*, *Comcast Cablevision of Broward Cnty., Inc. v. Broward Cnty.*, 124 F. Supp. 2d 685, 697-98 (S.D. Fla. 2000) (providing where government's

---

[11] None of the "research" or testimony cited by the district court (A-141 at 34-39) contradicts the APA's explicit conclusion that no empirical evidence of harm from SOCE exists. (*See supra* Factual Background Pt. C.)

alleged harm "appears to be non-existent," where government "conducted no inquiry" and "proffered no substantial evidence demonstrating that actual harm exists," government fails its burden and regulation of speech cannot survive First Amendment scrutiny).

Furthermore, the ordinances undermine several specific admonitions from the APA Report and related Sources, such as the APA imperative that minors be allowed to return to their biological gender, even after identifying as the other gender for a period of time. The ordinances also require therapists such as Counselors to cut off counseling with clients who express a desire to change their sexual orientation or gender identity, which requirement directly contradicts the APA Report's admonition to explore a client's identity issues instead of declining them outright. Thus, the ordinances prohibit therapists from assisting minors with change decisions the APA expressly endorses, and otherwise create harm identified by the APA rather than reducing any.

2.    **Localities' Ordinances Are Not the Least Restrictive Means or Otherwise Narrowly Tailored.**

As shown above (Factual Background Pt. E), the Localities failed to try, discuss, or even consider any less restrictive alternatives to their blanket therapy bans. Even the anecdotal hearsay brought to the Localities by the ordinances' chief advocate, Hoch, complained of alleged "aversive" and "coercive" therapies,

happening to someone somewhere, and not voluntary SOCE as practiced by Counselors; but the Localities did not consider banning only aversive or coercive therapies, or even imposing specific informed consent requirements consistent with the APA Report's recommendations. Instead, the Localities acted contrary to the APA Report recommendations and banned SOCE outright, foreclosing the further development of the scientific record on SOCE sought by the APA, and usurping for politicians and activists the discretionary judgment that the APA deemed appropriate for licensed mental health professionals. The Localities' failure to consider any alternatives cannot satisfy the demanding narrow tailoring burden placed upon them by the Supreme Court in *McCullen*.

Remarkably, despite *McCullen*'s clear rejection of Massachusetts' convenience as a justification to skip narrow tailoring, the County one-upped the Commonwealth and argued its **ignorance** as justification at the preliminary injunction hearing:

> As I will show you in the . . . APA report, your Honor, **there have been no factors discovered about what types of therapy cause harm** and what types of therapies are going to lead to a benefit.
>
> **Because we don't know** the identifying factors of what about this person makes the therapy beneficial, **we don't know.**

(A-129 at 124:3-8 (emphasis added).) Though worse than Massachusetts'
convenience argument in *McCullen*, the County's "we don't know" plea is
sufficiently similar that there can be little doubt it, too, should be rejected.

The Localities also fail narrow tailoring because their ordinances cannot, as a
practical matter, be enforced to remedy any purported harms they claim to have in
view. (*See supra* Factual Background Pt. F.) As the Supreme Court taught in
*McCullen*, the First Amendment "demand[s] a close fit between ends and means."
134 S. Ct. at 2534. The inability to enforce the ordinances through their respective
code officials, which is admitted by both Localities' senior officials in their
testimony and unfiltered pre-ordinance correspondence, forecloses the required fit
between the ordinances and the Localities' purported interests in enacting them. The
Localities' untrained code officials and procedure-less enforcement scheme are
objectively ill-equipped to investigate and make determinations about appropriate
mental health therapeutic practices.

Furthermore, if the purpose of the ordinances is to protect children and youth
from the purported harms of SOCE counseling, they are "'wildly underinclusive,'"
further undermining any notion of narrow tailoring. *See NIFLA*, 138 S. Ct. at 2376
(quoting *Brown v. Entertainment Merchants Assn.*, 564 U.S. 786, 802 (2011)). Both
ordinances regulate only licensed professionals, and expressly exclude "conversion
therapy" offered by unlicensed religious counselors and clergy. (A-126-27, A-1-4 at

6:26-7:3; A-126-20, A-1-5 at ECF 13:16-19.) The Palm Beach County Attorney, however, expressly advised the County Commissioners that "[m]ost of the universal complaints seem to be about religious organizations that the ordinance would not legally be able to address." (A-126-16 at 1.) If the Localities genuinely believe all "conversion therapy" is harmful to minors, then exempting unlicensed religious counselors and clergy from regulation makes no sense, especially if they are the source of the "universal complaints." The APA Report is also relevant here because, not only does it fail to present empirical evidence of harm from **any** kind of SOCE counselling, its non-empirical, anecdotal reporting of harm does not differentiate between SOCE from licensed professionals and SOCE from religious organizations or persons. Thus, the Localities cannot justify the underinclusivity of their ordinances on any claimed difference in harm between licensed SOCE and unlicensed religious SOCE, still further undermining any notion of narrow tailoring.

> **D.** **The District Court Erred in Failing to Hold Counselors Satisfy Irreparable Harm and the Remaining Preliminary Injunction Factors.**

> **1.** **Irreparable Harm Is Presumed from the Localities' Denial of Counselors' First Amendment Freedoms.**

As shown above, Counselors are likely to succeed on the merits of their First Amendment challenges to the ordinances. Thus, the irreparable harm prong of the preliminary injunction standard is satisfied as a matter of law: "The loss of First

Amendment freedoms, for even minimal periods of time, **unquestionably constitutes irreparable injury**." *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (emphasis added). Indeed, First Amendment violations are **presumed** to impose irreparable injury. *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012); *see also* 11A Charles Alan Wright, Arthur R. Miller, & Mary Kay Kane*, Federal Practice & Procedure* §2948.1 (2d ed. 1995) ("When an alleged constitutional right is involved, most courts hold that **no further showing of irreparable injury is necessary**." (emphasis added)).

### 2. The Balance of Equities and Public Interest Favor the Preliminary Injunction.

A law that is like unconstitutional for preliminary injunction purposes is not only presumed to cause irreparable injury, but also *ipso facto* is not in the public interest. *See Scott v. Roberts*, 612 F.3d 1279, 1297 (11th Cir. 2010). Indeed, the inability to punish Counselors and other professionals for engaging in an ethical form of counseling that is desired by their clients "does not outweigh the serious loss of first amendment freedoms." *ACLU of Fla., Inc. v. The Florida Bar*, 744 F. Supp. 1094, 1099 (N.D. Fla. 1990).

The Localities suffer no harm by being forced to comply with the dictates of the First Amendment. Importantly, the Localities have **never identified a single person being harmed** within their jurisdictions by any SOCE counseling, let alone voluntary SOCE counseling that the person requests and is willing to receive. The

Localities have never received any complaints of any SOCE-related harm to their citizens. Accordingly, the Localities will not suffer any harm if their unconstitutional ordinances are enjoined. Their citizens were not being harmed prior to the enactment of the ordinances, and they will not be harmed while a preliminary injunction is in effect.

Moreover, as shown above, the ordinances are unenforceable by the Localities' code officials in any event. The Localities cannot be harmed by an injunction against ordinances that they lack the capacity or competency to enforce. Protection of First Amendment rights is always in the public interest, while violating First Amendment rights at the whim of ideological opponents does not serve the public. *See KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006).

## II. COUNSELORS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT CLAIM THAT THE ORDINANCES ARE UNCONSTITUTIONAL VIEWPOINT-BASED RESTRICTIONS ON COUNSELORS' SPEECH.

A viewpoint-based restriction on private speech has never been upheld by the Supreme Court or any court. Indeed, a finding of viewpoint discrimination is dispositive. *See Sorrell v. IMS Health*, 131 S. Ct. 2653, 2667 (2011). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995); *see also Searcy v. Harris*, 888 F.2d 1314, 1325 (11th Cir. 1989)

("The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis.").

The ordinances are textbook examples of viewpoint discrimination. On their faces, they explicitly prohibit a specific viewpoint on the subject of sexual orientation, namely that unwanted same-sex attractions can be reduced or eliminated to the benefit of the client. The discrimination is baked into the prohibition against counseling that seeks to "eliminate or reduce sexual or romantic attractions or feelings **toward individuals of the same gender or sex**." (A-126-20 at 12 (emphasis added); A-126-27 at 7 (same).). Similarly, the ordinances permit Counselors to affirm and facilitate same-sex attraction when minor clients question those feelings, but prohibit Counselors from affirming and facilitating (through speech) minors' desires to change unwanted same-sex attractions, even when the minor clients themselves request that outcome. (*Id.*).

The ordinances also prohibit licensed counselors from engaging in any speech facilitating a client's goal to change gender identity, behaviors, or expression, but only if the change is towards the client's biological sex. (*Id.*) The ordinances specifically exempt from their prohibitions counseling that "provides support and assistance to a person undergoing gender transition." (*Id.*). To undergo "gender transition," a minor has to be seeking to change from the minor's biological gender. **Change is the definition of transition**. *See* Dictionary.com Unabridged,

https://www.dictionary.com/browse/transition?s=t (last visited Apr. 9, 2019) ("movement, passage, or **change** from one position, state, stage, subject, concept, etc., to another; **change**" (emphasis added).) So, under the ordinances, if a minor client wants to undergo radical surgery to alter his appearance or genitalia, counseling to assist in **that** change is permitted. But, if a minor merely wants to speak with a counselor about unwanted feelings concerning her gender identity or expression, the counselor is absolutely prohibited from engaging in such counseling if it aids the minor in reducing unwanted cross-gender identity, behaviors, or expressions. This is unquestionably viewpoint discrimination.

The Supreme Court and several other courts have invalidated regulations of professional speech as unconstitutional viewpoint discrimination. *See Sorrell*, 131 S. Ct. 2653 (2011); *Valazquez*, 531 U.S. 533; *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002). In these cases, the courts recognized the axiomatic truth that the government is not permitted to impose its viewpoint on speakers, even professional speakers subject to licensing requirements and regulation. In both cases, the challenged laws expressed a preference for the message the government approves and disdain attached to punishment for the viewpoint the government abhors. As was true of the laws in *Valazquez* and *Conant*, the ordinances here should be invalidated as unconstitutional viewpoint discrimination.

If a minor client presents to Dr. Otto with the desire to change his same-sex attractions and behavior to conform to his Christian beliefs on homosexuality, and Dr. Otto affirms the client's *beliefs* through talk therapy that leaves any decisions about change to the client, then the Localities both would interpret that therapy as violating their respective ordinances because Dr. Otto would have facilitated the client's goal to change sexual orientation (or sexual orientation identity, *see supra* note 4).[12] By this interpretation the ordinances discriminate against Dr. Otto's Christian viewpoint that voluntary change is possible and good, which viewpoint he expressed by accepting the client's goals and affirming the client's beliefs. By contrast, if presented with the same minor client desiring to conform attractions and behaviors to the client's Christian beliefs, a therapist who expresses beliefs contrary to the client's in order to effect the desired conformity—*i.e.*, by changing the client's beliefs instead of the client's attractions or behaviors—would not violate the ordinances under the Localities' interpretation because the therapist would not have facilitated the client's goal of changing sexual orientation. But the only substantive difference between the therapies offered by Dr. Otto and the hypothetical therapist was the viewpoint expressed regarding the client's beliefs.

---

[12] This hypothetical encounter is drawn directly from Dr. Otto's unrefuted testimony in response to questioning by the County. (A-121-7 at 155:9-156:20; A-121-28 at 2.)

The record leaves little doubt that it is "conversion therapy" from a religious viewpoint that the County had in view when the ordinances were passed. (A-126-16 at 1 ("Most of the universal complaints seem to be about religious organizations . . . .").) It is also clear from the Sources relied on by the Localities that counselors and clients with strong religious beliefs about the efficacy of SOCE are disproportionately affected by the bans because this category of clients perceive the most benefit from SOCE. (*See supra* Factual Background Pt. C.2.)

The district court erroneously concluded that *R.A.V. v. City of St. Paul*, gives the government license to discriminate on the basis of content and viewpoint in this context. (A-141 at 51-52.) But *R.A.V.* provides no such refuge. There, the Supreme Court noted that "[w]hen the basis for the content discrimination consists entirely of the very reason the entire class of speech at issue is proscribable, no significant danger of idea or viewpoint discrimination exists." 505 U.S. 377, 387 (1992). The district court failed to consider, however, that such classes of proscribable speech are severely limited by Supreme Court precedent to certain "well-defined and narrowly limited classes of speech," including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct. *See United States v. Stevens*, 559 U.S. 460, 468-69 (2010). To be sure, elsewhere in its order, the district court found that "[t]he ordinances at issue in this case do not fall within these limited areas in which restrictions on the content of speech has been historically recognized." (A-

141 at 24-25.) Thus, this Court should reject the district court's suggestion that Counselors' speech is akin to the long-recognized categories of proscribable speech discussed in *R.A.V.*

## III. COUNSELORS ARE LIKELY TO SUCCEED ON THE MERITS OF THEIR PRIOR RESTRAINT AND VAGUENESS CLAIMS UNDER THE FIRST AMENDMENT.

### A. The ordinances Are Unconstitutional Prior Restraints.

The ordinances are unconstitutional prior restraints because they impose total prohibitions on Counselors' speech, perpetually and without exception. *See, e.g.*, *Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360, 1364 (M.D. Fla. 2000) ("This Court also finds that . . . moratoria are governed by prior restraint analysis in the same manners as permitting schemes."); *D'Ambra v. City of Providence*, 21 F. Supp. 2d 106, 113-14 (D.R.I. 1998) (same); *ASF, Inc. v. City of Seattle*, 408 F. Supp. 2d 1102, 1108 (W.D. Wash. 2005) (holding prohibitions on protected expression unlimited in time fail prior restraint analysis).

Prior restraints against constitutionally protected expression are presumptively unconstitutional. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). In fact, "any system of prior restraints comes to this Court bearing the heavy presumption against its constitutional validity." *Bantham Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). This is why "[t]he Supreme Court and this Court consistently have permitted facial challenges to prior restraints without requiring a

plaintiff to show that there are no conceivable set of facts where the application of the particular government regulation might or would be constitutional." *United States v. Frandsen*, 212 F.3d 1231, 1236 (11th Cir. 2000).

The district court erroneously distinguished the ordinances from unconstitutional prior restraints because they do not create permitting or licensing schemes for speech. (A-141 at 55-56.) But this conclusion imposes an overly rigid gloss on prior restraint analysis. In *Barrett v. Walker Cnty. Sch. Dist.*, a case cited by the district court (A-141 at 55), this Court explained, "Permitting ordinances and licensing ordinances are classic examples of prior restraints, but **the category is not rigid** because court-ordered injunctions that forbid speech can also be considered prior restraints." 872 F.3d 1209, 1223 (11th Cir. 2017) (emphasis added) (citations omitted). Thus, whether compared to official moratoria or court orders forbidding protected speech, the ordinances are not effectively different in banning Counselors' speech and therefore should be considered unconstitutional prior restraints.

### B. The ordinances Are Unconstitutionally Vague.

A law is unconstitutionally vague and overbroad if it "either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). Government policies "must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course

it is lawful for him to take." *Id.* at 393. "Precision of regulation" is the touchstone of the First Amendment. *Button*, 371 U.S. at 435. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While all regulations must be reasonably clear, "laws which threaten to inhibit the exercise of constitutionally protected" expression must satisfy "a more stringent vagueness test." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). Such a law must give "adequate warning of what activities it proscribes" and must "set out explicit standards for those who apply it." *See Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973) (citing *Grayned*, 408 U.S. at 108).

The ordinances do not fulfill either requirement and thus force both those enforcing the ordinances and licensed professionals to guess at their meaning and differ as to their application. As shown above (Factual Background Pt. B), both the City and County interpret their ordinances such that the same therapy content can be both allowed and prohibited by the ordinances, depending on whether the **intent** is to change a minor's sexual orientation or gender identity. Furthermore, the testimony of the City's Rule 30(b)(6) witness on enforcement illustrates that untrained code officials have no chance of applying the undefined concept of "gender identity" (Factual Background Pt. F), leaving the regulated professionals no chance of knowing how the ordinances will be enforced. Such uncertainty cannot satisfy the

stringent requirements of the First Amendment. *See Hoffman Estates,* 455 U.S. at 499.

IV.    **THE DISTRICT COURT'S ORDER DENYING PRELIMINARY INJUNCTION SHOULD BE REVERSED BECAUSE PLAINTIFFS ARE SUFFERING IRREPARABLE INJURY FROM THE LOCALITIES' *ULTRA VIRES* ORDINANCES WHICH REGULATE A FIELD PREEMPTED TO THE STATE.**

Counselors' Proposed Findings and Conclusions to the district court painstakingly demonstrate both the pervasiveness of the state's legislative scheme regulating licensed mental health providers, evidencing the state's intent to preempt the area, and the strong public policy reasons for finding regulation of licensed mental health providers to be preempted to the state. (A-134 at 59-63; *see also supra* Factual Background Pt. G.) But the district court did engage with these arguments, opting instead to focus only on Counselors' irreparable harm resulting from the *ultra vires* ordinances. (A-141 at 58-60.) The district court's finding that Counselors have not demonstrated irreparable harm is in error.

Counselors have demonstrated on an unrebutted record that they are prohibited by the ordinances from engaging in voluntary SOCE counseling with existing clients, potential new clients who contact Counselors, and potential new clients who want counseling but will not seek it because of the ordinances. (A-1 at 34-36.) As an initial matter, Counselors' loss of potential revenue from these client categories is incalculable to any reasonable certainty. More importantly, however,

the damage to Counselors' therapeutic alliances with their existing clients who are denied the counseling they want and need to reduce their distress will never be compensable monetarily, and may have long term mental health consequences for the clients. *See, e.g., Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861, 866-67 (8th Cir. 1977) (holding interruption of medical business, incalculable loss of revenue, and imperiled goodwill provide basis for finding irreparable injury). Accordingly, the district court should have found irreparable harm satisfied, and engaged with Counselors' substantive preemption arguments to find Counselors entitled to the preliminary injunction.

## CONCLUSION

For the foregoing reasons, the district court's denial of Counselors' motion for preliminary injunction was in error, and this Court should reverse.

Dated this April 9, 2019.

/s/ Roger K. Gannam
Mathew D. Staver (Fla. 0701092)
Horatio G. Mihet (Fla. 026581)
Roger K. Gannam (Fla. 240450)
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
E-mail: court@lc.org

*Attorneys for Plaintiffs–Appellants*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.      This document complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B), as expanded by this Court's Order of March 19, 2019. Not counting the items excluded from the length by Fed. R. App. P. 32(f), this document contains 14,998 words.

2.      This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). This document has been prepared using Microsoft Word in 14-point Times New Roman font.

DATED this April 9, 2019

/s/ Roger K. Gannam
Roger K. Gannam
*Attorney for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this April 9, 2019, a copy of the foregoing Motion was electronically filed through the Court's ECF system, and that I also provided a copy by e-mail to the following:

*Attorneys for Defendant–Appellee*
*City of Boca Raton, Florida*

Jamie A. Cole
jcole@wsh-law.com
Daniel L. Abbott
dabbott@wsh-law.com
Anne R. Flanigan
aflanigan@wsh-law.com
WEISS SEROTA HELFMAN
COLE & BIERMAN, P.L.
200 East Broward Boulevard
Suite 1900
Fort Lauderdale, FL 33301

*Attorney for Defendant–Appellee*
*Palm Beach County, Florida*

Helene C. Hvizd
hvizd@pbcgov.org
Senior Assistant County Attorney
Palm Beach County Attorney's Office
301 North Olive Avenue, Suite 601
West Palm Beach, FL 33401

/s/ Roger K. Gannam
Roger K. Gannam
*Attorney for Plaintiffs–Appellants*