No. 19-10604

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

ROBERT W. OTTO, PH.D. LMFT, individually and on behalf of his patients, and
JULIE H. HAMILTON, PH.D., LMFT, individually and on behalf of her patients,
Plaintiffs–Appellants
*v.*
CITY OF BOCA RATON, FLORIDA, and
COUNTY OF PALM BEACH, FLORIDA
Defendants–Appellees

---

On Appeal from the United States District Court
for the Southern District of Florida
In Case No. 9:18-cv-80771-RLR before the Honorable Robin L. Rosenberg

---

**PLAINTIFFS-APPELLANTS' APPENDIX**

**VOLUME I**

---

Mathew D. Staver (Fla. 0701092)
Horatio G. Mihet (Fla. 026581)
Roger K. Gannam (Fla. 240450)
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
E-mail: court@lc.org

*Attorneys for Plaintiffs–Appellants*

# INDEX OF APPENDIX

Dkt./Tab Number

**VOLUME I**

District Court Docket Sheet ...................................................................................A

Verified Complaint ...................................................................................................1

Plaintiff's Motion for Preliminary Injunction with Incorporated
Memorandum of Law.................................................................................................8

2009 Report of the American Psychological Association Task Force on
Appropriate Therapeutic Responses to Sexual Orientation ("APA Report") ..... 85-5

American School Counselor Association Position Paper (2014) ...................... 85-11

**VOLUME II**

Substance Abuse and Mental Health Services Administration (SAMHSA),
*Ending Conversion Therapy: Supporting and Affirming LGBTQ Youth*
(2015) ............................................................................................................... 85-12

American College of Physicians Position Paper, *Lesbian, Gay, Bisexual, and
Transgender Health Disparities* (2015)........................................................... 85-13

Declaration of Plaintiff Julie H. Hamilton, Ph.D., LMFT ................................. 96-1

Palm Beach County Ordinance 2017-046 ....................................................... 121-1

**VOLUME III**

Deposition of Robert W. Otto, Ph.D., LMFT ................................................... 121-7

**VOLUME IV**

Deposition of Julie H. Hamilton, Ph.D., LMFT (Vol. I) ................................... 121-8

**VOLUME V**

Deposition of Julie H. Hamilton, Ph.D., LMFT (Vol. II)................................... 121-8

## VOLUME VI

Deposition of Helene C. Hvizd, Esquire (pp. 1–250)........................................ 121-9

## VOLUME VII

Deposition of Helene C. Hvizd, Esquire (pp. 251–291, Exs. 1–21).................. 121-9

Deposition of Dr. Shayna Ginsburg................................................................ 121-10

Declaration of Helene Hvizd ........................................................................ 121-11

Statement of American Academy of Child & Adolescent Psychiatry
(AACAP), *Practice Parameter on Gay, Lesbian, or Bisexual Sexual
Orientation, Gender Nonconformity, and Gender Discordance in Children
and Adolescents* (2012).................................................................................. 121-17

Plaintiff Julie H. Hamilton, Ph.D., LMFT's Objections and Responses to the
Preliminary Injunction Interrogatories of Defendant Palm Beach County ..... 121-24

Plaintiff Robert W. Otto, Ph.D., LMFT's Objections and Responses to the
Preliminary Injunction Interrogatories of Defendant Palm Beach County ..... 121-28

SDG Counseling, LLC's Informed Consent Forms ........................................ 121-33

December 5, 2017 Palm Beach County Commission Meeting Transcript
Excerpt ......................................................................................................... 126-2

December 19, 2017 Palm Beach County Commission Meeting Transcript
Excerpt ......................................................................................................... 126-3

June 10, 2016 E-mail from Rand Hoch to Palm Beach County
Commissioners.............................................................................................. 126-6

## VOLUME VIII

August 26, 2016 E-mail from Denise Marie Nieman to Rand Hoch (thread)... 126-9

August 29, 2016 E-mail from Denise Marie Nieman to Helene Hvizd, Rand
Hoch (thread) ................................................................................................ 126-11

September 8, 2017 E-mail rom Rand Hoch to Denise Marie Nieman
(thread) ......................................................................................................... 126-16

Palm Beach County Senior Code Enforcement Officer Job Description ........ 126-18

Palm Beach County Ordinance 2017-046 ....................................................... 126-20

December 11, 2017 E-mail from Helene Hvizd to Julie Hamilton, Todd
Bonlarron (thread) ........................................................................................... 126-21

2009 Report of the American Psychological Association Task Force on
Appropriate Therapeutic Responses to Sexual Orientation ("APA Report") . 126-22

August 17, 2017 Memorandum from Diana Grub Frieser, City Attorney to
Mayor and City Council .................................................................................. 126-23

Digital Media File (placeholder) ..................................................................... 126-24

July 18, 2017 E-mail from George S. Brown to Diana Grub Frieser
(thread) ............................................................................................................ 126-25

July 21, 2017 E-mail from Paul Schofield to George S. Brown (thread) ........ 126-26

City of Boca Raton Ordinance 5407 ................................................................ 126-27

American Psychologist Association, *Guidelines for Psychological Practice
with Transgender and Gender Nonconforming People* (2015) ....................... 126-30

## VOLUME IX

Deposition of Michael Woika ......................................................................... 126-41

## VOLUME X

Transcript of Preliminary Injunction Hearing, October 18, 2018 ........................ 129

## VOLUME XI

[Plaintiffs' Proposed Post-Hearing] Findings of Fact and Conclusions of
Law on Plaintiffs' Motion for Preliminary Injunction ........................................... 134

Order Denying Plaintiffs' Motion for Preliminary Injunction .............................. 141

Notice of Appeal ................................................................................................... 142

# TAB - A

APPEAL,BER,CLOSED,MEDREQ,REF_DISCOV,STAYED

# U.S. District Court
## Southern District of Florida (West Palm Beach)
## CIVIL DOCKET FOR CASE #: 9:18-cv-80771-RLR

Otto et al v. City of Boca Raton, Florida et al
Assigned to: Judge Robin L. Rosenberg
Referred to: Magistrate Judge Bruce E. Reinhart
Case in other court: USCA, 19-10604-A
Cause: 42:1983 Civil Rights Act

Date Filed: 06/13/2018
Date Terminated: 02/19/2019
Jury Demand: None
Nature of Suit: 440 Civil Rights: Other
Jurisdiction: Federal Question

**Plaintiff**

**Robert W. Otto**

represented by **Mathew Duane Staver**
Liberty Counsel
1053 Maitland Center Commons
2nd Floor
Maitland, FL 32751-7214
800-671-1776
Fax: 407-875-0770
Email: mat@lc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger K. Gannam**
Liberty Counsel
PO Box 540774
Jacksonville, FL 32854
United Sta
800-671-1776
Fax: 407-875-0770
Email: rgannam@lc.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Horatio G. Mihet**
Liberty Counsel
P.O. Box 540774
Orlando, FL 32854-0774
800-671-1776
Fax: 407-875-0770
Email: hmihet@lc.org
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Julie H. Hamilton**

represented by **Mathew Duane Staver**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger K. Gannam**

(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Horatio G. Mihet**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**City of Boca Raton, Florida**                 represented by **Daniel Lawrence Abbott**
Weiss Serota Helfman Cole Bierman &
Popok,P.L.
200 E. Broward Blvd.
Suite 1900
Ft. Lauderdale, FL 33301
954-763-4242
Fax: 954-764-7770
Email: dabbott@wsh-law.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Anne Reilly Flanigan**
Weiss Serota Helfman Cole , Bierman, P.L.
2525 Ponce de Leon Blvd.
Suite 700
CORAL GABLES, FL 33134
305-854-0800
Fax: 305-854-2323
Email: areilly@wsh-law.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**County of Palm Beach, Fl**                 represented by **Rachel Marie Fahey**
Palm Beach County Attorney's Office
300 N Dixie Hwy
Ste 359
West Palm Beach, FL 33401
(561) 355-6337
Email: rFahey@pbcgov.org
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Kim Ngoc Phan**
Palm Beach County Board of County
Commissioners
300 North Dixie Hwy, Suite 359
WPB, FL 33401
561-355-2529
Email: kphan@pbcgov.org
*ATTORNEY TO BE NOTICED*

**Amicus**

**Alliance for Therapeutic Choice**        represented by **Max Richard Price , Jr.**
                                                 Law Offices of Max R. Price, P.A.
                                                 6701 Sunset Drive
                                                 Suite 104
                                                 Miami, FL 33143
                                                 305-662-2272
                                                 Fax: 305-667-3975
                                                 Email: mprice@pricelegal.com
                                                 *LEAD ATTORNEY*
                                                 *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/13/2018 | 1 | COMPLAINT against All Defendants. Filing fees $ 400.00 receipt number 113C-10733447, filed by Robert W. Otto, Julie H. Hamilton. (Attachments: # 1 Civil Cover Sheet, # 2 Summon(s) City of Boca Raton, FL, # 3 Summon(s) County of Palm Beach, FL, # 4 Exhibit A - City Ordinance, # 5 Exhibit B - County Ordinance, # 6 Exhibit C - APA Report, # 7 Exhibit D - Cummings Article, # 8 Exhibit E - ACPeds Statement, # 9 Exhibit F - BMQA Confirmation, # 10 Exhibit G - CA SOCE Ltr)(Mihet, Horatio) (Entered: 06/13/2018) |
| 06/13/2018 | 2 | Clerks Notice of Judge Assignment to Judge Robin L. Rosenberg and Magistrate Judge Bruce E. Reinhart.<br><br>Pursuant to 28 USC 636(c), the parties are hereby notified that the U.S. Magistrate Judge Bruce E. Reinhart is available to handle any or all proceedings in this case. If agreed, parties should complete and file the Consent form found on our website. It is not necessary to file a document indicating lack of consent.<br><br>Pro se (NON-PRISONER) litigants may receive Notices of Electronic Filings (NEFS) via email after filing a Consent by Pro Se Litigant (NON-PRISONER) to Receive Notices of Electronic Filing. The consent form is available under the forms section of our website. (ail) (Entered: 06/14/2018) |
| 06/14/2018 | 3 | MOTION for Preliminary Injunction by Julie H. Hamilton, Robert W. Otto. (Mihet, Horatio) (Entered: 06/14/2018) |
| 06/14/2018 | 4 | Summons Issued as to City of Boca Raton, Florida, County of Palm Beach, Fl. (ail) (Entered: 06/14/2018) |
| 06/18/2018 | 5 | PAPERLESS ORDER denying without prejudice 3 Plaintiff's Motion for Preliminary Injunction. Federal Rule of Civil Procedure 65(a)(1) states that "The court may issue a preliminary injunction only on notice to the adverse party." To date, the Defendants have not appeared and there is no evidence that Defendants have been served with the Complaint. Signed by Judge Robin L. Rosenberg on 6/18/2018. (ege) (Entered: 06/18/2018) |
| 06/22/2018 | 6 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,, with a 21 day response/answer filing deadline by Robert W. Otto, Julie H. Hamilton. City of Boca Raton, Florida served on 6/18/2018, answer due 7/9/2018. (Mihet, Horatio) (Entered: 06/22/2018) |
| 06/22/2018 | 7 | SUMMONS (Affidavit) Returned Executed on 1 Complaint,, with a 21 day response/answer filing deadline by Robert W. Otto, Julie H. Hamilton. County of Palm |

| | | Beach, Fl served on 6/18/2018, answer due 7/9/2018. (Mihet, Horatio) (Entered: 06/22/2018) |
|---|---|---|
| 06/22/2018 | 8 | Renewed MOTION for Preliminary Injunction *(with Certificate of Service indicating successful service of Complaint and PI Motion)* by Julie H. Hamilton, Robert W. Otto. (Mihet, Horatio) (Entered: 06/22/2018) |
| 06/25/2018 | 9 | PAPERLESS ORDER. Once Defendants City of Boca Raton, Florida and County of Palm Beach, Florida appear in this case, the Court will enter an order setting a briefing schedule on 8 Plaintiff's Motion for Preliminary Injunction. Signed by Judge Robin L. Rosenberg on 6/25/2018. (ege) (Entered: 06/25/2018) |
| 06/25/2018 | 10 | NOTICE by County of Palm Beach, Fl *of Appearance*. Attorney Rachel Marie Fahey added to party County of Palm Beach, Fl(pty:dft). (Fahey, Rachel) (Entered: 06/25/2018) |
| 06/26/2018 | 11 | ORDER SETTING STATUS CONFERENCE,CALENDAR CALL, AND TRIAL DATE, ORDER OF REQUIREMENTS, AND ORDER OF REFERENCE TO MAGISTRATE JUDGE: Calendar Call set for 6/5/2019 at 9:00 AM before Judge Robin L. Rosenberg., Trial set for 6/10/2019 at 9:00 AM in West Palm Beach Division before Judge Robin L. Rosenberg., Status Conference set for 4/24/2019 at 30 AM before Judge Robin L. Rosenberg. Signed by Judge Robin L. Rosenberg on 6/26/2018. (ail) (Entered: 06/26/2018) |
| 06/27/2018 | 12 | STANDING DISCOVERY ORDER FOR MAGISTRATE JUDGE BRUCE REINHART Signed by Magistrate Judge Bruce E. Reinhart on 6/26/2018. (ail) (Entered: 06/27/2018) |
| 06/29/2018 | 13 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,, *Defendant, City of Boca Raton's Unopposed Motion for Extension of Time to Respond to Plaintiffs' Complaint* by City of Boca Raton, Florida. Attorney Daniel Lawrence Abbott added to party City of Boca Raton, Florida(pty:dft). (Abbott, Daniel) (Entered: 06/29/2018) |
| 07/02/2018 | 14 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer as to 1 Complaint,, by County of Palm Beach, Fl. (Fahey, Rachel) (Entered: 07/02/2018) |
| 07/02/2018 | 15 | PAPERLESS ORDER granting 13 14 Defendants' Motion for Extension of Time to Respond to Plaintiffs' Complaint. Defendants' responsive pleadings to 1 Plaintiffs' Complaint are due by August 1, 2018. Signed by Judge Robin L. Rosenberg on 7/2/2018. (ege) (Entered: 07/02/2018) |
| 07/03/2018 | 16 | PAPERLESS ORDER setting status conference on 8 Plaintiffs' Motion for Preliminary Injunction for Friday, July 13, 2018 at 10:00 a.m. At the status conference, the parties shall be prepared to discuss a briefing schedule on the Motion. Prior to the status conference, the parties shall meet and confer to discuss what discovery, if any, will be needed to inform a hearing on 8 Plaintiffs' Motion. Two days prior to the Status Conference, the parties shall submit a proposed joint discovery plan to the Court's e-mail address in Word format (rosenberg@flsd.uscourts.gov). The proposed joint discovery plan shall specify all depositions to be taken and include the dates and times for which those depositions have been scheduled. The plan should also reflect a schedule for propounding and responding to any written discovery requests. Counsel may appear at the Status Conference via telephone but must file a notice of telephonic appearance at least one (1) day prior. Instructions for appearing via telephone are as follows: (1) Please call five (5) minutes prior to the Status Conference or Calendar Call; (2) The toll-free number is: 1 (877) 873-8018; (3) The access code is: 9890482; (4) The security code is: 4008. Signed by Judge Robin L. Rosenberg on 7/3/2018. (ege) (Entered: 07/03/2018) |
| 07/03/2018 | 17 | NOTICE of Attorney Appearance by Kim Ngoc Phan on behalf of County of Palm |

| | | |
|---|---|---|
| | | Beach, Fl. Attorney Kim Ngoc Phan added to party County of Palm Beach, Fl(pty:dft). (Phan, Kim) (Entered: 07/03/2018) |
| 07/06/2018 | 18 | Joint SCHEDULING REPORT - **Rule 16.1** by Julie H. Hamilton, Robert W. Otto (Mihet, Horatio) (Entered: 07/06/2018) |
| 07/09/2018 | 19 | SCHEDULING ORDER AND ORDER REFERRING CASE TO MEDIATION: Amended Pleadings due by 9/10/2018., Discovery due by 2/11/2019., Joinder of Parties due by 9/10/2018., Mediation Deadline 4/10/2019., In Limine Motions due by 3/8/2019., Dispositive Motions due by 3/8/2019., Motions due by 3/8/2019., Pretrial Stipulation due by 5/10/2019. Signed by Judge Robin L. Rosenberg on 7/9/2018. *See attached document for full details.* (ail)<br><br>**Pattern Jury Instruction Builder -** To access the latest, up to date changes to the 11th Circuit Pattern Jury Instructions go to https://pji.ca11.uscourts.gov or click here. (Entered: 07/09/2018) |
| 07/10/2018 | 20 | ORDER SETTING DISCOVERY STATUS CONFERENCE: Status Conference Re: Discovery Matters set for 1/10/2019 at 2:30 PM in West Palm Beach Division before Magistrate Judge Bruce E. Reinhart. Signed by Magistrate Judge Bruce E. Reinhart on 7/9/2018. *See attached document for full details.* (ail) (Entered: 07/10/2018) |
| 07/10/2018 | 21 | NOTICE of Attorney Appearance by Anne Reilly Flanigan on behalf of City of Boca Raton, Florida. Attorney Anne Reilly Flanigan added to party City of Boca Raton, Florida(pty:dft). (Flanigan, Anne) (Entered: 07/10/2018) |
| 07/10/2018 | 22 | NOTICE of Attorney Appearance by Daniel Lawrence Abbott on behalf of City of Boca Raton, Florida (Abbott, Daniel) (Entered: 07/10/2018) |
| 07/11/2018 | 23 | NOTICE by City of Boca Raton, Florida re 16 Set/Reset Hearings,,,,,, Order,,,,, *Notice of Telephonic Appearance* (Flanigan, Anne) (Entered: 07/11/2018) |
| 07/12/2018 | 24 | NOTICE by Julie H. Hamilton, Robert W. Otto *of Telephonic Appearance of their Counsel at Status Conference* (Mihet, Horatio) (Entered: 07/12/2018) |
| 07/13/2018 | 25 | JOINT DISCOVERY PLAN FOR PRELIMINARY INJUNCTION MOTION. Signed by Judge Robin L. Rosenberg on 7/13/2018. *See attached document for full details.* (vmz) (Entered: 07/13/2018) |
| 07/13/2018 | 26 | PAPERLESS Minute Entry for proceedings held before Judge Robin L. Rosenberg: Status Conference re 8 Plaintiffs' Motion for Preliminary Injunction held on 7/13/2018. Total time in court: 30 minutes. Attorney Appearance(s): Anne Reilly Flanigan, Rachel Marie Fahey, Kim Ngoc Phan, Roger K. Gannam, Horatio G. Mihet. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (ir) (Entered: 07/13/2018) |
| 07/16/2018 | | Prelinjhrg Hearing set for 10/5/2018 09:00 AM before Judge Robin L. Rosenberg. Set Hearings Per DE 25 . (vmz) (Entered: 07/16/2018) |
| 07/25/2018 | | Set/Reset Hearings Discovery Hearing set for 8/2/2018 at 03:00 PM in West Palm Beach Division before Magistrate Judge Bruce E. Reinhart. Counsel may appear by phone using the following conference call instructions: Dial 1-888-557-8511; Enter access code 4098267#; and Enter security code 1234#. (kry) (Entered: 07/25/2018) |
| 07/26/2018 | 27 | NOTICE by Julie H. Hamilton, Robert W. Otto re Set/Reset Hearings, *of Filing Discovery Memorandum for August 2, 2018 Hearing* (Attachments: # 1 Exhibit A - Plaintiff Otto's Second Set of Discovery Requests to Defendant County, # 2 Exhibit B - Plaintiffs' First Amended Notice of Taking Depositions of Defendants, # 3 Exhibit C - |

| | | |
|---|---|---|
| | | Plaintiff Otto's First Set of Discovery Requests to Defendant County, # 4 Exhibit D - Plaintiffs original Notice of Deposition of Defendants) (Mihet, Horatio) (Entered: 07/26/2018) |
| 07/26/2018 | 28 | MEMORANDUM in Opposition re 27 Notice (Other),, *Response to Plaintiffs' Discovery Memorandum* by County of Palm Beach, Fl. (Attachments: # 1 Exhibit Email dated July 6, 2018, # 2 Exhibit Email dated July 10, 2018, # 3 Exhibit Proposed Joint Discovery Plan for Preliminary Injunction Motion, # 4 Exhibit Email dated July 11, 2018)(Fahey, Rachel) (Entered: 07/26/2018) |
| 07/30/2018 | 29 | PAPERLESS ORDER resetting Discovery Hearing. The Discovery Hearing will still be set for 8/2/2018 at 03:00 PM in West Palm Beach Division, but will be before Judge Robin L. Rosenberg. Counsel may appear via telephone but must file a notice of telephonic appearance at least one (1) day prior to the Discovery Hearing. Instructions for appearing via telephone are as follows: (1) Please call five (5) minutes prior to the Hearing; (2) The toll-free number is: 1 (877) 873-8018; (3) The access code is: 9890482; (4) The security code is: 4008. Signed by Judge Robin L. Rosenberg on 7/30/2018. (ege) (Entered: 07/30/2018) |
| 07/30/2018 | 30 | Defendant's MOTION for Extension of Time to Respond To Second Set Of Discovery Requests ( Responses due by 8/13/2018), MOTION for Protective Order by City of Boca Raton, Florida. (Attachments: # 1 Exhibit A - Second Set of Discovery Requests, # 2 Exhibit B - First Amended Notice of Taking Depositions)(Abbott, Daniel) (Entered: 07/30/2018) |
| 07/31/2018 | 31 | PAPERLESS ORDER setting hearing on 30 Defendant City of Boca Raton's Motion for Extension of Time and for Protective Order for 8/2/2018 at 03:00 PM in West Palm Beach Division before Judge Robin L. Rosenberg. Counsel may appear via telephone but must file a notice of telephonic appearance at least one (1) day prior to the Discovery Hearing. Instructions for appearing via telephone are as follows: (1) Please call five (5) minutes prior to the Hearing; (2) The toll-free number is: 1 (877) 873-8018; (3) The access code is: 9890482; (4) The security code is: 4008. Signed by Judge Robin L. Rosenberg on 7/31/2018. (ege) (Entered: 07/31/2018) |
| 08/01/2018 | 32 | NOTICE by City of Boca Raton, Florida re 29 Order,,, Set/Reset Hearings,, 31 Order Setting Hearing on Motion,, *Notice of Telephonic Appearance* (Flanigan, Anne) (Entered: 08/01/2018) |
| 08/01/2018 | 33 | NOTICE by Julie H. Hamilton, Robert W. Otto *of Telephonic Appearance of their Counsel at August 2, 2018 Discovery Hearing* (Mihet, Horatio) (Entered: 08/01/2018) |
| 08/01/2018 | 34 | Defendant's MOTION TO DISMISS 1 Complaint,, FOR FAILURE TO STATE A CLAIM *Defendant, City Of Boca Raton's Motion To Dismiss And Incorporated Memorandum Of Law* by City of Boca Raton, Florida. Responses due by 8/15/2018 (Abbott, Daniel) (Entered: 08/01/2018) |
| 08/01/2018 | 35 | NOTICE by County of Palm Beach, Fl *Filing Certified Copy of Palm Beach County Ordinance No. 84-8* (Attachments: # 1 Exhibit Palm Beach County Ordinance No. 84-8) (Fahey, Rachel) (Entered: 08/01/2018) |
| 08/01/2018 | 36 | NOTICE by County of Palm Beach, Fl *Filing Transcribed Recording of BCC Meeting Dated 12/05/17* (Attachments: # 1 Exhibit Transcribed Recording of BCC Meeting Dated 12/05/17) (Fahey, Rachel) (Entered: 08/01/2018) |
| 08/01/2018 | 37 | NOTICE by County of Palm Beach, Fl *Filing Transcribed Recording of BCC Meeting Dated 12/19/17* (Attachments: # 1 Exhibit Transcribed Recording of BCC Meeting Dated 12/19/17) (Fahey, Rachel) (Entered: 08/01/2018) |

| 08/01/2018 | 38 | Defendant's MOTION Motion For Permission to File DVDs by County of Palm Beach, Fl. (Fahey, Rachel) (Entered: 08/01/2018) |
|---|---|---|
| 08/01/2018 | 39 | MOTION TO DISMISS 37 Notice (Other), 35 Notice (Other), 36 Notice (Other), 1 Complaint,, FOR FAILURE TO STATE A CLAIM by County of Palm Beach, Fl. Responses due by 8/15/2018 (Fahey, Rachel) (Entered: 08/01/2018) |
| 08/02/2018 | 40 | RESPONSE in Opposition re 30 Defendant's MOTION for Extension of Time to Respond To Second Set Of Discovery Requests MOTION for Protective Order filed by Julie H. Hamilton, Robert W. Otto. Replies due by 8/9/2018. (Attachments: # 1 Exhibit A - City's Initial Disclosures)(Mihet, Horatio) (Entered: 08/02/2018) |
| 08/02/2018 | 41 | PAPERLESS ORDER granting 38 Defendant Palm Beach County's Motion for Permission to File DVDs. Signed by Judge Robin L. Rosenberg on 8/2/2018. (ege) (Entered: 08/02/2018) |
| 08/02/2018 | 46 | PAPERLESS Minute Entry for proceedings held before Judge Robin L. Rosenberg: Motion Hearing held on 8/2/2018 re 30 Defendant's MOTION for Extension of Time to Respond To Second Set Of Discovery Requests MOTION for Protective Order filed by City of Boca Raton, Florida, Discovery Hearing held on 8/2/2018. Total time in court: 1 hour(s) : 30 minutes. Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. (mg) (Entered: 08/03/2018) |
| 08/03/2018 | 42 | PAPERLESS ORDER memorializing status conference held on August 2, 2018. For the reasons stated on the record, all discovery, except for discovery already served, is stayed until after the hearing on 8 Plaintiffs' Motion for Preliminary Injunction. The parties shall respond to the discovery that has already been served, pursuant to the deadline the parties agree to in an amended proposed joint discovery plan. Accordingly, Defendant-City's 30 Motion for Extension of Time and for Protective Order is denied. The parties shall submit to the Court's e-mail address (rosenberg@flsd.uscourts.gov) in Word format an amended proposed joint discovery plan setting deadlines necessary for the completion of the discovery that was already served prior to the Preliminary Injunction hearing, as well any other deadlines that should be modified in light of the new hearing date. The Court hereby moves the Preliminary Injunction Hearing from October 5, 2018 to October 18 and 19, 2018. Following the Preliminary Injunction Hearing, the Court will hold a status conference for the parties to inform the Court of what additional discovery is needed and the deadline to complete the discovery, if said deadline differs from the discovery deadline set forth in the Court's Scheduling Order at docket entry 19. Signed by Judge Robin L. Rosenberg on 8/3/2018. (ege) (Entered: 08/03/2018) |
| 08/03/2018 | | Set/Reset Hearings Preliminary Injunction Hearing set for 10/18/2018 09:00 AM in West Palm Beach Division before Judge Robin L. Rosenberg. (ege) (Entered: 08/03/2018) |
| 08/03/2018 | 43 | NOTICE by County of Palm Beach, Fl re 38 Defendant's MOTION Motion For Permission to File DVDs *Notice of Filing Affidavit of Harrison Hollis* (Attachments: # 1 Affidavit Affidavit of Harrison Hollis, # 2 Exhibit Exhibit 1 - DVDs of 12-05-17 BCC Meeting, # 3 Exhibit Exhibit 2 - DVDs of 12-19-17 BCC Meeting) (Fahey, Rachel) (Entered: 08/03/2018) |
| 08/03/2018 | 44 | NOTICE by County of Palm Beach, Fl *Notice of Filing BCC Meeting Video Dated 12-05-17* (Fahey, Rachel) (Entered: 08/03/2018) |
| 08/03/2018 | 45 | NOTICE by County of Palm Beach, Fl *Notice of Filing BCC Meeting Video Dated 12-19-17* (Fahey, Rachel) (Entered: 08/03/2018) |
| 08/03/2018 | 47 | Notice of Filing Palm Beach County Board of County Commissioners' Meeting Video Dated December 19, 2017 by County of Palm Beach, Fl re 41 Paperless Order. (kpe) |

| | | |
|---|---|---|
| | | (Entered: 08/03/2018) |
| 08/06/2018 | 48 | PAPERLESS ORDER setting Discovery Hearing for 8/10/2018 at 02:00 PM in West Palm Beach Division before Magistrate Judge Bruce E. Reinhart. Counsel may appear by phone using the following conference call instructions: Dial 1-888-557-8511; Enter access code 4098267#; and Enter security code 1234#. Signed by Magistrate Judge Bruce E. Reinhart on 8/6/2018. (kry) (Entered: 08/06/2018) |
| 08/07/2018 | 49 | MEMORANDUM of Law *Regarding Discovery Dispute to be Heard at August 10, 2018 Hearing* by Julie H. Hamilton, Robert W. Otto. (Attachments: # 1 Exhibit A - Plaintiffs' Initial Communication Regarding ESI, # 2 Exhibit B - Plaintiffs' Correspondence with the City Defendant, # 3 Exhibit C - Plaintiffs' Correspondence with the County, # 4 Exhibit D - Additional Correspondence with the County)(Mihet, Horatio) (Entered: 08/07/2018) |
| 08/08/2018 | 50 | AMENDED DISCOVERY PLAN FOR PRELIMINARY INJUNCTION MOTION Signed by Judge Robin L. Rosenberg on 8/8/2018. *See attached document for full details.* (ail) (Entered: 08/08/2018) |
| 08/10/2018 | 51 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Bruce E. Reinhart: Telephone Conference held on 8/10/2018. Total time in court: 28 minutes. (Digital 14:02:04) (kry) (Entered: 08/10/2018) |
| 08/10/2018 | 52 | Joint MOTION for Extension of Time to Mediate *and to Select Mediator and to Schedule Mediation, Until After Preliminary Injunction Hearing* by Julie H. Hamilton, Robert W. Otto. (Mihet, Horatio) (Entered: 08/10/2018) |
| 08/14/2018 | 53 | Unopposed MOTION for Extension of Time to File Response/Reply/Answer *to Defendants' Motions to Dismiss*, Unopposed MOTION for Leave to File *One Consolidated Response to Defendants' Separate Motions to Dismiss* by Julie H. Hamilton, Robert W. Otto. (Mihet, Horatio) (Entered: 08/14/2018) |
| 08/14/2018 | 54 | PAPERLESS ORDER granting 53 Plaintiffs' Unopposed Motion for Leave to File Consolidated Response in Opposition to Defendants' Separate Motions to Dismiss and for a One-Week Extension of Time. Plaintiffs' consolidated response in opposition to 34 Defendant City of Boca Raton's Motion to Dismiss and 39 Defendant Palm Beach County's Motion to Dismiss is due by August 22, 2018. Signed by Judge Robin L. Rosenberg on 8/14/2018. (ege) (Entered: 08/14/2018) |
| 08/14/2018 | 55 | ORDER granting 52 Motion for Extension of Time to Mediate. Signed by Judge Robin L. Rosenberg on 8/13/2018. *See attached document for full details.* (ail) (Entered: 08/14/2018) |
| 08/22/2018 | 56 | Joint MOTION for Extension of Time to File Response/Reply/Answer *on Defendants' Motions to Dismiss -- One Day for Plaintiffs' Opposition and Seven Business Days for Defendants' Reply* by Julie H. Hamilton, Robert W. Otto. (Mihet, Horatio) (Entered: 08/22/2018) |
| 08/22/2018 | 57 | MOTION for Leave to File *Amicus Brief and Supporting Memorandum of Law* by The Trevor Project. Attorney Douglas C Dreier added to party The Trevor Project(pty:mov). (Dreier, Douglas) (Entered: 08/22/2018) |
| 08/22/2018 | 58 | Corporate Disclosure Statement by The Trevor Project (Dreier, Douglas) (Entered: 08/22/2018) |
| 08/22/2018 | 59 | PAPERLESS ORDER granting 56 Motion for Extension of Time to File Response and Reply to Defendants' 34 39 Motions to Dismiss. Responses are now due by 8/23/2018, |

| | | |
|---|---|---|
| | | and the replies are due by 9/10/2018. Signed by Judge Robin L. Rosenberg on 8/22/2018. (ege) (Entered: 08/22/2018) |
| 08/22/2018 | 60 | PAPERLESS ORDER expediting briefing on 57 Trevor Project's Motion for leave to file amicus brief. Plaintiffs and Defendants shall file their responses to the motion by August 28, 2018. Signed by Judge Robin L. Rosenberg on 8/22/2018. (ege) (Entered: 08/22/2018) |
| 08/23/2018 | 61 | PAPERLESS ORDER setting Discovery Hearing for 8/28/2018 at 02:30 PM in West Palm Beach Division before Magistrate Judge Bruce E. Reinhart. Counsel shall file a joint discovery memorandum of five pages or less specifying the substance of the matter to be heard by 8/27/18 at 12:00 PM. Signed by Magistrate Judge Bruce E. Reinhart on 8/23/2018. (kry) (Entered: 08/23/2018) |
| 08/23/2018 | 62 | RESPONSE in Opposition re 34 Defendant's MOTION TO DISMISS 1 Complaint,, FOR FAILURE TO STATE A CLAIM *Defendant, City Of Boca Raton's Motion To Dismiss And Incorporated Memorandum Of Law*, 39 MOTION TO DISMISS 37 Notice (Other), 35 Notice (Other), 36 Notice (Other), 1 Complaint,, FOR FAILURE TO STATE A CLAIM filed by Julie H. Hamilton, Robert W. Otto. Replies due by 8/30/2018. (Mihet, Horatio) (Entered: 08/23/2018) |
| 08/27/2018 | 63 | MEMORANDUM of Law re 61 Order,, Set/Reset Hearings, *Joint Discovery Memorandum* by Julie H. Hamilton, Robert W. Otto. (Attachments: # 1 Exhibit A - Hamilton Discovery Responses, # 2 Exhibit B - Otto Discovery Responses, # 3 Exhibit C - Florida Attorney General Opinion)(Gannam, Roger) (Entered: 08/27/2018) |
| 08/27/2018 | 64 | NOTICE by Julie H. Hamilton, Robert W. Otto re 63 Memorandum, *Plaintiffs' Errata for Joint Discovery Memorandum for August 28, 2018 Discovery Hearing* (Attachments: # 1 Exhibit A - Corrected Joint Discovery Memorandum) (Gannam, Roger) (Entered: 08/27/2018) |
| 08/27/2018 | 65 | RESPONSE to Motion re 57 MOTION for Leave to File *Amicus Brief and Supporting Memorandum of Law Defendant, City Of Boca Raton's Response To The Trevor Projection's Motion For Leave To File Amicus Brief* filed by City of Boca Raton, Florida. Replies due by 9/4/2018. (Abbott, Daniel) (Entered: 08/27/2018) |
| 08/27/2018 | 66 | RESPONSE to Motion re 57 MOTION for Leave to File *Amicus Brief and Supporting Memorandum of Law* filed by County of Palm Beach, Fl. Replies due by 9/4/2018. (Fahey, Rachel) (Entered: 08/27/2018) |
| 08/28/2018 | 67 | PAPERLESS ORDER permitting counsel for Defendant City of Boca Raton to appear telephonically at the discovery hearing set for 8/28/18 at 2:30PM. Counsel may appear by phone using the following conference call instructions: Dial 1-888-557-8511; Enter access code 4098267#; and Enter security code 1234# Signed by Magistrate Judge Bruce E. Reinhart on 8/28/2018. (kry) (Entered: 08/28/2018) |
| 08/28/2018 | 68 | MOTION for Leave to Appear *Amicus by Equality Florida Institute, Inc.*. Attorney/Representative: *Jennifer Yasko* by Equality Florida Institute, Inc.. Attorney Jennifer A. Yasko added to party Equality Florida Institute, Inc.(pty:mov) Responses due by 9/11/2018 (Yasko, Jennifer) (Entered: 08/28/2018) |
| 08/28/2018 | 69 | ORDER Memorializing Court Rulings at Discovery Hearing and Setting Deadline. Signed by Magistrate Judge Bruce E. Reinhart on 8/28/2018. *See attached document for full details.* (kry) (Entered: 08/28/2018) |
| 08/28/2018 | 70 | RESPONSE in Opposition re 57 MOTION for Leave to File *Amicus Brief and Supporting Memorandum of Law* filed by Julie H. Hamilton, Robert W. Otto. Replies due |

| | | |
|---|---|---|
| | | by 9/4/2018. (Attachments: # 1 Exhibit A - City of Boca Raton's Initial Disclosures) (Gannam, Roger) (Entered: 08/28/2018) |
| 08/29/2018 | 71 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Bruce E. Reinhart: Discovery Hearing held on 8/28/2018. Total time in court: 1 hour(s):3 minutes. (Digital 14:36:23) (kry) (Entered: 08/29/2018) |
| 08/30/2018 | 72 | REPLY to Response to Motion re 57 MOTION for Leave to File *Amicus Brief and Supporting Memorandum of Law* filed by The Trevor Project. (Dreier, Douglas) (Entered: 08/30/2018) |
| 09/04/2018 | 73 | PAPERLESS ORDER granting in part and denying in part [DE 57] The Trevor Project's and [DE 68] Equality Florida's Motions for Leave to File Amicus Briefs. The Court has "inherent authority" to grant such motions when the Court finds that motions may be able to present the Court with additional research and information. See In re Bayshore Food Trucks Sales, Inc., 471 F.3d 1233, 1249, n.34 (11th Cir. 2006). It is "solely within the discretion of the court to determine the fact, extent, and manner of participation of the amicus." Resort Timeshare Resales, Inc. v. Stuart, 764 F. Supp. 1495, 1501 (S.D. Fla. 1991). The Court grants permission to The Trevor Project and Equality Florida to file amicus briefs in support of Defendants' Opposition to Plaintiffs' Motion for Preliminary Injunction. The Trevor Project and Equality Florida must file their briefs by September 18, 2018 to be considered at the Preliminary Injunction hearing. The Trevor Project and Equality Florida are limited to twenty pages in their briefs, per Local Rule 7.1(c)(2). Signed by Judge Robin L. Rosenberg on 9/4/2018. (kbs) (Entered: 09/04/2018) |
| 09/05/2018 | 74 | PAPERLESS ORDER Setting Discovery Hearing for 9/12/2018 at 10:00 AM in West Palm Beach Division before Magistrate Judge Bruce E. Reinhart. By 9/7/18 at 12:00PM, counsel shall file a joint discovery memorandum specifying the substance of the matter to be heard. Counsel may appear by phone using the following conference call instructions: Dial 1-888-557-8511; Enter access code 4098267#; and Enter security code 1234# Signed by Magistrate Judge Bruce E. Reinhart on 9/5/2018. (kry) (Entered: 09/05/2018) |
| 09/07/2018 | 75 | MEMORANDUM of Law re 74 Order,, Order Setting Status Conference,, Set/Reset Hearings, *Joint Discovery Memorandum* by Julie H. Hamilton, Robert W. Otto. (Attachments: # 1 Exhibit A - Plaintiffs Deposition Notice, # 2 Exhibit B - City Responses to Second Interrogatories, # 3 Exhibit C - City Responses to Second Production Requests, # 4 Exhibit D - County Responses to Second Requests, # 5 Exhibit E - Defendants' Objections to Deposition Notice, # 6 Exhibit F - City Search Terms, # 7 Exhibit G - County Search Terms)(Gannam, Roger) (Entered: 09/07/2018) |
| 09/07/2018 | 76 | Corporate Disclosure Statement by Equality Florida Institute, Inc. (Yasko, Jennifer) (Entered: 09/07/2018) |
| 09/10/2018 | 77 | NOTICE by County of Palm Beach, Fl *of Filing Deposition Transcripts of Julie Hamilton, Ph.D., LMFT* (Attachments: # 1 Exhibit Exhibit A, # 2 Exhibit Exhibit B) (Fahey, Rachel) (Entered: 09/10/2018) |
| 09/10/2018 | 78 | NOTICE by County of Palm Beach, Fl *of Filing Julie Hamilton, Ph.D., LMFT's Objections and Responses to Palm Beach County's Preliminary Injunction Interrogatories and Requests for Admissions* (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Fahey, Rachel) (Entered: 09/10/2018) |
| 09/10/2018 | 79 | NOTICE by County of Palm Beach, Fl *of Filing Robert W. Otto, Ph.D., LMFT's Objections and Responses to Palm Beach County's Preliminary Injunction Interrogatories and Requests for Admissions* (Attachments: # 1 Exhibit A, # 2 Exhibit B) (Fahey, Rachel) (Entered: 09/10/2018) |

| | | |
|---|---|---|
| 09/10/2018 | 80 | NOTICE by County of Palm Beach, Fl *of Filing Deposition Exhibits of Julie H. Hamilton, Ph.D., LMFT* (Attachments: # 1 Exhibit 7, # 2 Exhibit 8, # 3 Exhibit 9, # 4 Exhibit 10, # 5 Exhibit 11, # 6 Exhibit 12, # 7 Exhibit 13, # 8 Exhibit 14, # 9 Exhibit 15, # 10 Exhibit 16, # 11 Exhibit 17, # 12 Exhibit 18, # 13 Exhibit 19, # 14 Exhibit 20) (Fahey, Rachel) (Entered: 09/10/2018) |
| 09/10/2018 | 81 | NOTICE by County of Palm Beach, Fl *of Filing Deposition Transcript of Robert W. Otto, Ph.D., LMFT* (Attachments: # 1 Deposition, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6) (Fahey, Rachel) (Entered: 09/10/2018) |
| 09/10/2018 | 82 | REPLY to Response to Motion re 39 MOTION TO DISMISS 37 Notice (Other), 35 Notice (Other), 36 Notice (Other), 1 Complaint,, FOR FAILURE TO STATE A CLAIM filed by County of Palm Beach, Fl. (Fahey, Rachel) (Entered: 09/10/2018) |
| 09/10/2018 | 83 | RESPONSE in Opposition re 8 Renewed MOTION for Preliminary Injunction *(with Certificate of Service indicating successful service of Complaint and PI Motion)* filed by City of Boca Raton, Florida. Replies due by 9/17/2018. (Flanigan, Anne) (Entered: 09/10/2018) |
| 09/10/2018 | 84 | REPLY to Response to Motion re 34 Defendant's MOTION TO DISMISS 1 Complaint,, FOR FAILURE TO STATE A CLAIM *Defendant, City Of Boca Raton's Motion To Dismiss And Incorporated Memorandum Of Law* filed by City of Boca Raton, Florida. (Flanigan, Anne) (Entered: 09/10/2018) |
| 09/10/2018 | 85 | RESPONSE in Opposition re 8 Renewed MOTION for Preliminary Injunction *(with Certificate of Service indicating successful service of Complaint and PI Motion)* filed by County of Palm Beach, Fl. Replies due by 9/17/2018. (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit B)(Fahey, Rachel) (Entered: 09/10/2018) |
| 09/11/2018 | 86 | NOTICE by County of Palm Beach, Fl *of Filing Corrected Exhibit 13 to the Declaration of Helene Hvizd (DE 85-14)* (Attachments: # 1 Exhibit 13) (Fahey, Rachel) (Entered: 09/11/2018) |
| 09/12/2018 | 87 | PAPERLESS Minute Entry for proceedings held before Magistrate Judge Bruce E. Reinhart: Discovery Hearing held on 9/12/2018. Total time in court: 1 hour: 12 minutes. (Digital 9:58:45) (kry) (Entered: 09/12/2018) |
| 09/15/2018 | 88 | OBJECTION of Magistrate Judge 87 Discovery Hearing to District Court *AND REQUEST FOR EXPEDITED CONSIDERATION* (Attachments: # 1 Transcripts Exhibit A)(Gannam, Roger) (Entered: 09/15/2018) |
| 09/18/2018 | 89 | ORDER overruling 88 Objection of Magistrate Judge Order to District Court. Signed by Judge Robin L. Rosenberg on 9/17/2018. *See attached document for full details.* (ail) (Entered: 09/18/2018) |
| 09/18/2018 | 90 | RESPONSE in Opposition re 8 Renewed MOTION for Preliminary Injunction *(with Certificate of Service indicating successful service of Complaint and PI Motion)* by Amicus Curiae filed by The Trevor Project. Replies due by 9/25/2018. (Dreier, Douglas) (Entered: 09/18/2018) |
| 09/18/2018 | 91 | RESPONSE in Opposition re 8 Renewed MOTION for Preliminary Injunction *(with Certificate of Service indicating successful service of Complaint and PI Motion)* filed by Equality Florida Institute, Inc.. Replies due by 9/25/2018. (Yasko, Jennifer) (Entered: 09/18/2018) |
| 10/08/2018 | 92 | MOTION for Extension of Time to File Response/Reply/Answer as to 8 Renewed |

| | | |
|---|---|---|
| | | MOTION for Preliminary Injunction *(with Certificate of Service indicating successful service of Complaint and PI Motion)*, 85 Response in Opposition to Motion,, 83 Response in Opposition to Motion, 90 Response in Opposition to Motion, 91 Response in Opposition to Motion, *AND REQUEST FOR EXPEDITED CONSIDERATION* by Julie H. Hamilton, Robert W. Otto. (Gannam, Roger) (Entered: 10/08/2018) |
| 10/09/2018 | 93 | PAPERLESS ORDER granting 92 Motion for Extension of Time to File Response/Reply to Motion. Replies due by 10/9/2018. Signed by Judge Robin L. Rosenberg on 10/9/2018. (kbs) (Entered: 10/09/2018) |
| 10/10/2018 | 94 | MOTION for Leave to File Excess Pages *FOR CONSOLIDATED REPLY IN SUPPORT OF PRELIMINARY INJUNCTION* by Julie H. Hamilton, Robert W. Otto. (Gannam, Roger) (Entered: 10/10/2018) |
| 10/10/2018 | 95 | REPLY to Response to Motion re 8 Renewed MOTION for Preliminary Injunction *(with Certificate of Service indicating successful service of Complaint and PI Motion)* filed by Julie H. Hamilton, Robert W. Otto. (Gannam, Roger) (Entered: 10/10/2018) |
| 10/10/2018 | 96 | NOTICE of Filing Discovery: Declaration and Deposition Transcripts by Julie H. Hamilton, Robert W. Otto. (Attachments: # 1 Affidavit Declaration of Plaintiff Julie H. Hamilton, Ph.D., LMFT, # 2 Deposition Helene C. Hvizd, Esq., as Rule 30(b)(6) Representative of Defendant Palm Beach County, Sep. 20, 2018, # 3 Deposition Dr. Shayna Ginsburg, as Rule 30(b)(6) Representative of Defendant Palm Beach County, Sep. 20, 2018, # 4 Deposition Michael Woika, as Rule 30(b)(6) Representative of Defendant City of Boca Raton, Sep. 21, 2018)(Gannam, Roger) (Entered: 10/10/2018) |
| 10/10/2018 | 97 | NOTICE of Filing Discovery: Deposition Exhibits by Julie H. Hamilton, Robert W. Otto. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28)(Gannam, Roger) (Entered: 10/10/2018) |
| 10/10/2018 | 98 | PAPERLESS ORDER granting 94 Motion for Leave to File Excess Pages. Signed by Judge Robin L. Rosenberg on 10/10/2018. (kbs) (Entered: 10/10/2018) |
| 10/11/2018 | 99 | NOTICE by Julie H. Hamilton, Robert W. Otto *Regarding Nature of Preliminary Injunction Hearing (No Live Evidence); AND Consent Motion for One Business Day Extension of Time for Parties to Provide Pre-Hearing Submissions; AND Plaintiffs' Request to Reduce Hearing Time to One Day and Commence Hearing on Friday, October 19, 2018* (Mihet, Horatio) (Entered: 10/11/2018) |
| 10/11/2018 | 100 | PAPERLESS ORDER granting in part and denying in part the 99 Motion regarding the upcoming Preliminary Injunction Hearing. First, in light of the parties' representation that no live testimony will be presented at the Preliminary Injunction Hearing, the parties are not required to file a Hearing Plan. Second, the parties are granted an extension to file their Exhibit Lists, which shall be filed by Monday, October 15 at 5:00 pm. Third, the deadline for Proposed Findings of Facts and Conclusions of Law is also extended. The parties shall simultaneously file Proposed Findings of Fact and Conclusions of Law at 5:00 pm. The proposed Findings of Fact and Conclusions of Law shall also be emailed to the chambers email (Rosenberg@flsd.uscourts.gov) in Word format. Fourth, the Plaintiffs' request to delay the Hearing is denied. The Hearing shall commence on Thursday, October 18, 2018 at 9:00 am. Signed by Judge Robin L. Rosenberg on 10/11/2018. (kbs) (Entered: 10/11/2018) |
| 10/11/2018 | 101 | PAPERLESS ORDER clarifying the Court's Order at DE 100. Proposed Findings of Fact |

| | | |
|---|---|---|
| | | and Conclusions of Law shall be filed simultaneously at 5:00 pm on Monday, October 15, 2018. The proposed Findings of Fact and Conclusions of Law shall also be emailed to the chambers email (Rosenberg@flsd.uscourts.gov) in Word format. Signed by Judge Robin L. Rosenberg on 10/11/2018. (kbs) (Entered: 10/11/2018) |
| 10/12/2018 | 102 | Defendant's MOTION to Bring Electronic Equipment into the courtroom *for Use at Preliminary Injunction Hearing* by County of Palm Beach, Fl. Responses due by 10/26/2018 (Attachments: # 1 Text of Proposed Order)(Fahey, Rachel) (Entered: 10/12/2018) |
| 10/15/2018 | 103 | ORDER GRANTING DEFENDANT PALM BEACH COUNTYS MOTION TO ALLOW ELECTRONIC EQUIPMENT IN COURTROOM FOR USE AT PRELIMINARY INJUNCTION HEARING; granting 102 Motion to Bring Electronic Equipment into the courtroom. Signed by Judge Robin L. Rosenberg on 10/12/2018. *See attached document for full details.* (ail) (Entered: 10/15/2018) |
| 10/15/2018 | 104 | Exhibit and Witness List by City of Boca Raton, Florida.. (Flanigan, Anne) (Entered: 10/15/2018) |
| 10/15/2018 | 105 | Exhibit and Witness List by Julie H. Hamilton, Robert W. Otto.. (Gannam, Roger) (Entered: 10/15/2018) |
| 10/15/2018 | 106 | Exhibit and Witness List by County of Palm Beach, Fl.. (Fahey, Rachel) (Entered: 10/15/2018) |
| 10/15/2018 | 107 | MOTION to Bring Electronic Equipment into the courtroom *at October 18, 2018 Preliminary Injunction Hearing* by Julie H. Hamilton, Robert W. Otto. Responses due by 10/29/2018 (Attachments: # 1 Text of Proposed Order)(Mihet, Horatio) (Entered: 10/15/2018) |
| 10/15/2018 | 108 | Defendant's MOTION to Bring Electronic Equipment into the courtroom by City of Boca Raton, Florida. Responses due by 10/29/2018 (Attachments: # 1 Text of Proposed Order Proposed Order)(Flanigan, Anne) (Entered: 10/15/2018) |
| 10/15/2018 | 109 | NOTICE by County of Palm Beach, Fl re 8 Renewed MOTION for Preliminary Injunction *(with Certificate of Service indicating successful service of Complaint and PI Motion) proposed findings of fact and conclusions of law* (Fahey, Rachel) (Entered: 10/15/2018) |
| 10/15/2018 | 110 | MOTION for Leave to File Excess Pages *for Plaintiffs' Proposed Findings of Fact and Conclusions of Law on Plaintiffs' Motion for Preliminary Injunction* by Julie H. Hamilton, Robert W. Otto. (Gannam, Roger) (Entered: 10/15/2018) |
| 10/15/2018 | 111 | Proposed Findings of Fact and Proposed Conclusions of Law *on Plaintiffs' Motion for Preliminary Injunction* by Julie H. Hamilton, Robert W. Otto. (Gannam, Roger) (Entered: 10/15/2018) |
| 10/15/2018 | 112 | Proposed Findings of Fact and Proposed Conclusions of Law by City of Boca Raton, Florida. (Flanigan, Anne) (Entered: 10/15/2018) |
| 10/15/2018 | 113 | PAPERLESS ORDER granting 110 Motion for Leave to File Excess Pages. The Court accepts the document as filed at DE 111. Signed by Judge Robin L. Rosenberg on 10/15/2018. (kbs) (Entered: 10/15/2018) |
| 10/15/2018 | 114 | NOTICE of Attorney Appearance by Max Richard Price, Jr on behalf of Alliance for Therapeutic Choice. Attorney Max Richard Price, Jr added to party Alliance for Therapeutic Choice(pty:am). (Price, Max) (Entered: 10/15/2018) |
| 10/15/2018 | 115 | MOTION for Leave to File *Amicus Brief* by Alliance for Therapeutic Choice. |

| | | |
|---|---|---|
| | | (Attachments: # 1 Exhibit A)(Price, Max) (Entered: 10/15/2018) |
| 10/16/2018 | 116 | PAPERLESS ORDER granting Alliance for Therapeutic Choice's Motion for Leave to File Amicus Brief 115 . The Court has "inherent authority" to grant such motions when the Court finds that amici may be able to present the Court with additional research and information. See In re Bayshore Food Trucks Sales, Inc., 471 F.3d 1233, 1249, n.34 (11th Cir. 2006). It is "solely within the discretion of the court to determine the fact, extent, and manner of participation of the amicus." Resort Timeshare Resales, Inc. v. Stuart, 764 F. Supp. 1495, 1501 (S.D. Fla. 1991). The Court grants permission to the Alliance for Therapeutic Choice to file its brief in support of Plaintiffs' Motion for Preliminary Injunction. The Court notes that other amicus briefs in this case had been due by September 18, 2018, DE 73. However, because the Alliance for Therapeutic Choice will be the first amicus to appear in support of the Plaintiffs' Motion for Preliminary Injunction, the Court finds it appropriate to permit this filing at this time. The Court also notes that the Brief filed conditionally with the Alliance's Motion at DE 115-1 is twenty-two pages. The other amicus briefs in this case were limited to twenty pages, DE 90, DE 91. However, because there are two amicus briefs filed in opposition to Plaintiffs' Motion for Preliminary Injunction, the Court finds it appropriate to permit this slight extension of the Alliance's brief. Accordingly, the Alliance's Motion 115 is granted, and the Court accepts the Amicus Brief as submitted at DE 115-1. Signed by Judge Robin L. Rosenberg on 10/16/2018. (kbs) (Entered: 10/16/2018) |
| 10/16/2018 | 117 | NOTICE by Julie H. Hamilton, Robert W. Otto *OF COURTS POTENTIALLY DISQUALIFYING RELATIONSHIP WITH INTERESTED NON-PARTY WITNESS* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D) (Gannam, Roger) (Entered: 10/16/2018) |
| 10/16/2018 | 118 | ORDER granting 107 Motion to Bring Electronic Equipment into the courtroom. Signed by Judge Robin L. Rosenberg on 10/15/2018. *See attached document for full details.* (ail) (Entered: 10/16/2018) |
| 10/16/2018 | 119 | ORDER granting 108 Motion to Bring Electronic Equipment into the courtroom. Signed by Judge Robin L. Rosenberg on 10/15/2018. *See attached document for full details.* (ail) (Entered: 10/16/2018) |
| 10/19/2018 | 120 | TRANSCRIPT of Excerpt of Hearing Proceedings held on 9/12/2018 before Magistrate Judge Bruce E. Reinhart, 1-14 pages, Court Reporter: Bonnie Joy Lewis, 954-985-8875. Transcript may be viewed at the court public terminal or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/9/2018. Redacted Transcript Deadline set for 11/19/2018. Release of Transcript Restriction set for 1/17/2019. (apz) (Entered: 10/22/2018) |
| 10/23/2018 | 121 | HEARING EXHIBITS 1-45 by County of Palm Beach, Fl. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45)(Fahey, Rachel) (Entered: 10/23/2018) |
| 10/23/2018 | 122 | CERTIFICATE of Compliance Re Admitted Evidence for exhibit(s): 1-45 by Rachel Marie Fahey on behalf of County of Palm Beach, Fl (Fahey, Rachel) (Entered: |

| | | |
|---|---|---|
| | | 10/23/2018) |
| 10/23/2018 | 123 | PAPERLESS ORDER memorializing deadlines set at the Hearing on the Plaintiff's Motion for Preliminary Injunction held on October 18, 2018. Pursuant to the parties' agreement at the Hearing, the parties are ordered to simultaneously file Final Proposed Findings of Fact and Conclusions of Law at 5:00 pm on November 9, 2018. The Final Proposed Findings of Fact and Conclusions of Law shall also be emailed to the chambers email (Rosenberg@flsd.uscourts.gov) in Word format. The Court acknowledges that no formal page limit has been set for these filings. However, the parties are strongly encouraged to be as judicious as possible and to focus their attention on the most significant facts and legal arguments. Signed by Judge Robin L. Rosenberg on 10/23/2018. (kbs) (Entered: 10/23/2018) |
| 10/24/2018 | 124 | NOTICE of Filing Discovery: Errata by Julie H. Hamilton, Robert W. Otto. (Attachments: # 1 Errata Otto (transcript at DE 121-7), # 2 Errata Hamilton (transcript at DE 121-8))(Gannam, Roger) (Entered: 10/24/2018) |
| 10/24/2018 | 125 | PAPERLESS ORDER supplementing the Court's Order at DE 123. In addition to the stated requirements in DE 123, the Court orders that citations to the record in the parties' Final Proposed Findings of Fact and Conclusions of Law shall follow the exhibit numbering and pagination imposed by the CMECF system. In addition, the parties shall parenthetically provide a brief title that explains what the document is in a few words. To illustrate, a citation to Dr. Otto's deposition would be formatted as follows: DE 121-7 (Dr. Otto Deposition), p. 15, lines 16-23. This format will aid the Court in avoiding any confusion about what record is being referenced. For all citations, whether to the record or case law, the parties are strongly encouraged to use as specific a pin cite as possible, referring to specific paragraphs or lines of a document when appropriate. Signed by Judge Robin L. Rosenberg on 10/24/2018. (kbs) (Entered: 10/24/2018) |
| 10/24/2018 | 126 | HEARING EXHIBITS 1-41 by Julie H. Hamilton, Robert W. Otto. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41)(Gannam, Roger) (Entered: 10/24/2018) |
| 10/24/2018 | 127 | CERTIFICATE of Compliance Re Admitted Evidence for exhibit(s): 1-41 by Roger K. Gannam on behalf of Julie H. Hamilton, Robert W. Otto (Gannam, Roger) (Entered: 10/24/2018) |
| 10/26/2018 | 128 | NOTICE by City of Boca Raton, Florida re 104 Exhibit and Witness List *Certificate of Compliance Re Admitted Evidence* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 21, # 19 Exhibit 22, # 20 Exhibit 23, # 21 Exhibit 24, # 22 Exhibit 25, # 23 Exhibit 26, # 24 Exhibit 27, # 25 Exhibit 28, # 26 Exhibit 29, # 27 Exhibit 30, # 28 Exhibit 31, # 29 Exhibit 32) (Flanigan, Anne) (Entered: 10/26/2018) |
| 11/02/2018 | 129 | TRANSCRIPT of Preliminary Injunction Hearing held on 10.18.2018 before Judge Robin L. Rosenberg, 1-254 pages, Court Reporter: Pauline Stipes, 561-803-3434 / Pauline_Stipes@flsd.uscourts.gov. Transcript may be viewed at the court public terminal |

| | | |
|---|---|---|
| | | or purchased by contacting the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 11/23/2018. Redacted Transcript Deadline set for 12/3/2018. Release of Transcript Restriction set for 1/31/2019. (ps) (Entered: 11/02/2018) |
| 11/08/2018 | [130](#) | MOTION for Extension of Time TO FILE FINAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PLAINTIFFS PRELIMINARY INJUNCTION MOTION *AND REQUEST FOR EXPEDITED CONSIDERATION* re 123 Order,,,, Set/Reset Deadlines,,, by Julie H. Hamilton, Robert W. Otto. Responses due by 11/23/2018 (Gannam, Roger) (Entered: 11/08/2018) |
| 11/08/2018 | 131 | PAPERLESS ORDER granting [130](#) Motion for Extension of Time. The parties are ordered to simultaneously file Final Proposed Findings of Fact and Conclusions of Law at 5:00 pm on Tuesday, November 13, 2018. The Final Proposed Findings of Fact and Conclusions of Law shall also be emailed to the chambers email (Rosenberg@flsd.uscourts.gov) in Word format. See docket entries 123 and 125 for additional requirements. Signed by Judge Robin L. Rosenberg on 11/8/2018. (kbs) (Entered: 11/08/2018) |
| 11/13/2018 | [132](#) | Proposed Findings of Fact and Proposed Conclusions of Law *Plfs' Renewed M-Preliminary Injunction {DE 8}* by County of Palm Beach, Fl. (Fahey, Rachel) (Entered: 11/13/2018) |
| 11/13/2018 | [133](#) | Proposed Findings of Fact and Proposed Conclusions of Law *On Plaintiff's Motion For Preliminary Injunction As To Defendant, City Of Boca Raton, Florida.* by City of Boca Raton, Florida. (Abbott, Daniel) (Entered: 11/13/2018) |
| 11/13/2018 | [134](#) | Proposed Findings of Fact and Proposed Conclusions of Law by Julie H. Hamilton, Robert W. Otto. (Gannam, Roger) (Entered: 11/13/2018) |
| 12/03/2018 | 135 | PAPERLESS ORDER. The Court has received an email communication from Plaintiffs with questions regarding the status of the stay on discovery in this case. In regards to the plaintiffs' questions, all pretrial deadlines in this case are hereby STAYED until the Court issues its Order on the Motion for Preliminary Injunction. Once the Court's Order is issued, the Court will reinstate pretrial deadlines as appropriate, in consultation with the parties. Furthermore, the Court advises the parties that to the extent they seek any relief from the Court moving forward, a motion should be filed on the docket, pursuant to the Local Rules and the instructions to civil litigants found on the Court's website (http://www.flsd.uscourts.gov/content/judge-robin-l-rosenberg), which the parties were directed to in the Court's Trial Order at DE 11, page 16. Signed by Judge Robin L. Rosenberg on 12/3/2018. (kbs) (Entered: 12/03/2018) |
| 01/04/2019 | 136 | PAPERLESS ORDER cancelling [20](#) Discovery Status previously set for 1/10/2019 at 2:30PM in light of the District Court's Order staying all pretrial deadlines and discovery at docket entry 135. Signed by Magistrate Judge Bruce E. Reinhart on 1/4/2019. (kry) Text on 1/7/2019 per DE 137 Order (ail). (Entered: 01/04/2019) |
| 01/04/2019 | 137 | PAPERLESS ORDER amending 136 to clarify that the cancelled Discovery Status Conference had previously been set for 1/10/2019. The Court will enter a separate order scheduling a final discovery status conference when the stay is lifted. Signed by Magistrate Judge Bruce E. Reinhart on 1/4/2019. (kry) (Entered: 01/04/2019) |
| 01/30/2019 | [138](#) | Notice of Supplemental Authority re [8](#) Renewed MOTION for Preliminary Injunction *(with Certificate of Service indicating successful service of Complaint and PI Motion)* by Julie H. Hamilton, Robert W. Otto (Attachments: # [1](#) Exhibit A - Tampa MTD Order, # [2](#) Exhibit B - Tampa PI Order) (Mihet, Horatio) (Entered: 01/30/2019) |
| | | |

| | | |
|---|---|---|
| 02/12/2019 | 139 | Unopposed MOTION for Leave to File *Unopposed Motion For Leave To File Response To Plaintiffs' Notice Of Supplemental Authority In Support Of Preliminary Injunction* by City of Boca Raton, Florida. (Attachments: # 1 Exhibit A - Response to Plaintiffs' Notice of Supplemental Authority)(Abbott, Daniel) (Entered: 02/12/2019) |
| 02/13/2019 | 140 | RESPONSE to Motion re 139 Unopposed MOTION for Leave to File *Unopposed Motion For Leave To File Response To Plaintiffs' Notice Of Supplemental Authority In Support Of Preliminary Injunction* filed by Julie H. Hamilton, Robert W. Otto. Replies due by 2/20/2019. (Attachments: # 1 Exhibit A. Tampa ordinance, # 2 Exhibit B. Tampa complaint)(Gannam, Roger) (Entered: 02/13/2019) |
| 02/13/2019 | 141 | ORDER denying 8 Renewed Motion for Preliminary Injunction. The Court will set a status conference in this case in a separate order. Signed by Judge Robin L. Rosenberg on 2/13/2019. *See attached document for full details.* (wc) (Entered: 02/13/2019) |
| 02/13/2019 | 142 | Notice of Interlocutory Appeal as to 141 Order on Motion for Preliminary Injunction by Julie H. Hamilton, Robert W. Otto. Filing fee $ 505.00 receipt number 113C-11393749. Within fourteen days of the filing date of a Notice of Appeal, the appellant must complete the Eleventh Circuit Transcript Order Form regardless of whether transcripts are being ordered [Pursuant to FRAP 10(b)]. For information go to our FLSD website under Transcript Information. (Gannam, Roger) (Entered: 02/13/2019) |
| 02/14/2019 | | Transmission of Notice of Appeal, Order under appeal and Docket Sheet to US Court of Appeals re 142 Notice of Interlocutory Appeal, Notice has been electronically mailed. (apz) (Entered: 02/14/2019) |
| 02/14/2019 | 143 | PAPERLESS ORDER Setting Status Conference. Status Conference set for 2/19/2019 01:30 PM in West Palm Beach Division before Judge Robin L. Rosenberg. The parties may appear telephonically. Call-in instructions: (1) Please call five (5) minutes prior to the Status Conference. (2) The toll-free number is: 1 (877) 873-8018. (3) The access code is: 9890482. (4) The security code is: 4008. Signed by Judge Robin L. Rosenberg on 2/14/2019. (kbs) (Entered: 02/14/2019) |
| 02/19/2019 | 144 | PAPERLESS ORDER. In advance of today's status conference, the parties should be prepared to address their respective positions on staying this case pending the appeal of the Court's Preliminary Injunction Order at DE 141. Prior to the status conference, the parties are ordered to meet and confer regarding their positions on this issue. To the extent the parties do not agree that the case should be stayed pending appeal, they must appear at the status conference with the legal grounds supporting their position, including any relevant rules and case law. Signed by Judge Robin L. Rosenberg on 2/19/2019. (kbs) (Entered: 02/19/2019) |
| 02/19/2019 | 145 | ORDER STAYING CASE. The parties joint ore tenus Motion to Stay is GRANTED. This case is STAYED. The Clerk of the Court shall CLOSE THIS CASE for statistical purposes. All pending motions and deadlines are TERMINATED. All hearings are CANCELLED. Motions terminated: 34 Defendant's MOTION TO DISMISS 1 Complaint,, FOR FAILURE TO STATE A CLAIM *Defendant, City Of Boca Raton's Motion To Dismiss And Incorporated Memorandum Of Law* filed by City of Boca Raton, Florida, 39 MOTION TO DISMISS 37 Notice (Other), 35 Notice (Other), 36 Notice (Other), 1 Complaint,, FOR FAILURE TO STATE A CLAIM filed by County of Palm Beach, Fl, 139 Unopposed MOTION for Leave to File *Unopposed Motion For Leave To File Response To Plaintiffs' Notice Of Supplemental Authority In Support Of Preliminary Injunction* filed by City of Boca Raton, Florida. Signed by Judge Robin L. Rosenberg on 2/19/2019. *See attached document for full details.* (amb) (Entered: 02/20/2019) |
| 02/21/2019 | 146 | Acknowledgment of Receipt of NOA from USCA re 142 Notice of Interlocutory Appeal, |

| | | filed by Julie H. Hamilton, Robert W. Otto. Date received by USCA: 2/14/2019. USCA Case Number: 19-10604-A. (apz) (Entered: 02/22/2019) |
|---|---|---|
| 02/22/2019 | 147 | TRANSCRIPT INFORMATION FORM by Julie H. Hamilton, Robert W. Otto re 142 Notice of Interlocutory Appeal,. No Transcript Requested. (Mihet, Horatio) (Entered: 02/22/2019) |
| 04/12/2019 | 148 | Pursuant to F.R.A.P. 11(c), the Clerk of the District Court for the Southern District of Florida certifies that the record is complete for purposes of this appeal re: 142 Notice of Interlocutory Appeal, Appeal No. 19-10604-AA. The entire record on appeal is available electronically. (hh) (Entered: 04/12/2019) |

| PACER Service Center | | | |
|---|---|---|---|
| **Transaction Receipt** | | | |
| 04/15/2019 15:02:14 | | | |
| **PACER Login:** | rgannam240450:4722907:4722632 | **Client Code:** | 17-11 |
| **Description:** | Docket Report | **Search Criteria:** | 9:18-cv-80771-RLR |
| **Billable Pages:** | 17 | **Cost:** | 1.70 |

1

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| ROBERT W. OTTO, PH.D. LMFT, | ) | |
| individually and on behalf of his patients, | ) | |
| JULIE H. HAMILTON, PH.D., LMFT, | ) | |
| individually and on behalf of her patients, | ) | Civil Action No.:_____ |
| | ) | |
| Plaintiffs, | ) | **INJUNCTIVE RELIEF SOUGHT** |
| v. | ) | |
| | ) | |
| CITY OF BOCA RATON, FLORIDA, | ) | |
| and COUNTY OF PALM BEACH, | ) | |
| FLORIDA, | ) | |
| | ) | |
| Defendants | ) | |

**VERIFIED COMPLAINT FOR DECLARATORY, PRELIMINARY
AND PERMANENT INJUNCTIVE RELIEF, AND DAMAGES**

For their VERIFIED COMPLAINT against Defendants CITY OF BOCA RATON, FLORIDA ("City") and COUNTY OF PALM BEACH, FLORIDA ("County") (collectively "Defendants"), ROBERT W. OTTO, PH.D. LMFT ("Dr. Otto"), and JULIE HAMILTON, PH.D., LMFT ("Dr. Hamilton") (collectively "Plaintiffs"), by and through the undersigned counsel, allege and aver as follows:

**INTRODUCTION**

1.     Since time immemorial, the relationship between clients and their licensed mental health professionals has represented a sacred trust. In this vital relationship, mental health professionals are tasked with providing essential care to their clients and forming critical therapeutic alliances that represent the unique relationship between professional and client. This therapeutic alliance is designed to facilitate the foundational principle of all mental health counseling: the client's fundamental right to self-determination. Throughout the history of this learned profession, clients have provided mental health professionals with their goals, desires, and

objectives that conform to their sincerely held desires and concept of self, and mental health professionals have provided counseling that aligns with the clients' fundamental right to self-determination. That unique relationship has, until now, been protected, revered, and respected as sacrosanct and inviolable. Now, Defendants have seen fit to storm the office doors of mental health professionals, thrust themselves into the therapeutic alliance, violate the sacred trust between client and counselor, and run roughshod over the fundamental right of client self-determination and the counselors' cherished First Amendment liberties. Defendants' purported justifications for such unconscionable actions: they do not like the goals, objectives, or desires of certain clients when it comes to one type of counseling. The First Amendment demands more, and Defendants' actions have caused, are causing, and will continue to cause irreparable injury to Plaintiffs' fundamental and cherished liberties.

2.     Plaintiffs bring this civil action to challenge the constitutionality of Boca Raton City Ordinance 5407, "Prohibition Of Conversion Therapy On Minors," ("City Ordinance") and Palm Beach County Ordinance 2017-046, "Prohibition Of Conversion Therapy On Minors," ("County Ordinance") (collectively "the Ordinances") to prevent the Ordinances from violating their respective federal and state constitutional guarantees of Freedom of Speech, Free Exercise of Religion, and the corresponding rights of their minor patients. The City Ordinance came into full effect immediately upon adoption on October 10, 2017, and the County Ordinance came into full effect immediately upon being filed with the Department of State on December 21, 2017. Thus, time is of the essence because Plaintiffs and their clients have suffered, are currently suffering, and will continue to suffer immediate and irreparable injury to their most cherished constitutional liberties absent injunctive relief.

3.      Plaintiffs engage in licensed, ethical, and professional counseling that honors their clients' autonomy and right to self-determination, that permits clients to prioritize their religious and moral values above unwanted same-sex sexual attractions, behaviors, or identities, and that enables clients to align their values with a licensed counselor who can address these values. Plaintiffs have First Amendment and state constitutional rights as licensed counselors to engage in and provide counseling consistent with their and their clients' sincerely held religious beliefs, and their clients have First Amendment and state constitutional rights to receive such counseling free from Defendants' viewpoint discrimination against such counseling.

4.      By preventing minors from seeking counseling to address the conflict about or questions concerning their unwanted same-sex sexual attractions, behaviors, and identities and from seeking to reduce or eliminate their unwanted same-sex sexual attractions, behaviors, or identities through counseling, such as sexual orientation change efforts ("SOCE"), the Ordinances deny or severely impair Plaintiffs' clients and all minors their right to self-determination, their right to prioritize their religious and moral values, and their right to receive effective counseling consistent with those values.

5.      By denying Plaintiffs' clients and all minors access to counseling from licensed counselors that can best help minors who desire to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity, the Ordinances infringe on the fundamental rights of Plaintiffs' clients, and the rights of the parents of Plaintiffs' clients to direct the upbringing and education of their children, which includes the right to meet each child's individual counseling, developmental, and spiritual needs.

6.      By prohibiting them from engaging in any efforts that seek to eliminate or reduce unwanted same-sex attractions, behaviors, or identity, even when the client, the parents, and the

licensed mental health professional all consent to such counseling, the Ordinances also violate the Plaintiffs' constitutional rights.

7.     Despite the value and benefit that Plaintiffs have provided by offering SOCE counseling, the Ordinances prohibit SOCE counseling to minors by licensed professionals, which is causing immediate and irreparable harm to Plaintiffs and Plaintiffs' clients.

8.     The Ordinances harm licensed counselors and their clients by prohibiting minors and their parents from obtaining the counseling services they choose, after receiving full disclosure and providing informed consent, to resolve, reduce, or eliminate unwanted same-sex sexual attractions, behaviors, or identity and harms counselors by placing them in a Catch-22 in which they will be forced to choose between violating ethical codes by complying with the Ordinances or violating the law by failing to comply with the Ordinances.

9.     By denying minors the opportunity to pursue a particular course of action that can most effectively help them address the conflicts between their sincerely held religious beliefs and goals to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity, the Ordinances are causing those minors confusion and anxiety over same-sex sexual attractions, behaviors, and identity and infringing on their free speech and religious liberty rights.

10.     Plaintiffs seek preliminary and permanent injunctive relief against Defendants, their agents, servants, departments, divisions, employees, and those acting in concert and with actual notice, enjoining the enforcement of the Ordinances because they violate: (1) the rights of Plaintiffs and their clients to freedom of speech and free exercise of religion, guaranteed by the First and Fourteenth Amendments to the United States Constitution, (2) the rights of Plaintiffs to liberty of speech and free exercise and enjoyment of religion, guaranteed by Article I, §§3, 4 of the Florida Constitution, (3) the Florida Patient's Bill of Rights and Responsibilities, Fla. Stat.

Ann. §381.026, and (4) and the Florida Religious Freedom Restoration Act, Fla. Stat. Ann. § 761.03.

11.     Plaintiffs also seek preliminary and permanent injunctive relief enjoining Defendants from enforcing the Ordinances because the Ordinances are void *ab initio* as *ultra vires* acts in excess of the City's and County's authority under Article VIII, Section 2(b) and Article VII, Section 1, respectively, of the Florida Constitution.

12.     Plaintiffs also pray for declaratory relief from this Court declaring that the Ordinances, both on their face and as-applied, are unconstitutional violations of the First and Fourteenth Amendments to the United States Constitution, are void *ab initio* as *ultra vires* acts in excess of the City's and County's authority under Article VIII, Section 2(b) and Article VII, Section 1, respectively, of the Florida Constitution, violated Plaintiffs and their clients rights under the Florida Patient's Bill of Rights and Responsibilities, Fla. Stat. Ann. §381.026, and violated the Florida Religious Freedom Restoration Act, Fla. Stat. Ann. § 761.03.

13.     An actual controversy exists between the parties involving substantial constitutional issues, in that the Ordinances, both facially and as-applied by the City and County violate Plaintiffs and their clients' rights to free speech and free exercise under the First Amendment.

## PARTIES

14.     Plaintiff, Robert W. Otto, Ph.D., LMFT, is a licensed marriage and family therapist who is licensed to practice mental health counseling in Florida.

15.     Plaintiff, Julie Hamilton, Ph.D., LMFT, is a licensed marriage and family therapist who is licensed to practice mental health counseling in Florida.

16.     Defendant, City of Boca Raton, is a municipal corporation and political subdivision of the State of Florida, with authority to sue and be sued.

17.     Defendant, County of Palm Beach, is a political subdivision of the State of Florida with authority to sue and be sued.

## JURISDICTION AND VENUE

18.     This action arises under the First and Fourteenth Amendments to the United States Constitution and is brought pursuant to 42 U.S.C. §1983. This action also arises under Article I, §§3, 4 of the Florida Constitution, the Florida Patient's Bill of Rights and Responsibilities, Fla. Stat. Ann. § 381.026, and the Florida Religious Freedom Restoration Act, Fla. Stat. Ann. § 761.03.

19.     This Court has jurisdiction under 28 U.S.C. §§1331, 1343, and 1367.

20.     Venue is proper in this Court under 28 U.S.C. §1391(b) because the City and County are situated in this judicial district, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

21.     This Court is authorized to grant declaratory judgment under the Declaratory Judgment Act, 28 U.S.C. §2201-02, implemented through Rule 57 of the Federal Rules of Civil Procedure, and is authorized to grant injunctive relief pursuant to Rule 65 of the Federal Rules of Civil Procedure.

22.     This Court is authorized to grant Plaintiffs' prayer for relief regarding costs, including a reasonable attorney's fee, pursuant to 42 U.S.C. §1988.

## GENERAL ALLEGATIONS

### A.     THE CITY ORDINANCE.

23.     On October 10, 2017, the Boca Raton City Council enacted Ordinance 5407 ("City Ordinance"), which created Article VI in Chapter 9 "Miscellaneous Offenses" of the Code of

Ordinances. A copy of the City Ordinance is attached hereto as EXHIBIT A and incorporated herein.

24. The City Ordinance immediately went into effect upon its adoption and approval. (*See* Exhibit A at 7) ("this Ordinance shall take effect immediately upon adoption").

25. Section 9-106 of the City Ordinance states that "[i]It shall be unlawful for any provider to practice conversion therapy on any individual who is a minor regardless of whether the provider receives monetary compensation in exchange for such services. (Ex. A at 7).

26. Section 9-105(a) of the City Ordinance defines "conversion therapy or reparative therapy" as:

> interchangeably, any counseling, practice or treatment performed with the goal of changing an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behaviors, gender identity, or gender expression, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex. Conversion therapy does not include counseling that provides support and assistance to a person undergoing gender transition or counseling that provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and development, including sexual orientation – neutral interventions to prevent or address unlawful conduct or unsafe sexual practices, as long as such counseling does not seek to change sexual orientation or gender identity.

(Ex. A at 6).

27. Section 9-105(c) of the City Ordinance defines "Provider" as:

> any person who is licensed by the State of Florida to provide professional counseling, or who performs counseling as part of his or her professional training under chapters 456, 458, 459, 490 or 491 of the Florida Statutes, as such chapters may be amended, including but not limited to, medical practitioners, osteopathic practitioners, psychologists, psychotherapists, social workers, marriage and family therapists, and licensed counselors.

(Ex. A at 6).

28.     Section 9-107 of the City Ordinance states that "[a]ny person that violates any provision of this article shall be subject to the civil penalty prescribed in section 1-16 and in no instance shall a violation of this article be punishable by imprisonment." (Ex. A at 7).

29.     The civil penalty prescribed in Section 1-16 of the Code of Ordinances provides:

> Whenever in this Code or in any ordinance of the city any act is prohibited or is made or declared to be unlawful or an offense, or whenever in such Code or ordinance the doing of any act is required or the failure to do any act is declared to be unlawful, where no specific penalty is provided therefor, the violation of any such provision of the Code or any ordinance shall be punished by a fine not exceeding $500.00 or imprisonment for a term not exceeding 60 days, or by both such fine and imprisonment. Each day any violation of any provision of this Code or of any ordinance continues shall constitute a separate offense.

## B.     THE COUNTY ORDINANCE.

30.     On December 19, 2017, the Board of County Commissioners of Palm Beach County enacted Ordinance 2017-046 ("County Ordinance"). A copy of the County Ordinance is attached hereto as EXHIBIT B and incorporated herein.

31.     The County Ordinance went into effect upon its filing with the Department of State on December 21, 2017. (*See* Exhibit B at 7).

32.     Section 5 of the County Ordinance states that "[i]t shall be unlawful for any provider to practice conversion therapy on any individual who is a minor regardless of whether the provider receives monetary compensation in exchange for such services. (Ex. B at 5).

33.     Section 4 of the County Ordinance defines "conversion therapy" as:

> the practice of seeking to change an individual's sexual orientation or gender identity, including but not limited to efforts to change behaviors, gender identity, or gender expressions or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex. Conversion therapy does not include counseling that provides support and assistance to a person undergoing gender transition, or counseling that: provides acceptance, support, and understanding of a person or facilitates a person's coping, social support, and identity exploration and development, including sexual-orientation-neutral

interventions to prevent or address unlawful conduct or unsafe sexual practices; and does not seek to change an individual's sexual orientation or gender identity.

(Ex. B at 5).

34.     Section 4 of the County Ordinance defines "Provider" as:

any person who is licensed by the State of Florida to perform counseling pursuant to Chapters 456, 458, 459, 490 or 491 of the Florida Statutes as such chapters may be amended, including but not limited to medical practitioners, osteopathic practitioners, psychologists, psychotherapists, social workers, marriage and family therapists, and licensed counselors, or a person who performs counseling as part of the person's professional training for any of these professions.

(Ex. B at 5).

35.     Section 6 of the County Ordinance states that: "pursuant to section 125.69, Florida Statutes, a violation of this ordinance shall be prosecuted in the same manner as misdemeanors are prosecuted. A violation of any provision of this Ordinance shall be punished by a fine of $250.00 for the first violation and $500.00 for each repeat violation. (Ex. B at 5).

36.     Section 7 of the County Ordinance states:

In addition to the penalties set forth in Section 6 of this Ordinance, pursuant to section 125.69(4), Florida Statutes, this Ordinance is enforceable by the County's Code Enforcement Officers and by all means provided by law. Additionally, Palm Beach County may choose to enforce this Ordinance by seeking injunctive relief in the Circuit Court of Palm Beach County.

(Ex. B at 5-6).

37.     Section 3 of the County Ordinance provides: "This Ordinance shall be applicable within the unincorporated areas of Palm Beach County, and in all municipalities that have not adopted an ordinance in conflict. Unless otherwise provided, nothing in this Ordinance shall be construed to relieve any person from compliance with any applicable county or municipal regulations." (Ex. B at 4).

C.      **RESEARCH ON SOCE COUNSELING.**

38.     The City Ordinance references the Report of the 2009 American Psychological Association's Task Force on Appropriate Therapeutic Responses to Sexual Orientation ("APA Report") for the proposition that SOCE counseling is harmful and both the City and County Ordinances reference the APA Resolution issued following the APA Report. (Ex. A at 2; Ex. B at 1).

39.     Defendants' use of the APA Report and Resolution as proof of harm caused by SOCE counseling misrepresents the findings of the report and ignores the substantial limitations the APA Report noted extensively throughout its findings. A copy of the APA Report is attached hereto as EXHIBIT C and incorporated herein.

40.     The APA Report specifically noted that "sexual orientation issues in children are **virtually unexamined**." (Ex. C at 91) (emphasis added).

41.     The APA Report stated that "[t]here is a lack of published research on SOCE among children." (*Id.* at 72).

42.     The APA Report also noted that it could make no conclusions about SOCE counseling **for those adolescents who request such counseling**. (*Id.* at 73) ("We found no empirical research on adolescents who request SOCE."); (*id.* at 76) (noting that its conclusions are not based on specific studies from individuals, including minors, who request SOCE counseling and stating that its conclusions were thus necessarily limited).

43.     The APA Report also concluded that "there is a dearth of scientifically sound research on the safety of SOCE. **Early and recent research studies provide no clear indication of the prevalence of harmful outcomes**." (*Id.* at 42) (emphasis added).

44.     But, from the research the APA Report examined, it found evidence of benefits achieved from SOCE counseling, while noting that there was "some" evidence of certain harm for others. (*Id.* at 91).

45.     Because it noted that there was evidence of benefits for some, the APA Report concluded that "it is still unclear which techniques or methods may or may not be harmful." (*Id.*).

46.     The APA Report also specifically noted that "for some, sexual orientation identity [is] fluid or has an indefinite outcome." (*Id.* at 2).

47.     In fact, the APA Report found among its studies that "[s]ome individuals report that they went on to lead outwardly heterosexual lives, developing a sexual relationship with an other-sex partner, and adopting a heterosexual identity." (*Id.* at 3).

48.     The APA Report does not support Defendants' conclusions that SOCE counseling causes harm to minors and therefore justifies Defendants' efforts to ban SOCE counseling.

49.     The APA Report itself is also highly partisan and politicized as a result of its researchers. Although many qualified conservative psychologists were nominated to serve on the task force, all of them were rejected.

50.     The director of the APA's Lesbian, Gay and Bisexual Concerns Office, Clinton Anderson, stated that such practitioners were rejected because the group could not take into account what are fundamentally negative religious perceptions of homosexuality because they do not fit into the APA's worldview.

51.     In seeking to reach conclusions in the APA Report, the APA operated with a litmus test when considering task force membership—the only views of homosexuality that were tolerated were those that uniformly endorsed same-sex behavior as a moral good. Thus, from the

outset of the task force, it was predetermined that conservative or religious viewpoints would only be acceptable when they fit within their pre-existing worldview.

52.     One example of this is the APA Report's failure to recommend any religious resources that adopt a traditional or conservative approach to addressing conflicts between religious beliefs and sexual orientation. This bias can hardly be said to respect religious diversity and had predictable consequences for how the task force addressed its work.

53.     The APA Report contains a significant contrast between the exceptionally rigorous methodological standards applied to SOCE outcomes and the considerably less rigorous and uneven standards applied to the question of harm. With regard to SOCE outcomes, the APA Report dismisses most of the relevant research because of methodological limitations, which are outlined in great detail (Ex. C at 26-34).

54.     Studies pertaining to SOCE outcomes that fall short of the task force's rigorous standards were deemed unworthy of examination and dismissed as containing no evidence of value to the questions at hand. But, the APA Report appears to adopt very different evidentiary standards for making statements about alleged harms attributed to SOCE.

55.     The standard as regards efficacy ruled out allegedly substandard studies as irrelevant; however, no such efficacy standards were employed in considering studies purporting to document harm. Additionally, the APA Report uses the absence of evidence to argue that SOCE is unlikely to produce change and thus strongly questions the validity of SOCE, but shows no parallel reticence to endorse affirmative therapy despite acknowledging that such therapy "has not been evaluated for safety and efficacy" (Ex. C at 91).

56.     Dr. Nicolas Cummings, former president of the American Psychological Association, has also noted that SOCE counseling can provide enormous benefits. A copy of Dr.

Cummings article discussing SOCE counseling is attached hereto as EXHIBIT D and incorporated herein.

57.     Dr. Cummings noted that Defendants' premise for adopting the Ordinances is damaging and incorrect. (*See* Ex. D. at 1) ("The sweeping allegation that [SOCE counseling] must be a fraud because homosexual orientation can't be changed is damaging.").

58.     Dr. Cummings personally counseled countless individuals in his years of mental health practice, and he reported that hundreds of those individuals seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity were successful. (*Id.*) ("Of the patients I oversaw who sought to change their orientation, **hundreds were successful**." (emphasis added)).

59.     Dr. Cummings said that the assertion that same-sex sexual attractions, behaviors, or identity is one identical inherited characteristic is unsupported by scientific evidence and that "**contending that all same-sex attraction is immutable is a distortion of reality**." (*Id.* at 2) (emphasis added).

60.     Dr. Cummings went on to criticize efforts to prohibit SOCE counseling as violative of the client's right to self-determination and therapeutic choice. (*Id.*) ("Attempting to characterize all sexual reorientation therapy as unethical violates patient choice and gives an outside party a veto over patients' goals for their own treatment.").

61.     Dr. Cummings concluded that "[a] political agenda shouldn't prevent gays and lesbians who desire to change from making their own decisions." (*Id.*).

62.     Dr. Cummings concluded by condemning political efforts to prohibit SOCE counseling as harmful to clients and counselors. (*Id.*) ("Whatever the situation at an individual clinic, accusing professionals from across the country who provide treatment to fully informed

persons seeking to change their sexual orientation of perpetrating a fraud **serves only to stigmatize the professional and shame the patient**." (emphasis added)).

63.     The American College of Pediatricians has noted that the political position statements of numerous mental health organizations, including many relied upon by the City here, have "no firm basis" in evidentiary support. A copy of the American College of Pediatricians statement on SOCE counseling is attached hereto as EXHIBIT E and incorporated herein.

64.     The American College of Pediatricians noted that, "[t]he scientific literature, however, is clear: **Same-sex attractions are more fluid than fixed, especially for adolescents— many of whom can and do change**." (Ex. E) (emphasis added).

65.     The American College of Pediatricians also noted that "there is a body of literature demonstrating a variety of positive outcomes from SOCE." (*Id.*).

66.     Like Dr. Cummings, the American College of Pediatricians concluded that SOCE counseling is beneficial and that laws, such as the Ordinances here, that prohibit such counseling serve only to impose harm on minors who seek it. (*Id.*) ("Banning change therapy or SOCE will threaten the health and well-being of children wanting therapy.").

67.     The City and County claim that the Ordinances are necessary to protect the health, safety and welfare of minors living within their jurisdictions.

68.     Section 9.104  of the City Ordinance provides:

The Intent of this Ordinance is to protect the physical and psychological well- being of minors, including but not limited to lesbian, gay, bisexual, transgender and/ or questioning youth, from exposure to the serious harms and risks caused by conversion therapy or reparative therapy by licensed providers, including but not limited to licensed therapists. These provisions are exercises of the police power of the City for the public safety, health, and welfare; and its provisions shall be liberally construed to accomplish that purpose.

(Ex. A at 6).

69.     Section 1 of the County Ordinance provides:

The intent of this Ordinance is to protect the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and/or questioning youth, from exposure to the serious harms and risks caused by conversion therapy or reparative therapy by licensed providers, including but not limited to licensed therapists and the unlicensed individuals who perform counseling as part of professional training to become a licensed provider. This Ordinance is an exercise of the County's police power for the benefit of the public health, safety, and welfare; and its sections are to be liberally construed to accomplish that purpose.

(Ex. B at 4).

70.     Despite the City and County's assertion that SOCE counseling causes serious harms and risks, in fact the Board of Medical Quality Assurance for the State of Florida has no records of any complaints against any licensed professionals in the State of Florida related to SOCE counseling, "conversion therapy" or "reparative therapy."  A true and correct copy of the response from the Board of Medical Quality Assurance to a public records request seeking such records is attached, marked as EXHIBIT F and incorporated herein.

### D.     VOLUNTARY SOCE COUNSELING PROVIDED BY PLAINTIFFS.

71.     Many of the position statements and studies referenced in the Ordinances improperly attempt to conflate involuntary, forced practices allegedly used by some in the past with the practices that Plaintiffs, along with all ethical SOCE practitioners, use in their counseling and therapy practices with clients who wish to reduce or eliminate same-sex sexual attractions, behaviors, or identity. The Ordinances indiscriminately ban both types.

72.     Plaintiffs do not engage in aversive techniques, nor are they aware of any practitioner who engages in such practices with clients seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity.

73.     In their practices, Plaintiffs help clients with their unwanted same-sex attractions, behaviors, and identity by talking with them about root causes, about gender roles and identities, and about their anxieties and confusion that arises from these attractions.

74.     Speech is the only tool that Plaintiffs use in their counseling with minors seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity. The only thing that happens in their counseling sessions is speech. They sit down with their clients and talk to their clients about the clients' goals, objectives, religious beliefs, desires, and identity.

75.     Throughout the Ordinances, the position statements refer to SOCE counseling as that counseling with the single goal of changing an individual's sexual orientation or gender identity. But, Plaintiffs do not begin counseling with any predetermined goals other than those that the clients themselves identify and set. This is consistent with the clients' fundamental right of self-determination.

76.     Plaintiffs employ speech to help clients understand and identify their anxiety or confusion regarding their attractions, behaviors, or identity and then to help the client formulate the method of counseling that will most benefit that particular client.

77.     Often times, a client is not ready or does not desire to immediately begin to seek to reduce or eliminate their unwanted same-sex attraction, behaviors, or identity. When that is the case, Plaintiffs focus on helping the client and parents to heal any wounds or frustrations and to begin to work on loving and accepting the minor client despite any challenges that arise from the unwanted same-sex attractions, behaviors, or identity.

78.     The presumption of the Ordinances that all such counseling from Plaintiffs is premised on the notion that homosexuality is an illness, defect, or shortcoming does not accurately

reflect Plaintiffs' practices, and it ignores the fact that Plaintiffs seek to treat the anxiety and confusion that arises from a client's unwanted same-sex attractions, behaviors, or identity.

79.     The presumption of the Ordinances that Plaintiffs seek to "cure" a client of same-sex attractions is false, because Plaintiffs seek only to assist a client with their stated desires and objectives in counseling, which sometime include reducing or eliminating the client's unwanted same-sex attractions.

80.     The presumption of the Ordinances that SOCE counseling and Plaintiffs view homosexuality as an "illness" does not reflect the truth of such counseling, and it ignores the point of mental health counseling in general.

81.     The only relevant consideration in Plaintiffs' counseling is that same-sex attractions, behaviors, or identity are an adaption that the client has anxiety or distress over, and that the client seeks to eliminate that anxiety or distress.

82.     This is the same relevant consideration in all forms of mental health counseling, and is true of many things that clients seek counseling for, including many that are not mental illnesses but that nevertheless impose great stress, anxiety, confusion, or grief on the client

**E.     CURRENT ETHICAL OBLIGATIONS PROTECTING MINOR CLIENTS IN MENTAL HEALTH COUNSELING.**

83.     The City Ordinance falsely asserts that there are no other effective means, including state statutes, to protect minors from the purported harms of SOCE counseling. (Ex. A at 4).

84.     Licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, are already prohibited by law from engaging in false, deceptive, or misleading advertisements relating to their practice of marriage and family therapy. Fla. Stat. Ann. § 491.009(1)(d).

85.     Licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, are already prohibited from "[m]aking misleading, deceptive, untrue, or fraudulent representations in

the practice of any profession licensed, registered, or certified" by Florida's Marriage and Family Therapy Board. Fla. Stat. Ann. § 491.009(1)(l).

86.     Licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, are already prohibited by law from engaging in any practice that is harmful to clients or patients, such as "[f]ailing to meet minimum standards of performance in professional activities when measured against generally prevailing peer performance." Fla. Stat. Ann. 491.009(1)(r).

87.     Licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, are already prohibited by law from violating other ethical regulations governing the practice of marriage and family therapy. Fla. Stat. Ann. § 491.001(1)(t).

88.     Failure of licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, to abide by the legal requirements imposed upon them by Florida law or other ethical regulations subjects them to significant fines, suspension of licensing, and permanent revocation of licensing depending on the nature and extent of the violation. Fla. Admin. Code § 64B4-5.001.

89.     Other ethical regulations imposed upon marriage and family therapists, such as the American Association of Marriage and Family Therapists Code of Ethics ("AAMFT Code"), prohibit licensed marriage and family therapists from engaging in practices that harm clients or patients, and also prohibit them from refusing to recognize their clients' right to self-determination and informed consent.

90.     Standard 1 of the AAMFT Code requires that licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, "advance the welfare of families and individuals and make reasonable efforts to find the appropriate balance between conflicting goals."

91.     Standard 1.1 of the AAMFT Code prohibits licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, from discriminating against clients based on their sexual orientation or gender identity.

92.     Standard 1.2 of the AAMFT Code mandates that licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, obtain "appropriate informed consent to therapy or related procedures" and that they inform the clients regarding all information necessary for the client to make such a decision.

93.     Standard 1.8 of the AAMFT Code requires licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, to "respect the rights of clients to make decisions and help them understand the consequences of these decisions."

94.     Standard 1.9 of the AAMFT Code prohibits licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, from continuing any therapeutic relationship if it becomes reasonably clear that the clients are not benefitting from the relationship.

95.     Thus, existing Florida law regulating licensed professionals and the other ethical obligations imposed upon such counselors, coupled with the absence of records of any complaints of harm related to SOCE counseling, demonstrate that the City's and County's stated rationales for adopting the Ordinances are fallacious, pretextual and unsupported by any governmental interest.

**F.      VAGUENESS PROBLEMS WITH THE ORDINANCES.**

96.     Despite the Ordinances' presumptions that same-sex attractions, behaviors, or identity are easily understandable and measurable, it is widely understood that there are actually tremendous difficulties in measuring sexual orientation or gender identity.

97.     Because of the difficulty in measuring sexual orientation or gender identity, the prohibitions in the Ordinances are hopelessly vague and leave Plaintiffs guessing at what practices are permitted or prohibited.

98.     Even in Defendants' own cited study, the APA Report, the difficulty in understanding exactly what is prohibited by the Ordinance is recognized. The APA Report states that "[s]ame-sex sexual attractions occur in the context of a variety of sexual orientations and sexual orientation identities, and for some, sexual orientation identity (i.e., individual or group membership and affiliation, self-labeling) **is fluid or has an indefinite outcome**." (Ex. C at 2 (emphasis added)).

99.     The Ordinances prohibit Plaintiffs under any circumstances from engaging in any practice that seeks to reduce or eliminate same-sex sexual attractions, behaviors, or identity. This prohibition is virtually impossible for Plaintiffs to comply with because it is well understood in the mental health profession, and conceded by Defendants' own references, that sexual orientation and gender identity are difficult to define and encompass a number of factors, including behavior, practices, identity, attractions, sexual fantasy, romantic attractions, and erotic desires.

100.    Given that sexual orientation is considered "fluid," even among the references the Defendants cite in the Ordinances, Plaintiffs are left to guess at what counseling practices might constitute a violation of the Ordinance.

101.    The Ordinances do not specify which clients would be classified as seeking to "change" and those that would merely be deemed conforming their behavior with their original "sexual orientation." As Plaintiffs' clients do not always immediately present wanting to "change," they are left to guess at which point any of their counseling practices would be deemed to constitute efforts to reduce or eliminate unwanted same-sex attractions.

102.     Sexual orientation is also nearly impossible to measure, and there is no agreement on whether sexual orientation is a categorical construct or exists on a continuum. A client's motives, attractions, identification, and behaviors vary over time and circumstances with respect to one another, which makes them dynastically changing features of an individual's concept of self and sexual orientation.

103.     Despite the difficulty in measuring sexual orientation and its fluid and changing nature, Plaintiffs must now put their professional licenses in jeopardy when even discussing something that could be perceived as "changing" sexual orientation or identity.

104.     The Ordinances also permit licensed counselors to provide counseling that provides "acceptance, support, and understanding" of a client's unwanted same-sex attractions, behaviors, or identity. This presents another major source of confusion, uncertainty, and vagueness for Plaintiffs.

105.     Under the Ordinances, it is impossible for Plaintiffs to provide acceptance and support to a client who comes in for counseling and requests assistance in seeking to eliminate unwanted same-sex attractions, behaviors, or identity.

106.     Many of Plaintiffs' clients do not initially request counseling to specifically reduce or eliminate their unwanted same-sex attractions, behaviors, or identity, but instead want help and counseling to understand the sources, causes, and origins of their anxiety over such feelings.

107.     During the course of such counseling, and without ever specifically setting out to reduce or eliminate unwanted same-sex attractions, behaviors, or identity, many clients will experience a change in their sexual attractions, behaviors, or identity, and this is true despite never specifically seeking to experience such a change or eliminate their unwanted feelings.

108.    Plaintiffs are left to guess at whether counseling simply discussing the confusion, anxiety, conflict, or stress a client feels about their unwanted same-sex attractions, behaviors, or identity, without specifically seeking to reduce or eliminate such feelings, runs afoul of the Ordinances' prohibitions.

109.    As the APA Report upon which the Ordinances rely admits, same-sex attractions, behaviors, or identities are fluid and can often spontaneously disappear, particularly in minors. If Plaintiffs are merely counseling an individual to understand the origins of their attractions or helping them to understand and resolve the conflict with their religious beliefs, they are unable to know whether such counseling may result in a spontaneous change for the minor client, even though it was not the topic or goal of their counseling.

110.    Plaintiffs are left to guess at what topics are permissible when a minor client presents with anxiety, confusion, distress, or conflict over their unwanted same-sex attractions, behaviors, or identity, and the Ordinances provide no clear guideposts on such issues.

**G.    INDIVIDUALIZED EXEMPTIONS IN THE ORDINANCES.**

111.    The City and County Ordinances also establish a system of individualized exemptions.

112.    The City Ordinance permits counseling on the broad topic of sexual orientation, gender identity, and attractions, behaviors, and identities of minors seeking counseling, but prohibits such counseling when the client desires to receive counseling to change, reduce, or eliminate same-sex attractions, behaviors, or identity. (Ex. A at 6).

113.    The City Ordinance, however, permits counseling relating to change of gender identity when such a client is "undergoing gender transition." (*Id.*).

114.    Thus, the City Ordinance prohibits change when an individual desires to conform their gender identity or gender confusion to their own concept of self and biological identity, but specifically provides an individual exemption for identical counseling when a client is seeking to change their gender identity and expression.

115.    The City Ordinance permits counseling seeking to affirm, accept, and support a client's unwanted same-sex attractions, behaviors, or identity, and permits counseling to affirm, accept, and support a client's gender identity and expression, but prohibits counseling providing acceptance and support for a client whose attractions, behaviors, expressions, or identity do not match their concept of self.

116.    Thus, the City Ordinance exempts counseling affirming a minor transitioning from one gender to another, but prohibits such counseling for a client seeking to eliminate the confusion or identity that does not match his or her biological makeup.

117.    The County Ordinance likewise permits counseling on the broad topic of sexual orientation, gender identity, and attractions, behaviors, and identities of minors seeking counseling, but prohibits such counseling when the client desires to receive counseling to change, reduce, or eliminate same-sex attractions, behaviors, or identity. (Ex. B at 5).

118.    The County Ordinance, however, permits counseling relating to change of gender identity when such a client is "undergoing gender transition." (*Id.*).

119.    Thus, the County Ordinance prohibits change when an individual desires to conform their gender identity or gender confusion to their own concept of self and biological identity, but specifically provides an individual exemption for identical counseling when a client is seeking to change their gender identity and expression.

120.     The County Ordinance permits counseling seeking to affirm, accept, and support a client's unwanted same-sex attractions, behaviors, or identity, and permits counseling to affirm, accept, and support a client's unwanted gender identity and expression, but prohibits counseling providing acceptance and support for a client whose attractions, behaviors, expressions, or identity do not match their concept of self.

121.     Thus, the County Ordinance exempts counseling affirming a minor transitioning from one gender to another, but prohibits such counseling for a client seeking to eliminate the confusion or identity that does not match his or her biological makeup

### H.     PLAINTIFF ROBERT W. OTTO, PH.D., LMFT.

122.     Plaintiff, Robert W. Otto, Ph.D, LMFT, is a licensed marriage and family therapist and is licensed to practice mental health counseling in Florida.

123.     Dr. Otto has lived in Palm Beach County continuously since 1998.

124.     Dr. Otto received his Master of Science and Doctor of Philosophy in Family Therapy from Nova Southeastern University.

125.     Dr. Otto maintains a counseling practice in the City of Boca Raton at Spanish River Counseling Center.

126.     Dr. Otto's practice includes voluntary SOCE counseling of minors who are experiencing unwanted same-sex attractions, behaviors, and identity.

127.     As a licensed marriage and family therapist who engages in SOCE counseling in the City of Boca Raton, which is located in Palm Beach County, Dr. Otto is subject to potential fines under the City Ordinance and County Ordinance.

128.     Prior to engaging in SOCE counseling with any client, Dr. Otto provides them with an extensive informed consent form and requires them to review and sign it prior to commencing

SOCE counseling. This informed consent form outlines the nature of SOCE counseling, explains the controversial nature of SOCE counseling, including the fact that some therapists do not believe sexual orientation can or should be changed, and informs the client of the potential benefits and risks associated with SOCE counseling.

129.    Many of Dr. Otto's clients who desire SOCE counseling profess to be Christians with sincerely held religious beliefs that homosexuality is harmful and destructive and therefore seek SOCE counseling in order to live a lifestyle that is in congruence with their faith and to conform their identity, concept of self, attractions, and behaviors to their sincerely held religious beliefs.

130.    Dr. Otto has never received any complaint or report of harm from any of his clients seeking and receiving SOCE counseling, including the many minors that he has counseled.

131.    Dr. Otto does not coerce his clients into engaging in SOCE counseling, but respects the clients' right of self-determination and treats each client with unconditional positive respect regardless of the client's concept of self or feelings of unwanted same-sex attractions, behaviors, or identity.

132.    One of Dr. Otto's clients is a minor who was surprised to receive a kiss from a same-sex friend. That caused confusion, and the minor wondered about being bisexual. The confusion caused conflicts in relationships at school. The minor was also experiencing depression, sadness, cutting, eating disorder issues, and suicide attempts. The client did not want the feelings of confusion regarding same-sex attractions and sought SOCE counseling, from which the client has benefitted.

133.    Dr. Otto also has an adolescent client who identified as homosexual and came seeking help for issues other than sexual orientation. Through the course of therapy, which never

included efforts to change sexual orientation or discussion of sexual orientation as a therapeutic goal, the client migratged from lesbian to bisexual to heterosexual.

134.    Dr. Otto also has an adolescent client who has had unwanted homosexual feelings that are contrary to the client's sincerely held religious convictions. The client has not been able to reconcile this difference or understand why these feelings are present. The client sought help from the parents, and the parents did not know how to address the issue. As a result, the client and parents sought help in the form of family and individual counseling.

135.    Another of Dr. Otto's clients is seeking counseling to address feelings of isolation, depression, hurt, and fear. The child began viewing homosexual pornography and toxic social media sites and engaging in sexting.  The child lost friends, was confused, and sought help from a Christian counselor.

136.    In each of these cases, and other similar cases, Dr. Otto is prohibited from engaging in SOCE counseling with his minor clients or must discontinue ongoing SOCE counseling despite the clients' and parents' consent and requests to continue, or face penalties under the City and County Ordinances.

137.     The City and County Ordinances will prevent Dr. Otto's patients from continuing to progress in their individually-determined course of counseling, and from continuing to receive counseling in accordance with their sincerely held religious beliefs. In addition, the Ordinances will adversely affect future clients. Dr. Otto periodically receives requests for therapy for both unwanted homosexual attractions and gender identity confusion, and he and other licensed professionals in the City and County will be prohibited from providing and the clients prohibited from receiving help.

138.     The City and County Ordinances also leave Dr. Otto on an irresolvable collision course with his ethical requirements as a marriage and family therapist. According to the AAMFT Code Standard 1.11, if a therapist stops treatment prior to termination, it is considered abandonment, which is unethical. Therefore, if he complies with the Ordinances, Dr. Otto will violate the code of ethics, and if he does not comply and engages in the requested therapy, then he violates the Ordinances.

139.     By prohibiting minors from receiving SOCE counseling, the Ordinances have purported to make a portion of Dr. Otto's practice illegal and unethical despite the fact that SOCE counseling has not been declared illegal or unethical by the statewide licensing body or the State Legislature. As a result, the Ordinances have created an inconsistent patchwork of regulations under which certain counseling practices are permitted in one portion of the state but prohibited in neighboring portions of the state, creating conflict and confusion for Dr. Otto and for his clients.

## I.     PLAINTIFF JULIE H. HAMILTON, PH.D., LMFT.

140.     Plaintiff, Julie H. Hamilton, Ph.D., LMFT, is a licensed marriage and family therapist licensed to practice therapy in the state of Florida who practices marriage and family therapy in Palm Beach County.

141.     Dr. Hamilton received her Master of Science in Marriage and Family Therapy from Nova Southeastern University in 1995 and her Ph.D. in Marriage and Family Therapy from Nova Southeastern University in 1999.

142.     In her current practice, Dr. Hamilton provides individual, marital, and family therapy for a wide variety of issues, including the issues of unwanted same-sex attractions and gender identity confusion.

143.    Prior to engaging in therapy for any issue, Dr. Hamilton provides all of her clients with informed consent, in which she explains that, because there are many variables in psychotherapy, there is no guarantee that by pursuing therapy clients will be happier; that no particular treatment method can be guaranteed to be effective; and that therapy can be uncomfortable as clients talk about unresolved life experiences.

144.    Dr. Hamilton is a client-directed therapist, in that it is the client who sets the goals for therapy. Dr. Hamilton does not impose an agenda on her clients, nor does she determine clients' goals for therapy. Clients set their own goals for therapy. In family or marital situations, all parties are voluntary participants. One family member cannot determine the goals for another family member. This would include situations in which a parent brings a minor child to therapy. If a child is not interested or willing to work on goals that the parent may have for him or her, Dr. Hamilton does not force or coerce the child to adopt such goals. Dr. Hamilton only works with voluntary clients who determine the goals that they have for themselves. Dr. Hamilton does not coerce her clients into engaging in therapy, but respects the clients' rights of self-determination and treats each client with unconditional positive respect regardless of the client's personal beliefs, concept of self or feelings of unwanted same-sex attractions, behaviors, or identity.

145.    Many of Dr. Hamilton's clients are referred through churches or word of mouth. Many of her clients uphold a Biblical worldview. Dr. Hamilton's clients with same-sex attractions, behaviors, or identity or gender identity confusion who adhere to a Biblical worldview believe that embracing a gay identity is not in accordance with God's plan for their lives, nor is adopting a gender identity that is different from their biological sex. They believe that attractions do not dictate behavior, nor do feelings and perceptions determine identity. Clients who identify as Christians, holding to a Biblical worldview, believe that their faith and their relationships with

God supersede romantic attractions, and that God determines their identity, according to what He has revealed in the Bible, rather than their attractions or perceptions determining their identity.

146.     Many such clients who have same-sex attractions or gender identity confusion, who also prioritize their faith above their feelings, seek out therapy to clear up gender identity confusion, reduce same-sex attractions, change same-sex behaviors, and/or simply live a life consistent with their faith. Clients who have been living a life inconsistent with their faith often present with internal conflicts, depression, anxiety, substance abuse and so forth; therefore, they are seeking resolution to such turmoil.

147.     Dr. Hamilton has never received any complaint or report of harm from any of her clients seeking and receiving therapy for any issue, including the many minors that she has counseled.

148.     Dr. Hamilton has had parents who have brought their minor child to therapy to address homosexual attractions or behaviors, and whose minor child did not share the same goal. In such cases where minors have expressed that they are happy identifying as gay, lesbian, or bi-sexual, and do not want help for changing identity, attractions, or behavior, Dr. Hamilton asks if there is any other goals that the minor is interested in pursuing. In many cases, minors ask for help with social issues, family relationships, parent-child communication, or helping to facilitate the parents' coping with the sexual identity of the child. Dr. Hamilton has helped a number of minors and parents with those goals of the minors, instead of trying to help minors change their attractions, behavior, or identity, when minor clients  tell her that they are not seeking change of attractions, behavior, or identity. In other cases, minors have stated that they do not have a therapeutic goal, and therapy is terminated.

149.     Dr. Hamilton currently has a minor teen-aged client, who originally presented with the goal of reducing same-sex attractions and avoiding a homosexual identity. At the start of therapy, this client was self-identifying as "bi-curious." During the course of therapy, the client decided to pursue a homosexual relationship rather than pursue change. Dr. Hamilton offered to discontinue therapy at that time, and yet the minor client requested to continue therapy, and even requested more frequent visits, changing from bi-weekly to weekly sessions. Throughout the course of therapy, the client has changed identity labels as well as therapeutic goals several times, pursuing both same-sex and opposite sex-relationships. Following the Easter season, Dr. Hamilton's client reported that his sincerely held religious beliefs have convicted him (outside of therapy) and that he sincerely desires to pursue reducing and eliminating his unwanted same-sex attractions.

150.     Dr. Hamilton has another client who began counseling with a litany of changing emotions regarding her perceived sexual orientation and identity. This minor client was 12-years-old at the beginning of counseling and indicated that her sexual identity was very fluid, fluctuating between homosexual, bisexual and pansexual. After engaging in counseling with Dr. Hamilton, who encouraged her to explore the reasons why she felt she needed a "label," the client began to understand the origins and nature of her confusion regarding her sexual orientation. On her own accord and through the process of counseling with Dr. Hamilton, this minor client determined that she was heterosexual and that her same-sex attractions and confusion did not represent her own concept of self.

151.     Dr. Hamilton's minor client noted in her counseling that she had many friends who identify as bisexual, homosexual, pansexual, transgender, asexual, etc., but that all of them had indicated they were confused and struggling. Many of her friends dealt with problems of cutting,

depression, substance abuse, and a few even had thoughts of suicide. Dr. Hamilton's minor client actually witnessed one of her friends, who identifies as transgender and bisexual, try to harm himself through cutting. Her best friend identifies as bisexual and struggles with depression. This friend attempted suicide at the age of ten, and has attempted other times as well.

152.    After engaging in counseling with Dr. Hamilton, this minor client believes she has discovered her true self, that she is healthier, that she feels happy, and that she benefitted from her counseling with Dr. Hamilton. Dr. Hamilton's client has also discussed with Dr. Hamilton her desire to have her friends and other minors be able to obtain the help and counseling she received. During her counseling with Dr. Hamilton, this client expressed her sincere love for these friends, stated that she has cried with her friends, cried for her friends, hugged and consoled her friends, calls some of these friends siblings because they are so close, and hopes that these friends can also get assistance for the struggles and confusion they are experiencing.

153.    Dr. Hamilton has another client who is an elementary-aged child whose parents initiated therapy due to concerns about the child's apparent gender identity confusion, as the child was demonstrating a discontentment with the child's biological sex. Throughout the course of therapy, this child's gender identity confusion appears to have decreased tremendously. This child now reports to be much more comfortable with the child's own biological sex. At this time, Dr. Hamilton meets periodically with both the parents and the child to maintain the positive changes that have occurred.

154.    With elementary-aged children who appear to have gender identity confusion, Dr. Hamilton spends most of the time in therapy working with the parents and a small portion of the time meeting with the child. The majority of therapy takes place with the parents, helping them to relate to the child in such a way that the child becomes more comfortable and confident in his or

her identity as biologically male or female. In addition, a small amount of time is spent with the child addressing concerns, confusion, and perceptions of the child.

155.    According to the County Ordinance, Dr. Hamilton is now prohibited from continuing to meet with this minor client to address gender identity. According to this Ordinance, the only therapy that would be permissible for gender identity confusion is therapy that supports a child in "gender transition" or helping the child to proceed down a path towards changing that child's biological sex.

156.    The County Ordinance and its restrictions are greatly problematic for this client for many reasons: It only allows for gender transition rather than therapy that is gender affirming; gender transition is not the goal of this child or the child's parents; there is no scientific evidence that gender transition is safe or effective for children; there are many adverse side effects to gender transition; and this particular child's therapy with Dr. Hamilton, which has been gender affirming, has been very helpful up to this point. Abruptly stopping therapy would be both unprofessional and potentially harmful to the client.

157.    Dr. Hamilton has also been approached by a pre-teenage gender confused client, requesting counseling to address gender confusion. This client's gender confusion appears to have originated externally, through cultural input, rather than internally as a genuine transgender condition. Because of the County Ordinance, Dr. Hamilton has been forced to inform the client and family that this child is not permitted to receive the counseling they are seeking from Dr. Hamilton. Dr. Hamilton has told the parents that they are free to attend counseling with Dr. Hamilton, but that she is prohibited by the County Ordinance from including the gender-confused client who desires the counseling. This has harmed both the parents and their minor child.

158.    Since the passage of the County Ordinance, Dr. Hamilton has also been contacted by the parents of another pre-teenage client who is experiencing gender confusion. This minor client also desired counseling to assist with her gender confusion, but Dr. Hamilton had to inform the minor client and parents that the County Ordinance prohibits the counseling that they seek. This has harmed both the parents and their minor child.

159.    In addition to Dr. Hamilton's current clients, there are potentially many future clients who will be adversely affected by the County Ordinance. Dr. Hamilton periodically receives requests for therapy for both unwanted homosexual attractions and gender identity confusion. This Ordinance will prevent future clients from getting help.

160.    The County Ordinance also leaves Dr. Hamilton on an irresolvable collision course with her ethical requirements as a marriage and family therapist. According to the AAMFT Code Standard 1.11, if a therapist stops treatment prior to termination, it is considered abandonment, which is unethical. Therefore, if she complies with the County Ordinance, then she will violate the code of ethics, and if she does not comply and engages in the requested therapy, then she violates the County Ordinance.

161.    By prohibiting minors from receiving SOCE counseling, the County Ordinance has purported to make a portion of Dr. Hamilton's practice illegal and unethical despite the fact that SOCE counseling has not been declared illegal or unethical by the statewide licensing body or the State Legislature. As a result, the County Ordinance has created an inconsistent patchwork of regulations under which certain counseling practices are permitted in one portion of the state but prohibited in neighboring portions of the state, creating conflict and confusion for Dr. Hamilton and for her clients.

**J.      IRREPARABLE HARM TO DR. OTTO, DR. HAMILTON, AND THEIR CLIENTS.**

162.    Dr. Otto and Dr. Hamilton desire to advertise their counseling, including SOCE counseling, to clients and potential clients in the City and County, including minors.

163.    Consistent with their First Amendment rights, Dr. Otto and Dr. Hamilton want to offer their counseling, including SOCE counseling, to clients and potential clients in the City and County, including minors.

164.    Consistent with their First Amendment rights, Dr. Otto and Dr. Hamilton want to provide their counseling, including voluntary SOCE counseling, to clients and potential clients in the City and County, including minors.

165.    Consistent with their First Amendment rights, Dr. Otto and Dr. Hamilton would like to be able to inform religious leaders, organizations, and ministries that there is help from licensed mental health professionals with expertise in this area and that it is available to individuals desiring assistance in the area of unwanted same-sex attractions, behaviors, and identity.

166.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton are prohibited from advertising SOCE counseling to clients and potential clients, including minors, in the City and County.

167.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton are prohibited from offering voluntary SOCE counseling to clients and potential clients, including minors, in the City and County.

168.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton are prohibited from engaging in SOCE counseling with clients and potential clients, including minors who desire such counseling, in the City and County.

169.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton are restricted from engaging in constitutionally protected speech, including advertising their SOCE counseling to clients and potential clients in the City and County.

170.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton are prohibited from engaging in constitutionally protected speech, including offering their SOCE counseling to clients and potential clients in the City and County.

171.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton are prohibited from engaging in constitutionally protected speech, including providing their SOCE counseling to willing clients and potential clients in the City and County.

172.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton have been chilled in their constitutionally protected expression.

173.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton are prohibited from engaging in constitutionally protected speech, including providing their SOCE counseling to willing clients and potential clients in the City and County in violation of their clients and potential clients' First Amendment right to receive information.

174.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton have been and will be forced to deny voluntary SOCE counseling to their clients and potential clients in violation of their and their clients' sincerely held religious beliefs.

175.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton have been and will be forced to deny SOCE counseling to their willing clients and potential clients in violation of the clients' fundamental rights to self-determination.

176.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their cherished First Amendment rights to freedom of speech.

177.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their cherished First Amendment rights to free exercise of religion.

178.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton's clients have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their cherished First Amendment rights to receive information.

179.    Because of the City and County Ordinances, Dr. Otto's and Dr. Hamilton's current minor clients are prohibited from receiving the SOCE counseling that the clients desire to obtain from a licensed professional with expertise in this area.

180.    Dr. Otto's and Dr. Hamilton's minor clients have thus suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to the clients' cherished First Amendment rights to receive information.

181.    Because of the City and County Ordinances, Dr. Otto and Dr. Hamilton's clients have suffered, are suffering, and will continue to suffer ongoing, immediate, and irreparable injury to their cherished First Amendment rights to free exercise of religion.

182.    Dr. Otto, Dr. Hamilton, and their clients and potential clients have no adequate remedy at law to protect the ongoing, immediate, and irreparable injury to their cherished First Amendment liberties.

### COUNT I – THE CITY AND COUNTY ORDINANCES VIOLATE PLAINTIFFS' RIGHT TO FREEDOM OF SPEECH UNDER THE FIRST AMENDMENT.

183.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1-182.

184.     The Free Speech Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' freedom of speech.

185.     The City and County Ordinances, on their face and as applied, are unconstitutional prior restraints on Plaintiffs' speech.

186.     The City and County Ordinances, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

187.     The City and County Ordinances, on their face and as applied, authorize only one viewpoint on SOCE counseling and unwanted same-sex sexual attractions, behaviors, and identity by forcing Plaintiffs to present only one viewpoint on the otherwise permissible subject matter of same-sex attractions, behaviors, or identity. The Ordinances also force Plaintiffs' clients and their parents to receive only one viewpoint on this otherwise permissible subject matter.

188.     The City and County Ordinances, on their face and as applied, discriminate against Plaintiffs' speech on the basis of the content of the message they offer and that Plaintiffs' clients seek to receive.

189.     Defendants lack compelling, legitimate, significant, or even rational governmental interests to justify the City and County Ordinances' infringement of the right to free speech.

190.     The City and County Ordinances, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the law.

191.     Informed consent provisions outlining the required disclosure prior to engaging in SOCE counseling with a minor would have been far less restrictive of Plaintiffs' speech, and mental health counseling organizations have urged legislatures to adopt informed consent

provisions. A copy of the California mental health organizations' letter to the California legislature concerning legislation virtually identical to the City and County Ordinances is attached as EXHIBIT G and incorporated herein.

192.     The City and County Ordinances do not leave open ample alternative channels of communication for Plaintiffs.

193.     The City and County Ordinances, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on constitutionally protected speech.

194.     The City and County Ordinances, on their face and as applied, unconstitutionally chill and abridge the right of Plaintiffs to freely communicate information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

195.     The City and County Ordinances, on their face and as applied, unconstitutionally chill and abridge the right of Plaintiffs' clients to freely receive information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

196.     The City and County Ordinances' prohibitions on licensed mental health counselors offering voluntary SOCE counseling that could change, reduce, or otherwise address a minor client's unwanted same-sex attractions, behaviors, or identity, which would include a referral to someone who offers SOCE counseling, on their face and as applied, abridge Plaintiffs' right to offer and Plaintiffs' clients' right to receive information.

197.     The City and County Ordinances vest unbridled discretion in government officials to apply or not apply the Ordinances in a manner that restricts free speech, and subject Plaintiffs to ethical code violations.

198.     The City and County Ordinances, on their face and as applied, are impermissibly vague as they require licensed professionals subject to their dictates and government officials tasked with enforcing them to guess at their meaning and differ as to their application.

199.     The City and County Ordinances, on their face and as applied, are under-inclusive by limiting the prohibition on using SOCE counseling to minors.

200.     The City and County Ordinances, on their face and as applied, are unconstitutionally overbroad as they chill and abridge the free speech rights of all licensed mental health providers in the City of Boca Raton and County of Palm Beach who use counseling techniques to provide assistance to minors seeking to reduce or eliminate their unwanted same-sex attractions, behaviors, or identity, and do not leave open alternative methods of communication.

201.     The City and County Ordinances' violations of Plaintiffs' rights of free speech have caused, are causing, and will continue to cause Plaintiffs and their clients to suffer undue and actual hardship and irreparable injury.

202.     Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

### COUNT II – THE CITY AND COUNTY ORDINANCES VIOLATE PLAINTIFFS' CLIENTS' FIRST AMENDMENT RIGHT TO RECEIVE INFORMATION

203.     Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1-182.

204.     The First Amendment, as applied to the states by the Fourteenth Amendment, protects an individual's freedom of speech, and the corollary to that right, the right to receive information.

205.     Plaintiffs' clients have sincerely held religious beliefs that shape their desire to receive SOCE counseling and the information that Plaintiffs can provide on reducing or eliminating unwanted same-sex attractions, behaviors, and identity.

206.     The City and County Ordinances prevent Plaintiffs' clients from receiving SOCE counseling and deprive them of the opportunity to even obtain the information about SOCE counseling from licensed mental health professionals in the City and County.

207.     The City and County Ordinances are not supported by compelling government interests.

208.     Even if The City and County Ordinances were supported by compelling government interest, they are not narrowly tailored to achieve that purpose and therefore violate the fundamental rights of Plaintiffs' clients to receive information.

209.     The City and County Ordinances, on their face and as applied, are not the least restrictive means to accomplish any permissible government purpose sought to be served by the law.

210.     The City and County Ordinances' violations of the fundamental rights of Plaintiffs' clients have caused, are causing, and will continue to cause undue and actual hardship and irreparable injury.

211.     Plaintiffs' clients have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

WHEREFORE, Plaintiffs pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT III – THE CITY AND COUNTY ORDINANCES VIOLATE PLAINTIFFS' RIGHT TO FREE EXERCISE OF RELIGION

212.     Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1-182.

213.    The Free Exercise Clause of the First Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, prohibits Defendants from abridging Plaintiffs' right to free exercise of religion.

214.    Many of Plaintiffs' clients have sincerely held religious beliefs that same-sex sexual attractions, behaviors, or identity are wrong, and they seek to resolve these conflicts between their religious beliefs and their attractions in favor of their religious beliefs.

215.    Plaintiffs also have sincerely held religious beliefs to provide spiritual counsel and assistance to their clients who seek such counsel. Plaintiffs hold sincerely held religious beliefs that they should counsel clients on the subject matter of same-sex attractions, behaviors, or identity from a religious viewpoint that aligns with their religious beliefs and those of their clients.

216.    The City and County Ordinances, on their face and as applied, target Plaintiffs' and their clients' sincerely held religious beliefs regarding human nature, gender, ethics, morality, and SOCE counseling, which are informed by the Bible and constitute central components of their faith. The City and County Ordinances cause them a direct and immediate conflict with their religious beliefs by prohibiting them from offering, referring, and receiving counseling that is consistent with their religious beliefs.

217.    The City and County Ordinances, on their face and as applied, have impermissibly burdened Plaintiffs' and their clients' sincerely held religious beliefs and compel them to both change those religious beliefs and to act in contradiction to them. The Ordinances have also forced Plaintiffs and their clients to choose between the teachings and requirements of their sincerely held religious beliefs and the value system imposed by the City and County.

218.    The City and County Ordinances place Plaintiffs and their clients in an irresolvable conflict between compliance with their sincerely held religious beliefs and compliance with the Ordinances.

219.    The Ordinances also put substantial pressure on Plaintiffs and their clients to violate their sincerely held religious beliefs by ignoring the fundamental tenets of their faith concerning same-sex attractions, behaviors, or identity.

220.    The City and County Ordinances, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious speech, beliefs, and viewpoint of those individuals who believe change is possible, and thus expressly constitute a substantial burden on sincerely held religious beliefs that are contrary to the City- and County-approved viewpoints on same-sex attractions, behavior, or identity.

221.    The City's and County's alleged interests in protecting minors from the so-called harm of SOCE counseling are unsubstantiated and do not constitute compelling government interests.

222.    No compelling government interest justifies the burdens Defendants impose upon Plaintiffs and their clients' rights to the free exercise of religion.

223.    Even if the City and County Ordinances were supported by compelling government interests, they are not the least restrictive means to accomplish any permissible government purpose which the City and County Ordinances seek to serve.

224.    The City and County Ordinances, both on their face and as-applied, have failed and refused to accommodate Plaintiffs' sincerely held religious beliefs.

225.    The City and County Ordinances, both on their face and as-applied, specifically target religion for disparate treatment and have set up a system of individualized exemptions that

permits certain counseling on same-sex attractions, behaviors, or identity while denying religious counseling on the same subjects.

226.    The City and County Ordinances, both on their face and as-applied, constitute a religious gerrymander

227.    The City and County Ordinances' violations of Plaintiffs' and their clients' rights to free exercise of religion have caused, are causing, and will continue to cause Plaintiffs and their clients to suffer undue and actual hardship and irreparable injury.

228.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

**COUNT IV – THE CITY AND COUNTY ORDINANCES VIOLATE PLAINTIFFS' RIGHTS TO LIBERTY OF SPEECH UNDER ARTICLE 1, SECTION 4 OF THE FLORIDA CONSTITUTION**

229.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1-182.

230.    Article I, §4 of the Constitution of the State of Florida states, "Every person may speak, write and publish sentiments on all subjects but shall be responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press."

231.    The City and County Ordinances, on their face and as applied, are unconstitutional prior restraints on Plaintiffs' speech.

232.    The City and County Ordinances, on their face and as applied, unconstitutionally discriminate on the basis of viewpoint.

233.    The City and County Ordinances, on their face and as applied, authorize only one viewpoint on SOCE counseling and unwanted same-sex sexual attractions, behaviors, and identity

by forcing Plaintiffs to present only one viewpoint on the otherwise permissible subject matter of same-sex attractions, behaviors, or identity. The City and County Ordinances also force Plaintiffs' clients to receive only one viewpoint on this otherwise permissible subject matter.

234.    The City and County Ordinances, on their face and as applied, discriminate against Plaintiffs' speech on the basis of the content of the message they offer or that Plaintiffs' clients seek to receive.

235.    Defendants lack compelling, legitimate, significant, or even rational governmental interests to justify the City and County Ordinances' infringements of the right to free speech.

236.    The City and County Ordinances, on their face and as applied, are not the least restrictive means to accomplish any permissible government purposes sought to be served by the laws.

237.    Informed consent provisions outlining the required disclosure prior to engaging in SOCE counseling with a minor would have been far less restrictive of Plaintiffs' speech, and mental health counseling organizations have urged legislatures to adopt informed consent provisions. (*See* Ex. G).

238.    The City and County Ordinances do not leave open ample alternative channels of communication for Plaintiffs.

239.    The City and County Ordinances, on their face and as applied, are irrational and unreasonable and impose unjustifiable and unreasonable restrictions on constitutionally protected speech.

240.    The City and County Ordinances, on their face and as applied, unconstitutionally chill and abridge the right of Plaintiffs to freely communicate information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

241.    The City and County Ordinances, on their face and as applied, unconstitutionally chill and abridge the right of Plaintiffs' clients to freely receive information pertaining to unwanted same-sex sexual attractions, behaviors, or identity.

242.    The City and County Ordinances' prohibitions on licensed mental health counselors offering voluntary SOCE counseling that could change, reduce, or otherwise address a minor client's unwanted same-sex attractions, behaviors, or identity, which would include a referral to someone who offers SOCE counseling, on their face and as applied, abridge Plaintiffs' rights to offer and Plaintiffs' clients' rights to receive information.

243.    The City and County Ordinances vest unbridled discretion in government officials, including Defendants, to apply or not apply the Ordinances in a manner that restricts free speech, and subject Plaintiffs to ethical code violations.

244.    The City and County Ordinances, on their face and as applied, are impermissibly vague as they require licensed professionals subject to their dictates and government officials tasked with enforcing them to guess at their meaning and differ as to their application.

245.    The City and County Ordinances, on their face and as applied, are under-inclusive by limiting the prohibition on SOCE counseling to minors.

246.    The City and County Ordinances, on their face and as applied, are unconstitutionally overbroad as they chill and abridge the free speech rights of all licensed mental health providers in the City of Boca Raton and County of Palm Beach who use voluntary counseling techniques that have the potential to help minors reduce or eliminate their unwanted same-sex attractions, behaviors, or identity and do not leave open alternative methods of communication.

247.    The City and County Ordinances' violation of Plaintiffs' rights of free speech have caused, are causing, and will continue to cause Plaintiffs and their clients to suffer undue and actual hardship and irreparable injury.

248.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

### COUNT V – THE CITY AND COUNTY ORDINANCES VIOLATE PLAINTIFFS' RIGHT TO FREE EXERCISE AND ENJOYMENT OF RELIGION UNDER ARTICLE I, SECTION 3 OF THE FLORIDA CONSTITUTION

249.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1-182.

250.    Article I, § 3 of the Florida Constitution states, "There shall be no law respecting the establishment of religion or prohibiting or penalizing the free exercise thereof."

251.    Many of Plaintiffs' clients have sincerely held religious beliefs that same-sex sexual attractions, behaviors, or identity are wrong, and they seek to resolve these conflicts between their religious beliefs and their attractions in favor of their religious beliefs.

252.    Plaintiffs also have sincerely held religious beliefs to provide spiritual counsel and assistance to their clients who seek such counsel. Plaintiffs hold sincerely held religious beliefs that they should counsel clients on the subject matter of same-sex attractions, behaviors, or identity from a religious viewpoint that aligns with their religious beliefs and those of their clients.

253.    The City and County Ordinances, on their face and as applied, target Plaintiffs' and their clients' sincerely held religious beliefs regarding human nature, gender, ethics, morality, and SOCE counseling, which are informed by the Bible and constitute central components of their faith. The City and County Ordinances will cause them a direct and immediate conflict with their

religious beliefs by prohibiting them from offering, referring, and receiving counseling that is consistent with their religious beliefs.

254.   The City and County Ordinances, on their face and as applied, have impermissibly burdened Plaintiffs' and their clients' sincerely held religious beliefs and compel them to both change those religious beliefs and to act in contradiction to them. The City and County Ordinances have also forced Plaintiffs and their clients to choose between the teachings and requirements of their sincerely held religious beliefs and the value system imposed by the City and County.

255.   The City and County Ordinances place Plaintiffs and their clients in an irresolvable conflict between compliance with their sincerely held religious beliefs and compliance with the Ordinances.

256.   The City and County Ordinances put substantial pressure on Plaintiffs to violate their sincerely held religious beliefs by ignoring the fundamental tenets of their faith concerning same-sex attractions, behaviors, or identity

257.   The City and County Ordinances, on their face and as applied, are neither neutral nor generally applicable, but rather specifically and discriminatorily target the religious speech, beliefs, and viewpoint of those individuals who believe change is possible. The City and County Ordinances, expressly on their face and as applied, constitute a substantial burden on sincerely held religious beliefs that are contrary to the City- and County-approved viewpoints on same-sex attractions, behavior, or identity.

258.   The City's and County's alleged interests in protecting minors from the so-called harm of SOCE counseling are unsubstantiated and do not constitute compelling government interests.

259.     No compelling government interests justify the burdens Defendants impose upon Plaintiffs' and their clients' rights to the free exercise of religion.

260.     Even if the City and County Ordinances were supported by compelling government interests, they are not the least restrictive means to accomplish any permissible government purpose which the Ordinances seek to serve.

261.     The City and County Ordinances, both on their face and as-applied, have failed and refused to accommodate Plaintiffs' sincerely held religious beliefs.

262.     The City and County Ordinances, both on their face and as-applied, specifically target religion for disparate treatment and have set up a system of individualized exemptions that permits certain counseling on same-sex attractions, behaviors, or identity while denying religious counseling on the same subject.

263.     The City and County Ordinances, both on their face and as-applied, constitute a religious gerrymander.

264.     The City and County Ordinances' violations of Plaintiffs' and their clients' rights to free exercise of religion have caused, are causing, and will continue to cause Plaintiffs and their clients to suffer undue and actual hardship and irreparable injury.

265.     Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

**COUNT VI – THE CITY AND COUNTY HAD NO AUTHORITY TO ENACT THE ORDINANCES AND THEIR ADOPTION IS THUS *ULTRA VIRES* UNDER FLORIDA STATUTES AND ARTICLE VIII, SECTIONS 1(G) AND 2(B) OF THE FLORIDA CONSTITUTION**

266.     Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1-182.

267.     Article VIII, §2(b) of the Florida Constitution provides that "[m]unicipalities shall have governmental, corporate and proprietary powers to enable them to conduct municipal government, perform municipal functions and render municipal services, and may exercise any power for municipal purposes except as otherwise provided by law."

268.     Fla. Stat. Ann. §166.021(1) provides: "municipalities shall have the governmental, corporate, and proprietary powers to enable them to conduct municipal government, perform municipal functions, and render municipal services, and may exercise any power for municipal purposes, except when expressly prohibited by law."

269.     Fla. Stat. Ann. §166.021(2) defines "municipal purpose" as "any activity or power which may be exercised by the state or its political subdivisions."

270.     Fla. Stat. Ann. §166.021(3)(c) states that the legislative body of each municipality has the power to enact legislation concerning any subject matter upon which the state Legislature may act, except "[a]ny subject expressly preempted to state or county government by the constitution or by general law."

271.     As a municipality in the State of Florida, the City is limited to enacting ordinances for "municipal purposes" as provided in Fla. Stat. Ann. §166.021(2), but only to the extent that said purposes do not seek to impose regulations on any subject that has been preempted by the State of Florida.

272.     Article VIII, §1(g) of the Florida Constitution provides that "Counties operating under county charters shall have all powers of local self-government not inconsistent with general law, or with special law approved by vote of the electors. The governing body of a county operating under a charter may enact county ordinances not inconsistent with general law."

273.    The County of Palm Beach has enacted a home rule charter pursuant to Fla. Stat. Ann. §125.60 and therefore is empowered to enact county ordinances, but said ordinances cannot be inconsistent with general law as adopted by the State Legislature.

274.    The Legislature of the State of Florida has pre-empted the field of regulation of mental health professionals, through enactment of Florida Statutes, Title XXXII, Chapter 491.

275.    More particularly, the Legislature of the State of Florida has pre-empted the field of disciplinary actions for licensed mental health professionals in Fla. Stat. Ann. § §491.009 and the regulations promulgated thereunder, Fla. Admin. Code Ann. r. 64B-5001.

276.    Fla. Admin. Code Ann. r. 64B-5001 sets forth procedures for determining whether a licensed mental health professional in the State of Florida has engaged in conduct that is subject to discipline, and establishes schedules of fees and penalties for said conduct.

277.    The Legislature of the State of Florida has not prohibited the use of so-called "conversion therapy" or SOCE counseling or otherwise included the use of such counseling in the list of conduct that can subject a licensed mental health professional to disciplinary action under Fla. Stat. Ann. §491.009 or Fla. Admin. Code Ann. r. 64B-5001.

278.    In fact, in its capacity as the sole regulator of mental health professionals in the State of Florida, the Legislature has specifically declined to adopt such restrictions on SOCE counseling. Indeed, H.B. 137, 2016 Leg. (Fla. 2016) and S.B. 258 2016 Leg. (Fla. 2016), which were both proposals to prohibit SOCE counseling, were defeated in committee and thus not adopted by the sole regulator of mental health professionals in Florida.

279.    The City and County Ordinances prohibit licensed mental health professionals from practicing a type of mental health counseling that is not prohibited by the state and that the state specifically chose not prohibit when it had the opportunity.

280.    The City and County have no authority to adopt any ordinance or provision that exceeds state law in a preempted field, and their actions are void *ab initio* as *ultra vires* acts in violation of the laws and Constitution of the State of Florida.

281.    Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

## COUNT VII – THE CITY AND COUNTY ORDINANCES VIOLATE PLAINTIFFS' RIGHTS UNDER THE FLORIDA PATIENT'S BILL OF RIGHTS AND RESPONSIBILITIES

282.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1-182.

283.    Plaintiffs' clients have the "right to impartial access to medical treatment or accommodations, regardless of . . . religion." Fla. Stat. Ann. §381.026(4)(d)(1).

284.    Plaintiffs' clients have the "right to access any mode of treatment that is, in his or her own judgment and the judgment of his or her health care practitioner, in the best interests of the patient, including complementary or alternative health care treatments, in accordance with the provisions of §456.41." Fla. Stat. Ann. §381.026(4)(d)(3).

285.    Plaintiffs Dr. Otto and Dr. Hamilton are "health care practitioners" under the Florida Patient's Bill of Rights and Responsibilities because they are health care practitioners under Fla. Stat. Ann. §456.41. *See* Fla. Stat. Ann. §456.41(2)(b) (defining "health care practitioner" as that terms is defined in Fla. Stat. Ann. §456.001(4), which includes marriage and family therapist licensed under Fla. Stat. Ann. §491.003(5)).

286.    Fla. Stat. Ann. §456.41 states that "[i]t is the intent of the Legislature that citizens be able to choose from all health care options, including the prevailing or conventional treatment

methods as well as other treatments designed to complement or substitute for the prevailing or conventional treatment methods." Fla. Stat. Ann. §456.41(1).

287.    Fla. Stat. Ann. §456.41 states that "[i]t is the intent of the Legislature that health care practitioners be able to offer complementary or alternative health care treatments." *Id.*

288.    "Complementary or alternative health care treatment means **any treatment** that is designed to provide patients with an effective option to the prevailing or conventional treatments methods." Fla. Stat. Ann. §456.41(2)(a) (emphasis added).

289.    If SOCE counseling is considered "complementary or alternative health care treatment," Plaintiffs have a right to offer and their clients have a right to receive such counseling under Florida law.

290.    Plaintiffs Dr. Otto and Dr. Hamilton desire to offer SOCE counseling in the City and County to those minor clients who desire such counseling and are seeking their expertise in engaging in such counseling.

291.    Plaintiffs Dr. Otto and Dr. Hamilton comply with all requirements of Fla. Stat. Ann. §456.41(3), by providing all required information to their clients prior to engaging in SOCE counseling, and by obtaining informed consent from the client.

292.    In the informed and best judgment of Plaintiffs Dr. Otto and Dr. Hamilton, voluntary SOCE counseling is in the best interest of those clients experiencing unwanted same-sex attractions, behaviors, or identity.

293.    In the informed and best judgment of Plaintiffs' clients, voluntary SOCE counseling is in their best interest.

294.    By prohibiting voluntary SOCE counseling, the Ordinance violates Plaintiffs Dr. Otto's and Dr. Hamilton's right to offer SOCE counseling in compliance with Fla. Stat. Ann. §381.026(d)(2) and Fla. Stat. Ann. §456.41.

295.    By prohibiting voluntary SOCE counseling, the Ordinance violates Plaintiffs' clients' right to receive SOCE counseling under Fla. Stat. Ann. §381.026(d)(3).

296.    Plaintiffs' clients have sincerely held religious beliefs that they should seek counseling to aid them in reducing or eliminating their unwanted same-sex attractions, behaviors, and identity, and Plaintiffs Dr. Otto and Dr. Hamilton have sincerely held religious beliefs that they should offer such counseling to those clients who seek such counseling to conform their attractions, behaviors, and identity to their sincerely held religious beliefs.

297.    By prohibiting voluntary SOCE counseling, the Ordinance violates Plaintiffs' clients' right to impartial access of medical treatment and accommodations based on their religious beliefs under Fla. Stat. Ann. §381.026(d)(1).

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief.

### COUNT VIII – THE CITY AND COUNTY ORDINANCES VIOLATE PLAINTIFFS' RIGHTS UNDER THE FLORIDA RELIGIOUS FREEDOM RESTORATION ACT

298.    Plaintiffs hereby reiterate and adopt each and every allegation in paragraphs 1-182.

299.    Fla. Stat. Ann. § 761.03 prohibits the government from substantially burdening a person's exercise of religion, "even if the burden result from a rule of general applicability." Fla. Stat. Ann. § 761.03(1).

300.    If the government does burden an individual's exercise of religion, it must demonstrate that "application of the burden to the person: (a) Is in furtherance of a compelling

government interest; and (b) Is the least restrictive mean of furthering that compelling government interest." Fla. Stat. Ann. § 761.03(1)(a)-(b).

301.    Any person whose religious beliefs were burdened by the government "may assert that violation as a claim or defense in a judicial proceeding." Fla. Stat. Ann. § 761.03(2).

302.    Plaintiffs and their clients have sincerely held religious beliefs that same-sex sexual attractions, behaviors, or identity are wrong, and they seek to resolve these conflicts between their religious beliefs and their attractions in favor of their religious beliefs.

303.    Plaintiffs also have sincerely held religious beliefs to provide spiritual counsel and assistance to their clients who seek such counsel. Plaintiffs hold sincerely held religious beliefs that they should counsel clients on the subject matter of same-sex attractions, behaviors, or identity from a religious viewpoint that aligns with their religious beliefs and those of their clients.

304.    The City and County Ordinances, on their face and as applied, target Plaintiffs' and their clients' sincerely held religious beliefs regarding human nature, gender, ethics, morality, and SOCE counseling, which are informed by the Bible and constitute central components of their faith. The Ordinances cause them a direct and immediate conflict with their religious beliefs by prohibiting them from offering, referring, and receiving counseling that is consistent with their religious beliefs.

305.    The City and County Ordinances, on their face and as applied, have substantially and impermissibly burdened Plaintiffs' and their clients' sincerely held religious beliefs and compel them to both change those religious beliefs and to act in contradiction to them. The Ordinances have also forced Plaintiffs and their clients to choose between the teachings and requirements of their sincerely held religious beliefs and the value system imposed by the City and County.

306.     No compelling government interest justifies the burdens Defendants impose upon Plaintiffs and their clients' rights to the free exercise of religion.

307.     Even if the Ordinances were supported by a compelling government interest, they are not the least restrictive means to accomplish any permissible government purpose which the Ordinances seek to serve.

308.     Plaintiffs have no adequate remedy at law to correct the continuing deprivation of their most cherished constitutional liberties.

WHEREFORE, Plaintiffs respectfully pray for the relief against Defendants as hereinafter set forth in their prayer for relief

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief as follows:

A.     That this Court issue a Preliminary Injunction enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in active concert or participation with them, from enforcing the City and County Ordinances so that:

   i.   Defendants will not use the City and County Ordinances in any manner to infringe Plaintiffs' constitutional and statutory rights in the counseling of their clients or from offering a viewpoint on an otherwise permissible subject matter;

   ii.  Defendants will not use the City and County Ordinances in any manner to prohibit Plaintiffs from engaging in SOCE counseling with those minor clients who seek such counseling;

   iii. Defendants will not use the City and County Ordinances to prohibit Plaintiffs' clients from seeking or receiving SOCE counseling for unwanted same-sex sexual attractions, behaviors, or identity; and

iv.   Defendants will not use the City and County Ordinances in any manner to punish Plaintiffs or their clients for engaging, referring to, seeking, or receiving voluntary SOCE counseling.

B.     That this Court issue a Permanent Injunction enjoining Defendants, Defendants' officers, agents, employees, attorneys, and all other persons acting in active concert or participation with them, from enforcing the City and County Ordinances so that:

i.   Defendants will not use the City and County Ordinances in any manner to infringe Plaintiffs' constitutional and statutory rights in the counseling of their clients or from offering a viewpoint on an otherwise permissible subject matter;

ii.   Defendants will not use the City and County Ordinances in any manner to prohibit Plaintiffs from engaging in SOCE counseling with those minor clients who seek such counseling;

iii.   Defendants will not use the City and County Ordinances to prohibit Plaintiffs' clients from seeking or receiving SOCE counseling for unwanted same-sex sexual attractions, behaviors, or identity; and

iv.   Defendants will not use the City and County Ordinances in any manner to punish Plaintiffs or their clients for engaging, referring to, seeking, or receiving voluntary SOCE counseling.

C.     That this Court render a Declaratory Judgment declaring the City and County Ordinances and Defendants' actions in applying the City and County Ordinances unconstitutional under the United States Constitution and Florida Constitution, and declaring that:

i.   Defendants violated Plaintiffs' and their clients' right to freedom of speech by prohibiting them from providing, referring to, seeking, or receiving information concerning SOCE counseling;

ii.   Defendants violated Plaintiffs' and their clients' right to free exercise of religion by prohibiting Plaintiffs from providing, referring to, seeking, or receiving information concerning SOCE counseling in accordance with their sincerely held religious beliefs;

iii.   Defendants acted without authority under Florida law and Article VIII, § 2(b) of the Florida Constitution, and their *ultra vires* actions in adopting and approving the City and County Ordinances were void *ab initio* such that the City and County Ordinances are of no force and effect;

iv.   Defendants violated Fla. Stat. Ann. §381.026(d)(3) by infringing Plaintiffs' right to offer, and their clients' right to receive, available methods of treatment that Plaintiffs and their clients believe are in their best interest;

v.   Defendants violated Fla. Stat. Ann. §381.026(d)(1) by infringing Plaintiffs' clients' right to receive medical treatment regardless of their religious beliefs; and

vi.   Defendants violated Fla. Stat. Ann. § 763.01 by substantially burdening Plaintiffs' and their clients' free exercise of religion, that Defendants had no compelling interest in enacting the City and County Ordinances, and that the Ordinances are not narrowly tailored to achieve any government interest.

D.   That this Court award Plaintiffs nominal damages for the violation of Plaintiffs' constitutional rights.

E.       That this Court award Plaintiffs actual damages in an amount to be determined at trial;

F.       That this Court adjudge, decree, and declare the rights and other legal relations with the subject matter here in controversy so that such declaration shall have the force and effect of final judgment;

G.       That this Court retain jurisdiction of this matter for the purpose of enforcing this Court's order;

H.       That this Court award Plaintiffs the reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. § 1988.

I.       That this Court grant such other and further relief as this Court deems equitable and just under the circumstances.

/s/ Horatio G. Mihet
Mathew D. Staver (FL Bar 0701092)
Horatio G. Mihet (FL Bar 026581)
Roger K. Gannam (FL Bar 240450)
Daniel J. Schmid*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Facsimile: (407) 875-0770
Email: court@lc.org

*Pro hac vice pending
Attorneys for Plaintiffs

## VERIFICATION

I, Robert W. Otto, Ph.D., LFMT, am over the age of 18 and one of the Plaintiffs in this action. The statements and allegations about me or which I make in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed this __7th__ day of June, 2018

_Robert W. Otto, Ph.D._

Robert W. Otto, Ph.D. LMFT

**VERIFICATION**

I, Julie H. Hamilton, Ph.D. LFMT, am over the age of 18 and one of the Plaintiffs in this action. The statements and allegations about me or which I make in this VERIFIED COMPLAINT are true and correct, based upon my personal knowledge (unless otherwise indicated), and if called upon to testify as to their truthfulness, I would and could do so competently. I declare under penalties of perjury, under the laws of the United States, that the foregoing statements are true and correct.

Executed this ___ day of June, 2018

Julie H. Hamilton, Ph.D. LMFT

8

IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| ROBERT W. OTTO, PH.D. LMFT, | ) | |
| individually and on behalf of his patients, | ) | |
| JULIE H. HAMILTON, PH.D., LMFT, | ) | |
| individually and on behalf of her patients, | ) | Civil Action No.:___9:18-cv-80771-RLR___ |
| | ) | |
| Plaintiffs, | ) | **INJUNCTIVE RELIEF SOUGHT** |
| v. | ) | |
| | ) | |
| CITY OF BOCA RATON, FLORIDA, | ) | |
| and COUNTY OF PALM BEACH, | ) | |
| FLORIDA, | ) | |
| | ) | |
| Defendants | ) | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
WITH INCORPORATED MEMORANDUM OF LAW**

# TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................................i

TABLE OF AUTHORITIES........................................................................................iii

REQUEST FOR HEARING........................................................................................vii

PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION...................................1

MEMORANDUM OF LAW IN SUPPORT..................................................................1

BACKGROUND FACTS.............................................................................................2

LEGAL ARGUMENT.................................................................................................3

I.       PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE
         MERITS. ........................................................................................................3

         A.       The Ordinances Unconstitutionally Discriminate On The Basis Of
                  Viewpoint..........................................................................................3

         B.       The Ordinances Unconstitutionally Discriminate On The Basis Of Content..........7

                  1.       No Compelling Government Interests Support The Ordinances.................9

                           a.       "Dubious" decisions from other Circuits do not constitute
                                    a compelling interest......................................................9

                           b.       Defendants cannot assert a compelling interest in
                                    preventing harm from voluntary SOCE counseling to
                                    willing minor clients....................................................10

                           c.       Defendants' own studies admit that "no empirical research"
                                    supports banning voluntary SOCE counseling for willing
                                    minor clients, and Defendants cannot manufacture a
                                    compelling interest by misrepresenting those studies...................11

                  2.       The Ordinances Are Not Narrowly Tailored.............................................12

         C.       The Ordinances Are Unconstitutional Prior Restraints.........................................15

         D.       The Ordinances Are Unconstitutionally Vague....................................................16

         E.       Defendants' Enactment Of The Ordinances Is *Ultra Vires* And *Void
                  Ab Initio*........................................................................................17

II.     PLAINTIFFS ARE SUFFERING IRREPARABLE INJURY..........................................19

III.    THE BALANCE OF THE EQUITIES FAVORS INJUNCTIVE RELIEF......................20

IV.     INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST.........................................20

CONCLUSION...........................................................................................................................21

# TABLE OF AUTHORITIES

**Cases**

*ACLU of Ill. v. Alvarez*, 679 F.3d 583 (7th Cir. 2012)....................................................20

*ASF, Inc. v. City of Seattle*, 408 F. Supp. 2d 1102 (W.D. Wash. 2005) ..........................16

*Awad v. Ziriax*, 670 F.3d 1111 (10th Cir. 2012) ............................................................15

*Bantham Books, Inc. v. Sullivan*, 372 U.S. 58 (1963) ....................................................15

*Broadrick v. Oklahoma*, 413 U.S. 601 (1973) ...............................................................17

*Cate v. Oldham*, 707 F.2d 1176 (11th Cir. 1983) ..........................................................19

*City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789 (1984) .............................4

*Classy Cycles, Inc. v. Bay Cnty.*, 201 So.3d 779 (Fla. 2016) .........................................18

*Connally v. Gen. Const. Co.*, 269 U.S. 385 (1926) ........................................................16

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) .......................................................5, 6

*D'Ambra v. City of Providence*, 21 F. Supp. 2d 106 (D.R.I. 1998) ...............................16

*Elrod v. Burns*, 427 U.S. 347 (1976) .......................................................................19, 20

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618 (1995) ..................................................6

*Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123 (1992) .......................................15

*Grayned v. City of Rockford*, 408 U.S. 104 (1972) .................................................16, 17

*Horton v. City of St. Augustine*, 272 F.3d 1318 (11th Cir. 2001) ..................................15

*Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360 (M.D. Fla. 2000......................16

*Joelner v. Vill. of Washington Park*, 378 F.3d 613 (7th Cir. 2004)...............................20

*KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261 (11th Cir. 2006). .....................20

*King v. Governor of New Jersey*, 767 F.3d 216 (3d Cir. 2014) .......................................8

*Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384 (1993) ..............4

*Legal Servs. Corp. v. Valazquez*, 531 U.S. 533 (2001) ...................................................5

*Machesky v. Bizzell*, 414 F.2d 283 (5th Cir. 1969) .....................................................20

*NAACP v. Button*, 371 U.S. 415 (1963) ..............................................................8, 16

*Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283 (11th Cir. 1990) ...................................19

*Pickup v. Brown,* 740 F. 3d 1208 (9th Cir. 2014) ..........................................................9

*R.A.V. v. City of St. Paul*, 505 U.S. 377 (1992) ..................................................7, 13, 14

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ......................................................7, 8

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995)...........................3

*Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115 (1989) ........................................13

*Sarasota Alliance For Fair Elections, Inc. v. Browning*, 28 So.3d 880 (Fla. 2010)...............17, 18

*Schneider v. New Jersey*, 308 U.S. 147 (1939) ..........................................................20

*Searcy v. Harris*, 888 F.2d 1314 (11th Cir. 1989) ........................................................4

*Siegel v. Lepore*, 234 F.3d 1163 (11th Cir. 2000) ..........................................................3

*Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105 (1991)..................................................................................8

*Sorrell v. IMS Health*, 131 S. Ct. 2653 (2011) ...............................................3, 5, 10, 13

*Time, Inc. v. Hill*, 385 U.S. 374 (1967) ....................................................................20

*United States v. Frandsen*, 212 F.3d 1231 (11th Cir. 2000) ........................................15

*United States v. Salerno*, 481 U.S. 739 (1987) ..........................................................15

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489 (1982)..........................16

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989) ....................................................13

*Wollschlaeger v. Florida*, 848 F.3d 1293 (11th Cir. 2017) ......................................*passim*

**Statutes**

Fed. R. Civ. P. 65.................................................................................................................1

Fla. Stat. Ann. §491.009...............................................................................................13, 14

Fla. Stat. Ann. §491.001..........................................................................................................14

Fla. Admin. Code §64B5-5.001..............................................................................................14

S.D. Fla. L.R. 7.1....................................................................................................................1

## REQUEST FOR HEARING

Pursuant to S.D. Fla. L.R. 7.1(b)(2), Plaintiffs hereby request that their Motion for Preliminary Injunction be scheduled for a hearing at the Court's earliest opportunity. Given the significant First Amendment issues presented in Plaintiffs' Motion for Preliminary Injunction, and the ongoing and irreparable injury being visited on Plaintiffs and their clients each day Defendants' Ordinances remain in effect, Plaintiffs believe that oral argument would assist this Court in understanding and deciding the weighty constitutional issues presented in the instant Motion.

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Pursuant to Fed. R. Civ. P. 65 and. S.D. Fla. L.R.7.1, Plaintiffs, ROBERT W. OTTO, PH.D. LMFT and JULIE H. HAMILTON, PH.D., LMFT, individually and on behalf of their patients, respectfully move this Court to enter a preliminary injunction enjoining Defendants, CITY OF BOCA RATON, FLORIDA ("City") and COUNTY OF PALM BEACH ("County"), together with their officers, agents, servants, employees, and others who are in active concert or participation with them, from enforcing Boca Raton City Ordinance 5407 ("City Ordinance") and Palm Beach County Ordinance 2017-046 ("County Ordinance") (collectively "Ordinances"), on the grounds that the Ordinances violate the First Amendment and Florida law.

## MEMORANDUM OF LAW IN SUPPORT

### "**We found no empirical research on adolescents <u>who request</u> SOCE**."[1]

By enacting the Ordinances, Defendants are storming the office doors of therapists, thrusting themselves into the sacrosanct relationship of counselor and client, and running roughshod over the clients' and counselors' cherished First Amendment liberties. Defendants' justification for such unconscionable actions is that they do not approve of counseling which addresses the possibility of reducing or eliminating minors' unwanted same-sex attractions ("SSA") or desires to "transition to another gender," **even if the clients desire such change**. Defendants offer no evidence of harm arising from such **voluntary** treatment, but rely upon position papers from advocacy groups, an inconclusive study, and court decisions upholding similar ordinances in other states, which the Eleventh Circuit has dismissed as "dubious."

---

[1]      2009 American Psychological Association Task Force Report on Appropriate Therapeutic Response to Sexual Orientation, on which **Defendants** principally rely. (Verified Complaint, Ex. C, p. 73) (emphasis added).

*Wollschlaeger v. Florida*, 848 F.3d 1293, 1307 (11th Cir. 2017) (en banc). The Ordinances are in gross violation of the Constitution and Florida law, and should be enjoined.

## BACKGROUND FACTS

Plaintiffs refer to the sworn facts set forth in the Verified Complaint ("VC") filed simultaneously with this Motion and Memorandum, and incorporate those facts herein as if set forth in full. Without limitation, Plaintiffs particularly emphasize the following facts:

Plaintiffs Robert Otto ("Dr. Otto") and Julie Hamilton ("Dr. Hamilton") are licensed marriage and family therapists practicing in the City of Boca Raton and County of Palm Beach. (VC ¶¶ 125, 140). As part of their practices, they counsel **willing** minors who are experiencing unwanted SSA and would like to reduce or eliminate the unwanted desires. (VC ¶¶ 126, 142). Many of the clients are Christians who struggle with the conflict between their unwanted SSA and their sincerely held religious beliefs, and they ask Plaintiffs for help in reducing or eliminating SSA to relieve the conflict. (VC ¶¶ 129, 145). The talk therapy that Plaintiffs use to help their clients achieve their goals of reducing or eliminating SSA constitutes Sexual Orientation Change Efforts ("SOCE") counseling, which the Ordinances now prohibit. (VC ¶¶ 126, 142).

Plaintiffs would never force any therapy on any unwilling client, minor or adult. (VC ¶¶131-35, 143-54). Plaintiffs only conduct therapy to assist clients, including minors, with **goals and objectives that the clients themselves set**. (*Id.* ¶¶71-82, 131-35, 143-54). **Plaintiffs would never engage in any counseling with any minor client unless the client himself or herself desires counseling and provides informed consent**. (*Id.*).

Defendants' Ordinances prohibit licensed professionals such as Plaintiffs from engaging in voluntary SOCE counseling under threat of fines and disciplinary actions. (VC, Exs. A, B). Defendants have carved out individualized exemptions and exceptions for counseling that affirms

and supports minors' SSA and desires to "transition to another gender," thereby punishing only the viewpoint that these attractions can be changed if the client desires. (VC Exs. A, B). The Ordinances purport to be aimed at protecting minors from harm caused by SOCE counseling, but offer no evidence of such harm for SOCE counseling **that is voluntarily sought, given and received**. (VC ¶¶131, 144). State regulatory officials have confirmed that there are no records of complaints of harm from voluntary SOCE counseling. (VC Ex. F). In addition, the Ordinances purport to impose differential regulations on practitioners than are imposed elsewhere in Florida, exceeding Defendants' constitutional and statutory authority. (*Id.* ¶¶ 139, 161, 267-81).

**LEGAL ARGUMENT**

Injunctive relief is appropriate where, as here: (1) Plaintiffs have a substantial likelihood of success on the merits, (2) Plaintiffs will suffer irreparable injury absent injunctive relief, (3) the balance of the equities tips in Plaintiffs' favor, and (4) the injunction would serve the public interest. *Siegel v. Lepore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc). Plaintiffs meet these criteria and the injunction should issue.

**I.      PLAINTIFFS HAVE A SUBSTANTIAL LIKELIHOOD OF SUCCESS ON THE MERITS.**

**A.      The Ordinances Unconstitutionally Discriminate On The Basis Of Viewpoint.**

A viewpoint-based restriction on private speech has never been upheld by the Supreme Court or any court. Indeed, a finding of viewpoint discrimination is dispositive. *See Sorrell v. IMS Health*, 131 S. Ct. 2653, 2667 (2011). "It is axiomatic that the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "When the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the

more blatant." *Id.* at 829. In fact, **viewpoint-based regulations are always unconstitutional**. *See, e.g.*, *Lamb's Chapel v. Ctr. Moriches Union Free Sch. Dist.*, 508 U.S. 384, 394 (1993) ("'the First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others'") (quoting *City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 804 (1984)). *See also Searcy v. Harris*, 888 F.2d 1314, 1324 (11th Cir. 1989) (the government "may not discriminate between speakers who will speak on the topic merely because it disagrees with their views"); *id.* at 1325 ("**The prohibition against viewpoint discrimination is firmly embedded in first amendment analysis**." (emphasis added)).

The Ordinances are textbook examples of viewpoint discrimination. On their face, the Ordinances purport to allow licensed therapists to discuss the subject of sexual orientation, but explicitly prohibit only one particular viewpoint on that subject, namely that unwanted SSA can be reduced or eliminated to the benefit of the client, if the client so desires. The Ordinances define "conversion therapy" in such a way that it is clear that Defendants are targeting only one viewpoint, *i.e.*, SOCE that seeks to "eliminate or reduce sexual or romantic attractions or feelings **toward individuals of the same gender or sex**." (VC, Ex A at 6 (emphasis added)). Similarly, the Ordinances permit counselors to accept and facilitate SSA, even if their minor clients are merely questioning such feelings, but prohibit counselors from counseling minor clients to change unwanted SSA, even when the minor clients themselves request and seek that outcome. (*Id.*).

The Ordinances purport to prohibit licensed counselors from engaging in any practice that seeks to change behaviors, gender identity, or gender expression. But the plain text of the Ordinances demonstrates that they only prohibit such counseling for minor clients who wish to reduce or eliminate behaviors, identity, or expressions that differ from their biological sex. That this is true cannot be questioned because the Ordinances specifically exempt counseling that

"provides support and assistance to a person undergoing gender transition." (VC, Ex. A at 6; Ex. B at 5). To undergo "gender transition," one has to be – at minimum – seeking to change from one gender to the other. To transition is to change. So, under the Ordinances, if a minor client wants to undergo radical surgery to alter their appearance or genitalia, Defendants have no problem with a counselor providing counseling to assist in that change. But, if a minor client merely wants to speak with a counselor about unwanted feelings concerning their gender identity or expression, the counselor is absolutely prohibited from engaging in such counseling if it aids the minor in reducing unwanted other-sex identity, behaviors, or expressions. There can be no question that this is viewpoint discrimination.

The Supreme Court and several other courts have invalidated regulations of professional speech as unconstitutional viewpoint discrimination. *See Sorrell*, 131 S. Ct. 2653 (2011); *Legal Servs. Corp. v. Valazquez*, 531 U.S. 533 (2001); *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002). In these cases, the courts recognized the axiomatic truth that the government is not permitted to impose its viewpoint on speakers, even professional speakers subject to licensing requirements and regulation.

In *Velazquez*, the Court addressed a federal funding limitation on legal aid attorneys that operated in the same viewpoint-based manner as the Ordinances. *Velazquez*, 531 U.S. at 537-38. The law provided that attorneys could not receive funds if they challenged welfare laws. The Court invalidated the law as viewpoint discriminatory, because it had the effect of prohibiting "advice or argumentation that existing welfare laws are unconstitutional or unlawful," and thereby excluded certain "vital theories and ideas" from the lawyers' representation. *Id.* at 547-49.

In *Conant*, the Ninth Circuit invalidated a federal policy that punished physicians for communicating with their patients about the benefits or options of marijuana as a potential

treatment. *Conant*, 309 F.3d at 633. The Ninth Circuit noted that the doctor-patient relationship is

entitled to robust First Amendment protection:

> An integral component of the practice of medicine is the communication between a doctor and a patient. **Physicians must be able to speak frankly and openly to patients**. That need has been recognized by courts through the application of the common law doctor-patient privilege.

*Id.* at 636 (emphasis added). Far from being a First Amendment orphan, such professional speech

"may be entitled to the strongest protection our Constitution has to offer." *Id.* at 637 (quoting

*Florida Bar v. Went For It, Inc.*, 515 U.S. 618, 634 (1995)). The ban impermissibly regulated

physician speech based on viewpoint:

> The government's policy in this case seeks to punish physicians on the basis of the content of doctor-patient communications. Only doctor-patient conversations that include discussions of the medical use of marijuana trigger the policy. Moreover, the **policy does not merely prohibit the discussion of marijuana; it condemns expression of a particular viewpoint, i.e., that medical marijuana would likely help a specific patient**. Such condemnation of particular views is especially troubling in the First Amendment context.

*Id.* at 637-38 (emphasis added). The court rejected as inadequate the government's justification

that the policy prevented clients from engaging in harmful behavior, and permanently enjoined

enforcement of the policy. *Id.* at 638-39.

The Ordinances here operate almost identically to the federal policy enjoined in *Conant*.

Just as the policy in *Conant* prohibited physicians from speaking about the benefits of marijuana

to a suffering patient, so do the Ordinances prohibit counselors from speaking about the potential

for reduction or elimination of unwanted same-sex attractions, or desires to "transition to another

gender," that might benefit a client distressed by the unwanted desires. In both cases, the laws

express a preference for the message the government approves of and disdain attached to

punishment for the viewpoint with which the government disagrees. As was true of the law in

*Conant*, the Ordinances here should be invalidated as unconstitutional viewpoint discrimination.

### B.     The Ordinances Unconstitutionally Discriminate On The Basis Of Content.

"Content-based laws—those that target speech on its communicative content—are presumptively unconstitutional and may be justified only if the government proves that they are narrowly tailored to serve compelling government interests." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015); *see also R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (same). "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose. Both distinctions are drawn based on the message a speaker conveys, and, therefore, are subject to strict scrutiny." *Reed*, 135 S. Ct. at 2227 (emphasis added). Put simply, the Supreme Court has handed down a firm rule: **laws that are content based on their face must satisfy strict scrutiny**. *Id.*; *see also id.* at 2233 ("As the Court holds, what we have termed 'content-based' laws must satisfy strict scrutiny.") (Alito, J., concurring).

Importantly, this firm rule mandating strict scrutiny of facially content-based restrictions applies regardless of the government's alleged purpose in enacting the law. *Id.* at 2227. "On its face, the [law] is a content-based regulation of speech. We thus have no need to consider the government's justifications or purposes for enacting the [law] to determine whether it is subject to strict scrutiny." *Id.* In so holding, the Court rejected the lower court's rationale that the alleged purpose behind enacting the content-based law can justify subjecting it to diminished constitutional protection. *Id.* "But this analysis skips the crucial first step . . . determining whether the law is content neutral on its face." *Id.* at 2228. The answer to that question, the *Reed* Court said, is dispositive of the level of scrutiny applicable to the regulation of speech. *Id.* "**A law that is content based on its face is subject to strict scrutiny regardless of the government's benign motive, content-neutral justification, or lack of animus toward the ideas contained in the**

**regulated speech**." *Id.* (emphasis added). "[A]n innocuous justification cannot transform a facially content-based law into one that is content neutral." *Id.*

> This rule also applies to content-based restrictions of the speech of licensed professionals.

> Although *Button* predated our more recent formulations of strict scrutiny, the Court rightly rejected the State's claim that its interest in the regulation of professional conduct rendered the statute consistent with the First Amendment, observing that **it is no answer to say that the purpose of these regulations was merely to insure high professional standards and not to curtail free expression**.

*Id.* at 2229 (citing *NAACP v. Button*, 371 U.S. 415, 438-39 (1963)) (emphasis added). The en banc Eleventh Circuit, too, has unequivocally stated that the prohibition on content-based laws applies equally to laws targeting the speech of licensed professionals. *Wollschlaeger,* 848 F.3d at 1307 ("Speech is speech, and it must be analyzed as such for purposes of the First Amendment") (quoting *King v. Governor of New Jersey*, 767 F.3d 216, 229 (3d Cir. 2014)); *id.* at 1308 (rejecting Florida's contention that it can prohibit certain types of speech as a regulation of licensed professionals) ("Keeping in mind that no law abridging freedom of speech is ever promoted as a law abridging freedom of speech . . . we do not find the [state's] argument persuasive.").

Thus, content-based laws must satisfy strict scrutiny, even if targeted at licensed professionals. *Reed*, 135 S. Ct. at 2229. **There are no exceptions to this rule**.[2] Indeed, the notion that a content-based restriction on speech is presumptively unconstitutional is "so engrained in our First Amendment jurisprudence that last term we found it so 'obvious' as to not require explanation." *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105,

---

[2]    The concurring Justices confirm the concrete nature of the rule. *See, e.g.*, *Reed*, 135 S. Ct. at 2234 (Breyer, J., concurring) (noting that under the majority's rule, a finding of content discrimination is "**an automatic strict scrutiny trigger**." (emphasis added)); *id.* at 2236 (Kagan, J., concurring in the judgment) ("Says the majority, When laws single out specific subject matter, they are facially content based; and when they are facially content based, they are **automatically subject to strict scrutiny**." (emphasis added)).

115-16 (1991). The burden is on Defendants to prove they can satisfy strict scrutiny, and they cannot meet that burden.

1.      **No Compelling Government Interests Support The Ordinances.**

a.      **"Dubious" decisions from other Circuits do not constitute a compelling interest.**

Defendants claim that the Ordinances are justifiable exercises of their interests in protecting their citizens because other federal courts have upheld similar prohibitions enacted in other states. (VC, Ex. A at 4 (citing *Pickup v. Brown,* 740 F. 3d 1208 (9th Cir. 2014)); Ex. B at 3). However, Defendants ignore the fact that they are in the Eleventh, not the Ninth, Circuit, and the Eleventh Circuit has expressed "serious doubts about whether *Pickup* was correctly decided," because "**characterizing speech as conduct is a dubious constitutional enterprise**." *Wollschlaeger*, 848 F.3d at 1309. "[W]e do not think it is appropriate to subject content-based restrictions on speech by those engaged in a certain profession to mere rational basis review," as the Ninth Circuit had done in *Pickup. Id.* at 1311.

In *Wollschlaeger*, the en banc Eleventh Circuit invalidated portions of Florida's Firearm Owners' Privacy Act (FOPA), which prohibited physicians from "making a written inquiry or asking questions concerning the ownership of a firearm or ammunition by the patient or by a family member of the patient, or the presence of a firearm in a private home." *Id.* at 1302-03. The Court found that the provisions regulated speech on the basis of content by restricting (and providing disciplinary sanctions for) speech by medical professionals on the subject of firearm ownership. *Id.* Specifically, the court noted that because the restrictions "apply only to the speech of doctors and medical professionals, and only on the topic of firearm ownership," they were "speaker-focused and content-based restrictions." *Id.* at 1307. The Eleventh Circuit found that the provisions could not even satisfy intermediate scrutiny, let alone the strict scrutiny required for presumptively

9

unconstitutional content-based regulations. *Id*. This binding precedent from the Eleventh Circuit

specifically rejecting the constitutional analysis employed by the Ninth Circuit in *Pickup* vitiates

Defendants' reliance upon that case to justify enactment of the Ordinances.

> **b.** **Defendants cannot assert a compelling interest in preventing harm from voluntary SOCE counseling to willing minor clients.**

Defendants assert that they have compelling interests in preventing minors from receiving

SOCE counseling because it could potentially be harmful to them. This assertion is not only based

on intentional misrepresentations of various studies, *see* Section I.B.1.c *infra*, but is also

insufficient as a matter of law to serve as a compelling interest. *Wollschlaeger* noted that laws

targeting the content of certain doctor-patient or counselor-client communications cannot be

justified by the "paternalistic assertion that the policy was valid because patients might otherwise

make bad decisions" if left to determine the best course of counseling for themselves. 848 F.3d at

1310. Indeed, just because Defendants "may generally believe that doctors and medical

professionals should not ask about, nor express views hostile to, [a certain topic or course of

counseling], [they] 'may not burden the speech of others in order to tilt the public debate in a

preferred direction.'" *Id.* at 1313-14 (quoting *Sorrell* 564 U.S. at 578-79). Where, as here, "[t]he

record demonstrates that some patients do not object to questions and advice about [the prohibited

content of speech], and some even express gratitude for their doctor's discussion of the topic," a

law is unconstitutional if it "does not provide for such patients a means by which they can hear

from their doctors on the topic." *Id.* at 1313.

There are no such means provided in the Ordinances. Instead, Defendants assert that they

need to protect minors from purported harms they claim would result if licensed professionals

talked to willing minors about the possibility that unwanted same-sex attractions or desires to

"transition to another gender" can be changed, **even if the clients seek and desire such discussions**.  (VC, Ex. A at 5; Ex. B at 3-4). No such harm will occur, according to Defendants, if counselors support and affirm minors' same-sex attractions or desires to "transition to another gender," (VC, Ex. A at 6; Ex. B at 5), revealing that Defendants are attempting to tilt the debate in favor of those advocating against SOCE counseling, not prevent purported harm. However, Defendants do "**not have carte blanche to restrict the speech of doctors and medical professionals on a certain subject without satisfying the demands [of the First Amendment]**." *Wollschlaeger*, 848 F.3d at 1314 (emphasis added). Defendants cannot support the claim that the Ordinances are necessary to protect a purported state interest in preventing harm from a politically undesirable type of counseling.

> c. **Defendants' own studies admit that "no empirical research" supports banning voluntary SOCE counseling for willing minor clients, and Defendants cannot manufacture a compelling interest by misrepresenting those studies.**

Defendants also contend that the Ordinances serve a compelling state interest by pointing to statements and reports issued by professional associations which supposedly establish that SOCE counseling is harmful to minors. In particular, Defendants cite to the 2009 American Psychological Association Task Force Report on Appropriate Therapeutic Response to Sexual Orientation ("APA Report"), and the subsequent resolution, as justification for prohibiting SOCE counseling. (VC, Ex. A at 2-4; Ex. B at 1-3).

However, the APA Report does not support the conclusion that voluntary SOCE counseling is harmful to minor clients who desire to receive it. In fact, the APA Report specifically noted that the research is inadequate to draw **any** conclusions concerning SOCE counseling. (VC Ex. C). The APA Report specifically noted that "sexual orientation issues in children are **virtually**

**unexamined**." (VC Ex. C at 91 (emphasis added)), and noted that "[t]here is a lack of published research on SOCE among children." (*Id.* at 72). The APA Report also concluded that "there is a dearth of scientifically sound research on the safety of SOCE. **Early and recent research studies provide no clear indication of the prevalence of harmful outcomes**." (*Id.* at 42 (emphasis added)). The APA Report also noted that it could make no conclusions about SOCE counseling for those minors who request such counseling because "**We found no empirical research on adolescents who request SOCE**." (*Id.* at 73 (emphasis added)).

The APA Report also noted that its conclusions were necessarily limited because they are not based on specific studies from individuals, including minors, who request SOCE counseling. (*Id.* at 76). In fact, contrary to Defendants' representations, the APA Report noted that it found evidence of **benefit** to individuals seeking such counseling. (*Id.* at 43, 85) The APA Report specifically noted that "[s]ome individuals report that they went on to lead outwardly heterosexual lives, developing a sexual relationship with an other-sex partner, and adopting a heterosexual identity." (*Id.* at 84-85). Since the APA admitted that its report was inconclusive and that there was **no evidence regarding** the effect of SOCE counseling on children, it does not support Defendants' claim that the Ordinances are necessary to protect children from harm.

Furthermore, the Board of Medical Quality Assurance for the State of Florida has also admitted that it has no records of any complaints against any licensed professionals in Florida related to SOCE counseling. (VC Ex. F). Absent such evidence, Defendants cannot establish a compelling state interest sufficient to support a content- and viewpoint-based speech restriction.

### 2.    The Ordinances Are Not Narrowly Tailored.

Even if Defendants could substantiate compelling interests for the Ordinances' prohibition on SOCE counseling, which they cannot, Defendants could not meet their burden of showing that

the Ordinances are narrowly tailored. "It is not enough to show that the Government's ends are compelling; the means must be carefully tailored to achieve those ends." *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989). There must be a 'fit between the . . . ends and the means chosen to accomplish those ends.'" *Wollschlaeger*, 848 F.3d at 1312 (quoting *Sorrell*, 564 U.S. at 572). While "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity, government may regulate the area of First Amendment freedoms only with narrow specificity." *Id.* at 1320 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989)).

The Supreme Court has clearly established that "The government may not regulate a ['mode of speech'] based on hostility—or favoritism—towards the underlying message expressed." *R.A.V.* 505 U.S. at 386. As shown above, the Ordinances are based on political preferences to ban such counseling, not on scientific evidence of harm. Where, as here, other, content-neutral alternatives exist, government cannot fulfill its narrow tailoring burden by ignoring those alternatives. *See id.* at 395 ("The existence of adequate content-neutral alternatives thus 'undercut[s] significantly' any defense of such a statute, casting considerable doubt on the government's protestations that the 'asserted justification is in fact an accurate description of the purpose and effect of the law.'" (citations omitted)).

The Ordinances woefully fail narrow tailoring. They are not necessary to prevent harm (which has not been proven) because existing Florida law and the ethical codes of the professions engaging in this form of counseling already prohibit practices that actually harm patients. (VC ¶¶ 83-95). Licensed marriage and family therapists are already prohibited by law from "[m]aking misleading, deceptive, untrue, or fraudulent representations in the practice of any profession licensed, registered, or certified" by Florida's Marriage and Family Therapy Board. *See* Fla. Stat.

Ann. §491.009(1)(l). They are prohibited by law from engaging in any practice that is harmful to clients or patients, such as "[f]ailing to meet minimum standards of performance in professional activities when measured against generally prevailing peer performance." Fla. Stat. Ann. §491.009(1)(r).

Existing Florida law regulating professional counselors also imposes upon them a legal obligation to abide by the other ethical requirements of their profession. *See* Fla. Stat. Ann. §491.001(1)(t). These ethical obligations include codes promulgated by the American Association of Marriage and Family Therapists ("AAMFT Code"). Standard 1 of the AAMFT Code mandates that counselors not harm their clients or engage in practices that might do so. (VC ¶¶89-90). Standard 1.1 of the AAMFT Code prohibits licensed marriage and family therapists, such as Dr. Otto and Dr. Hamilton, from discriminating against clients based on their sexual orientation or gender identity (VC ¶91). If violated, these provisions come with legal sanction under existing Florida law. *See* Fla. Admin. Code §64B5-5.001. Thus, Defendants' assertions that no other alternatives or existing laws prevent the harm they allege are demonstrably false. (VC Ex. A at 5; Ex. B at 4). The fact that children are already protected from harmful and dangerous therapies reveals that Defendants' underlying purpose is not protecting minors. Statutes, regulations and ethical rules already protect minors without suppressing speech. Under *R.A.V.*, if Defendants had content-neutral means of preventing the alleged harm, failing to employ those means demonstrates that the Ordinances are not narrowly tailored as a matter of law. *R.A.V.*, 505 U.S. at 395.

Moreover, if Defendants were concerned with alleged harms resulting to minors who are **involuntarily** subjected to counseling against their will, Defendants could have banned those practices without indiscriminately outlawing **voluntary** SOCE counseling to willing patients. Indeed, informed consent would be another less restrictive means to achieve Defendants'

14

purported interests. When legislation virtually identical to the Ordinances was being debated in California, several mental health organizations recognized that this type of "legislation is attempting to undertake an unprecedented restriction on psychotherapy." (*See* VC Ex. G at 1). They proposed informed consent language that would have been much more narrowly tailored than the unprecedented intrusion into the relationship between counselor and willing client. (*Id.*). Although this alternative is in the public record, Defendants either never considered it or rejected it for no good reason.

In sum, a complete ban a viewpoint regarding SSA is not the least restrictive means to achieve any governmental interest. Total prohibitions on constitutionally protected speech are "hardly an exercise of narrow tailoring." *Awad v. Ziriax*, 670 F.3d 1111, 1131 (10th Cir. 2012). Absent narrow tailoring the Ordinances cannot survive strict scrutiny.

## C. The Ordinances Are Unconstitutional Prior Restraints.

Prior restraints against constitutionally protected expression are highly suspect and disfavored. *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 130 (1992). In fact, "any system of prior restraints comes to this Court bearing the heavy presumption against its constitutional validity." *Bantham Books, Inc. v. Sullivan*, 372 U.S. 58, 70 (1963). This is why "[t]he Supreme Court and [the Eleventh Circuit] consistently have permitted facial challenges to prior restraints without requiring a plaintiff to show that there are no conceivable set of facts where the application of the particular government regulation might or would be constitutional." *United States v. Frandsen*, 212 F.3d 1231, 1236 (11th Cir. 2000); *Horton v. City of St. Augustine*, 272 F.3d 1318, 1331-32 (11th Cir. 2001) ("the Supreme Court itself in *Salerno* acknowledged [that prior restraints are the] exception to the 'unconstitutional-in-every-conceivable-application' rule" (quoting *United States v. Salerno*, 481 U.S. 739, 745 (1987)).

15

Total prohibitions, such as the Ordinances here, constitute prior restraints. *See, e.g.*, *Howard v. City of Jacksonville*, 109 F. Supp. 2d 1360, 1364 (M.D. Fla. 2000) ("This Court also finds that . . . moratoria are governed by prior restraint analysis in the same manners as permitting schemes."); *D'Ambra v. City of Providence*, 21 F. Supp. 2d 106, 113-14 (D.R.I. 1998) (same); *ASF, Inc. v. City of Seattle*, 408 F. Supp. 2d 1102, 1108 (W.D. Wash. 2005) (total prohibitions on protected expression fail prior restraint analysis).

Here, as in *ASF*, the Ordinances go "a step further in suppressing protected speech." *Id.* The Ordinances completely prohibit SOCE counseling, even voluntary counseling, with minors in the City and County. There is no exception to the Ordinances' perpetual prohibition on protected expression. As the court held in *Howard*, such bans are subject to prior restraint analysis. *Howard*, 109 F. Supp. 2d at 1364. The Ordinances fail that analysis.

**D.     The Ordinances Are Unconstitutionally Vague.**

A law is unconstitutionally vague and overbroad if it "either forbids or requires the doing of an act in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application." *Connally v. Gen. Const. Co.*, 269 U.S. 385, 391 (1926). Government policies "must be so clearly expressed that the ordinary person can intelligently choose, in advance, what course it is lawful for him to take." *Id.* at 393. "Precision of regulation" is the touchstone of the First Amendment. *Button*, 371 U.S. at 435. "It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While all regulations must be reasonably clear, "laws which threaten to inhibit the exercise of constitutionally protected" expression must satisfy "a more stringent vagueness test." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). Such a law must give "adequate warning of what activities it proscribes"

and must "set out explicit standards for those who apply it." *See Broadrick v. Oklahoma*, 413 U.S. 601, 607 (1973) (citing *Grayned*, 408 U.S. at 108).

The Ordinances do not fulfill either requirement and thus force both those enforcing the Ordinances and mental health professionals to guess at their meaning and differ as to their application. Defendants attempted to defeat a vagueness claim by offering statements of intended limitations in the preliminary provisions of the Ordinances (VC Ex. A at 4-5, Ex. B at 3). However, those limiting statements are not part of the operative terms of the Ordinances and so are unavailing. Because sexual orientation and gender identity are fluid and changing concepts, licensed professionals such as Dr. Otto and Dr. Hamilton are left to guess about what they are permitted to say to their clients who present with unwanted same-sex attractions or unwanted desires to "transition to another gender." (VC ¶¶96-110). The Ordinances leave licensed counselors uncertain whether and at what point a particular recommendation or even a particular statement with a minor client will cost them hundreds of dollars in fines and other disciplinary actions. Similarly, code enforcement officers and others tasked with enforcing the Ordinances are uncertain at what point a counselor has crossed the line. This does not satisfy the stringent test required for the threat to Plaintiffs' First Amendment rights. *Village of Hoffman,* 455 U.S. at 499.

E.     **Defendants' Enactment Of The Ordinances Is *Ultra Vires* And *Void Ab Initio*.**

Plaintiffs also have a substantial likelihood of success on the merits because the Ordinances are *ultra vires* enactments that violate the Florida Constitution and statutes. A local government enactment will be considered inconsistent with state law if (1) the Legislature "has preempted a particular subject area" or (2) the local enactment conflicts with a state statute." *Sarasota Alliance For Fair Elections, Inc. v. Browning*, 28 So.3d 880, 886 (Fla. 2010). The Ordinances fail on both counts. The State has impliedly preempted the field of regulation of mental health professionals

through enactment of a comprehensive licensing and disciplinary scheme in Florida Statutes, Title

XXXII, Chapter 491. Furthermore, the Ordinances conflict with Florida law by purporting to make

illegal a form of counseling that the state legislature permits.

Preemption is implied when "the state legislative scheme of regulation is pervasive and the

local legislation would present the danger of conflict with that pervasive regulatory

scheme." *Sarasota*, 28 So.3d at 886. When determining if implied preemption applies, the court

must look at the provisions of the policy as a whole, the nature of power exercised by the

legislature, the object sought to be attained by the statute, and the character of the obligations

imposed by the statute. *Classy Cycles, Inc. v. Bay Cnty.*, 201 So.3d 779, 784 (Fla. 2016). In *Classy*

*Cycles*, the Florida Supreme Court held that local ordinances regarding insurance requirements for

certain vehicles were impliedly preempted by the State. *Id.* at 788-90. The court reasoned that the

State had created a pervasive and extensive scheme of regulation and that the local ordinances

were "attempt[s] to regulate in an area well-covered by existing statutes" and thus were impliedly

preempted. *Id.* at 788.  Where the State has not specifically granted any authority to local officials

to be involved with certain regulation, the State's extensive law in that particular area demonstrates

implied preemption. *Id.* The same is true of the Ordinances here, as Florida has enacted a pervasive

and comprehensive scheme for regulating mental health professionals. (VC ¶¶84-88).

The Ordinances conflict with Section 491.009 of the Florida Statutes, and Rule 64B4-

5.001, in purporting to impose additional fees and penalties and, more importantly, attempting to

expand upon conduct that would subject a provider to discipline. The Ordinances purport to make

illegal in the City and County a form of therapy that is legal elsewhere in Florida. Thus, the

Ordinances are in direct conflict with Florida law that has occupied the field of professional

regulation for mental health counselors. The Ordinances are void as *ultra vires* acts in violation of Defendants' authority under the laws and Constitution of the State of Florida.

## II.  PLAINTIFFS ARE SUFFERING IRREPARABLE INJURY.

Plaintiffs are suffering and will continue to suffer immediate and irreparable injury absent injunctive relief. Indeed, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976); *Cate v. Oldham*, 707 F.2d 1176, 1188 (11th Cir. 1983); *Northeastern Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990).

As was true of the law invalidated in *Wollschlaeger*, the Ordinances here discriminate on the basis of content and viewpoint, prohibiting only the viewpoint that same-sex attractions and desires to "transition to another gender" can be changed if unwanted. The Ordinances silence licensed counselors who wish to engage in a course of counseling with consenting minor clients that aligns with the clients' sincerely held religious beliefs. Such a prohibition constitutes a deprivation of First Amendment rights and imposes immediate and irreparable harm on Plaintiffs and their clients.

Plaintiffs are suffering irreparable injury by being silenced in their ability to speak to their willing, minor clients about counseling which is legally available throughout Florida, and which can assist the clients in reducing or eliminating unwanted same-sex attractions. (VC ¶¶ 162-182). If Plaintiffs violate the Ordinances' prohibitions, then they are subject to fines and other disciplinary actions. (VC ¶¶29, 35). If they follow the Ordinances' requirements, then Plaintiffs will be subject to sanctions for violating ethical codes mandating that the clients have the right to self-determination and that the counselor should not impose an ideology on the clients. (*Id.* ¶¶138, 160). The imposition of punishment for discussing a course of counseling desired by the clients

and permitted by professional standards is a deprivation of constitutional rights, and constitutes *a priori* irreparable harm.

## III.    THE BALANCE OF THE EQUITIES FAVORS INJUNCTIVE RELIEF.

An injunction in this matter will protect the very rights the Supreme Court has characterized as "lying at the foundation of a free government of free men." *Schneider v. New Jersey*, 308 U.S. 147, 151 (1939). The granting of a preliminary injunction that enjoins enforcement of the Ordinances will not impose any harm on the City or County. As noted above, "even a temporary infringement of First Amendment rights constitutes a serious and substantial injury." *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 72 (11th Cir. 2006). Conversely, "there can be no harm to [the government] when it is prevented from enforcing an unconstitutional statute." *Joelner v. Vill. of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004). That is because the government "has no legitimate interest in enforcing an unconstitutional [law]." *KH Outdoor*, 458 F.3d at 1272. As such, there can be no comparison between the irreparable and unconscionable loss of First Amendment freedoms suffered by Plaintiffs and their clients absent injunctive relief, and Defendants' non-existent interest in enforcing unconstitutional ordinances. The balance of the equities tips decidedly in Plaintiffs' favor, and the preliminary injunction should issue.

## IV.    INJUNCTIVE RELIEF SERVES THE PUBLIC INTEREST.

The protection of First Amendment rights is of the highest public interest. *See Elrod v. Burns*, 427 U.S. at 373. This protection is *ipso facto* in the interest of the general public because "First Amendment rights are not private rights [but] rights of the general public [for] the benefits of all of us." *Machesky v. Bizzell*, 414 F.2d 283, 288-90 (5th Cir. 1969) (citing *Time, Inc. v. Hill*, 385 U.S. 374 (1967)). Indeed, "[i]njunctions protecting First Amendment freedoms are **always in the public interest**," *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 590 (7th Cir. 2012) (emphasis added).

**CONCLUSION**

For the foregoing reasons, the preliminary injunction should issue.

/s/ Horatio G. Mihet
Mathew D. Staver (FL Bar 0701092
Horatio G. Mihet (FL Bar 026581)
Roger K. Gannam (FL Bar 240450)
Daniel J. Schmid*
LIBERTY COUNSEL
P.O. Box 540774
Orlando, FL 32854
Phone: (407) 875-1776
Email: court@lc.org

*Pro hac vice* pending

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing *Motion for Preliminary Injunction and Memorandum in Support* was served on Jun 18, 2018 via process server, along with the Summons and original service of process of the Complaint, on the following parties:

Defendant City of Boca Raton, Florida
Scott Singer, Mayor
201 West Palmetto Park Road
Boca Raton, FL 33432

and

Defendant County of Palm Beach, Florida
Melissa McKinlay, Mayor
301 N. Olive Avenue, Suite 1201
West Palm Beach, FL 33401

The Affidavits of Service, indicating service of the Summons, Complaint and Preliminary Injunction Motion/Memorandum are filed at dkts. 6 and 7.


/s/ Horatio G. Mihet
Horatio G. Mihet
Counsel for Plaintiffs

85-5



AMERICAN
PSYCHOLOGICAL
ASSOCIATION

Report of the American Psychological Association Task Force on

# Appropriate Therapeutic Responses to Sexual Orientation



PBC 007493

PBC 007494

Report of the American Psychological Association Task Force on

# Appropriate Therapeutic Responses to Sexual Orientation



## Task Force Members

Judith M. Glassgold, PsyD, Chair

Lee Beckstead, PhD

Jack Drescher, MD

Beverly Greene, PhD

Robin Lin Miller, PhD

Roger L. Worthington, PhD

Clinton W. Anderson, PhD, Staff Liaison

PBC 007495

Report of the American Psychological Association Task Force on

# Appropriate Therapeutic Responses to Sexual Orientation

Available online at http://www.apa.org/pi/lgbc/publications/
therapeutic-resp.html

*Printed copies available from:*

Lesbian, Gay, Bisexual, and Transgender Concerns Office

Public Interest Directorate

American Psychological Association

750 First Street, NE

Washington, DC 20002-4242

202-336-6041

lgbc@apa.org

*Suggested bibliographic reference:*
American Psychological Association, Task Force on Appropriate Therapeutic Responses to Sexual Orientation. (2009). *Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation.* Retrieved from http://www.apa.org/pi/lgbc/publications/therapeutic-resp.html

Copyright © 2009 by the American Psychological Association. This material may be reproduced in whole or in part without fees or permission provided that acknowledgment is given to the American Psychological Association. This material may not be reprinted, translated, or distributed electronically without prior permission in writing from the publisher. For permission, contact APA, Rights and Permissions, 750 First Street, NE, Washington, DC 20002-4242.

APA reports synthesize current psychological knowledge in a given area and may offer recommendations for future action. They do not constitute APA policy or commit APA to the activities described therein. This particular report originated with the APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation.

August 2009
Printed in the USA

CONTENTS

Abstract . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

Executive Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Preface . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

1. Introduction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11
   Laying the Foundation of the Report . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
   Psychology, Religion, and Homosexuality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

2. A Brief History of Sexual Orientation Change Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   Homosexuality and Psychoanalysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
   Sexual Orientation Change Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
   Affirmative Approaches: Kinsey; Ford and Beach; and Hooker . . . . . . . . . . . . . . . . . . . . . . . . . 22
   Decline of Sexual Orientation Change Efforts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24
   Sexual Orientation Change Efforts Provided to Religious Individuals . . . . . . . . . . . . . . . . . . . . . 25

3. A Systematic Review of Research on the Efficacy of Sexual Orientation Change Efforts . . . . . . . . . . . . . . . . . . 26
   Overview of the Systematic Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
   Methodological Problems in the Research Literature on Sexual Orientation Change Efforts . . . . . . . . . . . . . . 28
   Summary . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

4. A Systematic Review of Research on the Efficacy of Sexual Orientation Change Efforts: Outcomes . . . . . . . . . . 35
   Reports of Benefit . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
   Reports of Harm . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

5. Research on Adults Who Undergo Sexual Orientation Change Efforts................................... 44

Demographics................................................................................................... 45

Why Individuals Undergo Sexual Orientation Change Efforts ................................... 45

Reported Impacts of Sexual Orientation Change Efforts .......................................... 49

Remaining Issues............................................................................................... 52

Summary and Conclusion................................................................................... 52

6. The Appropriate Application of Affirmative Therapeutic Interventions for Adults
Who Seek Sexual Orientation Change Efforts ....................................................... 54

A Framework for the Appropriate Application of Affirmative Therapeutic Interventions ......... 55

Conclusion ...................................................................................................... 63

7. Ethical Concerns and Decision Making in Psychotherapy With Adults ...................... 65

Bases for Scientific and Professional Judgments and Competence ............................. 66

Benefit and Harm .............................................................................................. 67

Justice and Respect for Rights and Dignity ............................................................. 68

Summary ......................................................................................................... 70

8. Issues for Children, Adolescents, and Their Families............................................ 71

Task Force Charge and Its Social Context .............................................................. 71

Literature Review .............................................................................................. 72

Appropriate Application of Affirmative Interventions With Children and Adolescents ........... 76

Conclusion....................................................................................................... 79

9. Summary and Conclusions............................................................................... 81

Summary of the Systematic Review of the Literature............................................... 82

Recommendations and Future Directions............................................................... 86

References ........................................................................................................ 93

Appendix A: Resolution on Appropriate Affirmative Responses
to Sexual Orientation Distress and Change Efforts..................................................... 119

Appendix B: Studies Included (N = 55) in the Systematic Review.................................... 125



# ABSTRACT

The American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation conducted a systematic review of the peer-reviewed journal literature on sexual orientation change efforts (SOCE) and concluded that efforts to change sexual orientation are unlikely to be successful and involve some risk of harm, contrary to the claims of SOCE practitioners and advocates. Even though the research and clinical literature demonstrate that same-sex sexual and romantic attractions, feelings, and behaviors are normal and positive variations of human sexuality regardless of sexual orientation identity, the task force concluded that the population that undergoes SOCE tends to have strongly conservative religious views that lead them to seek to change their sexual orientation. Thus, the appropriate application of affirmative therapeutic interventions for those who seek SOCE involves therapist acceptance, support, and understanding of clients and the facilitation of clients' active coping, social support, and identity exploration and development, without imposing a specific sexual orientation identity outcome.

PBC 007499

PBC 007500

# EXECUTIVE SUMMARY

n February 2007, the American Psychological Association (APA) established the Task Force on Appropriate Therapeutic Responses to Sexual Orientation and charged the task force with three major tasks:

1. Review and update the 1997 Resolution on Appropriate Therapeutic Responses to Sexual Orientation (APA, 1998).

2. Generate a report that includes discussion of the following:

   - The appropriate application of affirmative therapeutic interventions for children and adolescents who present a desire to change either their sexual orientation or their behavioral expression of their sexual orientation, or both, or whose guardian expresses a desire for the minor to change.

   - The appropriate application of affirmative therapeutic interventions for adults who present a desire to change their sexual orientation or their behavioral expression of their sexual orientation, or both.

   - The presence of adolescent inpatient facilities that offer coercive treatment designed to change sexual orientation or the behavioral expression of sexual orientation.

   - Education, training, and research issues as they pertain to such therapeutic interventions.

   - Recommendations regarding treatment protocols that promote stereotyped gender-normative behavior to mitigate behaviors that are perceived to be indicators that a child will develop a homosexual orientation in adolescence and adulthood.

3. Inform APA's response to groups that promote treatments to change sexual orientation or its behavioral expression and support public policy that furthers affirmative therapeutic interventions.

As part of the fulfillment of its charge, the task force undertook an extensive review of the recent literature on psychotherapy and the psychology of sexual orientation. There is a growing body of evidence concluding that sexual stigma, manifested as prejudice and discrimination directed at non-heterosexual sexual orientations and identities, is a major source of stress for sexual minorities.[*] This stress, known as *minority stress*, is a factor in mental health disparities found in some sexual minorities. The minority stress model also provides a framework for considering psychotherapy with sexual minorities, including understanding stress, distress, coping, resilience, and recovery. For instance, the affirmative approach to psychotherapy grew out of an awareness that sexual minorities benefit

---

[*] We use the term *sexual minority* (cf. Blumenfeld, 1992; McCarn & Fassinger, 1996; Ullerstam, 1966) to designate the entire group of individuals who experience significant erotic and romantic attractions to adult members of their own sex, including those who experience attractions to members of their own and of the other sex. This term is used because we recognize that not all sexual minority individuals adopt a lesbian, gay, or bisexual identity.

when the sexual stigma they experience is addressed in psychotherapy with interventions that reduce and counter internalized stigma and increase active coping.

The task force, in recognition of human diversity, conceptualized affirmative interventions within the domain of cultural competence, consistent with general multicultural approaches that acknowledge the importance of age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status. We see this multiculturally competent and affirmative approach as grounded in an acceptance of the following scientific facts:

- Same-sex sexual attractions, behavior, and orientations per se are normal and positive variants of human sexuality—in other words, they do not indicate either mental or developmental disorders.

- Homosexuality and bisexuality are stigmatized, and this stigma can have a variety of negative consequences (e.g., minority stress) throughout the life span.

- Same-sex sexual attractions and behavior occur in the context of a variety of sexual orientations and sexual orientation identities, and for some, sexual orientation identity (i.e., individual or group membership and affiliation, self-labeling) is fluid or has an indefinite outcome.

- Gay men, lesbians, and bisexual individuals form stable, committed relationships and families that are equivalent to heterosexual relationships and families in essential respects.

- Some individuals choose to live their lives in accordance with personal or religious values (i.e., telic congruence).

## Summary of the Systematic Review of the Literature

### Efficacy and Safety

In order to ascertain whether there was a research basis for revising the 1997 Resolution on Appropriate Therapeutic Responses to Sexual Orientation (APA, 1998) and providing more specific recommendations to licensed mental health practitioners, the public, and policymakers, the task force performed a systematic review of the peer-reviewed literature to answer three questions:

- Are sexual orientation change efforts (SOCE)** effective at changing sexual orientation?

- Are SOCE harmful?

- Are there any additional benefits that can be reasonably attributed to SOCE?

The review covered the peer-reviewed journal articles in English from 1960 to 2007. Most studies in this area were conducted before 1981, and only a few studies have been conducted in the last 10 years. We found serious methodological problems in this area of research; only a few studies met the minimal standards for evaluating whether psychological treatments such as efforts to change sexual orientation are effective. Few studies—all conducted in the period from 1969 to 1978—could be considered true experiments or quasi-experiments that would isolate and control the factors that might effect change (Birk, Huddleston, Miller, & Cohler, 1971; S. James, 1978; McConaghy, 1969, 1976; McConaghy, Proctor, & Barr, 1972; Tanner, 1974, 1975). Only one of these studies (Tanner, 1974) actually compared people who received a treatment with people who did not and could therefore rule out the possibility that other things, such as being motivated to change, were the true cause of any change the researchers observed in the study participants.

None of the recent research (1999–2007) meets methodological standards that permit conclusions regarding efficacy or safety. The few high-quality studies of SOCE conducted recently are qualitative (e.g., Beckstead & Morrow, 2004; Ponticelli, 1999; Wolkomir, 2001); although they aid in an understanding of the population that undergoes sexual orientation change, they do not provide the kind of information needed for definitive answers to questions of safety and efficacy. Given the limited amount of methodologically sound research, claims that recent SOCE is effective are not supported.

We concluded that the early high-quality evidence is the best basis for predicting what the outcome of valid interventions would be. These studies show that

---

** In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved.



enduring change to an individual's sexual orientation is uncommon. The participants in this body of research continued to experience same-sex attractions following SOCE and did not report significant change to other-sex attractions that could be empirically validated, though some showed lessened physiological arousal to sexual stimuli. Compelling evidence of decreased same-sex sexual behavior and of engagement in sexual behavior with the other sex was rare. Few studies provided strong evidence that any changes produced in laboratory conditions translated to daily life. Thus, the results of scientifically valid research indicate that it is unlikely that individuals will be able to reduce same-sex attractions or increase other-sex sexual attractions through SOCE.

We found that there was some evidence to indicate that individuals experienced harm from SOCE. Early studies documented iatrogenic effects of aversive forms of SOCE. These negative side effects included loss of sexual feeling, depression, suicidality, and anxiety. High dropout rates characterized early aversive treatment studies and may be an indicator that research participants experienced these treatments as harmful. Recent research reports on religious and nonaversive efforts indicate that there are individuals who perceive they have been harmed. Across studies, it is unclear what specific individual characteristics and diagnostic criteria would prospectively distinguish those individuals who will later perceive that they been harmed by SOCE.

## Individuals Who Seek SOCE and Their Experiences

Although the recent SOCE research cannot provide conclusions regarding efficacy or safety, it does provide some information on those individuals who participate in change efforts. SOCE research identified a population of individuals who experienced conflicts and distress related to same-sex attractions. The vast majority of people who participated in the early studies were adult White males, and many of these individuals were court-mandated to receive treatment. In the research conducted over the last 10 years, the population was mostly well-educated individuals, predominantly men, who consider religion to be an extremely important part of their lives and participate in traditional or conservative faiths (e.g., The Church of Jesus Christ of Latter-Day Saints, evangelical Christianity, and Orthodox Judaism). These recent studies included a small number of participants who identified as members of ethnic minority groups, and a few studies included women.

Most of the individuals studied had tried a variety of methods to change their sexual orientation, including psychotherapy, support groups, and religious efforts. Many of the individuals studied were recruited from groups endorsing SOCE. The relation between the characteristics of the individuals in samples used in these studies and the entire population of people who seek SOCE is unknown because the studies have relied entirely on convenience samples.

Former participants in SOCE reported diverse evaluations of their experiences: Some individuals perceived that they had benefited from SOCE, while others perceived that they had been harmed. Individuals who failed to change sexual orientation, while believing they should have changed with such efforts, described their experiences as a significant cause of emotional and spiritual distress and negative self-image. Other individuals reported that SOCE was helpful—for example, it helped them live in a manner consistent with their faith. Some individuals described finding a sense of community through religious SOCE and valued having others with whom they could identify. These effects are similar to those provided by mutual support groups for a range of problems, and the positive benefits reported by participants in SOCE, such as reduction of isolation, alterations in how problems are viewed, and stress reduction, are consistent with the findings of the general mutual support group literature. The research literature indicates that the benefits of SOCE mutual support groups are not unique and can be provided within an affirmative and multiculturally competent framework, which can mitigate the harmful aspects of SOCE by addressing sexual stigma while understanding the importance of religion and social needs.

Recent studies of participants who have sought SOCE do not adequately distinguish between *sexual orientation* and *sexual orientation identity*. We concluded that the failure to distinguish these aspects of human sexuality has led SOCE research to obscure what actually can or cannot change in human sexuality. The available evidence of both early and recent studies suggests that although sexual orientation is unlikely to change, some individuals modified their sexual orientation identity (e.g., individual or group membership and affiliation, self-labeling) and other aspects of sexuality (e.g., values and behavior). They did so in a variety of ways and with varied and

PBC 007503

unpredictable outcomes, some of which were temporary. For instance, in some research, individuals, through participating in SOCE, became skilled in ignoring or tolerating their same-sex attractions. Some individuals reported that they went on to lead outwardly heterosexual lives, developing a sexual relationship with an other-sex partner, and adopting a heterosexual identity. These results were less common for those with no prior heterosexual experience.

### Literature on Children and Adolescents

To fulfill part of the task force charge, we reviewed the limited research on child and adolescent issues and drew the following conclusions: There is no research demonstrating that providing SOCE to children or adolescents has an impact on adult sexual orientation. The few studies of children with gender identity disorder found no evidence that psychotherapy provided to those children had an impact on adult sexual orientation. There is currently no evidence that teaching or reinforcing stereotyped gender-normative behavior in childhood or adolescence can alter sexual orientation. We have concerns that such interventions may increase self-stigma and minority stress and ultimately increase the distress of children and adolescents.

We were asked to report on adolescent inpatient facilities that offer coercive treatment designed to change sexual orientation or the behavioral expression of sexual orientation. The limited published literature on these programs suggests that many do not present accurate scientific information regarding same-sex sexual orientations to youths and families, are excessively fear-based, and have the potential to increase sexual stigma. These efforts pose challenges to best clinical practices and professional ethics, as they potentially violate current practice guidelines by not providing treatment in the least-restrictive setting possible, by not protecting client autonomy, and by ignoring current scientific information on sexual orientation.

## Recommendations and Future Directions

### Practice

The task force was asked to report on the appropriate application of affirmative therapeutic interventions for adults who present a desire to change their sexual orientation or their behavioral expression of their sexual orientation, or both. The clinical literature indicated that adults perceive a benefit when they are provided with client-centered, multicultural, evidence-based approaches that provide (a) acceptance and support, (b) a comprehensive assessment, (c) active coping, (d) social support, and (e) identity exploration and development. Acceptance and support include unconditional acceptance of and support for the various aspects of the client; respect for the client's values, beliefs, and needs; and a reduction in internalized sexual stigma. Comprehensive assessment involves an awareness of the complete person, including mental health concerns that could impact distress about sexual orientation. Active coping includes both cognitive and emotional strategies to manage stigma and conflicts, including the development of alternative cognitive frames to resolve cognitive dissonance and the facilitation of affective expression and resolution of losses. Social support, which can mitigate distress caused by isolation, rejection, and lack of role models, includes psychotherapy, self-help groups, or welcoming communities (e.g., ethnic communities, social groups, religious denominations). Identity exploration and development include offering permission and opportunity to explore a wide range of options and reducing the conflicts caused by dichotomous or conflicting conceptions of self and identity without prioritizing a particular outcome.

This framework is consistent with multicultural and evidence-based practices in psychotherapy and is built on three key findings:

- Our systematic review of the early research found that enduring change to an individual's sexual orientation was unlikely.

- Our review of the scholarly literature on individuals distressed by their sexual orientation indicated that clients perceived a benefit when offered interventions that emphasize acceptance, support, and recognition of important values and concerns.

- Studies indicate that experiences of stigma—such as self-stigma, shame, isolation and rejection from relationships and valued communities, lack of emotional support and accurate information, and conflicts between multiple identities and between values and attractions—played a role in creating distress in individuals. Many religious individuals desired to live their lives in a manner consistent with their values (telic congruence); however, telic



congruence based on stigma and shame is unlikely to result in psychological well-being.

In terms of formulating the goals of treatment, we propose that, on the basis of research on sexual orientation and sexual orientation identity, what appears to shift and evolve in some individuals' lives is sexual orientation identity, not sexual orientation. Given that there is diversity in how individuals define and express their sexual orientation identity, an affirmative approach is supportive of clients' identity development without an a priori treatment goal concerning how clients identify or live out their sexual orientation or spiritual beliefs. This type of therapy can provide a safe space where the different aspects of the evolving self can be acknowledged, explored, respected, and potentially rewoven into a more coherent sense of self that feels authentic to the client, and it can be helpful to those who accept, reject, or are ambivalent about their same-sex attractions. The treatment does not differ, although the outcome of the client's pathway to a sexual orientation identity does. Other potential targets of treatment are emotional adjustment, including shame and self-stigma, and personal beliefs, values, and norms.

We were asked to report on the appropriate application of affirmative therapeutic interventions for children and adolescents who present a desire to change either their sexual orientation or the behavioral expression of their sexual orientation, or both, or whose parent or guardian expresses a desire for the minor to change. The framework proposed for adults (i.e., acceptance and support, a comprehensive assessment, active coping, social support, and identity exploration and development) is also pertinent—with unique relevant features—to children and adolescents. For instance, the clinical literature stresses interventions that accept and support the development of healthy self-esteem, facilitate the achievement of appropriate developmental milestones—including the development of a positive identity—and reduce internalized sexual stigma.

*For parents who are concerned or distressed by their child's sexual orientation, licensed mental health providers (LMHP) can provide accurate information about sexual orientation and sexual orientation identity and can offer anticipatory guidance and psychotherapy that support family reconciliation.*

Research indicates that family interventions that reduce rejection and increase acceptance of their child and adolescent are helpful. For parents who are concerned or distressed by their child's sexual orientation, licensed mental health providers (LMHP) can provide accurate information about sexual orientation and sexual orientation identity and can offer anticipatory guidance and psychotherapy that support family reconciliation (e.g., communication, understanding, and empathy) and maintenance of the child's total health and well-being.

Additionally, the research and clinical literature indicates that increasing social support for sexual minority children and youth by intervening in schools and communities to increase their acceptance and safety is important. Services for children and youth should support and respect age-appropriate issues of self-determination; services should also be provided in the least restrictive setting that is clinically possible and should maximize self-determination. At a minimum, the assent of the youth should be obtained, including whenever possible a developmentally appropriate informed consent to treatment.

Some religious individuals with same-sex attractions experience psychological distress and conflict due to the perceived irreconcilability of their sexual orientation and religious beliefs. The clinical and research literature encourages the provision of acceptance, support, and recognition of the importance of faith to individuals and communities while recognizing the science of sexual orientation. This includes an understanding of the client's faith and the psychology of religion, especially issues such as religious coping, motivation, and identity. Clients' exploration of possible life paths can address the reality of their sexual orientation and the possibilities for a religiously and spiritually meaningful and rewarding life. Such psychotherapy can enhance clients' search for meaning, significance, and a relationship with the sacred in their lives; increase positive religious coping; foster an understanding of religious motivations; help integrate religious and sexual orientation identities; and reframe sexual orientation identities to reduce self-stigma.

LMHP strive to provide interventions that are consistent with current ethical standards. The APA *Ethical Principles of Psychologists and Code of Conduct* (APA, 2002b) and relevant APA guidelines and resolutions (e.g., APA, 2000, 2002c, 2004, 2005a, 2007b) are resources for psychologists, especially Ethical Principles A (Beneficence and Nonmaleficense), D (Justice), and E (Respect for People's Rights and

PBC 007505

Dignity, including self-determination). For instance, LMHP reduce potential harm and increase potential benefits by basing their scientific and professional judgments and actions on the most current and valid scientific evidence, such as the evidence provided in this report (see APA, 2002b, Standard 2.04, Bases for Scientific and Professional Judgments). LMHP enhance principles of social justice when they strive to understand the effects of sexual stigma, prejudice, and discrimination on the lives of individuals, families, and communities. Further, LMHP aspire to respect diversity in all aspects of their work, including age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, and socioeconomic status.

Self-determination is the process by which a person controls or determines the course of her or his own life (according to the *Oxford American Dictionary*, 2007). LMHP maximize self-determination by (a) providing effective psychotherapy that explores the client's assumptions and goals, without preconditions on the outcome; (b) providing resources to manage and reduce distress; and (c) permitting the client to decide the ultimate goal of how to self-identify and live out her or his sexual orientation. Although some accounts suggest that providing SOCE increases self-determination, we were not persuaded by this argument, as it encourages LMHP to provide treatment that has not provided evidence of efficacy, has the potential to be harmful, and delegates important professional decisions that should be based on qualified expertise and training—such as diagnosis and type of therapy. Rather, therapy that increases the client's ability to cope, understand, acknowledge, and integrate sexual orientation concerns into a self-chosen life is the measured approach.

## Education and Training

The task force was asked to provide recommendations on education and training for LMHP working with this population. We recommend that mental health professionals working with individuals who are considering SOCE learn about evidence-based and multicultural interventions and obtain additional knowledge, awareness, and skills in the following areas:

- Sexuality, sexual orientation, and sexual identity development.

- Various perspectives on religion and spirituality, including models of faith development, religious coping, and the positive psychology of religion.

- Identity development, including integration of multiple identities and the resolution of identity conflicts.

- The intersections of age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status.

- Sexual stigma and minority stress.

We also recommend that APA (a) take steps to encourage community colleges, undergraduate programs, graduate school training programs, internship sites, and postdoctoral programs in psychology to include this report and other relevant material on lesbian, gay, bisexual, and transgender (LGBT) issues in their curriculum; (b) maintain the currently high standards for APA approval of continuing professional education providers and programs; (c) offer symposia and continuing professional education workshops at APA's annual convention that focus on treatment of individuals distressed by their same-sex attractions, especially those who struggle to integrate religious and spiritual beliefs with sexual orientation identities; and (d) disseminate this report widely, including publishing a version of this report in an appropriate journal or other publication.

The information available to the public about SOCE is highly variable and can be confusing and misleading. Sexual minorities, individuals aware of same-sex attractions, families, parents, caregivers, policymakers, the public, and religious leaders can benefit from accurate scientific information about sexual orientation and the appropriate interventions for individuals distressed by their same-sex attractions. We recommend that APA take the lead in creating informational materials for sexual minority individuals, families, parents, and other stakeholders, including religious organizations, on appropriate multiculturally competent and client-centered interventions for those distressed by their sexual orientation and who may seek SOCE. We also recommended that APA collaborate with other relevant organizations, especially religious organizations, to disseminate this information.

## Research

The task force was asked to provide recommendations for future research. We recommend that researchers and practitioners investigate multiculturally competent and affirmative evidence-based treatments for sexual



minorities that do not aim to alter sexual orientation. For such individuals, the focus would be on frameworks that include acceptance and support, a comprehensive assessment, active coping, social support, and identity exploration and development without prioritizing one outcome over another.

The research on SOCE has not adequately assessed efficacy and safety. Any future research should conform to best-practice standards for the design of efficacy research. Research on SOCE would (a) use methods that are prospective and longitudinal; (b) employ sampling methods that allow proper generalization; (c) use appropriate, objective, and high-quality measures of sexual orientation and sexual orientation identity; (d) address preexisting and co-occurring conditions, mental health problems, other interventions, and life histories to test competing explanations for any changes; (e) address participants' biases and potential need for monitoring self-impression and life histories; and (f) include measures capable of assessing harm.

## Policy

The task force was asked to inform (a) the association's response to groups that promote treatments to change sexual orientation or its behavioral expression and (b) public policy that furthers affirmative therapeutic interventions. We encourage APA to continue its advocacy for LGBT individuals and families and to oppose stigma, prejudice, discrimination, and violence directed at sexual minorities. We recommend that APA take a leadership role in opposing the distortion and selective use of scientific data about homosexuality by individuals and organizations and in supporting the dissemination of accurate scientific and professional information about sexual orientation in order to counteract bias. We encourage APA to engage in collaborative activities with religious communities in pursuit of shared prosocial goals when such collaboration can be done in a mutually respectful manner that is consistent with psychologists' professional and scientific roles.

The 1997 Resolution on Appropriate Responses to Sexual Orientation (APA, 1998) focuses on ethical issues for practitioners and still serves this purpose. However, on the basis of (a) our systematic review of efficacy and safety issues, (b) the presence of SOCE directed at children and adolescents, (c) the importance of religion for those who currently seek SOCE, and (d) the ideological and political disputes that affect this area, the task force recommended that the APA

Council of Representatives adopt a new resolution, the **Resolution on Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts**, to address these issues. [The Council adopted the resolution in August 2009.] (See Appendix A.)

# PREFACE

n February 2007, the American Psychological Association (APA) established the Task Force on Appropriate Therapeutic Responses to Sexual Orientation and charged the task force with three major tasks:

1. Review and update the 1997 Resolution on Appropriate Therapeutic Responses to Sexual Orientation (APA, 1998);

2. Generate a report that includes discussion of the following:

   • The appropriate application of affirmative therapeutic interventions for children and adolescents who present a desire to change either their sexual orientation or their behavioral expression of their sexual orientation, or both, or whose guardian expresses a desire for the minor to change.

   • The appropriate application of affirmative therapeutic interventions for adults who present a desire to change their sexual orientation or their behavioral expression of their sexual orientation, or both.

   • The presence of adolescent inpatient facilities that offer coercive treatment designed to change sexual orientation or the behavioral expression of sexual orientation.

   • Education, training, and research issues as they pertain to such therapeutic interventions.

   • Recommendations regarding treatment protocols that promote stereotyped gender-normative behavior to mitigate behaviors that are perceived to be indicators that a child will develop a homosexual orientation in adolescence and adulthood.

3. Inform APA's response to groups that promote treatments to change sexual orientation or its behavioral expression and support public policy that furthers affirmative therapeutic interventions.

Nominations of task force members were solicited through an open process that was widely publicized through professional publications, electronic media, and organizations. The qualifications sought were (a) advanced knowledge of current theory and research on the development of sexual orientation; (b) advanced knowledge of current theory and research on therapies that aim to change sexual orientation; and (c) extensive expertise in affirmative mental health treatment for one or more of the following populations: children and adolescents who present with distress regarding their sexual orientation, religious individuals in distress regarding their sexual orientation, and adults who present with desires to their change sexual orientation or have undergone therapy to do so. An additional position was added for an expert in research design and methodology.

Nominations were open to psychologists, qualified counselors, psychiatrists, or social workers, including members and nonmembers of APA. Nominations of



PBC 007508

ethnic minority psychologists, bisexual psychologists, psychologists with disabilities, transgender psychologists, and other psychologists who are members of underrepresented groups were welcomed. In April 2007, then-APA President Sharon Stephens Brehm, PhD, appointed the following people to serve on the task force: Judith M. Glassgold, PsyD (chair); Lee Beckstead, PhD; Jack Drescher, MD; Beverly Greene, PhD; Robin Lin Miller, PhD; and Roger L. Worthington, PhD.

The task force met face-to-face twice in 2007 and supplemented these meetings with consultation and collaboration via teleconference and the Internet. Initially, we reviewed our charge and defined necessary bodies of scientific and professional literature to review to meet that charge. In light of our charge to review the 1997 resolution, we concluded that the most important task was to review the existing scientific literature on treatment outcomes of sexual orientation change efforts (SOCE).

We also concluded that a review of research before 1997 as well as since 1997 was necessary to provide a complete and thorough evaluation of the scientific literature. Thus, we conducted a review of the available empirical research on treatment efficacy and results published in English from 1960 on and also used common databases such as PsycINFO and Medline, as well as other databases such as the ATLA Religion Database, LexisNexis, Social Work Abstracts, and Sociological Abstracts, to review evidence regarding harm and benefit from SOCE. The literature review for other areas of the report was also drawn from these databases and included lay sources such as GoogleScholar and material found through Internet searches. Due to our charge, we limited our review to sexual orientation and did not address gender identity, because the final report of another task force, the APA Task Force on Gender Identity and Gender Variance, was forthcoming (see APA, 2009).

The task force received comments from the public, professionals, and other organizations and read all comments received. We also welcomed submission of material from the interested public, mental health professionals, organizations, and scholarly communities. All nominated individuals who were not selected for the task force were invited to submit suggestions for articles and other material for us to review. We reviewed all material received. Finally, APA staff met with interested parties to understand their concerns.

The writing of the report was completed in 2008, with editing and revisions occurring in 2009. After a draft report was generated in 2008, we asked for professional review by noted scholars in the area who were also APA members. Additionally, APA boards and committees were asked to select reviewers to provide feedback. After these reviews were received, the report was revised in line with these comments. In 2009, a second draft was sent to a second group of reviewers, including those who had previously reviewed the report, scholars in the field (including some who were not members of APA), representatives of APA boards and committees, and APA staff. The task force consulted with Nathalie Gilfoyle, JD, of the APA Office of General Counsel, as well as with Stephen Behnke, PhD, JD, of the APA Ethics Office. Other staff members of APA were consulted as needed.

We would like to thank the following two individuals who were essential to the accomplishment of our charge: Clinton W. Anderson, PhD, and Charlene DeLong. Dr. Anderson's knowledge of the field of LGBT psychology as well as his sage counsel, organizational experience, and editorial advice and skills were indispensable. Ms. DeLong was fundamental in providing technological support and aid in coordinating the activities of the task force.

We appreciate the assistance of Maria T. Valenti, MA, in conducting the research review and in organizing the tables. Mary Campbell also provided editorial advice on the report, and Stephanie Liotta provided assistance in preparing the final manuscript. We are grateful to David Spears for designing the report.

We would also like to acknowledge 2007 APA President Sharon Stephens Brehm, PhD, who was supportive of our goals and provided invaluable perspective at our first meeting, and to thank Alan E. Kazdin, PhD, past president, James H. Bray, PhD, president, and Carol D. Goodheart, EdD, president-elect, for their support. Douglas C. Haldeman, PhD, served as the Board of Director's liaison to the task force in 2007–2008 and provided counsel and expertise. Melba J.T. Vasquez, PhD, Michael Wertheimer, PhD, and Armand R. Cerbone, PhD, members of the APA Board of Directors, also reviewed this report and provided feedback.

We would very much like to thank Gwendolyn Puryear Keita, PhD, the executive director of the APA Public Interest Directorate, for her advice, support, and expertise. In addition, we acknowledge Rhea Farberman, executive director, and Kim Mills, associate executive director, of the APA Public and Member Communications office, for their expertise and support. Stephen H. Behnke, PhD, director of the APA Ethics

Office, and Nathalie Gilfoyle, APA Office of the General Counsel, provided valuable feedback on the report.

We acknowledge the following individuals, who served as scholarly reviewers of the first and second drafts of the report; their feedback on the content was invaluable (in alphabetical order): Eleonora Bartoli, PhD; Rosie Phillips Bingham, PhD; Elizabeth D. Cardoso, PhD; June W. J. Ching, PhD; David Michael Corey, PhD; Isiaah Crawford, PhD; Anthony D'Augelli, PhD; Sari H. Dworkin, PhD; Randall D. Ehrbar, PsyD; Angela Rose Gillem, PhD; Terry Sai-Wah Gock, PhD; Marvin R. Goldfried, PhD; John C. Gonsiorek, PhD; Perry N. Halkitis, PhD; Kristin A. Hancock, PhD; J. Judd Harbin, PhD; William L. Hathaway, PhD; Gregory M. Herek, PhD; W. Brad Johnson, PhD; Jon S. Lasser, PhD; Alicia A. Lucksted, PhD; Connie R. Matthews, PhD; Kathleen M. Ritter, PhD; Darryl S. Salvador, PsyD; Jane M. Simoni, PhD; Lori C. Thomas, JD, PhD; Warren Throckmorton, PhD; Bianca D. M. Wilson, PhD; Mark A. Yarhouse, PsyD; and Hirokazu Yoshikawa, PhD.



PBC 007510

# 1. INTRODUCTION

I n the mid-1970s, on the basis of emerging scientific evidence and encouraged by the social movement for ending sexual orientation discrimination, the American Psychological Association (APA) and other professional organizations affirmed that homosexuality per se is not a mental disorder and rejected the stigma of mental illness that the medical and mental health professions had previously placed on sexual minorities.[1] This action, along with the earlier action of the American Psychiatric Association that removed *homosexuality* from the *Diagnostic and Statistical Manual of Mental Disorders* (*DSM*; American Psychiatric Association, 1973), helped counter the social stigma that the mental illness concept had helped to create and maintain. Through the 1970s and 1980s, APA and its peer organizations not only adopted a range of position statements supporting nondiscrimination on the basis of sexual orientation (APA, 1975, 2005a; American Psychiatric Association, 1973; American Psychoanalytic Association, 1991, 1992; National Association of Social Workers [NASW], 2000) but also acted on the basis of those positions to advocate for legal and policy changes (APA, 2003, 2005a, 2008b; NASW, 2000). On the basis of growing scientific evidence (Gonsiorek, 1991), licensed mental health providers (LMHP)[2] of all professions increasingly took the perspective throughout this period that homosexuality per se is a normal variant[3] of human sexuality and that lesbian, gay, and bisexual (LGB) people deserve to be affirmed and supported in their sexual orientation,[4] relationships, and social opportunities. This approach to psychotherapy is generally termed *affirmative*, *gay affirmative*, or *lesbian, gay, and bisexual (LGB) affirmative*.

Consequently, the published literature on psychotherapeutic efforts to change sexual orientation that had been relatively common during the 1950s and 1960s began to decline, and approaches to psychotherapy that were not LGB affirmative came under increased scrutiny (cf. Mitchell, 1978; G.T. Wilson & Davison, 1974). The mainstream organizations for psychoanalysis and behavior therapy—the two types of therapeutic orientation most associated with the published literature on sexual orientation change therapies—publicly rejected these practices (American Psychoanalytic Association, 1991, 1992; Davison, 1976, 1978; Davison & Wilson, 1973; D. J. Martin, 2003).

---

[1] We use the term *sexual minority* (cf. Blumenfeld, 1992; McCarn & Fassinger, 1996; Ullerstam, 1966) to designate the entire group of individuals who experience significant erotic and romantic attractions to adult members of their own sex, including those who experience attractions to members of their own and of the other sex. This term is used because we recognize that not all sexual minority individuals adopt a lesbian, gay, or bisexual identity.

[2] We use the term *licensed mental health providers* (LMHP) to refer to professional providers of mental health services with a variety of educational credentials and training backgrounds, because state licensure is the basic credential for independent practice.

[3] We use the adjective *normal* to denote both the absence of a mental disorder and the presence of a positive and healthy outcome of human development.

[4] We define sexual orientation as an individual's patterns of erotic, sexual, romantic, and affectional arousal and desire for other persons based on those persons' gender and sex characteristics (see pp. 29–32 for a more detailed discussion).

PBC 007511

In the early 1990s, some APA members began to express concerns about the resurgence of individuals and organizations that actively promoted the idea of homosexuality as a developmental defect or a spiritual and moral failing and that advocated psychotherapy and religious ministry to alter homosexual feelings and behaviors, because these practices seemed to be an attempt to repathologize sexual minorities (Drescher & Zucker, 2006; Haldeman, 1994; S. L. Morrow & Beckstead, 2004). Many of the individuals and organizations appeared to be embedded within conservative political and religious movements that supported the stigmatization of homosexuality (Drescher, 2003; Drescher & Zucker, 2006; Southern Poverty Law Center [SPLC], 2005).

The concerns led to APA's adoption in 1997 of the Resolution on Appropriate Therapeutic Responses to Sexual Orientation (APA, 1998). In the resolution, APA reaffirmed the conclusion shared by all mainstream health and mental health professions that homosexuality is not a mental disorder and rejected any form of discrimination based on sexual orientation. In addition, APA highlighted the ethical issues that are raised for psychologists when clients present with a request to change their sexual orientation—issues such as bias, deception, competence, and informed consent (APA, 1998; Schneider, Brown, & Glassgold, 2002). APA reaffirmed in this resolution its opposition to "portrayals of lesbian, gay, and bisexual youths and adults as mentally ill due to their sexual orientation" and defined appropriate interventions as those that "counteract bias that is based in ignorance or unfounded beliefs about sexual orientation" (APA, 1998, p. 934).

In the years since APA's adoption of the 1997 resolution, there have been several developments that have led some APA members to believe that the resolution needed to be reevaluated. First, several professional mental health and medical associations adopted resolutions that opposed sexual orientation change efforts (SOCE)[5] on the basis that such efforts were ineffective and potentially harmful (e.g., American Counseling Association, 1998; American Psychiatric Association, 2000; American Psychoanalytic Association, 2000; NASW, 1997). In most cases, these statements were substantially different from APA's position, which did not address questions of efficacy or safety of SOCE.

Second, several highly publicized research reports on samples of individuals who had attempted sexual orientation change (e.g., Nicolosi, Byrd, & Potts, 2000; Shidlo & Schroeder, 2002; Spitzer, 2003) and other empirical and theoretical advances in the understanding of sexual orientation were published (e.g., Blanchard, 2008; Chivers, Seto, & Blanchard, 2007; Cochran & Mays, 2006; Diamond, 2008; Diaz, Ayala, & Bein, 2004; DiPlacido, 1998; Harper, Jernewall, & Zea, 2004; Herek, 2009; Herek & Garnets, 2007; Mays & Cochran, 2001; Meyer, 2003; Mustanski, Chivers, & Bailey, 2002; Rahman & Wilson, 2005; Savic & Lindstrom 2008; Szymanski, Kashubeck-West, & Meyer, 2008).

Third, advocates who promote SOCE as well as those who oppose SOCE have asked that APA take action on the issue. On the one hand, professional organizations and advocacy groups that believe that sexual orientation change is unlikely, that homosexuality is a normal variant of human sexuality, and that efforts to change sexual orientation are potentially harmful[6] wanted APA to take a clearer stand and to clarify the conflicting media reports about the likelihood of sexual orientation change (cf. Drescher, 2003; Stålström & Nissinen, 2003). On the other hand, the proponents of SOCE that consist of organizations that adopt a disorder model of homosexuality and/or advocate a religious view of homosexuality as sinful or immoral wanted APA to clearly declare that consumers have the right to choose SOCE (Nicolosi, 2003; Nicolosi & Nicolosi, 2002; Rosik, 2001).

For these reasons, in 2007, APA established the Task Force on Appropriate Therapeutic Responses to Sexual Orientation, with the following charge:

1. Revise and update the 1997 Resolution on Appropriate Therapeutic Responses to Sexual Orientation (APA, 1998);

2. Generate a report that includes discussion of the following:

   • The appropriate application of affirmative therapeutic interventions for children and adolescents who present a desire to change either their sexual orientation or their behavioral expression of their sexual orientation, or both, or

---

[5] In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved.

[6] Two advocacy organizations (Truth Wins Out and Lambda Legal) are encouraging those who feel they were harmed by SOCE to seek legal action against their providers.



PBC 007512

whose guardian expresses a desire for the minor to change.

- The appropriate application of affirmative therapeutic interventions for adults who present a desire to change their sexual orientation or their behavioral expression of their sexual orientation, or both.

- The presence of adolescent inpatient facilities that offer coercive treatment designed to change sexual orientation or the behavioral expression of sexual orientation.

- Education, training, and research issues as they pertain to such therapeutic interventions.

- Recommendations regarding treatment protocols that promote stereotyped gender-normative behavior to mitigate behaviors that are perceived to be indicators that a child will develop a homosexual orientation in adolescence and adulthood.

3. Inform APA's response to groups that promote treatments to change sexual orientation or its behavioral expression and support public policy that furthers affirmative therapeutic interventions.

The task force addressed its charge by completing a review and analysis of the broad psychological literature in the field. After reviewing the existing 1997 resolution in light of this literature review, we concluded that a new resolution was necessary. The basis for this conclusion, including a review and analysis of the extant research, is presented in the body of this report, and a new resolution, adopted in August 2009 by the APA Council of Representatives, is presented in Appendix A.

The report starts with a brief review of the task force charge and the psychological issues that form the foundation of the report. The second chapter is a brief history of the evolution of psychotherapy, from treatments based on the idea that homosexuality is a disorder to those that focus on affirmative approaches to sexual orientation diversity. Chapters 3 and 4 are a review of the peer-reviewed research on SOCE: Chapter 3 provides a methodological evaluation of this research, and Chapter 4 reports on the outcomes of this research. Chapter 5 reviews a broader base of literature regarding the experience of individuals who seek SOCE in order to elucidate the nature of clients' distress and identity conflicts. Chapter 6 then examines affirmative approaches for psychotherapy practice with adults and presents a specific framework for interventions. Chapter

7 returns to the 1997 APA resolution and its focus on ethics to provide an updated discussion of the ethical issues surrounding SOCE. Chapter 8 considers the more limited body of research on SOCE and reports of affirmative psychotherapy with children, adolescents, and their families. Chapter 9 summarizes the report and presents recommendations for research, practice, education, and policy. The policy resolution that the task force recommended and that was adopted by the APA Council of Representatives on August, 5, 2009, is in Appendix A.

# Laying the Foundation of the Report

## *Understanding Affirmative Therapeutic Interventions*

The task force was asked to report on appropriate application of affirmative psychotherapeutic interventions for those who seek to change their sexual orientation. As some debates in the field frame SOCE and conservative religious values as competing viewpoints to affirmative approaches (cf. Throckmorton, 1998; Yarhouse, 1998a) and imply that there is an alternative "neutral" stance, we considered it necessary to explain the *affirmative therapeutic interventions*, its history, its relationship to our charge and to current psychotherapy literature, and our application and definition of the term.

The concept of gay-affirmative therapeutic interventions emerged in the early literature on the psychological concerns of sexual minorities (Malyon, 1982; Paul, Weinrich, Gonsiorek, & Hotvedt, 1982), and its meaning has evolved over the last 25 years to include more diversity and complexity (APA, 2000; Bieschke, Perez, & DeBord, 2007; Firestein, 2007; Herek & Garnets, 2007; Perez, DeBord, & Bieschke, 2000; Ritter & Terndrup, 2002). The affirmative approach grew out of a perception that sexual minorities benefit from psychotherapeutic interventions that address the sexual stigma[7] they experience and the impacts of stigma on their lives (APA, 2000; Brown, 2006; Browning, Reynolds, & Dworkin, 1991; Davison, 1978; Malyon, 1982; Pachankis & Goldfried, 2004; Ritter & Terndrup, 2002; Shannon & Woods, 1991; Sophie, 1987). For example, Garnets, Hancock, Cochran, Goodchilds, and Peplau (1991) proposed that LHMP use an understanding of societal prejudice and

---

7 See p. 15 for the definition of *sexual stigma*.



discrimination to guide treatment for sexual minority clients and help these clients overcome negative attitudes about themselves.

The most recent literature in the field (e.g., APA, 2000, 2002c, 2004, 2005b, 2007b; Bartoli & Gillem, 2008; Brown, 2006; Herek & Garnets, 2007) places affirmative therapeutic interventions within the larger domain of cultural competence, consistent with general multicultural approaches. Multicultural approaches recognize that individuals, families, and communities exist in social, political, historical, and economic contexts (cf. APA, 2002b) and that human diversity is multifaceted and includes age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status. Understanding and incorporating these aspects of diversity are important to any intervention (APA, 2000, 2002c, 2004, 2005b, 2007b).

The task force takes the perspective that a multi-culturally competent and affirmative approach with sexual minorities is based on the scientific knowledge in key areas: (a) homosexuality and bisexuality are stigmatized, and this stigma can have a variety of negative consequences throughout the life span (D'Augelli & Patterson, 1995, 2001); (b) same-sex sexual attractions, behavior, and orientations per se are normal and positive variants of human sexuality and are not indicators of either mental or developmental disorders (American Psychiatric Association, 1973; APA, 2000; Gonsiorek, 1991); (c) same-sex sexual attractions and behavior can occur in the context of a variety of sexual orientation identities (Diamond, 2006, 2008; Klein, Sepekoff, & Wolf, 1985; McConaghy, 1999); and (d) lesbians, gay men, and bisexual people can live satisfying lives and form stable, committed relationships and families that are equivalent to heterosexuals' relationships and families in essential respects (APA, 2005c; Kurdek, 2001, 2003, 2004; Peplau & Fingerhut, 2007).

Although affirmative approaches have historically been conceptualized around helping sexual minorities

> *We define an affirmative approach as supportive of clients' identity development without a priori treatment goals for how clients identify or express their sexual orientations.*

accept and adopt a gay or lesbian identity (e.g., Browning et al., 1991; Shannon & Woods, 1991), the recent research on sexual orientation identity diversity illustrates that sexual behavior, sexual attraction, and sexual orientation identity are

labeled and expressed in many different ways, some of which are fluid (e.g., Diamond, 2006, 2008; Firestein, 2007; Fox, 2004; Patterson, 2008; Savin-Williams, 2005; R. L. Worthington & Reynolds, 2009). We define an affirmative approach as supportive of clients' identity development without a priori treatment goals for how clients identify or express their sexual orientations. Thus, a multiculturally competent affirmative approach aspires to understand the diverse personal and cultural influences on clients and enables clients to determine (a) the ultimate goals for their identity process; (b) the behavioral expression of their sexual orientation; (c) their public and private social roles; (d) their gender roles, identities, and expression[8]; (e) the sex[9] and gender of their partner; and (f) the forms of their relationships.

## EVIDENCE-BASED PRACTICE AND EMPIRICALLY SUPPORTED TREATMENTS

Interest in the efficacy,[10] effectiveness, and empirical basis of psychotherapeutic interventions has grown in the last decade. Levant and Hasan (2009) distinguished between two types of treatments: empirically supported treatments (EST) and evidence-based approaches to psychotherapy (EBPP). EST are interventions for individuals with specific disorders; these interventions have been demonstrated to be effective through rigorously controlled trials (Levant & Hasan, 2009). EBPP is, as defined by APA's Policy Statement on Evidence-Based Practice in Psychology[11] (2005a), "the integration of the best available research with clinical expertise in the context of patient characteristics, culture, and preferences" (p. 1; see also, Sackett, Rosenberg, Gray, Haynes, & Richardson, 1996).

We were not able to identify affirmative EST for this population (cf. Martell, Safran, & Prince, 2004).

---

[8] *Gender* refers to the cultural roles, behaviors, activities, and psychological attributes that a particular society considers appropriate for men and women. *Gender identity* is a person's own psychological sense of identification as male or female, another gender, or identifying with no gender. *Gender expression* is the activities and behaviors that purposely or inadvertently communicate one's gender identity to others, such as clothing, hairstyles, mannerisms, way of speaking, and social roles.

[9] We define *sex* as biological maleness and femaleness in contrast to gender, defined above.

[10] *Efficacy* is the measurable effect of an intervention, and *effectiveness* aims to determine whether interventions have measurable effects in real-world settings across populations (Nathan, Stuart, & Dolan, 2000).

[11] Discussion of the overall implications for practice can be found in Goodheart, Kazdin, and Sternberg (2006) and the *Report of the 2005 Presidential Task Force on Evidence-Based Practice* (APA, 2005b).


PBC 007514

The lack of EST is a common dilemma when working with diverse populations for whom EST have not been developed or when minority populations have not been included in trials (Brown, 2006; Martell et al., 2004; Sue & Zane, 2006; Whaley & Davis, 2007). Thus, we provide an affirmative model in Chapter 2 that is consistent with APA's definition of EBPP in that it applies the most current and best evidence available to guide decisions about the care of this population (APA, 2005a; Sackett et al., 1996). We considered the APA EBPP resolution as utilizing a flexible concept of evidence, because it incorporates research based on well-designed studies with client values and clinical expertise. Given that the distress surrounding sexual orientation is not included in psychotherapy research (because it is not a clearly defined syndrome) and most treatment studies in psychology are for specific mental health disorders, not for problems of adjustment or identity relevant to sexual orientation concerns, we saw this flexibility as necessary (Brown, 2006). However, EST for specific disorders can be incorporated into this affirmative approach (cf. Martell et al., 2004). We acknowledge that the model presented in this report would benefit from rigorous evaluation.

Affirmative approaches, as understood by this task force, are evidence-based in three significant ways:

- They are based on the evidence that homosexuality is not a mental illness or disorder, which has a significant empirical foundation (APA, 2000; Gonsiorek, 1991).

- They are based on studies of the role of stigma in creating distress and health disparities in sexual minorities (Balsam & Mohr, 2007; Cochran & Mays, 2006; Omoto & Kurtzman, 2006; Pachankis, 2007; Pachankis, Goldfried, & Ramrattan, 2008; Safren & Heimberg, 1999; Syzmanski & Kashubeck-West, 2008).

- They are based on the literature that has shown the importance of the therapeutic alliance and relationship on outcomes in therapy and that these outcomes are linked to empathy, positive regard, honesty, and other factors encompassed in the affirmative perspective on therapeutic interventions (Ackerman & Hilsenroth, 2003; Brown, 2006; Farber & Lane, 2002; Horvath & Bedi, 2002; Norcross, 2002; Norcross & Hill, 2004).

The affirmative approach was the subject of a recent literature review that found that clients describe the safety, affirmation, empathy, and nonjudgmental acceptance inherent in the affirmative approach as helpful in their therapeutic process (M. King, Semlyen, Killaspy, Nazareth, & Osborn, 2007; see also, M. A. Jones & Gabriel, 1999). M. King et al. concluded that a knowledge base about sexual minorities' lives and social context is important for effective practice.

## Sexual Stigma

To understand the mental health concerns of sexual minorities, one must understand the social psychological concept of stigma (Herek & Garnets, 2007). Goffman (1963) defined stigma as an undesirable difference that discredits the individual. Link and Phelan (2001) characterized stigma as occurring when (a) individual differences are labeled; (b) these differences are linked to undesirable traits or negative stereotypes; (c) labeled individuals are placed in distinct categories that separate them from the mainstream; and (d) labeled persons experience discrimination and loss of status that lead to unequal access to social, economic, and political power. This inequality is a consequence of stigma and discrimination rather than of the differences themselves (Herek, 2009). Stigma is a fact of the interpersonal, cultural, legal, political, and social climate in which sexual minorities live.

The stigma that defines sexual minorities has been termed *sexual stigma*[12]: "the stigma attached to any non-heterosexual behavior, identity, relationship or community" (Herek, 2009, p. 3). This stigma operates both at the societal level and the individual level. The impact of this stigma as a stressor may be the unique factor that characterizes sexual minorities as a group (Herek, 2009; Herek & Garnets, 2007; Katz, 1995).

Further, stigma has shaped the attitudes of mental health professions and related institutions toward this population (Drescher, 1998b; Haldeman, 1994; LeVay, 1996; Murphy, 1997; Silverstein, 1991). Moral and religious values in North America and Europe provided the initial rationale for criminalization, discrimination, and prejudice against same-

*In the late modern period, the medical and mental health professions added a new type of stigmatization and discrimination by conceptualizing and treating homosexuality as a mental illness or disorder.*

[12] Herek (2009) coined this term, and we use it because of the comprehensive analysis in which it is embedded. There are other terms for the same construct, such as Balsam and Mohr's (2007) *sexual orientation stigma*.

sex behaviors (Katz, 1995). In the late modern period, the medical and mental health professions added a new type of stigmatization and discrimination by conceptualizing and treating homosexuality as a mental illness or disorder (Brown, 1996; Katz, 1995).

Sexual minorities may face additional stigmas, as well, such as those related to age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status. At the societal level, sexual stigma is embedded in social structures through civil and criminal law, social policy, psychology, psychiatry, medicine, religion, and other social institutions. Sexual stigma is reflected in disparate legal and social treatment by institutions and is apparent in, for example, (a) the long history of criminalization of same-sex sexual behaviors; (b) the lack of legal protection for LGB individuals from discrimination in employment, health care, and housing; and (c) the lack of benefits for LGB relationships and families that would support their family formation, in contrast to the extensive benefits that accrue to heterosexual married couples and even sometimes to unmarried heterosexual couples.[13] The structural sexual stigma, called *heterosexism* in the scholarly literature, legitimizes and perpetuates stigma against sexual minorities and perpetuates the power differential between sexual minorities and others (Herek, 2007; see also Szymanski et al., 2008).

Expressions of stigma, such as violence, discrimination, rejection, and other negative interpersonal interactions, are *enacted stigma* (Herek, 2009). Individuals' expectations about the probability that stigma will be enacted in various situations is *felt stigma*. Individuals' efforts to avoid enacted and felt stigma may include withdrawing from self (e.g., self-denial or compartmentalization) and withdrawing from others (e.g., self-concealment or avoidance) (e.g., see Beckstead & Morrow, 2004; Drescher, 1998b; Malyon, 1982; Pachankis, 2007; Pachankis et al., 2008; Troiden, 1993).

In Herek's (2009) model, *internalized stigma*[14] is the adoption of the social stigma applied to sexual minorities. Members of the stigmatized groups as well as nonmembers of the group can internalize these values. *Self-stigma* is internalized stigma in those individuals who experience same-sex sexual attractions and whose self-concept matches the stigmatizing interpretations of society. Examples of this self-stigma are (a) accepting society's negative evaluation and (b) harboring negative attitudes toward oneself and one's own same-sex sexual attractions. *Sexual prejudice* is the internalized sexual stigma held by the non-stigmatized majority.

## The Impact of Stigma on Members of Stigmatized Groups

One of the assumptions of the stigma model is that social stigma influences the individual through its impact on the different settings, contexts, and relationships in which each human being takes part (D'Augelli, 1994). This assumption is supported by a body of literature comparing sexual minority populations to the general population that has found health disparities between the two (Cochran & Mays, 2006; Mays & Cochran, 2001). The concept of minority stress (e.g., DiPlacido, 1998; Hatzenbuehler, Nolen-Hoeksema, & Erickson, 2008; Meyer, 1995, 2003) has been increasingly used to explain these health disparities in much the same way that concepts of racism-derived stress and minority stress have been used to explain health disparities and mental health concerns in ethnic minority groups (Carter, 2007; Harrell, 2000; Mays, Cochran, & Barnes, 2007; Saldaina, 1994; Wei, Ku, Russell, Mallinckrodt, & Liao, 2008). Theoretically any minority group facing social stigma and prejudice, including stigma due to age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status, could develop minority stress.

In theory, minority stress—chronic stress experienced by members of minority groups—causes distress in

---

[13] Same-sex sexual behaviors were only recent universally decriminalized in the United States by Supreme Court action in *Lawrence v. Texas* (2003). There is no federal protection from employment and housing discrimination for LGB individuals, and only 20 states offer this protection. Only 6 states permit same-sex couples to marry; 6 states have broad recognition laws; 4 states have limited recognition laws; and 2 states recognize other states' marriages. For more examples, see National Gay and Lesbian Task Force, Reports & Research: http://www.thetaskforce.org/reports_and_research/reports).

[14] Herek (2009) defined *internalization* as "the process whereby individuals adopt a social value, belief, regulation, or prescription for conduct as their own and experience it as part of themselves" (p. 7). The internalization of negative attitudes and assumptions concerning homosexuality has often been termed *internalized homophobia* (Malyon, 1982; Sophie, 1987; Weinberg, 1972). However, this term has been criticized because holding negative attitudes does not necessarily involve a phobia, in other words, "an exaggerated usually inexplicable and illogical fear of a particular object, class of objects, situation (*Merriam-Webster's Online Dictionary*).



PBC 007516

certain sexual minority individuals (DiPlacido, 1998; Meyer, 1995, 2003). Meyer (2003) described these stress processes as due to (a) external objective events and conditions, such as discrimination and violence; (b) expectations of such events, and the vigilance that such expectations bring; and (c) internalization of negative social and cultural attitudes. For instance, mental health outcomes among gay men have been found to be influenced by negative appraisals of stigma-related stressors (Meyer, 1995).

The task force sees stigma and minority stress as playing a manifest role in the lives of individuals who seek to change their sexual orientation (Davison, 1978, 1982, 1991; Herek, Cogan, Gillis, & Glunt, 1998; Green, 2003; Silverstein, 1991; Tozer & Hayes, 2004). Davison, in particular, has argued that individuals who seek psychotherapy to change their sexual orientation do so because of the distress arising from the impact of stigma and discrimination. A survey of a small sample of former SOCE clients in Britain supports this hypothesis, as many of the former participants reported that hostile social and family attitudes and the criminalization of homosexual conduct were the reasons they sought treatment (G. Smith, Bartlett, & King, 2004).

One of the advantages of the minority stress model is that it provides a framework for considering the social context of stress, distress, coping, resilience (Allen, 2001; David & Knight, 2008; Herek, Gillis, & Cogan, 2009; Selvidge, Matthews, & Bridges, 2008; Levitt et al., 2009; Pachankis, 2007), and acceptance and goals of treatment (Beckstead & Israel, 2007; Bieschke, 2008; Frost & Meyer, 2009; Glassgold, 2007; Rostosky, Riggle, Horne, & Miller, 2009; Martell et al., 2004; Russell & Bohan, 2007). Some authors have proposed that LGB men and women improve their mental health and functioning through a process of positive coping, termed *stigma competence* (David & Knight, 2008). In this model, it is proposed that through actions such as personal acceptance of one's LGB identity and reduction of internalized stigma, an individual develops a greater ability to cope with stigma (cf. Crawford, Allison, Zamboni, & Soto, 2002; D'Augelli, 1994). For instance, Herek and Garnets (2007) proposed that collective identity (often termed *social identity*)[15] mitigates the impact of minority stress above and beyond the effects of individual factors such as coping skills, optimism, and resiliency. Individuals with a strong sense of positive collective identity integrate their group affiliation into

their core self-concept and have community resources for responding to stigma (Balsam & Mohr, 2007; Crawford et al., 2002; Levitt et al., 2009). In support of this hypothesis, Balsam and Mohr (2007) found that collective identity, community participation, and identity confusion predicted coping with sexual stigma.

# Psychology, Religion, and Homosexuality

Most of the recent studies on SOCE focus on populations with strong religious beliefs (e.g., Beckstead & Morrow, 2004; Nicolosi et al., 2000; Ponticelli, 1999; Schaeffer, Hyde, Kroencke, McCormick, & Nottebaum, 2000; Spitzer, 2003; Tozer & Hayes, 2004; Wolkomir, 2001). Beliefs about sexual behavior and sexual orientation rooted in interpretations of traditional religious doctrine also guide some efforts to change others' sexual orientation as well as political opposition to the expansion of civil rights for LGB individuals and their relationships (Burack & Josephson, 2005; S. L. Morrow & Beckstead, 2004; Olyam & Nussbaum, 1998; Pew Forum on Religion and Public Life, 2003; Southern Poverty Law Center, 2005). Some authors have documented an increase in the provision of relously-based SOCE (Burack & Josephson, 2005; Cianciotto & Cahill, 2006). Religious beliefs, motivations, and struggles play a role in the motivations of individuals who currently engage in SOCE (Beckstead & Morrow, 2004; Ponticelli, 1999; Shidlo & Schroeder, 2002; Wolkomir, 2001; Yarhouse, Tan, & Pawlowski, 2005). Thus, we considered an examination of issues in the psychology of religion to be an important part of fulfilling our charge.

## Intersections of Psychology, Religion, and Sexual Orientation

World religions regard homosexuality from a spectrum of viewpoints. It is important to note that some religious denominations' beliefs and practices have changed over time, reflecting evolving scientific and civil rights perspectives on homosexuality and sexual orientation (see, e.g., Dorff, Nevins, & Reisner, 2006; Olyam & Nussbaum, 1998; see also Hebrew Union College, Institute for Judaism & Sexual Orientation [http://www.huc.edu/ijso], and Ontario Consultants on Religious Tolerance [http://www.religioustolerance. org]). A number of religious denominations in the United States welcome LGB laity, and a smaller

---

[15] A collective or social identity refers to an individual's sense of belonging to a group (the collective), and the collective or social identity forms a part of his or her personal identity.

number ordain LGB clergy (e.g., Reconstructionist Judaism, Reform Judaism, Conservative Judaism, Buddhist Peace Fellowship, Buddhist Churches of America, Episcopal Church of America, Friends General Conference, Unitarian Society, United Church of Christ Congregational) (Greenberg, 2004; Olyam & Nussbaum, 1998; see also Hebrew Union College, Institute for Judaism & Sexual Orientation [http://www.huc.edu/ijso], and Ontario Consultants on Religious Tolerance [http://www.religioustolerance.org]). However, others view homosexuality as immoral and sinful (e.g., Christian Reformed Church of North America, Church of Jesus Christ of Latter-Day Saints, Eastern Orthodox Christianity, Orthodox Judaism, Presbyterian Church in American, Roman Catholicism, Southern Baptist Convention, United Methodist Church) (see Ontario Consultants on Religious Tolerance: http://www.religioustolerance.org). These issues are being discussed within numerous denominations (e.g., Van Voorst, 2005), and some views are in flux (e.g., the Presbyterian Church [USA]) (see Ontario Consultants on Religious Tolerance: http://www.religioustolerance.org).

Several professional publications (e.g., *Journal of Gay and Lesbian Psychotherapy*, 2001, *5*[3/4]; *Professional Psychology*, 2002, *33*[3]; *Archives of Sexual Behavior*, 2003, *32*[5]; *The Counseling Psychologist*, 2004, *32*[5]; *Journal of Psychology and Christianity*, 2005, *24*[4]) have specifically considered the interactions among scientific views of sexual orientation, religious beliefs, psychotherapy, and professional ethics.

> *Some difficulties arise because the professional psychological community considers same-sex sexual attractions and behaviors to be a positive variant of human sexuality, while some traditional faiths continue to consider it a sin, a moral failing, or a disorder that needs to be changed.*

Some difficulties arise because the professional psychological community considers same-sex sexual attractions and behaviors to be a positive variant of human sexuality, while some traditional faiths continue to consider it a sin, a moral failing, or a disorder that needs to be changed.

The conflict between psychology and traditional faiths may have its roots in different philosophical viewpoints. Some religions give priority to *telic congruence* (i.e., living consistently within one's valuative goals[16]) (W.

Hathaway, personal communication, June 30, 2008; cf. Richards & Bergin, 2005). Some authors propose that for adherents of these religions, religious perspectives and values should be integrated into the goals of psychotherapy (Richards & Bergin, 2005; Throckmorton & Yarhouse, 2006). Affirmative and multicultural models of LGB psychology give priority to *organismic congruence* (i.e., living with a sense of wholeness in one's experiential self[17]) (W. Hathaway, personal communication, June 30, 2008; cf. Gonsiorek, 2004; Malyon, 1982). This perspective gives priority to the unfolding of developmental processes, including self-awareness and personal identity.

This difference in worldviews can impact psychotherapy. For instance, individuals who have strong religious beliefs can experience tensions and conflicts between their ideal self and beliefs and their sexual and affectional needs and desires (Beckstead & Morrow, 2004; D. F. Morrow, 2003). The different worldviews would approach psychotherapy for these individuals from dissimilar perspectives: The telic strategy would prioritize values (Rosik, 2003; Yarhouse & Burkett, 2002), whereas the organismic approach would give priority to the development of self-awareness and identity (Beckstead & Israel, 2007; Gonsiorek, 2004; Haldeman, 2004).

It is important to note that the organismic worldview can be congruent with and respectful of religion (Beckstead & Israel, 2007; Glassgold, 2008; Gonsiorek, 2004; Haldeman, 2004; Mark, 2008; Ritter & O'Neil, 1995), and the telic worldview can be aware of sexual stigma and respectful of sexual orientation (Tan, 2008; Throckmorton & Yarhouse, 2006; Yarhouse, 2008). Understanding this philosophical difference may improve the dialogue between these two perspectives represented in the literature, as it refocuses the debate not on one group's perceived rejection of homosexuals or the other group's perceived minimization of religious viewpoints but on philosophical differences that extend beyond this particular subject matter. However, some of the differences between these philosophical assumptions may be difficult to bridge.

Contrasting views exist within psychology regarding religious views about homosexuality. One way in which psychology has traditionally examined the

---

[16] These conflicts are not unique to religious individuals but are applicable to individuals making commitments and decisions about how to live according to specific ethics and ideals (cf. Baumeister & Exline, 2000; Diener, 2000; Richards & Bergin, 2005; B. Schwartz, 2000).

[17] Such naturalistic and empirically based models stress the organization, unity, and integration of human beings expressed through each individual's inherent growth or developmental tendency (see, e.g., Rogers, 1961; R. M. Ryan, 1995).



intersections between religion and homosexuality is by studying the impact of religious beliefs and motivations on attitudes and framing the discussion in terms of tolerance and prejudice (Fulton, Gorsuch, & Maynard, 1999; Herek, 1987; Hunsberger & Jackson, 2005; Plugge-Foust & Strickland, 2000; J. P. Schwartz & Lindley, 2005). For instance, one finding is that religious fundamentalism is correlated with negative views of homosexuality, whereas a quest orientation is associated with decreased discriminatory or prejudicial attitudes (Batson, Flink, Schoenrade, Fultz, & Pych, 1986; Batson, Naifeh, & Pate, 1978; Fulton et al., 1999; Plugge-Foust & Strickland, 2000). However, some authors have argued, in contrast to this approach, that conservative religious moral beliefs and evaluations about same-sex sexual behaviors and LGB individuals and relationships should be treated as religious diversity rather than as sexual prejudice (e.g., Rosik, 2007; Yarhouse & Burkett, 2002; Yarhouse & Throckmorton, 2002).

## APA Policies on the Intersection of Religion and Psychology

APA has addressed the interactions of religion and psychology in two recent resolutions: the Resolution Rejecting Intelligent Design as Scientific and Reaffirming Support for Evolutionary Theory (APA, 2008a) and the Resolution on Religious, Religion-Related, and/or Religion-Derived Prejudice (2008c). The first resolution articulates psychology's epistemological commitment: Hypothesis testing through rigorous scientific methods is the best means to gain new knowledge and to evaluate current practices, and psychologists base their theories on such research:

> While we are respectful of religion and individuals' right to their own religious beliefs, we also recognize that science and religion are separate and distinct. For a theory to be taught as science it must be testable, supported by empirical evidence and subject to disconfirmation. (APA, 2007a)

This is in contrast to viewpoints based on faith, as faith does not need confirmation through scientific evidence. Further, science assumes that some ideas can be rejected when proven false; faith and religious beliefs cannot be falsified in the eyes of adherents.

The APA Council of Representatives also passed a Resolution on Religious, Religion-Related, and/or Religion-Derived Prejudice (2008c). This resolution acknowledges the existence of two forms of prejudice

related to religion: one derived from religious beliefs and another directed at religions and their adherents. The APA strongly condemns both forms of prejudice. The resolution affirms APA's position that prejudices directed at individuals because of their religious beliefs and prejudices derived from or justified by religion are harmful to individuals, society, and international relations.

In areas of conflicts between psychology and religion, as the APA Resolution on Religious, Religion-Related,

> *The resolution affirms APA's position that prejudices directed at individuals because of their religious beliefs and prejudices derived from or justified by religion are harmful to individuals, society, and international relations.*

and/or Religion-Derived Prejudice (2008c) states, psychology has no legitimate function in "arbitrating matters of faith and theology" or to "adjudicate religious or spiritual tenets" (p. 432) and psychologists are urged to limit themselves to speak to "psychological implications of religious/spiritual beliefs or practices when relevant psychological findings about those implications exist" (p. 433). Further, the resolution states that faith traditions "have no legitimate place arbitrating behavioral or other sciences" or to "adjudicate empirical scientific issues in psychology" (p. 432).

The APA (2002b, 2008c) recommends that psychologists acknowledge the importance of religion and spirituality as forms of meaning-making, tradition, culture, identity, community, and diversity. Psychologists do not discriminate against individuals based on those factors. Further, when devising interventions and conducting research, psychologists consider the importance of religious beliefs and cultural values and, where appropriate, consider religiously and culturally sensitive techniques and approaches (APA, 2008c).

## Psychology of Religion

Historically, some in psychology and psychiatry have held negative views of religion (Wulff, 1997). Yet, with the development of more sophisticated methodologies and conceptualizations, the field of the psychology of religion has flourished in the last 30 years (Emmons & Paloutzian, 2003), culminating in new interest in a diverse field (e.g., Koenig & Larson, 2001; Paloutzian & Park, 2005; Pargament, 2002; Pargament & Mahoney,

2005; Richards & Bergin, 2005; Sperry & Shafranske, 2004; Spilka, Hood, Hunsberger, & Gorsuch, 2003).

Many scholars have attempted to elucidate what is significant and unique about religious and spiritual faith, beliefs, and experiences (e.g., George, Larson, Koenig, & McCullough, 2000; McClennon, 1994). Pargament, Maygar-Russell, and Murray-Swank (2005) summarized religion's impact on people's lives as a unique form of motivation regarding how to live one's life and how to respond to self, others, and life events; a source of significance regarding what aspects of life one imbues with meaning and power; a contributor to mortality and health; a form of positive and negative coping; and a source of fulfillment and distress. Others, such as Fowler (1981, 1991) and colleagues (Oser, 1991; Streib, 2001, 2005) have posited developmental models of religious identity that are helpful in understanding personal faith.

Additionally, there is a growing literature on integrating spirituality into psychotherapy practice (Richards & Bergin, 2000, 2004, 2005; Shafranske, 2000; Sperry & Shafranske, 2004; E. L. Worthington, Kurusu, McCullough, & Sandage, 1996). These approaches include delineating how LMHP can work effectively with individuals from diverse religious traditions (Richards & Bergin, 2000, 2004; Sperry & Shafranske, 2004). Many of these techniques can be effective (McCullough, 1999) and improve outcomes in clinical treatment with religious clients (Probst, Ostrom, Watkins, Dean, & Mashburn, 1992; Richards, Berrett, Hardman, & Eggett, 2006; E. L. Worthington et al., 1996), even for clients in treatment with secular LMHP (Mayers, Leavey, Vallianatou, & Barker, 2007). These innovations point to ways that psychology can explore and understand religious beliefs and faith in an evidence-based and respectful manner.

There have been claims that some LMHP do not address the issues of conservative religious individuals who are distressed by their same-sex sexual attractions (e.g., Yarhouse, 1998a; Throckmorton, 2002; Yarhouse & Burkett, 2002; Yarhouse & Throckmorton, 2002). One of the problems in the field has been an either/or perspective in which sexual orientation and religion are seen as incompatible (Phillips, 2004). Certainly, some individuals may perceive their religion and their sexual orientation as incompatible, because in some faiths homosexuality is perceived as sinful and immoral. However, there is a growing body of evidence illustrating that many individuals do integrate their religious and sexual orientation identities (Coyle & Rafalin, 2000; Kerr, 1997; Mahaffy, 1996; Rodriguez,

2006; Rodriguez & Ouellette, 2000; Thumma, 1991; Yip, 2002, 2003, 2005). Thus, this dichotomy may be enabling a discourse that does not fully reflect the evidence and may be hindering progress to find a variety of viable solutions for clients.

Recently, some authors have suggested alternative frameworks, many of which are drawn from a variety of models of psychotherapy, such as multicultural views of psychology and the psychology of religion, that provide frames for appropriate psychotherapeutic interventions seeking to bridge this divide (Bartoli & Gillem, 2008; Beckstead & Israel, 2007; Buchanon, Dzelme, Harris, & Hecker, 2001; Glassgold, 2008; Gonsiorek; 2004; Haldeman, 2004; Lasser & Gottlieb, 2004; S. L. Morrow & Beckstead, 2004; Ritter & O'Neill, 1989; Tan, 2008; Throckmorton & Yarhouse, 2006; Yarhouse, 2008). For instance, a growing number of authors address the religious and spiritual needs of LGBT individuals from integrative and affirmative perspectives that provide resources for LMHP working with this population (Astramovich, 2003; Beckstead & Israel, 2007; Beckstead & Morrow, 2004; Glassgold, 2008; Haldeman, 1996, 2004; Horne & Noffsinger-Frazier, 2003; Mark, 2008; D. F. Morrow, 2003; O'Neill & Ritter, 1992; Ritter & O'Neill, 1989; Throckmorton & Yarhouse, 2006; Yarhouse, 2008). On the basis of these scholarly contributions, we take the perspective that religious faith and psychology do not have to be seen as being opposed to each other. Further, psychotherapy that respects faith can also explore the psychological implications and impacts of such beliefs.

We support affirmative and multiculturally competent approaches that integrate concepts from the psychology of religion and the modern psychology of sexual orientation. These perspectives are elaborated later in this report. In the next chapter we review the history of SOCE in order to provide a perspective on the foundation and evolution of these approaches.

> *We take the perspective that religious faith and psychology do not have to be seen as being opposed to each other. Further, psychotherapy that respects faith can also explore the psychological implications and impacts of such beliefs.*

PBC-007520

# 2. A BRIEF HISTORY OF SEXUAL ORIENTATION CHANGE EFFORTS

Sexual orientation change efforts (SOCE)[18] within mental health fields originally developed from the science of sexuality in the middle of the 19th century (Katz, 1995). At that time, same-sex eroticism and gender-nonconforming behaviors came under increased medical and scientific scrutiny. New terms such as *urnings*, *inversion*, *homosexual*, and *homosexuality* emerged as scientists, social critics, and physicians sought to make sense of what was previously defined as sin or crime (Katz, 1995). This shift to a scientific approach did not challenge the underlying social values, however, and thus continued to reflect the existing sexual stigma, discrimination, criminalization, and heterosexism. Much of the medical and scientific work at that time conceptualized homosexual attractions and behaviors as abnormal or as an illness (Katz, 1995).

In that era, homosexuality was predominantly viewed as either a criminal act or a medical problem, or both (Krafft-Ebing, 1886/1965). Homosexuality was seen as caused by psychological immaturity (i.e., as a passing phase to be outgrown on the road to adult heterosexuality) or pathology (e.g., genetic defects, gender-based confusions, intrauterine hormonal exposure, too much parental control, insufficient parenting, hostile parenting, seduction, molestation, or decadent lifestyles) (Drescher, 1998b, 2002). The first treatments attempted to correct or repair the damage done by pathogenic factors or to facilitate maturity (Drescher, 1998b, 2002; LeVay, 1996; Murphy, 1992, 1997). These perspectives on homosexuality lasted into the first half of the 20th century, shaping the views of psychoanalysis, the dominant psychiatric paradigm of that time (Drescher, 1998b).

## Homosexuality and Psychoanalysis

Initial psychotherapeutic approaches to homosexuality in the first half of the 20th century reflected psychoanalytic theory. Freud's own views on sexual orientation and homosexuality were complex. Freud viewed homosexuality as a developmental arrest and heterosexuality as the adult norm (Freud, 1905/1960). However, in a now-famous letter, Freud (1935/1960) reassured a mother writing to him about her son that homosexuality was "nothing to be ashamed of, no vice, no degradation, it cannot be classified as an illness, but a variation of sexual function" (p. 423). He further went on to say that psychoanalysts could not promise to "abolish homosexuality and make normal heterosexuality take its place" (p. 423), as the results of treatment could not be determined. Freud's only report (1920/1960) about his deliberate attempt to change someone's sexual orientation described his unsuccessful efforts at changing the sexual orientation of a young woman brought for involuntary treatment by her

---

[18] In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved.

parents. At the end of this case, Freud concluded that attempts to change homosexual sexual orientation were likely to be unsuccessful.[19]

In the psychoanalysis that dominated the mental health fields after Freud, especially in the United States, homosexuality was viewed negatively, considered to be abnormal, and believed to be caused by family dynamics (Bieber et al., 1962; Rado, 1940; Socarides, 1968). Other approaches based loosely on psychoanalytic ideas advocated altering gender-role behaviors to increase conformity with traditional gender roles (Moberly, 1983; Nicolosi, 1991). Significantly impacting psychiatric thought in the mid-20th century, these theories were part of the rationale for including homosexuality as a mental illness in both the first (1952) and second (1968) editions of the American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* (*DSM*), thus reinforcing and exacerbating sexual stigma and sexual prejudice. It was during this period that the first attempts to study the efficacy of SOCE were conducted (e.g., Bieber et al., 1962).

## Sexual Orientation Change Efforts

The pathologizing psychiatric and psychological conception of homosexuality and concomitant efforts to alter sexual orientation through psychoanalytic and behavior therapy were prevalent through the 1960s and into the early 1970s. Although behavior therapy emerged in the 1960s, adding a different set of techniques to psychotherapy, the goals of SOCE did not change. For example, Ovesey (1969) based his behavioral interventions on the belief that homosexuality developed from a phobia of taking on the normal qualities of one's gender and that sexual intercourse with the other[20] sex would cure the so-called phobia.

Behavior therapists tried a variety of aversion treatments, such as inducing nausea, vomiting, or paralysis; providing electric shocks; or having the

individual snap an elastic band around the wrist when the individual became aroused to same-sex erotic images or thoughts. Other examples of aversive behavioral treatments included covert sensitization, shame aversion, systematic desensitization, orgasmic reconditioning, and satiation therapy (Beckstead & Morrow, 2004; S. James, 1978; Katz, 1995; Langevin, 1983; LeVay, 1996; Murphy, 1992, 1997). Some nonaversive treatments used an educational process of dating skills, assertiveness, and affection training with physical and social reinforcement to increase other-sex sexual behaviors (Binder, 1977; Greenspoon & Lamal, 1987; Stevenson & Wolpe, 1960). Cognitive therapists attempted to change gay men's and lesbians' thought patterns by reframing desires, redirecting thoughts, or using hypnosis, with the goal of changing sexual arousal, behavior, and orientation (e.g., Ellis, 1956, 1959, 1965).

## Affirmative Approaches: Kinsey; Ford and Beach; and Hooker

At the same time that the pathologizing views of homosexuality in American psychiatry and psychology were being codified, countervailing evidence was accumulating that this stigmatizing view was ill founded. The publication of *Sexual Behavior in the Human Male* (Kinsey, Pomeroy, & Martin, 1948) and *Sexual Behavior in the Human Female* (Kinsey, Pomeroy, Martin, & Gebhard, 1953) demonstrated that homosexuality was more common than previously assumed, thus suggesting that such behaviors were part of a continuum of sexual behaviors and orientations. C. S. Ford and Beach (1951) revealed that same-sex behaviors and homosexuality were present in a wide range of animal species and human cultures. This finding suggested that there was nothing unnatural about same-sex behaviors or homosexual sexual orientation.

Psychologist Evelyn Hooker's (1957) research put the idea of homosexuality as mental disorder to a scientific test. She studied a nonclinical sample of homosexual men and compared them with a matched sample of heterosexual men. Hooker found, among other things, that based on three projective measures (the Thematic Apperception Test, the Make-a-Picture Story test, and the Rorschach), the homosexual men were comparable to their matched heterosexual peers on ratings of adjustment. Strikingly, the experts who examined the Rorschach protocols could not

---

[19] Analyses of this case have focused on Freud's intense negative reactions to this young woman and his attempts to enforce social conformity—especially with regard to traditional female gender roles and sexuality (e.g., Lesser & Schoenberg, 1999; O'Connor & Ryan, 1993).

[20] We use *other sex* instead of *opposite sex*, as the latter term makes assumptions regarding the binary nature of male and female that are unsupported. We acknowledge that this term also has limitations, as there are fluid and diverse representations of sex and gender in many cultures.



distinguish the protocols of the homosexual cohort from the heterosexual cohort, a glaring inconsistency with the then-dominant understanding of homosexuality and projective assessment techniques. Armon (1960) performed research on homosexual women and found similar results.

In the years following Hooker's (1957) and Armon's (1960) research, inquiry into sexuality and sexual orientation proliferated. Two major developments marked an important change in the study of homosexuality. First, following Hooker's lead, more researchers conducted studies of nonclinical samples of homosexual men and women. Prior studies primarily included participants who were in distress or incarcerated. Second, quantitative methods to assess human personality (e.g., Eysenck Personality Inventory, Cattell's Sixteen Personality Factor Questionnaire [16PF] and mental disorders (Minnesota Multiphasic Personality Inventory [MMPI]) were developed and were

*Research conducted with these newly developed measures indicated that homosexual men and women were essentially similar to heterosexual men and women in adaptation and functioning.*

a vast psychometric improvement over prior measures, such as the Rorschach, Thematic Apperception Test, and House-Tree-Person Test. Research conducted with these newly developed measures indicated that homosexual men and women were essentially similar to heterosexual men and women in adaptation and functioning (Siegelman, 1979; M. Wilson & Green, 1971; see also the review by Gonsiorek, 1991). Studies failed to support theories that regarded family dynamics, gender identity, or trauma as factors in the development of sexual orientation (e.g., Bell, Weinberg, & Hammersmith, 1981; Bene, 1965; Freund & Blanchard, 1983; Freund & Pinkava, 1961; Hooker, 1969; McCord, McCord, & Thurber, 1962; D. K. Peters & Cantrell, 1991; Siegelman, 1974, 1981; Townes, Ferguson, & Gillem, 1976). This research was a significant challenge to the model of homosexuality as psychopathology.

## Homosexuality Removed From the Diagnostic and Statistical Manual

In recognition of the legal nexus between psychiatric diagnosis and civil rights discrimination, especially for government employees, activists within the homophile[21] rights movement, including Frank Kameny and the Mattachine Society of Washington, DC, launched a campaign in late 1962 and early 1963 to remove homosexuality as a mental disorder from the American Psychiatric Association's *DSM* (D'Emilio, 1983; Kameny, 2009). This campaign grew stronger in the aftermath of the Stonewall riots in 1969. Those riots were a watershed, as the movement for gay and lesbian civil rights was embraced openly by thousands rather than limited to small activist groups (D'Emilio, 1983; Katz, 1995). In the area of mental health, given the results of research, activists within and outside of the professions led a large and vocal advocacy effort directed at mental health professional associations, such as the American Psychiatric Association, the American Psychological Association, and the American Association for Behavior Therapy, and called for the evaluation of prejudice and stigma within mental health associations and practices (D'Emilio, 1983; Kameny, 2009). At the same time, some LGB professionals and their allies encouraged the field of psychotherapy to assist sexual minority clients to accept their sexual orientation (Silverstein, 2007).

As a result of the research and the advocacy outside of and within the American Psychiatric Association, that association embarked upon an internal process of evaluating the literature to address the issue of homosexuality as a psychiatric disorder (Bayer, 1981; Drescher 2003; Drescher & Merlino, 2007; Sbordone, 2003; Silverstein, 2007). On the recommendation of its committee evaluating the research, the American Psychiatric Association Board of Trustees and general membership voted to remove homosexuality per se[22] from the *DSM* in December 1973 (Bayer, 1981). The American Psychiatric Association (1973) then issued a position statement supporting civil rights protection for gay people in employment, housing, public accommodation, and licensing, and the repeal of all sodomy laws.

In December 1974, the American Psychological Association (APA) passed a resolution affirming the resolution of the American Psychiatric Association. APA concluded:

---

[21] *Homophile* is an early term for what would become the gay rights or gay and lesbian rights movement.

[22] The diagnoses of sexual orientation disturbance and ego-dystonic homosexuality sequentially replaced homosexuality. These diagnoses, however, were ultimately removed, due to conceptual problems and psychiatry's evolving evidence-based approach to delineating a mental disorder (Drescher, Stein, & Byne, 2005).

Homosexuality per se implies no impairment in judgment, stability, reliability, or general social and vocational capabilities. Further, the American Psychological Association urges all mental health professionals to take the lead in removing the stigma of mental illness that has long been associated with homosexual orientations. (APA, 1975, p. 633)

Since that time, the APA has passed numerous resolutions supporting LGB civil rights and psychological well-being (see APA, 2005a).

Other mental health associations, including the National Association of Social Workers and the American Counseling Association, and medical associations, including the American Medical Association and the American Academy of Pediatrics, have passed similar resolutions. Gradual shifts began to take place in the international mental health community as well. In 1992, the World Health Organization removed homosexuality per se from the *International Classification of Diseases* (Nakajima, 2003).

## Decline of Sexual Orientation Change Efforts

Following the removal of homosexuality from the *DSM*, the publication of studies of SOCE decreased dramatically, and nonaffirming approaches to psychotherapy came under increased scrutiny. Behavior therapists became increasingly concerned that aversive therapies designed as SOCE for homosexuality were inappropriate, unethical, and inhumane (Bancroft, 2003; Davison, 1976, 1978; Davison & Wilson, 1973; M. King, Smith, & Bartlett, 2004; D. J. Martin, 2003; Silverstein, 1991, 2007). The Association for Behavioral and Cognitive Therapies (formerly the Association for Advancement of Behavior Therapy) as well as other associations affiliated with cognitive and behavior therapies currently reject the use of SOCE (D. J. Martin, 2003). Behavior therapy for LGB individuals now focuses on issues of increasing adjustment, as well as on addressing a variety of their mental health concerns (Campos & Goldfried, 2001; Hart & Heimberg, 2001; Martell et al., 2004; Pachankis & Goldfried, 2004; Safren & Rogers, 2001).

Prominent psychoanalytic practitioners (see, e.g., Mitchell, 1978, 1981) began questioning SOCE within their own profession and challenged therapies that started with assumptions of pathology. However, such a movement did not take hold until the late 1980s

and early 1990s (Drescher, 1998a, 1998b; Glassgold & Iasenza, 1995). In 1991, the American Psychoanalytic Association (ApsaA) effectively ended stigmatization of homosexuality by mainstream psychoanalysis when it adopted a sexual orientation nondiscrimination policy regarding the selection of candidates for psychoanalytic training. This policy was revised in 1992 to include selection of faculty and training analysts as well (ApsaA, 1991, 1992). In 2000, ApsaA adopted a policy against SOCE, attempting to end that practice within the field:

> As in all psychoanalytic treatments, the goal of analysis with homosexual patients is understanding. Psychoanalytic technique does not encompass purposeful efforts to "convert" or "repair" an individual's sexual orientation. Such directed efforts are against fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by reinforcing damaging internalized homophobic attitudes. (¶ 1)

Numerous publications document the theoretical limitations and problems with SOCE within psychoanalysis (Drescher, 1998a, 1998b; O'Connor & Ryan, 1993). In the last decade, many psychoanalytic publications have described an affirmative approach to sexual orientation variation and diversity.[23]

Currently, mainstream mental health professional associations support affirmative approaches that focus on helping sexual minorities cope with the impact of minority stress and stigma (American Counseling Association Governing Council, 1998; American Psychiatric Association, 2000; APA, 1997, 2000; NASW, 1997). The literature on affirmative psychotherapy has grown enormously during this time (e.g., Bieschke et al., 2007; Eubanks-Carter, Burckell, & Goldfried, 2005; Ritter & Terndrup, 2002). Included in this literature are publications that aim to support individuals with strong religious beliefs and same-sex sexual orientation in exploring ways to integrate the two (e.g., Astramovich, 2003; Beckstead & Israel, 2007; Glassgold, 2008; Haldeman, 1996, 2004; Horne & Noffsinger-Frazier, 2003; Mark, 2008; D. F. Morrow, 2003; O'Neill & Ritter, 1992; Ritter & O'Neill, 1989, 1995; Ritter & Terndrup, 2002; Tan, 2008; Throckmorton & Yarhouse, 2006; Yarhouse, 2008). These changes within the mental health fields are reflected in the larger society, where there have been increasing shifts in acceptance of LGB

---

[23] ApsaA and Divisions 39 (Psychoanalysis) and 44 (Society for the Psychological Study of Lesbian, Gay, & Bisexual Concerns) have collaborated on a bibliography of affirmative resources in psychoanalysis.

PBC 007524



individuals (see National Gay and Lesbian Task Force: http://www.thetaskforce.org). For instance, in 2003, the U.S. Supreme Court made a landmark ruling in *Lawrence v. Texas* that declared as unconstitutional the sodomy laws of the 13 states that still criminalized homosexuality. However, issues such as same-sex marriage are still controversial (Phy-Olsen, 2006).

However, SOCE is still provided by LMHP. Some LMHP (Nicolosi, 2003, Nicolosi & Nicolosi, 2002; Rosik, 2001) advocate for SOCE to be provided to distressed individuals, and an organization was founded to advocate for these types of treatments (National Association for Research and Treatment of Homosexuality). Additionally, a survey of randomly selected British LMHP (psychologists, counselors, and psychiatrists) completed in 2003 found that 17% of the total sample of 1,328 had provided SOCE in the past and that 4% would consider providing such therapy upon client request in the future (Bartlett, King, & Phillips, 2001; cf. Liszcz & Yarhouse, 2005). Among those who provided such services, the number of clients provided SOCE had remained constant over time (Bartlett et al., 2001; cf. M. King et al., 2004).

# Sexual Orientation Change Efforts Provided to Religious Individuals

The visibility of SOCE has increased in the last decade (Drescher, 2003; Drescher & Zucker, 2006; Herek, 2003). From our survey of recent publications and research, most SOCE currently seem directed to those holding conservative religious and political beliefs, and recent research on SOCE includes almost exclusively individuals who have strong religious beliefs (e.g., Beckstead & Morrow, 2004; S. L. Jones & Yarhouse, 2007; Nicolosi et al., 2000; Ponticelli, 1999; Shidlo & Schroeder, 2002; Spitzer, 2003). In an evolution for some religious communities, sexual minorities are not automatically expelled or shunned (Drescher & Zucker, 2006; Sanchez, 2007; SPLC, 2005). Instead, individuals with a same-sex sexual orientation are embraced for renouncing their homosexuality and seeking "healing" or change (Burack & Josephson, 2005; Erzen, 2006; Ponticelli, 1999). This development has led to a movement of religiously based self-help groups for distressed individuals who often refer to themselves as ex-gay (Erzen, 2006; Ponticelli, 1999; Wolkomir, 2001, 2006). Individuals and organizations that promote religion-based efforts to change sexual orientation often target messages to adults, adolescents, and

their families that portray homosexuality as negative (Burack & Josephson, 2005; Cianciotto & Cahill, 2006; Wolkomir, 2006). These efforts include religious outreach, support groups, and psychotherapy (Erzen, 2006, Ponticelli, 1999; Wolkomir, 2001, 2006).

Debates between those who advocate SOCE and those who oppose it have at times become polemical, with charges that professional psychology has not reflected the concerns of religious individuals,[24] and both supporters and opponents of SOCE have presented themselves as advocates for consumers (cf. Brooke, 2005). Despite the polarization, there have been recent attempts to envision alternate frameworks to address these issues (e.g., Bartoli & Gillem, 2008; Beckstead & Israel, 2007; Benoit, 2005; Haldeman, 2004; McMinn, 2005; Phillips, 2004; Tan, 2008; Throckmorton & Yarhouse, 2006).

We concluded that these debates can only be resolved through an evidence-based appraisal of the potential benefits and harm of SOCE. In the next two chapters, we consider the research evidence on SOCE. In Chapter 3 we discuss methodological concerns, and in Chapter 4, the results that can be drawn from this literature.

---

[24] APA has received correspondence from individuals and organizations asserting this point.

# 3. A SYSTEMATIC REVIEW OF RESEARCH ON THE EFFICACY OF SEXUAL ORIENTATION CHANGE EFFORTS: OVERVIEW AND METHODOLOGICAL LIMITATIONS

Although the charge given to the task force did not explicitly call for a systematic review of research on the efficacy and safety of sexual orientation change efforts (SOCE),[25] we decided in our initial deliberations that such a review was important to the fulfillment of our charge. First, the debate over SOCE has centered on the issues of efficacy, benefit, and harm. Thus, we believe it was incumbent on us to address those issues in our report. We attempted to answer the following questions in this review:

· Do SOCE alter sexual orientation?

· Are SOCE harmful?

· Do SOCE result in any outcomes other than changing sexual orientation?

Second, systematic literature reviews are frequently used to answer questions about the effectiveness of interventions in health care to provide the basis for informed treatment decisions (D. J. Cook, Mulrow, & Haynes, 1998; Petticrew, 2001). Current criteria for effective treatments and interventions are specific in stating that to be considered effective, an intervention has consistent positive effects without serious harmful side effects (Beutler, 2000; Flay et al., 2005). Based on Lilienfeld's (2007) comprehensive review of the issue of

harm in psychotherapy, our systematic review examines harm in the following ways:

· Negative side effects of treatment (iatrogenic effects)

· Client reports of perceptions of harm from treatment

· High drop-out rates

· Indirect harm such as the costs (time, energy, money) of ineffective interventions

Finally, we were given the charge to "inform APA's response to groups that promote treatments to change sexual orientation or its behavioral expression and support public policy that furthers affirmative therapeutic interventions." We decided that a systematic review[26] would likely be the only effective basis for APA's response to advocacy groups for SOCE.

In our review, we considered only peer-reviewed research, in keeping with current standards for conducting scientific reviews (see Khan, Kunz, Kleijnen, & Antes, 2003), which exclude the grey literature[27] and lay material. In this chapter, we provide an overview of the review and a detailed report on the methodological concerns that affect the validity[28] of the conclusions

---

[25] In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved.

[26] A systematic review starts with a clear question to be answered, strives to locate all relevant research, has clear inclusion and exclusion criteria, carefully assesses study quality, and synthesizes study results (Petticrew, 2001).

[27] Grey literature refers to any publication in any format published outside of peer-reviewed scientific journals.

[28] *Validity* is defined as the extent to which a study or group of studies produce information that is useful for a specific purpose. It also includes an overall evaluation of the plausibility of the intended



26    Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation

PBC 007526

derived from the research. In the next chapter, we present our review of the outcomes of the research.

# Overview of the Systematic Review

Our review included peer-reviewed empirical research on treatment outcomes published from 1960 to 2007. Studies were identified through systematic searches of scholarly databases, including PsycINFO and Medline, using such search terms as *reparative therapy, sexual orientation, homosexuality,* and *ex-gays* cross-referenced with treatment and therapy. Reference lists from all identified articles were searched for additional nonindexed, peer-reviewed material. We also obtained review articles and commentaries and searched the reference lists of these articles to identify refereed publications of original research investigations on SOCE that had not been identified via the aforementioned procedures. As noted earlier, in keeping with standards for systematic reviews, only empirically based, peer-reviewed articles addressing the key questions of this review regarding SOCE efficacy, safety, and harm were included in this section. Other research studies of children, adolescents, and adults, including the grey literature and clinical accounts, are included in other sections of this report, most notably Chapter 5 (Research on Adults Who Undergo Sexual Orientation Change Efforts) and Chapter 8 (Issues for Children, Adolescents, and Their Families). The studies that met our criteria and are mentioned in this chapter on the systematic review are listed in Appendix B.[29]

The vast majority of research on SOCE was conducted prior to 1981. This early research predominantly focused on evaluating behavioral interventions, including those using aversive methods. Following the declassification of homosexuality as a mental disorder in 1973 (American Psychiatric Association, 1973) and subsequent statements of other mental health professional associations, including APA (Conger, 1975), research on SOCE declined dramatically. Indeed, we found that the peer-reviewed empirical literature after 1981 contains no rigorous intervention trials on changing same-sex sexual attractions.

There is a small, more recent group of studies conducted since 1999 that assess perceived effects of SOCE among individuals who have participated in psychotherapy as well as efforts based in religious beliefs or practices, including support groups, faith healing, and prayer. There are distinct types of research within this recent literature. One type focused on evaluating individuals' positive accounts of sexual orientation change (Nicolosi et al., 2000; Schaeffer et al., 2000; Spitzer, 2003). Another type examined potential harm of SOCE and experiences of those who seek sexual orientation change (Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002). A third type is high-quality[30] qualitative research investigations that provide insight into people's experiences of efforts aimed at altering their same-sex sexual attractions (e.g., Beckstead & Morrow, 2004; Ponticelli, 1999; Wolkimir, 2001).[31]

In all areas of intervention evaluation, the quality of the methods used in the research affects the validity and credibility of any claims the researcher can make about whether the intervention works, for whom it works, and under what circumstances it works. Many have described methodological concerns regarding the research literature on sexual orientation change efforts (e.g., Cramer, Golom, LoPresto, & Kirkley, 2008; Haldeman, 1994; S. L. Morrow & Beckstead, 2004; Murphy, 1992; Sandfort, 2003). Overall, we found that the low quality of the research on SOCE is such that claims regarding its effectiveness and widespread applicability must be viewed skeptically.

> Overall, we found that the low quality of the research on SOCE is such that claims regarding its effectiveness and widespread applicability must be viewed skeptically.

As shown in Appendix B, few studies on SOCE produced over the past 50 years of research rise to current scientific standards for demonstrating the efficacy of psychological interventions (cf. Chambless & Hollon, 1998; Chambless & Ollendick, 2001;

---

interpretations—in this case, does SOCE produce a change in sexual orientation (see American Educational Research Association, APA, & National Council on Measurement in Education, 1999).

[29] A meta-analytic review of 14 research articles (Byrd & Nicolosi, 2002) is not discussed in this report. The review suffers from significant methodological shortcomings and deviations from recommended meta-analytic practice (see, e.g., Durlak, Meerson, & Ewell Foster, 2003; Lipsey & Wilson, 2001) that preclude reliable conclusions being drawn from it. However, studies that were included in the meta-analysis and were published in refereed journals between 1960 and the present are included and described in the current review. Additionally, a recent study (Byrd, Nicolosi, & Potts, 2008) is not included, as it was published after the review period and appears to be a reworking of an earlier study by Nicolosi, Byrd, and Potts (2000).

[30] These studies meet the standards of research rigor that are used for the qualitative research paradigms that informed each of the studies (e.g., grounded theory, ethnomethodology, phenomenology).

[31] These studies are discussed more thoroughly in later sections of the report.

Flay et al., 2005; Shadish, Cook, & Campbell, 2002; Society for Prevention Research, 2005) or provide for unambiguous causal evidence regarding intervention outcomes. Indeed, only six studies, all conducted in the early period of research, used rigorous experimental[32] procedures. Only one of these experiments (Tanner, 1974) assessed treatment outcomes in comparison to an untreated control group. Only three additional studies used strong quasi-experimental procedures such as a nonequivalent comparison group (see Appendix B). All of these studies were also from the early period. The rest of the studies that we reviewed are nonexperimental (see Appendix B). We thus concluded that there is little in the way of credible evidence that could clarify whether SOCE does or does not work in changing same-sex sexual attractions.

The studies in this area also include a highly select group of people who are unique among those who experience same-sex sexual attractions. Thus, psychologists should be extremely cautious in attributing success to SOCE and assuming that the findings of the studies of it can be applied to all sexual minorities. An overview of the methodological problems in determining the effects of SOCE and making treatment decisions based on findings from these studies follows.

# Methodological Problems in the Research Literature on Sexual Orientation Change Efforts

## Problems in Making Causal Claims

A principal goal of the available research on SOCE was to demonstrate that SOCE consistently and reliably produce changes in aspects of sexual orientation. Overall, due to weaknesses in the scientific validity of research on SOCE, the empirical research does not provide a sound basis for making compelling causal claims. A detailed analysis of these issues follows.

## INTERNAL VALIDITY CONCERNS

Internally valid research convincingly demonstrates that a cause (such as SOCE) is the only plausible explanation for an observed outcome such as change in same-sex sexual attractions. Lack of internal validity limits certainty that observed changes in people's attitudes, beliefs, and behaviors are a function of the particular interventions to which they were exposed. A major limitation to research on SOCE, both the early and the recent research, stems from the use of weak research designs that are prone to threats to internal validity. Research on SOCE has rarely used designs that allow for confident conclusions regarding cause-and-effect relationships between exposure to SOCE and outcomes.

*Research on SOCE has rarely used designs that allow for confident conclusions regarding cause-and-effect relationships between exposure to SOCE and outcomes.*

As noted previously, true experiments and rigorous quasi-experiments are rare in the SOCE research. There are only a few studies in the early period that are experiments or quasi-experiments, and no true experiments or quasi-experiments exist within the recent research. Thus, none of these recent studies meet current best practice standards for experimental design and cannot establish whether SOCE is efficacious.

In early studies, comparison and no-treatment control groups were uncommon procedures, and early studies rarely employed multiple baseline assessments, randomization to condition, multiple long-term follow-up assessments, or other procedures to aid in making causal inferences. These procedures are widely accepted as providing the most compelling basis for ruling out the possibility that an alternative source is responsible for causing an observed or reported treatment effect.

Common threats to internal validity in early studies include history (i.e., other events occurring over the same time period as the treatment that could produce the results in the absence of the intervention), regression (i.e., extreme scores are typically less extreme on retest in the absence of intervention), and testing (i.e., taking a test once influences future scores on the test in the absence of intervention). Within-subject and patient case studies are the most common designs in the early SOCE research (see Appendix

---

[32] True experiments have more methodological rigor because study participants are randomly assigned to treatment groups such that individual differences are more equally distributed and are not confounded with any change resulting from the treatment. Experiments are also rigorous because they include a way for the researcher to determine what would have happened in the absence of any treatment (e.g., a counterfactual) through the use of a no-treatment control group. Quasi-experimental designs do not have random assignment but do incorporate a comparison of some kind. Although they are less rigorous than experiments, quasi-experiments, if appropriately designed and conducted, can still provide for reasonable causal conclusions to be made.



PBC 007528

B). In these designs, an individual's scores or clinical status prior to treatment is compared with his or her scores or status following treatment. These designs are particularly vulnerable to internal validity threats.

*Sample attrition*

Early research is especially vulnerable to threats to internal validity related to sample attrition. The proportions of participants in these studies who dropped out of the intervention and were lost to follow-up are unacceptably high; drop-out rates go as high as 74% of the initial study sample. Authors also reported high rates of refusal to undergo treatment after participants were initially enrolled in the studies. For instance, 6 men in Bancroft's (1969) study refused to undergo treatment, leaving only 10 men in the study. Callahan and Leitenberg (1973) reported that of 23 men enrolled, 7 refused and 2 dropped out of treatment; 8 also showed inconsistent baseline responses in penile arousal to the experimental stimuli so could not be included in the analysis, leaving only 6 subjects on whom treatment analyses could be performed. Of 37 studies reviewed by H. E. Adams and Sturgis (1977), 31 studies lost from 36% to 58% of the sample. In many studies, therefore, what appear to be intervention effects may actually reflect systematic changes in the composition of the study sample; in the handful of available comparison group studies, differences between the groups in the studies in the rate of dropout and in the characteristics of those who drop out may be the true cause of any observed differences between the groups. Put simply, dropout may undermine the comparability of groups in ways that can bias study outcomes.

*Retrospective pretest*

With the exception of prospective ethnographic studies (e.g., Ponticelli, 1999; Wolkomir, 2001), the recent research (e.g., Nicolosi et al., 2000; Schaeffer et al., 2000; Spitzer, 2003) relies exclusively on uncontrolled retrospective pretest designs. In these studies, people who have been exposed to SOCE are asked to recall and report on their feelings, beliefs, and behaviors at an earlier age or time and are then asked to report on these same issues at present. Change is assessed by comparing contemporary scores with scores provided for the earlier time period based on retrospective recall. In a few studies, LMHP who perform SOCE reported their view of how their clients had changed. The design is problematic because all of the pretest measures are not true pretests but retrospective accounts of pretest status. Thus, the recent research studies on SOCE have even weaker designs than do nonexperimental studies from the early period of research on SOCE. Again, none of these recent studies can establish whether SOCE is efficacious.

An extensive body of research demonstrates the unreliability of retrospective pretests. For example, retrospective pretests are extremely vulnerable to response-shift biases resulting from recall distortion and degradation (C. E. Schwartz & Rapkin, 2004; Schwarz & Clore, 1985). People find it difficult to recall and report accurately on feelings, behaviors, and occurrences from long ago and, with the passage of time, will often distort the frequency, intensity, and salience of things they are asked to recall.

Retrospective pretests are also vulnerable to biases deriving from impression management (Fisher & Katz, 2000; Schwarz, Hippler, Deutsch, & Strack, 1985; A. E. Wilson & Ross, 2001), change expectancy (Hill & Betz, 2005; Lam & Bengo, 2003; Norman, 2003; M. A. Ross, 1989; Sprangers, 1989), and effort justification (Aronson & Mills, 1959; Beauvois & Joule, 1996; Festinger, 1957). Individuals tend to want to present themselves in a favorable light. As a result, people have a natural tendency to report on their current selves as improved over their prior selves (impression management). People will also report change under circumstances in which they have been led to expect that change will occur, even if no change actually does occur (change expectancy). In addition, people will seek to justify the time and effort that they have made in treatment to reduce any dissonance they may feel at experiencing no change or less than they had expected by overestimating the effectiveness of the treatment (effort justification). Effort justification has been demonstrated to become stronger as intervention experiences become more unpleasant. In combination, these factors lead to inaccurate self-reports and inflated estimates of treatment effects, distortions that are magnified in the context of retrospective pretest designs.

## CONSTRUCT VALIDITY CONCERNS

Construct validity is also a significant concern in research on SOCE. Construct validity refers to the degree to which the abstract concepts that are investigated in the study are validly defined, how well these concepts are translated into the study's treatments and measures, and, in light of these definitional and operational decisions, whether the study findings are appropriately interpreted. For

instance, do the researchers adequately define and measure sexual orientation? Are their interpretations of the study results regarding change in sexual orientation appropriate, given how the constructs were defined and translated into measures? On the whole, research on SOCE presents serious concerns regarding construct validity.

*Definition of sexual orientation*

Sexual orientation is a complex human characteristic involving attractions, behaviors, emotions, and identity. Research on sexual orientation is usually seen as beginning with the Kinsey studies (Kinsey et al., 1948, 1953). Kinsey used a unidimensional, 7-category taxonomic continuum, from 0 (*exclusively heterosexual*) to 6 (*exclusively homosexual*), to classify his participants. As the research has developed since the Kinsey studies, the assessment of sexual orientation has focused largely on measuring three variables—identity, behavior, and attraction. Many studies measure only one or two, but very seldom all three, of these variables.

A key finding in the last 2 decades of research on sexual orientation is that sexual behavior, sexual attraction, and sexual orientation identity are labeled and expressed in many different ways (Carrillo, 2002; Diamond, 2003, 2006; Dunne, Bailey, Kirk, & Martin, 2000; Laumann, Gagnon, Michael, & Michals, 1994; Savin-Williams, 2005). For instance, individuals with sexual attractions may not act on them or may understand, define, and label their experiences differently than those with similar desires, because of the unique cultural and historical constructs regarding ethnicity, gender, and sexuality (Harper et al., 2004; Mays & Cochran, 1998; Walters, Simoni, & Horwath, 2001; Weinrich & Williams, 1991).

Further, a subset of individuals who engage in same-sex sexual behaviors or have same-sex sexual attractions do not self-identify as LGB or may remain unlabeled, and some self-identified lesbian and gay individuals may engage in other-sex sexual behaviors without self-identifying as bisexual or heterosexual (Beckstead, 2003; Carrillo, 2002; Diamond, 2003, 2008; Diamond & Savin-Williams, 2000; Dunne et al., 2000; Fox, 2004; Gonsiorek, Sell, & Weinrich, 1995; Hoburg, Konik, Williams, & Crawford, 2004; Kinsey et al., 1948, 1953; Klein et al., 1985; Masters & Johnson, 1979; McConaghy, 1987, 1999; McConaghy, Buhrich, & Silove, 1994; Storms, 1980; Thompson & Morgan, 2008). Thus, for some individuals, personal and social identities differ from sexual attraction, and sexual orientation

identities may vary due to personal concerns, culture, contexts, ethnicity, nationality, and relationships.

As a result, a number of scholars have argued that the construct of sexual orientation would be more easily and reliably assessed and defined if it were disentangled from sexual orientation identity (e.g., Chang & Katayama, 1996; Drescher, 1998a, 1998b; Drescher, Stein, & Byne, 2005; Rust, 2003; Stein, 1999; R. L. Worthington, Savoy, Dillon, & Vernaglia, 2002). Recent research has found that distinguishing the constructs of sexual orientation and sexual orientation identity adds clarity to an understanding of the variability inherent in reports of these two variables (R. L. Worthington et al., 2002; R. L. Worthington & Reynolds, 2009).

We adopted this current understanding of sexuality to clarify issues in the research literature. For instance, *sexual orientation* refers to an individual's patterns of sexual, romantic, and affectional arousal and desire for other persons based on those persons' gender and sex characteristics. Sexual orientation is tied to physiological drives and biological systems that are beyond conscious choice and involve profound emotional feelings, such as "falling in love." Other dimensions commonly attributed to sexual orientation (e.g., sexual behavior with men and/or women, social affiliations with LGB or heterosexual individuals and communities, emotional attachment preferences for men or women, gender role and identity, lifestyle choices) are potential correlates of sexual orientation rather than principal dimensions of the construct.

*Sexual orientation identity* refers to acknowledgment and internalization of sexual orientation and reflects self-exploration, self-awareness, self-recognition, group membership and affiliation, culture, and self-stigma. Sexual orientation identity involves private and public ways of self-identifying and is a key element in determining relational and interpersonal decisions, as it creates a foundation for the formation of community, social support, role models, friendship, and partnering (APA, 2003; Jordan & Deluty, 1998; McCarn & Fassinger, 1996; Morris, 1997; Ponticelli, 1999; Wolkomir, 2001).

Given this new understanding of sexual orientation and sexual orientation identity, a great deal of debate surrounds the question of how best to assess sexual orientation in research (Gonsiorek et al., 1995; Kinsey et al., 1948, 1953; Masters & Johnson, 1979; Sell, 1997). For example, some authors have criticized the Kinsey scale for dichotomizing sexual orientation—with heterosexuality and homosexuality as opposites along a single dimension and bisexuality in between—



PBC 007530

thus implying that in increasing desire for one sex represents reduced desire for the other sex (Gonsiorek et al., 1995; Sell, 1997; R. L. Worthington, 2003; R. L. Worthington & Reynolds, 2009). An alternative that has been proposed suggests that same-sex and other-sex attractions and desires may coexist relatively independently and may not be mutually exclusive (Diamond, 2003, 2006; 2008; Fox, 2004; Klein et al., 1985,[33] Sell, 1997; Shively & DeCecco, 1977; Storms, 1980; R. L. Worthington, 2003; R. L. Worthington & Reynolds, 2009). Models with multiple dimensions that permit the rating of the intensity of an individual's sexual desire or arousal for other-sex individuals separately from the intensity of that individual's sexual desire or arousal for same-sex individuals allow individuals to have simultaneous levels of attractions. Some commentators believe such models allow for greater understanding of sexual diversity and its interactions with other aspects of identity and culture (Mays & Cochran, 1998; R. L. Worthington et al. 2002).

Considered in the context of the conceptual complexities of and debates over the assessment of sexual orientation, much of the SOCE research does not adequately define the construct of sexual orientation, does not differentiate it from sexual orientation identity, or has misleading definitions that do not accurately assess or acknowledge bisexual individuals. Early research that focuses on sexual arousal may be more precise than that which relies on self-report of behavior. Overall, recent research may actually measure sexual orientation identity (i.e., beliefs about sexual orientation, self-report of identity or group affiliation, self-report of behavior, and self-labeling) rather than sexual orientation.

> *Much of the SOCE research does not adequately define the construct of sexual orientation, does not differentiate it from sexual orientation identity, or has misleading definitions that do not accurately assess or acknowledge bisexual individuals.*

### Study treatments

In general, what constitutes SOCE in empirical research is quite varied. As we show in Appendix B, early studies tested a variety of interventions that include aversive conditioning techniques (e.g., electric shock, deprivation of food and liquids, smelling salts, chemically induced nausea), biofeedback, hypnosis, masturbation reconditioning, psychotherapy, systematic desensitization, and combinations of these approaches. A small number of early studies compare approaches alone or in combination. The more recent research includes an even wider variety of interventions (e.g., gender role reconditioning, support groups, prayer, psychotherapy) and providers (e.g., licensed and unlicensed LMHP in varied disciplines, pastoral counselors, laypersons). The recent studies were conducted in such a way that it is not possible to attribute results to any particular intervention component, approach, or provider. For instance, these interventions were provided simultaneously or sequentially, without specific separate evaluations of each intervention. The recent research and much of the early research cannot provide clarity regarding which specific efforts are associated with which specific outcomes.

### Outcome measures

Regarding assessment mode, outcomes in early studies were assessed by one or more of the following: gauging an individual's physiological responses when presented with sexual stimuli, obtaining the person's self-report of recent sexual behavior and attractions, and using clinical opinion regarding improvement. In men especially, physiological measures are considered more dependable than self-report of sexual arousal or attraction (Freund, 1976; McConaghy, 1999). However, these measures have important limitations when studying sexual orientation. Some men are incapable of sexual arousal to any stimuli in the laboratory and must be excluded from research investigations in which the measure is the sole outcome measure. More recent research indicates that some penile circumference gauges are less consistent than penile volume gauges (Kuban, Barbaree, & Blanchard, 1999; McConaghy, 1999; Quinsey & Lalumiere, 2001; Seto, 2004) and that some men can intentionally produce false readings on the penile circumference gauges by suppressing their standard sexual arousal responses (Castonguay, Proulx, Aubut, McKibben, & Campbell, 1993; Lalumiere & Harris, 1998) or consciously making themselves aroused when presented with female erotic stimuli (Freund, 1971, 1976; Freund, Watson, & Rienzo, 1988; Lalumiere & Earls, 1992; McConaghy, 1999, 2003). The physiological measure used in all the SOCE experiements was the penile circumference gauge.

---

[33] Although Klein advanced the notion of sexual orientation as a multidimensional variable, his Sexual Orientation Grid confounds constructs of sexual orientation and sexual orientation identity, as it includes attraction; behavior; identification; and emotional, political, and social preferences.

McConaghy (1999) has questioned the validity of the results of SOCE research using this gauge and believes that data illustrating a reduction in same-sex sexual attraction should be viewed skeptically.

In recent research on SOCE, overreliance on self-report measures and/or on measures of unknown validity and reliability is common. Reliance on self-reports is especially vulnerable to a variety of reactivity biases such that shifts in an individual's score will reflect factors other than true change. Some of these biases are related to individual motivations, which have already been discussed, and others are due to features of the experimental situation. Knowing that one is being studied and what the experimenter hopes to find can heighten people's tendency to self-report in socially desirable ways and in ways that please the experimenter.

Measures used in early studies vary tremendously in their psychometric acceptability, particularly for attitudinal and mental health measures, with a limited number of studies using well-validated measures. Recent research has not advanced significantly in using psychometrically sound measures of important study variables such as depression, despite the widespread use of measures that permit accurate assessment of these variables in other studies. Measures in these studies are also sources of bias due to problems such as item wording and response anchors from which participants may have inferred that other-sex attraction is a normative standard, as well as from the exclusion of items related to healthy homosexual functioning to parallel items that ask for reports on healthy heterosexual functioning.

*Study operations*

Regarding the adequacy of study operations, few of the early studies attempted to overcome the demand characteristics associated with the interventionists' obtaining measures of change themselves. In other words, few studies sought to minimize the possibility that people receiving treatment would be motivated to please their treatment providers by providing them with reports that were consistent with what the providers were perceived to desire and expect. Issues in recruitment of participants may also contribute to this effect; subjects were aware of the goals of the study, were recruited by individuals with that knowledge, or were participating in treatment to avoid legal and/or religious sanction. Novelty effects associated with exposure to an experimental laboratory situation

may also have influenced study results. People may become excited and energized by participating in a research investigation, and these reactions to being in the research environment may contribute to change in scores. Recent research is also vulnerable to demand characteristics as a function of how individuals are recruited into samples, which is discussed in more detail in the section on sampling concerns.

## CONCLUSION VALIDITY CONCERNS

Conclusion validity concerns the validity of the inferences about the presence or absence of a relationship among variables that are drawn from statistical tests. Small sample sizes, sample heterogeneity, weak measures, and violations to the assumptions of statistical tests (e.g., non-normally distributed data) are central threats to drawing valid conclusions. In this body of research, conclusion validity is often severely compromised. Many of the studies from the early period are characterized by samples that are very small, containing on the average about 9 subjects (see Appendix B; see also H. E. Adams & Sturgis, 1977). Combined with high rates of attrition, skewed distributions, unreliable measures, and infrequent use of statistical tests designed for small and skewed samples, confidence in the statistical results of many of these studies may be misplaced. The recent research involved unreliable measures and inappropriate selection and performance of statistical tests, which are threats to their statistical conclusion validity,[34] even though these studies involved larger samples than the early research.

---

[34] For instance, to assess whether sexual orientation had changed, Nicolosi et al. (2000) performed a chi-square test of association on individuals' prior and current self-rated sexual orientation. Several features of the analysis are problematic. Specifically, the nature of the data and research question are inappropriate to a chi-square test of association, and it does not appear that the tests were properly performed. Chi-square tests of association assume that data are independent, yet these data are not independent because the row and column scores represent an individual's rating of his or her past and present self. Chi-square tests ought not to be performed if a cell in the contingency table includes fewer than five cases. Other tests, such as the nonparametric McNemar's test for dichotomous variables (McNemar, 1969) or the sign (Conover, 1980) or Wilcoxon signed-rank tests (Wilcoxon, 1945) for nominal and ordinal data, respectively, are used to assess whether there are significant differences between an individual's before and after score and are appropriate when data fail to meet the assumptions of independence and normality, as these data do and would have been more appropriate choices. Paired *t* tests for mean differences could also have been performed on these data. There are procedural problems in how Nicolosi et al. conducted the chi-square test, such as missing data, and the analyses were conducted without adjustment for chance, with different numbers of subjects responding to each item, and without corrections to the gain scores to address regression artifacts. Taken together, the problems associated with running so many tests without adjusting for chance associations



## Problems in Generalizing Findings

A significant challenge to interpreting the research on SOCE is establishing external validity—that is, judging to whom and to what circumstances the results of any particular study might reasonably be generalized.

### SAMPLE COMPOSITION

Concerns regarding the sample composition in these studies are common in critiques (e.g., Cramer et al., 2008). The studies from the early period are characterized by samples that are narrow in their demographic characteristics, composed almost exclusively of Caucasian males over the age of 18. No investigations are of children and adolescents exclusively, although adolescents are included in a very few study samples. Few SOCE studies in the early period include women. Although more recent research includes women and respondents of diverse ethnic and racial backgrounds (e.g., Moran, 2007; Nicolosi et al., 2000;

*The research findings from early and recent studies may have limited applicability to non-Whites, youth, or women.*

Ponticelli, 1999; Schaeffer et al., 2000; Spitzer, 2003; Wolkomir, 2001), White men continue to dominate recent study samples. Thus, the research findings from early and recent studies may have limited applicability to non-Whites, youth, or women. The samples in the recent research have been narrowly defined in other respects, focusing on well-educated, middle-class individuals to whom religion is extremely important (e.g., Beckstead & Morrow, 2004; Nicolosi et al., 2000; Pattison & Pattison, 1980; Schaeffer et al., 2000; Spitzer, 2003; Wolkomir, 2001). Same-sex sexual attraction and treatments are confounded with these particular demographic characteristics across the recent literature. These research findings may be most applicable to educated White men who consider themselves highly religious.

The early research sometimes included men who were receiving intervention involuntarily (e.g., Barlow, Agras, Abel, Blanchard, & Young, 1975; Callahan & Leitenberg, 1973; S. James, 1978; MacCulloch & Feldman, 1967; MacCulloch et al., 1965; McConaghy, 1969, 1976; McConaghy et al., 1972), usually men who were court referred as a result of convictions on charges related to criminalized acts of homosexual sex.[35] The samples also include men who were not receiving intervention because of same-sex sexual attractions; rather, some of the men receiving intervention are described as pedophiles, exhibitionists, transvestites, and fetishists (Callahan & Leitenberg, 1973; Conrad & Wincze, 1976; Fookes, 1960; Hallam & Rachman, 1972; Marquis, 1970; Thorpe, Schmidt, Brown, & Castell, 1964; Thorpe, Schmidt, & Castell, 1963). Thus, the early samples are notable for including men who may not be same-sex attracted at all or have been distressed by their attractions but who had to undergo intervention by court order or out of fear of being caught by law enforcement in the future.

Moreover, in the early research—to the extent that it was assessed—the samples contained individuals who varied widely along the spectrum of same-sex sexual orientation prior to intervention, so that the studies included men who were other-sex sexually attracted to varying degrees alongside men who were primarily or exclusively same-sex sexually attracted (Bancroft, 1969; Barlow et al., 1975; Birk, 1974; Conrad & Wincze, 1976; Fookes, 1960; Hallman & Rachman, 1972; Kendrick & MacCulloch, 1972; LoPiccolo, Stewart, & Watkins, 1972; Marquis, 1970; McCrady, 1973). Additionally, study samples included men with and without histories of current and prior sexual contact with men and women (Bancroft, 1969; Colson, 1972; Curtis & Presly, 1972; Fookes, 1960; Freeman & Meyer, 1975; Gray, 1970; Hallman & Rachman, 1972; Herman, Barlow, & Agras, 1974; Larson, 1970; Levin, Hirsch, Shugar, & Kapche, 1968; LoPiccolo et al., 1972; MacCulloch & Feldman, 1967; McConaghy, 1969; McConaghy, Armstrong, & Blaszcynski, 1981; McConaghy & Barr, 1973; McConaghy et al., 1972; Segal & Sims, 1972; Thorpe et al., 1964), so that men who were or had been sexually active with women and men, only women, only men, or neither were combined. Some recent studies of SOCE have similar problems (e.g., Spitzer, 2003). Including participants with attractions, sexual arousal, and behaviors to both sexes in the research on SOCE makes evaluating change more difficult (Diamond, 2003; Rust, 2003; Vasey & Rendell, 2003; R. L. Worthington, 2003).

Data analyses rarely adjust for preintervention factors such as voluntary pursuit of intervention, initial degree of other-sex attraction, or past and current other-sex and same-sex behaviors; in very few studies did investigators perform and report subgroup analyses to clarify how

---

or correcting for regression artifacts and having different respondents in nearly every test make it difficult to assess what changes in scores across these items actually reflect.

[35] Shidlo and Schroeder (2002) found that roughly 24% of their respondents perceived that SOCE was imposed on them rather than pursued voluntarily.

subpopulations fared as a result of intervention. The absence of these analyses obscures results for men who are primarily same-sex attracted and seeking intervention regarding these attractions versus any other group of men in these studies, such as men who could be characterized as bisexual in their attractions and behaviors or those on whom treatment was imposed. For these reasons, the external validity (generalizability) of the early studies is unclear, with selection–treatment interactions of particular concern. It is uncertain which effects observed in these studies would hold for which groups of same-sex attracted people.

## SAMPLING AND RECRUITMENT PROCEDURES

Early and recent study samples are typically of convenience, so it is unclear precisely what populations these samples represent. Respondents in the recent studies were typically recruited through ex-gay ministries and advocates of SOCE rather than through population-based probability sampling strategies designed to obtain a representative sample of same-sex attracted people or the subset who experience their attractions as distressing and have sought and been exposed to SOCE. Additionally, study respondents are often invited to participate in these studies by LMHP who are proponents of SOCE, introducing unknown selection biases into the recruitment process (cf. Beckstead, 2003; Shidlo & Schroeder, 2002).

Qualitative studies have been more successful in applying a variety of purposive stratified sampling strategies (e.g., Beckstead & Morrow, 2004; Ponticelli, 1999; Wolkomir, 2001) and developing appropriate comparison samples. However, the qualitative studies were not undertaken with the purpose of determining if SOCE interventions are effective in changing sexual orientation. These studies focused on understanding aspects of the experience of participating in SOCE from the perspective of same-sex attracted people in distress.

As noted previously, recent research has used designs that are incapable of making attributions of intervention effects. In many of the recent studies, the nature of the procedures for recruiting samples is likely to have accentuated response-shift biases rather than to have minimized them, because study recruiters were open proponents of the techniques under scrutiny; it cannot be assumed that the recruiters sought to encourage the participation of those individuals whose experiences ran counter to their own view of the value of these approaches. Proponents of these efforts may also have limited access to the research for former clients who were perceived to have failed the intervention or who experienced it as harmful. Some of the recent research to assess harm resulting from these interventions (Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002) suffers from sampling weaknesses and biases of a similar nature.

## Treatment Environments

Clinically trained professionals using reasonably well-described change efforts generally conducted early research in clinical laboratory settings. By contrast, the recent research included a wide variety of change efforts, providers, and settings in which these efforts may take place. The recent research has not been performed in a manner that permits examination of the interactions among characteristics of change efforts, providers, settings, and individuals seeking to change, nor does the research associate these patterns with outcomes.

## Summary

Our analysis of the methodology of SOCE reveals substantial deficiencies. These deficiencies include limitations in making causal claims due to threats to internal validity (such as sample attrition, use of retrospective pretests); lack of construct validity, including definition and assessment of sexual orientation; and variability of study treatments and outcome measures. Additional limitations with recent research include problems with conclusion validity (the ability to make inferences from the data) due to small or skewed samples, unreliable measures, and inappropriate selection and performance of statistical tests. Due to these limitations, the recent empirical literature provides little basis for concluding whether SOCE has any effect on sexual orientation. Any reading of the literature on SOCE outcomes must take into account the limited generalizability of the study samples to the population of people who experience same-sex sexual attraction and are distressed by it. Taking into account the weaknesses and limitations of the evidence base, we next summarize the results from research in which same-sex sexual attraction and behavior have been treated.

> *The recent empirical literature provides little basis for concluding whether SOCE has any effect on sexual orientation.*



PBC 007534

# 4. A SYSTEMATIC REVIEW OF RESEARCH ON THE EFFICACY OF SEXUAL ORIENTATION CHANGE EFFORTS: OUTCOMES

In Chapter 3, we provided an overview of our systematic review of research on sexual orientation change efforts (SOCE)[36] and the results of the review for methodological concerns. In this chapter, we describe the evidence on outcomes associated with SOCE, whether beneficial or harmful. No studies reported effect size estimates or confidence intervals, and many studies did not report all of the information that would be required to compute effect sizes. As a result, statistical significance and methodology are considered in interpreting the importance of the findings. As the report will show, the peer-refereed empirical research on the outcomes of efforts to alter sexual orientation provides little evidence of efficacy and some evidence of harm. We first summarize the evidence of efficacy and then the evidence of unintended harmful effects.

## Reports of Benefit

Sexual orientation change efforts have aimed to address distress in individuals with same-sex sexual attractions by achieving a variety of outcomes:

- Decreased interest in, sexual attraction to, and sexual behavior with same-sex sexual partners.

- Increased interest in, sexual attraction to, and sexual behavior with other-sex sexual partners.

- Increased healthy relationships and marriages with other-sex partners.

- Improved quality of life and mental health.

Although not all of these aims are equally well studied, these are the outcomes that have been studied frequently enough to be reported in this systematic review. One general point that we wish to emphasize as we begin the discussion of the outcomes that have been reported in this literature is that nonexperimental studies often find positive effects that do not hold up under the rigor of experimentation. The literature on SOCE is generally consistent with this point. In other words, the least rigorous studies in this body of research generally provide a more positive assessment of efficacy than do studies that meet even the most minimal standards of scientific rigor.

### Decreasing Same-Sex Sexual Attraction

EARLY STUDIES

A number of investigators have assessed aversion therapy interventions to reduce physiological and self-reported sexual arousal in response to same-sex stimuli and self-reports of same-sex sexual attraction (see Appendix B).

---

[36] In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved

*Experimental studies*

Results from the experimental studies of aversive techniques provide some evidence that these treatments can reduce self-reported and physiological sexual arousal for some men. The experimental studies that we reviewed showed lower rates of change in sexual arousal toward the same sex than did the quasi-experimental and nonexperimental studies. This finding was consistent with H. E. Adams and Sturgis's (1977) review of studies published through 1976.

In their review, H. E. Adams and Sturgis (1977) found that across the seven studies that they classified as controlled studies, 34% of the 179 subjects that were retained in these studies decreased their same-sex sexual arousal. McConaghy (1976) found that roughly half of the men who received one of four treatment regimens reported less intense sexual interest in men at 6 months. McConaghy et al. (1972) found reductions in penile response in the laboratory following treatment. Penile response to female nudes also declined for those men who initially responded to female stimuli. McConaghy (1969) similarly reported a decline in sexual arousal to all stimuli as a result of treatment for some men and that treatment also increased same-sex sexual arousal for some men. Overall, however, a majority of participants showed decreases in same-sex sexual arousal immediately following treatment. McConaghy and Barr (1973) found that about half of men reported that their same-sex sexual attractions were reduced. Tanner (1975) found that aversive shock could lessen erectile response to male stimuli.

An important caveat in considering the results of these experiments is that none compared treatment outcomes to an untreated control group. That is, these studies compared treatments to one another. The fact that four of these studies also involved men who were being treated by court referral should also be considered in interpreting the findings. These experiments cannot address whether men would have changed their sexual arousal pattern in the absence of treatment. Only one of the experiments that we identified compared treatment outcomes against the outcomes for an untreated control group. Tanner (1974) examined change in sexual arousal among 8 men receiving electric shock therapy. Tanner found that physiological arousal to male stimuli in the laboratory had declined at the 8-week follow-up, when scores among the 8 men in the treatment were compared with those of the 8 men in a control group. Changes were not achieved for all of the men, and there were no differences between the experimental and control groups in the frequency of same-sex sexual behavior.

The results of the experimental studies suggest that some men who participate in clinical treatment studies may be conditioned to control their sexual arousal response to sexual stimuli, although McConaghy's (cf. McConaghy, 1999) studies suggest that aversive treatments may affect sexual arousal indiscriminately. These studies found that not all men reduce their sexual arousal to these treatments and that changes in sexual arousal in the lab are not necessarily associated with changes in sexual behavior.

*Quasi-experimental studies*

The three quasi-experiments listed in Appendix B all compare treatment alternatives for nonequivalent groups of men. Birk et al. (1971) found that 5 (62%) of the 8 men in the aversive treatment condition reported decreased sexual feelings following treatment; one man out of the 8 (12%) demonstrated reduced sexual arousal at long-term follow-up. In comparing groups, the researchers found that reports of same-sex "cruising," same-sex sexual "petting," and orgasm declined significantly for men receiving shocks when compared with men receiving associative conditioning. McConaghy and colleagues (1981) found that 50% of respondents reported decreased sexual feelings at 1 year. S. James (1978) reported that anticipatory avoidance learning was relatively ineffective when compared with desensitization. In their review, H. E. Adams and Sturgis (1977) found that 50% of the 124 participants in what they termed uncontrolled studies reported reduced sexual arousal.

*Nonexperimental studies*

Nonexperimental studies, which lack sufficient rigor to assess efficacy but which may be useful in identifying potential treatment approaches, offer a similar view of the impact of aversive treatment on reductions in sexual arousal. For instance, Bancroft (1969), in a within-subject study without a comparison group, delivered electric shocks based on males' penile volume responses to photographs of nude men as they were fantasizing about homosexual sexual encounters. Research subjects underwent a minimum of 30 treatment sessions. Bancroft reported that of the men who were initially sexually attracted to both sexes, 30% ($n = 3$) of these men lessened their same-sex sexual interest over the long-term. Among those with no initial other-sex sexual attraction, no lasting changes were observed in sexual



PBC 007536

arousal and attraction. Several other uncontrolled studies found reductions in participants' self-reported sexual attraction and physiological response under laboratory conditions (range = 7%–100%; average = 58%) (Callahan & Leitenberg, 1973; Feldman & MacCulloch, 1965; Fookes, 1960; Hallam & Rachman, 1972; MacCulloch & Feldman, 1967; Sandford, Tustin, & Priest, 1975).

As is typically found in intervention research, the average proportion of men who are reported to change in uncontrolled studies is roughly double the average proportion of men who are reported to change in controlled studies. For instance, as noted previously, results from controlled studies show that far less change can be produced in same-sex sexual arousal by aversion techniques. H.E. Adams and Sturgis (1977) reported that in the nonexperimental studies in their review, 68% of 47 participants reduced their same-sex sexual arousal, compared with 34% of participants in experimental studies.

The studies of nonaversive techniques as the primary treatment, such as biofeedback and hypnosis, were only assessed in the nonexperimental within-subject and patient case studies. For example, Blitch and Haynes (1972) treated a single female who was heterosexually experienced and whom they described as strongly committed to reducing her same-sex sexual attractions. Using relaxation, rehearsal, and masturbation reconditioning, she was reported to be able to masturbate without female fantasies 2 months after intervention. Curtis and Presly (1972) used covert sensitization to treat a married man who experienced guilt about his attraction to and extramarital engagement with men. After intervention, he showed reduced other-sex and same-sex sexual interest, as measured by questionnaire items. Huff (1970) treated a single male who was interested in becoming sexually attracted to women. Following desensitization, his journal entries showed that his same-sex sexual fantasies continued, though the ratio of other-sex to same-sex sexual fantasies changed by the 6-month follow-up to favor other-sex sexual fantasies. His MMPI scores showed improvement in his self-concept and reductions in his distress.

By contrast, among the 4 men exposed to orgasmic reconditioning by Conrad and Wincze (1976), all reported decreased same-sex sexual attractions immediately following intervention, but only one demonstrated a short-term measurable alteration in physiological responses to male stimuli. Indeed, one subject's sexual arousal to same-sex sexual stimuli increased rather than decreased, a result that was obtained for some men in the experimental studies. In a study by Barlow and colleagues (1975), among 3 men who were each exposed to unique biofeedback treatment regimens, all maintained same-sex sexual arousal patterns at follow-up, as measured by penile circumference change in response to photos of male stimuli.

Mintz (1966) found that 8 years after initiating group and individual therapy, 5 of his 10 research participants (50%) had dropped out of therapy. Mintz perceived that among those who remained, 20% ($n = 1$) were distressed, 40% ($n = 2$) accepted their same-sex sexual attractions, and 40% ($n = 2$) were free from conflict regarding same-sex sexual attractions. Birk (1974) assessed the impact of behavioral therapy on 66 men, of whom 60% ($n = 40$) had dropped out of intervention by 7 months. Among those who remained in the study, a majority shifted toward heterosexual scores on the Kinsey scale by 18 months.

*Overall, the low degree of scientific rigor in these studies is likely to lead to overestimates of the benefits of these treatments on reductions in same-sex sexual arousal and attraction and may also explain the contradictory results obtained in nonexperimental studies.*

Overall, the low degree of scientific rigor in these studies is likely to lead to overestimates of the benefits of these treatments on reductions in same-sex sexual arousal and attraction and may also explain the contradictory results obtained in nonexperimental studies.

## RECENT STUDIES

Recent studies have investigated whether people who have participated in efforts to change their sexual orientation report decreased same-sex sexual attractions (Nicolosi et al., 2000; Schaeffer et al., 2000; Spitzer, 2003) or how people evaluate their overall experiences of SOCE (Beckstead & Morrow 2004; Pattison & Pattison, 1980; Ponticelli, 1999; Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002; Wolkomir, 2001). These studies all use designs that do not permit cause-and-effect attributions to be made. We conclude that although these studies may be useful in describing people who pursue SOCE and their experiences of SOCE, none of the recent studies can address the efficacy of SOCE or its promise as an intervention. These studies are therefore described elsewhere in the

report in places where they contribute to understanding respondents' motivations for and experiences of SOCE.

## SUMMARY

Overall, early studies suggest that modest short-term effects on reducing same-sex sexual arousal in the laboratory may be obtained for a minority of study participants through some forms of SOCE, principally interventions involving aversion procedures such as electric shock. Short-term reductions in sexual arousal to other-sex stimuli were also reported for some treatments. When outcomes were described for individual participants or subgroups of participants, short-term reductions in same-sex sexual arousal patterns were more commonly reported for people described as having other-sex sexual attractions prior to intervention and high levels of motivation to change. Initial and sustained reductions in sexual arousal were reported less commonly for people who were described as having no other-sex sexual attraction prior to intervention. The results from the uncontrolled studies are more positive than those from the controlled studies, as would be expected. Yet these studies also found that reduction in sexual arousal may not occur for study participants. Recent studies provide no sound scientific basis for determining the impact of SOCE on decreasing same-sex sexual attraction.

## Decreasing Same-Sex Sexual Behavior

### EARLY STUDIES

Early studies show that SOCE have limited impact on same-sex sexual behavior, even in cases in which lab results show some reduction in same-sex sexual arousal.[37]

### Experimental studies

In their review, H. E. Adams and Sturgis (1977) found that across the seven controlled studies published between 1960 and 1976, 18% of 179 subjects in these studies were reported to have decreased same-sex sexual behavior; the percentage reporting reductions in sexual arousal was nearly double that percentage, at 34%. In our review, we found that the results of

the experimental studies that we reviewed provided a picture of the effects of aversive forms of SOCE similar to that painted by H. E. Adams & Sturgis.

For instance, in his study comparing aversion and aversion relief therapies,[38] McConaghy (1969) reported that about 20% of men had engaged in same-sex sexual behavior within 2 weeks following treatment. No longer-term follow-up data were reported. McConaghy (1976) found that 50% of men had reduced the frequency of their same-sex behavior, 25% had not changed their same-sex behavior, and 25% reported no same-sex behavior at 1 year. McConaghy and Barr (1973) reported that 25% of men had reduced their same-sex sexual behavior at 1-year. Tanner (1975) reported a significant decline in same-sex behavior across treatments. In the only untreated control group study that we identified, Tanner (1974) found that intervention had no effect on rates of same-sex behavior, even though the intervention did reduce changes in penile circumference in response to male stimuli in the lab.

### Quasi-experimental studies

Birk and colleagues (1971) found that 2 of 18 men (11%) had avoided same-sex behavior at 36 months. McConaghy et al. (1981) reported that among the 11 men who were sexually active with same-sex partners, about 25% reduced their same-sex behavior. S. James (1978) did not report on behavior. In their review, H. E. Adams and Sturgis (1977) found that 50% of the 124 participants in what they called uncontrolled group studies reported reduced sexual arousal, and 42% reported less frequent same-sex sexual behavior. Among the quasi-experiments that we reviewed, the reported reductions in sexual behavior were lower (i.e., 11% and 25%) than what was reported by H. E. Adams and Sturgis. These differences may be due to our more rigorous criteria of what constitutes a quasi-experiment than the criteria employed by Adams and Sturgis.

### Nonexperimental studies

Among the case and single-group within-subject studies, the results are mixed. Some studies found that people reported having abstained from same-sex behavior in the months immediately following intervention or having decreased its frequency. Bancroft (1969) found that 4 of the 10 men in his study had reduced their behavior at follow-up. Freeman and Meyer (1975) found that 7 of the 9 men in their study were abstinent at 18

---

[37] In considering the results of early studies on this outcome, readers are advised that data on this outcome are not always reported. In some cases, not all research participants in these studies had engaged in sexual activity with same-sex partners prior to treatment, though they may have fantasized about doing so. In other studies, reducing sexual arousal under lab conditions was examined and not behavior in daily life.

[38] Aversion therapy involves the application of a painful stimulus; aversion relief therapy involves the cessation of an aversive stimulus.



months. Other single-subject and case study subjects reported declines in or no same-sex behavior (Gray, 1970; Huff, 1970; B. James, 1962, 1963; Kendrick & McCullough, 1972; Larson, 1970; LoPiccolo, 1971; Segal & Sims, 1972).

Not all individuals, however, successfully abstained on every occasion of sexual opportunity (Colson, 1972; Rehm & Rozensky, 1974), and some relapse occurred within months following treatment (Bancroft, 1969; Freeman & Meyer, 1975; Hallam & Rachman, 1972; Levin et al., 1968; MacCulloch et al., 1965; Marquis, 1970). In other studies, the proportion reporting that they changed their sexual behavior was a minority. For instance, among Barlow et al.'s (1975) research participants, 2 of the 3 men demonstrated no change in their same-sex behavior. In the case studies, clients who were described as exclusively attracted to the same sex prior to treatment were most commonly reported to have failed to avoid same-sex sexual behavior following treatment.

## RECENT STUDIES

As we have noted, recent studies provide no sound basis for attributing individual reports of their current behavior to SOCE. No results are reported for these studies.

## SUMMARY

In the early studies with the greatest rigor, it appears that SOCE may have decreased short-term same-sex sexual behavior for a minority of men. However, in the only randomized control group trial, the intervention had no effect on same-sex sexual behavior. Quasi-experimental results found that a minority of men reported reductions in same-sex sexual behavior following SOCE. The nonexperimental studies found that study participants often reported reduced behavior but also found that reductions in same-sex sexual behavior, when reported, were not always sustained.

## Increasing Other-Sex Sexual Attraction

Early studies provide limited evidence for reductions in sexual arousal to same-sex stimuli and for reductions in same-sex sexual behavior following aversive treatments. The impact of the use of aversive treatments for increasing other-sex sexual arousal is negligible.

## EARLY STUDIES

### Experimental studies

In many of the early experiments on aversive treatments, sexual arousal to female sexual stimuli was a desired outcome. McConaghy (1969) found that about 16% of 40 men increased their sexual arousal to female stimuli immediately following treatment and that 5% increased their sexual arousal to male stimuli. It is unclear how the 50% of men in this study who were aroused by females prior to the treatment were distributed among the men who increased their sexual arousal and among those who did not. In other words, it is possible that most of the men who changed were sexually aroused by women initially. In interviews following treatment, McConaghy (1976) reported that 25% of 157 men indicated that they felt more sexual arousal toward females than they did before treatment. McConaghy et al. (1972) found no change in rates of sexual arousal to female stimuli. McConaghy et al.'s (1972) research participants showed no change in penile volume in response to female stimuli after intervention.

In a randomized control trial, Tanner's (1974) 8 research participants reported increases in sexual fantasizing about other-sex partners after aversive conditioning. However, penile circumference data showed no increased sexual arousal to female stimuli. H. E. Adams and Sturgis (1977) found that 26% of 179 participants in the controlled studies that they reviewed increased their sexual arousal toward the other-sex.

### Quasi-experimental studies

Birk and colleagues (1971) found no difference between their treatment groups in reported sexual arousal to women. Two men (11% of 18 participants) in the study reported sustained sexual interest in women following treatment. McConaghy and colleagues (1981) reported no significant improvement in attraction to females. S. James (1978) reported little impact of treatment on participants in anticipatory avoidance learning. He noted a general improvement among 80% of the 40 men undergoing desensitization to other-sex situations.

### Nonexperimental studies

Among the nonexperimental studies, for men who were described as having some degree of other-sex sexual attraction and experience before the intervention, the balance of studies showed an increase in other-sex sexual attraction over time, although given the nonexperimental nature of these studies, this change

cannot be validly attributed to SOCE. For men with little or no preintervention other-sex sexual attraction, the research provides little evidence of increased other-sex sexual attraction.

As in some of the experimental studies, the results reported in the nonexperiments were not always in the desired direction. Studies occasionally showed that reductions in sexual arousal and interest may occur for same- and other-sex partners, suggesting the possibility that treatments may lower sexual arousal to sexual stimuli in general. For instance, Curtis and Presly's (1972) married male subject reported slightly lower rates of sexual arousal in response to women than before intervention, in addition to reduced same-sex sexual arousal.

Among early studies, many found little or no increases in other-sex sexual attraction among participants who showed limited or no other-sex sexual attraction to begin with. For instance, 2 of the 3 men in Barlow et al.'s (1975) within-subject biofeedback investigation reported little or no other-sex sexual interest prior to intervention. As measured by penile circumference, one of these men demonstrated negligible increases in other-sex sexual attraction; one other individual showed stable low other-sex sexual attraction, which contradicted his self-report.

In contrast, a handful of the early single-patient case studies found increases in other-sex attraction. For instance, Hanson and Adesso's (1972) research participant, who was reported to be primarily same-sex sexually attracted at the onset of intervention, increased his sexual arousal to women and ultimately reported that he enjoyed sex with women. Huff's (1970) male research participant also reported increased other-sex sexual attraction at 6 months following desensitization.

## RECENT STUDIES

As we have noted, recent studies provide no sound basis for attributing individual reports of their current other-sex sexual attraction to SOCE. No results are reported for these studies.

## SUMMARY

Taken together, the research provides little support for the ability of interventions to develop other-sex sexual attraction where it did not previously exist, though it may be possible to accentuate other-sex sexual attraction among those who already experience it.

## Increasing Other-Sex Sexual Behavior

Studies on whether interventions can lead to other-sex sexual activity show limited results. These studies show more success for those who had some other-sex sexual orientation (e.g., sexual arousal) and were sexually experienced with members of the other sex prior to intervention than for those who had no other-sex sexual orientation and no history of other-sex sexual behavior. The results for this outcome suggest that some people can initiate other-sex sexual behavior whether or not they have any observed other-sex sexual orientation.

As previously noted, in the early studies many people were described as heterosexually experienced. From the data provided by H.E. Adam and Sturgis in their 1977 review, 61%–80% of male research participants appeared to have histories of dating women, and 33%–63% had sexual intercourse with women prior to intervention. Additionally, some of the men were married at the time of intervention. Because so many of the research participants in these studies had other-sex sexual attractions or intimate relationships at the outset, it is unclear how to interpret changes in their levels of other-sex sexual activity.

## EARLY STUDIES

### Experimental studies

According to H. E. Adams and Sturgis (1977), only 8% of participants in controlled studies are reported to have engaged in other-sex sexual behavior following SOCE. Among those studies we reviewed, only 2 participants showed a significant increase in other-sex sexual activity (McConaghy & Barr, 1973; Tanner, 1974). In Tanner's randomized controlled trial, men increased the frequency of intercourse with females but maintained the frequency of intercourse with males.

### Quasi-experimental studies

McConaghy et al. (1981) found no difference in the frequency of other-sex sexual behavior following SOCE.

### Nonexperimental studies

Among within-subject patient studies in which aversion techniques were used, some studies reported that a subset of 12%–40% of people in the multiple-subject studies and all people in single-patient studies engaged in other-sex sexual behavior following intervention (e.g., Bancroft, 1969; Fookes, 1960; Hallam & Rachman, 1972; Hanson & Adesso, 1972; Kendrick & McCullough, 1972; Larson, 1970). Regarding other techniques



studied in early intervention research, Barlow et al. (1975) reported that 1 of 3 research participants began to date women after biofeedback. Huff's (1970) research participant also began to date women after desensitization training. LoPiccolo (1971) used orgasmic reconditioning to treat a male–female couple. The male could not achieve an erection with his female partner and found sex with women dissatisfying. At 6 months, he was able to develop and maintain an erection and ejaculate intravaginally.

## RECENT STUDIES

As previously noted, recent studies provide no sound basis for attributing individual reports of their current sexual behavior to SOCE. No results are reported for these studies.

## SUMMARY

In general, the results from studies indicate that while some people who undergo SOCE do engage in other-sex sexual behavior afterward, the balance of the evidence suggests that SOCE is unlikely to increase other-sex sexual behavior. Findings show that the likelihood of having sex with other-sex partners for those research participants who possess no other-sex sexual orientation prior to the intervention is low.

## Marriage

One outcome that some proponents of efforts to change sexual orientation are reported to value is entry into heterosexual marriage. Few early studies reported on whether people became heterosexually married after intervention. In a quasi-experimental study, Birk et al. (1971) found that 2 of 18 respondents (11%) were married at 36 months. Two uncontrolled studies (Birk, 1974; Larson, 1970) indicated that a minority of research participants ultimately married, though it is not clear what role, if any, intervention played in this outcome. Recent research provides more information on marriage, though research designs do not permit any attribution of marital outcomes to SOCE.

## Improving Mental Health

The relationship between mental health, psychological well-being, sexual orientation, sexual orientation identity, and sexual behavior is important. Few studies report health and mental health outcomes, and those that do report outcomes tend to use psychometrically

weak measures of these constructs and weak study designs. Among the early studies that report on mental health, three nonexperimental single-patient case studies report that clients were more self-assured (Blitch & Haynes, 1972) or less fearful and distressed (Hanson & Adesso, 1972; Huff, 1970).

Overall, the lack of high-quality data on mental health outcomes of efforts to change sexual orientation provide no sound basis for claims that people's mental health and quality of life improve. Indeed, these studies add little to understanding how SOCE affects people's long-term mental health.

## Reports of Harm

Determining the efficacy of any intervention includes examination of its side effects and evidence of its harm (Flay et al., 2005; Lilienfeld, 2007). A central issue in the debates regarding efforts to change same-sex sexual attractions concerns the risk of harm to people that may result from attempts to change their sexual orientation. Here we consider evidence of harm in early and recent research.

## EARLY STUDIES

Early research on efforts to change sexual orientation focused heavily on interventions that include aversion techniques. Many of these studies did not set out to investigate harm. Nonetheless, these studies provide some suggestion that harm can occur from aversive efforts to change sexual orientation.

## EXPERIMENTAL STUDIES

In McConaghy and Barr's (1973) experiment, 1 respondent of 46 subjects is reported to have lost all sexual feeling and to have dropped out of the treatment as a result. Two participants reported experiencing severe depression, and 4 others experienced milder depression during treatment. No other experimental studies reported on iatrogenic effects.

## QUASI-EXPERIMENTAL STUDIES

None reported on adverse events.

## NONEXPERIMENTAL STUDIES

A majority of the reports on iatrogenic effects are provided in the nonexperimental studies. In the study conducted by Bancroft (1969), the negative outcomes reported include treatment-related anxiety (20% of 16

participants), suicidal ideation (10% of 16 participants), depression (40% of 16 participants), impotence (10% of 16 participants), and relationship dysfunction (10% of 16 participants). Overall, Bancroft reported the intervention had harmful effects on 50% of the 16 research subjects who were exposed to it. Quinn, Harbison, and McAllister (1970) and Thorpe et al. (1964) also reported cases of debilitating depression, gastric distress, nightmares, and anxiety. Herman and Prewett (1974) reported that following treatment, their research participant began to engage in abusive use of alcohol that required his rehospitalization. It is unclear to what extent and how his treatment failure may have contributed to his abusive drinking. B. James (1962) reported symptoms of severe dehydration (acetonuria), which forced treatment to be suspended.

Overall, although most early research provides little information on how research participants fared over the longer term and whether interventions were associated with long-term negative effects, negative effects of treatment are reported to have occurred for some people during and immediately following treatment.

High dropout rates characterize early treatment studies and may be an indicator that research participants experience these treatments as harmful. Lilienfeld's (2007) review of harm in psychotherapy identified dropout as not only an indicator of direct harm but also of treatment ineffectiveness.

### RECENT STUDIES

Although the recent studies do not provide valid causal evidence of the efficacy of SOCE or of its harm, some recent studies document that there are people who perceive that they have been harmed through SOCE (Beckstead & Morrow, 2004; Nicolosi et al., 2000; Schaeffer et al., 2000; Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002; G. Smith et al., 2004), just as other recent studies document that there are people who perceive that they have benefited from it (Beckstead & Morrow, 2004; Nicolosi et al., 2000; Pattison & Pattison, 1980; Schaeffer et al., 2000; Spitzer, 2003). Among those studies reporting on the perceptions of harm, the reported negative social and emotional consequences include self-reports of anger, anxiety, confusion, depression, grief, guilt, hopelessness, deteriorated relationships with family, loss of social support, loss of faith, poor self-image, social isolation, intimacy difficulties, intrusive imagery, suicidal ideation, self-hatred, and sexual dysfunction. These reports of perceptions of harm are countered by accounts of perceptions of relief, happiness, improved relationships with God, and perceived improvement in mental health status, among other reported benefits. Many participants in studies by Beckstead and Morrow (2004) and Shidlo and Schroeder (2002) described experiencing first the positive effects and then experiencing or acknowledging the negative effects later.

Overall, the recent studies do not give an indication of the client characteristics that would lead to perceptions of harm or benefit. Although the nature of these studies precludes causal attributions for harm or benefit to SOCE, these studies underscore the diversity of and range in participants' perceptions and evaluations of their SOCE experiences.

## Summary

We conclude that there is a dearth of scientifically sound research on the safety of SOCE. Early and recent research studies provide no clear indication of the prevalence of harmful outcomes among people who have undergone efforts to change their sexual orientation or the frequency of occurrence of harm because no study to date of adequate scientific rigor has been explicitly designed to do so. Thus, we cannot conclude how likely it is that harm will occur from SOCE. However, studies from both periods indicate that attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including depression and suicidal thoughts. The lack of rigorous research on the safety of SOCE represents a serious concern, as do studies that report perceptions of harm (cf. Lilienfeld, 2007).

*Studies from both periods indicate that attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including depression and suicidal thoughts. The lack of rigorous research on the safety of SOCE represents a serious concern, as do studies that report perceptions of harm.*

## Conclusion

The limited number of rigorous early studies and complete lack of rigorous recent prospective research on SOCE limits claims for the efficacy and safety of SOCE. Within the early group of studies, there are a small number of rigorous studies of SOCE, and those focus on the use of aversive treatments. These studies show that



enduring change to an individual's sexual orientation is uncommon and that a very small minority of people in these studies showed any credible evidence of reduced same-sex sexual attraction, though some show lessened physiological arousal to all sexual stimuli. Compelling evidence of decreased same-sex sexual behavior and increased attraction to and engagement in sexual behavior with the other sex was rare. Few studies provided strong evidence that any changes produced in laboratory conditions translated to daily life. We found that nonaversive and recent approaches to SOCE have not been rigorously evaluated. Given the limited amount of methodologically sound research, we cannot draw a conclusion regarding whether recent forms of SOCE are or are not effective.

*Few studies provided strong evidence that any changes produced in laboratory conditions translated to daily life.*

We found that there was some evidence to indicate that individuals experienced harm from SOCE. Early studies do document iatrogenic effects of aversive forms of SOCE. High dropout rates characterize early aversive treatment studies and may be an indicator that research participants experience these treatments as harmful. Recent research reports indicate that there are individuals who perceive they have been harmed and others who perceive they have benefited from nonaversive SOCE. Across studies, it is unclear what specific individual characteristics and diagnostic criteria would prospectively distinguish those individuals who will later perceive that they have succeeded and benefited from nonaversive SOCE from those who will later perceive that they have failed or been harmed. In the next chapter, we explore the literature on individuals who seek to change their sexual orientation to better understand their concerns.

# 5. RESEARCH ON ADULTS WHO UNDERGO SEXUAL ORIENTATION CHANGE EFFORTS

In the preceding three chapters, we have focused on sexual orientation change efforts (SOCE),[39] because such interventions have been the primary focus of attention and contention in recent decades. Now we turn from the problem of sexual orientation change, as it has been defined by "expert" narratives of sin, crime, disorder, and dysfunction in previous chapters, to the problem of sexual orientation distress, as it exists in the lives of individuals who seek and participate in sexual orientation change. We try to present what the research literature reveals—and clarify what it does not—about the natural history of the phenomenon of people who present to LMHP seeking SOCE.

We do this for two major reasons. The first is to provide a scholarly basis for responding to the core task force charge: "the appropriate application of affirmative therapeutic interventions" for the population of those individuals who seek sexual orientation change. The second is our hope to step out of the polemic that has defined approaches to sexual orientation distress. As discussed in the introduction, some professional articles (e.g., Rosik, 2001, 2003; Yarhouse & Burkett, 2002), organizations, and accounts of debates (cf. Drescher, 2003) have argued that APA and mainstream psychology are ignoring the needs of those for whom same-sex sexual attractions are unwanted, especially

*We hope that an empathic and comprehensive review of the scholarly literature of the population that seeks and participates in SOCE can facilitate an increased understanding of the needs of this population so that an affirmative therapeutic approach may be developed.*

for religious populations. We hope that an empathic and comprehensive review of the scholarly literature of the population that seeks and participates in SOCE can facilitate an increased understanding of the needs of this population so that an affirmative therapeutic approach may be developed.

We decided to expand our review beyond empirical literature to have a fuller view of the population in question. Because of the lack of empirical research in this area, the conclusions must be viewed as tentative. The studies that are included in this discussion are (a) surveys and studies of individuals who participated in SOCE and their perceptions of change, benefit, and harm (e.g., S. L. Jones & Yarhouse, 2007; Nicolosi et al., 2000; Schaeffer et al., 2000; Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002; Spitzer, 2003; Throckmorton & Welton, 2005)[40]; (b) high-quality qualitative studies of the concerns of participants and the dynamics of SOCE (e.g., Beckstead & Morrow, 2004; Erzen, 2006; Ponticelli, 1999; Wolkomir, 2001, 2006); (c) case reports, clinical articles, dissertations, and reviews in

---

[39] In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved.

[40] As previously noted, these studies, due to their significant methodological issues, cannot assess whether actual sexual orientation change occurred.



which sexual orientation or sexual orientation identity change were considered or attempted (e.g., Borowich, 2008; Drescher, 1998b; Glassgold, 2008; Gonsiorek, 2004; Haldeman, 2004; Horlacher, 2006; Karten, 2006; Mark, 2008; Tan, 2008, Yarhouse et al., 2005; Yarhouse, 2008); and (d) scholarly articles, case reports, dissertations, and reviews on the concerns of religious individuals who are conflicted by their same-sex sexual attractions, some of whom accept their same-sex sexual orientation (e.g., Coyle & Rafalin, 2000, Horlacher, 2006; Kerr, 1997; Mahaffy, 1996; Mark, 2008, Moran, 2007; O'Neill & Ritter, 1992; Shallenberger, 1998; Tan, 2008; Thumma, 1991; Yarhouse, 2008; Yarhouse et al., 2005; Yip, 2000, 2002, 2003, 2005). We also reviewed a variety of additional scholarly articles on subtopics such as individuals in other-sex marriages and general literature on sexual orientation concerns.

## Demographics

The majority of participants in research studies on SOCE have been Caucasian men. Early studies included some men who were court-referred and whose participation was not voluntary (S. James, 1978; McConaghy, 1969, 1976; McConaghy et al., 1972), but more recent research primarily included men who indicated that their religion is of central importance (Beckstead & Morrow, 2004; S. L. Jones & Yarhouse, 2007; Wolkomir, 2001). Some studies included small numbers of women (22%–29%; Nicolosi et al., 2000; S. L. Jones & Yarhouse, 2007; Schaeffer et al., 2000; Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002; Spitzer, 2003), and two studies focused exclusively on women (Moran, 2007; Ponticelli, 1999). However, these studies do not examine if there are potential differences between the concerns of men and women.

*To date, the research has not fully addressed age, gender, gender identity, race, ethnicity, culture, national origin, disability, language, and socioeconomic status in the population of distressed individuals who have sought SOCE.*

Members of racial-ethnic groups are not included in some samples (Beckstead & Morrow, 2004; Ponticelli, 1999; Wolkomir, 2001) and are a small percentage (5%–14%) of the sample in other studies (S. L. Jones & Yarhouse, 2007; Nicolosi et al., 2000; Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002; Spitzer, 2003). In the recent studies, no comparisons were reported between the ethnic minorities in the sample and others. Thus, there is no evidence that can elucidate concerns of ethnic minority individuals who have sought SOCE. To date, the research has not fully addressed age, gender, gender identity, race, ethnicity, culture, national origin, disability, language, and socioeconomic status in the population of distressed individuals who have sought SOCE.

Samples in recent SOCE studies have been composed predominantly of individuals from conservative Christian denominations (Beckstead & Morrow, 2004; Erzen, 2006; Nicolosi et al., 2000; Ponticelli, 1999; Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002; Spitzer, 2003; Wolkomir, 2001). These studies included very few nonreligious individuals, and the concerns of religious individuals of faiths other than Christian are not described. Thus, the existing literature limits information to the concerns of a particular group of religious individuals. Finally, most individuals in studies of SOCE have tried multiple ways to change their sexual orientation, ranging from individual psychotherapy to religiously oriented groups, over long periods of time and with varying degrees of satisfaction and varying perceptions of success (Beckstead & Morrow, 2004; Comstock, 1996; Horlacher, 2006; S. L. Jones & Yarhouse, 2007; Mark, 2008; Nicolosi et al., 2000; Shidlo & Schroeder, 2002).

## Why Individuals Undergo Sexual Orientation Change Efforts

Because no research provides prevalence estimates of those participating in SOCE, we cannot determine how prevalent the wish to change sexual orientation is among the conservative Christian men who have predominated in the recent research, or among any other population. Clients' motivations to seek out and participate in SOCE seem to be complex and varied and may include mental health and personality issues, cultural concerns, religious faith, internalized stigma, as well as sexual orientation concerns (Beckstead & Morrow, 2004; Drescher, 1998b; Glassgold, 2008; Gonsiorek, 2004; Haldeman, 2004; Lasser & Gottlieb, 2004; S. L. Jones & Yarhouse, 2007; Nicolosi et al., 2000). Some of the factors influencing a client's request for SOCE that have been identified in the literature include the following:

- Confusion or questions about one's sexuality and sexual orientation (Beckstead & Morrow, 2004; G. Smith et al., 2004)

- Religious beliefs that consider homosexuality sinful or unacceptable (Erzen, 2006; Haldeman, 2004; S. L. Jones & Yarhouse, 2007; Mark, 2008; Ponticelli, 1999; Tan, 2008; Tozer & Hayes, 2004; Wolkomir, 2001, 2006; Yarhouse, 2008)

- Fear, stress, and anxiety surrounding the implications of an LGB identity (especially the illegitimacy of such an identity within the client's religious faith or community) (Beckstead & Morrow, 2004; Glassgold, 2008; Haldeman, 2004; Mark, 2008; Shidlo & Schroeder, 2002)

- Family pressure to be heterosexual and community rejection of those who are LGB (Haldeman, 2004; Glassgold, 2008; Mark, 2008; Shidlo & Schroeder, 2002; G. Smith et al., 2004)

Some individuals who have pursued SOCE report having had only unsuccessful or unfulfilling same-sex sexual experiences in venues such as bars or sexual "cruising" areas (Beckstead & Morrow, 2004; Shidlo & Schroeder, 2002). These experiences reflected and re-created restricted views that the "gay lifestyle" is nonspiritual, sexually desperate, or addicted, depressive, diseased, and lonely (Drescher, 1998b; Green, 2003; Rosik, 2003; Scasta, 1998). Many sexual minority individuals who do not seek SOCE are also affected by these factors. Thus, these findings do not explain why some people seek SOCE and others do not.

There are some initial findings that suggest differences between those who seek SOCE and those who resolve their sexual minority stress through other means. For example, Ponticelli (1999) and S. L. Jones and Yarhouse (2007) reported higher levels of self-reported family violence and sexual abuse in their samples than were reported by Laumann et al. (1994) in a population-based sample. Beckstead and Morrow (2004) and S. L. Jones and Yarhouse reported high levels of parental rejection or authoritarianism among their religious samples (see also G. Smith et al., 2004). Wolkomir (2001) found that distress surrounding nonconformity to traditional gender roles distinguished the men in her sample who did not accept their sexual orientation from those who did. Similarly, Beckstead and Morrow found that distress and questions about masculinity were an important appeal of SOCE; some men who sought SOCE described feeling distress about

not acting more traditionally masculine. In reviewing the SOCE literature, Miville and Ferguson (2004) proposed that White, conservatively religious men might not feel adept at managing a minority status and thus seek out SOCE as a resolution.

The views of LMHP concerning SOCE and homosexuality appear to influence clients' decision making in choosing SOCE; some clients reported being urged by their provider to participate in SOCE (M. King et al. 2004; Schroeder & Shidlo, 2001; G. Smith et al., 2004). For example, G. Smith et al. (2004) found that some who had received SOCE had not requested it. These individuals stated they had presented with confusion and distress about their orientation due to cultural and relational conflicts and were offered SOCE as the solution.

## Specific Concerns of Religious Individuals

In general, the participants in research on SOCE have come from faiths that believe heterosexuality and other-sex relationships are part of the natural order and are morally superior to homosexuality (Beckstead & Morrow, 2004; Ponticelli, 1999; Shidlo & Schroeder, 2002; Wolkomir, 2001, 2006). The literature on SOCE suggests that individuals reject or fear their same-sex sexual attractions because of the internalization of the values and attitudes of their religion that characterize homosexuality negatively and as something to avoid (Beckstead & Morrow, 2004; Erzen, 2006; Glassgold, 2008; Mark, 2008; Nicolosi et al., 2000; Ponticelli, 1999; Wolkomir, 2001, 2006).

The experiences of some conservative religious individuals with same-sex sexual attractions who undergo SOCE appear to involve significant stress due to the struggle to live life congruently with their religious beliefs (S. L. Jones & Yarhouse, 2007; Yarhouse et al., 2005; Yarhouse & Tan, 2004). These individuals perceive homosexuality to be irreconcilable with their faith and do not wish to surrender or change their faith (Wolkomir, 2006). Some report fearing considerable shifts or losses in their core identity, role, purpose, and sense of order if they were to pursue an outward LGB identity (Beckstead & Morrow, 2004; Glassgold, 2008; Haldeman, 2004; Mark, 2008; O'Neill & Ritter, 1992; Ritter & O'Neill, 1989, 1995; Wolkomir, 2006). Some report difficulty coping with intense guilt over the failure to live a virtuous life and inability to stop committing unforgivable sins, as defined by their



PBC 007546

religion (Beckstead & Morrow, 2004; Glassgold, 2008; Mark, 2008). Some struggled with their belief in God, perceiving that God was punishing or abandoning them—or would if they acted on their attractions; some expressed feelings of anger at the situation in which their God had placed them (Beckstead & Morrow, 2004; Glassgold, 2008; cf. Exline, 2002; Pargament, Smith, Koenig, & Perez, 1998; Pargament et al., 2005).

Some individuals' distress took the form of a crisis of faith in which their religious beliefs that a same-sex sexual orientation and religious goodness are diametrically opposed led them to question their faith and themselves (Glassgold, 2008; Moran, 2007; Tozer & Hayes, 2004). Spiritual struggles also occurred for religious sexual minorities due to struggling with conservatively religious family, friends, and communities who thought differently than they did. The distress experienced by religious individuals appeared intense, for not only did they face sexual stigma from society at large but also messages from their faith that they were deficient, sinful, deviant, and possibly unworthy of salvation unless they changed sexual orientation (Beckstead & Morrow, 2004).

> The distress experienced by religious individuals appeared intense, for not only did they face sexual stigma from society at large but also messages from their faith that they were deficient, sinful, deviant, and possibly unworthy of salvation unless they changed sexual orientation.

These spiritual struggles had mental health consequences. Clinical publications and studies of religious clients (both male and female) (Beckstead & Morrow, 2004; Glassgold, 2008; Haldeman, 2004; Mark, 2008) have described individuals who felt culpable, unacceptable, unforgiven, disillusioned, and distressed due to the conflict between their same-sex sexual attractions and religion. The inability to integrate religion and sexual orientation into a religiously sanctioned life (i.e., one that provides an option for positive self-esteem and religiously sanctioned sexuality and family life) has been described as causing great emotional distress (Beckstead & Morrow, 2004; Glassgold, 2008; Mark, 2008; D. F. Morrow, 2003). These spiritual struggles were sometimes associated with anxiety, panic disorders, depression, and suicidality, regardless of the level of religiosity or the perception of religion as a source of comfort and coping (Beckstead & Morrow, 2004; Glassgold, 2008; Haldeman, 2004; Horalcher, 2006). The emotional

reactions reported in the literature on SOCE among religious individuals are consistent with those reported in the psychology of religion literature that describes both the impact of an inability to live up to religious motivations and the effects of religion and positive and negative religious coping (Ano & Vasconcelles, 2005; Exline, 2002; Pargament & Mahoney, 2002; Pargament et al., 2005; Trenholm, Trent, & Compton, 1998).

Some individuals coped by trying to compartmentalize their sexual orientation and religious identities and behaviors or to suppress one identity in favor of another (Beckstead & Morrow, 2004; Glassgold, 2008; Haldeman, 2004; Mark, 2008). Relief came as some sought repentance from their "sins," but others continued to feel isolated and unacceptable in both religious and sexual minority communities (Shidlo & Schroeder, 2002; Yarhouse & Beckstead, 2007). As an alternative, some with strong religious motivations and purpose were willing to make sexual abstinence a goal and to limit sexual and romantic needs in order to achieve congruence with their religious beliefs (S. L. Jones & Yarhouse, 2007; Yarhouse et al., 2005; Yarhouse, 2008). These choices are consistent with the psychology of religion that emphasizes religious motivations and purpose (cf. Emmons, 1999; Emmons & Paloutzian, 2003; Hayduk, Stratkotter, & Rovers, 1997; Roccas, 2005). Success with this choice varied greatly and appeared successful in a minority of participants of studies, although not always in the long term, and both positive and negative mental heath effects have been reported (Beckstead & Morrow, 2004; Horlacher, 2006; S. L. Jones & Yarhouse, 2007; Shidlo & Schroeder, 2002).

Some conservatively religious individuals felt a need to change their sexual orientation because of the positive benefits that some individuals found from religion (e.g., community, mode of life, values, sense of purpose) (Beckstead & Morrow, 2004; Borowich, 2008; Glassgold, 2008; Haldeman, 2004; Mark, 2008; Nicolosi et al., 2000; Yarhouse, 2008). Others hoped that being heterosexual would permit them to avoid further negative emotions (e.g., self-hatred, unacceptability, isolation, confusion, rejection, and suicidality) and expulsion from their religious community (Beckstead & Morrow, 2004; Borowich, 2008; Glassgold, 2008; Haldeman, 2004; Mark, 2008).

The literature on non-Christian religious denominations is very limited, and no detailed literature was found on most faiths that differed from the descriptions cited previously. There is limited information on the specific concerns of observant

and Orthodox Jews[41] (e.g., Blechner, 2008; Borowich, 2008; Glassgold, 2008; Mark, 2008; Wolowelsky & Weinstein, 1995). This work stresses the conflicts that emerge within a communal and insular culture that values obedience to religious law and separates itself from mainstream society and other faiths, including mainstream LGB communities, thus isolating those in conflict and distress (Glassgold, 2008; Mark, 2008). As marriage, family, and community are the central units of life within such a religious context, LGB individuals do not have a place in Orthodox Judaism and traditional Jewish society and may fear losing contact with family and society or bringing shame and negative consequences to their family if their sexual orientation is disclosed.[42] Many of the responses and concerns of the conservative Christian population appear relevant to those who are Orthodox Jews, especially those that arise from the conflicts of faith and sexual orientation, such as feelings of guilt, doubt, crisis of faith, unworthiness, and despair (Glassgold, 2008; Mark, 2008).

We found no scholarly psychological literature on sexual minority Muslims who seek SOCE. There is some

> *It is important to note that not all sexual minorities with strong religious beliefs experience sexual orientation distress, and some resolve such distress in other ways than SOCE.*

literature on debates about homosexuality within Islam and cultural conflicts for those Muslims who live in Western societies with more progressive attitudes toward homosexuality (Halstead & Lewicka, 1998; Hekma, 2002; de Jong & Jivraj, 2002; Massad, 2002; Nahas, 2004). Additionally, there is some literature on ways in which individuals integrate LGBT identities with their Muslim faith (Minwalla, Rosser, Feldman, & Varga, 2005; Yip, 2005). We did not find scholarly articles about individuals from other faiths who sought SOCE, except for one article (Nicolosi et al., 2000) that that did not report any separate results for individuals from non-Christian faiths.

It is important to note that not all sexual minorities with strong religious beliefs experience sexual orientation distress, and some resolve such distress

in other ways than SOCE (Coyle & Rafalin, 2000; Mahaffy, 1996; O'Neill & Ritter, 1992; Ritter & O'Neill, 1989, 1995; Rodriguez, 2006; Rodriguez & Ouellette, 2000; Yip, 2000, 2002, 2003, 2005). For instance, some individuals are adherents of more accepting faiths and thus experience less distress. Some end their relationship with all religious institutions, although they may retain the religious and spiritual aspects of their original faiths that are essential to them. Others choose another form of religion or spirituality that is affirming of sexual minorities (Lease, Horne, & Noffsinger-Frazier, 2005; Ritter & O'Neill, 1989, 1995; Ritter & Terndrup, 2002; Rodriguez & Ouellette, 2000; Yip, 2000, 2002, 2003, 2004).

## Conflicts of Individuals in Other-Sex Marriages or Relationships

There is indication that some individuals with same-sex sexual attractions in other-sex marriages or relationships may request SOCE. Many subjects in the early studies were married (H. E. Adams & Sturgis, 1977). In the more recent research, some individuals were married (e.g., Horlacher, 2006; Spitzer, 2003), and there are clinical reports of experiences of SOCE among other-sex married people (e.g., Glassgold, 2008; Isay, 1998). For some, the marriage to an other-sex person was described as based on socialization, religious views that deny same-sex sexual attractions, lack of awareness of alternatives, and hopes that marriage would change them (Gramick, 1984; Higgins, 2006; Isay, 1998; Malcolm, 2000; Ortiz & Scott, 1994; M. W. Ross, 1989). Others did not recognize or become aware of their sexuality, including same-sex sexual attractions, until after marriage, when they became sexually active (Bozett, 1982; Carlsson, 2007; Schneider et al., 2002). Others had attractions to both men and women (Brownfain, 1985; Coleman, 1989; Wyers, 1987).

For those who experienced distress with their other-sex relationship, some were at a loss as to how to decide what to do with their conflicting needs, roles, and responsibilities and experienced considerable guilt, shame, and confusion (Beckstead & Morrow, 2004; Bozett, 1982; Buxton, 1994, 2004, 2007; Gochros, 1989; Hays & Samuels, 1989; Isay, 1998; Shidlo & Schroeder, 2002; Yarhouse & Seymore, 2006). Love for their spouse conflicted with desires to explore or act on same-sex romantic and sexual feelings and relationships or to connect with similar others (Bridges & Croteau, 1994; Coleman, 1981/1982; Yarhouse & Seymore, 2006).

---

[41] Among Jewish traditions, Orthodox Judaism is the most conservative and does not have a role for same-sex relationships or sexual orientation identities within its faith (Mark, 2008). Individuals in other denominations (e.g., Conservative, Reform, Reconstructionist) may not face this type of conflict or this degree of conflict.

[42] These conflicts may also be relevant to those whose religion and community are similarly intertwined and separate from larger society; see Cates (2007), for instance, regarding an individual from an Old Amish community.



However, many individuals wished to maintain their marriage and work at making that relationship last (Buxton, 2007; Glassgold, 2008; Yarhouse, Pawlowski, & Tan, 2003; Yarhouse & Seymore, 2006). Thus, the sexual minority individual sometimes felt frustrated and hopeless in facing feelings of loss and guilt that result from trying to decide whether to separate from or remain in the marriage as he or she balanced hopes and ambiguities (e.g., the chances of finding a same-sex romantic or sexual partner or the possibilities of experiencing further intimacy with one's heterosexual spouse) (Hernandez & Wilson, 2007).

# Reported Impacts of Sexual Orientation Change Efforts

## Perceived Positives of SOCE

In this section we review the perceptions of individuals who underwent SOCE in order to examine what may be perceived as being helpful or detrimental by such individuals, distinct from a scientific evaluation of the efficacy or harm associated with sexual orientation change efforts, as reported in Chapter 4.

Individuals have reported that SOCE provided several benefits: (a) a place to discuss their conflicts (Beckstead & Morrow, 2004; Erzen, 2006; Ponticelli, 1999; Wolkomir, 2001); (b) cognitive frameworks that permitted them to reevaluate their sexual orientation identity, attractions, and selves in ways that lessened shame and distress and increased self-esteem (Erzen, 2006; Karten, 2006; Nicolosi et al., 2000; Ponticelli, 1999; Robinson, 1998; Schaeffer et al., 2000; Spitzer, 2003; Throckmorton, 2002); (c) social support and role models (Erzen, 2006; Ponticelli, 1999; Wolkomir, 2001, 2006); and (d) strategies for living consistently with their religious faith and community (Beckstead & Morrow, 2004; Erzen, 2006; Horlacher, 2006; S. L. Jones & Yarhouse, 2007; Nicolosi et al., 2000; Ponticelli, 1999; Robinson, 1998; Throckmorton & Welton, 2005; Wolkomir, 2001, 2006).

For instance, participants reporting beneficial effects in some studies perceived changes to their sexuality, such as in their sexual orientation, gender identity, sexual behavior, sexual orientation identity (Beckstead, 2001; Nicolosi et al., 2000; Schaeffer et al., 2000; Spitzer, 2003; Throckmorton & Welton, 2005), or improving nonsexual relationships with men (Karten, 2006). These changes in sexual self-views were described in a variety of ways (e.g., ex-

gay, heterosexual, heterosexual with same-sex sexual attractions, heterosexual with a homosexual past) and with varied and unpredictable outcomes, some of which were temporary (Beckstead, 2003; Beckstead & Morrow, 2004; Shidlo & Schroeder, 2002). McConaghy (1999) reported that some men felt they had more control in their sexual behavior and struggled less with their attractions after interventions, although same-sex sexual attractions still existed (cf. Beckstead & Morrow, 2004). Additionally, some SOCE consumers noted that trying and failing to change their same-sex sexual orientation actually allowed them to accept their same-sex attractions (Beckstead & Morrow, 2004; G. Smith et al., 2004).

Participants described the social support aspects of SOCE positively. Individuals reported as positive that their LMHP accepted their goals and objections and had similar values (i.e., believing that a gay or lesbian identity is bad, sick, or inferior and not supporting same-sex relationships) (Nicolosi et al., 2000; Throckmorton & Welton, 2005). Erzen (2006), Ponticelli (1999), and Wolkomir (2001) described these religiously oriented ex-gay groups as a refuge for those who were excluded from conservative churches and from their families because of their same-sex sexual attractions, as well as from gay organizations and social networks because of their conservative religious beliefs. In Erzen's experiences with these men, these organizations seemed to provide options for individuals to remain connected to others who shared their religious beliefs, despite ongoing same-sex sexual feelings and behaviors. Wolkomir (2006) found that ex-gay groups recast homosexuality as an ordinary sin, and thus salvation was still achievable. Erzen observed that such groups built hope, recovery, and relapse into an ex-gay identity, thus expecting same-sex sexual behaviors and conceiving them as opportunities for repentance and forgiveness.

> … such groups built hope, recovery, and relapse into an ex-gay identity, thus expecting same-sex sexual behaviors and conceiving them as opportunities for repentance and forgiveness.

Some participants of SOCE reported what they perceived as other positive values and beliefs underlying SOCE treatments and theories, such as supporting celibacy, validating other-sex marriage, and encouraging and supporting other-sex sexual behaviors (Beckstead & Morrow, 2004; S. L. Jones & Yarhouse, 2007; Nicolosi et al., 2000; Throckmorton & Welton, 2005). For instance, many SOCE theories

and communities focus on supporting clients' values and views, often linked to religious beliefs and values (Nicolosi et al., 2000; Schaeffer et al., 2000; Throckmorton & Welton, 2005). According to Ponticelli (1999), ex-gay support groups provide alternate ways of viewing same-sex attractions that permit individuals to see themselves as heterosexual, which provided individuals a sense of possibility.

Participants' interpretations of their SOCE experiences and the outcomes of their experiences appeared to be shaped by their religious beliefs and by their motivations to be heterosexual. In Schaeffer et al. (2000), people whose motivation to change was strongly influenced by their Christian beliefs and convictions were more likely to perceive themselves as having a heterosexual sexual orientation after their efforts. Schaeffer et al. also found that those who were less religious were more likely to perceive themselves as having an LGB sexual orientation after the intervention. Some of the respondents in Spitzer's (2003) study concluded that they had altered their sexual orientation, although they continued to have same-sex sexual attractions. These findings underscore the importance of the nature and strength of participants' motivations, as well as the importance of religious identity in shaping self-reports of perceived sexual orientation change.

*These findings underscore the importance of the nature and strength of participants' motivations, as well as the importance of religious identity in shaping self-reports of perceived sexual orientation change.*

A number of authors (Beckstead & Morrow, 2004; Ponticelli, 1999; Wolkomir, 2001; Yarhouse et al., 2005; Yarhouse & Tan, 2004) have found that identity exploration and reinterpretation were important parts of SOCE. Beckstead and Morrow (2004) described the identity development of their research participants who were or had been members of the Church of Jesus Christ of Latter-Day Saints and had undergone therapy to change their sexual orientation to heterosexual. In this research, those who experienced the most satisfaction with their lives seemed to undergo a developmental process that included the following aspects: (a) becoming disillusioned, questioning authorities, and reevaluating outside norms; (b) wavering between ex-gay, "out" gay, heterosexual, or celibate identities that depended on cultural norms and fears rather than on internally self-informed choices; and (c) resolving their conflicts through developing self-acceptance, creating

a positive self-concept, and making decisions about their relationships, religion, and community affiliations based on expanded information, self-evaluations, and priorities. The participants had multiple endpoints, including LGB identity, "ex-gay" identity, no sexual orientation identity, and a unique self-identity. Some individuals chose actively to *disidentify* with a sexual minority identity so the individual's sexual orientation identity and sexual orientation could be incongruent (Wolkomir, 2001, 2006; Yarhouse, 2001; Yarhouse & Tan, 2004; Yarhouse et al., 2005).

Further, the findings suggest that some participants may have reconceptualized their *sexual orientation identity* as heterosexual but *not* achieved sexual orientation change, as they still experienced same-sex sexual attractions and desires (for a discussion of the distinction between sexual orientation and sexual orientation identity, see Chapter 3; see also R. L. Worthington, 2003; R. L. Worthington et al., 2002). For these individuals, sexual orientation identity may not reflect underlying attractions and desires (Beckstead, 2003; Beckstead & Morrow, 2004; McConaghy, 1999; Rust, 2003; Shidlo & Schroeder, 2002).

## Perceived Negatives of SOCE

Participants in the studies by Beckstead and Morrow (2004) and Shidlo and Schroeder (2002) described the harm they experienced as (a) decreased self-esteem and authenticity to others; (b) increased self-hatred and negative perceptions of homosexuality; (c) confusion, depression, guilt, helplessness, hopelessness, shame, social withdrawal, and suicidality; (d) anger at and a sense of betrayal by SOCE providers; (e) an increase in substance abuse and high-risk sexual behaviors; (f) a feeling of being dehumanized and untrue to self; (g) a loss of faith; and (h) a sense of having wasted time and resources. Interpreting SOCE failures as individual failures was also reported in this research, in that individuals blamed themselves for the failure (i.e., weakness, and lack of effort, commitment, faith, or worthiness in God's eyes). Intrusive images and sexual dysfunction were also reported, particularly among those who had experienced aversion techniques.

Participants in these studies related that their relationships with others were also harmed in the following ways: (a) hostility toward and blame of parents, believing their parents "caused" their homosexuality; (b) anger at and a sense of betrayal by SOCE providers; (c) loss of LGB friends and potential romantic partners because of the belief that they should



PBC 007550

avoid sexual minority people; (d) problems in sexual and emotional intimacy with other-sex partners; (e) stress due to the negative emotions of spouses and family members because of expectations that SOCE would work (e.g., disappointment, self-blame for failure of change, perception of betrayal by partner) (see also J. G. Ford, 2001); and (f) guilt and confusion when they were sexually intimate with other same-sex members of the ex-gay groups to which they had turned for help in avoiding their attractions.

LMHP working with former participants in SOCE noted that when clients who formerly engaged in SOCE consider adopting an LGB identity or experience same-sex romantic and sexual relationships later in life, they have more difficulty with identity development due to delayed developmental tasks and dealing with any harm associated with SOCE (Haldeman, 2001; Isay, 2001). Such treatments can harm some men's understanding of their masculine identity (Haldeman, 2001; Schwartzberg & Rosenberg, 1998) and obscure other psychological issues that contribute to distress (Drescher, 1998b).

Schroeder and Shidlo (2001) identified aspects of SOCE that their participants perceived as negative, which included (a) receiving pejorative or false information regarding sexual orientation and the lives of LGB individuals; (b) encountering overly directive treatment (told not to be LGB) or to repress sexuality; (c) encountering treatments based on unsubstantiated theories or methods; (d) being misinformed about the likelihood of treatment outcomes (i.e., sexual orientation change); (e) receiving inadequate information about alternative options; and (f) being blamed for lack of progress of therapy. Some participants in Schroeder and Shidlo's (2001) study reported feeling coerced by their psychotherapist or religious institution to remain in treatment and pressured to represent to others that they had achieved a "successful reorientation" to heterosexuality.

## Religiously Oriented Mutual Support Groups

Much of the literature discusses the specific dynamics and processes of religiously oriented mutual self-help groups. A reduction of distress through sexual orientation identity reconstruction or development is described in the literature of self-help or religious groups, both for individuals who reject (Erzen, 2006; Ponticelli, 1999; Wolkomir, 2001, 2006) and for individuals who accept a minority sexual orientation identity (Kerr, 1997; Rodriguez, 2006; Rodriguez & Ouellette, 2000; Thumma, 1991; Wolkomir, 2006).

Ponticelli (1999) and Wolkomir (2001, 2006) found several emotional and cognitive processes that seemed central to the sexual orientation "identity reconstruction" (i.e., recasting oneself as ex-gay, heterosexual, disidentifying as LGB) (Ponticelli, 1999, p. 157) that appeared to relieve the distress caused by conflicts between religious values and sexual orientation (Ponticelli, 1999). Ponticelli identified certain conditions necessary for resolving identity conflicts, including (a) adopting a new discourse or worldview, (b) engaging in a biographical reconstruction, (c) embracing a new explanatory model, and (d) forming strong interpersonal ties. For those rejecting a sexual minority identity, these changes occurred by participants taking on "ex-gay" cultural norms and language and finding a community that enabled and reinforced their primary religious beliefs, values, and concerns. For instance, participants were encouraged to rely on literal interpretations of the Bible, Christian psychoanalytic theories about the causes of homosexuality, and "ex-gay" social relationships to guide and redefine their lives.

Interesting counterpoints to the SOCE support groups are LGB-affirming religious support groups. These groups employ similar emotional and cognitive strategies to provide emotional support, affirming ideologies, and identity reconstruction. Further, they appear to facilitate integration of same-sex sexual attractions and religious identities into LGB-affirming identities (Kerr, 1997; Thumma, 1991; Wolkomir, 2001, 2006).

Both sexual-minority-affirming and ex-gay mutual help groups potentially appear to offer benefits to their participants that are similar to those claimed for self-help groups, such as social support, fellowship, role models, and new ways to view a problem through unique philosophies or ideologies (cf. Levine, Perkins, & Perkins, 2004).

The philosophy of mutual help groups often gives a normalizing meaning to the individual's situation and may act as an "antidote" to a sense of deficiency (Antze, 1976). New scripts can shape how a member views and shares her or his life story by replacing existing personal or cultural scripts with the group ideology (Humphreys, 2004; Mankowski, 1997, 2000; Maton, 2000). For instance, individuals who are involved in SOCE or LGB-affirming groups may adopt a new explanation for their homosexuality that permits reconceptualizing themselves as heterosexual or acceptable as LGB people (Ponticelli, 1999; Wolkomir, 2001, 2006).

## Remaining Issues

Ponticelli (1999) ended her article with the following questions: "What leads a person to choose Exodus and a frame that defined them as sinful and in need of change?" (p. 170). Why do some individuals choose SOCE over sexual-minority-affirming groups, and why are some individuals attracted to and able to find relief in a particular ideology or group over other alternatives?

There are some indications that the nature and type of religious motivation and faith play a role. In comparing individuals with intrinsic[43] and quest religious motivations, Tozer and Hayes (2004) proposed that those with a greater intrinsic religiosity may be motivated to seek out SOCE more than those with the quest motivation. However, within both groups (intrinsic and quest motivation), internalized stigma influenced who sought SOCE; those who sought SOCE had higher levels of internalized stigma. Tozer and Hayes (2004) and Mahaffy (1996) found that individuals in earlier stages of sexual minority identity development (see, e.g., Cass, 1979; Troiden, 1993) were more likely to pursue SOCE.

Wolkomir (2001, 2006) found some evidence that biographical factors may be central to these choices. Wolkomir (2006) found that motivations for participation in faith distinguished individuals who joined ex-gay groups from sexual-minority-affirming groups. For instance, men who joined conservative Christian communities as a solution to lives that had been lonely and disconnected and those who turned to faith when they felt overwhelmed by circumstance were more likely to join ex-gay groups. Wolkomir hypothesized that these men perceived homosexuality as a threat to the refuge that conservative faith provided (cf. Glassgold, 2008).

The other common path to an ex-gay (as well as, to some degree, to a sexual-minority-affirming) group was remaining in the community of faith in which one was raised and meeting the expectations of that faith, such as heterosexuality. The loss of a personal relationship or a betrayal by a loved one might influence an individual's choice of a group, and the stress of loss and the self-blame that accompany such a loss may constitute factors that lead someone to seek SOCE (Wolkomir, 2001, 2006).

Additionally, Wolkomir found that a sense of gender inadequacy (see also "gender role strain"; Levant, 1992;

Pleck, 1995) made groups that embraced traditional gender roles and gender-based models of homosexuality appealing to some men. Gender-based internalized stigma and self-stigma increased distress in these men.

Finally, "contractual promises" to God (Wolkomir, 2001, p. 332) regarding other concerns (e.g., drug/alcohol abuse) increased the likelihood that men would choose ex-gay groups. However, these issues are as yet underresearched and remain unresolved.

Very little is known about the concerns of other religious faiths and diverse ethnicities and cultures (Harper et al., 2004; Miville & Ferguson, 2004). There are some studies in the empirical and theoretical literature, clinical cases, and material from other fields (e.g., anthropology, sociology) on sexual orientation among ethnic minorities and in different cultures and countries. Sexual orientation identity may be constructed differently in ethnic minority communities and internationally (Boykin, 1996; Carillo, 2002; Crawford et al., 2002; Harper et al., 2004; Mays, Cochran, & Zamudio, 2004; Miville & Ferguson, 2004; Walters, Evans-Campbell, Simoni, Ronquillo, & Bhuyan, 2006; B. D.Wilson & Miller, 2002; Zea, Diaz, & Reisen, 2003). There is some information that such populations experience distress or conflicts due to legal discrimination, cultural stigma, and other factors (McCormick, 2006), and in some other countries, homosexuality is still seen as a mental disorder or is illegal (Forstein, 2001; see also the publications of the International Gay & Lesbian Human Rights Commission: http://www.iglhrc.org). We did not identify empirical research on members of these populations who had sought or participated in SOCE other than as part of the research already cited.

## Summary and Conclusion

The recent literature on those who participate in SOCE identifies a population of predominantly White men who are strongly religious and participate in conservative faiths. This contrasts with the early research that included primarily nonreligious individuals. There is a lack of research on non-Christian individuals and limited information on ethnic minority populations, women, and nonreligious populations.

The religious individuals in the recent literature report experiencing serious distress, including depression, identity confusion, and fear due to the strong prohibitions of their faith regarding same-sex sexual orientation, behaviors, and relationships.

---

[43] Internal motivation refers to a motivation that focuses on belief and values as ends in themselves, and quest sees religion as a process of exploration.



These individuals struggle to combine their faiths and their sexualities in meaningful personal and social identities. These struggles cause them significant distress, including frequent feelings of isolation from both religious organizations and sexual minority communities. The ensuing struggles with faith, sexuality, and identity lead many individuals to attempt sexual orientation change through professional interventions and faith-based efforts.

These individuals report a range of effects from their efforts to change their sexual orientation, including both benefits and harm. The benefits include social and spiritual support, a lessening of isolation, an understanding of values and faith, and sexual orientation identity reconstruction. The perceived harms include negative mental health effects (depression and suicidality), decreased self-esteem and authenticity to others, increased self-hatred and negative perceptions of homosexuality, a loss of faith, and a sense of having wasted time and resources.

*Mutual self-help groups (whether affirming or rejecting of sexual minorities) may provide a means to resolve the distress caused by conflicts between religious values and sexual orientation.*

Mutual self-help groups (whether affirming or rejecting of sexual minorities) may provide a means of resolving the distress caused by conflicts between religious values and sexual orientation (Erzen, 2006; Kerr, 1997; Ponticelli, 1999; Thumma, 1991; Wolkomir, 2001, 2006). Sexual orientation identity reconstruction found in such groups (Ponticelli, 1999; Thumma, 1991) and identity work in general may provide reduction in individual distress (Beckstead & Morrow, 2004). Individuals may seek out sexual-minority-affirming religious groups or SOCE in the form of ex-gay religious support groups due to (a) a lack of other sources of social support; (b) a desire for active coping, including both cognitive and emotional coping (Folkman & Lazarus, 1980); and (c) access to methods of sexual orientation identity exploration and reconstruction (Ponticelli, 1999; Wolkomir, 2001).

The limited information provided by the literature on individuals who experience distress with their sexual attractions and seek SOCE provides some direction to LMHP in formulating affirmative interventions for this population. The following appear to be helpful to clients:

- Finding social support and interacting with others in similar circumstances

- Experiencing understanding and recognition of the importance of religious beliefs and concerns

- Receiving empathy for their very difficult dilemmas and conflicts

- Being provided with affective and cognitive tools for identity exploration and development

Reports of clients' perceptions of harm also provide information about aspects of interventions to avoid:

- Overly directive treatment that insists on a particular outcome

- Inaccurate, stereotypic, or unscientific information or lack of positive information about sexual minorities and sexual orientation

- The use of unsound or unproven interventions

- Misinformation on treatment outcomes

It is important to note that the factors that are identified as benefits are not unique to SOCE. An affirmative and multiculturally competent framework can mitigate the harmful aspects of SOCE by addressing sexual stigma while understanding the importance of religion and social needs. An approach that integrates the information identified in this chapter as helpful is described in an affirmative model of psychotherapy in Chapter 6.

# 6. THE APPROPRIATE APPLICATION OF AFFIRMATIVE THERAPEUTIC INTERVENTIONS FOR ADULTS WHO SEEK SEXUAL ORIENTATION CHANGE EFFORTS

Our charge was to "generate a report that includes discussion of "the appropriate application of affirmative therapeutic interventions for children, adolescents, and adults who present [themselves for treatment expressing] a desire to change either their sexual orientation or their behavioral expression of their sexual orientation." In this chapter, we report on affirmative interventions for adults. Affirmative interventions for children and adolescents are reported separately in Chapter 8.

The appropriate application of affirmative psychotherapy is based on the following scientific facts:

- Same-sex sexual attractions, behavior, and orientations per se are normal and positive variants of human sexuality; in other words, they are not indicators of mental or developmental disorders.

- Homosexuality and bisexuality are stigmatized, and this stigma can have a variety of negative consequences (e.g., minority stress) throughout the life span (D'Augelli & Patterson, 1995; DiPlacido, 1998; Herek & Garnets, 2007; Meyer, 1995, 2003).

- Same-sex sexual attractions and behavior can occur in the context of a variety of sexual orientations and sexual orientation identities (Diamond, 2006; Hoburg et al., 2004; Rust, 1996; Savin-Williams, 2005).

- Gay men, lesbians, and bisexual individuals can live satisfying lives as well as form stable, committed relationships and families that are equivalent to heterosexual relationships in essential respects

(APA, 2005c; Kurdek, 2001, 2003, 2004; Peplau & Fingerhut, 2007).

- There are no empirical studies or peer-reviewed research that support theories attributing same-sex sexual orientation to family dysfunction or trauma (Bell et al., 1981; Bene, 1965; Freund & Blanchard, 1983; Freund & Pinkava, 1961; Hooker, 1969; McCord et al., 1962; D. K. Peters & Cantrell, 1991; Siegelman, 1974, 1981; Townes et al., 1976).

## A Framework for the Appropriate Application of Affirmative Therapeutic Interventions

The task force findings that are relevant to the appropriate application of affirmative therapeutic interventions for adults are the following:

1. Our systematic review of the research on sexual orientation change efforts (SOCE)[44] found that enduring change to an individual's sexual orientation as a result of SOCE was unlikely. Further, some participants were harmed by the interventions.

---

[44] In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved.


54    Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation

PBC 007554

2. What appears to shift and evolve in some individuals' lives is sexual orientation identity, not sexual orientation (Beckstead, 2003; Beckstead & Morrow, 2004; Buchanan, et al., 2001; Cass, 1983/1984; Diamond, 1998, 2006; McConaghy, 1999; Ponticelli, 1999; Rust, 2003; Tan, 2008; Throckmorton & Yarhouse, 2006; Troiden, 1988; Wolkomir, 2001, 2006; R. L. Worthington, 2003, 2004).

3. Some participants in SOCE reported benefits, but the benefits were not specific to SOCE. Rather, clients perceived a benefit when offered interventions that emphasized acceptance, social support, and recognition of important values and concerns.

On the basis of theaw three findings and our comprehensive review of the research and clinical literature, we developed a framework for the appropriate application of affirmative therapeutic interventions for adults that has the following central elements: (a) acceptance and support, (b) a comprehensive assessment, (c) active coping, (d) social support, and (e) identity exploration and development.

## Acceptance and Support

In our review of the research and clinical literature, we found that the appropriate application of affirmative therapeutic interventions for adults presenting with a desire to change their sexual orientation has been grounded in a client-centered approach[45] (e.g., Astramovich, 2003; Bartoli & Gillem, 2008; Beckstead & Israel, 2007, Buchanan et al., 2001; Drescher, 1998b; Glassgold; 2008; Gonsiorek; 2004; Haldeman, 2004, Lasser & Gottlieb, 2004; Mark, 2008; Ritter & O'Neill, 1989, 1995; Tan, 2008; Throckmorton & Yarhouse, 2006; Yarhouse, 2008; Yarhouse & Tan, 2005a). The client-centered approach (Rogers, 1957; cf. Brown, 2006) stresses (a) the LMHP's unconditional positive regard for and congruence and empathy with the client, (b) openness to the client's perspective as a means of understanding their concerns, and (c) encouragement of the client's positive self-concept. This approach incorporates aspects of the therapeutic relationship that have been shown in the research literature to have a positive benefit, such as empathy, positive regard, and honesty (APA, 2005a, 2005b; Lambert & Barley, 2001; Norcross, 2002; Norcross & Hill, 2004).

[45] We consider the client-centered approach not as the ultimate theoretical basis of our model but as a foundation that is consistent with a variety of theoretical approaches, as most psychotherapy focuses on acceptance and support as a foundation of interventions.

This approach consists of empathic attunement to concerns regarding sexual orientation identity that acknowledges the role of cultural context and diversity and allows the different aspects of the evolving self to be acknowledged, explored, respected, and potentially rewoven into a more coherent sense of self that feels authentic to the client (Bartoli & Gillem, 2008; Beckstead & Morrow, 2004; Brown, 2006; Buchanan et al., 2001; Glassgold, 2008; Gonsiorek, 2004; Haldeman, 2004; Mark, 2008; Miville & Ferguson, 2004; Tan, 2008; Throckmorton & Yarhouse, 2006; Yarhouse, 2008). The empathic therapeutic environment aspires to be a place of compassionate caring and respect that facilitates development (Bronfennbrenner, 1979; Winnicott, 1965) by exploring issues without criticism or condemnation (Bartoli & Gillem, 2008; Beckstead & Morrow, 2004; McMinn, 2005; Throckmorton & Welton, 2005) and by reducing distress caused by isolation, stigma, and shame (Drescher, 1998b; Glassgold, 2008; Haldeman, 2004; Isay, 2001).

*The empathic therapeutic environment aspires to be a place of compassionate caring and respect that facilitates development… by exploring issues without criticism or condemnation and reducing distress caused by isolation, stigma, and shame.*

This approach involves empathizing with the client's desire to change his or her sexual orientation while understanding that this outcome is unlikely (Beckstead & Israel, 2007; Glassgold, 2008; Haldeman, 2004). Haldeman (2004) cautioned that LMHP who turn down a client's request for SOCE at the onset of treatment without exploring and understanding the many reasons why the client may wish to change may instill hopelessness in the client, who already may feel at a loss about viable options. Haldeman emphasized that before coming to a conclusion regarding treatment goals, LMHP should seek to validate the client's wish to reduce suffering and normalize the conflicts at the root of distress, as well as create a therapeutic alliance that recognizes the issues important to the client (cf. Beckstead & Israel, 2007; Glassgold, 2008; Liddle, 1996; Yarhouse, 2008).

Affirmative client-centered approaches consider sexual orientation to be uniquely individual and inseparable from an individual's personality and sense of self (Glassgold, 1995, 2008). This includes (a) being aware of the client's unique personal, social, and historical context; (b) exploring and countering the harmful impact of stigma and stereotypes on the

client's self-concept (including the prejudice related to age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status); and (c) maintaining a broad view of acceptable life choices. LMHP who work with religious clients who are distressed by their sexual orientation may wish to consult the literature from the psychology of religion. This literature reminds us that religion is a complex way of making meaning that includes not only beliefs and values but also community, relationships, traditions, family ties, coping, and social identity (Mark, 2008; Pargament & Mahoney, 2002, 2005; Pargament et al., 2005; Park, 2005).

> *LMHP who work with religious clients who are distressed by their sexual orientation may wish to consult the literature from the psychology of religion. This literature reminds us that religion is a complex way of making meaning that includes not only beliefs and values but also community, relationships, traditions, family ties, coping, and social identity.*

## A Comprehensive Assessment

In our review of the research and clinical literature, we found that the appropriate application of affirmative therapeutic interventions for adults presenting with a desire to change their sexual orientation included providing a comprehensive assessment in order to obtain a fuller understanding of the multiple issues that influence that client's presentation. Such an assessment allows the LMHP and client to see the client's sexual orientation as part of the whole person and to develop interventions based on all significant variables (Beckstead & Israel, 2007; Gonsiorek, 2004; Haldeman, 2004; Lasser & Gottlieb, 2004). This comprehensive assessment includes understanding how a client's distress may involve (a) psychological disequilibrium from trying to manage the stressors (e.g., anxiety, depression, substance abuse and dependence, sexual compulsivity, posttraumatic stress disorder) and (b) negative effects from developmental experiences and traumas and the impact of cultural and family norms. Assessing the influence of factors such as age, gender, gender identity, race, ethnicity, culture, national origin, religion, disability, language, and socioeconomic status on the experience and expression of sexual orientation and sexual orientation identity may aid the LMHP in understanding the complexity of the client's distress.

The literature indicated that most of the individuals who are extremely distressed about their same-sex sexual orientation and who are interested in SOCE have conservative religious beliefs. A first step to addressing the conflicts regarding faith and sexual orientation is a thorough assessment of clients' spiritual and religious beliefs, religious identity and motivations, and spiritual functioning (Exline, 2002; Hathaway, Scott, & Garver, 2004; Pargament et al., 2005). This helps the LMHP understand how the current dilemmas impact clients' spiritual functioning (and vice versa) and assess resources for growth and renewal.

This assessment could include (a) understanding the specific religious beliefs of the client; (b) assessing the religious and spiritual conflicts and distress experienced by the client (Hathaway et al., 2004); (c) assessing the client's religious goals (Emons & Paloutzian, 2003) and motivations (e.g., internal, external, quest, fundamentalism) and positive and negative ways of coping within his or her religion (Pargament, Koenig, Tasakeshwas, & Hahn, 2001; Pargament & Mahoney, 2005; Pargament et al., 1998); (d) seeking to understand the impact of religious beliefs and religious communities on the experience of the client's self-stigma, sexual prejudice, and sexual orientation identity (Beckstead & Morrow, 2004; Buchanan et al., 2001; Fulton et al., 1999; Herek, 1987; Hunsberger & Jackson, 2005; J. P. Schwartz & Lindley, 2005; Schulte & Battle, 2004); (e) developing an understanding of the client's faith identity development (Fowler, 1981, 1991; Oser, 1991; Reich, 1991; Streib, 2005) and its intersection with his or her sexual orientation identity development (Harris, Cook, & Kashubeck-West, 2008; Hoffman et al., 2007; Knight & Hoffman, 2007; Mahaffy, 1996; Yarhouse & Tan, 2005a; Yarhouse et al., 2005); and (f) enhancing with the client, when applicable, the search for meaning, significance, and a relationship with the definitions of the sacred in his or her life (Fowler, 2001; Goldstein, 2007; Pargament & Mahoney, 2005; Shafranske, 2000). Finally, an awareness of the varieties of religious faith, issues for religious minorities, and the unique role of religion in ethnic minority communities is important (Trujillo, 2000; Zea, Mason, & Muruia, 2000).

Some individuals who present with requests for SOCE may have clinical concerns that go beyond their sexual orientation conflicts. These may include mental health disorders, personality disorders, or trauma-related conditions that influence the presentation of sexual orientation conflicts and distress (cf. Brown, 2006; Drescher, 1998b; Glassgold, 2008; Haldeman,



2001; Iwasaki & Ristock, 2007; Lasser & Gottlieb, 2004; Mohr & Fassinger, 2003; S. L. Morrow, 2000; Pachankis et al., 2008; Schneider et al., 2002; Sherry, 2007; Szymanski & Kashubeck-West, 2008). Such conditions may require intervention separate from or in conjunction with the intervention directed at the sexual orientation distress. For instance, some clients who seek SOCE may have histories of trauma (Ponticelli, 1999), and in some individuals sexual abuse can cause sexual orientation identity confusion and other sexuality-related concerns (Gartner, 1999). Some heterosexual individuals may obsess over the fear of being gay and require a unique treatment model to help them accept their fear (M. Williams, 2008). Other individuals seeking SOCE may make homosexuality the explanation for all they feel is wrong with their lives (Beckstead & Morrow, 2004; Erzen, 2006; Ponticelli, 1999; Shidlo & Schroeder, 2002). This displacement of self-hatred onto homosexuality can be an attempt to resolve a sense of badness and shame (cf. Brandchaft, 2007; Drescher, 1998b), and clients may thus need effective interventions to deal with this self-hatred and shame (Brandchaft, 2007; Linehan, Dimeff, & Koerner, 2007; Zaslav, 1998).

Sexual stigma impacts a client's appraisal of sexuality, and since definitions and norms of healthy sexuality vary among individuals, LMHP, and religious and societal institutions, potential conflicts can arise for clients about what a person should do to be sexually acceptable and healthy. O'Sullivan, McCrudden, and Tolman (2006) emphasized that sexuality is an integral component of psychological health, involving mental and emotional health, physical health, and relational health.[46] Initiating sensitive but open and educated discussions with clients about their views of and experiences with sexuality may be helpful, especially for those who have never had the opportunity or the permission to talk about such issues (Schneider et al., 2002).

## Active Coping

In our review of the research and clinical literature, we found that the appropriate application of affirmative

therapeutic interventions for adults presenting with a desire to change their sexual orientation seeks to increase clients' capacity for active coping to mitigate distress. Coping strategies refer to the efforts that individuals use to resolve, endure, or diminish stressful life experiences, and active coping strategies are efforts that include cognitive, behavioral, or emotional responses designed to change the nature of the stressor itself or how an individual perceives it (Folkman & Lazarus, 1980). Research has indicated that active coping is superior to other efforts, such as passive coping, and that individuals use both cognitive and emotional strategies to address stressful events (Folkman & Lazarus, 1980). These strategies are described in more depth in the following sections.

> *Active coping strategies are efforts that include cognitive, behavioral, or emotional responses designed to change the nature of the stressor itself or how an individual perceives it.*

### COGNITIVE STRATEGIES

Research on those individuals who resolve their sexual orientation conflicts indicate that cognitive strategies helped to reduce cognitive dissonance (Coyle & Rafalin, 2000; Mahaffy, 1996). One of the dilemmas for many clients who seek sexual orientation change is that they see their situation as a dichotomy. For instance, their same-sex sexual attractions make them unworthy or bad, and only if they are heterosexual can they be worthy (Beckstead & Morrow, 2004; Haldeman, 2001, 2004; Lasser & Gottlieb, 2004; D. F. Morrow, 2003; Wolkomir, 2001, 2006). Cognitive strategies can reduce the all-or-nothing thinking, mitigate self-stigma, and alter negative self-appraisals (Beckstead & Israel, 2007; Johnson, 2001, 2004; Lasser & Gottlieb, 2004; Martell et al., 2004). For example, Buchanan et al. (2001), using a narrative therapy approach, described a process of uncovering and deconstructing dominant worldviews and assumptions with conflicted clients that enabled them to redefine their attitudes toward their spirituality and sexuality (cf. Bright, 2004; Comstock, 1996; Graham, 1997; Yarhouse, 2008). Similarly, rejection of stereotypes about LGB individuals was found to be extremely important for increased psychological well-being in a mixed sample of LGB individuals (Luhtanen, 2003).

Recent developments in cognitive–behavior therapy, such as mindfulness-based cognitive therapy, dialectical

---

[46] The Pan American Health Organization and the World Health Organization (2000) defined sexual health in the following manner: "Sexual health is the ongoing process of physical, psychological, and sociocultural well-being in relationship to sexuality. Sexual health can be identified through the free and responsible expressions of sexual capabilities that foster harmonious personal and social wellness, enriching life within an ethical framework. It is not merely the absence of dysfunction, disease and/or infirmity. For sexual health to be attained and maintained it is necessary that sexual rights be recognized and exercised" (p. 9).

behavior therapy, and acceptance and commitment therapy techniques are relevant (e.g., Hayes, Strosahl, & Wilson, 2003; Linehan et al., 2007). Acceptance of the presence of same-sex sexual attractions and sexual orientation paired with

*Acceptance of same-sex sexual attractions and sexual orientation may not mean the formation of an LGB sexual orientation identity; alternate identities may develop instead.*

exploring narratives or reframing cognitions, meanings, or assumptions about sexual attractions have been reported to be helpful (cf. Beckstead & Morrow, 2004; Buchanan et al., 2001; Moran, 2007; Rodriguez, 2006; Tan, 2008; Yarhouse, 2005a, 2005c; Yarhouse & Beckstead, 2007). For instance, using these techniques, Beckstead and Morrow (2004) and Tan (2008) found that clients were able to cope with their sexual arousal experiences and live with them rather than negatively judge or fight against them. Male participants in Beckstead and Morrow's (2004) investigation, regardless of their ultimate sexual orientation identity, described their ability to accept, reframe, or "surrender" to their attractions as reducing their distress by decreasing their self-judgments and reducing their fear, anxiety, and shame. However, acceptance of same-sex sexual attractions and sexual orientation may not mean the formation of an LGB sexual orientation identity; alternate identities may develop instead (Beckstead & Morrow, 2004; Tan, 2008; Throckmorton & Yarhouse, 2006; Yarhouse, 2008; Yarhouse et al., 2005).

For clients with strong values (religious or secular), an LMHP may wish to incorporate techniques that promote positive meaning-making, an active process through which people revise or reappraise an event or series of events (Baumeister & Vohs, 2002; cf. Taylor, 1983) to resolve issues that arise out of crises, loss, and suffering (cf. Frankl, 1992; Nolen-Hoeksema & Davis, 2002; O'Neill & Ritter, 1992; Pargament et al., 2005; Ritter & O'Neill, 1989, 1995). Such new meanings involve creating a new purpose in life, rebuilding a sense of mastery, and increasing self-worth (Nolen-Hoeksema & Davis, 2002; Pargament & Mahoney, 2002).

## EMOTION-FOCUSED STRATEGIES

For those who seek SOCE, the process of addressing one's sexual orientation can be very emotionally challenging, as the desired identity does not fit the individual's psychological, emotional, or sexual predispositions and needs. The experience of irreconcilability of one's sexual orientation to one's deeply felt values, life situation, and life goals may disrupt one's core sense of meaning, purpose, efficacy, and self-worth (Beckstead & Morrow, 2004; Yarhouse, 2008; cf. Baumeister & Vohs, 2002; L. A. King & Smith, 2004) and result in emotional conflict, loss, and suffering (Glassgold, 2008; O'Neill & Ritter, 1992; Ritter & O'Neill, 1989, 1995). Thus, emotion-focused strategies that facilitate mourning losses have reportedly been helpful to some (Beckstead & Israel, 2007; Glassgold, 2008; O'Neill & Ritter, 1992; Ritter & O'Neill, 1989, 1995; Yarhouse, 2008; cf. Wolkomir, 2001, 2006).

Therapeutic outcomes that have been reported include (a) coming to terms with the disappointments and losses and with the dissonances between psychological and emotional needs and possible and impossible selves (Bartoli & Gillem, 2008; Drescher, 1998b; L.A. King & Hicks, 2007; O'Neill & Ritter, 1992; Ritter & O'Neill, 1989, 1995); (b) clarifying and prioritizing values and needs (Glassgold, 2008; Yarhouse, 2008); and (c) learning to tolerate and adapt to the ambiguity, conflict, uncertainty, and multiplicity with a positive attitude (Bartoli & Gillem, 2008; Beckstead & Morrow, 2004; Buchanan et al., 2001; Corbett, 2001; Drescher, 1998b; Glassgold, 2008; Halbertal & Koren, 2006; Haldeman, 2002; Miville & Ferguson, 2004).

## RELIGIOUS STRATEGIES

Although many individuals desire to live their lives consistently with their values, primarily their religious values, we concluded that telic congruence grounded in self-stigma and shame was unlikely to result in psychological well-being (Beckstead & Morrow, 2004; Glassgold, 2008; Gonsiorek, 2004; Haldeman, 2004; Mark, 2008; Shidlo & Schroeder, 2002). Psychotherapeutic interventions can focus the client on positive religious coping (e.g., Ano &

*Connecting clients to core and overarching values and virtues such as charity, hope, forgiveness, gratitude, kindness, and compassion may shift the focus from their religion's rejection of homosexuality to the more accepting elements of their religion, which may provide more self-acceptance, direction, and peace.*

Vasconcelles, 2005; Pargament et al., 2005; Park, 2005; Silberman, 2005; T. B. Smith, McCullough, & Poll,



PBC-007558

2003) that may present the client with alternatives to the concreteness of the conflict between sexual orientation and religious values. For instance, several publications indicate that active engagement with religious texts can reduce identity conflicts by reducing the salience of negative messages about homosexuality and increasing self-authority or understanding (Brzezinski, 2000; Comstock, 1996; Coyle & Rafalin, 2000; Glassgold, 2008; Gross, 2008; Mahaffy, 1996; Ritter & O'Neill, 1989, 1995; Rodriguez, 2006; Rodriguez & Ouellette, 2000; Schnoor, 2006; Schuck & Liddle, 2001; Thumma, 1991; Wilcox, 2001, 2002; Yip, 2002, 2003, 2005). Additionally, connecting clients to core and overarching values and virtues such as charity, hope, forgiveness, gratitude, kindness, and compassion may shift the focus from their religion's rejection of homosexuality to the more accepting elements of their religion, which may provide more self-acceptance, direction, and peace (Lease et al., 2005; McMinn, 2005). Exploration of how to integrate religious values and virtues into their sexuality may further development (cf. Helminiak, 2004).

Reframing the meaning of suffering and the burden of being conflicted as spiritual challenges rather than as divine condemnation (Glassgold, 2008; Hall & Johnson, 2001) and believing that God continues to love and accept them, because of or despite their sexual orientation, may be helpful in resolving distress (Graham, 1997; Ritter & O'Neill, 1989, 1995). For some, reframing spiritual struggles not only as a crisis of faith but also as an opportunity to increase faith or delve more deeply into it may be productive (Bartoli & Gillem, 2008; de la Huerta, 1999; Glassgold, 2008; Horne & Noffisnger-Frazier, 2003, Ritter & Terndrup, 2002).

Examining the intersection between mental health concerns and the presentation of religious beliefs can be helpful in understanding the client (Johnson, 2001, 2004; Nielsen, 2001; Pargament et al., 2005; Robb, 2001; Shrafranske, 2004). For instance, Johnson (2004) described a rational emotive behavior therapy case study that focused on reducing excessive self-criticism, which lessened the self-stigma surrounding same-sex sexual attractions. This approach seeks to understand the core depressive cognitive structures and other problematic schemata that can become associated with the clients' religious values or distort their religious values (Johnson, 2001, 2004; Nielsen, 2001; Robb, 2001).

## Social Support

In our review of the research and clinical literature, we found that the appropriate application of affirmative therapeutic interventions for adults presenting with a desire to change their sexual orientation seeks to increase clients' access to social support. As Coyle (1993) and others have noted (e.g., Wright & Perry, 2006), struggling with a devalued identity without adequate social support has the potential to erode psychological well-being. Increasing social support through psychotherapy, self-help groups, or welcoming communities (ethnic communities, social groups, religious denominations) may relieve some distress. For instance, participants reported benefits from mutual support groups, both sexual-minority-affirming and ex-gay groups (Kerr, 1997; Ponticelli, 1999; Rodriguez, 2006; Rodriguez & Ouellette, 2000; Rodriguez, 2006; Thumma, 1991; Wolkomir, 2001). These changes counteracted and buffered minority stress, marginalization, and isolation. Religious denominations that provide cognitive and affective strategies that aid in the resolution of cognitive dissonance and increase religious coping were helpful to religious individuals as well (Kerr, 1997; Maton, 2000; Ponticelli, 1999; Rodriguez & Ouellette, 2000: Wolkomir, 2001, 2006).

LMHP can provide clients with information about a wide range of diverse sexual minority communities and religious and faith organizations available locally, nationally, or internationally in person or over the Internet.[47] These settings can provide contexts in which clients may explore and integrate identities, find role models, and reduce self-stigma (Heinz, Gu, Inuzuka, & Zender, 2002; Johnson & Buhrke, 2006; Schneider et al., 2002). However, some groups may reinforce prejudice and stigma by providing inaccurate or stereotyped information about homosexuality, and LMHP may wish to weigh with clients alternative options in these circumstances (Schneider et al., 2002).

For those clients who cannot express all aspects of themselves in the community settings currently available to them, LMHP can help the client to consider more flexible and strategic ways of expressing the multiple aspects of self that include managing self-disclosure and multiple identities (Bing, 2004; Glassgold, 2008; Halbertal & Koran, 2006; LaFromboise, Coleman, & Gerton, 1993). Social support may be difficult to find

---

[47] There are growing numbers of communities available that address unique concerns and identities (see, e.g., www.safraproject.org/ for Muslim women or http://www.al-fatiha.org/ for LGB Muslims; for Orthodox Jews, see http://tirtzah.wordpress.com/).

for clients whose communities stigmatize their sexual orientation identity and other identities (e.g., ethnic, racial, religious), and these clients may benefit from considering the alternate frame that the problem does not lie with the client but with the community that is not able to affirm their sexual orientation or particular identity or meet their developmental needs (Blechner, 2008; Buchanan et al., 2001; Lasser & Gottlieb, 2004; Mark, 2008; Tremble, 1989).

Individuals with same-sex attractions in other-sex marriages may struggle with the loss (or fear of the loss) of social support and important relationships. Several authors (e.g., Alessi, 2008; Auerback & Moser, 1987; Bridges & Croteau, 1994; Brownfain, 1985; Buxton, 1994, 2001, 2004, 2007; Carlsson, 2007; Coleman, 1989; Corley & Kort, 2006; Gochros, 1989; Hernandez & Wilson, 2007; Isay, 1998; Klein & Schwartz, 2001; Malcolm, 2000; Schneider et al. 2002; Treyger, Ehlers, Zajicek, & Trepper, 2008; Yarhouse et al., 2003) have laid out counseling strategies for individuals in marriages with the other sex who consider SOCE. These strategies for individual, couples, and group counseling do not focus solely on one outcome (e.g., divorce, marriage) but on exploring the underlying personal and contextual problems, motivations, realities, and hopes for being in, leaving, or restructuring the relationship.

## Identity Exploration and Development

In our review of the research and clinical literature, we found that identity issues, particularly the ability to explore and integrate aspects of the self, are central to the appropriate application of affirmative therapeutic interventions for adults presenting with a desire to change their sexual orientation. As described in earlier sections of this report, conflicts among disparate elements of identity appear to play a major role in the distress of those seeking SOCE, and identity exploration and development appear to be ways in which individuals resolve or avoid distress (e.g., Balsam & Mohr, 2007; Beckstead & Morrow, 2004; Coyle & Rafakin, 2000; Drescher, 1998b; Glassgold, 2008; Herek & Garnets, 2007; Mahaffy, 1996; Yarhouse et al., 2005; Yip, 2002, 2003, 2005).

Ideally, identity comprises a coherent sense of one's needs, beliefs, values, and roles, including those aspects of oneself that are the bases of social stigma, such as age, gender, race, ethnicity, disability, national origin, socioeconomic status, religion, spirituality, and sexuality (G. R. Adams & Marshall, 1996; Bartoli & Gillem, 2008; Baumeister & Vohs, 2002; LaFramboise

et al., 1993; Marcia, 1966; Meyers et al., 1991; R. L. Worthington et al., 2002). Marcia (1966) generated a model in which identity development is an active process of exploring and assessing one's identity and establishing a commitment to an integrated identity. R. L. Worthington et al. (2002) hypothesized that sexual orientation identity could be conceptualized along these same lines and advanced a model of heterosexual identity development based on the assumption that congruence among the dimensions of individual identity is the most adaptive status, which is achieved by active exploration. There is some empirical research supporting this model (R. L. Worthington, Navarro, Savoy, & Hampton, 2008). Additionally, research has found that the formation of a collective identity has important mental health benefits for sexual minorities by buffering individuals from sexual stigma and increasing self-esteem (Balsam & Mohr, 2007; Crawford et al., 2002; Herek & Garnets, 2007).

*An affirmative approach is supportive of clients' identity development without an a priori treatment goal for how clients identify or live out their sexual orientation.*

An affirmative approach is supportive of clients' identity development without an a priori treatment goal for how clients identify or live out their sexual orientation. Sexual orientation identity exploration can be helpful for those who eventually accept or reject their same-sex sexual attractions; the treatment does not differ, although the outcome does. For instance, the existing research indicates that possible outcomes of sexual orientation identity exploration for those distressed by their sexual orientation may be:

- LGB identities (Glassgold, 2008; Haldeman, 2004; Mahaffy, 1996; Yarhouse, 2008)

- Heterosexual sexual orientation identity (Beckstead & Morrow, 2004)

- Disidentifying from LGB identities (e.g., ex-gay) (Yarhouse, 2008; Yarhouse & Tan, 2004; Yarhouse et al., 2005)

- Not specifying an identity (Beckstead & Morrow, 2004; Haldeman, 2004; Tan, 2008)

The research literature indicates that there are variations in how individuals express their sexual orientation and label their identities based on ethnicity,



culture, age and generation, gender, nationality, acculturation, and religion (Boykin, 1996; Carrillo, 2002; Chan, 1997; Crawford et al., 2002; Denizet-Lewis, 2003; Kimmel & Yi, 2004; Martinez & Hosek, 2005; Miville & Ferguson, 2004; Millett, Malebranche, Mason, & Spikes, 2005; Stokes, Miller, & Mundhenk, 1998; Toro-Alfonso, 2007; Weeks, 1995; Yarhouse, 2008; Yarhouse et al., 2005; Zea et al., 2003). Some authors have provided analyses of identity that take into account diversity in sexual identity development and ethnic identity formation (Helms, 1995; LaFramboise et al., 1993; Myers et al., 1991; Yi & Shorter-Gooden, 1999), religious identity (Fowler, 1981, 1991; Oser, 1991; Strieb, 2001), as well as combinations of religious and sexual orientation identities (Coyle & Rafalin, 2000; Hoffman et al., 2007; Kerr, 1997; Knight & Hoffman, 2007; Ritter & O'Neill, 1989, 1995; Thumma, 1991; Throckmorton & Yarhouse, 2006; Yarhouse & Tan 2004).

In some of the literature on SOCE, religious beliefs and identity are presented as fixed, whereas sexual orientation is considered changeable (cf. Rosik, 2003). Given that there is a likelihood that some individuals will change religious affiliations during their lifetime (Pew Forum on Religion and Public Life, 2008) and that many scholars have found that both religious identity and sexual orientation identity evolve (Beckstead & Morrow, 2004; Fowler, 1981; Glassgold, 2008; Haldeman, 2004; Mahaffy, 1996; Ritter & Terndrup, 2002; Yarhouse & Tan, 2005b), it is important for LMHP to explore the development of religious identity and sexual orientation identity (Bartoli & Gillem, 2008). Some authors hypothesize that developmental awareness or stage of religious or sexual orientation identity may play a role in identity outcomes (Knight & Hoffman, 2007; Mahaffy, 1996; cf. Yarhouse & Tan, 2005a). Other authors have described a developmental process that includes periods of crisis, mourning, reevaluation, identity deconstruction, and growth (Comstock, 1996; O'Neill & Ritter, 1992; Ritter & O'Neill, 1989, 1995). Others have found that individuals disidentify or reject LGB identities (Ponticelli, 1999; Wolkomir, 2001, 2006; Yarhouse et al., 2005). Thus, LMHP seeking to take an affirmative attitude recognize that individuals will define sexual orientation identities in a variety of ways (Beckstead, as cited in Shidlo, Schroeder, & Drescher, 2002; Diamond, 2003; 2006; 2008; Savin-Williams, 2005; Yarhouse et al., 2005).

Some religious individuals may wish to resolve the tension between values and sexual orientation by choosing celibacy (sexual abstinence), which in some faiths, but not all, may be a virtuous path (Olson, 2007).

We found limited empirical research on the mental health consequences of that course of action.[48] Some clinical articles and surveys of individuals indicate that some may find such a life fulfilling (S. L. Jones & Yarhouse, 2007); however, there are others who cannot achieve such a goal and might struggle with depression and loneliness (Beckstead & Morrow, 2004; Glassgold, 2008; Haldeman, 2001; Horlacher, 2006; Rodriguez, 2006; Shidlo & Schroeder, 2002). In a similar way, acting on same-sex sexual attractions may not be fulfilling solutions for others (Beckstead & Morrow, 2004; Yarhouse, 2008).

LMHP may approach such a situation by neither rejecting nor promoting celibacy but by attempting to understand how this outcome is part of the process of exploration, sexual self-awareness, and understanding of core values and goals. The therapeutic process could entail exploration of what drives this goal for clients (assessing cultural, family, personal context and issues, sexual self-stigma), the possible short- and long-term consequences/rewards, and impacts on mental health while providing education about sexual health and exploring how a client will cope with the losses and gains of this decision (cf. L. A. King & Hicks, 2007; Ritter & O'Neill, 1989, 1995).

On the basis of the aforementioned analyses, we adopted a perspective that recognizes the following:

- The important functional aspects of identity (G. R. Adams & Marshall, 1996).

- The multiplicity inherent in experience and identity, including age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status (Bartoli & Gillem, 2008; Miville & Ferguson, 2004; Myers et al., 1991).

- The influence of social context and the environment on identity (Baumeister & Muraven, 1996; Bronfenbrenner, 1979; Meeus, Iedema, Helsen, & Vollebergh, 1999; Myers et al., 1991; Steenbarger, 1991).

- That aspects of multiple identities are dynamic and can be in conflict (Beckstead & Morrow, 2004; Glassgold, 2008; Mark, 2008; D. F. Morrow, 2003; Tan, 2008; Yarhouse, 2008).

---

[48] However, Sipe (1990, 2003) has surveyed clergy and found difficulty in maintaining behavior consistent with aspirations. Other studies indicate that this goal is only achieved for a minority of participants who choose it (Brzezinski, 2000; S. L. Jones & Yarhouse, 2007).

- Identities can be explored, experienced, or integrated without privileging or surrendering one or another at any age (Bartoli & Gillem, 2008; Glassgold, 2008; Gonsiorek, 2004; Haldeman, 2004; Myers et al., 1991; Phillips, 2004; Shallenberger, 1996).

Approaches based on models of biculturalism (LaFromboise et al., 1993) and pluralistic models of identity, including combining models of ethnic, sexual orientation, and religious identity that help individuals develop all aspects of self simultaneously or some sequentially, can encourage identity development and synthesis rather than identity conflict, foreclosure, or compartmentalization (Dworkin, 1997; Harris et al., 2008; Hoffman et al., 2007; Knight & Hoffman, 2007; Myers et al., 1991; Omer & Strenger, 1992; Ritter & O'Neill, 1989, 1995; Rosario, Schrimshaw, & Hunter, 2004; Rosario, Yali, Hunter, & Gwadz, 2006; Sophie, 1987; Troiden, 1988, 1993).

Sexual orientation identity exploration can help clients create a valued personal and social identity that provides self-esteem, belonging, meaning, direction, and future purpose, including the redefining of religious beliefs, identity, and motivations and the redefining of sexual values, norms, and behaviors (Beckstead & Israel, 2007; Glassgold, 2008; Haldeman, 2004; Mark, 2008; Tan, 2008; Yarhouse, 2008). We encourage LMHP to support clients in determining their own (a) goals for their identity process; (b) behavioral expression of sexual orientation; (c) public and private social roles; (d) gender role, identity, and expression; (e) sex and gender of partner; and (f) form of relationship(s).

Understanding gender roles and gender expression and developing a positive gender identity[49] continue to be concerns for many individuals who seek SOCE, especially as nonconformity with social expectations regarding gender can be a source of distress and stigma (APA, 2008e; Beckstead & Morrow, 2004; Corbett, 1996, 1998; Wolkomir, 2001). Some SOCE teach men how to adopt traditional masculine behaviors as a means of altering their sexual orientation (e.g., Nicolosi, 1991, 1993) despite the absence of evidence that such interventions affect sexual orientation. Such theoretical positions have been characterized as products of stigma and bias that are without an evidentiary basis

and may increase distress (American Psychoanalytic Association, 2000; Isay, 1987, 1999; Drescher, 1998b; Haldeman, 1994, 2001). For instance, Haldeman (2001) emphasized in his clinical work with men who had participated in SOCE that some men were taught that their homosexuality made them less masculine—a belief that was ultimately damaging to their self-esteem. Research on the impact of heterosexism and traditional gender roles indicates that an individual's adoption of traditional masculine norms increases sexual self-stigma and decreases self-esteem and emotional connection with others, thus negatively affecting mental health (Szymanski & Carr, 2008).

Advances in the psychology of men and masculinity provide more appropriate conceptual models for considering gender concerns—for instance, in such concepts as gender role strain or gender role stress (cf. Butler, 2004; Enns, 2008; Fischer & Good, 1997; Heppner & Heppner, 2008; Levant, 1992; Levant & Silverstein, 2006; O'Neil, 2008; Pleck, 1995; Wester, 2008). This literature suggests exploring with clients the role of traditional gender norms in distress and reconceptualizing gender in ways that feel more authentic to the client. Such approaches could also reduce the gender stereotypes associated with same-sex sexual orientation (Corbett, 1998; Haldeman, 2001; Schwartzberg & Rosenberg, 1998).

*Most literature in this area suggests that for clients who experience distress with their gender-role nonconformity, LMHP provide them with a more complex theory of gender that affirms a wider range of gender diversity and expands definitions and expressions of masculinity and femininity.*

Most literature in this area suggests that for clients who experience distress with their gender-role nonconformity, LMHP provide them with a more complex theory of gender that affirms a wider range of gender diversity and expands definitions and expressions of masculinity and femininity (Butler, 2004; Corbett, 1996, 1998, 2001; Haldeman, 2001; Levant & Silverstein, 2006).

Some women find current categories for conceptualizing their sexual orientation and sexual orientation identity limiting, as concepts in popular culture and professional literature do not mirror their experiences of fluidity and variation in sexuality and relationships (Chivers et al., 2007; Diamond, 2006, 2008; Peplau & Garnets, 2000). Some women, for example, may experience relationships with others as

---

[49] *Gender* refers to the roles, behaviors, activities, and attributes that a particular society considers appropriate for men and women. *Gender identity* is a person's own psychological sense of identification as male or female, another gender, or identifying with no gender. *Gender expression* is the activities and behaviors that purposely or inadvertently communicate our gender identity to others, such as clothing, hairstyles, mannerisms, way of speaking, and social roles.



important parts of sexuality and may place sexuality, sexual orientation, and sexual orientation identity in the context of interpersonal bonds and contexts (Diamond, 2003, 2006, 2008; Diamond & Savin-Williams, 2000; Garnets & Peplau, 2000; Kinnish, Strassberg, & Turner 2005; Kitzinger, & Wilkinson, 1994; Miller, 1991; Morgan & Thompson, 2006; Peplau & Garnets, 2000; Surrey, 1991). Specific psychotherapy approaches that focus on an understanding of emotional and erotic interpersonal connections in sexuality rather than simply on sexual arousal can aide LMHP in providing a positive framework and goals for therapy with women (Garnets & Peplau, 2000; Glassgold, 2008; Miller, 1991; Surrey, 1991).

For many women, religious or cultural influences discourage exploration of sexuality and do not portray female sexuality as positive or self-directed (Brown, 2006; Espin, 2005; Fassinger & Arseneau, 2006; Mahoney & Espin, 2008; Moran, 2007; Stone, 2008). Treatment might involve deconstructing cultural scripts in order to explore possibilities for religion, sexuality, sexual orientation, identity, and relationships (Avishai, 2008; Biaggio, Coan, & Adams, 2002; Morgan & Thompson, 2006; Rose & Zand, 2000).

# Conclusion

The appropriate application of affirmative therapeutic interventions to adults is built on three key findings in the research: (a) An enduring change to an individual's sexual orientation as a result of SOCE was unlikely, and some participants were harmed by the interventions; (b) sexual orientation identity—not sexual orientation—appears to change via psychotherapy, support groups, and life events; and (c) clients perceive a benefit when offered interventions that emphasize acceptance, support, and recognition of important values and concerns.

On the basis of these findings and the clinical literature on this population, we suggest client-centered approaches grounded on the following scientific facts:

- Same-sex sexual attractions, behavior, and orientations per se are normal and positive variants of human sexuality—in other words, they are not indicators of mental or developmental disorders.

- Same-sex sexual attractions and behavior can occur in the context of a variety of sexual orientations and sexual orientation identities.

- Gay men, lesbians, and bisexual individuals can live satisfying lives as well as form stable, committed relationships and families that are equivalent to heterosexual relationships in essential respects.

- No empirical studies or peer-reviewed research support theories attributing same-sex sexual orientation to family dysfunction or trauma.

Affirmative client-centered approaches consider sexual orientation uniquely individual and inseparable from an individual's personality and sense of self (Glassgold, 1995, 2008). This includes (a) being aware of the client's unique personal, social, and historical context; (b) exploring and countering the harmful impact of stigma and stereotypes on the client's self-concept (including the prejudice related to age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status); and (c) maintaining a broad view of acceptable life choices.

*Psychotherapy, self-help groups, or welcoming communities (ethnic communities, social groups, religious denominations) provide social support that can mitigate distress caused by isolation, rejection, and lack of role models.*

We developed a framework for the appropriate application of affirmative therapeutic interventions for adults that has the following central elements: (a) acceptance and support, (b) comprehensive assessment, (c) active coping, (d) social support, and (e) identity exploration and development.

Acceptance and support include (a) unconditional positive regard for and empathy with the client, (b) an openness to the client's perspective as a means of understanding their concerns, and (c) encouragement of the client's positive self-concept.

Comprehensive assessment includes an awareness of the complete person, including mental health concerns that could impact distress about sexual orientation.

Active coping strategies are efforts that include cognitive, behavioral, or emotional responses designed to change the nature of the stressor itself or how an individual perceives it and includes both cognitive and emotional strategies.

Psychotherapy, self-help groups, or welcoming communities (ethnic communities, social groups, religious denominations) provide social support that can

mitigate distress caused by isolation, rejection, and lack of role models.

Conflicts among disparate elements of identity play a major role in the conflicts and mental health concerns of those seeking SOCE. Identity exploration is an active process of exploring and assessing one's identity and establishing a commitment to an integrated identity that addresses the identity conflicts without an a priori treatment goal for how clients identify or live out their sexual orientation. The process may include a developmental process that includes periods of crisis, mourning, reevaluation, identity deconstruction, and growth.

LMHP address specific issues for religious clients by integrating aspects of the psychology of religion into their work, including obtaining a thorough assessment of clients' spiritual and religious beliefs, religious identity and motivations, and spiritual functioning; improving positive religious coping; and exploring the intersection of religious and sexual orientation identities. This framework is consistent with modern multiculturally competent approaches and evidence-based psychotherapy practices and can be integrated into a variety of theoretical systems.



# 7. ETHICAL CONCERNS AND DECISION MAKING IN PSYCHOTHERAPY WITH ADULTS[50]

Ethical concerns relevant to sexual orientation change efforts (SOCE)[51] have been a major theme in the literature and a central aspect of the debate around SOCE (e.g., Benoit, 2005; Cramer et al., 2008; Davison, 1976, 1978, 1991; Drescher, 1999, 2001, 2002; Gonsiorek, 2004; Haldeman, 1994, 2002, 2004; Herek, 2003; Lasser & Gottlieb, 2004; Rosik, 2003; Schreier, 1998; Schroeder & Shidlo, 2001; Sobocinski, 1990; Tozer & McClanahan, 1999; Wakefield, 2003; Yarhouse, 1998a; Yarhouse & Burkett, 2002; Yarhouse & Throckmorton, 2002). The major concerns raised in these publications have been (a) the potential for harm, (b) the client's right to choose SOCE and other issues generally related to the ethical issue of client autonomy, and (c) questions of how to appropriately balance respect for two aspects of diversity—religion and sexual orientation. SOCE presents an ethical dilemma to practitioners because these publications have urged LMHP to pursue multiple and incompatible courses of action (cf. Kitchener, 1984).

In 1997 APA adopted the Resolution on Appropriate Therapeutic Responses to Sexual Orientation (APA, 1998). This resolution highlighted the provisions of the then-current *Ethical Principles for Psychologists and Code of Conduct* (APA, 1992) that APA believed to be relevant to situations in which clients request treatments to alter sexual orientation and psychologists provide such treatments, including the provisions regarding bias and discrimination, false or deceptive information, competence, and informed consent to treatment. For a discussion of the resolution's application to clinical situations, readers are referred to Schneider et al. (2002). In the resolution, APA also reaffirmed (a) its position that homosexuality is not a mental disorder; (b) its opposition to stigma, prejudice, and discrimination based on sexual orientation; and (c) its concern about the contribution of the promotion of SOCE to the continuation of sexual stigma in U.S. culture.

The APA's charge to the task force included "to review and update the APA Resolution on Appropriate Therapeutic Responses to Sexual Orientation." In the process of fulfilling this aspect of our charge, we considered the possibility of recommending revisions to the 1997 resolution to update it with the specific principles and standards of the 2002 APA Ethics Code. Ultimately, we decided against a revision,[52] because the relevant concepts in the two versions of the principles and code are similar. Instead, this chapter examines the relevant sections of the 2002 APA *Ethical Principles for Psychologists and Code of Conduct* [hereafter referred to as the Ethics Code] in light of current debates regarding

---

[50] Ethical concerns for children and adolescents are considered in Chapter 8.

[51] In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved.

[52] We developed a new resolution that APA adopted in August 2009 (see Appendix A)..

ethical decision making in this area.[53] We build our discussion on the concepts outlined in the 1997 resolution and discuss some of the ethical controversies in light of the newer APA Ethics Code (2002b) and of the systematic research presented in Chapters 3 and 4 of this report. Although many of the principles and standards in the Ethics Code are potentially pertinent,[54] the principles and standards most relevant to this discussion are (in alphabetical order):

1. Bases for Scientific and Professional Judgments (Standard 2.04) and Competence (e.g., 2.01a, 2.01b)[55]

2. Principle A: Beneficence and Nonmaleficence

3. Principle D: Justice

4. Principle E: Respect for People's Rights and Dignity

## Bases for Scientific and Professional Judgments and Competence

Many of the standards of the Ethics Code are derived from the ethical and valuative foundations found in the principles (Knapp & VandeCreek, 2004). Two of the more important standards are competence and the bases for scientific and professional judgments. These standards are linked, as competence is based on knowledge of the scientific evidence relevant to a case (Glassgold & Knapp, 2008). When practicing with those who seek sexual orientation change for themselves or for others, commentators on ethical practice have recommended that the practitioner understand the scientific research on sexual orientation and SOCE (Glassgold & Knapp, 2008; Schneider et al., 2002). It is obviously beyond the task force's scope to provide a systematic review of the whole body of research on sexual orientation, but we have tried to provide a systematic review of the research on SOCE in Chapters 3 and 4. From this review, we have drawn two key conclusions.

The first finding from our review is that there is insufficient evidence that SOCE are efficacious for changing sexual orientation. Furthermore, there is some evidence that such efforts cause harm. On the basis of this evidence, we consider it inappropriate for psychologists and other LMHP to foster or support in clients the expectation that they will change their sexual orientation if they participate in SOCE.

> *On the basis of this evidence, we consider it inappropriate for psychologists and other LMHP to foster or support in clients the expectation that they will change their sexual orientation if they participate in SOCE.*

We believe that among the various types of SOCE, the greatest level of ethical concern is raised by SOCE that presuppose that same-sex sexual orientation is a disorder or a symptom of a disorder.[56] Treatments based on such assumptions raise the greatest level of ethical scrutiny by LMHP because they are inconsistent with the scientific and professional consensus that homosexuality per se is not a mental disorder. Instead, we counsel LMHP to consider other treatment options when clients present with requests for sexual orientation change.

The second key finding from our review is that those who participate in SOCE, regardless of the intentions of these treatments, and those who resolve their distress through other means, may evolve during the course of their treatment in such areas as self-awareness, self-concept, and identity. These changes may include (a) sexual orientation identity, including changes in private and public identification, behavior, group membership, and affiliation; (b) emotional adjustment, including reducing self-stigma and shame; and (c) personal beliefs, values, and norms, including changes in religious and moral beliefs and behaviors and motivations (Buchanon et al., 2001; Diamond, 1998, 2006; Rust, 2003; Savin-Williams, 2004; R. L.

---

[53] This section is for descriptive and educational purposes. It is not designed to interpret the APA (2002b) Ethics Code. The APA Ethics Committee alone has the authority to interpret the APA (2002b) Ethics Code and render decisions about whether a course of treatment is ethical. Furthermore, this section is not intended to provide guidelines or standards for practice. Guidelines and standards for practice are created through a specific process that is outside the purview of the task force.

[54] The following are some of the pertinent standards: 2. Competence, 2.01 Boundaries of Competence, 2.03 Maintaining Competence, 2.04 Bases for Scientific and Professional Judgments; 3. Human Relations, 3.01 Unfair Discrimination, 3.03 Other Harassment, 3.04 Avoiding Harm, 3.10 Informed Consent; 5.01 Avoidance of False or Deceptive Statements, 5.04 Media Presentations; 7.01 Design of Education and Training Programs; 8.02 Informed Consent to Research; 10.01 Informed Consent to Therapy, 10.02 Therapy Involving Couples or Families.

[55] Knapp and VandeCreek (2004) proposed that Ethical Standard 2 (Competence) is derived from Principle A: Beneficence & Nonmaleficence, as it is more likely that an LMHP can provide benefit if he or she is competent; however, for our purposes, this chapter will discuss these issues sequentially.

[56] See, e.g., Socarides (1968), Hallman (2008), and Nicolosi (1991); these theories assume homosexuality is always a sign of developmental defect or mental disorder.



PBC 007566

Worthington, 2002, 2004, 2005; Yarhouse, 2008). These areas become targets of LMHP interventions in order to reduce identity conflicts and distress and to explore and enhance the client's identity integration.

Because a large number of individuals who seek SOCE are from conservative faiths and indicate that religion is very important to them, integrating research on the psychology of religion into treatment may be helpful. For instance, individual religious motivations can be examined, positive religious coping increased, and religious identity and sexual orientation identity explored and integrated (Beckstead & Israel, 2007; Fowler, 1981; Glassgold, 2008; Haldeman, 2004; Knight & Hoffman, 2007; O'Neill & Ritter, 1992; Yarhouse & Tan, 2005a, 2005b). This is consistent with advances in the understanding of human diversity that place LGB-affirmative approaches within current multicultural perspectives that include age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status (e.g., Bartoli & Gillem, 2008; Brown, 2006; Fowers & Davidov, 2006), consistent with Principle D (Justice) and Principle E (Respect for People's Rights and Dignity).

However, in some of the debates on these issues, there are tensions between conservative religious perspectives and affirmative and scientific perspectives (Haldeman, 2002; Rosik, 2003; Throckmorton & Welton, 2005; Yarhouse, 1998a; Yarhouse & Burkett, 2002; Yarhouse & Throckmorton, 2002). Although there are tensions between religious and scientific perspectives, the task force and other scholars do not view these perspectives as mutually exclusive (Bartoli & Gillem, 2008; Haldeman, 2004; S. L. Morrow & Beckstead, 2004; Yarhouse, 2005b).

*APA (2008a) delineates a perspective that affirms the importance of science in exploring and understanding human behavior while respecting religion as an important aspect of human diversity.*

As we noted in the introduction, in its Resolution on Religious, Religion-Related, and/or Religion-Derived Prejudice, APA (2008a) delineates a perspective that affirms the importance of science in exploring and understanding human behavior while respecting religion as an important aspect of human diversity. Scientific findings from the psychology of religion can be incorporated into treatment, thus respecting all aspects of diversity while providing therapy that is consistent with scientific research.

Most important, respecting religious values does not require using techniques that are unlikely to have an effect. We proposed an approach that respects religious values and welcomes all of the client's actual and potential identities by exploring conflicts and identities without preconceived outcomes. This approach does not prioritize one identity over another and may aide a client in creating a sexual orientation identity consistent with religious values (see Chapter 6) (Bartoli & Gillem, 2008; Beckstead & Israel, 2007; Glassgold, 2008; Gonsiorek, 2004; Haldeman, 2004; Tan, 2008; Yarhouse, 2008).

## Benefit and Harm

Principle A of the APA Ethics Code, Beneficence and Nonmaleficence, establishes that psychologists aspire to provide services that maximize benefit and minimize harm (APA, 2002b). Many ethicists and scholars consider the avoidance of harm to be the priority of modern health care and medical ethics (Beauchamp & Childress, 2008; Herek, 2003; S. L. Morrow, 2000). The literature on effective treatments and interventions stresses that to be considered effective, interventions must not have serious negative side effects (Beutler, 2000; Flay et al., 2005). When applying this principle in the context of providing interventions, LMHP assess the risk of harm, weigh that risk with the potential benefits, and communicate this to clients through informed consent procedures that aspire to provide the client with an understanding of potential risks and benefits that are accurate and unbiased. Some of the published considerations of ethical issues related to SOCE have focused on the limited evidence for its efficacy, the potential for client harm, and the potential for misrepresentation of these issues by proponents of SOCE (Cramer et al., 2008; Haldeman, 1994, 2002, 2004; Herek, 2003; Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002). Other discussions focus on other harms of SOCE, such as reinforcing bias, discrimination, and stigma against LGB individuals (Davison, 1976, 1978, 1991; Drescher, 1999, 2001, 2002; Gonsiorek, 2004).

In weighing the harm and benefit of SOCE, LMHP can review with clients the evidence presented in this report. Research on harm from SOCE is limited, and some of the research that exists suffers from methodological limitations that make broad and definitive conclusions difficult. Early well-designed experiments that used aversive and behavioral

interventions did cause inadvertent and harmful mental health effects such as increased anxiety, depression, suicidality, and loss of sexual functioning in some participants. Additionally, client dropout rate is sometimes an indication of harmful effects (Lilienfeld, 2007). Early studies with aversive procedures are characterized by very high dropout rates, perhaps indicating harmful effects, and substantial numbers of clients unwilling to participate further. Other perceptions of harm mentioned by recipients of SOCE include increased guilt and hopelessness due to the failure of the intervention, loss of spiritual faith, and a sense of personal failure and unworthiness (Beckstead & Morrow, 2004; Haldeman, 2001, 2004; Shidlo & Schroeder, 2002). Other indirect harms from SOCE include the time, energy, and cost of interventions that were not beneficial (Beckstead & Morrow, 2004; Lilienfeld, 2007; G. Smith et al., 2004).

We found limited research evidence of benefits from SOCE. There is qualitative research that describes clients' positive perceptions of such efforts, such as experiencing empathy and a supportive environment to discuss problems and share similar values, which seemed to reduce their stress about their same-sex sexual attractions

> *… the benefits reported by participants in SOCE may be achieved through treatment approaches that do not attempt to change sexual orientation.*

(Beckstead & Morrow, 2004; Ponticelli, 1999; Wolkomir, 2001). The literature on SOCE support groups, for instance, illustrates results similar to those found for LGB-affirming groups and mutual help groups in general (e.g., Kerr, 1997; Levine et al., 2004; Thumma, 1991). The positive experiences clients report in SOCE are not unique. Rather, they are benefits that have been found in studies of therapeutic relationships and support groups in a number of different contexts (Levine et al., 2004; Norcross, 2002; Norcross & Hill, 2004). Thus, the benefits reported by participants in SOCE may be achieved through treatment approaches that do not attempt to change sexual orientation.

Perceptions of risks and rewards of certain courses of action influence the individual's decisions, distress, and process of exploration in psychotherapy. The client and LMHP may define these risks and rewards differently, leading to different perceptions of benefit and harm. Recognizing, understanding, and clarifying these different perceptions of risks and rewards are crucial for a thorough ethical analysis of each client's unique situation and are aspects of client-centered approaches. For instance, an LMHP may attempt to provide information to the client to reduce sexual stigma and increase life options by informing the client about the research literature on same-sex couples. Such relationships may be threatening to the client when such a life course is perceived as being inconsistent with existing religious beliefs and motivations and potentially having negative repercussions on existing relationships with religious communities. Thus, the client and LMHP may perceive the benefits and harms of the same course of action differently. Yet, discussing positive coping resources with clients regarding how to manage such inconsistencies, stigma, and negative repercussions may provide the client with more informed and empowered solutions from which to choose, thus increasing benefit and autonomy and reducing harm.

# Justice and Respect for Rights and Dignity

In this section, we focus on two concepts, Justice (Principle D) and Self-Determination (Principle E, Respect for People's Rights and Dignity). The first considers justice, both distributive and procedural justice (Knapp & VandeCreek, 2004), and the second focuses on recognizing diversity and maximizing a client's ability to choose. The APA Ethics Code uses the term *self-determination* to encompass the meanings for which many ethicists have used the term autonomy; we define self-determination as the process by which a person controls or determines the course of her or his own life (*Oxford American Dictionary*, 2007). Client self-determination encompasses the ability to seek treatment, consent to treatment, and refuse treatment. The informed consent process is one of the ways by which self-determination is maximized in psychotherapy.

Informed consent and self-determination cannot be considered without an understanding of the individual, community, and social contexts that shape the lives of sexual minorities. By understanding self-determination as context-specific and by working to increase clients' awareness of the influences of context on their decision making, the LMHP can increase clients' self-determination and thereby increase their ability to make informed life choices (Beckstead & Israel, 2007; Glassgold, 1995; 2008; Haldeman, 2004). For instance, some have suggested that social stigma and prejudice are fundamental reasons for sexual minorities' desire

PBC 007568

to change their sexual orientation (Davison, 1976, 1978, 1982, 1991; Haldeman, 1994; Silverstein, 1991; G. Smith et al., 2004; Tozer & Hayes, 2004). As stigma, prejudice, and discrimination continue to be prevalent,[57] we recommend that LMHP strive to understand their clients' request for SOCE in the context of sexual stigma and minority stress (e.g., DiPlacido, 1998; Meyer, 2001). We further recommend that providers explore with their clients the impact of these factors on their clients' decision making in order to assess the extent to which self-determination is compromised (cf. G. Smith et al., 2004).

For instance, repressive, coercive, or invalidating cultural, social, political, and religious influences can limit autonomous expression of sexual orientation, including the awareness and exploration of options for expression of sexual orientation within an individual life (e.g., Glassgold, 2008; Mark, 2008; McCormick, 2006; G. Smith et al., 2004; Wax, 2008). We recommend that LMHP consider the impact of discrimination and stigma on the client and themselves (e.g., Beckstead & Israel, 2007; Haldeman, 2001, 2002). This consideration can become quite complex when the client or the community of the client or the LMHP believes that homosexuality is sinful and immoral (see Beckstead & Israel, 2007). Further exploration of religious beliefs and the cognitive assumptions underlying those beliefs may be helpful in understanding the client's beliefs and perception of choices (Buchanan et al., 2001; Fischer & DeBord, 2007; Johnson, 2004; Yarhouse, 2008; Yip, 2000, 2002, 2005).

The issue of self-determination has become controversial, and some have suggested that SOCE be offered in the spirit of maximizing client autonomy so that clients have access to a treatment they request (e.g., Rosik, 2003; Yarhouse & Throckmorton, 2002). Others have cautioned against providing interventions that have very limited evidence of effectiveness, run counter to current scientific knowledge, and have the potential for harm, despite client requests (Drescher, 1999, 2002; Forstein, 2001; Gonsiorek, 2004; Haldeman, 2002; Herek, 2003). With regard to claims that client autonomy is the defining concern in treatment decision making, elevating one aspect of ethical reasoning, such as autonomy, above all others is not consistent with the current framework of the APA Ethics Code or medical ethics that focus on the interrelatedness of ethical principles (Beauchamp & Childress, 2008; Knapp & VandeCreek, 2004).

For instance, current ethics guidance focuses on the interrelatedness of ethical principles and understanding a clinical situation fully so as to appropriately balance the various pertinent principles (e.g., Knapp & VandeCreek, 2004). Self-determination and autonomy can vary in degree due to interpersonal and intrapersonal concerns and can be considered in relation to other ethical principles, such as providing services that (a) are likely to provide benefit, (b) are not effective, or (c) have the potential for harm.

We believe that simply providing SOCE to clients who request it does not necessarily increase self-determination but rather abdicates the responsibility of LMHP to provide competent assessment and interventions that have the potential for benefit with a limited risk of harm. We also believe that LMHP are more likely to maximize their clients' self-determination by providing effective psychotherapy that increases a client's abilities to cope, understand, acknowledge, explore, and integrate sexual orientation concerns into a self-chosen life in which the client determines the ultimate manner in which he or she does or does not express sexual orientation (Bartoli & Gillem, 2008; Beckstead & Israel, 2007; S. L. Morrow & Beckstead, 2004; Haldeman, 2004; Tan, 2008; Throckmorton & Yarhouse, 2006; Yarhouse, 2008).

*We also believe that LMHP are more likely to maximize their clients' self-determination by providing effective psychotherapy that increases a client's abilities to cope, understand, acknowledge, explore, and integrate sexual orientation concerns into a self-chosen life in which the client determines the ultimate manner in which he or she does or does not express sexual orientation.*

## Relational Issues in Treatment

Ideal or desired outcomes may not always be possible, and at times the client may face difficult decisions that

---

[57] For instance, the criminalization of certain forms of same-sex sexual behavior between consenting adults in private was constitutional in the United States until 2003 (see *Lawrence v. Texas*, 2003). The federal government and most U.S. states do not provide civil rights protections to LGB individuals and their families (National Gay and Lesbian Task Force: http://www.thetaskforce.org). In some other countries, homosexual behavior is still illegal and subject to extreme consequences, even death (e.g., Human Rights Watch, 2008; Wax, 2008; see also International Gay & Lesbian Human Rights Commission (IGLHRC): http://www.iglhrc.org). In extremely repressive environments, sexual orientation conversion efforts are provided in a coercive manner and have been the subject of human rights complaints (e.g., IGLHRC, 2001).

require different types and degrees of disappointment, distress, and sacrifice, as well as benefits, fulfillment, and rewards (Beckstead & Morrow, 2004; Glassgold, 2008; Haldeman, 2004; Yarhouse, 2008). LMHP may face strong emotions regarding the limits of their ability to provide relief from such difficult decisions or their consequences. Such emotions are understandable in this complex area, yet acting on such emotions within treatment has the potential to be harmful to the client (Knapp & VandeCreek, 2004; Pope & Vasquez, 2007). In these situations, in order to aid the client, the LMHP may have to address his or her own emotional reactions to the client's dilemmas. As the client must address regrets, losses (such as impossible and possible selves; see L. A. King & Hicks, 2007), and definitions of what is a fulfilling and worthwhile life, the LMHP must address his or her own values and beliefs about such issues. The LMHP's self-awareness, self-care, and judicious use of consultation can be helpful in these circumstances (Pope & Vasquez, 2007; Porter, 1995).

Moreover, LMHP may have their own internalized assumptions about sexual orientation, sexual orientation identity, sexuality, religion, race, ethnicity, and cultural issues (APA, 2000, 2002b; Garnets et al., 1991; McIntosh, 1990; Pharr, 1988; Richards & Bergin, 2005). The ethical principles of justice and respect for people's rights and dignity encourage LMHP to be aware of discrimination and prejudice so as to avoid condoning or colluding with the prejudices of others, including societal prejudices. As a way to increase awareness of their assumptions and promote the resolution of their own conflicts, R. L. Worthington, Dillon, and Becker-Schutte (2005) advised LMHP to develop their own competence surrounding sexual orientation, sexual minorities, and heterosexual privilege. Such competence requires self-reflection, contact with diverse sexual minority communities, and self-management of biases and sexual prejudice (cf. Israel, Ketz, Detrie, Burke, & Shulman, 2003).

Several authors (e.g., Faiver & Ingersoll, 2005; Lomax, Karff, & McKenny, 2002; Richards & Bergin, 2005; Yarhouse & Tan, 2005a; Yarhouse & VanOrman, 1999) have described potential ethical concerns related to working with religious clients. LMHP can strive to be aware of how their own religious values affect treatment and can aspire to focus on the client's perspective and aspire to become informed about the importance and content of specific religious beliefs and the psychology of religion (Bartoli, 2007; Yarhouse & Fisher, 2002; Yarhouse & VanOrman, 1999). Yet, for LMHP, the goal of treatment is determined by mental health concerns

*Although LMHP strive to respect religious diversity and to be aware of the importance of religion to clients' worldviews, LMHP focus on scientific evidence and professional judgment in determining mental health interventions.*

rather than directed by religious values (Gonsiorek, 2004). Although LMHP strive to respect religious diversity and to be aware of the importance of religion to clients' worldviews, LMHP focus on scientific evidence and professional judgment in determining mental health interventions (APA, 2008a; Beckstead, 2001; Glassgold, 2008; Haldeman, 2004; Yarhouse & Burkett, 2002).

## Summary

The principles and standards of the 2002 *Ethical Principles for Psychologists and Code of Conduct* most relevant to working with sexual minorities who seek to alter their sexual orientation are (a) Bases for Scientific and Professional Judgments (Standard 2.04) and Competence (2.01); (b) Beneficence and Nonmaleficence (Principle A); (c) Justice (Principle D); and (d) Respect for People's Rights and Dignity (Principle E). The key scientific findings relevant to the ethical concerns that are important in the area of SOCE are the limited evidence of efficacy or benefit and the potential for harm. LMHP are cautioned against promising sexual orientation change to clients. LMHP are encouraged to consider affirmative treatment options when clients present with requests for sexual orientation change. Such options include the therapeutic approaches included in Chapter 6. Self-determination is increased by approaches that support a client's exploration and development of sexual orientation identity. These approaches balance an understanding of the role of sexual stigma and respect other aspects of diversity in a client's exploration and maximize client self-determination.



# 8. ISSUES FOR CHILDREN, ADOLESCENTS, AND THEIR FAMILIES

## Task Force Charge and Its Social Context

The task force was asked to report on three issues for children and adolescents:

- The appropriate application of affirmative therapeutic interventions for children and adolescents[58] who present a desire to change either their sexual orientation or their behavioral expression of their sexual orientation, or both, or whose guardian expresses a desire for the minor to change.

- The presence of adolescent inpatient facilities that offer coercive treatment designed to change sexual orientation or the behavioral expression of sexual orientation.[59]

- Recommendations regarding treatment protocols that promote stereotyped gender-normative behavior to mitigate behaviors that are perceived to be indicators that a child will develop a homosexual orientation in adolescence and adulthood.

These issues reflected recent events in the current social context. Advocacy groups (Sanchez, 2007), law journals (Goishi, 1997; Morey, 2006; Weithorn, 1987), and the news media (A. Williams, 2005) have reported on involuntary[60] sexual orientation change efforts (SOCE)[61] among adolescents. Publications by LMHP directed at parents and outreach from religious organizations advocate SOCE for children and youth as interventions to prevent adult same-sex sexual orientation (e.g., Nicolosi & Nicolosi, 2002; Rekers, 1982; see also Cianciotto & Cahill, 2006; Kennedy & Cianciotto, 2006; Sanchez, 2007).

Reports by LGB advocacy groups (e.g., Cianciotto & Cahill, 2006; Kennedy & Cianciotto, 2006) have claimed that there has been an increase in attention to youths by religious organizations that believe homosexuality is a mental illness or an adverse developmental outcome. These reports further suggested that there has

---

[58] In this report, we define *adolescents* as individuals between the ages of 12 and 18 and children as individuals under age 12. The age of 18 was chosen because many jurisdictions in the United States use this age as the legal age of majority, which determines issues such as consent to treatment and other relevant issues.

[59] We define *coercive treatments* as practices that compel or manipulate a child or adolescent to submit to treatment through the use of threats, intimidation, trickery, or some other form of pressure or force. The threat of future harm leads to the cooperation or obedience. Threats of negative consequences can be physical or emotional, such as threats of rejection or abandonment from or disapproval by family, community, or peer-group; engendering feelings of guilt/obligation or loss of love; exploiting physical, emotional, or spiritual dependence.

[60] We define *involuntary treatment* as that which is performed without the individual's consent or assent and which may be contrary to his or her expressed wishes. Unlike coercive treatment, no threats or intimidation are involved.

[61] In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals,

been an increase in outreach to youths that portrays homosexuality in an extremely negative light and uses fear and shame to fuel this message. These reports expressed concern that such efforts have a negative impact on adolescents' and their parents' perceptions of their sexual orientation or potential sexual orientation, increase the perception that homosexuality and religion are incompatible, and increase the likelihood that some adolescents will be exposed to SOCE without information about evidence-based treatments.

One aspect of these concerns expressed by LGB advocacy groups has been the presence of residential programs in which adolescents have been placed by their parents, in some cases with reported lack of assent from the adolescent (e.g., Cianciotto & Cahill, 2006; Kennedy & Cianciotto, 2006). In addition, a longstanding concern raised by advocacy groups for both LGB people and transgender people has been the alleged use of residential psychiatric commitment and gender-normative behavioral treatments for children and adolescents whose expression of gender or sexuality violates gender norms (Goishi, 1997; Morey, 2006; Weithorn, 1988).

To fulfill our charge, we reviewed the literature on SOCE in children and adolescents and affirmative psychotherapy for children, adolescents, and their families. We considered the literature on best practices in child and adolescent treatment, inpatient treatment, and legal issues regarding involuntary or coercive treatments and consent to and refusal of treatment. We also reviewed the literature on the development of sexual orientation in children and adolescents.

## Literature Review

### Literature on Children

There is a lack of published research on SOCE among children. Research on sexuality in childhood is limited and seldom includes sexual orientation or sexual orientation identity (Perrin, 2002). Although LGB adults and others with same-sex sexual attractions often report emotional and sexual feelings and attractions from their childhood or early adolescence and recall a sense of being different even earlier in childhood (Beckstead & Morrow, 2004; Bell et al., 1981; D'Augelli & Hershberger, 1993; Diamond & Savin-Williams, 2000; Troiden, 1989), such concerns have not been studied directly in young children (cf. Bailey & Zucker, 1995; Cohen & Savin-Williams, 2004).

There is no published research suggesting that children are distressed about their sexual orientation per se. Parental concern or distress about a child's behavior, mental health, and possible sexual orientation plays a central role in referrals for psychotherapy (Perrin, 2002; C. Ryan & Futterman, 1997). Parents may be concerned about behaviors in the child that are stereotypically associated with a same-sex sexual orientation (e.g., affection directed at another child of the same sex, lack of interest in the other sex, or behaviors that do not conform to traditional gender norms) (American Academy of Pediatrics [AAP], 1999; Haldeman, 2000). This situation contrasts with the condition of gender dysphoria in childhood and adolescence, for which there is clear evidence that some children and adolescents experience distress regarding their assigned sex, and some experience distress with the consequences of their gender and biological sex (i.e., youth struggling with social discrimination and stigma surrounding gender nonconformity) (APA, 2008e; R. Green, 1986, 1987; J. D. Menveille, 1998; E. J. Menveille & Tuerk, 2002; Zucker & Bradley, 1995).

Childhood interventions to prevent homosexuality have been presented in non-peer-reviewed literature (see Nicolosi & Nicolosi, 2002; Rekers, 1982).[62] These interventions are based on theories of gender and sexual orientation that conflate stereotypic gender roles or interests with heterosexuality and homosexuality or that assume that certain patterns of family relationships cause same-sex sexual orientation. These treatments focus on proxy symptoms (such as nonconforming gender behaviors), since sexual orientation as it is usually conceptualized does not emerge until puberty, with the onset of sexual desires and drives (see APA, 2002a; Perrin, 2002). These interventions assume a same-sex sexual orientation is caused by certain family relationships that form gender identity and assume that encouraging gender stereotypic behaviors and certain family relationships will alter sexual orientation (Burack & Josephson, 2005; see, e.g., Nicolosi & Nicolosi, 2002; Rekers, 1979, 1982).

---

[62] The only peer-reviewed literature did not focus on sexual orientation but rather on children with gender identity disorder or who exhibited nonconformity with gender roles (e.g., Rekers, 1979, 1981; Rekers, Bentler, Rosen, & Lovaas, 1977; Rekers, Kilgus, & Rosen, 1990; Rekers & Lovaas, 1974). However, the relevance of such work to this topic is limited, as none of these children reported experiencing same-sex sexual attractions or were followed into adulthood. Gender nonconformity differs from gender identity disorder, and children with gender identity disorder are not necessarily representative of the larger population of those children who will experience same-sex sexual attractions in adulthood (Bailey & Zucker, 1995; Bradley & Zucker, 1998; Zucker, 2008).



The theories on which these interventions are based have not been confirmed by empirical study (Perrin, 2002; Zucker, 2008; Zucker & Bradley, 1995). Although retrospective research indicates that some gay men and lesbians recall gender nonconformity in childhood (Bailey & Zucker, 1995; Bem, 1996; Mathy & Drescher, 2008), there is no research evidence that childhood gender nonconformity and adult homosexuality are identical or are necessarily sequential developmental phenomena (Bradley & Zucker, 1998; Zucker, 2008). Theories that certain patterns of family relationships cause same-sex sexual orientation have been discredited (Bell et al., 1981; Freund & Blanchard, 1983; R. R. Green, 1987; D. K. Peters & Cantrell, 1991).

The research that has been attempted to determine whether interventions in childhood affect adult sexual orientation exists only within the specific population of children with gender identity disorder (GID). R. Green (1986, 1987) and Zucker and Bradley (1995) (to a limited degree) examined prospectively whether psychotherapy in children with GID influenced adult or adolescent sexual orientation and concluded that it did not (for a review of the issues for children with GID, see APA, 2009, *Report of the Task Force on Gender Identity and Gender Variance*). Thus, we concluded that there is no existing research to support the hypothesis that psychotherapy in children alters adult sexual orientation.

## Literature on Adolescents

We found no empirical research on adolescents who request SOCE, but there were a few clinical articles reporting cases of psychotherapy with religious adolescents who expressed confusion regarding their sexual orientation and conflicts between religious values and sexual orientation (Cates, 2007; Yarhouse, 1998b; Yarhouse & Tan, 2005a; Yarhouse et al., 2005). In some of these cases, the adolescents or their families sought SOCE or considered SOCE (Cates, 2007; Yarhouse & Tan, 2005a; Yarhouse et al., 2005). The general body of research on adolescents who identify themselves as same-sex oriented does not suggest that the normal development of a same-sex sexual orientation in adolescence is typically characterized by distress that results in requests for sexual orientation change (e.g., D'Augelli, 2002; Garofalo & Harper, 2003; Savin-Williams & Cohen, 2004).

The absence of evidence for adolescent sexual orientation distress that results in requests for SOCE and the few studies in the literature on religious adolescents seeking psychotherapy related to sexual orientation suggest that sexual orientation distress is most likely to occur among adolescents in families for whom religious views that homosexuality is sinful and undesirable are important. Yarhouse and colleagues (Yarhouse, 1998b; Yarhouse, Brooke, Pisano, & Tan, 2005; Yarhouse & Tan, 2005a) discussed clinical examples of distress caused by conflicts between faith and sexual orientation identity. For instance, a female adolescent client struggled with guilt and shame and fears that God would not love her, and a male adolescent experienced a conflict between believing God created him with same-sex feelings and believing that God prohibited their expression (Yarhouse & Tan, 2005a). Cates (2007) described three cases of Caucasian males who were referred by schools, courts, or parents for concerns that included their sexual orientation. All three youths perceived that within their faith community and family, an LGB identity was unacceptable and would probably result in exclusion and rejection (Cates, 2007). Because of the primacy of religious beliefs, the adolescents or their families requested religiously based therapy or SOCE. For instance, Cates described the treatment of an adolescent who belonged to the Old Amish Community and who requested SOCE. The young man perceived that there was no place for him in his faith community as a gay man and did not want to leave that community.

## Research on Parents' Concerns About Their Children's Sexual Orientation

We did not find specific research on the characteristics of parents who bring their children to SOCE. Thus, we do not know whether this population is similar to or different from the more general population of parents who may have concerns or questions regarding their children's sexual orientation or future sexual orientation. We cannot conclude that parents who present to LMHP with a request for SOCE are motivated by factors that cause distress in other parents of adolescents with emerging LGB identities.

*The general body of research on adolescents who identify themselves as same-sex oriented does not suggest that the normal development of a same-sex sexual orientation in adolescence is typically characterized by distress that results in requests for sexual orientation change.*

As reported in case studies and clinical papers, parents' religious beliefs appear to be factors in their request for SOCE for their children. These articles identified a population of parents who have strong conservative religious beliefs that reject LGB identities and perceive homosexuality as sinful (Cates, 2007; Yarhouse, 1998b; Yarhouse & Tan, 2005a; Yarhouse et al., 2005).

Other reports suggest that parents of adolescents with emerging same-sex sexual orientation and conservative religious beliefs that perceive homosexuality negatively appear to be influenced by religious authorities and LMHP who promote SOCE. For instance, Burack and Josephson (2005) and Cianciotto and Cahill (2006) reported that fear and stereotypes appeared to be contributing factors in parents who resort to residential SOCE or other related coercive treatment on youth. Cianciotto and Cahill found that some advocacy groups do outreach to parents that encourages commitment to SOCE residential programs even if the children do not assent. These programs also appear to provide information to parents that stresses that sexual orientation can be changed (Burack & Josephson, 2005; Cianciotto & Cahill, 2006), despite the very limited empirical evidence for that assertion.

## Residential and Inpatient Services

We were asked to report on "the presence of adolescent inpatient facilities that offer coercive treatment designed to change sexual orientation or the behavioral expression of sexual orientation." We performed a thorough review of the literature on these programs. Upon completion of this review, we decided that the best way to address this task was to evaluate issues of the appropriateness of these programs for adolescents in light of issues of harm and benefit based on the literature on adolescent development, standards for inpatient and residential treatment, and ethical issues such as informed consent.

There are several accounts of inpatient and residential treatment, sometimes involuntary or coerced, for adolescents who were LGB-identified, confused or questioning their sexual orientation, gender nonconforming, or transgender (Arriola, 1998; Burack & Josephson, 2005; Goishi, 1997; Molnar, 1997; Weithorn, 1988). These incidents mostly occurred because the parent or guardian was distressed regarding the child's actual sexual orientation or potential and perceived sexual orientation. An account of an adolescent boy who was placed in a program sponsored by Love in Action, a religious-based program, was reported widely in the press (A. Williams, 2005). This program was reported to focus on religious approaches to SOCE as well as approaches that stress conformity to traditional gender roles and behaviors.

Concerns have arisen over the conduct of some private psychiatric hospitals that use alternative diagnoses—such as GID, conduct disorders, oppositional defiant disorders, or behaviors identified as self-defeating or self-destructive—to justify hospitalization of LGB and questioning youth and expose adolescents to SOCE (Arriola, 1998; Morey, 2006). Data on these issues are incomplete, as each state has different reporting requirements for public and private hospitals, and laws regarding confidentiality understandably protect client information.

## ADOLESCENTS' RIGHTS TO CONSENT TO TREATMENT

In researching involuntary treatment, we reviewed the recent literature on the growing movement to increase adolescents' rights to consent to outpatient and inpatient mental health treatment so as to reduce involuntary hospitalization (Mutcherson, 2006; Redding, 1993). It is now recognized that adolescents are cognitively able to participate in some health care treatment decisions, and such participation is helpful

> *It is now recognized that adolescents are cognitively able to participate in some health care treatment decisions, and such participation is helpful.*

(Hartman, 2000, 2002; Mutcherson, 2006; Redding, 1993). The APA *Guidelines for Psychotherapy for Lesbian, Gay, and Bisexual Clients* (2000) and the APA Ethics Code (2002b) encourage professionals to seek the assent of minor clients for treatment. Within the field of adolescent mental health and psychiatry, there are developmental assessment models to determine an adolescent's competence to assent or consent to and potentially refuse treatment (Forehand & Ciccone, 2004; Redding, 1993; Rosner, 2004a, 2004b). Some states now permit adolescents some rights regarding choosing or refusing inpatient treatment, participating in certain interventions, and control over disclosure of records (Koocher, 2003).

## INPATIENT TREATMENT

The use of inpatient and residential treatments for SOCE is inconsistent with the recommendations of the



field. For instance, the American Academy of Child and Adolescent Psychiatry (1989) recommended that inpatient treatment, when it does occur, be of the shortest possible duration and reserved for the most serious psychiatric illnesses, such as those of a psychotic nature or where there is an acute danger to self or others. For less serious mental health conditions, the Academy recommended that inpatient hospitalization occur only after less restrictive alternatives (i.e., outpatient and community resources) are shown to be ineffective. In *Best Practice Guidelines: Serving LGBT Youth in Out-of-Home Care* (Wilber, Ryan, & Marksamer, 2006), the Child Welfare League of America recommended that, if necessary, hospitalization or residential substance abuse treatment for adolescents be in a setting that provides mental health treatments that are affirmative of LGB people and for which the staff is competent to provide such services. Further, in a review of the psychiatric literature, Weithorn (1988) concluded that the deprivation of normal social contacts and prevention of attendance at school and other normal social settings can be harmful as well as punitive.

## PROGRAMS WITH RELIGIOUS AFFILIATIONS

Programs such as Love in Action's Refuge [63] provided religiously based interventions that claimed to change sexual orientation, control sexual behavior, or prevent the development of same-sex sexual orientation (Burack & Josephson, 2005; Sanchez, 2007; A. Williams, 2005). Because such programs are religious in nature and are not explicitly mental health facilities,[64] they are not licensed or regulated by state authorities. Burack and Josephson reported that there was effort by religious organizations and sponsors of these programs to communicate to parents that homosexuality is abnormal and sinful and could be changed.[65] Such religious organizations, according to the authors of the report, encouraged parents to seek treatment for their children. Based on anecdotal accounts of current and past residents, these programs, to influence adolescents' life decisions, allegedly used fear and even threats about negative spiritual, health, and life consequences and

thus are viewed as coercive (Burack & Josephson, 2005; Sanchez, 2007).

To provide an overview of the issues with residential programs for youth, we reviewed information gathered by the APA (2002a) Committee on Children, Youth, and Families in collaboration with the APA State Advocacy Office and the testimony and subsequent published report by members of the U.S. General Accounting Office before the Committee on Education and Labor of the U.S. House of Representatives (Kutz & O'Connell, 2007). These reports and testimony evaluated some current problems in adolescent residential mental health care. There are a large number of unlicensed and unregulated programs marketed to parents struggling to find behavioral or mental health programs for their adolescent children. Although many of these programs avoid regulation by not identifying themselves as mental health programs, they do advertise mental health, behavioral, and/or educational goals, especially for those youth perceived as troubled by their parents. Many of these programs are involuntary and coercive and use seclusion or isolation and escort services to transport unwilling youth to program locations (Kutz & O'Connell, 2007). The testimony and report described the negative mental health impacts of these programs and expressed grave concerns about them, including questions about quality of care and harm caused by coercive or involuntary measures (Kutz & O'Connell, 2007).

*Although religious doctrines themselves are not the purview of psychologists, how religious doctrine is inculcated through educational and socialization practices is a psychological issue and an appropriate subject of psychological examination, especially if there are concerns regarding substantiation of benefit or harm, unlicensed and unregulated facilities, and coercive and involuntary treatment.*

Thus, residential and outpatient programs that are involuntary and coercive and provide inaccurate scientific information about sexual orientation or are excessively fear-based pose both clinical and ethical concerns, whether or not they are based on religious doctrine. Although religious doctrines themselves are not the purview of psychologists, how religious doctrine is inculcated through educational and socialization practices is a psychological issue and an appropriate subject of psychological examination, especially if there are concerns regarding substantiation of benefit

---

[63] The program "Refuge," directed at adolescents, was closed in 2007 and is no longer advertised. However, Love in Action still sponsors residential programs for adults.

[64] These programs advertise helping with addiction, "negative self-talk and irrational belief systems," and behavior change (see www.loveinaction.org).

[65] See www.loveinaction.org.

or harm, unlicensed and unregulated facilities, and coercive and involuntary treatment.

As noted earlier, we define coercive treatments as practices that compel or manipulate an individual to submit to treatment through the use of threats, intimidation, manipulation, trickery, or some other form of pressure, including threats of future harm. Harm can be physical or psychological. Harmful psychological consequences include disapproval; loss of love; rejection or abandonment by family, community, or peer group; feelings of guilt/obligation; and exploitation of physical, emotional, or spiritual dependence. Working with a variety of client populations presents ethical dilemmas for providers (APA, 2002b; Beauchamp & Childress, 2008; Davis, 2002); however, with children and adolescents, such concerns are heightened (Molnar, 1997; Weithorn, 1988). Children and adolescents are more vulnerable to such treatments because of the lack of legal rights and cognitive and emotional maturity and emotional and physical dependence on parents, guardians, and LMHP (Molnar, 1997; Weithorn, 1988). The involuntary nature of particular programs raises issues similar to those of other involuntary mental health settings; however, because they are religious programs, not mental health programs, they pose complex issues for licensure and regulation (A. Williams, 2005). On the basis of ethical principles (APA, 2002b; Beauchamp & Childress, 2008), LMHP should strive to maximize autonomous decision making and self-determination and avoid coercive and involuntary treatments.

## Appropriate Application of Affirmative Interventions With Children and Adolescents

### Multicultural and Client-Centered Approaches for Adolescents

A number of researchers and practitioners have advised LMHP that when working with children or adolescents and their families, they should address concerns regarding sexual orientation and base their interventions on the current developmental literature on children and adolescents and the scholarly literature on parents' responses to their child's sexual orientation (e.g., Ben-Ari, 1995; Bernstein, 1990; Holtzen & Agriesti, 1990; Mattison & McWhirter, 1995; Perrin, 2002; C. Ryan, Huebner, Diaz, & Sanchez, 2009;

Salzburg, 2004, 2007; Yarhouse & Tan, 2005a).[66] This literature recommends that LMHP learn about the law and scholarship on developmental factors in informed consent and take steps to ensure that minor clients have a developmentally appropriate understanding of treatment, are afforded complete information about their rights, and are provided treatment in the least restrictive environment. LMHP can review the recommendations for assent to treatment recommended in the *Guidelines for Psychotherapy for Lesbian, Gay, and Bisexual Clients* (APA, 2000) and can seek an adolescent's consent consistent with evolving considerations of developmental factors (Forehand & Ciccone, 2004; Redding, 1993; Rosner, 2004a, 2004b).

APA policies (APA, 1993, 2000) and the vast majority of current publications on therapy for LGB and questioning adolescents who are concerned about their sexual orientation recommend that LMHP support adolescents' exploration of identity by

- accepting homosexuality and bisexuality as normal and positive variants of human sexual orientation,

- accepting and supporting youths as they address the stigma and isolation of being a sexual minority,

- using person-centered approaches as youths explore their identities and experience important developmental milestones (e.g., exploring sexual values, dating, and socializing openly),

- reducing family and peer rejection and increasing family and peer support (e.g., APA, 2000, 2002a; D'Augelli & Patterson, 2001; Floyd & Stein, 2002; Fontaine & Hammond, 1996; Hart & Heimberg, 2001; Hetrick & Martin, 1987; Lemoire & Chen, 2005; Mallon, 2001; A. D. Martin, 1982; Perrin, 2002; Radkowsky & Siegel, 1997; C. Ryan, 2001; C. Ryan et al., 2009; C. Ryan & Diaz, 2005; C. Ryan & Futterman, 1997; Schneider, 1991; Slater, 1988; Wilber, Ryan & Marksamer, 2006; Savin-Williams & Cohen, 2004; Yarhouse & Tan, 2005a).

When sexual minority and questioning youth require residential or inpatient treatment for mental health, behavioral, or family issues, it has been recommended that such treatment be safe from discrimination and

---

[66] Due to the limited research on children, adolescents, and families who seek SOCE, our recommendations for affirmative therapy for children, youth, and their families distressed about sexual orientation are based on general research and clinical articles addressing these and other issues, not on research specific to those who specifically request SOCE. We acknowledge that limitation in our recommendations.



prejudice and affirming of sexual orientation diversity by staff who are knowledgeable about LGB identities and life choices (Mallon, 2001; Wilber et al., 2006).

Other aspects of human diversity, such as age, gender, gender identity, race, ethnicity, culture, national origin, religion, disability, language, and socioeconomic status, may be relevant to an adolescent's identity development, and these differences may intersect with sexual orientation identity (Diamond & Savin-Williams, 2000; Rosario, Rotheram-Borus, & Reid, 1996; Rosario, Schrimshaw, & Hunter, 2004; Rosario, Schrimshaw, Hunter, & Braun, 2006). Some adolescents are more comfortable with fluid or flexible identities due to gender differences and generational or developmental concerns, and their sexual orientation identities may not be exclusive or dichotomous (Diamond, 2006; Morgan & Thompson, 2006; Savin-Williams, 2005).

Only a few articles addressed the specific conflicts between religious identities and sexual orientation identities among youth (Cates, 2007; Yarhouse, 1998b; Yarhouse & Tan, 2005a). For instance, Yarhouse and Tan proposed solutions that respect religious beliefs and emphasized nondirective exploration of religious and sexual orientation identity that does not advocate a particular sexual orientation identity outcome. As adolescents may experience a crisis of faith and distress linked to religious and spiritual beliefs, the authors explored interventions that integrate the psychology of religion into interventions that stress improving the client's positive religious coping and relationship with the sacred (e.g., Exline, 2002; Pargament & Mahoney, 2005; Pargament et al., 1998, 2005). Cates (2007), from a more secular frame, emphasized a client-centered approach that stresses the LMHP's unconditional acceptance of the client and client choices even if the client cannot accept his or her own sexual orientation.

The ethical issues outlined in Chapter 7 are also relevant to children and adolescents; however, working with adolescents presents unique ethical dilemmas to LMHP (Koocher, 2003). Children and adolescents are often unable to anticipate the future consequences of a course of action and are emotionally and financially dependent on adults. Further, they are in the midst of developmental processes in which the ultimate outcome is unknown. Efforts to alter that developmental path may have unanticipated consequences (Perrin, 2002). LMHP should strive to be mindful of these issues, particularly as these concerns affect assent and consent to treatment and goals of treatment (Koocher, 2003; Rosner, 2004a, 2004b; Sobocinski, 1990). Possible approaches include open-ended and scientifically based age-appropriate exploration with children, adolescents, and parents regarding these issues.

## Multicultural and Client-Centered Approaches for Parents and Families

Parental attitudes and behaviors play a significant role in children's and adolescents' adjustment (Radkowsky & Siegel, 1997; C. Ryan & Diaz, 2005; C. Ryan et al., 2009; Savin-Williams, 1989b, 1998; Wilber et al., 2006; Yarhouse, 1998b). One retrospective research study of adults indicated that LGB children are more likely to be abused by their families than by nonrelated individuals (Corliss, Cochran, & Mays, 2002). Another found that family rejection is a key predictor of negative health outcomes in White and Latino LGB young adults (C. Ryan et al., 2009).

> Reducing parental rejection, hostility, and violence (verbal or physical) may contribute to the mental health and safety of the adolescent.

Reducing parental rejection, hostility, and violence (verbal or physical) may contribute to the mental health and safety of the adolescent (Remafedi et al., 1991; C. Ryan et al., 2009; Savin-Williams, 1994; Wilber et al., 2006). Further, to improve parents' responses, LMHP can find ways to ameliorate parents' distress about their children's sexual orientation. Exploring parental attributions and values regarding same-sex sexual orientation is especially important in order to facilitate engagement in treatment, resolution of ethical dilemmas, and more beneficial psychotherapy (Morrissey-Kane & Prinz, 1999; Sobocinski, 1990).

Family therapy for families who are distressed by their child's sexual orientation may be helpful in facilitating dialogues, increasing acceptance and support, reducing rejection, and improving management of conflicts or misinformation that may exacerbate an adolescent's distress (Mattison & McWhirter, 1995; C. Ryan et al., 2009; Salzburg, 2004, 2007). Such therapy can include family psychoeducation to provide accurate information and teach coping skills and problem-solving strategies for dealing more effectively with the challenges sexual minority youth may face and the concerns the families and caretakers may have (Ben-Ari, 1995; Perrin, 2002; C. Ryan & Diaz, 2005; Ryan & Futterman, 1997; C. Ryan et al., 2009; Salzburg, 2004, 2007; Yarhouse, 1998b). C. Ryan and Futterman (1997) termed this *anticipatory*

*guidance*: LMHP provide family members with accurate information regarding same-sex sexual orientation and dispel myths regarding the lives, health, and psychological well-being of LGB individuals.

Perrin (2002) recommended that providers, when working with families of preadolescent children, counsel parents who are concerned that their young children may grow up to be lesbian or gay to tolerate the ambiguity inherent in the limited knowledge of development. In addition, Perrin suggested a two-pronged approach: (a) provide information to reduce heterosexism within the family and increase the family's capacity to provide support and (b) introduce information about LGB issues into family discussions to aid the child's own self-awareness and self-acceptance and to counter stigma. For adolescents, C. Ryan et al. (2009) recommended that LMHP assess family reactions to LGB youth, specifically the presence of family rejection. Further, the authors advocated explaining to families the link between family rejection and negative health problems in children and adolescents, providing anticipatory guidance to families that includes recommendations for support on the part of the family, and helping families to modify highly rejecting behaviors.

Families with strong religious beliefs that condemn homosexuality may struggle with a child's same-sex sexual orientation (Cates, 2007; Yarhouse, 1998b; Yarhouse & Tan, 2005a). Yarhouse and Tan (2005a) suggested that family therapy reframe the religious beliefs to focus on aspects of faith that encourage love and acceptance of their child rather than on a religion's prohibitions. The authors stressed that these positive elements of faith can lay a constructive foundation for communication and problem solving and reduce family discord and rejection.

Providing anticipatory guidance to parents to address their unique personal concerns can be helpful (C. Ryan & Futterman, 1997). The LMHP can help the parents plan in an affirmative way for the unique life challenges that they may face as parents of a sexual minority child. Parents must deal with their own unique choices and process of "coming out" and resolve fears of enacted stigma if they risk disclosure within their communities, at work, and to other family members (Bernstein, 1990). Further, the LMHP can address other stresses, such as managing life celebrations and transitions and coping with feelings of loss, and aid parents in advocating for their children in school situations—for example, when they face bullying or harassment. Multiple family groups led by LMHP might be helpful to counter the isolation that many parents experience (J. D. Menveille & Tuerk, 2002).

## Community Approaches for Children, Adolescents, and Families

Research has illuminated the potential that school-based and community interventions have for increasing safety and tolerance of sexual minorities, preventing distress and negative mental health consequences, and increasing the psychological well-being and health of sexual minority youth (APA, 1993; D'Augelli & Patterson, 2001; Goodenow, Szalacha, & Westheimer, 2006; Harper, Jamil, & Wilson, 2007; Kosciw & Diaz, 2006; A. J. Peters, 2003; Roffman, 2000; Safren & Heimberg, 1999; Schneider, 1991; Treadway & Yoakum, 1992). For instance, sexual minority adolescents in schools with support groups for LGB students reported lower rates of suicide attempts and victimization than those without such groups (Goodenow et al., 2006; Kosciw & Diaz, 2006; Szalacha, 2003). Kosciw and Diaz (2006) found that such support groups were related to improved academic performance and college attendance. The support groups that were examined in the research provided accurate affirmative information and social support, and the groups' presence was also related to increased school tolerance and safety for LGB youth (Goodenow et al., 2006; Kosciw & Diaz, 2006; Szalacha, 2003). School policies that increased staff support and positive school climate have been found to moderate suicidality and to positively affect sexual minority youth school achievement and mental health (Goodenow et al., 2006).

School and community interventions have the potential for introducing other sources of peer and adult support that may buffer children and adolescents from rejection that may occur in certain family, community, and religious contexts. These school and community interventions may provide alternative sources of information regarding LGB identities and lives. However, such school and community interventions are unlikely to directly affect the core attitudes and beliefs of the religious institutions and communities in which sexual orientation distress and family rejection might occur. These programs may have an indirect effect on communities and religious institutions because of their potential to change the general social context in which families deal with conflicts between their children's emerging sexual orientations and identities. We hope that such change will reduce the level of psychological

distress that such conflicts between religion and sexuality create and reduce the level of hostility and punitiveness to which some children and adolescents are exposed as a result of their sexual orientation.

For families, groups such as Parents, Families, and Friends of Lesbians and Gays (PFLAG) and the Straight Spouse Network may also provide a safe, nonjudgmental space in which to discuss their concerns, receive accurate information, reduce isolation, and reduce feelings of perceived stigma (Goldfried & Goldfried, 2001). PFLAG offers extensive literature for parents based on affirmative approaches to same-sex sexual attractions as well as a nationwide network of support groups. Such groups, by providing affirmative sources of information, could reduce the distress for parents that is and increase family support of their sexual minority children, thus positively affecting sexual minority youth and children whose families are concerned about their future sexual orientation.

Parents who are religious may benefit from finding support through religious organizations and groups. One concern is that some groups may provide parents with information that presents same-sex sexual orientation in a negative light (e.g., defective, "broken"), which could increase stigma and rejection of children and adolescents; thus, such groups should rarely be considered. Alternatively, some groups provide resources that are both LGB affirming and religious.[67]

## Conclusion

We were asked to report on three issues for children and adolescents. First, we were asked to provide recommendations regarding treatment protocols that attempt to prevent homosexuality in adulthood by promoting stereotyped gender-normative behavior in children to mitigate behaviors that are perceived to be indicators that a child will develop a homosexual orientation in adolescence and adulthood. We found no empirical evidence that providing any type of therapy in childhood can alter adult same-sex sexual orientation. Some advocates

*Some advocates of these treatments see homosexuality as a mental disorder, a concept that has been rejected by the mental health professions for more than 35 years.*

of these treatments see homosexuality as a mental disorder, a concept that has been rejected by the mental health professions for more than 35 years. Further, the theories that such efforts are based on have not been corroborated by scientific evidence or evaluated for harm. Thus, we recommend that LMHP avoid such efforts and provide instead multicultural, client-centered, and affirmative treatments that are developmentally appropriate (Perrin, 2002).

Second, we were asked to comment on the presence of adolescent inpatient facilities that offer coercive treatment designed to change sexual orientation or the behavioral expression of sexual orientation. We found that serious questions are raised by involuntary and coercive interventions and residential centers for adolescents due to their advocacy of treatments that have no scientific basis and potential for harm due to coercion, stigmatization, inappropriateness of treatment level and type, and restriction of liberty. Although the prevalence of these treatment centers is unknown, we recommend that some form of oversight be established for such youth facilities, such as licensure and monitoring, especially as a means of reporting abuse or neglect.

States have different requirements and standards for obtaining informed consent to treatment for adolescents; however, it is recognized that adolescents are cognitively able to participate in some health care treatment decisions and that such participation is helpful. We recommend that when it comes to treatment that purports to have an impact on sexual orientation, LMHP assess the adolescent's ability to understand treatment options, provide developmentally appropriate informed consent to treatment, and, at a minimum, obtain the youth's assent to treatment. SOCE that focus on negative representations of homosexuality and lack a theoretical or evidence base provide no documented benefits and can pose harm through increasing sexual stigma and providing inaccurate information. We further concluded that involuntary or coercive residential or inpatient programs that provide SOCE to children and adolescents may pose serious risk of harm, are potentially in conflict with ethical imperatives to maximize autonomous decision making and client self-determination, and have no documented benefits. Thus, we recommend that parents, guardians, or youth not consider such treatments.

Finally, we were asked to report on the appropriate application of affirmative therapeutic interventions for children and adolescents who present a desire to change their sexual orientation or their behavioral

---

[67] See, e.g., "Family Fellowship" (www.ldsfamilyfellowship.org/) for parents who belong to the Church of Jesus Christ of Latter-Day Saints. The Institute of for Sexual Orientation and Judaism also lists resources: www.huc.edu/ijso/.

expression of their sexual orientation, or both, or whose guardian expresses a desire for the minor to change.

*We recommend that LMHP provide multiculturally competent and client-centered therapies to children, adolescents, and their families rather than SOCE.*

We recommend that LMHP provide multiculturally competent and client-centered therapies to children, adolescents, and their families rather than SOCE. Such approaches include an awareness of the interrelatedness of multiple identities in individual development as well as an understanding of cultural, ethnic, and religious variation in families. Specific approaches can include (a) supporting children and youth in their developmental processes and milestones, (b) reducing internalized stigma in children and sexual stigma in parents, and (c) providing affirmative information and education on LGB identities and lives.

These approaches would support children and youth in identity exploration and development without seeking predetermined outcomes. Interventions that incorporate knowledge from the psychology of religion and that increase acceptance, love, and understanding among individuals, families, and communities are recommended for populations for whom religion is important. Family therapy that provides anticipatory guidance to parents to increase their support and reduce rejection of children and youth addressing these issues is essential. School and community interventions are also recommended to reduce societal-level stigma and provide information and social support to children and youth.

PBC 007580

# 9. SUMMARY AND CONCLUSIONS

APA's charge to the task force included three major tasks that this report has addressed:

1. Review and update the 1997 Resolution on Appropriate Therapeutic Responses to Sexual Orientation (APA, 1998).

2. Generate a report that includes discussion of the following:

   • The appropriate application of affirmative therapeutic interventions for children and adolescents who present a desire to change either their sexual orientation or their behavioral expression of their sexual orientation, or both, or whose guardian expresses a desire for the minor to change.

   • The appropriate application of affirmative therapeutic interventions for adults who present a desire to change their sexual orientation or their behavioral expression of their sexual orientation, or both.

   • The presence of adolescent inpatient facilities that offer coercive treatment designed to change sexual orientation or the behavioral expression of sexual orientation.

   • Education, training, and research issues as they pertain to such therapeutic interventions.

   • Recommendations regarding treatment protocols that promote stereotyped gender-normative behavior to mitigate behaviors that are perceived

to be indicators that a child will develop a homosexual orientation in adolescence and adulthood.

3. Inform APA's response to groups that promote treatments to change sexual orientation or its behavioral expression and support public policy that furthers affirmative therapeutic interventions.

The substance of the second task has been achieved in the preceding chapters of this report. In Chapters 3 and 4, we reviewed the body of research on the efficacy and safety of sexual orientation change efforts (SOCE).[68] In Chapter 5 we synthesized the literature on the nature of distress and identified conflicts in adults, which provided the basis for our recommendations for affirmative approaches to psychotherapy practice that are described in Chapter 6. Chapter 7 discussed ethical issues in SOCE for adults. In Chapter 8 we considered the more limited body of research on children and adolescents, including a review of SOCE with children and adolescents and affirmative approaches for psychotherapy.

In this final chapter, we summarize the report and focus on those two tasks—one and three—that have not been addressed in the report. With regard to the policy, we recommended that the 1997 policy be retained and

---

[68] In this report, we use the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a person's same-sex sexual orientation to other-sex, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved.

that a new policy be adopted to complement it. The new policy that we proposed (see Appendix A) was adopted by APA's Council of Representatives in August 2009. With regard to APA's response to groups that advocate for SOCE, we provide those recommendations at the end of this chapter in the section on policy.

To achieve the charge given by APA, we decided to conduct a systematic review of the empirical literature on SOCE. This review covered the peer-reviewed journal articles in English from 1960 to 2007.[69] The review is reported in Chapters 3 and 4: Chapter 3 addresses methodological issues in the research; and Chapter 4, the outcomes, such as safety, efficacy, benefit, and harm of SOCE.

We also reviewed the recent literature on the psychology of sexual orientation. There is a growing body of literature that concludes that social stigma, known specifically as sexual stigma, manifested as prejudice and discrimination directed at same-sex sexual orientations and identities, is a major source of stress for sexual minorities. This stress, known as minority stress, is a major cause of the mental health disparities of sexual minorities. On the basis of this literature, we recommend that all interventions and policy for these populations include efforts to mitigate minority stress and reduce stigma.

Further, we found that religious individuals with beliefs that homosexuality is sinful and morally unacceptable are prominent in the population that currently undergoes SOCE. These individuals seek SOCE because the disapproving stance of their faiths toward homosexuality produces conflicts between, on the one hand, their beliefs and values and, on the other, their sexual orientation. These conflicts result in significant distress due to clients' perceptions that they are unable to integrate their faith and sexual orientation. To respond as well as possible to this population, we included in our review some of the empirical and theoretical literature from the psychology of religion, recently adopted APA policies on religion and science, and specific interventions that have been proposed in the literature for religious populations.

SOCE has been quite controversial, and the controversy has at times become polemical because of clashes between differing political viewpoints about LGB individuals and communities and the differing values between some faith-based organizations and scientific and professional organizations (Drescher, 2003; Zucker, 2008). Psychology, as a science, and various faith traditions, as theological systems, can acknowledge and respect their profoundly different methodological and philosophical viewpoints. The APA has affirmed that proven methods of scientific inquiry are the best methods to explore and understand human behavior and are the basis for the association's policies (APA, 2007a, 2008a). The APA affirms that discrimination directed at religions and their adherents or derived from religious beliefs is unacceptable and that religious faith should be respected as an aspect of human diversity (APA, 2008c).

> *APA has affirmed that proven methods of scientific inquiry are the best methods to explore and understand human behavior and are the basis for the association's policies.*

# Summary of the Systematic Review of the Literature

To fulfill the charge given by APA, we undertook a systematic review to address the key questions: What are the outcomes of SOCE and their potential benefits and harms? Is SOCE effective or safe? The first step was to evaluate the research to determine if such conclusions could be drawn from the research—in other words, was the research performed with the appropriate degree of methodological rigor to provide such answers? The next question was to determine, if such research existed, what answers it provided.

## Efficacy and Safety

We found few scientifically rigorous studies that could be used to answer the questions regarding safety, efficacy, benefit, and harm (e.g., Birk et al., 1971; S. James, 1978; McConaghy, 1969, 1976; McConaghy et al., 1972; Tanner, 1974, 1975). Few studies could be considered true experiments or quasi-experiments that would isolate and control the factors that might effect change (see the list of studies in Appendix B). These studies were all conducted in the period from 1969 to 1978 and used aversive or other behavioral methods.

Recent SOCE differ from those interventions explored in the early research studies. The recent nonreligious interventions are based on the assumption that homosexuality and bisexuality are mental

---

[69] The articles in English include material on populations outside the United States, including Canada, Mexico, Western Europe, and some material on Middle Eastern, South Asian, and East Asian populations. No articles based on new research have been published since 2007. One article published in 2008 is a restatement of Schaeffer et al. (2000).



disorders or deficits and are based on older discredited psychoanalytic theories (e.g., Socarides, 1968; see American Psychoanalytic Association, 1991, 1992, 2000; Drescher, 1998b; Mitchell, 1978, 1981). Some focus on increasing behavioral consistency with gender norms and stereotypes (e.g., Nicolosi, 1991). None of these approaches is based on a credible scientific theory, as these ideas have been directly discredited through evidence or rendered obsolete. There is longstanding scientific evidence that homosexuality per se is not a mental disorder (American Psychiatric Association, 1973; Bell & Weinberg, 1978; Bell et al., 1981; Conger, 1975; Gonsiorek, 1991; Hooker, 1957), and there are a number of alternate theories of sexual orientation and gender consistent with this evidence (Bem, 1996; Butler, 2004; Chivers et al., 2007; Corbett, 1996, 1998, 2001; Diamond, 1998, 2006; Drescher, 1998b; Enns, 2008; Heppner & Heppner, 2008; Levant & Silverstein, 2006; Mustanksi et al., 2002; O'Neil, 2008; Peplau & Garnets, 2000; Pleck, 1995; Rahman & Wilson, 2005; Wester, 2008).

Other forms of recent SOCE are religious, are not based on theories that can be scientifically evaluated, and have not been subjected to rigorous examination of efficacy and safety. These approaches are based on religious beliefs that homosexuality is sinful and immoral and, consequently, that identities and life paths based on same-sex sexual orientation are not religiously acceptable. The few high-quality studies of SOCE conducted from 1999 to 2004 are qualitative (e.g., Beckstead & Morrow, 2004; Ponticelli, 1999; Wolkomir, 2001) and these, due to the research questions explored, aid in understanding the population that seeks sexual orientation change but do not provide the kind of information needed for definitive answers to questions of the safety and efficacy of SOCE.

Thus, we concluded that the early evidence, though extremely limited, is the best basis for predicting what would be the outcome of psychological interventions. Scientifically rigorous older work in this area (e.g., Birk et al., 1971; S. James, 1978; McConaghy, 1969, 1976; McConaghy et al., 1972; Tanner, 1974, 1975) shows that enduring change to an individual's sexual orientation is uncommon and that only a very small number of people in these studies show any credible evidence of reduced same-sex sexual attraction, though some show lessened physiological arousal to all sexual stimuli. Compelling evidence of decreased same-sex sexual behavior and increased sexual attraction to and engagement in sexual behavior with the other sex was rare. Few studies provided strong evidence

that any changes produced in laboratory conditions translated to daily life. Many individuals continued to experience same-sex sexual attractions following SOCE and seldom reported significant change to other-sex sexual attractions. Thus, we concluded the following about SOCE: *The results of scientifically valid research indicate that it is unlikely that individuals will be able to reduce same-sex sexual attractions or increase other-sex attractions through SOCE.*

The few early research investigations that were conducted with scientific rigor raise concerns about the safety of SOCE, as some participants suffered unintended harmful side effects from the interventions. These negative side effects included loss of sexual feeling, depression, suicidality, and anxiety. The high dropout rate in these studies may indicate that some research participants may have experienced these treatments as harmful and discontinued treatment (Lilienfeld, 2007). There are no scientifically rigorous studies of recent SOCE that would enable us to make a definitive statement about whether recent SOCE is safe or harmful and for whom.

## Individuals Who Undergo SOCE and Their Experiences

Although scientific evidence shows that SOCE is not likely to produce its intended outcomes and can produce harm for some of its participants, there is a population of consumers who participate in SOCE. To address the questions of appropriate application of affirmative interventions for this population, which was a major aspect of APA's charge to the task force, we returned to the research literature on SOCE, expanding beyond the scope of the systematic review to include other literature in order to develop an understanding of the current population that participates in SOCE. The research does reveal something about those individuals who undergo SOCE, how they evaluate their experiences, and why they may seek SOCE, even if the research does not indicate whether SOCE has anything to do with the changes some clients perceive themselves have experienced. We sought this information to be as comprehensive as possible and to develop an information base that would serve as a basis for considering affirmative interventions.

SOCE research identifies a population of individuals who experience conflicts and distress related to same-sex sexual attractions. The population of adults included in recent SOCE research is highly religious, participating

in faiths that many would consider traditional or conservative (e.g., the Church of Jesus Christ of Latter-Day Saints [Mormon], evangelical Christian, or Orthodox Jewish). Most of the participants in recent studies are White men who report that their religion is extremely important to them (Nicolosi et al., 2000; Schaeffer et al., 2000; Shidlo & Schroeder, 2002; Spitzer, 2003). These recent studies include a small number of participants who identify as members of ethnic minority groups. Recent studies include more women than in early studies, and one qualitative study focused exclusively on women (Ponticelli, 1999). Most of the individuals studied tried a variety of methods to change their sexual orientation, including psychotherapy, support groups, and religious efforts. Many of the individuals studied were recruited from groups endorsing SOCE. The body of literature overall is based on convenience samples; thus, the relationship between the characteristics of these individuals compared to the entire population of people who seek SOCE is unknown.

Comparisons of the early and recent research indicate changes in the demographics of those who seek SOCE. The individuals who participated in early research on SOCE were also predominantly White males, but those studies included men who were court-referred to treatment, men who were referred to treatment for a range of psychiatric and sexual concerns, and men who were fearful of criminal or legal sanctions, in addition to men who were distressed by their sexual attractions. There are no data on the religious beliefs of those in the early studies. As noted previously, the individuals in recent studies indicated that religion is very important to them.

We concluded that some of the controversy surrounding SOCE can be explained by different understandings of the nature of sexual orientation and sexual orientation identity. Recent research in the field of sexual orientation indicates a range of sexual attractions and desires, sexual orientations, and multiple ways of self-labeling and self-identifying (e.g., Carrillo, 2002; Diamond, 1998, 2006, 2008; Fox, 1995; Hoburg et al., 2004; Savin-Williams, 2005). Some researchers have found that distinguishing the constructs of sexual orientation and sexual orientation identity adds clarity to an understanding of the variability in reports of these two variables (R. L. Worthington & Reynolds, 2009). *Sexual orientation* refers to an individual's patterns of sexual, romantic, and affectional arousal and desire for other persons based on those persons' gender and sex characteristics. Sexual orientation is tied to physiological drives and

biological systems that are beyond conscious choice and involve profound emotional feelings such as "falling in love" and emotional attachment. Other dimensions commonly attributed to sexual orientation (e.g., sexual behavior with men and/or women; sexual values, norms, and motivations; social affiliations with LGB or heterosexual individuals and communities; emotional attachment preferences for men or women; gender role and identity; lifestyle choices) are potential correlates of sexual orientation rather than principal dimensions of the construct. *Sexual orientation identity* refers to recognition and internalization of sexual orientation and reflects self-awareness, self-recognition, self-labeling, group membership and affiliation, culture, and self-stigma. Sexual orientation identity is a key element in determining relational and interpersonal decisions, as it creates a foundation for the formation of community, social support, role models, friendship, and partnering (APA, 2003; Jordan & Deluty, 1998; McCarn & Fassinger, 1996; Morris, 1997).

Recent studies of SOCE participants frequently do not distinguish between sexual orientation and sexual orientation identity. We concluded that the failure to distinguish these aspects of human sexuality in this recent SOCE research has obscured an understanding of what aspects of human sexuality might and might not change through intervention. The available evidence, from both early and recent studies, suggests that although sexual orientation is unlikely to change, some individuals modified their sexual orientation identity (i.e., individual or group membership and affiliation, self-labeling) and other aspects of sexuality (i.e.,

> *The available evidence, from both early and recent studies, suggests that although sexual orientation is unlikely to change, some individuals modified their sexual orientation identity (i.e., individual or group membership and affiliation, self-labeling) and other aspects of sexuality (i.e., values and behavior).*

values and behavior). They did so in a variety of ways and with varied and unpredictable outcomes, some of which were temporary (Beckstead, 2003; Beckstead & Morrow, 2004; Shidlo & Schroeder, 2002). For instance, in recent research, many individuals claim that through participating in SOCE, they became skilled in ignoring or tolerating their attractions or limiting the impact of their attractions on their sexual behavior (Beckstead & Morrow, 2004; McConaghy, 1976; Shidlo & Schroeder, 2002). Early nonexperimental case studies described



individuals who reported that they went on to lead outwardly heterosexual lives, including, for some, developing a sexual relationship with an other-sex partner and adopting a heterosexual identity (Birk, 1974; Larson, 1970). Some of these individuals reported heterosexual experience prior to treatment. People whose sexual attractions were initially limited to people of the same sex report much lower increases (if any) in other-sex attractions compared to those who report initial attractions to both men and women (Barlow et al., 1975). However, the low degree of scientific rigor in these studies makes any conclusion tentative.

Recent research indicates that former participants in SOCE report diverse evaluations of their experiences. Some individuals perceive that they have benefited from SOCE, while other individuals perceive that they have been harmed by SOCE (Beckstead & Morrow, 2004; Nicolosi et al., 2000; Schroeder & Shidlo, 2001; Shidlo & Schroeder, 2002). Across studies, it is unclear what specific individual characteristics and diagnostic criteria would prospectively distinguish those individuals who will later perceive that they have succeeded and benefited from SOCE from those who will later perceive that they have failed or been harmed.

Some individuals who participated in the early research reported negative side effects such as loss of sexual arousal, impotence, depression, anxiety, and relationship dysfunction. Individuals who participated in recent research and who failed to change sexual orientation, while believing they should have changed with such efforts, described their experiences as a significant cause of emotional distress and negative self-image (Beckstead & Morrow, 2004; Shidlo & Schroeder, 2002). Overall, those in this recent research who indicated that they were harmed reported feelings of distress, anxiety, depression, suicidal ideation, self-blame, guilt, and loss of hope among other negative feelings. Some who experienced religious interventions and perceived them negatively said that they felt disillusioned with religion; others felt they had failed their religion by having same-sex attraction (Beckstead & Morrow, 2004; Shidlo & Schroeder, 2002). Indirect harm from the associated costs (time, effort, money, disillusionment with psychotherapy) spent in ineffective treatment is significant. Both the early and recent research provide little clarity on the associations between claims to modify sexual orientation from same-sex to other-sex and subsequent improvements or harm to mental health.

Other individuals reported that they perceived SOCE to be helpful by providing a place to discuss their conflicts, reduce isolation, and receive support (Beckstead & Morrow, 2004; S. L. Jones & Yarhouse, 2007; Nicolosi et al., 2000; Ponticelli, 1999; Shidlo & Schroeder, 2002; Spitzer, 2003; Wolkomir, 2001, 2006). Some reported that SOCE helped them view their sexual orientation in a different light that permitted them to live in a manner consistent with their faith, which they perceived as positive (Nicolosi et al., 2000). Some individuals described finding a sense of support and community through SOCE and valued having others with whom they could identify (Beckstead & Morrow, 2004; Ponticelli, 1999; Wolkomir, 2001). These effects mirror those provided by mutual support groups for a range of problems. And the positive benefits reported by participants in SOCE, such as reduction of isolation, change of meaning, and stress reduction, are consistent with the findings of social support literature (Levine et al., 2004). Given the findings of limited efficacy of change of sexual orientation, it is unlikely that SOCE provides any unique benefits other than those documented for the social support mechanisms of mutual help groups. For those who had received psychotherapy, the positive perceptions of SOCE seem inconsistent with the documented effects of the supportive function of psychotherapy relationships (e.g., Norcross, 2002).

## Literature on Children and Adolescents

The task force was asked to report on the following: (a) the appropriate application of affirmative therapeutic interventions for children and adolescents who present a desire to change either their sexual orientation or their behavioral expression of their sexual orientation, or both, or whose guardian expresses a desire for the minor to change; (b) the presence of adolescent inpatient facilities that offer coercive treatment designed to change sexual orientation or the behavioral expression of sexual orientation; and (c) recommendations regarding treatment protocols that promote stereotyped gender-normative behavior to mitigate behaviors that are perceived to be indicators that a child will develop a homosexual orientation in adolescence and adulthood.

We reviewed the limited research on child and adolescent issues and drew the following conclusions: There is no research demonstrating that providing SOCE to children or adolescents has an impact on adult sexual orientation. The few studies of children with gender identity disorder found no evidence that psychotherapy provided to those children had an impact on adult sexual orientation (R. Green, 1986,

1987; Zucker, 2008; Zucker & Bradley, 1995). There is currently no evidence that teaching or reinforcing stereotyped gender-normative behavior in childhood or adolescence can alter sexual orientation (Mathy & Drescher, 2008). We are concerned that such interventions may increase the self-stigma, minority stress, and ultimately the distress of children and adolescents. We have serious concerns that the coercive or involuntary treatment of children or adolescents has the potential to be harmful and may potentially violate current clinical and practice guidelines, standards for ethical practice, and human rights.

# Recommendations and Future Directions

## Affirmative Psychotherapy With Adults

The appropriate application of affirmative therapeutic interventions with adults is built on three key findings in the research: (a) an enduring change to an individual's sexual orientation as a result of SOCE was unlikely, and some participants were harmed by the interventions; (b) for some individuals, sexual orientation identity, not sexual orientation, shifted and evolved via psychotherapy, support groups, or life events; and (c) clients benefit from psychotherapeutic approaches that emphasize acceptance, support, and recognition of important values and concerns.

On the basis of these findings and the clinical literature on this population, we suggest client-centered, multiculturally competent approaches grounded in the following scientific facts: (a) same-sex sexual attractions, behavior, and orientations per se are normal and positive variants of human sexuality—in other words, they are not indicators of mental or developmental disorders; (b) same-sex sexual attractions and behavior can occur in the context of a variety of sexual orientations and sexual orientation identities; (c) gay men, lesbians, and bisexual individuals can live satisfying lives and form stable, committed relationships and families that are equivalent to those of heterosexual individuals in essential respects; and (d) no empirical studies or peer-reviewed research supports theories attributing same-sex sexual orientation to family dysfunction or trauma.

Based on these findings summarized above and our comprehensive review of the research and clinical literature, we developed a framework for the appropriate application of affirmative therapeutic interventions for adults that has the following central elements:

· Acceptance and support

· A comprehensive assessment

· Active coping

· Social support

· Identity exploration and development

Acceptance and support include (a) unconditional positive regard for and empathy with the client, (b) openness to the client's perspective as a means of understanding his or her concerns, and (c) encouragement of the client's positive self-concept.

A comprehensive assessment considers sexual orientation uniquely individual and inseparable from an individual's personality and sense of self. This includes (a) being aware of the client's unique personal, social, and historical context and (b) exploring and countering the harmful impact of stigma and stereotypes on the client's self-concept (including the prejudice related to age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status).

Active coping strategies are efforts that include cognitive, behavioral, or emotional responses designed to change the nature of the stressor itself or how an individual perceives it and include both cognitive and emotional strategies. These may include cognitive strategies to reframe conflicts and emotional strategies to manage potential losses.

Psychotherapy, self-help groups, or welcoming communities (ethnic communities, social groups, religious denominations) provide social support that can mitigate distress caused by isolation, rejection, and lack of role models. Conflicts among disparate elements of identity play a major role in the conflicts and mental health concerns of those seeking SOCE (Bartoli & Gillem, 2008; Beckstead & Morrow, 2004).

Identity exploration is an active process of exploring and assessing one's identity and establishing a commitment to an integrated identity. LMHP facilitate this exploration by not having an a priori treatment goal for how clients identify or live out their sexual orientation. The process may include a developmental process that includes periods of crisis, mourning, reevaluation, identity deconstruction and reconstruction, and growth.



Treatments that are based on the assumption that homosexuality or same-sex sexual attractions are a mental disorder or based on inaccurate stereotypes regarding LGB people are to be avoided because they run counter to empirical data and because reports of harm suggest that such treatments can reinforce restricting stereotypes, increase internalized stigma, and limit a client's development (Beckstead & Morrow, 2004; Haldeman, 2001; Shidlo & Schroeder, 2002; G. Smith et al., 2004; see Lilienfeld, 2007, for information on psychotherapy harms).

## Psychotherapy With Children and Adolescents

We were asked to report on the appropriate application of affirmative therapeutic interventions for children and adolescents who present a desire to change either their sexual orientation or the behavioral expression of their sexual orientation, or both, or whose guardian expresses a desire for the minor to change. Consistent with the current scientific evidence, those working with children and adolescents strive to have a developmentally appropriate perspective that includes a client-centered multicultural perspective to reduce self-stigma and mitigate minority stress. This includes interventions that (a) reduce stigma and isolation, (b) support the exploration and development of identity, (c) facilitate achievement of developmental milestones, and (d) respect age-appropriate issues regarding self-determination. Such services are ideally provided in the least restrictive setting and with, at a minimum, the assent of the youth. However, LMHP are encouraged to acquire developmentally appropriate informed consent to treatment.

Affirmative approaches encourage families to reduce rejection and increase acceptance of their child and adolescent (Perrin, 2002; Ryan et al., 2009). Parents who are concerned or distressed by their children's sexual orientation can be provided accurate information about natural variation and sexual orientation identity and offered anticipatory guidance and psychotherapy that supports family reconciliation (e.g., communication, understanding, and empathy) and maintenance of their child's total health and well-being. Interventions that increase family, school, and community acceptance and safety of sexual minority children and youth appear particularly helpful. Such interventions are offered in ways that are consistent with aspects of diversity such as age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status.

## Special Concerns of Religious Individuals and Families

Many religious sexual minorities experience significant psychological distress and conflict due to the divergence between their sexual orientation and religious beliefs. To support clients who have these concerns, LMHP can provide psychological acceptance, support, and recognition of the importance of faith to individuals and communities while recognizing the science of sexual orientation. LMHP working with religious individuals and families can incorporate research from the psychology of religion into the client-centered multicultural framework summarized previously. The goal of treatment is for the client to explore possible life paths that address the reality of his or her sexual orientation while considering the possibilities for a religiously and spiritually meaningful and rewarding life. Such psychotherapy can enhance clients' search for meaning, significance, and a relationship with the sacred in their lives (e.g., Pargament & Maloney, 2005). Such an approach would focus on increasing positive religious coping, understanding religious motivations, integrating religious and sexual orientation identities, and reframing sexual orientation identities to reduce or eliminate self-stigma.

*The goal of treatment is for the client to explore possible life paths that address the reality of his or her sexual orientation while considering the possibilities for a religiously and spiritually meaningful and rewarding life.*

## Ethical Considerations

LMHP strive to provide interventions that benefit clients and avoid harm, consistent with current professional ethics. Psychologists aspire to provide treatment that is consistent with the APA *Ethical Principles of Psychologists and Code of Conduct* (APA, 2002b) and relevant APA guidelines and resolutions (e.g., APA, 2000, 2002c, 2004, 2005a, 2007b) with a special focus on ethical principles such as Beneficence and Nonmaleficence; Justice; and Respect for People's Rights and Dignity (including self-determination). LMHP reduce potential harms and increase potential benefits by basing their professional judgments

and actions on the most current and valid scientific evidence, such as that provided in this report (see APA, 2002b, Standard 2.04, Bases for Scientific and Professional Judgments).

LMHP enhance principles of social justice when they strive to understand and mitigate the effects of sexual stigma, prejudice, and discrimination on the lives of individuals, families, and communities. Further, LMHP aspire to respect diversity in all aspects of their work, including age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, and socioeconomic status.

Self-determination is the process by which a person controls or determines the course of her or his own life (*Oxford American Dictionary*, 2007). LMHP maximize self-determination by (a) providing effective psychotherapy that explores the client's assumptions and goals, without preconditions on the outcome; (b) providing resources to manage and reduce distress; and (c) permitting the client herself or himself to decide the ultimate goal of how to self-identify and live out her or his sexual orientation. We were not persuaded by some accounts that suggest that providing SOCE increases self-determination, because these suggestions encourage LMHP to offer treatment that (a) has not provided evidence of efficacy; (b) has the potential to be harmful; and (c) delegates important professional decisions that should be based on qualified expertise and training—such as diagnosis and the type of intervention. Rather, therapy that increases the client's ability to cope, understand, acknowledge, and integrate sexual orientation concerns into a self-chosen life is the measured approach.

> … therapy that increases the client's ability to cope, understand, acknowledge, and integrate sexual orientation concerns into a self-chosen life is the measured approach.

## Education, Training, and Research

We were asked to provide recommendations for education, training, and research as they pertain to such affirmative interventions. We examine these areas separately.

### EDUCATION AND TRAINING

#### Professional education and training

Training of LMHP to provide affirmative, evidence-based, and multicultural interventions with individuals distressed by their same-sex sexual attractions is critical. Research on LMHP behaviors indicates a range of interventions, some of which are based on attitudes and beliefs rather than evidence, especially as some LMHP may have been educated during the period when homosexuality was pathologized (cf. Bartlett et al., 2001; Beutler, 2000; M. King et al., 2004; Liszcz & Yarhouse, 2005). We recommend that LMHP increase their awareness of their own assumptions and attitudes toward sexual minorities (APA, 2000; R. L. Worthington et al., 2005). This occurs by increasing knowledge about the diversity of sexual minorities (e.g., age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status), as well as the management of the LMHP's own biases in order to avoid colluding with clients' internalized stigma and with the negating environments in which clients and LMHP live (APA, 2000; Dillon et al., 2004; Israel & Hackett, 2004; R. L. Worthington et al., 2005). We recommend that training in affirmative, evidence-based, and multiculturally informed interventions for sexual minorities be offered at all graduate schools and postgraduate training programs.

An important resource for LMHP is the APA (2000) *Guidelines for Psychotherapy With Lesbian, Gay, and Bisexual Clients*,[70] which advises LMHP to be competent in a variety of domains, including knowledge of the impact of stigma on mental health, the unique issues facing same-sex relationships and families, and the range of diversity concerns for sexual minority individuals. We recommend that several areas in which LMHP working with clients seeking SOCE obtain additional knowledge and skills include: (a) sexuality, sexual orientation, and sexual identity development; (b) the psychology of religion and spirituality, including models of faith development, religious coping, and the positive psychology of religion; (c) identity development models, including those that integrate multiple identities and facilitate identity conflict resolution; and (d) adaptive ways to manage stigma, minority stress, and multiple aspects of identity. We also recommend that practitioners review publications that explicate the above-mentioned topics and evidence-based, LGB-affirmative, and multicultural approaches to psychological interventions (APA, 2000, 2002a, 2002c, 2004, 2005b, 2006, 2007b, 2008a; Bartoli & Gillem, 2008; Brown, 2006; Fowers & Davidov, 2006; Schneider et al., 2002).

---

[70] These guidelines are being revised, and a new version will be available in 2010.



Those less familiar with religious perspectives can broaden their views on religion and religious individuals and reduce their potential biases by seeking relevant information on religious faith and the psychology of religion (e.g., Ano & Vasconcelles, 2005; Exline, 2002; Emmons, 1999; Emmons & Paloutzian, 2003; Fowler, 2001; Goldstein, 2007; Pargament & Mahoney, 2005; Pargament et al., 1998, 2005). Training programs for practitioners can increase competencies in these areas by including comprehensive material on religion and spirituality (Bartoli, 2007; Hage, 2006; Hathaway et al., 2004; Yarhouse & Fisher, 2002; Yarhouse & VanOrman, 1999) and on ways to incorporate religious approaches into psychotherapy (see, e.g., Richards & Bergin, 2000, 2004; Sperry & Shafranske, 2004). Additionally, publications that illustrate affirmative integration and resolution of religious and sexual minority identity are helpful (Astramovich, 2003; Beckstead & Israel, 2007; Glassgold, 2008; Haldeman, 2004; Ritter & O'Neil, 1989, 1995).

Conservative religious practitioners can increase their compassionate and understanding responses to sexual minorities. Some focus on increasing compassionate responses toward sexual minorities by conservative religious students or individuals (Bassett et al., 2005; Benoit, 2005; Fischer & DeBord, 2007; McMinn, 2005; Yarhouse, Burkett, & Kreeft, 2001; Zahniser & Boyd, 2008; Zahniser & Cagle, 2007). One study found an evolution of positive attitudes toward sexual minorities among LMHP who hold conservative religious values (E. Adams, Longoria, Hitter, & Savage, 2009). These perspectives are based on established social psychology research, such as the contact hypothesis, where increasing personal contact with members of minority groups of equal status reduces bias, including attitudes toward sexual minorities (e.g., Herek & Capitanio, 1996; Herek & Glunt, 1993; Pew Forum on Religion and Public Life, 2003).

Finally, although this report has limited information regarding sexual minorities in other countries, the research review and practice recommendations may be helpful to professionals. We recommend dissemination of this report to international mental health organizations and LGBT advocacy groups.

We recommend the following steps be taken by the APA to educate LMHP and support training programs in providing education:

1. Disseminate this report to accredited doctoral programs, internships, and other postdoctoral programs in psychology both in the United States and other countries to encourage the incorporation of this report and other relevant material on LGBT issues into graduate school training programs and internship sites.

2. Disseminate information to faculty in psychology departments in community colleges, colleges, and university programs as information and for use in curriculum development.

3. Maintain the currently high standards for APA approval of continuing professional education providers and programs.

4. Offer symposia and continuing professional education workshops at APA's annual convention that focus on treatment of individuals distressed by their same-sex sexual attractions, especially those who struggle to integrate religious and spiritual beliefs with sexual orientation identity.

5. Pursue the publication of a version of this report in an appropriate journal or other publication.

*Public education*

The information available to the public about SOCE and sexual orientation is highly variable and can be confusing. In those information sources that encourage SOCE, the portrayals of homosexuality and sexual minorities tend to be negative and at times to emphasize inaccurate and misleading stereotypes (Kennedy & Cianciotto, 2006; SPLC, 2005). Sexual minorities, individuals aware of same-sex sexual attractions, families, parents, caregivers, policymakers, religious leaders, and society at large can benefit from accurate scientific information about sexual orientation and about appropriate interventions for individuals distressed by their same-sex sexual attractions both in the United States and internationally. We recommend that APA:

1. Create informational materials for sexual minority individuals, families, parents, and other stakeholders on appropriate multiculturally competent and client-centered interventions for those distressed by their sexual orientation who may seek SOCE.

2. Create informational materials on sexual orientation, sexual orientation identity, and religion for all stakeholders, including the public and institutions of faith.

3. Create informational materials focused on the integration of ethnic, racial, national origin and

cultural issues, and sexual orientation and sexual orientation identity.

4. Integrate the conclusions of this report into existing APA public information resources, including print, media, and the Internet.

5. Collaborate with other relevant organizations, especially religious organizations, to disseminate this information.

## RESEARCH

Our systematic review of research has highlighted the methodological problems pervasive in recent research on SOCE. This raises two issues: (a) the publication of poorly designed research and (b) whether more research on SOCE should be conducted to pursue questions of benefit, harm, and safety. These two issues are addressed separately.

Much of the recent research on SOCE has had serious methodological problems. Although this research area presents serious challenges (e.g., obtaining a representative sample, finding appropriate measures, and using evidence-based constructs), many of the problems were avoidable. Problems included (a) inappropriate use of statistical tests, (b) poor measurement, and (c) designs that did not permit valid causal conclusions to be drawn.

Hunt and Carlson (2007) have argued that studies with immediate social relevance that have an impact on social policy or social issues should be held to a higher standard because this literature has the potential to influence policymakers and the public, and incomplete or misleading information has serious costs. Research published on SOCE needs to meet current best-practice research standards. Many of the problems in published SOCE research indicate the need for improvement in the journal review process. It is recommended that professional and scientific journals retain reviewers and editors with expertise in this area to maintain the standards of published research.

We concluded that research on SOCE (psychotherapy, mutual self-help groups, religious techniques) has not answered basic questions of whether it is safe or effective and for whom. Any future research should conform to best-practice standards for the design of efficacy research. Additionally, research into harm and safety is essential. Certain key issues are worth highlighting. Future research must use methods that are prospective and longitudinal, allow for conclusions about

cause and effect to be confidently drawn, and employ sampling methods that allow proper generalization.[71]

Future research should also include appropriate measures in terms of specificity of measurement of sexual orientation, sexual orientation identity and outcomes, and psychometric adequacy. Mixed-method research, in which methods and measures with offsetting weaknesses are simultaneously employed, may be especially advantageous. Alternative physiological means of measuring sexual orientation objectively may also be helpful. Recent research has used alternatives to genital gauges for the assessment of sexual orientation in men and women, such as functional magnetic resonance imaging (Ponseti et al., 2006). Physiological measures often use visual portrayals of nude individuals that some religious individuals may find morally unacceptable. Jiang, Costello, Fang, Huang, and He (2006) have explored the use of invisible images and have measured selective inattention/attention as an alternative to assess sexual arousal. Such methods or the development of methods that are less intrusive and are more consistent with religious values would be helpful to develop for this population.

Additionally, preexisting and co-occurring conditions, mental health problems, participants' need for monitoring self-impression, other interventions, and life histories would have to be given appropriate consideration so that research can better account for and test competing explanations for any changes observed in study participants over time. Specific conceptual and methodological challenges exist in research related to sexual minority populations, such as the conceptualization of sexual orientation and sexual orientation identity and obtaining representative samples. Researchers would be advised to consider and compensate for the unique conceptual and

---

[71] A published study that appeared in the grey literature in 2007 (S. L. Jones & Yarhouse, 2007) has been described by SOCE advocates and its authors as having successfully addressed many of the methodological problems that affect other recent studies, specifically the lack of prospective research. The study is a convenience sample of self-referred populations from religious self-help groups. The authors claim to have found a positive effect for some study respondents in different goals such as decreasing same-sex sexual attractions, increasing other-sex attractions, and maintaining celibacy. However, upon close examination, the methodological problems described in Chapter 3 (our critique of recent studies) are characteristic of this work, most notably the absence of a control or comparison group and the threats to internal, external, construct, and statistical validity. Best-practice analytical techniques were not performed in the study, and there are significant deficiencies in the analysis of longitudinal data, use of statistical measures, and choice of assessment measures. The authors' claim of finding change in sexual orientation is unpersuasive due to their study's methodological problems.



methodological challenges in this area (Meyer & Wilson, 2009; Moradi, Mohr, Worthington, Fassinger, 2009).

Safety issues continue to be important areas of study. As noted previously, early research indicates that aversive techniques have been found to have very limited benefits as well as potentially harmful effects. These documented harms were serious. An additional finding is that these treatments had extremely high dropout rates, which has been linked to adverse effects. Some individuals report harm from recent nonaversive techniques, and some individuals report benefits.

Some authors have stated that SOCE should not be investigated or practiced until safety issues have been resolved (Davison, 1976, 1991; Herek, 2003), as it is still unclear which techniques or methods may or may not be harmful. Assessing the safety of recent practices is a high priority given that this research is the least rigorous. Given that types of harm can be multiple, outcome studies with measures capable of assessing deterioration in mental health, appearance of new symptoms, heightened concern regarding existing symptoms, excessive dependency on the LMHP, and reluctance to seek out new treatment are important to include in future research (Lilienfeld, 2007). Other areas to assess are types of harm to others (e.g., some individuals have noted that advocating other-sex marriage or promising sexual orientation change may negatively affect spouses, potential spouses, and children) (Buxton, 1994, 2007; Wolkomir, 2006).

Finally, LMHP must be mindful of the indirect harms of SOCE, such as the "opportunity costs" (Lilienfeld, 2007) and the time, energy, effort, and expense of interventions that offer limited benefit and have the potential to cause disillusionment in psychotherapy. However, as concerns regarding harm have been raised, addressing risks to research participants and concerns regarding voluntary participation (see Standard 8.02 in APA, 2002b) must be carefully considered in any future research.

Research that meets these scientific standards and addresses efficacy and safety might help to clarify the issues. Even so, scientific research may not help to resolve the issues unless it can better account for the complexity of the concerns of the current population. The results of current research are complicated by the belief system of many of the participants whose religious faith and beliefs may be intricately tied to the possibility of change. Future research will have to better account for the motivations and beliefs of participants in SOCE.

Emerging research reveals that affirmative interventions show promise for alleviating the distress

of children, adolescents, and families around sexual orientation and identity concerns (D'Augelli, 2002, 2003; Goodenow et al., 2006; Perrin, 2002; C. Ryan et al., 2009). However, sexual minority adolescents are underrepresented in research on evidence-based approaches, and sexual orientation issues in children are virtually unexamined (APA, 2008d). Specific research on sexual minority adolescents and children has identified that stigma can be reduced through community interventions, supportive client-centered approaches, and family reconciliation techniques that focus on strengthening the emotional ties of family members to each other, reducing rejection, and increasing acceptance (D'Augelli, 2003; Goodenow et al., 2006; C. Ryan et al., 2009). This line of research should be continued and expanded to include conservatively religious youth and their families.

Finally, we presented a framework for therapy with this population. Although this model is based on accepted principles of psychotherapy and is consistent with evidence-based approaches to psychotherapy, it has not been evaluated for safety and efficacy. Such studies would have to be conducted in the same manner as research on SOCE and in ways that are consistent with current standards (see, e.g., Flay et al., 2005).

### Recommendations for basic research

To advance knowledge in the field and improve the lives of individuals distressed by same-sex sexual attractions who seek SOCE, it is recommended that researchers, research-funding organizations, and other stakeholders, including those who establish funding priorities, work together to improve our knowledge of sexuality, sexual orientation, and sexual orientation identity in the following areas:

1. The nature and development of sexuality, sexual orientation, sexual orientation identity across the life span and the correlates to these variables, incorporating differences across age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status.

2. Religious identity and faith development (inclusive of all world religions) and their intersection with other aspects of human life and identity, such as sexual orientation, sexual orientation identity, and the multiple social identity statuses related to privilege and stigma.

3. Identity integration, reduction in distress, and positive mental health for populations of religious sexual minorities and ethnic minority populations.

4. Culture, gender, religion, and race/ethnicity in the experience and construction of sexual orientation and sexual orientation identity.

5. Mental health outcomes of those who choose not to act on their sexual orientation by living celibately or in relationships with other-sex partners.

*Recommendations for research in psychotherapy*

We recommend that researchers and practitioners rigorously investigate multiculturally competent and affirmative evidence-based treatments for sexual minorities and those distressed by their sexual orientation that do not aim to alter sexual orientation but rather focus on sexual orientation identity exploration, development, and integration without prioritizing one outcome over another, for the following populations:

1. Sexual minorities who have traditional religious beliefs

2. Sexual minorities who are members of ethnic minority and culturally diverse communities both in the United States and internationally

3. Children and adolescents who are sexual minorities or questioning their sexual orientation

4. Parents who are distressed by their children's perceived future sexual orientation

5. Populations with any combination of the above demographics

## Policy

We were asked to make recommendations to APA to inform the association's response to groups that promote treatments to change sexual orientation or its behavioral expression and to support public policy that furthers affirmative therapeutic interventions.

The debate surrounding SOCE has become mired in ideological disputes and competing political agendas (Drescher, 2003; Drescher & Zucker, 2006). Some organizations opposing civil rights for LGBT individuals advocate SOCE (SPLC, 2005). Other policy concerns involve religious or socially conservative agendas where issues of religious morality conflict with scientific-based conceptions of positive and healthy

development. We encourage APA to continue its advocacy for lesbian, gay, bisexual, and transgender individuals and families and to oppose prejudice against sexual minorities (APA, 2003, 2005, 2006, 2008b). We encourage collaborative activities in pursuit of shared prosocial goals between psychologists and religious communities when such collaboration can be done in a mutually respectful manner that is consistent with psychologists' professional and scientific roles. These collaborative relationships can be designed to integrate humanitarian perspectives and professional expertise (Tyler, Pargament, & Gatz, 1983).

Thus, the task force urges APA to:

1. Actively oppose the distortion and selective use of scientific data about homosexuality by individuals and organizations seeking to influence public policy and public opinion and take a leadership role in responding to such distortions.

2. Support the dissemination of accurate scientific and professional information about sexual orientation in order to counteract bias that is based on lack of scientific knowledge about sexual orientation.

3. Encourage advocacy groups, elected officials, policymakers, religious leaders, and other organizations to seek accurate information and avoid promulgating inaccurate information about sexual minorities.

4. Seek areas where collaboration with religious leaders, institutions, and organizations can promote the well-being of sexual minorities through the use of accurate scientific data regarding sexual orientation and sexual orientation identity.

5. Encourage the Committee on Lesbian, Gay, Bisexual, and Transgender Concerns to prioritize initiatives that address religious and spiritual concerns and the concerns of sexual minorities from conservative faiths.

6. Adopt a new resolution: the Resolution on Appropriate Affirmative Responses to Sexual Orientation Distress and Change Efforts (see Appendix A).[72]

---

[72] The resolution was adopted by the APA Council of Representatives in August 2009.



# REFERENCES

Ackerman, S., & Hilsenroth, M. (2003). A review of therapist characteristics and techniques positively impacting the therapeutic alliance. *Clinical Psychology Review, 23,* 1-33.

Adams, E., Longoria, V., Hitter, T. L., & Savage, T. A. (2009, January). *Experiences of religiously conservative therapists who are gay-affirmative.* Poster session presented at the National Multicultural Summit, New Orleans, LA.

Adams, G. R., & Marshall, S. K. (1996). A developmental social psychology of identity: Understanding the person-in-context. *Journal of Adolescence, 19,* 429-442.

Adams, H. E., & Sturgis, E. T. (1977). Status of behavioral reorientation techniques in the modification of homosexuality: A review. *Psychological Bulletin, 84,* 1171-1188.

Alessi, E. J. (2008). Staying put in the closet: Examining clinical practice and counter transference issues in work with gay men married to heterosexual women. *Clinical Social Work Journal, 36,* 195-201.

Allen, D. J. (2001). The role of personality and defense mechanisms in the adjustment to a homosexual identity. *Journal of Homosexuality, 42,* 45-62.

American Academy of Child & Adolescent Psychiatry. (1989). Inpatient treatment of children and adolescents [Policy statement]. *American Acadamy of Child and Adolescent Psychiatry.* Retrieved from www.aacap.org/cs/root/policy_statements/inpatient_hospital_treatment_of_children_and_adolescents

American Academy of Pediatrics. (1999). *Caring for your school age child: Ages 5-12* (E. I. Schor, Ed.). New York: Bantam.

American Counseling Association Governing Council. (1998). *Affirmative resolution on lesbian, gay, and bisexual people.* Alexandria, VA: Author.

American Educational Research Association (AERA), American Psychological Association and National Council on Measurement in Education (NCME). (1999). *The standards for educational and psychological testing.* Washington, DC: Author.

American Psychiatric Association. (1952). *Mental disorders: Diagnostic and statistical manual* (1st ed.). Washington, DC: Author.

American Psychiatric Association. (1968). *Diagnostic and statistical manual of mental disorders* (2nd ed.). Washington, DC: Author.

American Psychiatric Association. (1973). *Homosexuality and civil rights: Position statement.* Retrieved January 5, 2008, from www.psych.org/edu/other_res/lib_archives/archives/197310.pdf.

American Psychiatric Association. (2000). *Therapies focused on attempts to change sexual orientation (reparative or conversion therapies).* Retrieved July 5, 2008, from www.psych.org/Departments/EDU/Library/APAOfficial-DocumentsandRelated/PositionStatements/200001.aspx

American Psychoanalytic Association. (1991). *Position statement: Homosexuality.* Retrieved July 7, 2008, from www.apsa.org/ABOUTAPSAA/POSITION-STATEMENTS/HOMOSEXUALITY/tabid/473/Default.aspx

American Psychoanalytic Association. (1992). *Position statement: Homosexuality* (Rev.). Retrieved July 7, 2008, from www.apsa.org/ABOUTAPSAA/POSITIONSTATEMENTS/HOMOSEXUALITY/tabid/473/Default.aspx

American Psychoanalytic Association. (2000). *Position statement on reparative therapy.* Retrieved November 30, 2007, from www.apsa.org/ABOUTAPSAA/POSITIONSTATEMENTS/REPARATIVETHERAPY/tabid/472/Default.aspx

American Psychological Association. (1975). Resolution on discrimination against homosexuals. *American Psychologists, 30*, 633.

American Psychological Association. (1992). *Ethical principles of psychologists and code of conduct*. Washington, DC: Author.

American Psychological Association. (1993). Resolution on lesbian, gay, and bisexual youths in the schools. *American Psychologist, 48*, 782-783.

American Psychological Association. (1998). Resolution on appropriate therapeutic responses to sexual orientation. *American Psychologist, 43*, 934-935.

American Psychological Association. (2000). Guidelines for psychotherapy with lesbian, gay, and bisexual clients. *American Psychologist, 55*, 1440-1451.

American Psychological Association. (2002a). *Developing adolescents: A reference guide for professionals*. Retrieved from www.apa.org/pi/pii/develop.pdf

American Psychological Association. (2002b). Ethical principles of psychologists and code of conduct. *American Psychologist, 57*, 1060-1073. Retrieved from www.apa.org/ethics/code2002.html

American Psychological Association. (2002c). *Guidelines on multicultural education, training, research, practice, and organizational change for psychologists*. Retrieved January 5, 2008, from www.apa.org/pi/multiculturalguidelines/formats.html

American Psychological Association. (2003). *Lawrence v. Texas: Brief for amicus curiae, Supreme Court of the United States*. Washington, DC. Retrieved February 25, 2008, from http://www.apa.org/pi/lgbc/policy/amicusbriefs.html#lawrence

American Psychological Association. (2004). Guidelines for psychological practice with older adults. *American Psychologist, 59*, 236-260.

American Psychological Association. (2005a). *Policy statements on lesbian, gay, and bisexual concerns*. Retrieved July 4, 2008, from www.apa.org/pi/lgbc/policy/pshome.html

American Psychological Association. (2005b). *Report of the 2005 Presidential Task Force on Evidence-Based Practice*. Retrieved January 4, 2008, from www.apa.org/practice/ebpreport.pdf

American Psychological Association. (2005c). Resolution on sexual orientation and marriage and resolution on sexual orientation, parents, and children. *American Psychologist, 60*, 494-496.

American Psychological Association. (2006a). Policy statement on evidence-based practice in psychology. *American Psychologist, 61*, 475-476

American Psychological Association. (2006b). Resolution on prejudice, stereotypes, and discrimination. *American Psychologist, 62*, 475-481.

American Psychological Association. (2007a, March 1). *APA adopts policy statement opposing the teaching of intelligent design as scientific theory* [Press release]. Retrieved from www.apa.org/releases/design.html

American Psychological Association. (2007b). Guidelines for psychological practice with girls and women. *American Psychologist, 62*, 949-979.

American Psychological Association. (2008a). Resolution rejecting intelligent design as scientific and reaffirming support for evolutionary theory. *American Psychologist, 63*, 426-427.

American Psychological Association. (2008b). Resolution on opposing discriminatory legislation and initiatives aimed at lesbian, gay, and bisexual persons. *American Psychologist, 63*, 428-430.

American Psychological Association. (2008c). Resolution on religious, religion-related, and/or religion-derived prejudice. *American Psychologist, 63*, 431-434.

American Psychological Association. (2008d). Resolution rejecting intelligent design as scientific and reaffirming support for evolutionary theory. *American Psychologist, 63*, 426-427.

American Psychological Association. (2008e). *Disseminating evidence-based practice for children & adolescents: A systems approach to enhancing care*. Retrieved February 17, 2009, from http://www.apa.org/pi/cyf/evidence.html

American Psychological Association. (2009). *Report of the APA Task Force on Gender Identity and Gender Variance*. Retrieved February 17, 2009, from www.apa.org/pi/lgbc/transgender/2008TaskForceReport.pdf

Ano, G. G., & Vasconcelles, E. B. (2005). Religious coping and psychological adjustment to stress: A meta-analysis. *Journal of Clinical Psychology, 61*, 461-480.

Antze, P. (1976). The role of ideologies in peer psychotherapy organizations: Some theoretical considerations of three case studies. *Journal of Applied Behavioral Science, 12*, 323-346.

Armon, V. (1960). Some personality variables in overt female homosexuality. *Journal of Projective Techniques, 24*, 293-309.

Aronson, E., & Mills, J. (1959). The effect of severity of liking for a group. *Journal of Abnormal and Social Psychology, 59*, 177-181.

Arriola, E. R. (1998). The penalties for puppy love: Institutionalized violence against lesbian, gay, bisexual, and transgender youth. *Journal of Gender, Race, and Justice, 429*, 1-43.

Astramovich, R. L. (2003). Facilitating spiritual wellness with gays, lesbians, and bisexuals: Composing a spiritual autobiography. In J. S. Whitman & C. J. Boyd (Eds.), *The therapist's notebook for lesbian, gay, and bisexual clients: Homework, handouts and activities for use in psychotherapy* (pp. 210-214). Binghamton, NY: Haworth Clinical Press.

Auerback, S., & Moser, C. (1987). Groups for the wives of gay and bisexual men. *Social Work, 32*, 321-325.



94   Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation

PBC-007594

Avishai, O. (2008). Doing religion in a secular world: Women in conservative religions and the question of agency. *Gender & Society, 22,* 409-433.

Bailey, J. M., & Zucker, K. J. (1995). Childhood sex-typed behavior and sexual orientation: A conceptual analysis and quantitative review. *Developmental Psychology, 31,* 43-55.

Balsam, K. F., & Mohr, J. J. (2007). Adaptation to sexual orientation stigma: A comparison of bisexual and lesbian/gay adults. *Journal of Counseling Psychology, 54,* 306-319.

Bancroft, J. (1969). Aversion therapy of homosexuality: A pilot study of 10 cases. *British Journal of Psychiatry, 115,* 1417-1431.

Bancroft, J. (2003). Can sexual orientation change? A long-running saga. *Archives of Sexual Behavior, 32,* 419-468.

Barlow, D., & Agras, W. (1973). Fading to increase heterosexual responsiveness in homosexuals. *Journal of Applied Behavior Analysis. 6,* 355-366.

Barlow, D. H., Agras, W. S., Abel, G. G., Blanchard, E. B., & Young, L. D. (1975). Biofeedback and reinforcement to increase heterosexual arousal in homosexuals. *Behaviour Research & Therapy, 13,* 45-50.

Bartlett, A., King, M., & Phillips, P. (2001). Straight talking: An investigation of the attitudes and practice of psychoanalysts and psychotherapists in relation to gays and lesbians. *British Journal of Psychiatry, 179,* 545-549.

Bartoli, E. (2007). Religious and spiritual issues in psychotherapy practice: Training the trainer. *Psychotherapy: Theory, Research, Practice, Training, 44,* 54-65.

Bartoli, E., & Gillem, A. R. (2008). Continuing to depolarize the debate on sexual orientation and religious identity and the therapeutic process. *Professional Psychology: Research and Practice, 39,* 202-209.

Bassett, R. L., Van Nikkelen-Kuyper, M., Johnson, D., Miller, A., Carter, A., & Grimm, J. P. (2005). Being a good neighbor: Can students come to value homosexual persons? *Journal of Psychology and Theology, 33,* 17-26.

Batson, C. D., Flink, C. H., Schoenrade, P. A., Fultz, J., & Pych, V. (1986). Religious orientation and overt and covert racial prejudice. *Journal of Personality and Social Psychology, 50,* 175-181.

Batson, C. D., Naifeh, S. J., & Pate, S. (1978). Social desirability, religiosity, and prejudice. *Journal for the Scientific Study of Religion, 50,* 31-41.

Baumeister, R. F., & Exline, J. J. (2000) Self-control, morality, and human strength. *Journal of Social and Clinical Psychology, 19,* 29-43.

Baumeister, R. F., & Muraven, M. (1996). Identity as adaptation to social, cultural, and historical context. *Journal of Adolescence, 19,* 405-416.

Baumeister, R. F., & Vohs, K. D. (2002). The pursuit of meaningfulness in life. In C. R. Snyder & S. J. Lopez (Eds.), *Handbook of positive psychology* (pp. 608-618). New York: Oxford University Press.

Bayer, R. (1981). *Homosexuality and American psychiatry: The politics of diagnosis.* New York: Basic Books.

Beauchamp, T. L., & Childress, J. (2008). *Principles of biomedical ethics* (6th ed.). New York: Oxford University Press.

Beauvois, J. L. O., & Joule, R. V. (1996). *A radical dissonance theory.* Philadelphia: Taylor & Francis.

Beckstead, A. L. (2003). Understanding the self-reports of reparative therapy "successes." *Archives of Sexual Behavior, 32,* 421-423.

Beckstead, A. L., & Morrow, S. L. (2004). Mormon clients' experiences of conversion therapy: The need for a new treatment approach. *The Counseling Psychologist, 32,* 651-690.

Beckstead, L., & Israel, T. (2007). Affirmative counseling and psychotherapy focused on issues related to sexual orientation conflicts. In K. J. Bieschke, R. M. Perez, & K. A. DeBord (Eds.), *Handbook of counseling and psychotherapy with lesbian, gay, bisexual, and transgender clients* (2nd ed., pp. 221-244). Washington, DC: American Psychological Association.

Bell, A. P., & Weinberg, M. S. (1978). *Homosexuality: A study of diversity among men and women.* New York: Simon & Schuster.

Bell, A. P., Weinberg, M., & Hammersmith, S. K. (1981). *Sexual preference: Its development in men and women.* Bloomington: Indiana University Press.

Bem, D. (1996). Exotic becomes erotic: A developmental theory of sexual orientation. *Psychological Review, 103,* 320-355.

Ben-Ari, A. (1995). The discovery that an offspring is gay: Parents', gay men's, and lesbians' perspectives. *Journal of Homosexuality, 30,* 89-112.

Bene, E. (1965). On the genesis of male homosexuality: An attempt at classifying the role of the parents. *British Journal of Psychiatry, 3,* 803.

Benoit, M. (2005). Conflict between religious commitment and same-sex attraction: Possibilities for a virtuous response. *Ethics & Behavior, 15,* 309–325.

Bernstein, B. E. (1990). Attitudes and issues of parents of gay men and lesbians and implications for therapy. *Journal of Gay & Lesbian Psychotherapy, 1,* 37-53.

Beutler, L. E. (2000). David and Goliath: When empirical and clinical standards of practice meet. *American Psychologist, 55,* 997-1007.

Biaggio, M., Coan, S., & Adams, W. (2002). Couples therapy for lesbians: Understanding merger and the impact of homophobia. *Journal of Lesbian Studies, 6,* 129-138.

Bieber, I., Dain, H. J., Dince, P. R., Drellich, M. G., Grand, H. G., Gundlach, R. H., et al. (1962). *Homosexuality: A psychoanalytic study.* New York: Basic Books.

Bieschke, K. J. (2008). We've come a long way, baby. *The Counseling Psychologist, 36,* 631-638.

Bieschke, K. J., Perez, R. M., & DeBord, K. A. (Eds.). (2007). *Handbook of counseling and psychotherapy with lesbian, gay, bisexual, and transgender clients* (2nd ed.). Washington, DC: American Psychological Association.

Binder, C. V. (1977). Affection training: An alternative to sexual reorientation. *Journal of Homosexuality, 2,* 251-259.

Bing, V. M. (2004). Out of the closet but still in hiding: Conflicts and identity issues for a Black-White biracial lesbian. *Women and Therapy, 27,* 185-201.

Birk, L. (1974). Group psychotherapy for men who are homosexual. *Journal of Sex & Marital Therapy, 1,* 29-52.

Birk, L., Huddleston, W., Miller, E., & Cohler, B. (1971). Avoidance conditioning for homosexuality. *Archives of General Psychiatry, 25,* 314-323.

Blanchard, R. (2008). Review and theory of handedness, birth order, and homosexuality in men. *Laterality: Asymmetries of Body, Brain and Cognition, 13,* 51-70.

Blechner, M. J. (2008). Selective inattention and bigotry: A discussion of the film *Trembling Before G-d*. *Journal of Gay and Lesbian Mental Health, 12,* 195-204.

Blitch, J. W., & Haynes, S. N. (1972). Multiple behavioral techniques in a case of female homosexuality. *Journal of Behavior Therapy & Experimental Psychiatry, 3,* 319-322.

Blumenfeld, W. J. (Ed.). (1992). *How we all pay the price* [Introduction.]. New York: Beacon Press.

Borowich, A. (2008). Failed reparative therapy of Orthodox Jewish homosexuals. *Journal of Gay and Lesbian Mental Health, 12,* 167-177.

Boykin, K. (1996). *One more river to cross: Black and gay in America*. New York: Anchor.

Bozett, F. W. (1982). Heterogeneous couples in heterosexual marriages: Gay men and straight women. *Journal of Marital & Family Therapy, 8,* 81-89.

Bradley, S., & Zucker, K. (1998). Drs. Bradley and Zucker reply. *Journal of the American Academy of Child and Adolescent Psychiatry, 37,* 244-245.

Brandchaft, B. (2007). Systems of pathological accommodation and change in analysis. *Psychoanalytic Psychology 24,* 667-687.

Bridges, K. L., & Croteau, J. M. (1994). Once-married lesbians: Facilitating life patterns. *Journal of Counseling & Development, 73,* 134-140.

Bright, C. (2004). Deconstructing reparative therapy: An examination of the processes involved when attempting to change sexual orientation. *Clinical Social Work Journal, 32,* 471-481.

Bronfenbrenner, U. (1979). *The ecology of human development*. Cambridge, MA: Harvard.

Brooke, H. L. (2005). "Gays, ex-gays, ex-ex-gays: Examining key religious, ethical, and diversity Issues": A follow-up interview with Douglas Haldeman, Ariel Shidlo, Warren Throckmorton, and Mark Yarhouse. *Journal of Psychology and Christianity, 24,* 343-351.

Brown, L. S. (1996). Ethical concerns with sexual minority patients. In R. P. Cabaj & T. S. Stein (Eds), *Textbook of homosexuality and mental health* (pp. 887-916). Washington, DC: American Psychiatric Press.

Brown, L. S. (2006). The neglect of lesbian, gay, bisexual and transgendered clients. In J. Norcross, L. Beutler, & R. Levant (Eds.), *Evidence-based practices in mental health: Debate and dialogue on fundamental questions* (pp. 346-352). Washington, DC: American Psychological Association.

Brownfain, J. J. (1985). A study of the married bisexual male: Paradox and resolution. *Journal of Homosexuality, 11*(1/2), 173-188.

Browning, C., Reynolds, A. L., & Dworkin, S. H. (1991). Affirmative psychotherapy for lesbian women. *The Counseling Psychologist, 19,* 177–196.

Brzezinski, L. G. (2000). *Dealing with disparity: Identity development of same-sex attracted/gay men raised in the Church of Jesus Christ of Latter-Day Saints*. Unpublished doctoral dissertation, University of Utah, Salt Lake City.

Buchanan, M., Dzelme, K., Harris, D., & Hecker, L. (2001). Challenges of being simultaneously gay or lesbian and spiritual and/or religious: A narrative perspective. *The American Journal of Family Therapy, 29,* 435–449.

Bullough, V. L. (1976). *Sexual variance in society and history*. Chicago: University of Chicago Press.

Burack, C., & Josephson, J. J. (2005). *A report from "Love Won Out: Addressing, Understanding, and Preventing Homosexuality."* New York: National Gay and Lesbian Task Force Policy Institute. Retrieved from www.thetaskforce.org/downloads/reports/reports/LoveWonOut.pdf

Butler, J. (2004). *Undoing gender*. New York: Routledge.

Buxton, A. P. (1994). *The other side of the closet: The coming-out crisis for straight spouses and families*. New York: Wiley.

Buxton, A. P. (2001). Writing our own script: How bisexual men and their heterosexual wives maintain their marriages after disclosure. *Journal of Bisexuality, 1*(2-3), 155-189.

Buxton, A. P. (2004). Works in progress: How mixed-orientation couples maintain their marriages after their wives come out. *Journal of Bisexuality, 1/2,* 57-82.

Buxton, A. P. (2007). Counseling heterosexual spouses of bisexual or transgender partners. In B. Firestein (Ed.), *Becoming visible: counseling bisexuals across the lifespan* (pp. 395-416). New York: Columbia University Press.

Byrd, A. D., & Nicolosi, J. (2002). A meta-analytic review of treatment of homosexuality. *Psychological Reports, 90,* 139-152.

Byrd, A. D., Nicolosi, J., & Potts, R. W. (2008). Clients' perceptions of how reorientation therapy and self-help can promote changes in sexual orientation. *Psychological Reports, 102,* 3-28.

Callahan, E. J., & Leitenberg, H. (1973). Aversion therapy for sexual deviation: Contingent shock and covert sensitization. *Journal of Abnormal Psychology, 81,* 60-73.



PBC 007596

Campos, P. E., & Goldfried, M. E. (2001). Introduction: Perspectives on gay, lesbian, and bisexual clients. *Journal of Clinical Psychology, 57,* 609-613.

Carlsson, G. (2007). Counseling the bisexual married man. In B.A. Firestein (Ed.), *Becoming visible: Counseling bisexuals across the lifespan* (pp. 108-126). New York: Columbia University Press.

Carrillo, H. (2002). *The night is young: Sexuality in Mexico in the time of AIDS.* Chicago: University of Chicago Press.

Carter, R. T. (2007). Racism and psychological and emotional injury: Recognizing and assessing race-based traumatic stress. *The Counseling Psychologist, 35,* 13-105.

Cass, V. C. (1979). Homosexual identity formation: A theoretical model. *Journal of Homosexuality, 4,* 219-235.

Cass, V. C. (1983/1984). Homosexual identity: A concept in need of definition. *Journal of Homosexuality, 9*(2-3), 105-126.

Castonguay, L. G., Proulx, J., Aubut, J., McKibben, A., & Campbell, M. (1993). Sexual preference assessment of sexual aggressors: Predictors of penile response magnitude. *Archives of Sexual Behavior, 22,* 325–334.

Cates, J. A. (2007). Identity in crisis: Spirituality and homosexuality in adolescence. *Child and Adolescent Social Work Journal, 24,* 369-383.

Chambless, D. L, & Hollon, S. D. (1998). Defining empirically supported therapies. *Journal of Consulting and Clinical Psychology, 66,* 7-18.

Chambless, D. L, & Ollendick, T. H. (2001). Empirically supported psychological interventions: Controversies and evidence. *Annual Review of Psychology, 52,* 685-716.

Chan, C. S. (1997). Don't ask, don't tell, don't know: The formation of a homosexual identity and sexual expression among Asian American lesbians. In B. Greene (Ed.), *Ethnic and cultural diversity among lesbians and gay men* (pp. 240–248). Thousand Oaks, CA: Sage.

Chang, Y. B., & Katayama, M. (1996). Assessment of sexual orientation in lesbian/gay/bisexual studies. *Journal of Homosexuality, 30*(4), 49-62.

Chivers, M. L., Seto, M. C., & Blanchard, R. (2007). Gender and sexual orientation differences in sexual response to sexual activities versus gender of actors in sexual films. *Journal of Personality and Social Psychology, 93,* 1108-1121.

Cianciotto, J., & Cahill, S. (2006). *Youth in the crosshairs: The third wave of ex-gay activism.* New York: National Gay and Lesbian Task Force.

Cochran, S. D., & Mays, V. M. (2006). Estimating prevalence of mental and substance use disorders among lesbians and gay men from existing national health data. In A. Omoto & H. Kurtzman (Eds.), *Sexual orientation and mental health: Examining identity and development in lesbian, gay, and bisexual people* (pp. 143-165). Washington DC: American Psychological Association.

Cohen, K. M., & Savin-Williams, R. C. (2004). Growing up with same-sex attractions. *Current Problems in Pediatric and Adolescent Health Care, 34,* 361-369.

Coleman, E. (1981/1982). Developmental stages of the coming out process. *Journal of Homosexuality, 7*(2/3), 31-43.

Coleman, E. (1989). The married lesbian. *Marriage & Family Review, 14*(3/4), 119-135.

Colson, C. E. (1972). Olfactory aversion therapy for homosexual behavior. *Journal of Behavior Therapy & Experimental Psychiatry, 3,* 185-187.

Comstock, G. D. (1996). *Unrepentant, self-affirming, practicing: Lesbian/bisexual/gay people within organized religion.* London: Continuum International Publishing Group.

Conger, J. J. (1975). Proceedings of the American Psychological Association, Incorporated, for the year 1974: Minutes of the annual meeting of the Council of Representatives. *American Psychologist, 30,* 620-651.

Conover, W. (1980). *Practical non-parametric statistics.* New York: Wiley.

Conrad, S. R., & Wincze, J. P. (1976). Orgasmic reconditioning: A controlled study of its effects upon the sexual arousal and behavior of adult male homosexuals. *Behavior Therapy, 7,* 155-166.

Cook, D. A., & Wiley, C. Y. (2000). Psychotherapy with members of African-American churches and spiritual traditions. In P. S. Richards & A. E. Bergin, (Eds.), *Handbook of psychotherapy and religious diversity* (pp. 369-398). Washington, DC: American Psychological Association.

Cook, D. J., Mulrow, C. D., & Haynes, R. B. (1998). Synthesis of best evidence for clinical decisions. In C. D. Mulrow & D. J. Cook (Eds.), *Systematic reviews: Synthesis of best evidence for health care decisions.* Philadelphia: American College of Physicians.

Corbett, K. (1996). Homosexual boyhood: Notes on girlyboys. *Gender & Psychoanalysis, 1,* 429-461.

Corbett, K. (1998). Cross-gendered identifications and homosexual boyhood: Toward a more complex theory of gender. *American Journal of Orthopsychiatry, 68,* 352-360.

Corbett, K. (2001). More life: Centrality and marginality in human development. *Psychoanalytic Dialogues, 11,* 313-335.

Corley, M. D., & Kort, J. (2006). The sex addicted mixed-orientation marriage: Examining attachment styles, internalized homophobia and viability of marriage after disclosure. *Sexual Addiction & Compulsivity, 13*(2-3), 167-193.

Corliss, H. L., Cochran, S. D., & Mays, V. (2002). Reports of parental maltreatment during childhood in a United States population-based survey of homosexual, bisexual, and heterosexual adults. *Child Abuse & Neglect, 26,* 1165-1178.

Coyle, A. (1993). A study of psychological well-being among gay men using the GHQ-30. *British Journal of Clinical Psychology, 32,* 218-220.



Coyle, A., & Rafalin, D. (2000). Jewish gay men's accounts of negotiating cultural, religious, and sexual identity: A qualitative study. *Journal of Psychology & Human Sexuality, 12,* 21-48.

Cramer, R. J., Golom, F. D., LoPresto, C. T., & Kirkley, S. M. (2008). Weighing the evidence: Empirical assessment and ethical implications of conversion therapy. *Ethics & Behavior, 18,* 93-114.

Crawford, I., Allison, K., Zamboni, B., & Soto, T. (2002). The influence of dual identity development on the psychosocial functioning of African-American gay and bisexual men. *Journal of Sex Research, 39,* 179-189.

Curtis, R. H., & Presly, A. S. (1972). The extinction of homosexual behavior by covert sensitization: A case study. *Behaviour Research & Therapy, 10,* 81-83.

D'Augelli, A. R (1994). Lesbian and gay male development: Steps toward an analysis of lesbians' and gay men's lives. In B. Greene & G. M. Herek (Eds.), *Lesbian and gay psychology: Theory, research, and clinical application* (pp. 118-132). Newbury Park, CA: Sage.

D'Augelli, A. R. (2002). Mental health problems among lesbian, gay, and bisexual youths ages 14 to 21. *Clinical Child Psychology and Psychiatry,* 7, 439-462.

D'Augelli, A. R. (2003). Lesbian and bisexual female youths aged 14 to 21: Developmental challenges and victimization experiences. *Journal of Lesbian Studies, 7,* 9-29.

D'Augelli, A. R., & Hershberger, S. L. (1993). Lesbian, gay, and bisexual youth in community settings: Personal challenges and mental health problems. *American Journal of Community Psychology, 21,* 421-448.

D'Augelli, A. R., Hershberger, S. L., & Pilkington, N. W. (1998). Lesbian, gay, and bisexual youth and their families: Disclosure of sexual orientation and its consequences. *American Journal of Orthopsychiatry, 68,* 361-371.

D'Augelli, A. R., & Patterson, C. J. (Eds.). (1995). *Lesbian, gay, and bisexual identities over the lifespan.* New York: Oxford University Press.

D'Augelli, A. R., & Patterson, C. J. (Eds.). (2001). *Lesbian, gay, and bisexual identities and youths: Psychological perspectives.* New York: Oxford University Press.

David, S., & Knight, B. G. (2008). Stress and coping among gay men: Age and ethnic differences. *Psychology and Aging, 23,* 62-69.

Davis, S. (2002). Autonomy versus coercion: Reconciling competing perspectives in community mental health. *Community Mental Health Journal, 38,* 239-250.

Davison, G. C. (1976). Homosexuality: The ethical challenge. *Journal of Consulting and Clinical Psychology, 44,* 157-162.

Davison, G. C. (1978). Not can but ought: The treatment of homosexuality. *Journal of Consulting and Clinical Psychology, 46,* 170–172.

Davison, G. C. (1982). Conceptual and ethical issues in therapy for the psychological problems of gay men, lesbians, and bisexuals. *JCLP/In Session: Psychotherapy in Practice, 57,* 695-704.

Davison, G. C. (1991). Constructionism and morality in therapy for homosexuality. In J. C. Gonsiorek & J. D. Weinrich (Eds.), *Homosexuality: Research implications for public policy* (pp. 137-148). Newbury Park, CA: Sage.

Davison, G. C., & Wilson, G. T. (1973). Attitudes of behavior therapists toward homosexuality. *Behavior Therapy, 4,* 686-696.

D'Emilio, J. (1983). *Sexual politics, sexual communities: The making of a homosexual minority in the United States 1940-1970.* Chicago: University of Chicago Press.

de Jong, A., & Jivraj, S. (2002, September/October). The journey to self-acceptance: Working with and for lesbian and gay refugees from Muslim countries. *InExile.* Retrieved February 10, 2009, from http://www.safraproject.org/Reports/Inexile.pdf

de la Huerta, C. (1999). *Coming out spiritually: The next step.* New York: Penguin Putnam.

Denizet-Lewis, B. (2003, August). Double lives on the down low. *The New York Times.* August 3, 2003. Retrieved February 10, 2009, from http://query.nytimes.com/gst/fullpage.html?sec=health&res=9F0CE0D61E3FF930A3575BC0A9659C8B63

Diamond, L. M. (1998). Development of sexual orientation among adolescent and young adult women. *Developmental Psychology, 34,* 1085-1095.

Diamond, L. M. (2003). Was it a phase? Young women's relinquishment of lesbian/bisexual identities over a 5-year period. *Journal of Personality and Social Psychology, 84,* 352- 364.

Diamond, L. M. (2006). What we got wrong about sexual identity development: Unexpected findings from a longitudinal study of young women. In A. M. Omoto & H. S. Kurtzman (Eds.), *Sexual orientation and mental health: Examining identity and development in lesbian, gay, and bisexual people* (pp. 73-94). Washington, DC: American Psychological Association.

Diamond, L. M. (2008). Female bisexuality from adolescence to adulthood: Results from a 10-year longitudinal study. *Developmental Psychology, 44,* 5-14.

Diamond, L. M., & Savin-Williams, R. C. (2000). Explaining diversity in the development of same-sex sexuality among young women. *Journal of Social Issues, 56,* 297-313.

Diaz, R. M., Ayala, G., & Bein, E. (2004). Sexual risk as an outcome of social oppression: Data from a probability sample of Latino gay men in three U.S. cities. *Cultural Diversity and Ethnic Minority Psychology, 10,* 255-267.

Diener, E. (2000). Subjective well-being: The science of happiness and a proposal for a national index. *American Psychologist, 55,* 34-43.



PBC 007598

Dillon, F. R., Worthington, R. L., Bielstein Savoy, H. B., Rooney, S. C., Becker-Schutte, A., & Guerra, R. M. (2004). On becoming allies: A qualitative study of LGB-affirmative counselor training. *Counselor Education & Supervision, 43,* 162-178.

DiPlacido, J. (1998). Minority stress among lesbians, gay men, and bisexuals: A consequence of heterosexism, homophobia, and stigmatization. In G. M. Herek (Ed.), *Stigma and sexual orientation: Understanding prejudice against lesbians, gay men, and bisexuals* (pp. 138-159). Thousand Oaks, CA: Sage.

Dorff, E., Nevins, D., & Reisner, A. (2006) *Homosexuality, human dignity and halakhah.* Retrieved December 31, 2008, from http://rabbinicalassembly.org/law/teshuvot_public.html

Drescher, J. (1998a). I'm your handyman: A history of reparative therapies. *Journal of Homosexuality, 36,* 19-42.

Drescher, J. (1998b). *Psychoanalytic therapy and the gay man.* Hillsdale, NJ: Analytic Press.

Drescher, J. (1999). The therapist's authority and the patient's sexuality. *Journal of Gay & Lesbian Psychotherapy, 3,* 61-80.

Drescher, J. (2001). Ethical concerns raised when patients seek to change same-sex attractions. *Journal of Gay & Lesbian Psychotherapy,* 5(3/4), 181-210.

Drescher, J. (2002). Causes and becauses: On etiological theories of homosexuality. *The Annual of Psychoanalysis, 30,* 57-68.

Drescher, J. (2003). The Spitzer study and the culture wars. *Archives of Sexual Behavior, 32,* 431-432.

Drescher, J., & Merlino, J. P. (Eds.). (2007). *American psychiatry and homosexuality: An oral history.* New York: Harrington Park Press.

Drescher, J., Stein, T. S., & Byne, W. (2005). Homosexuality, gay, and lesbian identities, and homosexual behavior. In B. Sadock & V. Sadock (Eds.), *Kaplan and Sadock's comprehensive textbook of psychiatry* (8th ed., pp. 1936-1965). Baltimore: Lippincott Williams & Wilkins/Wolters Kluwer.

Drescher, J., & Zucker, K. J. (Eds.). (2006). *Ex-gay research: Analyzing the Spitzer study and its relation to science, religion, politics, and culture.* New York: Harrington Park Press.

Dunne, M. P., Bailey, J., Kirk, K. M., & Martin, N. G. (2000). The subtlety of sex-atypicality. *Archives of Sexual Behavior, 29,* 549-565.

Durlak, J. A., Meerson, I., & Ewell Foster, C. J. (2003). Meta-analysis. In J. C. Thomas & M. Hersen (Eds.), *Understanding research in clinical and counseling psychology* (pp. 243-267). Mahwah, NJ: Erlbaum.

Dworkin, S. (1997). Female, lesbian, and Jewish: complex and invisible. In B. Greene (Ed.), *Ethnic and cultural diversity among lesbians and gay men* (pp. 63-87). Thousand Oaks, CA: Sage.

Dworkin, S. H. (2001). Treating the bisexual client. *Journal of Clinical Psychology, 57,* 671-680.

Ellis, A. (1956). The effectiveness of psychotherapy with individuals who have severe homosexual problems. *Journal of Consulting Psychology, 20,* 191-195.

Ellis, A. (1959). A homosexual treated with rational psychotherapy. *Journal of Clinical Psychology, 15,* 338-343.

Ellis, A. (1965). *Homosexuality: Its causes and cure.* New York: Lyle Stuart.

Emmons, R. A. (1999). *The psychology of ultimate concerns: Motivation and spirituality in personality.* New York: Guilford Press.

Emmons, R. A., & Paloutzian, R. E. (2003). The psychology of religion. *Annual Review of Psychology, 54,* 377-402.

Enns, C. Z. (2008). Toward a complexity paradigm for understanding gender role conflict. *The Counseling Psychologist, 36,* 446-454.

Erzen, T. (2006). *Straight to Jesus: Sexual and Christian conversions in the ex-gay movement.* Los Angeles: University of California Press.

Espin, O. M. (2005, January). *The age of the cookie cutter has passed: Contradictions in identity at the core of therapeutic intervention.* Paper presented at the National Multicultural Conference and Summit IV, Los Angeles, CA.

Eubanks-Carter, C., Burckell, L. A., & Goldfried, M. R. (2005). Enhancing therapeutic effectiveness with lesbian, gay, and bisexual clients. *Clinical Psychology: Science & Practice, 12,* 1-18.

Exline, J. J. (2002). Stumbling blocks on the religious road: Fractured relationships, nagging vices, and inner struggle to believe. *Psychological Inquiry, 13,* 182-189.

Faiver, C., & Ingersoll, R. E. (2005). Knowing one's limits. In C. S. Cashwell & J. S. Young (Ed.), *Integrating spirituality and religion into counseling: A guide to competent practice* (pp. 169-184). Alexandria, VA: American Counseling Association.

Farber, B. A., & Lane, J. S. (2002). Positive regard. In J. C. Norcross (Ed.), *Psychotherapy relationships that work: Therapist contributions and responsiveness to patients* (pp. 175-194). New York: Oxford University Press.

Fassinger, R. E., & Arseneau, J. R. (2006). "I'd rather get wet than be under that umbrella": Differentiating the experiences and identities of lesbian, gay, bisexual, and transgender people. In K. J. Bieschke, R. M. Perez, & K. A. DeBord (Eds.), *Handbook of counseling and psychotherapy with lesbian, gay, bisexual, and transgender clients* (2nd ed., pp. 19–49). Washington, DC: American Psychological Association.

Feldman, M. P., & MacCulloch, M. J. (1965). The application of anticipatory avoidance learning to the treatment of homosexuality: I. Theory, technique, and preliminary results. *Behaviour Research & Therapy, 3,* 165-183.

Festinger, L. (1957). *A theory of cognitive dissonance.* Palo Alto, CA: Stanford University Press.

Firestein, B. A. (Ed). (2007). *Becoming visible: Counseling bisexuals across the lifespan.* New York: Columbia University Press.

Fischer, A. R., & DeBord, K. A. (2007). Perceived conflicts between sexual and religious diversity affirmation: "That's perceived." In K. J. Bieschke, R. M. Perez, & K. A. DeBord (Eds.), *Handbook of counseling and psychotherapy with lesbian, gay, bisexual, and transgender clients* (2nd ed., pp. 317-339). Washington, DC: American Psychological Association.

Fischer, A. R., & Good, G. E. (1997). Men and psychotherapy: An investigation of alexithymia, intimacy, and masculine gender roles. *Psychotherapy: Theory, Research, Practice, Training, 43,* 160-170.

Fisher, R. J., & Katz, J. E. (2000). Social-desirability bias and the validity of self-reported values. *Psychology and Marketing, 17,* 105-120.

Flay, B. R., Biglan, A., Boruch, R. F., Castro, F. G., Gottfredson, D., Kellam, S., et al. (2005). Standards of evidence: Criteria for efficacy, effectiveness, and dissemination. *Prevention Science, 6,* 151-175.

Floyd, F. J., & Stein, T. S. (2002). Sexual orientation identity formation among gay, lesbian and bisexual youths: Multiple patterns of milestone. *Journal of Research on Adolescence, 12,* 167-191.

Folkman, S., & Lazarus, R. S. (1980). An analysis of coping in a middle-aged community sample. *Journal of Health and Social Behavior, 21,* 219-239.

Fontaine, J. H., & Hammond, N. L. (1996). Counseling issues with gay and lesbian adolescents. *Adolescence, 31,* 817-830.

Fookes, B. H. (1960). Some experiences in the use of aversion therapy in male homosexuality, exhibitionism, and fetishism-transvestism. *British Journal of Psychiatry, 115,* 339-341.

Ford, C. S., & Beach, F. A. (1951). *Patterns of sexual behavior.* New York: Harper & Row.

Ford, J. G. (2001). Healing homosexuals: A psychologist's journey through the ex-gay movement and the pseudo-science of reparative therapy. *Journal of Gay and Lesbian Psychotherapy, 5,* 69-86.

Forehand, H., & Ciccone, J. R. (2004). The competence of adolescents to consent to treatment. *Adolescent Psychiatry, 28,* 5-27.

Forstein, M. (2001). Overview of ethical and research issues in sexual orientation therapy. *Journal of Gay & Lesbian Psychotherapy, 5*(3/4), 167-179.

Fowers, B. J., & Davidov, B. J. (2006). The virtue of multiculturalism: Personal transformation, character, and openness to the other. *American Psychologist, 61,* 581-594.

Fowler, J. (1981). *Stages of faith: The psychology of human development and the quest for meaning.* New York: Harper & Row.

Fowler, J. (1991). Stages in faith consciousness. *New Directions for Child Development, 52,* 27-45.

Fowler, J. W. (2001). Faith development theory and the postmodern challenges. *International Journal for the Psychology of Religion, 11,* 159-172.

Fox, R. C. (1995). Bisexual identities. In A. R. D'Augelli & C. J. Patterson (Eds.), *Lesbian, gay and bisexual identities across the lifespan* (pp. 48-86). New York: Oxford University Press.

Fox, R. C. (Ed.). (2004). *Current research on bisexuality.* Ithaca, NY: Harrington Park Press. [Published simultaneously as *Journal of Bisexuality, 4*(1/2).]

Frankl, V. (1992). *Man's search for meaning* (4th ed.). New York: Simon & Schuster.

Freeman, W., & Meyer, R. G. (1975). A behavioral alteration of sexual preferences in the human male. *Behavior Therapy, 6,* 206-212.

Freud, S. (1960). Three essays on the theory of sexuality. In J. Strachey (Ed. & Trans.), *The standard edition of the complete psychological works of Sigmund Freud* (Vol. 7, 123-143). London: Hogarth. (Original work published 1905)

Freud, S. (1960). The psychogenesis of a case of homosexuality in a woman. In J. Strachey (Ed. & Trans.), *The standard edition of the complete psychological works of Sigmund Freud* (Vol. 18, 147-172). London: Hogarth. (Original work published 1920)

Freud, S. (1960). Anonymous (Letter to an American mother). In E. Freud (Ed.), *The letters of Sigmund Freud* (pp. 423-424). New York: Basic Books. (Original work published 1935)

Freund, K. (1971). A note on the use of the phallometric method of measuring mild sexual arousal in the male. *Behavior Therapy, 2,* 223–228.

Freund, K. (1976). Psycho-physiological assessment of change in erotic preferences. *Behavioral Research and Therapy, 15,* 297-301.

Freund, K., & Blanchard, R. (1983). Is the distant relationship of fathers and homosexual sons related to the sons' erotic preference for male partners, or to the sons' atypical gender identity, or to both? *Journal of Homosexuality, 9,* 7-25.

Freund, K., & Pinkava, V. (1961). Homosexuality in man and its association with parental relationships. *Review of Czechoslovak Medicine, 7,* 32-40.

Freund, K., Watson, R., & Rienzo, D. (1988). Signs of feigning in the phallometric test. *Behaviour Research & Therapy, 26,* 105-112.

Frost, D. M., & Meyer, I. H. (2009). Internalized homophobia and relationship quality among lesbians, gay men, and bisexuals. *Journal of Counseling Psychology, 56,* 97-109.

Fulton, A. S., Gorsuch, R. L., & Maynard, E. A. (1999). Religious orientation, antihomosexual sentiment and fundamentalism among Christians. *Journal for the Scientific Study of Religion, 38,* 14-22.



PBC 007600

Garnets, L. D., Hancock, K., Cochran, S., Goodchilds, J., & Peplau, L. (1991). Issues in psychotherapy with lesbians and gay men: A survey of psychologists. *American Psychologist, 46,* 964-972.

Garnets, L. D., & Peplau, L. A. (2000). Understanding women's sexualities and sexual orientations: An introduction. *Journal of Social Issues, 56,* 181-192.

Garofalo, R., & Harper, G. W. (2003). Not all adolescents are the same: Addressing the unique needs of gay and bisexual male youth. *Adolescent Medicine, 14,* 595-612.

Gartner, R. (1999). *Betrayed as boys.* New York: Guilford Press.

George, L., Larson, D., Koenig, H., & McCullough, M. (2000). Spirituality and health: What we know and what we need to know. *Journal of Social and Clinical Psychology, 19,* 102–116.

Glassgold, J. M. (1995). Psychoanalysis with lesbians: Self-reflection and agency. In J. M. Glassgold & S. Iasenza (Eds.), *Lesbians & psychoanalysis: Revolutions in theory and practice.* New York: The Free Press.

Glassgold, J. M. (2007). "In dreams begin responsibilities": Psychology, agency & activism. *Journal of Gay and Lesbian Mental Health, 11*(3/4), 37-57.

Glassgold, J. M. (2008). Bridging the divide: Integrating lesbian identity and orthodox Judaism. *Women and Therapy, 31, 59-73.*

Glassgold, J. M., & Iasenza, S. (1995). *Lesbians & psychoanalysis: Revolutions in theory and practice* [Introduction]. New York: The Free Press

Glassgold, J. M., & Iasenza, S. (2004). Lesbians, feminism and psychoanalysis: The second wave [Introduction]. *Journal of Lesbian Studies, 8*(1/2), 1-10.

Glassgold, J. M., & Knapp, S (2008). Ethical issues in screening clergy or candidates for religious professions for denominations that exclude homosexual clergy. *Professional Psychology: Research and Practice, 39,* 346-352.

Gochros, J. S. (1989). *When husbands come out of the closet.* Binghamton, NY: Harrington.

Goffman, E. (1963). *Stigma: Notes on the management of spoiled identity.* Englewood Cliffs, NJ: Prentice-Hall.

Goishi, M. A. (1997). Legal and social responses to the problems of queer youth: Unlocking the closet door: Protecting children from involuntary civil commitment because of their sexual orientation. *Hastings Law Journal, 48.*

Goldfried, M. R., & Goldfried, A. P. (2001). The importance of parental support in the lives of lesbian, gay, and bisexual individuals. *Journal of Clinical Psychology, 57,* 681–693.

Goldstein, E. D. (2007). Sacred moments: Implications on well-being and stress. *Journal of Clinical Psychology, 63,* 1001–1019.

Gonsiorek, J. C. (1991). The empirical basis for the demise of the illness model of homosexuality. In J. C. Gonsiorek & J. D. Weinrich (Eds.), *Homosexuality: Research implications for public policy* (pp. 115-136). Newbury Park, CA: Sage.

Gonsiorek, J. C. (2004). Reflections from the conversion therapy battlefield. *The Counseling Psychologist, 32,* 750-759.

Gonsiorek, J. C., Sell, R. L., & Weinrich, J. D. (1995). Definition and measurement of sexual orientation. *Suicide and Life-Threatening Behavior, 25,* 40-51.

Goodenow, C., Szalacha L., & Westheimer K. (2006). School support groups, other school factors, and the safety of sexual minority adolescents. *Psychology in the Schools, 43,* 573-589.

Goodheart, C. D., Kazdin, A. E., & Sternberg, R. J. (Eds.). (2006). *Evidence-based psychotherapy: Where practice and research meet.* Washington, DC: American Psychological Association.

Graham, L. K. (1997). *Discovering images of God: Narratives of care among lesbians and gays.* Louisville, KY: Westminster John Knox Press.

Gramick, J. (1984). Developing a lesbian identity. In T. Darty & S. Potter (Eds.), *Women-identified women* (pp. 31-44). Palo Alto, CA: Mayfield.

Gray, J. J. (1970). Case conference: Behavior therapy in a patient with homosexual fantasies and heterosexual anxiety. *Journal of Behavior Therapy & Experimental Psychiatry, 1,* 225-232.

Green, R. (1985). Gender identity in childhood and later sexual orientation: Follow-up of 78 males. *American Journal of Psychiatry, 142,* 339-441.

Green, R. (1987). *The "sissy boy syndrome" and the development of homosexuality.* New Haven, CT: Yale University Press.

Green, R. J. (2003). When therapists do not want their clients to be homosexual: A response to Rosik's article. *Journal of Marital and Family Therapy, 29,* 29–38.

Greenberg, S. (2004). *Wrestling with God and men: Homosexuality in the Jewish tradition.* Madison: University of Wisconsin.

Greenspoon, J., & Lamal, P. A. (1987). A behavioristic approach. In L. Diamant (Ed), *Male and female homosexuality: Psychological approaches* (pp. 109-128). Washington, DC: Hemisphere.

Gross, M. (2008). To be Christian and homosexual. From shame to identity-based claims. *Nova Religio, 11,* 77-101.

Hage, S. M. (2006). A closer look at the role of spirituality in psychology training programs. *Professional Psychology: Research and Practice, 37,* 303-310.

Halbertal, T. H., & Koren, I. (2006). Between "being" and "doing": Conflict and coherence in the identity formation of gay and lesbian orthodox Jews. In D. P. McAdams, R. Josselson, & A. Lieblich (Eds.), *Identity and story: Creating self in narrative* (p. 37-61). Washington, DC: American Psychological Association.

Haldeman, D. C. (1994). The practice and ethics of sexual orientation conversion therapy. *Journal of Consulting and Clinical Psychology, 62,* 221-227.

Haldeman, D. C. (1996). Spirituality and religion in the lives of lesbians and gay men. In R. P. Cabaj & T. S. Stein (Eds.), *Textbook of homosexuality and mental health* (pp. 881-896). Washington, DC: American Psychiatric Press.

Haldeman, D. C. (2000). Gender atypical youth: Clinical and social issues. *School Psychology Review, 29,* 192-200.

Haldeman, D. C. (2001). Therapeutic antidotes: Helping gay and bisexual men recover from conversion therapies. *Journal of Gay and Lesbian Psychotherapy, 5*(3-4), 117-130.

Haldeman, D. C. (2002). Gay rights, patient rights: The implications of sexual orientation conversion therapy. *Professional Psychology, 33,* 200-204.

Haldeman, D. C. (2004). When sexual and religious orientation collide: Considerations in working with conflicted same-sex attracted male clients. *The Counseling Psychologist, 32,* 691-715.

Hall, M. E. L., & Johnson, E. J. (2001). Theodicy and therapy: Philosophical/theological contributions to the problem of suffering. *Journal of Psychology and Christianity, 20,* 5-17.

Hallam, R. S., & Rachman, S. (1972). Some effects of aversion therapy on patients with sexual disorders. *Behaviour Research & Therapy, 10,* 171-180.

Hallman, J. (2008). *The heart of female same-sex attraction.* Downer's Grove, IL: Intervarsity Press

Halstead, J. M., & Lewicka, K. (1998). Should homosexuality be taught as an acceptable alternative lifestyle? A Muslim perspective. *Cambridge Journal of Education, 28,* 49-64.

Hanson, R. W., & Adesso, V. J. (1972). A multiple behavioral approach to male homosexual behavior: A case study. *Journal of Behavior Therapy & Experimental Psychiatry, 3,* 323-325.

Harper, G. W., Jamil, O. B., & Wilson, B. D. M. (2007). Collaborative community-based research as activism: Giving voice and hope to lesbian, gay, and bisexual youth. *Journal of Lesbian and Gay Psychotherapy, 11*(3/4), 99-119.

Harper, G. W., Jernewall, N., & Zea, M. C. (2004). Giving voice to emerging science and theory for lesbian, gay, and bisexual people of color. *Cultural Diversity and Ethnic Minority Psychology, 10,* 187-199.

Harrell, S. P. (2000). A multidimensional conceptualization of racism-related stress: Implications for the well-being of people of color. *American Journal of Orthopsychiatry, 70,* 42-57.

Harris, J. I., Cook, S. W., & Kashubeck-West, S. (2008). Religious attitudes, internalized homophobia, and identity in gay and lesbian adults. *Journal of Gay and Lesbian Mental Health, 12,* 205-225.

Hart, T. A., & Heimberg, R. G. (2001). Presenting problems among treatment-seeking gay, lesbian, and bisexual youth. *Journal of Clinical Psychology, 57,* 615-627.

Hartman, R. G. (2000). Adolescent autonomy: Clarifying an ageless conundrum. *Hastings Law Journal, 51,* 1265.

Hartman, R. G. (2002). Coming of age: Devising legislation for adolescent medical decision-making. *American Journal of Law and Medicine, 28,* 409.

Hathaway, W. L., Scott, S. Y., & Garver, S. A. (2004). Assessing religious/spiritual functioning: A neglected domain in clinical practice? *Professional Psychology: Research and Practice, 35,* 97-104.

Hatzenbuehler, M. L., Nolen-Hoeksema, S. & Erickson, S. J. (2008). Depressive symptoms: Results from a prospective study of bereaved Gay men. *Health Psychology, 27,* 455-462.

Hayduk, L. A., Stratkotter, R. F., & Rovers, M. W. (1997). Sexual orientation and the willingness of Catholic seminary students to conform to church teachings. *Journal for the Scientific Study of Religion, 36*(3), 455-467.

Hayes, S. C., Strosahl, K. D., & Wilson, K. G. (2003). *Acceptance and commitment therapy: An experiential approach to behavior change.* New York: Guildford Press.

Hays, D., & Samuels, A. (1989). Heterosexual women's perceptions of their marriages to bisexual or homosexual men. *Journal of Homosexuality, 18*(1-2), 81-100.

Heinz, B., Gu, L., Inuzuka, A., & Zender, R. (2002). Under the rainbow flag: Webbing global gay identities. *International Journal of Sexuality & Gender Studies, 7,* 107-124.

Hekma, G. (2002). Imams and homosexuality: A post-gay debate in the Netherlands. *Sexualities, 5,* 237-248.

Helminiak, D. A. (2004). The ethics of sex: A call to the gay community. *Pastoral Psychology, 52,* 259-267.

Helms, J. E. (1995). An update of Helms' White and people of color racial identity models. In J. G. Ponterotto, J. M. Casas, A. Suzuki, & C. M. Alexander (Eds.), *Handbook of multicultural counseling* (pp. 181-198). Thousand Oaks, CA: Sage.

Heppner, P. P., & Heppner, M. J. (2008). The gender role conflict literature: Fruits of sustained commitment. *The Counseling Psychologist, 36,* 455-461.

Herek, G. M. (1987). Religion and prejudice: A comparison of racial and sexual attitudes. *Personality and Social Psychology Bulletin, 13,* 56-65.

Herek, G. M. (2003). Evaluating interventions to alter sexual orientation: Methodological and ethical considerations. *Archives of Sexual Behavior, 32,* 438-439.

Herek, G. M. (2007). Confronting sexual stigma and prejudice: Theory and practice. *Journal of Social Issues, 63,* 905-925.



Herek, G. M. (2009). Sexual stigma and sexual prejudice in the United States: A conceptual framework. In D. A. Hope (Ed.), *Nebraska Symposium on Motivation: Vol. 54. Contemporary perspectives on lesbian, gay, and bisexual identities* (pp. 65-111). New York: Springer.

Herek, G. M., & Capitanio, J. P. (1996). "Some of my best friends": Intergroup contact, concealable stigma, and heterosexuals' attitudes toward gay men and lesbians. *Personality and Social Psychology Bulletin, 22,* 412-424.

Herek, G. M., Cogan, J. C., Gillis, J. R., & Glunt, E. K. (1998). Correlates of internalized homophobia in a community sample of lesbians and gay men. *Journal of the Gay and Lesbian Medical Association, 2,* 17-25.

Herek, G. M., & Garnets, L. (2007). Sexual orientation and mental health. *Annual Review of Clinical Psychology, 3,* 353-375.

Herek, G. M., Gillis, J. R., & Cogan, J. C. (2009). Internalized stigma among sexual minority adults: Insights from a social psychological perspective. *Journal of Counseling Psychology, 56,* 32-43.

Herek, G. M., & Glunt, E. K. (1993). Interpersonal contact and heterosexuals' attitudes toward gay men: Results from a national survey. *The Journal of Sex Research, 30,* 239-244.

Herman, S. H., Barlow, D. H., & Agras, W. S. (1974). An experimental analysis of exposure to "explicit" heterosexual stimuli as an effective variable in changing arousal patterns of homosexuals. *Behaviour Research & Therapy, 12,* 335-345.

Herman, S. H., & Prewett, M. (1974). An experimental analysis of feedback to increase sexual arousal in a case of homo- and heterosexual impotence: A preliminary report. *Journal of Behavior Therapy & Experimental Psychiatry, 5,* 271-274.

Hernandez, B. C., & Wilson, C. M. (2007). Another kind of ambiguous loss: Seventh-day Adventist women in mixed-orientation marriages. *Family Relations, 56,* 184-195.

Hetrick, E. S., & Martin, A. D. (1987). Developmental issues and their resolution for gay and lesbian adolescents. *Journal of Homosexuality, 14,* 25-43.

Higgins, D. J. (2006). Same-sex attraction in heterosexually partnered men: Reasons, rationales and reflections. *Sexual and Relationship Therapy, 21,* 217-228.

Hill, L. G., & Betz, D. L. (2005). Revisiting the retrospective pretest. *American Journal of Evaluation, 26,* 501-517.

Hoburg, R., Konik, J., Williams, M., & Crawford, M. (2004). Bisexuality among self-identified heterosexual college students. *Journal of Bisexuality, 4*(1/2), 25-36.

Hoffman, L., Knight, S. K., Hoffman, J. L., Boscoe-Huffman, S., Galaska, D., & Arms, M., et al. (2007, August). *Examining the interplay of religious, spiritual, and homosexual dynamics of psychological health: A preliminary investigation.* Poster session presented at the annual meeting of the American Psychological Association, San Francisco.

Holtzen, D. W., & Agriesti, A. A. (1990). Parental responses to gay and lesbian children: Differences in homophobia, self-esteem, and sex-role stereotypes. *Journal of Social & Clinical Psychology, 9,* 390-399.

Hooker, E. A. (1957). The adjustment of the male overt homosexual. *Journal of Projective Techniques, 21,* 18-31.

Hooker, E. A. (1969). Parental relations and male homosexuality in patient and nonpatient populations. *Journal of Consulting and Clinical Psychology, 33,* 140-142.

Horlacher, G. T. (2006, October). *Religion and sexual orientation in conflict: Changing values of same-sex oriented Mormons.* Paper presented at the annual meeting of the Society for the Scientific Study of Religion, Portland, OR.

Horne, S., & Noffsinger-Frazier, N. (2003). Reconciling with religion/exploring spirituality. In J. S. Whitman & C. J. Boyd (Eds.), *The therapist's notebook for lesbian, gay, and bisexual clients: Homework, handouts and activities for use in psychotherapy* (pp. 202-205). Binghamton, NY: Haworth Clinical Press.

Horvath, A. O., & Bedi, R. P. (2002). The alliance. In J. C. Norcross (Ed.), *Psychotherapy relationships that work: Therapist contributions and responsiveness to patients* (pp. 37-69). New York: Oxford.

Huff, F. W. (1970). The desensitization of a homosexual. *Behaviour Research & Therapy, 8,* 99-102.

Humphreys, K. (2004). *Circles of recovery: Self-help organizations for addictions.* Cambridge, England: Cambridge University Press.

Hunsberger, B., & Jackson, L. M. (2005). Religion, meaning, and prejudice. *Journal of Social Issues, 61,* 807-826.

Hunt, E., & Carlson, J. (2007). The standards for conducting research on topics of immediate social relevance. *Intelligence, 35,* 393-399.

Isay, R. A. (1987). Fathers and their homosexually-inclined sons in childhood. *Psychoanalytic Study of the Child, 42,* 275-294.

Isay, R. A. (1998). Heterosexually married homosexual men: Clinical and developmental issues. *American Journal of Orthopsychiatry, 68,* 424-432.

Isay, R. A. (2001). The development of sexual identity in homosexual men. In S. I. Greenspan & G. H. Pollock (Eds.), *The course of life: Adolescence* (Vol.4, pp. 469-491). Madison, CT: International Universities Press.

Israel, T., & Hackett, G. (2004). Counselor education on lesbian, gay, and bisexual issues: Comparing information and attitude exploration. *Counselor Education & Supervision, 43,* 179-191.

Israel, T., Ketz, K., Detrie, P. M., Burke, M. C., & Shulman, J. (2003). Identifying counselor competencies for working with lesbian, gay, and bisexual clients. *Journal of Gay & Lesbian Psychotherapy, 7,* 3-21.

Iwasaki, Y., & Ristock, J. L. (2007). The nature of stress experienced by lesbians and gay men. *Anxiety, Stress & Coping: An International Journal, 20,* 299-319.

James, B. (1962). Case of homosexuality treated by aversion therapy. *British Medical Journal, 1,* 768-770.

James, S. (1978). Treatment of homosexuality: II. Superiority of desensitization/arousal as compared with anticipatory avoidance conditioning: Results of a controlled trial. *Behavior Therapy, 9,* 28-36.

Jlang, Y., Costello, P., Fang, F., Huang, M. & He, S. (2006). A gender and sexual orientation dependent attentional effect of invisible images. *PNAS, 103,* 17048-17052.

Johnson, W. B. (2001). To dispute or not to dispute: Ethical REBT with religious clients. *Cognitive and Behavioral Practice, 8,* 39-47.

Johnson, W. B. (2004). Rational emotive behavior therapy for disturbance about sexual orientation. In P. S. Richards & A. E. Bergin (Eds.), *Casebook for a spiritual strategy in counseling and psychotherapy* (pp. 247-265). Washington, DC: American Psychological Association.

Johnson, W. B., & Buhrke, R. A. (2006). Service delivery in a "don't ask, don't tell" world: Ethical care of gay, lesbian, and bisexual military personnel. *Professional Psychology: Research and Practice, 37,* 91–98.

Jones, M.A., & Gabriel, M. A. (1999). Utilization of psychotherapy by lesbians, gay men, and bisexuals: Findings from a nationwide survey. *American Journal of Orthopsychiatry, 69,* 209-219.

Jones, S. L., & Yarhouse, M. A. (2007). *Ex-gay? A longitudinal study of religiously mediated change in sexual orientation.* Downer's Grove, IL: Intervarsity Press.

Jordan, K. M., & Deluty, R. H. (1998). Coming out for lesbian women: Its relation to anxiety, positive affectivity, self-esteem, and social support. *Journal of Homosexuality, 35,* 41-63.

Kameny, F. (2009). How it all started. *Journal of Gay and Lesbian Mental Health, 13,* 76-81.

Karten, E. (2006). Sexual reorientation efforts in dissatisfied same-sex attracted men: What does it really take to change? *Dissertation Abstracts International, 67*(01), 547B. (UMI No. 3201129)

Katz, J. (1995). *Gay American history: Lesbians and gay men in the United States.* New York: Thomas Crowell.

Kendrick, S. R., & McCullough, J. P. (1972). Sequential phases of covert reinforcement and covert sensitization in the treatment of homosexuality. *Journal of Behavior Therapy & Experimental Psychiatry, 3,* 229-231.

Kennedy, S., & Cianciotto, J. (2006). *Homophobia at "hell house": Literally demonizing lesbian, gay, bisexual, and transgender youth.* Washington, DC: National Gay and Lesbian Task Force Policy Institute. Retrieved from www.thetaskforce.org/downloads/reports/reports/Homophobia_Hell_House.pdf

Kerr, R. A. (1997). The experience of integrating gay identity with evangelical Christian faith. *Dissertation Abstracts International, 58*(09), 5124B. (UMI No. 9810055).

Khan, K. S., Kunz, R., Kleijnen, J., & Antes, G. (2003). *Systematic reviews to support evidence-based medicine.* London: Royal Society of Medicine Press.

Kimmel, D. C., & Yi, H. (2004). Characteristics of gay, lesbian, and bisexual Asians, Asian Americans, and immigrants from Asia to the USA. *Journal of Homosexuality, 47,* 143-172.

King, L. A., & Hicks, J. A. (2007). Whatever happened to "what might have been"? Regret, happiness, and maturity. *American Psychologist, 62,* 625-636.

King, L. A., & Smith, N. G. (2004). Gay and straight possible selves: Goals, identity, subjective well-being, and personality development. *Journal of Personality, 72,* 967-994.

King, M., Semlyen, J., Killaspy, H., Nazareth, I., & Osborn, D. (2007). *A systematic review of research on counseling and psychotherapy for lesbian, gay, bisexual, & transgender people.* Leicestershire, England: British Association for Counseling & Psychotherapy.

King, M., Smith, G., & Bartlett, A. (2004). Treatments of homosexuality in Britain since the 1950's—an oral history: The experience of professionals. *British Medical Journal, 328,* 429-432.

Kinnish, K. K., Strassberg, D. S., & Turner, C. W. (2005). Sex differences in the flexibility of sexual orientation: A multidimensional retrospective assessment. *Archives of Sexual Behavior, 34,* 173-183.

Kinsey, A. C., Pomeroy, W. B., & Martin, C. E. (1948). *Sexual behavior in the human male.* Philadelphia: W.B. Saunders.

Kinsey, A. C., Pomeroy, W. B., Martin, C. E., & Gebhard, P. (1953). *Sexual behavior in the human female.* Philadelphia: W.B. Saunders.

Kitchener, K. S. (1984). Intuition, critical evaluation and ethical principles: The foundation for ethical decisions in counseling psychology. *The Counseling Psychologist, 12,* 43-55.

Kitzinger, C., & Wilkinson, S. (1994). Re-viewing heterosexuality. *Feminism & Psychology, 4,* 330-336.

Klein, F., & Schwartz, T. (Eds.). (2001). *Bisexual and gay husbands: Their stories, their words.* New York: Harrington Park Press.

Klein, F., Sepekoff, B., & Wolf, T. J. (1985). Sexual orientation: A multi-variable dynamic process. *Journal of Homosexuality, 11*(1/2), 35-49.

Knapp, S. J., & VandeCreek, L. (2003). *A guide to the 2002 revision of the American Psychological Association's Ethics Code.* Sarasota, Fl: Professional Resource Press.

Knapp, S. J., & VandeCreek, L. (2004). A principle-based analysis of the 2002 American Psychological Association Ethics Code. *Psychotherapy: Theory, Research, Practice, Training, 41,* 247-254.

PBC 007604



Knight, S. K., & Hoffman, L. (2007, August). *Sexual identity development and spiritual development: The impact of multiple lines of development.* Paper presented at the annual meeting of the American Psychological Association, San Francisco.

Koenig, H. G., & Larson, D. B. (2001). Religion and mental health: Evidence for an association. *International Review of Psychiatry, 13,* 67-78.

Koocher, G. P. (2003). Ethical issues in psychotherapy with adolescents. *Journal of Clinical Psychology, 59,* 1247-1256.

Kosciw, J. G., & Diaz, E. M. (2006). *The 2005 National School Climate Survey: The experiences of lesbian, gay, bisexual and transgender youth in our schools.* New York: GLSEN.

Krafft-Ebing, R., von. (1965). *Psychopathia sexualis.* New York: G. P. Putnam's. (Original work published 1886)

Kuban, M., Barbaree, H. E., & Blanchard, R. (1999). A comparison of volume and circumference phallometry: Response magnitude and method agreement. *Archives of Sexual Behavior, 28,* 345-359.

Kurdek, L. A. (2001). Differences between heterosexual non-parent couples and gay, lesbian, and heterosexual parent couples. *Journal of Family Issues, 22,* 727-754.

Kurdek, L. A. (2003). Differences between gay and lesbian cohabiting couples. *Journal of Social Personal Relationships, 20,* 411-436.

Kurdek, L. A. (2004). Are gay and lesbian cohabiting couples really different from heterosexual married couples? *Journal of Marriage and Family, 66,* 880-901.

Kutz, G. D., & O'Connell, A. (2007). *Residential treatment programs: Concerns regarding abuse and neglect and death in certain programs for troubled youth.* Washington, DC: General Accounting Office. Retrieved January 5, 2008, from http://www.gao.gov/new.items/d08146t.pdf

LaFromboise, T., Coleman, H. L. K., & Gerton, J. (1993). Psychological impact of biculturalism: Evidence and theory. *Psychological Bulletin, 114,* 395-412.

Lalumiere, M. L., & Earls, C. M. (1992). Voluntary control of penile responses as a function of stimulus duration and instructions. *Behavioral Assessment, 14,* 121-132.

Lalumiere, M. L., & Harris, G. T. (1998). Common questions regarding the use of phallometric testing with sexual offenders. *Sexual Abuse: Journal of Research & Treatment, 10,* 227-237.

Lam, T. C. M., & Bengo, P. (2003). A comparison of three retrospective self-reporting methods of measuring change in instructional practice. *American Journal of Evaluation, 24,* 65-80.

Lambert, M. J., & Barley, D. E. (2001). Research summary on the therapeutic relationship and psychotherapy outcome. *Psychotherapy: Theory, Research, Practice, Training, 38,* 357-361.

Langevin, R. (1983). *Sexual strands: Understanding and treating sexual anomalies in men.* New York: Erlbaum.

Larson, D. E. (1970). An adaptation of the Feldman and MacCulloch approach to treatment of homosexuality by the application of anticipatory avoidance learning. *Behaviour Research & Therapy, 8,* 209-210.

Lasser, J. S., & Gottlieb, M. C. (2004). Treating patients distressed regarding their sexual orientation: Clinical and ethical alternatives. *Professional Psychology: Research and Practice, 35,* 194-200.

Laumann, E. O., Gagnon, J. H., Michael, R. T., & Michaels, S. (1994). *The social organization of sexuality: Sexual practices in the United States.* Chicago: University of Chicago.

Lavizzo-Mourey, R. J., & MacKenzie, E. (1995). Cultural competence: An essential hybrid for delivering high quality care in the 1990s and beyond. *Transactions of the American Clinical and Climatological Association, 107,* 226-237.

Lawrence v. Texas, 539 U.S. 558 (2003).

Lease, S., Horne, S., & Noffsinger-Frazier, N. (2005). Affirming faith experiences and psychological health for Caucasian lesbian, gay, and bisexual individual. *Journal of Counseling Psychology, 52,* 378-388.

Lemoire, S. J., & Chen, C. P. (2005). Applying person-centered counseling to sexual minority adolescents. *Journal of Counseling & Development, 83,* 146–154.

Lesser, R. C., & Schoenberg, E. (Eds.). (1999). *That obscure subject of desire: Freud's female homosexual revisited.* New York: Routledge.

Levant, R. F. (1992). Toward the reconstruction of masculinity. *Journal of Family Psychology, 5,* 379-402.

Levant, R. F. & Hasan, N. T. (2009). Evidence-based practice in psychology. *Professional Psychology: Research and Practice, 39,* 658-662.

Levant, R. F., & Silverstein, L. B. (2006). Gender is neglected by both evidence-based practices and treatment as usual. In J. Norcross, L. Beutler, & R. Levant (Eds.), *Evidence-based practices in mental health: Debate and dialogue on fundamental questions* (pp. 338-345). Washington, DC: American Psychological Association.

LeVay, S. (1996). *Queer science: The use and abuse of research in homosexuality.* Cambridge: Massachusetts Institute Technology Press.

Levin, S. M., Hirsch, I. S., Shugar, G., & Kapche, R. (1968). Treatment of homosexuality and heterosexual anxiety with avoidance conditioning and systematic desensitization: Data and case report. *Psychotherapy: Theory, Research, & Practice, 5,* 160-168.

Levine, M., Perkins, D. D., & Perkins, D. V. (2004). *Principles of community psychology: Perspectives and applications* (3rd ed.). New York: Oxford University Press.

Levitt, H. M., Ovrebo, E., Anderson-Cleveland, M. B., Leone, C., Jeong, J. V., Arm, J. R., Bonin, B. P., et al. (2009). Balancing dangers: GLBT experience in a time of anti-GLBT legislation. *Journal of Counseling Psychology, 56,* 67-81.

Liddle, B. J. (1996). Therapist sexual orientation, gender, and counseling practices as they relate to ratings on helpfulness by gay and lesbian clients. *Journal of Counseling Psychology, 43,* 394-401.

Lilienfeld, S. O. (2007). Psychological treatments that cause harm. *Perspectives on Psychological Science, 2,* 53-70.

Linehan, M. M., Dimeff, L. A., & Koerner, K. (Eds.). (2007). *Dialectical behavior therapy in clinical practice: Applications across disorders and settings.* New York: Guildford Press.

Link, B. G., & Phelan, J. C. (2001). Conceptualizing stigma. *Annual Review of Sociology, 27,* 363-385.

Liszcz, A. M., & Yarhouse, M. A. (2005). Same-sex attraction: A survey regarding client-directed treatment goals. *Psychotherapy: Theory, Research, Practice, Training, 42,* 111-115.

Lomax, J. W., Karff, S., & McKenny, G. P. (2002). Ethical considerations in the integration of religion and psychotherapy: Three perspectives. *Psychiatric Clinics of North America, 25,* 547-559.

LoPiccolo, J. (1971). Case study: Systematic desensitization of homosexuality. *Behavior Therapy, 2,* 394-399.

LoPiccolo, J., Stewart, R., & Watkins, B. (1972). Treatment of erectile failure and ejaculatory incompetence of homosexual etiology. *Journal of Behavior Therapy & Experimental Psychiatry, 3,* 233-236.

Luhtanen, R. K. (2003). Identity, stigma management, and well-being: A comparison of lesbians/bisexual women and gay/bisexual men. *Journal of Lesbian Studies, 7,* 85-100.

MacCulloch, M. J., & Feldman, M. P. (1967). Aversion therapy in management of 43 homosexuals. *British Medical Journal, 2,* 594-597.

MacCulloch, M. J., Feldman, M. P., & Pinshoff, J. M. (1965). The application of anticipatory avoidance learning to the treatment of homosexuality II. *Behaviour Research & Therapy, 3,* 21–43.

Mahaffy, K. A. (1996). Cognitive dissonance and its resolution: A study of lesbian Christians. *Journal for the Scientific Study of Religion, 35,* 392-402.

Mahoney A., & Espin, O. M. (Eds.). (2008). Sin or salvation: The relationship between sexuality and spirituality in psychotherapy [Special issue]. *Women and Therapy, 31*(1).

Malcolm, J. P. (2000). Sexual identity development in behaviourally bisexual married men. *Psychology, Evolution, & Gender, 2,* 263-299.

Mallon, G. P. (2001). *Lesbian and gay youth issues: A practical guide for youth workers.* Washington, DC: CWLA Press.

Malyon, A. K. (1982). Psychotherapeutic implications of internalized homophobia in gay men. In J. C. Gonsiorek (Ed.), *Homosexuality and psychotherapy: A practitioner's handbook of affirmative models* (pp. 59-69). Binghamton, NY: Haworth Press.

Mankowski, E. S. (1997). *Community, identity, and masculinity: Changing men in a mutual support group.* Unpublished doctoral dissertation, University of Illinois at Urbana–Champaign.

Mankowski, E. S. (2000). Reconstructing masculinity: Role models in the life stories of men's peer mutual support group members. In E. R. Barton (Ed.), *Mythopoetic perspectives of men's healing work: An anthology for therapists and others* (pp. 100-117). Westport, CT: Bergin & Garvey.

Marcia, J. E. (1966). Development and validation of ego identity status. *Journal of Personality and Social Psychology, 5,* 551-558.

Mark, N. (2008). Identities in conflict: Forging an orthodox gay identity. *Journal of Gay and Lesbian Mental Health, 12,* 179-194.

Marquis, J. N. (1970). Orgasmic reconditioning: Changing sexual object choice through controlling masturbation fantasies. *Journal of Behavior Therapy & Experimental Psychiatry, 1,* 263-271.

Martell, C. R., Safren, S. A., & Prince, S. E. (2004). *Cognitive-behavioral therapies with lesbian, gay, and bisexual clients.* New York: Guilford Press.

Martin, A. D. (1982). Learning to hide: The socialization of the gay and lesbian adolescent. *Adolescent Psychiatry, 10,* 52-65.

Martin, D. J. (2003, April). The dearth of cognitive and behavioral treatments for gays and lesbians. *Newsletter of the Academy of Cognitive Therapy, 2*(2). Retrieved from www.academyofct.org/Library/InfoManage/Guide.asp?FolderID=184&SessionID={ED2061C4-FAC9-4B6C-BC44-464343721CB9}

Martinez, J., & Hosek, S. G. (2005). An exploration of the down-low identity: Nongay-identified young African-American men who have sex with men. *Journal of the National Medical Association, 97,* 1103-1112.

Massad, J. (2002). Re-orienting desire: The gay international and the Arab world. *Public Culture, 14,* 361-386.

Masters, W. H., & Johnson, V. E. (1979). *Homosexuality in perspective.* Boston: Little, Brown.

Mathy, R., & Drescher, J. (Eds.). (2008). Childhood gender nonconformity and the development of adult homosexuality [Special Issue]. *Journal of Gay & Lesbian Mental Health, 12*(1/2), 1-165.

Maton, K. I. (2000). Mutual-help and self-help. In A. E. Kazdin (Ed.), *Encyclopedia of psychology* (pp. 369-373). Washington, DC: American Psychological Association and Oxford University Press.

Mattison, A. M., & McWhirter, D. P. (1995). Lesbians, gay men, and their families: Some therapeutic issues. *Psychiatric Clinics of North America, 18,* 123-137.



PBC 007606

Mayers, C., Leavey, G., Vallianatou, C., & Barker, C. (2007). How clients with religious or spiritual beliefs experience psychological help-seeking and therapy: A qualitative study. *Clinical Psychology and Psychotherapy, 14,* 317-327.

Mays, V. M., & Cochran, S. D. (1998). Kinsey and male homosexuality in the African-American population: A question of fit. *Sexualities, 1,* 98-100.

Mays, V. M., & Cochran, S. D. (2001). Mental health correlates of perceived discrimination among lesbian, gay, and bisexual adults in the United States. *American Journal of Public Health, 91,* 1869-1876.

Mays, V. M., Cochran, S. D., & Barnes, N. W. (2007). Race, race-based discrimination, and health outcomes among African Americans. *Annual Review of Psychology, 58,* 201-225.

Mays, V. M., Cochran, S. D., & Zamudio, A. (2004). HIV prevention research: Are we meeting the needs of African American men who have sex with men? *Journal of Black Psychology, 30,* 78-105.

McCarn, S. R., & Fassinger, R. E. (1996). Revisioning sexual minority identity formation: A new model of lesbian identity and its implications for counseling and research. *The Counseling Psychologist, 24,* 508-534.

McClennon, J. (1994). *Wondrous events.* Philadelphia: University of Pennsylvania Press.

McConaghy, N. (1969). Subjective and penile plethysmograph responses following aversion-relief and Apomorphine aversion therapy for homosexual impulses. *British Journal of Psychiatry, 115,* 723-730.

McConaghy, N. (1976). Is a homosexual orientation irreversible? *British Journal of Psychiatry, 129,* 556-563.

McConaghy, N. (1987). Heterosexuality/homosexuality: Dichotomy or continuum. *Archives of Sexual Behavior, 16,* 411-424.

McConaghy, N. (1999). Time to abandon the gay/heterosexual dichotomy? *Archives of Sexual Behavior, 34,* 1-2.

McConaghy, N. (2003). Peer commentaries on Spitzer: Penile plethysmography and change in sexual orientation. *Archives of Sexual Behavioral, 32,* 444-445.

McConaghy, N., Armstrong, M. S., & Blaszczynski, A. (1981). Controlled comparison of aversive therapy and covert sensitization in compulsive homosexuality. *Behaviour Research & Therapy, 19,* 425-434.

McConaghy, N., & Barr, R. F. (1973). Classical, avoidance, and backward conditioning treatment of homosexuality. *British Journal of Psychiatry, 122,* 151-162.

McConaghy, N., Buhrich, N., & Silove, D. (1994). Opposite sex-linked behaviors and homosexual feelings in the predominantly heterosexual male majority. *Archives of Sexual Behavior, 23,* 565-577.

McConaghy, N., Proctor, D., & Barr, R. (1972). Subjective and penile plethysmography responses to aversion therapy for homosexuality: A partial replication. *Archives of Sexual Behavior, 2,* 65-79.

McCord, W., McCord, J., & Thurber, E. (1962). Some effects of parental absence on male children. *Journal of Abnormal and Social Psychology, 64,* 361-369.

McCormick, A. (2006). Transition Beirut: Gay identities, lived realities: The balancing act in the Middle East. In S. Khalaf, & J. Gagnon (Eds.), *Sexuality in the Arab World* (pp. 243-260). London: SAQI.

McCrady, R. E. (1973). A forward-fading technique for increasing heterosexual responsiveness in male homosexuals. *Journal of Behavior Therapy & Experimental Psychiatry, 4,* 257-261.

McCullough, M. E. (1999). Research on religion-accommodative counseling: Review and meta-analysis. *Journal of Counseling Psychology, 46,* 92-98.

McIntosh, P. (1990). *White privilege: Unpacking the invisible knapsack.* Retrieved August 18, 2009, from www.case.edu/president/aaction/UnpackingTheKnapsack.pdf

McMinn, L. G. (2005). Sexual identity concerns for Christian young adults: Practical considerations for being a supportive presence and compassionate companion. *Journal of Psychology and Christianity, 24,* 368-377.

McNemar, Q. (1969). *Psychologica statistics* (4th ed.). New York: Wiley.

Meeus, W., Iedema, J., Helsen, M., & Vollebergh, W. (1999). Patterns of adolescent identity developmental: Review of literature and longitudinal analysis. *Developmental Review, 19,* 419-461.

Menveille, E. J. (1998). Gender identity disorder [Letter to the editor]. *Journal of the American Academy of Child and Adolescent Psychiatry, 37,* 243-244.

Menveille, J. D., & Tuerk, C. (2002). A support group for parents of gender-nonconforming boys. *Journal of the American Academy of Child and Adolescent Psychiatry, 41,* 1010-1013.

Meyer, I. H. (1995). Minority stress and mental health in gay men. *Journal of Health and Social Behavior, 7,* 9-25.

Meyer, I. H. (2003). Prejudice, social stress, and mental health in lesbian, gay, and bisexual populations: Conceptual issues and research evidence. *Psychological Bulletin, 129,* 674-697.

Meyer, I. H., & Wilson, P. A. (2009). Sampling lesbian, gay, and bisexual populations. *Journal of Counseling Psychology, 56,* 23-31.

Miller, J. B. (1991). The development of a women's sense of self. In J. V. Jordan, A. G. Kaplan, J. B. Miller, I. P. Stiver, & J. L. Surrey (Eds.), *Women's growth in connection: Writings from the Stone Center* (pp. 11-26). New York: Guildford Press.

Millett, G., Malebranche, D., Mason, B., & Spikes, P. (2005). Focusing "down low": Bisexual Black men, HIV risk and heterosexual transmission. *Journal of the National Medical Association, 97,* 585-595.

Mintz, E. E. (1966). Overt male homosexuals in combined group and individual treatment. *Journal of Consulting Psychology, 30,* 193-198.

Minwalla, O., Rosser, B. R. S., Feldman, J., & Varga, C. (2005). Identity experience among progressive gay Muslims in North America: A qualitative study within Al-Fatiha. *Culture, Health & Sexuality, 7,* 113-128.

Mitchell, S. A. (1978). Psychodynamics, homosexuality, and the question of pathology. *International Journal of Psychoanalysis, 15,* 170-189.

Mitchell, S. A. (1981). The psychoanalytic treatment of homosexuality: Some technical considerations. *International Review of Psycho-Analysis, 8,* 63-80.

Miville, M. L., & Ferguson, A. D. (2004). Impossible "choices": Identity and values at a crossroads. *The Counseling Psychologist, 32,* 760-770.

Moberly, E. (1983). *Homosexuality: A new Christian ethic.* Greenwood, SC: Attic Press.

Mohr, J. J., & Fassinger, R. E. (2003). Self-acceptance and self-disclosure of sexual orientation in lesbian, gay, and bisexual adults: An attachment perspective. *Journal of Counseling Psychology, 50,* 282-295.

Molnar, B. E. (1997). Juveniles and psychiatric institutionalization: Toward better due process and treatment review in the United States. *Health and Human Rights, 2,* 98-116.

Moradi, B., Mohr, J. J., Worthington, R. L., & Fassinger, R. E. (2009). Counseling psychology research on sexual (orientation) minority issues: Conceptual and methodological challenges and opportunities. *Journal of Counseling Psychology, 56,* 5-22.

Moran, M. E. (2007). *An examination of women's sexuality and spirituality: The effects of conversion therapy—A mixed study.* Unpublished doctoral dissertation, University of Utah, Salt Lake City.

Morey, M. (2006). The civil commitment of state dependent minors: Resonating discourses that leave her heterosexuality and his homosexuality vulnerable to scrutiny. *New York University Law Review, 81,* 2129.

Morgan, E. M., & Thompson, E. M. (2006). Young women's sexual experiences within same-sex friendships: Discovering and defining bisexual and bi-curious identity. *Journal of Bisexuality, 6,* 7-34.

Morris, J. F. (1997). Lesbian coming out as a multidimensional process. *Journal of Homosexuality, 3,* 1-22.

Morrissey-Kane, E., & Prinz, R. J. (1999). Engagement in child and adolescent treatment: The role of parental cognitions and attributions. *Clinical Child and Family Psychology Review, 2,* 183-198.

Morrow, D. F. (2003). Cast into the wilderness: The impact of institutionalized religion on lesbians. *Journal of Lesbian Studies, 7,* 109-123.Morrow, S. L. (2000). First do no harm: Therapist issues in psychotherapy with lesbian, gay, and bisexual clients. In R. M. Perez, K. A. DeBord, & K. J. Bieschke (Eds.), *Handbook of counseling and psychotherapy with lesbian, gay, and bisexual clients* (pp. 137-156). Washington, DC: American Psychological Association.

Morrow, S. L., & Beckstead, A. L. (2004). Conversion therapies for same-sex attracted clients in religious conflict: Context, predisposing factors, experiences, and implications for therapy. *The Counseling Psychologist, 32,* 641-650.

Murphy, T. F. (1992). Redirecting sexual orientation: Techniques and justifications. *Journal of Sex Research, 29,* 501-523.

Murphy, T. F. (1997). *Gay science: The ethics of sexual orientation research.* New York: Columbia University Press.

Mustanski, B. S., Chivers, M. L., & Bailey, J. M. (2002). A critical review of recent biological research on human sexual orientation. *Annual Review of Sex Research, 13,* 89-140.

Mutcherson, K. M. (2006). Minor discrepancies: Forging a common understanding of adolescent competence in healthcare decision-making and criminal responsibility. *Nevada Law Journal, 6,* 927.

Myers, L. J., Speight, S. L., Highlen, P. S., Cox, C. I., Reynolds, A. L., Adams, E. M., & Hanley, P. (1991). Identity development and worldview: Toward an optimal conceptualization. *Journal of Counseling & Development, 70,* 54-63.

Nahas, O. (2004). Yoesuf: An Islamic idea with Dutch quality. *Journal of Gay and Lesbian Social Services, 16,* 53-64.

Nakajima, G. A. (2003). The emergence of an international lesbian, gay, and bisexual psychiatric movement. *Journal of Gay & Lesbian Psychotherapy, 7*(1/2), 165-188.

Nathan, P. E., Stuart, S. P., & Dolan, S. L. (2000). Research on psychotherapy efficacy and effectiveness: Between Scylla and Charybdis? *Psychological Bulletin, 126,* 964-981.

National Association of Social Workers. (1997). Policy statement: Lesbian, gay, and bisexual issues [approved by NASW Delegate Assembly, August 1996]. In *Social work speaks: NASW policy* (4th ed., pp. 198-209). Washington, DC: Author.

National Association of Social Workers. (2000). *"Reparative" and "conversion" therapies for lesbians and gay men: Position statement.* Retrieved July 7, 2008, from: http://www.socialworkers.org/diversity/lgb/reparative.asp

Nicolosi, J. (1991). *Reparative therapy of male homosexuality.* Northvale, NJ: Jason Aronson.

Nicolosi, J. (1993). *Healing homosexuality.* Northvale, NJ: Jason Aronson.

Nicolosi, J. (2003). Finally, recognition of a long-neglected population. *Sexual Behavior, 32,* 445-447.

Nicolosi, J., Byrd, A. D., & Potts, R. W. (2000). Retrospective self-reports of changes in homosexual orientation: A consumer survey of conversion therapy clients. *Psychological Reports, 86,* 1071-1088.

Nicolosi, J., & Nicolosi, L. A. (2002). *A parent's guide to preventing homosexuality.* Downers Grove, IL: InterVarsity Press.



PBC 007608

Nielsen, S. L. (2001). Accommodating religion and integrating religious material during rational emotive behavior therapy. *Cognitive & Behavior Practice, 8,* 29-34.

Nolen-Hoeksema, S., & Davis, C. G. (2002). Positive responses to loss: Perceiving benefits and growth. In C. R. Snyder & S. J. Lopez (Eds.), *Handbook of positive psychology* (pp. 598-606). New York: Oxford University Press.

Norcross, J. C. (2002). *Psychotherapy relationships that work: Therapist contributions and responsiveness to patients.* New York: Oxford University Press.

Norcross, J.C., & Hill, C.E. (2004). Empirically supported therapy relationships. *The Clinical Psychologist, 57,* 19-24.

Norman, G. (2003). Hi! How are you? Response shift, implicit theories, and differing epistemologies. *Quality of Life Research, 12,* 238-249.

O'Connor, N., & Ryan, J. (1993). *Wild desires and mistaken identities: Lesbianism and psychoanalysis.* New York: Columbia University Press.

Olson, C. (Ed.). (2007). *Celibacy and religious traditions.* New York: Oxford University Press.

Olyam, S. C., & Nussbaum, M. C. (Eds.). (1998). *Sexual orientation & human rights in American religious discourse.* New York: Oxford University Press.

Omer, H., & Strenger, C. (1992). The pluralistic revolution: From the one true meaning to an infinity of constructed ones. *Psychotherapy: Theory, Research, Practice, Training, 29,* 253-261.

Omoto, A., & Kurtzman, H. S. (Eds.). (2006). *Sexual orientation and mental health: Examining identity and development in lesbian, gay, and bisexual people.* Washington, DC: American Psychological Association.

O'Neil, J. M. (2008). Summarizing 25 years of research on men's gender role conflict using the gender role conflict scale: New research paradigms and clinical implications. *The Counseling Psychologist, 36,* 358-445.

O'Neill, C., & Ritter, K. (1992). *Coming out within: Stages of spiritual awakening for lesbians and gay men.* San Francisco: Harper.

Ortiz, E. T., & Scott, P. R. (1994). Gay husbands and fathers: Reasons for marriage among homosexual men. *Journal of Gay and Lesbian Social Services, 1,* 59-71.

Oser, F. K. (1991). Toward a logic of religious development. In K. N. Nipkow, J. W. Fowler, & F. Schweitzer (Eds.), *Stages of religious development: Implications for church, education, and society* (pp. 37-64). New York: Crossroad Publishing.

O'Sullivan, L., & McCrudden, M. C., & Tolman, D. L. (2006). To your sexual health! Incorporating sexuality into the health perspective. In J. Worell & C. D. Goodheart (Eds.), *Handbook of girls' and women's psychological health: Gender and well-being across the lifespan* (pp. 192-199). New York: Oxford University Press.

Ovesey, L. (1969). *Homosexuality and pseudohomosexuality.* New York: Science House.

*Oxford American Dictionary.* (2007). New York: Oxford University Press.

Pachankis, J. E. (2007). The psychological implications of concealing a stigma: A cognitive-affective-behavioral model. *Psychological Bulletin, 133,* 328-345.

Pachankis, J. E., & Goldfried, M. R. (2004). Clinical issues in working with lesbian, gay, and bisexual clients. *Psychotherapy: Theory, Research, Practice, Training, 41,* 227-246.

Pachankis, J. E., Goldfried, M. R., & Ramrattan, M. E. (2008). Extension of the rejection sensitivity construct to the interpersonal functioning of gay men. *Journal of Consulting and Clinical Psychology, 76,* 306-317.

Paloutzian, R.F., & Park, C.L. (Eds.). (2005). *Handbook of the psychology of religion and spirituality.* New York: Guilford Press.

Pan American Health Organization & World Health Organization. (2000, May 19-22). *Promotion of sexual health: Recommendations for action.* Proceedings of a regional consultation convened in collaboration with the World Association for Sexology, Antigua, Guatemala. Retrieved from www.paho.org/English/HCP/HCA/PromotionSexualHealth.pdf

Pargament, K. I. (2002). The bitter and the sweet: An evaluation of the costs and benefits or religiousness. *Psychological Inquiry, 13,* 168-181.

Pargament, K. I., Koenig, H. G., Tasakeshwas, N., & Hahn, J. (2001). Religious struggle as a predictor of mortality among medically ill elderly patients: A two-year longitudinal study. *Archives of Internal Medicine, 161,* 1881-1885.

Pargament, K. I., & Mahoney, A. (2002). Spirituality: Discovering and conserving the sacred. In C. R. Snyder & S. J. Lopez (Eds.), *Handbook of positive psychology* (pp. 646-659). New York: Oxford University Press.

Pargament, K. I., & Mahoney, A. (2005). Sacred matters: Sanctification as a vital topic for the psychology of religion. *The International Journal for the Psychology of Religion, 15,* 179-198.

Pargament, K. I., Maygar-Russell, G. M., & Murray-Swank, N. A. (2005). The sacred and the search for significance: Religion as a unique process. *Journal of Social Issues, 61,* 665-687.

Pargament, K. I., Smith, B. W., Koenig, H. G., & Perez, L. (1998). Patterns of positive and negative religious coping with major life stressors. *Journal for the Scientific Study of Religion, 37,* 710-724.

Park, C. L. (2005). Religion as a meaning-making framework in coping with life stress. *Journal of Social Issues, 61,* 707-729.

Patterson, C. J. (2008). Sexual orientation across the lifespan: Introduction to the special section. *Developmental Psychology, 44,* 1-4.

Pattison, E. M., & Pattison, M. L. (1980). "Ex-gays": Religiously mediated change in homosexuals. *American Journal of Psychiatry, 137,* 1553-1562.

Paul, W., Weinrich, J. D., Gonsiorek, J. C., & Hotvedt, M. E. (Eds.). (1982). *Homosexuality: Social, psychological, and biological issues.* Beverly Hills, CA: Sage.

Peplau, L. A., & Garnets, L. D. (2000). A new paradigm for understanding women's sexuality and sexual orientation. *Journal of Social Issues, 56,* 329-350.

Peplau, L. A., & Fingerhut, A. W. (2007). The close relationships of lesbians and gay men. *Annual Review of Psychology, 58,* 405-424.

Perez, R. M., DeBord, K. A., & Bieschke, K. J. (Eds.). (2000). *Handbook of counseling and psychotherapy with lesbian, gay, and bisexual clients.* Washington, DC: American Psychological Association.

Perrin, E. C. (2002). *Sexual orientation in child and adolescent health care.* New York: Kluwer/Plenum.

Peters, A. J. (2003). *Isolation or inclusion: Creating safe spaces for lesbian and gay youth, families in society* (Vol. 84, pp. 331-337). Milwaukee, WI: Alliance for Children & Families.

Peters, D. K., & Cantrell, P. J. (1991). Factors distinguishing samples of lesbian and heterosexual women. *Journal of Homosexuality, 21,* 1-15.

Petticrew, M. (2001). Systematic reviews from astronomy to zoology: Myths and misconceptions. *British Medical Journal, 322,* 98-101.

Pew Forum on Religion and Public Life. (2003). *Republicans unified, Democrats split on gay marriage: Religious beliefs underpin opposition to homosexuality.* Washington, DC: Pew Research Center. Retrieved March 24, 2009, from http://pewforum.org/docs/index.php?DocID=37.

Pew Forum on Religion and Public Life. (2008). *U.S. Religious Landscape Survey.* Washington, DC: Pew Research Center. Retrieved March 18, 2008, from http://religions.pewforum.org/reports

Pharr, S. (1988). *Homophobia: A weapon of sexism.* New York: Chardon Press.

Phillips, J. C. (2004). A welcome addition to the literature: Non-polarized approaches to sexual orientation and religiosity. *The Counseling Psychologist, 32,* 771-777.

Phy-Olsen, A. (2006). *Same-sex marriage.* Santa Barbara, CA: Greenwood Press.

Pleck, J. H. (1995). The gender role strain paradigm: An update. In R. F. Levant & W. S. Pollack (Eds.), *A new psychology of men* (pp. 11-32). New York: Plenum.

Plugge-Foust, C., & Strickland, G. (2000). Homophobia, irrationality, and Christian ideology: Does a relationship exist? *Journal of Sex Education and Therapy, 25,* 240-244.

Ponseti, J., Bosinski, H. A., Wolff, S., Peller, M., Jansen, O., Mehdorn, H. M., et al. (2006). A functional endophenotype for sexual orientation in humans. *NeuroImage, 33,* 825-833.

Ponticelli, C. M. (1999). Crafting stories of sexual identity reconstruction. *Social Psychology Quarterly, 62,* 157-172.

Pope, K. S., & Vasquez, M. J. T. (2007). *Ethics in psychotherapy and counseling: A practical guide* (3rd ed.). San Francisco: Jossey-Bass.

Porter, N. (1995). Therapist self-care: A proactive ethical approach. In E. J. Rave and C. C. Larsen (Eds.), *Ethical decision making in therapy: A feminist approach* (pp. 247-266). New York: Guilford Press.

Probst, L. R., Ostrom, R., Watkins, P., Dean, T., & Mashburn, D. (1992). Comparative efficacy of religious and nonreligious cognitive-behavioral therapy for the treatment of clinical depression in religious individuals. *Journal of Consulting and Counseling Psychology, 60,* 94-103.

Quinn, J. T., Harbison, J. J. M., & McAllister, H. (1970). An attempt to shape human penile responses. *Behaviour Research & Therapy, 8,* 213-216.

Quinsey, V. L., & Lalumiere, M. L. (2001). *Assessment of sexual offenders against children.* Thousand Oaks, CA: Sage.

Radkowsky, M., & Siegel, L. J. (1997). The gay adolescent: Stressors, adaptations, and psychosocial interventions. *Clinical Psychology Review, 17,* 191-216.

Rado, S. (1940), A critical examination of the concept of bisexuality. *Psychosomatic Medicine, 2,* 459-467.

Rahman, Q., & Wilson, G. D. (2005). *Born gay: The psychobiology of sexual orientation.* London: Peter Owens.

Redding, R. E. (1993). Children's competence to provide informed consent for mental health treatment. *Washington & Lee Law Review, 50,* 695.

Rehm, L. P., & Rozensky, R. H. (1974). Multiple behavior therapy techniques with a homosexual client: A case study. *Journal of Behavior Therapy & Experimental Psychiatry, 5,* 53-57.

Reich, K. H. (1991). The role of complementary reasoning in religious development. *New Directions for Child Development, 52,* 77-89.

Rekers, G. A. (1979). Sex-role behavior change: Intrasubject studies of boyhood gender disturbance. *Journal of Psychology, 103,* 255-269.

Rekers, G. A. (1981). Childhood sexual identity disorders. *Medical Aspects of Human Sexuality, 15,* 141-142.

Rekers, G. A. (1982). *Shaping your child's sexual identity.* Grand Rapids, MI: Baker Book House.

Rekers, G. A., Bentler, P. M., Rosen, A. C., & Lovaas, O. I. (1977). Child gender disturbances: A clinical rationale for intervention. *Psychotherapy: Theory, Research, & Practice, 14,* 2-11.

Rekers, G. A., Kilgus, R., & Rosen, A. C. (1990). Long-term effects of treatment for childhood gender disturbance. *Journal of Psychology and Human Sexuality, 3,* 121-153.

Rekers, G. A., & Lovaas, O. I. (1974). Behavioral treatment of deviant sex-role behaviors in a male child. *Journal of Applied Behavioral Analysis, 7,* 173-190.



Remafedi, G., Farrow, J. A., & Deisher, R. W. (1991). Risk factors of attempted suicide in gay and bisexual youth. *Pediatrics, 87*, 869-875.

Richards, P. S., & Bergin, A. E. (Eds.). (2000). *Handbook of psychotherapy and religious diversity*. Washington, DC: American Psychological Association.

Richards, P. S., & Bergin, A. E. (Eds) (2004). *Casebook for a spiritual strategy in counseling and psychotherapy*. Washington, DC: American Psychological Association.

Richards, P. S., & Bergin, A.E. (2005). *A spiritual strategy for counseling and psychotherapy*. Washington, DC: American Psychological Association.

Richards, P. S., Berrett, M. E., Hardman, R. K., & Eggett, D. L. (2006). Comparing efficacy of spirituality, cognitive, and emotional support groups for treating eating disorder inpatients. *Eating Disorders, 14*, 401-415.

Ritter, K. Y., & O'Neill, C. W. (1989). Moving through loss: The spiritual journey of gay men and lesbian women. *Journal of Counseling & Development, 68*, 9-14.

Ritter, K. Y., & O'Neill, C. W. (1995). Moving through loss: The spiritual journey of gay men and lesbian women. In M. T. Burke & J. G. Miranti (Eds.), *Counseling: The spiritual dimension* (pp. 126-141). Alexandria, VA: American Counseling Association.

Ritter, K. Y., & Terndrup, A. I. (2002). *Handbook of affirmative psychotherapy with lesbians and gay men*. New York: Guilford Press.

Robb, H.B. (2001). Facilitating rational emotive behavior therapy by including religious beliefs. *Cognitive & Behavior Practice, 8*, 34-39.

Robinson, J. W. (1998). *Understanding the meaning of change for married Latter-Day Saint men with histories of homosexual activity*. Unpublished doctoral dissertation, Brigham Young University, Provo.

Roccas, S. (2005). Religion and value systems. *Journal of Social Issues, 61*, 747-759.

Rodriguez, E. M. (2006). At the intersection of church and gay: Religion, spirituality, conflict, and integration in gay, lesbian, and bisexual people of faith. *Dissertation Abstracts International, 67*(3-B), 1742. (UMI No. 3213142)

Rodriguez, E. M., & Ouellette, S. C. (2000). Gay and lesbian Christians: Homosexual and religious identity integration in the members and participants of a gay-positive church. *Journal for the Scientific Study of Religion, 39*, 334-347.

Roffman, D. M. (2000). A model for helping schools address policy options regarding gay and lesbian youth. *Journal of Sex Education and Therapy, 25*(2/3), 130-136.

Rogers, C. R. (1957). The necessary and sufficient conditions of therapeutic personality change. *Journal of Consulting Psychology, 21*, 95-103.

Rogers, C. (1961). *On becoming a person*. Boston: Houghton Mifflin.

Rosario, M., Rotheram-Borus, M. J., & Reid, H. (1996). Gay-related stress and its correlates among gay and bisexual male adolescents of predominantly Black and Hispanic background. *Journal of Community Psychology, 24*, 136-159.

Rosario, M., Schrimshaw, E., Hunter, J. (2004). Ethnic/racial differences in the coming-out process of lesbian, gay, and bisexual youths: A comparison of sexual identity development over time. *Cultural Diversity and Ethnic Minority Psychology, 10*, 215-228.

Rosario, M., Schrimshaw, E., Hunter, J., & Braun, L. (2006, February). Sexual identity development among lesbian, gay, and bisexual youths: Consistency and change over time. *Journal of Sex Research, 43*, 46-58.

Rosario, M., Yali, A. M., Hunter, J., & Gwadz, M. V. (2006). Religion and health among lesbian, gay, and bisexual youths: An empirical investigation and theoretical explanation. In A. Omoto & H. Kurtzman (Eds.), *Sexual orientation and mental health: Examining identity and development in lesbian, gay, and bisexual people* (pp. 117-141). Washington, DC: American Psychological Association.

Rose, S. M., & Zand, D. (2000). Lesbian dating and courtship from young adulthood to midlife. *Journal of Gay and Lesbian Social Services, 11*(2-3), 77-104.

Rose, S. M., & Zand, D. (2002). Lesbian dating and courtship from young adulthood to midlife. *Journal of Lesbian Studies, 6*, 85-109.

Rosik, C. H. (2001). Conversion therapy revisited: Parameters and rationale for ethical care. *Journal of Pastoral Counseling, 55*, 47-67.

Rosik, C. H. (2003). Motivational, ethical, and epistemological foundations in the treatment of unwanted homoerotic attractions. *Journal of Marital and Family Therapy, 29*, 13-28.

Rosik, C. H. (2007). Ideological concerns in the operationalization of homophobia: Part II. The need for interpretive sensitivity with conservatively religious persons. *Journal of Psychology & Theology, 35*, 132-144.

Rosner, R. (2004a). Adolescents' rights to refuse treatment. *Adolescent Psychiatry*. Retrieved October 10, 2007, from http://findarticles.com/p/articles/mi_qa3882/is_200401/ai_n9383804

Rosner, R. (2004b). A four-step model for legal regulation of the practice of adolescent psychiatry and adolescents' rights to refuse treatment. *Adolescent Psychiatry*. Retrieved October 10, 2007, from http://findarticles.com/p/articles/mi_qa3882/is_200401/ai_n9383804

Ross, M. A. (1989). Relation of implicit theories to the construction of personal histories. *Psychological Review, 96*, 341-357.

Ross, M. W. (1989). Married homosexual men: Prevalence and background. *Marriage & Family Review, 14*(3-4), 35-57.

Rostosky, S. S., Riggle, E. D. B., Horne, S. G., & Miller, A. D. (2009). Marriage amendments and psychological distress in lesbian, gay, and bisexual (LGB) adults. *Journal of Counseling Psychology, 59,* 56-66.

Russell, G. M., & Bohan, J. S. (2007). Liberating psychotherapy: Liberation psychology and psychotherapy with LGBT clients. *Journal of Gay and Lesbian Psychology, 11*(3/4), 59-77.

Rust, P. C. (1996). Managing multiple identities: Diversity among bisexual women and men. In B. A. Firestein (Ed.), *Bisexuality: The psychology and politics of an invisible minority* (pp. 53-83). Thousand Oaks, CA: Sage.

Rust, P. C. (2003). Reparative science and social responsibility: The concept of a malleable core as theoretical challenge and psychological comfort. *Archives of Sexual Behavior, 32,* 449-451.

Ryan, C. (2001). Counseling lesbian, gay, and bisexual youths. In A. R. D'Augelli & C. J. Patterson (Eds.), *Lesbian, gay, and bisexual identities and youth* (pp. 224-250). New York: Oxford University Press.

Ryan, C., & Diaz, R. (2005, February). *Family responses as a source of risk and resiliency for LGBT youth.* Paper presented at the Child Welfare League of America Preconference Institute, Washington, DC.

Ryan, C., & Futterman, D. (1997). Lesbian and gay youth: Care and counseling. *Adolescent Medicine: State of the Art Reviews, 8, 207-324.*

Ryan, C., Huebner, D., Diaz, R.M., & Sanchez, J. (2009). Family rejection as a predictor of negative health outcomes in White and Latino lesbian, gay, and bisexual young adults. *Pediatrics, 129,* 346-352.

Ryan, R. M. (1995). Psychological needs and the facilitation of integrative processes. *Journal of Personality, 63,* 397-427.

Sackett, D. L, Rosenberg, W. M, Gray, J. A., Haynes, R.B., & Richardson, W. S. (1996). Evidence-based medicine: What it is and what it isn't. *British Medical Journal, 312*(7023), 71-72.

Safren, S. A., & Heimberg, R. G. (1999). Depression, hopelessness, suicidality, and related factors in sexual minority and heterosexual adolescents. *Journal of Consulting and Clinical Psychology, 67,* 859-866.

Safren, S. A., & Rogers, T. (2001). Cognitive-behavioral therapy with gay, lesbian, and bisexual clients. *Journal of Clinical Psychology, 57,* 629-643.

Saldaina, D. H. (1994). Acculturative stress: Minority status and distress. *Hispanic Journal of Behavioral Sciences, 16,* 116-128.

Salzburg, S. (2004). Learning that an adolescent child is gay or lesbian: The parent experience. *Social Work, 49,* 109-118.

Salzburg, S. (2007). Narrative therapy pathways for re-authoring with parents of adolescents coming-out as lesbian, gay, and bisexual. *Contemporary Family Therapy, 29,* 57-69.

Sanchez, D. (2007). "Ex-Gay" movement making strides. *Southern Poverty Law Center Intelligence Report.* Retrieved from www.splcenter.org/intel/intelreport/article.jsp?aid=844

Sandford, D. A., Tustin, R. D., & Priest, P. N. (1975). Increasing heterosexual arousal in two adult male homosexuals using a differential reinforcement procedure. *Behavior Therapy, 6,* 689-696.

Sandfort, T. G. M. (2003). Studying sexual orientation change. *Journal of Gay & Lesbian Psychotherapy, 7,* 15–29.

Savic, I., & Lindstrom, P. (2008). PET and MRI show differences in cerebral asymmetry and functional connectivity between homo- and heterosexual subjects. *Proceedings of the National Academy of Sciences.* Retrieved from http://www.pnas.org/content/105/27/9403.full

Savin-Williams, R. C. (1989). Parental influences on the self-esteem of gay and lesbian youths: A reflected appraisals model. *Journal of Homosexuality, 17*(1/2), 93-109.

Savin-Williams, R. C. (1994). Verbal and physical abuse as stressors in the lives of lesbian, gay male, and bisexual youths: Associations with school problems, running away, substance abuse, prostitution, and suicide. *Journal of Consulting and Clinical Practice, 62,* 261-269.

Savin-Williams, R. C. (1998). The disclosure to families of same-sex attractions by lesbian, gay, and bisexual youths. *Journal of Research on Adolescence, 8,* 49-68.

Savin-Williams, R. C. (2004). Boy-on-boy sexuality. In N. Way & J. Y Chu (Eds.), *Adolescent boys: Exploring diverse cultures of boyhood* (pp. 271-292). New York: New York University Press.

Savin-Williams, R. C. (2005). *The new gay teenager.* Cambridge, MA: Harvard University Press.

Savin-Williams, R. C, & Cohen, K. M. (2004). Homoerotic development during childhood and adolescence. *Child and Adolescent Psychiatric Clinics of North America, 13,* 529-549.

Sbordone, A. J. (2003). An interview with Charles Silverstein, PhD. *Journal of Gay & Lesbian Psychotherapy, 7,* 49-61.

Scasta, D. (1998). Issues in helping people come out. *Journal of Gay and Lesbian Psychotherapy, 2,* 89-98.

Schaeffer, K. W., Hyde, R. A., Kroencke, T., McCormick, B., & Nottebaum, L. (2000). Religiously motivated sexual orientation change. *Journal of Psychology & Christianity, 19,* 61-70.

Schilder, A. J., Kennedy, C., Goldstone, I., Ogden, R. D., Hogg, R. S., & O'Shaughnessy, M. V. (2001). "Being dealt with as a whole person." Care seeking and adherence: The benefits of culturally competent care. *Social Science & Medicine, 52,* 1643-1659.

Schneider, M. S. (1991). Developing services for lesbian and gay adolescents. *Canadian Journal of Community Mental Health, 10,* 133-151.



Schneider, M. S., Brown, L. S., & Glassgold, J. M. (2002). Implementing the resolution on appropriate therapeutic responses to sexual orientation: A guide for the perplexed. *Professional Psychology: Research and Practice, 33,* 265-276.

Schnoor, R. F. (2006). Being gay and Jewish: Negotiating intersecting identities. *Sociology of Religion 67,* 43-60.

Schreier, B. A. (1998). Of shoes, and ships, and sealing wax: The faulty and specious assumptions of sexual reorientation therapies. *Journal of Mental Health Counseling, 20,* 305-314.

Schroeder, M., & Shidlo, A. (2001). Ethical issues in sexual orientation conversion therapies: An empirical study of consumers. *Journal of Gay & Lesbian Psychotherapy, 5*(3/4), 131-166.

Schuck, K. D., & Liddle, B. J. (2001). Religious conflicts experienced by lesbian, gay, and bisexual individuals. *Journal of Gay and Lesbian Psychotherapy, 5,* 63-82.

Schulte, L. J., & Battle, J. (2004). The relative importance of ethnicity and religion in predicting attitudes toward gays and lesbians. *Journal of Homosexuality, 47,* 127-142.

Schwartz, B. (2000). Self-determination: The tyranny of freedom. *American Psychologist, 55,* 79-88.

Schwartz, C. E., & Rapkin, B. D. (2004). Reconsidering the psychometrics of quality of life assessment in light of response shift and appraisal. *Health Quality Life Outcomes, 2,* 16.

Schwartz, J. P., & Lindley, L. D. (2005). Religious fundamentalism and attachment: Predictors of homophobia. *International Journal for the Psychology of Religion, 15,* 145-157.

Schwartzberg, S., & Rosenberg, L. G. (1998). Being gay and being male: Psychotherapy with gay and bisexual men. In W. S. Pollack & R. F. Levant (Eds.), *New psychotherapy for men* (pp. 259-281). New York: Wiley.

Schwarz, N., & Clore, G. L. (1985). Mood as information: 20 years later. *Psychological Inquiry, 14,* 196-303.

Schwarz, N., Hippler, H. J., Deutsch, B., & Strack, F. (1985). Response scales: Effects of category range on reported behavior and comparative judgments. *Public Opinion Quarterly, 49,* 388-395.

Segal, B., & Sims, J. (1972). Covert sensitization with a homosexual: A controlled replication. *Journal of Consulting & Clinical Psychology, 39,* 259-263.

Sell, R. L. (1997). Defining and measuring sexual orientation: A review. *Archives of Sexual Behavior, 26,* 643-658.

Selvidge, M. M. D., Matthews, C. R, & Bridges, S. K. (2008). The relationship of minority stress and flexible coping to psychological well being in lesbian and bisexual women. *Journal of Homosexuality, 55,* 450-470.

Seto, M. C. (2004). Pedophilia and sexual offenses against children. *Annual Review of Sex Research, 15,* 321-361.

Shadish, W. R., Cook, T. D., & Campbell, D. T. (2002). *Experimental and quasi-experimental designs for generalized causal inference.* Boston: Houghton Mifflin.

Shafranske, E. P. (2000). Religious involvement and professional practices of psychiatrists and other mental health professionals. *Psychiatric Annals, 30,* 525-532.

Shallenberger, D. (1996). Reclaiming the spirit: The journeys of gay men and lesbian women toward integration. *Qualitative Sociology, 19,* 195-215.

Shannon, J. W., & Woods, W. J. (1991). Affirmative psychotherapy for gay men. *The Counseling Psychologist, 19,* 197-215.

Sherry, A. (2007). Internalized homophobia and adult attachment: Implications for clinical practice. *Psychotherapy: Theory, Research, Practice, Training, 44,* 219-225.

Shidlo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumer's report. *Professional Psychology: Research and Practice, 33,* 249-259.

Shidlo, A., Schroeder, M., & Drescher, J. (Eds.). (2002). *Sexual conversion therapy: Ethical, clinical, and research perspectives* (pp. 87-115). New York: Haworth Press.

Shively, M. G., & DeCecco, J. P. (1977). Components of sexual identity. *Journal of Homosexuality, 3,* 41-48.

Siegelman, M. (1974). Parental background of male homosexuals and heterosexuals. *Archives of Sexual Behavior, 3,* 3-18.

Siegelman, M. (1979). Adjustment of homosexual and heterosexual women: A cross-national replication. *Archives of Sexual Behavior, 8,* 371-378.

Siegelman, M. (1981). Parental backgrounds of homosexual and heterosexual men: A cross national replication. *Archives of Sexual Behavior, 10,* 505-513.

Silberman, I. (2005). Religion as a meaning system: Implications for the new millennium. *Journal of Social Issues, 61*(4), 641-663.

Silverstein, C. (1991). Psychological and medical treatments of homosexuality. In J. C. Gonsiorek & J. D. Weinrich (Eds.), *Homosexuality: Research implications for public policy* (pp. 101-114). Newbury Park, CA: Sage.

Silverstein, C. (2007), Wearing two hats: The psychologist as activist and therapist. *Journal of Gay & Lesbian Psychotherapy, 11*(3/4), 9-35.

Sipe, A. W. R. (1990). *A secret world: Sexuality and the search for celibacy.* New York: Routledge.

Sipe, A. W. R. (2003). *Celibacy in crisis: A secret world revisited.* New York: Brunner/Routledge.

Slater, B. R. (1988). Essential issues in working with lesbian and gay youth. *Professional Psychology: Research and Practice, 2,* 226-235.

Smith, G., Bartlett, A. & King, M. (2004). Treatments of homosexuality in Britain since 1950—an oral history: The experience of patients. *British Medical Journal, 328*(7437), 427-429.

Smith, T. B., McCullough, M. E., & Poll, J. (2003). Religiousness and depression: Evidence for a main effect and the moderating influence of stressful life events. *Psychological Bulletin, 129*(4), 614-636.

Sobocinski, M. R. (1990). Ethical principles in the counseling of gay and lesbian adolescents: Issues of autonomy, competence, and confidentiality. *Professional Psychology: Research and Practice, 21,* 240-247.

Socarides, C. W. (1968). *The overt homosexual.* New York: Grune & Stratton.

Society for Prevention Research. (2005). *Standards of evidence: Criteria for efficacy, effectiveness and dissemination.* Retrieved from http://www.preventionresearch.org/commlmon.php#SofE

Solyom, L., & Miller, S. (1965). A differential conditioning procedure as the initial phase of behavior therapy of homosexuality. *Behaviour Research and Therapy, 3,* 147-160.

Sophie, J. (1987). Internalized homophobia and lesbian identity. *Journal of Homosexuality, 14*(1/2), 53-65.

Southern Poverty Law Center. (2005, Spring). *A might army.* Retrieved February 2, 2009, from www.splcenter.org/intel/intelreport/article.jsp?aid=524

Sperry, L., & Shafranske, E. P. (2004). *Spiritually oriented psychotherapy.* Washington, DC: American Psychological Association.

Spilka, B., Hood, R., Hunsberger, B., & Gorsuch, R. (2003). *The psychology of religion: An empirical approach* (3rd ed.). New York: Guilford Press.

Spitzer, R. L. (2003). Can some gay men and lesbians change their sexual orientation? Two hundred participants reporting a change from homosexual to heterosexual orientation. *Archives of Sexual Behavior, 32,* 403-417.

Sprangers, M. (1989). Subject bias and the retrospective pretest in retrospect. *Bulletin of the Psychonomic Society, 27,* 11-14.

Stålström, O., & Nissinen, J. (2003). The Spitzer Study and the Finnish Parliament. *Journal of Gay & Lesbian Psychotherapy, 7,* 83-95.

Steenbarger, B. N. (1991). All the world is not a stage: Emerging contextualistic themes in counseling and development. *Journal of Counseling & Development, 70,* 288-296.

Stein, E. (1999). *The mismeasure of desire: The science, theory, and ethics of sexual orientation.* New York: Oxford University Press.

Stevenson, I., & Wolpe, J. (1960). Recovery from sexual deviations through overcoming nonsexual neurotic responses. *American Journal of Psychiatry, 116,* 737-742.

Stokes, J. P., Miller, R. L., & Mundhenk, R. (1998). Toward an understanding of behaviourally bisexual men: The influence of context and culture. *The Canadian Journal of Human Sexuality, 7,* 101-114.

Stone, K. C. (2008). Sexual messages, self-schema, and contentment: An influential threesome for women's sexuality? *Dissertation Abstracts International: Section B: Sciences and Engineering, 68*(8-B), 5639. (UMI No. 3276731)

Storms, M. D. (1980). Theories of sexual orientation. *Journal of Personality and Social Psychology, 38,* 783-792.

Streib, H. (2001). Faith development theory revisited: The religious styles perspective. International Journal for the Psychology of Religion, 11, 143-158.

Streib, H. (2005). Faith development research revisited: Accounting for diversity in structure, content, and narrativity of faith. *International Journal for the Psychology of Religion, 15,* 99-121.

Sue, S., & Zane, N. (2006). Ethnic minority populations have been neglected by evidence-based practices. In J. C. Norcross, L. E. Beutler, & R. F. Levant (Eds.), *Evidence-based practices in mental health: Debate and dialogue on the fundamental questions* (pp. 329-337). Washington, DC: American Psychological Association.

Surrey, J. L. (1991). The "self-in-relation": A theory of women's development. In J. V. Jordan, A. G. Kaplan, J. B. Miller, I. P. Stiver, & J. L. Surrey (Eds.), *Women's growth in connection: Writings from the Stone Center* (pp. 51-66). New York: Guildford Press.

Szalacha, L. A. (2003). Safer sexual diversity climates: Lessons learned from an evaluation of Massachusetts Safe Schools Program for Gay and Lesbian Students. *American Journal of Education, 110,* 58-88.

Szymanski, D. M., & Carr, E. R. (2008). The roles of gender role conflict and internalized heterosexism in gay and bisexual men's psychological distress: Testing two mediation models. *Journal of Men & Masculinity, 9,* 40-54.

Szymanski, D. M., & Kashubeck-West, S. (2008). Internalized heterosexism: Clinical implications and training considerations. *The Counseling Psychologist, 36,* 615-630.

Szymanski, D. M., Kashubeck-West, S., & Meyer, J. (2008). Internalized heterosexism: A historical and theoretical overview. *The Counseling Psychologist, 36,* 510-524.

Tan, E. (2008). Mindfulness in sexual identity therapy: A case study. *Journal of Psychology and Christianity, 27,* 274-278.

Tanner, B. A. (1974). A comparison of automated aversive conditioning and a waiting list control in the modification of homosexual behavior in males. *Behavior Therapy, 5,* 29-32.

Tanner, B. A. (1975). Avoidance training with and without booster sessions to modify homosexual behavior in males. *Behavior Therapy, 6,* 649-653.

Taylor, S. (1983). Adjustment to threatening events: A theory of cognitive adaptation. *American Psychologist, 38,* 1161-1173.

Thompson, E. M., & Morgan, E. M. (2008). "Mostly straight" young women: Variations in sexual behavior and identity development. *Developmental Psychology, 44,* 15-21.



PBC 007614

Thorpe, J. G., Schmidt, E., Brown, P. T., & Castell, D. (1964). Aversion-relief therapy: A new method for general application. *Behaviour Research & Therapy, 2,* 71-82.

Thorpe, J. G., Schmidt, E., & Castell, D. (1963). A comparison of positive and negative (aversive) conditioning in the treatment of homosexuality. *Behaviour Research & Therapy, 1,* 357-362.

Throckmorton, W. (2002). Initial empirical and clinical findings concerning the change process for ex-gays. *Professional Psychology: Research and Practice, 33,* 242-248.

Throckmorton, W., & Welton, G. (2005). Counseling practices as they relate to ratings of helpfulness by consumers of sexual reorientation therapy. *Journal of Psychology and Christianity, 24,* 332-342.

Throckmorton, W. & Yarhouse, M. A. (2006). *Sexual identity therapy: Practice guidelines for managing sexual identity conflicts.* Unpublished paper. Retrieved August 21, 2008, from http://wthrockmorton.com/wp-content/uploads/2007/04/sexualidentitytherapyframeworkfinal.pdf

Thumma, S. (1991). Negotiating a religious identity: The case of the gay evangelical. *Sociological Analysis, 52,* 333-347.

Toro-Alfonso, J. (2007, August). *Latino perspectives on sexual orientation: The desire that we do not dare to name.* Retrieved September 21, 2007, from www.apa.org/pi/oema/homepage.html

Townes, B. D., Ferguson, M. D., & Gillem, S. (1976). Differences in psychological sex, adjustment, and familial influences among homosexual and nonhomosexual populations. *Journal of Homosexuality, 1,* 261-272.

Tozer, E. E., & Hayes, J. A. (2004). The role of religiosity, internalized homonegativity, and identity development: Why do individuals seek conversion therapy? *The Counseling Psychologist, 32,* 716-740.

Tozer, E. E., & McClanahan, M. K. (1999). Treating the purple menace: Ethical considerations of conversion therapy and affirmative alternatives. *The Counseling Psychologist, 27,* 722-742.

Treadway, L., & Yoakum, J. (1992). Creating a safer school environment for lesbian and gay students. *Journal of School Health,* 352-357.

Tremble, B., Schneider, M., & Appathurai, C. (1989). Growing up gay or lesbian in a multicultural context. In G. H. Herdt (Ed.), *Gay and lesbian youth* (pp. 253-267). Ithaca, NY: Haworth Press.

Trenholm, P., Trent, J., & Compton, W. C. (1998). Negative religious conflict as a predictor of panic disorder. *Journal of Clinical Psychology, 54,* 59-65.

Treyger, S., Ehlers, N., Zajicek, L., & Trepper, T. (2008). Helping spouses cope with partners coming out: A solution-focused approach. *American Journal of Family Therapy, 36,* 30-47.

Troiden, R. R. (1988). Homosexual identity development. *Journal of Adolescent Health Care, 9,* 105-113.

Troiden, R. R. (1989). The formation of homosexual identities. *Journal of Homosexuality, 17*(1-2), 43-73.

Troiden, R. R. (1993). The formation of homosexual identities. In L. Garnets & D. Kimmel (Eds.), *Psychological perspectives on lesbian and gay male experiences* (pp. 191-217). New York: Columbia University Press.

Trujillo, A. (2000). Psychotherapy with Native Americans: A view into the role of religion and spirituality. In P. S. Richards & A. Bergin (Eds.), *Handbook of psychotherapy and religious diversity* (pp. 445-466). Washington, DC: American Psychological Association.

Tyler, F. B., Pargament, K. I., & Gatz, M. (1983). The resource collaborator role: A model for interactions involving psychologists. *American Psychologist, 38,* 388-398.

Ullerstam, L. (1966). *The erotic minorities: A Swedish view.* New York: Grove.

Van Voorst, R. E. (Ed.). (2005). Homosexuality and the church. *Reformed Review: A Theological Journal of Western Theological Seminary, 59*(1).

Vasey, P. L., & Rendall, D. (2003). Sexual diversity and change along a continuum of bisexual desire. *Archives of Sexual Behavior, 32,* 453-455.

Wakefield, J. C. (2003). Sexual reorientation therapy: Is it ever ethical? Can it ever change sexual orientation? *Archives of Sexual Behavior, 32,* 457-461.

Walters, K. L., Evans-Campbell, T., Simoni, J. M., Ronquillo, T., & Bhuyan, R. (2006). My spirit in my heart: Identity experiences and challenges among American Indian two-spirit women. *Journal of Lesbian Studies, 10*(1/2), 125-149.

Walters, K. L., Simoni, J. M., & Horwath, P. F. (2001). Sexual orientation bias experiences and service needs of gay, lesbian, bisexual, transgendered, and two-spirited American Indians. *Journal of Gay & Lesbian Social Services: Issues in Practice, Policy & Research, 13*(1-2), 133-149

Wax, E. (2008, November 15). For gays in India, fear rules, blackmailers thrive using law that makes homosexuality a crime. *Washington Post Foreign Service,* A13.

Weeks, J. (1995). Histories, desire and identities. In R. G. Parker & J. H. Gagnon (Eds.), *Conceiving sexualities* (pp. 33-50). New York: Routledge.

Wei, M., Ku, T-Y., Russell, D. W., Mallinckrodt, B., & Liao, K. Y-H. (2008). Moderating effects of three coping strategies and self-esteem on perceived discrimination and depressive symptoms: A minority stress model for Asian international students. *Journal of Counseling Psychology, 55,* 451-462.

Weinberg, G. (1972). *Society and the healthy homosexual.* New York: St. Martin's Press.

Weinrich, J. D., & Williams, W. L. (1991). Strange customs, familiar lives: Homosexualities in other cultures. In J. C. Gonsiorek & J. D. Weinrich (Eds.), *Homosexuality: Research implications for public policy* (pp. 44-59). Newbury Park, CA: Sage.

Weithorn, L. A. (1987). Mental hospitalization of troublesome youth: An analysis of skyrocketing admission rates. *Stanford Law Review, 40,* 773-838.

Wester, S. R. (2008). Male gender role conflict and multiculturalism: Implications for counseling psychology. *The Counseling Psychologist, 36,* 294-324.

Whaley, A. L., & Davis, K. E. (2007). Cultural competence and evidence-based practice in mental health services. *American Psychologist, 62,* 563-574.

Wilber, S., Ryan, C., & Marksamer, J. (2006). *CWLA, Best practice guidelines*. Washington, DC: Child Welfare League of America.

Wilcox, M. M. (2001). Dancing on the fence: Researching lesbian, gay, bisexual, and transgender Christians. In J. V. Spickard, J. S. Landres, & M. B. McGuire (Eds.), *Personal knowledge and beyond: Reshaping the ethnography of religion*. New York: New York University Press.

Wilcoxon, F. (1945). Individual comparisons by ranking methods. *Biometrics, 1,* 80-83.

Williams, A. (2005, July 17). Gay teenager stirs a storm. *The New York Times,* Style Section, pp. 1, 6.

Williams, M. (2008). Homosexuality anxiety: A misunderstood form of OCD. In L. V. Sebeki (Ed.), *Leading-edge health education issues* (pp. 195-205). Hauppauge, NY: Nova Science.

Wilson, A. E., & Ross, M. (2001). From chump to champ: People's appraisal of their earlier and present selves. *Journal of Personality and Social Psychology, 80,* 572-584.

Wilson, B. D. M. & Miller, R. L. (2002). Strategies for managing heterosexism used among African American gay and bisexual men. *Journal of Black Psychology, 28,* 371-391.

Winnicott, D. W. (1965). *The maturational process and the facilitating environment*. New York: International Universities Press.

Wilson, G. T., & Davison, G. C. (1974). Behavior therapy and homosexuality: A critical perspective. *Behavior Therapy, 5,* 16-28.

Wilson, M. L., & Green, R. L. (1971). Personality characteristics of female homosexuals. *Psychological Reports, 28,* 407-412.

Wolkomir, M. (2001). Emotion work, commitment, and the authentication of the self: The case of gay and ex-gay Christian support groups. *Journal of Contemporary Ethnography, 30,* 305-334.

Wolkomir, M. (2006). *Be not deceived: The sacred and sexual struggles of gay and ex-gay Christian men*. New Brunswick, NJ: Rutgers University Press.

Wolowelsky, J. B., & Weinstein, B. L. (1995). Initial religious counseling for a male orthodox adolescent homosexual. *Tradition, 29,* 49-55.

Worthington, E. L., Kurusu, T. A., McCullough, M. E., & Sandage, S. J. (1996). Empirical research on religion and psychotherapeutic process outcomes: A 10-year review and research prospectus. *Psychological Bulletin, 119,* 448-487.

Worthington, R. L. (2003). Heterosexual identities, sexual reorientation therapies, and science. *Archives of Sexual Behavior, 32,* 460-461.

Worthington, R. L. (2004). Sexual identity, sexual orientation, religious identity, and change: Is it possible to depolarize the debate? *The Counseling Psychologist, 32,* 741-749.

Worthington, R. L., Dillon, F. R., & Becker-Schutte, A. M. (2005). Development, reliability, and validity of the LGB knowledge and attitudes scale for heterosexuals (LGB-KASH). *Journal of Counseling Psychology, 52,* 104-118.

Worthington, R. L., Navarro, R. L., Savoy, H. B., & Hampton, D. (2008). Development, reliability, and validity of the measure of sexual identity exploration and commitment (MoSIEC). *Developmental Psychology, 44,* 22-44.

Worthington, R. L., & Reynolds, A. L. (2009). Within group differences in sexual orientation and identity. *Journal of Counseling Psychology, 56,* 44-55.

Worthington, R. L., Savoy, H., Dillon, F. R., & Vernaglia, E. R. (2002). Heterosexual identity development: A multidimensional model of individual and group identity. *The Counseling Psychologist, 30,* 496-531.

Wright, E. R., & Perry, B. L. (2006). Sexual identity distress, social support, and the health of gay, lesbian, and bisexual youth. *Journal of Homosexuality, 51,* 81-110.

Wulff, D. M. (1997). *Psychology of religion: Classic and contemporary* (2nd ed.). Oxford, England: Wiley.

Wyers, N. (1987, March/April). Homosexuality in the family: Lesbian and gay spouses. *Social Work,* 143-148.

Yarhouse, M. A. (1998a). When clients seek treatment for same-sex attraction: Ethical issues in the "right to choose" debate. *Psychotherapy: Theory, Research, Practice, Training, 35,* 248-259.

Yarhouse, M. A. (1998b). When families present with concerns about an adolescent's experience of same-sex attraction. *The American Journal of Family Therapy, 26,* 321-330.

Yarhouse, M. A. (2001). Sexual identity development: The influence of valuative frameworks on identity synthesis. *Psychotherapy: Theory, Research, Practice, Training, 38,* 331-341.

Yarhouse, M. A. (2005a). Christian explorations in sexual identity. *Journal of Psychology and Christianity, 24,* 291-292.

Yarhouse, M. A. (2005b). Constructive relationships between religion and the scientific study of sexuality. *Journal of Psychology and Christianity, 24,* 29-35.

Yarhouse, M. A. (2005c). Same-sex attraction, homosexual orientation, and gay identity: A three-tier distinction for counseling and pastoral care. *Journal of Pastoral Care & Counseling, 59,* 201-212.



Yarhouse, M. A. (2008). Narrative sexual identity therapy. *American Journal of Family Therapy, 39*, 196-210.

Yarhouse, M., & Beckstead, A. L. (2007, August). Sexual identity group therapy to navigate religious and spiritual conflicts. In M. Yarhouse & A. L. Beckstead (Chairs), *Sexual identity therapy to address religious and spiritual conflicts*. Symposium conducted 116th Convention of the American Psychological Association, San Francisco.

Yarhouse, M. A., Brooke, H. L., Pisano, P., & Tan, E. S. N. (2005). Project Inner Compass: Young adults experiencing sexual identity confusion. *Journal of Psychology and Christianity, 24,* 352-360.

Yarhouse, M. A., & Burkett, L. A. (2002). An inclusive response to LGB and conservative religious persons: The case of same-sex attraction and behavior. *Professional Psychology: Research and Practice, 33*, 235-241.

Yarhouse, M. A., Burkett, L. A., Kreeft, E. M. (2001). Competing models for shepherding those in the church who contend with same-sex attraction. *Journal of Psychology and Christianity, 20*, 53-65.

Yarhouse, M. A., & Fisher, W. (2002). Levels of training to address religion in clinical practice. *Psychotherapy: Theory, Research, Practice, Training, 39*, 171-176.

Yarhouse, M. A., & Pawlowski, L. M, & Tan, E. S. N. (2003). Intact marriages in which one partner dis-identifies with experiences of same-sex attraction. *American Journal of Family Therapy, 31*, 369-388.

Yarhouse, M. A., & Seymore, R. L. (2006). Intact marriages in which one partner dis-identifies with experiences of same-sex attraction: A follow-up study. *The American Journal of Family Therapy, 34,* 151-161.

Yarhouse, M. A., & Tan, E. S. N. (2004). *Sexual identity synthesis: Attributions, meaning-making, and the search for congruence.* Lanham, MD: University Press of America.

Yarhouse, M. A., & Tan, E. S. N. (2005a). Addressing religious conflicts in adolescents who experience sexual identity confusion. *Professional Psychology: Research and Practice, 6*, 530-536.

Yarhouse, M. A., & Tan, E. S. N. (2005b). Sexual identity and being a Christian. *Journal of Psychology and Christianity, 24,* 60-64.

Yarhouse, M. A., Tan, E. S. N., & Pawlowski, L. M. (2005). Sexual identity development and synthesis among LGB-identified and LGB dis-identified persons. *Journal of Psychology and Theology, 33*, 3-16.

Yarhouse, M. A., & Throckmorton, W. (2002). Ethical issues in attempts to ban reorientation therapies. *Psychotherapy: Theory, Research, Practice, Training, 39*, 66-75.

Yarhouse, M. A., & VanOrman, B. T. (1999). When psychologists work with religious clients: Applications of the general principles of ethical conduct. *Professional Psychology: Research and Practice, 30*, 557-562.

Yi, K., & Shorter-Gooden, K. (1999). Ethnic identity formation: From stage theory to a constructivist narrative model. *Psychotherapy: Theory, Research, Practice, Training, 36*, 16-26.

Yip, A. K. T. (2000). Leaving the church to keep my faith: The lived experiences of non-heterosexual Christians. In L. J. Francis & Y. J. Katz (Eds.), *Joining and leaving religion: Research perspectives* (pp. 129-145). Leominster, MA: Gracewing.

Yip, A. K. T. (2002). The persistence of faith among nonheterosexual Christians. *Journal for the Scientific Study of Religion, 41*, 199-212.

Yip, A. K. T. (2003). The self as the basis of religious faith: Spirituality of gay, lesbian, and bisexual Christians. In G. Davie, L. Woodhead, & P. Heelas (Eds.), *Predicting religion* (pp. 135-146). Aldershot, England: Ashgate.

Yip, A. K. T. (2004). Embracing Allah and sexuality? South Asian non-heterosexual Muslims in Britain. In K. A. Jacobsen & P. P. Kumar (Eds.), *South Asians in the Diaspora* (pp. 294-310). Leiden, Netherlands: Brill.

Yip, A. K. T. (2005). Queering religious texts: An exploration of British non-heterosexual Christians' and Muslims' strategy of constructing sexuality-affirming hermeneutics. *Sociology, 39,* 47-65.

Zahniser, J. H., & Boyd, C. A. (2008). The work of love, the practice of compassion and the homosexual neighbor. *Journal of Psychology and Christianity, 27*, 215-226.

Zahniser, J. H., & Cagle, L. (2007). Homosexuality: Toward an informed, compassionate response. *Christian Scholar's Review, 36*, 323-348.

Zaslav, M. R. (1998). Shame-related states of mind in psychotherapy. *Journal of Psychotherapy Practice and Research, 7*, 154-166.

Zea, M. C., Diaz, R. M., & Reisen, C. A. (2003). Methodological issues in research with Latino gay and bisexual men. *American Journal of Community Psychology, 31,* 281-291.

Zea, M. C., Mason, MA, & Muruia, J. (2000). Psychotherapy with members of Latino/Latina religious and spiritual traditions. In P. S. Richards, & A. Bergin (Eds.), *Handbook of psychotherapy and religious diversity* (pp. 397-419). Washington, DC: American Psychological Association.

Zucker, K. J. (2008). Reflections on the relation between sex-typed behavior in childhood and sexual orientation in adulthood. *Journal of Gay & Lesbian Mental Health, 12*(1/2), 29-59.

Zucker, K. J., & Bradley, S. J. (1995). *Gender identity disorder and psychosexual problems in children and adolescents.* New York: Guilford Press.

PBC 007618

# APPENDIX A: RESOLUTION ON APPROPRIATE AFFIRMATIVE RESPONSES TO SEXUAL ORIENTATION DISTRESS AND CHANGE EFFORTS

## Research Summary

The longstanding consensus of the behavioral and social sciences and the health and mental health professions is that homosexuality per se is a normal and positive variation of human sexual orientation (Bell, Weinberg, & Hammersmith, 1981; Bullough, 1976; Ford & Beach 1951; Kinsey, Pomeroy, & Martin, 1948; Kinsey, Pomeroy, Martin, & Gebhard, 1953). Homosexuality per se is not a mental disorder (APA, 1975). Since 1974, the American Psychological Association (APA) has opposed stigma, prejudice, discrimination, and violence on the basis of sexual orientation and has taken a leadership role in supporting the equal rights of lesbian, gay, and bisexual individuals (APA, 2005).

APA is concerned about ongoing efforts to mischaracterize homosexuality and promote the notion that sexual orientation can be changed and about the resurgence of sexual orientation change efforts (SOCE).[A1] SOCE has been controversial due to tensions between the values held by some faith-based organizations, on the one hand, and those held by lesbian, gay, and bisexual rights organizations and professional and scientific organizations, on the other (Drescher, 2003; Drescher & Zucker, 2006).

Some individuals and groups have promoted the idea of homosexuality as symptomatic of developmental defects or spiritual and moral failings and have argued that SOCE, including psychotherapy and religious efforts, could alter homosexual feelings and behaviors (Drescher & Zucker, 2006; Morrow & Beckstead, 2004). Many of these individuals and groups appeared to be embedded within the larger context of conservative religious political movements that have supported the stigmatization of homosexuality on political or religious grounds (Drescher, 2003; Drescher & Zucker, 2006; Southern Poverty Law Center, 2005). Psychology, as a science, and various faith traditions, as theological systems, can acknowledge and respect their profoundly different methodological and philosophical viewpoints. The APA concludes that psychology must rely on proven methods of scientific inquiry based on empirical data, on which hypotheses and propositions are confirmed or disconfirmed, as the basis to explore and understand human behavior (APA, 2008a, 2008c).

In response to these concerns, APA appointed the Task Force on Appropriate Therapeutic Responses to Sexual Orientation to review the available research on SOCE and to provide recommendations to the association. The task force reached the following findings.

Recent studies of participants in SOCE identify a population of individuals who experience serious distress related to same-sex sexual attractions. Most of these participants are Caucasian males who report that their religion is extremely important to them (Beckstead & Morrow, 2004; Nicolosi, Byrd, & Potts,

---

[A1] APA uses the term *sexual orientation change efforts* (SOCE) to describe methods (e.g., behavioral techniques, psychoanalytic techniques, medical approaches, religious and spiritual approaches) that aim to change a same-sex sexual orientation to heterosexual, regardless of whether mental health professionals or lay individuals (including religious professionals, religious leaders, social groups, and other lay networks, such as self-help groups) are involved.

2000; Schaeffer, Hyde, Kroencke, McCormick, & Nottebaum, 2000; Shidlo & Schroeder, 2002, Spitzer, 2003). These individuals report having pursued a variety of religious and secular efforts intended to help them change their sexual orientation. To date, the research has not fully addressed age, gender, gender identity, race, ethnicity, culture, national origin, disability, language, and socioeconomic status in the population of distressed individuals.

There are no studies of adequate scientific rigor to conclude whether or not recent SOCE do or do not work to change a person's sexual orientation. Scientifically rigorous older work in this area (e.g., Birk, Huddleston, Miller, & Cohler, 1971; James, 1978; McConaghy, 1969, 1976; McConaghy, Proctor, & Barr, 1972; Tanner, 1974, 1975) found that sexual orientation (i.e., erotic attractions and sexual arousal oriented to one sex or the other, or both) was unlikely to change due to efforts designed for this purpose. Some individuals appeared to learn how to ignore or limit their attractions. However, this was much less likely to be true for people whose sexual attractions were initially limited to people of the same sex.

Although sound data on the safety of SOCE are extremely limited, some individuals reported being harmed by SOCE. Distress and depression were exacerbated. Belief in the hope of sexual orientation change followed by the failure of the treatment was identified as a significant cause of distress and negative self-image (Beckstead & Morrow, 2004; Shidlo & Schroeder, 2002).

Although there is insufficient evidence to support the use of psychological interventions to change sexual orientation, some individuals modified their sexual orientation identity (i.e., group membership and affiliation), behavior, and values (Nicolosi et al., 2000). They did so in a variety of ways and with varied and unpredictable outcomes, some of which were temporary (Beckstead & Morrow, 2004; Shidlo & Schroeder, 2002). Based on the available data, additional claims about the meaning of those outcomes are scientifically unsupported.

On the basis of the task force's findings, the APA encourages mental health professionals to provide assistance to those who seek sexual orientation change by utilizing affirmative multiculturally competent (Bartoli & Gillem, 2008; Brown, 2006) and client-centered approaches (e.g., Beckstead & Israel, 2007; Glassgold, 2008; Haldeman, 2004; Lasser & Gottlieb, 2004) that recognize the negative impact of social stigma on sexual minorities  (Herek, 2009; Herek &

Garnets, 2007)[A2] and balance ethical principles of beneficence and nonmaleficence, justice, and respect for people's rights and dignity (APA, 1998, 2002; Davison, 1976; Haldeman, 2002; Schneider, Brown, & Glassgold, 2002).

## Resolution

WHEREAS, The American Psychological Association expressly opposes prejudice (defined broadly) and discrimination based on age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, or socioeconomic status (APA, 1998, 2000, 2002, 2003, 2005, 2006, 2008c);

WHEREAS, The American Psychological Association takes a leadership role in opposing prejudice and discrimination (APA, 2008b, 2008c), including prejudice based on or derived from religion or spirituality, and encourages commensurate consideration of religion and spirituality as diversity variables (APA, 2008c);

WHEREAS, Psychologists respect human diversity including age, gender, gender identity, race, ethnicity, culture, national origin, religion, sexual orientation, disability, language, and socioeconomic status (APA, 2002) and psychologists strive to prevent bias from their own spiritual, religious, or nonreligious beliefs from taking precedence over professional practice and standards or scientific findings in their work as psychologists (APA, 2008c);

WHEREAS, Psychologists are encouraged to recognize that it is outside the role and expertise of psychologists, as psychologists, to adjudicate religious or spiritual tenets, while also recognizing that psychologists can appropriately speak to the psychological implications of religious/spiritual beliefs or practices when relevant psychological findings about those implications exist (APA, 2008c);

WHEREAS, Those operating from religious/spiritual traditions are encouraged to recognize that it is outside their role and expertise to adjudicate empirical scientific issues in psychology, while

---

[A2] We use the term *sexual minority* (cf. Blumenfeld, 1992; McCarn & Fassinger, 1996; Ullerstam, 1966) to designate the entire group of individuals who experience significant erotic and romantic attractions to adult members of their own sex, including those who experience attractions to members of both their own and the other sex. This term is used because we recognize that not all sexual minority individuals adopt an LGB bisexual identity.



also recognizing they can appropriately speak to theological implications of psychological science (APA, 2008c);

WHEREAS, The American Psychological Association encourages collaborative activities in pursuit of shared prosocial goals between psychologists and religious communities when such collaboration can be done in a mutually respectful manner that is consistent with psychologists' professional and scientific roles (APA, 2008c);

WHEREAS, Societal ignorance and prejudice about a same-sex sexual orientation places some sexual minorities at risk for seeking sexual orientation change due to personal, family, or religious conflicts, or lack of information (Beckstead & Morrow, 2004; Haldeman, 1994; Ponticelli, 1999; Shidlo & Schroeder, 2002; Wolkomir, 2001);

WHEREAS, Some mental health professionals advocate treatments based on the premise that homosexuality is a mental disorder (e.g., Nicolosi, 1991; Socarides, 1968);

WHEREAS, Sexual minority children and youth are especially vulnerable populations with unique developmental tasks (Perrin, 2002; Ryan & Futterman, 1997) who lack adequate legal protection from involuntary or coercive treatment (Arriola, 1998; Burack & Josephson, 2005; Molnar, 1997) and whose parents and guardians need accurate information to make informed decisions regarding their development and well-being (Cianciatto & Cahill, 2006; Ryan & Futterman, 1997); and

WHEREAS, Research has shown that family rejection is a predictor of negative outcomes (Remafedi, Farrow, & Deisher, 1991; Ryan, Huebner, Diaz, & Sanchez, 2009; Savin-Williams, 1994; Wilber, Ryan, & Marksamer, 2006) and that parental acceptance and school support are protective factors (D'Augelli, 2003; D'Augelli, Hershberger, & Pilkington, 1998; Goodenow, Szalacha, & Westheimer, 2006; Savin-Williams, 1989) for sexual minority youth;

THEREFORE, BE IT RESOLVED, That the American Psychological Association affirms that same-sex sexual and romantic attractions, feelings, and behaviors are normal and positive variations of human sexuality regardless of sexual orientation identity;

BE IT FURTHER RESOLVED, That the American Psychological Association reaffirms its position that homosexuality per se is not a mental disorder and opposes portrayals of sexual minority youths and adults as mentally ill due to their sexual orientation;

BE IT FURTHER RESOLVED, That the American Psychological Association concludes that there is insufficient evidence to support the use of psychological interventions to change sexual orientation;

BE IT FURTHER RESOLVED, That the American Psychological Association encourages mental health professionals to avoid misrepresenting the efficacy of sexual orientation change efforts by promoting or promising change in sexual orientation when providing assistance to individuals distressed by their own or others' sexual orientation;

BE IT FURTHER RESOLVED, That the American Psychological Association concludes that the benefits reported by participants in sexual orientation change efforts can be gained through approaches that do not attempt to change sexual orientation;

BE IT FURTHER RESOLVED, That the American Psychological Association concludes that the emerging knowledge on affirmative multiculturally competent treatment provides a foundation for an appropriate evidence-based practice with children, adolescents and adults who are distressed by or seek to change their sexual orientation (Bartoli & Gillem, 2008; Brown, 2006; Martell, Safren, & Prince, 2004; Norcross, 2002; Ryan & Futterman, 1997);

BE IT FURTHER RESOLVED, That the American Psychological Association advises parents, guardians, young people, and their families to avoid sexual orientation change efforts that portray homosexuality as a mental illness or developmental disorder and to seek psychotherapy, social support and educational services that provide accurate information on sexual orientation and sexuality, increase family and school support, and reduce rejection of sexual minority youth;

BE IT FURTHER RESOLVED, That the American Psychological Association encourages practitioners to consider the ethical concerns outlined in the 1997 APA Resolution on Appropriate Therapeutic Response to Sexual Orientation (APA, 1998), in particular the following standards and principles:

PBC 007621

Bases for Scientific and Professional Judgments, Beneficence and Harm, Justice, and Respect for People's Rights and Dignity;

BE IT FURTHER RESOLVED, That the American Psychological Association encourages practitioners to be aware that age, gender, gender identity, race, ethnicity, culture, national origin, religion, disability, language, and socioeconomic status may interact with sexual stigma and contribute to variations in sexual orientation identity development, expression, and experience;

BE IT FURTHER RESOLVED, That the American Psychological Association opposes the distortion and selective use of scientific data about homosexuality by individuals and organizations seeking to influence public policy and public opinion and will take a leadership role in responding to such distortions;

BE IT FURTHER RESOLVED, That the American Psychological Association supports the dissemination of accurate scientific and professional information about sexual orientation in order to counteract bias that is based in lack of knowledge about sexual orientation; and

BE IT FURTHER RESOLVED, That the American Psychological Association encourages advocacy groups, elected officials, mental health professionals, policymakers, religious professionals and organizations, and other organizations to seek areas of collaboration that may promote the well-being of sexual minorities.

## REFERENCES

American Psychological Association. (1975). Policy statement on discrimination against homosexuals. *American Psychologist, 30*, 633.

American Psychological Association. (1998). Resolution on appropriate therapeutic responses to sexual orientation. *American Psychologist, 43,* 934-935.

American Psychological Association. (2000). Guidelines for psychotherapy with lesbian, gay, and bisexual clients. *American Psychologist, 55*, 1440-1451.

American Psychological Association. (2002). Ethical principles of psychologists and code of conduct. *American Psychologist, 57*, 1060-1073.

American Psychological Association. (2003). *Lawrence v. Texas: Brief for amicus curiae, Supreme Court of the United States*. Washington, DC. Retrieved February 25, 2008, from http://www.apa.org/pi/lgbc/policy/amicusbriefs. html#lawrence

American Psychological Association. (2005). *APA policy statements on lesbian, gay, and bisexual concerns*. Retrieved July 4, 2008, from http://www.apa.org/pi/lgbc/policy/ pshome.html

American Psychological Association. (2006). Resolution on prejudice, stereotypes, and discrimination. *American Psychologist, 62*, 475-481.

American Psychological Association. (2008a). Resolution rejecting intelligent design as scientific and reaffirming support for evolutionary theory. *American Psychologist, 63*, 426-427.

American Psychological Association. (2008b). Resolution opposing discriminatory legislation and initiatives aimed at lesbian, gay, and bisexual persons. *American Psychologist, 63*, 428-430.

American Psychological Association. (2008c). Resolution on religious, religion-related and/or religion-derived prejudice. *American Psychologist, 63*, 431-434.

Arriola, E. R. (1998). The penalties for puppy love: Institutionalized violence against lesbian, gay, bisexual, and transgender youth. *The Journal of Gender, Race, and Justice, 429*, 1-43.

Bartoli, E., & Gillem, A. R. (2008). Continuing to depolarize the debate on sexual orientation and religious identity and the therapeutic process. *Professional Psychology: Research and Practice, 39*, 202-209.

Beckstead, L., & Israel, T. (2007). Affirmative counseling and psychotherapy focused on issues related to sexual orientation conflicts. In K. J. Bieschke, R. M. Perez, & K. A. DeBord (Eds.), *Handbook of counseling and psychotherapy with lesbian, gay, bisexual, and transgender clients* (2nd ed., pp. 221-244). Washington, DC: American Psychological Association.



PBC 007622

Beckstead, A. L., & Morrow, S. L. (2004). Mormon clients' experiences of conversion therapy: The need for a new treatment approach. *The Counseling Psychologist, 32,* 651-690.

Bell, A. P., Weinberg, M. S., & Hammersmith, S. K. (1981). *Sexual preference: Its development in men and women.* Bloomington: Indiana University Press.

Birk, L., Huddleston, W., Miller, E., & Cohler, B. (1971). Avoidance conditioning for homosexuality. *Archives of General Psychiatry, 25,* 314-323.

Blumenfeld, W. J. (1992). Introduction. In W. J. Blumenfeld (Ed.), *Homophobia: How we all pay the price* (pp. 1-19). New York: Beacon Press.

Brown, L. S. (2006). The neglect of lesbian, gay, bisexual, and transgendered clients. In J. C. Norcross, L. E. Beutler, & R. F. Levant (Eds.), *Evidence-based practices in mental health: Debate and dialogue on the fundamental questions* (pp. 346-353). Washington, DC: American Psychological Association.

Bullough, V. L. (1976). *Sexual variance in society and history.* Chicago: University of Chicago Press.

Burack, C., & Josephson, J. J. (2005). *A report from "Love Won Out: Addressing, Understanding, and Preventing Homosexuality."* New York: National Gay and Lesbian Task Force Policy Institute. Retrieved from www.thetaskforce.org/downloads/reports/reports/LoveWonOut.pdf

Cianciatto, J., & Cahill, S. (2006). *Youth in the crosshairs: The third wave of ex-gay activism.* New York: National Gay and Lesbian Task Force Policy Institute.

D'Augelli, A. R. (2003). Lesbian and bisexual female youths aged 14 to 21: Developmental challenges and victimization experiences. *Journal of Lesbian Studies, 7,* 9-29.

D'Augelli, A. R., Hershberger, S. L., & Pilkington, N. W. (1998). Lesbian, gay, and bisexual youth and their families: Disclosure of sexual orientation and its consequences. *American Journal of Orthopsychiatry, 68,* 361-371.

Davison, G. C. (1976). Homosexuality: The ethical challenge. *Journal of Consulting and Clinical Psychology, 44,* 157-162.

Drescher, J. (2003). The Spitzer study and the culture wars. *Archives of Sexual Behavior, 32,* 431-432.

Drescher, J., & Zucker, K. J. (Eds.). (2006). *Ex-gay research: Analyzing the Spitzer study and its relation to science, religion, politics, and culture.* New York: Harrington Park Press.

Ford, C. S., & Beach, F. A. (1951). *Patterns of sexual behavior.* New York: Harper & Row.

Glassgold, J. M. (2008). Bridging the divide: Integrating lesbian identity and Orthodox Judaism. *Women and Therapy, 31,* 59-73.

Goodenow, C., Szalacha, L., & Westheimer, K. (2006). School support groups, other school factors, and the safety of sexual minority adolescents. *Psychology in the Schools, 43,* 573-589.

Haldeman, D. C. (1994). The practice and ethics of sexual orientation conversion therapy. *Journal of Consulting and Clinical Psychology, 62,* 221-227.

Haldeman, D. C. (2002). Gay rights, patient rights: The implications of sexual orientation conversion therapy. *Professional Psychology: Research and Practice, 33,* 200-204.

Haldeman, D. C. (2004). When sexual and religious orientation collide: Considerations in working with conflicted same-sex attracted male clients. *The Counseling Psychologist, 32,* 691-715.

Herek, G. M. (2009). Sexual stigma and sexual prejudice in the United States: A conceptual framework. In D. A. Hope (Ed.), *Nebraska Symposium on Motivation: Vol. 54. Contemporary perspectives on lesbian, gay, and bisexual identities* (pp. 65-111). New York: Springer.

Herek, G. M., & Garnets, L. D. (2007). Sexual orientation and mental health. *Annual Review of Clinical Psychology, 3,* 353-375.

James, S. (1978). Treatment of homosexuality II. Superiority of desensitization/arousal as compared with anticipatory avoidance conditioning: Results of a controlled trial. *Behavior Therapy, 9,* 28-36.

Kinsey, A. C., Pomeroy, W. B., & Martin, C. E. (1948). *Sexual behavior in the human male.* Philadelphia: W. B. Saunders.

Kinsey, A. C., Pomeroy, W. B., Martin, C. E., & Gebhard, P. (1953). *Sexual behavior in the human female.* Philadelphia: W. B. Saunders.

Lasser, J. S., & Gottlieb, M. C. (2004). Treating patients distressed regarding their sexual orientation: Clinical and ethical alternatives. *Professional Psychology: Research and Practice, 35,* 194-200.

Martell, C. R., Safren, S. A., & Prince, S. E. (2004). *Cognitive-behavioral therapies with lesbian, gay, and bisexual clients.* New York: Guilford Press.

McCarn, S. R., & Fassinger, R. E. (1996). Revisioning sexual minority identity formation: A new model of lesbian identity and its implications for counseling and research. *The Counseling Psychologist, 24,* 508–534.

McConaghy, N. (1969). Subjective and penile plethysmograph responses following aversion-relief and Apomorphine aversion therapy for homosexual impulses. *British Journal of Psychiatry, 115,* 723–730.

McConaghy, N. (1976). Is a homosexual orientation irreversible? *British Journal of Psychiatry, 129,* 556–563.

McConaghy, N., Proctor, D., & Barr, R. (1972). Subjective and penile plethysmography responses to aversion therapy for homosexuals: A partial replication. *Archives of Sexual Behavior, 2,* 65–79.

Molnar, B. E. (1997). Juveniles and psychiatric institutionalization: Toward better due process and treatment review in the United States. *Health and Human Rights, 2,* 98–116.

Morrow, S. L., & Beckstead, A. L. (2004). Conversion therapies for same-sex attracted clients in religious conflict: Context, predisposing factors, experiences, and implications for therapy. *The Counseling Psychologist, 32,* 641–650.

Nicolosi, J. (1991). *Reparative therapy of male homosexuality.* Northvale, NJ: Jason Aronson.

Nicolosi, J., Byrd, A. D., & Potts, R. W. (2000). Retrospective self-reports of changes in homosexual orientation: A consumer survey of conversion therapy clients. *Psychological Reports, 86,* 1071–1088.

Norcross, J. C. (2002). *Psychotherapy relationships that work: Therapist contributions and responsiveness to patients.* New York: Oxford University Press.

Perrin, E. C. (2002). *Sexual orientation in child and adolescent health care.* New York: Kluwer/Plenum.

Ponticelli, C. M. (1999). Crafting stories of sexual identity reconstruction. *Social Psychology Quarterly, 62,* 157–172.

Remafedi, G., Farrow, J. A., & Deisher, R. W. (1991). Risk factors of attempted suicide in gay and bisexual youth. *Pediatrics, 87,* 869–875.

Ryan, C., & Futterman, D. (1997). Lesbian and gay youth: Care and counseling. *Adolescent Medicine: State of the Art Reviews, 8,* 207–374.

Ryan, C., Huebner, D., Diaz, R. M., & Sanchez, J. (2009). Family rejection as a predictor of negative health outcomes in White and Latino lesbian, gay, and bisexual young adults. *Pediatrics, 129,* 346–352.

Savin-Williams, R. C. (1989). Parental influences on the self-esteem of gay and lesbian youths: A reflected appraisals model. *Journal of Homosexuality, 17*(1/2), 93-109.

Savin-Williams, R. C. (1994). Verbal and physical abuse as stressors in the lives of lesbian, gay male, and bisexual youths: Associations with school problems, running away, substance abuse, prostitution, and suicide. *Journal of Consulting and Clinical Practice, 62,* 261–269.

Schaeffer, K. W., Hyde, R. A., Kroencke, T., McCormick, B., & Nottebaum, L. (2000). Religiously motivated sexual orientation change. *Journal of Psychology & Christianity, 19,* 61–70.

Schneider, M. S., Brown, L., & Glassgold, J. (2002). Implementing the Resolution on Appropriate Therapeutic Responses to Sexual Orientation: A guide for the perplexed. *Professional Psychology: Research and Practice, 33,* 265–276.

Shidlo, A., & Schroeder, M. (2002). Changing sexual orientation: A consumer's report. *Professional Psychology: Research and Practice, 33,* 249–259.

Socarides, C. W. (1968). *The overt homosexual.* New York: Grune & Stratton.

Southern Poverty Law Center. (2005, Spring). *A might army.* Retrieved February 2, 2009, from www.splcenter.org/intel/intelreport/article.jsp?aid=524

Spitzer, R. L. (2003). Can some gay men and lesbians change their sexual orientation? Two hundred participants reporting a change from homosexual to heterosexual orientation. *Archives of Sexual Behavior, 32,* 403–417.

Tanner, B. A. (1974). A comparison of automated aversive conditioning and a waiting list control in the modification of homosexual behavior in males. *Behavior Therapy, 5,* 29–32.

Tanner, B. A. (1975). Avoidance training with and without booster sessions to modify homosexual behavior in males. *Behavior Therapy, 6,* 649–653.

Ullerstam, L. (1966). *The erotic minorities: A Swedish view.* New York: Grove.

Wilber, S., Ryan, C., & Marksamer, J. (2006). *CWLA, best practice guidelines.* Washington, DC: Child Welfare League of America.

Wolkomir, M. (2001). Emotion work, commitment, and the authentication of the self: The case of gay and ex-gay Christian support groups. *Journal of Contemporary Ethnography, 30,* 305–334.



PBC 007624

# APPENDIX B: STUDIES INCLUDED ($N = 55$) IN THE SYSTEMATIC REVIEW (CHAPTERS 3 AND 4)

PBC 007625

**Experimental studies**

| Study | N | % Males | Sample | Retention & treatment withdrawals | Research design | Treatment | Outcome measure |
|---|---|---|---|---|---|---|---|
| McConaghy, 1969 | 40 | 100 | Clinical (6 by court order; 18 with arrest history) | 3 withdrawals | 4 treatment group randomized experiment | Immediate and delayed aversion apomorphine therapy and aversion relief therapy | Penile circumference |
| McConaghy, 1976 | 157 | 100 | Clinical (21 by court order) | None reported | 4 experimental substudies ($ns = 40, 40, 46, 31$, respectively) with random assignment to one of two or three treatment alternatives | Aversive apomorphine therapy or aversion-relief; aversive therapy or apomorphine or avoidance conditioning; classical, or avoidance, or backward conditioning; classical aversive therapy or positive conditioning | Sexual feelings; sexual behavior; penile circumference; sexual orientation |
| McConaghy & Barr, 1973 | 46 | 100 | Clinical | 26 had incomplete treatment exposure; 2 of 20 with complete exposure lost to follow-up | 3 treatment group randomized experiment | Classical conditioning, avoidance conditioning, backward conditioning | Heart rate; penile circumference; galvanic skin response |
| McConaghy, Proctor, & Barr, 1972 | 40 | 100 | Clinical (police and psychiatric referrals) | 16 with incomplete follow-up data and 2 withdrawals | 4 treatment group randomized experiment | Immediate and delayed aversive apomorphine therapy; immediate and delayed anticipatory avoidance learning | Penile circumference |
| Tanner, 1974 | 16 | 100 | Clinical | None reported | Random assignment experiment with wait list control | Aversive shock therapy | Penile circumference; sexual behavior; personality |
| Tanner, 1975 | 10 | 100 | Clinical | None reported | 2 treatment group randomized experiment | Aversive shock therapy with/without booster sessions | Penile circumference; self-reported arousal; sexual behavior; personality |

PBC 007626

**Quasi-experimental studies**

| Study | N | % Males | Sample | Retention & treatment withdrawals | Research design | Treatment | Outcome measure |
|---|---|---|---|---|---|---|---|
| Birk, Huddleston, Miller, & Cohler, 1971 | 18 | 100 | Clinical | 2 withdrew participation | Nonequivalent 2 treatment group comparison design | Aversive shock therapy vs. associative conditioning | Sexual behavior; clinical judgment; personality |
| S. James, 1978 | 40 | 100 | Court-referred | None reported | Nonequivalent 2 treatment group comparison design | Anticipatory avoidance, desensitization, hypnosis, anticipatory avoidance | Sexual orientation; personality |
| McConaghy, Armstrong, & Blaszczynski, 1981 | 20 | 100 | Clinical | None reported | Nonequivalent 2 treatment group comparison design | Aversive therapy; covert sensitization | Sexual feelings |

**Nonexperimental studies**

| Study | N | % Males | Sample | Retention & treatment withdrawals | Research design | Treatment | Outcome measure |
|---|---|---|---|---|---|---|---|
| Bancroft, 1969 | 16 | 100 | Clinical | 6 withdrew participation prior to treatment and 1 during treatment | Case study | Aversive shock therapy | Sexual behavior |
| Barlow & Agras, 1973 | 3 | 100 | Clinical | None reported | Case study | Fading | Penile circumference; sexual urges; sexual fantasies |
| Barlow, Agras, Abel, Blanchard, & Young, 1975 | 3 | 100 | Clinical | None reported | Single case pre–post within-subject | Biofeedback | Penile circumference |
| Beckstead & Morrow, 2004 | 50 | 80 | Purposive | None | Qualitative retrospective, grounded theory | Conversion therapy, ex-gay ministries, and/ or support groups | Subjective experiences of treatment; subjective appraisal of sexual orientation identity, attraction, & behavior |
| Birk, 1974 | 66 | 100 | Clinical | 13 withdrew participation | Pre–post within-subject | Psychotherapy | Sexual orientation |
| Blitch & Haynes, 1972 | 1 | 0 | Clinical | None reported | Case study | Relaxation therapy and masturbation reconditioning | Sexual behavior |
| Callahan & Leitenberg, 1973 | 23 | 100 | Clinical with 2 by court order | 9 men withdrew participation and 8 excluded from data analyses | Pre–post within-subject | Aversion shock therapy and covert sensitization | Penile circumference |
| Colson, 1972 | 1 | 100 | Clinical | None reported | Case study | Olfactory aversion therapy | Sexual behavior |

| Study | N | % Males | Sample | Retention & treatment withdrawals | Research design | Treatment | Outcome measure |
|---|---|---|---|---|---|---|---|
| Conrad & Wincze, 1976 | 4 | 100 | Clinical | None reported | Case study | Orgasmic reconditioning | Sexual behavior; sexual fantasies; penile circumference |
| Curtis & Presly, 1972 | 1 | 100 | Clinical | None reported | Case study | Covert sensitization | Sexual orientation |
| Feldman & MacCulloch, 1965 | 43 | 100 | Clinical | 7 withdrawals | Pre–post within-subject | Anticipatory avoidance | Sexual orientation |
| Fookes, 1960 | 27 | 100 | Clinical (7 exhibitionists, 5 fetishists, and 15 bisexual and homosexual men) | None reported | Pre–post within-subject | Aversion shock therapy and calorie deprivation | Clinical judgment |
| Freeman & Meyer, 1975 | 9 | 100 | Clinical | None reported | Pre–post within-subject | Aversion shock therapy and masturbation reconditioning | Sexual behavior; sexual orientation |
| Freund, 1960 | 67 | 100 | Clinical | 20 withdrawals | Pre–post within-subject | Aversion apomorphine therapy | Clinical judgment |
| Gray, 1970 | 1 | 100 | Clinical | None reported | Case study | Desensitization and masturbation reconditioning | Sexual behavior |
| Hallam & Rachman, 1972 | 7 | 100 | Clinical (2 pedophiles, 1 fetishist, 3 bisexual and homosexual men, and 1 voyeur) | None reported | Pre–post within-subject | Aversion shock therapy | Heart rate; galvanic skin response |
| Hanson & Adesso, 1972 | 1 | 100 | Clinical | None reported | Case study | Desensitization and aversive counter-conditioning | Sexual behavior |
| Herman, Barlow, & Agras, 1974 | 4 | 100 | Clinical | None reported | Case study | Counter-conditioning | Penile circumference; self-reported arousal |
| Herman & Prewett, 1974 | 1 | 100 | Clinical | None reported | Case study | Biofeedback | Penile circumference |
| Huff, 1970 | 1 | 100 | Clinical | None reported | Case study | Desensitization | Sexual behavior; personality |
| B. James, 1962 | 1 | 100 | Clinical | Treatment stopped due to adverse reaction | Case study | Aversion apomorphine therapy | Sexual fantasies; sexual behavior |
| Kendrick & McCullough, 1972 | 1 | 100 | Clinical | None reported | Case study | Covert sensitization | Sexual fantasies; sexual behavior |
| Larson, 1970 | 3 | 100 | Clinical | None reported | Case study | Anticipatory avoidance | Sexual fantasies; sexual behavior |
| Levin, Hirsch, Shugar, & Kapche, 1968 | 1 | 100 | Clinical | None reported | Case study | Desensitization, avoidance conditioning | Personality |

PBC 007628

| Study | N | % Males | Sample | Retention & treatment withdrawals | Research design | Treatment | Outcome measure |
|---|---|---|---|---|---|---|---|
| LoPiccolo, 1971 | 1 | 100 | Clinical | None reported | Case study | Desensitization | Masturbation fantasies |
| LoPiccolo, Stewart, & Watkins, 1972 | 1 | 100 | Clinical | None reported | Case study | Orgasmic reconditioning | Sexual behavior |
| MacCulloch & Feldman, 1967 | 43 | ? | Clinical (18 by court order and 4 psychiatric referrals) | 7 withdrawals | Pre–post within-subject | Anticipatory avoidance with aversion shock therapy | Sexual orientation; sexual behavior |
| MacCulloch, Feldman, & Pinshoff, 1965 | 4 | 100 | Clinical (3 by court order) | 1 withdrawal | Case study | Anticipatory avoidance with aversion shock therapy | Attractions; pulse rate |
| Marquis, 1970 | 14 | 79 | Clinical | None reported | Case study | Orgasmic reconditioning | Clinical judgment |
| McCrady, 1973 | 1 | 100 | Clinical | None reported | Case study | Forward fading | Sexual preference, sexual behavior |
| Mintz, 1966 | 10 | 100 | Clinical | 5 withdrawals | Case study | Therapy | Clinical judgment |
| Nicolosi, Byrd, & Potts, 2000 | 882 | 78 | Convenience (NARTH and ex-gay ministry members) | None reported | Retrospective pretest | Conversion therapy | Sexual orientation; sexual behavior |
| Pattison & Pattison, 1980 | 11 | 100 | Convenience | None reported; 19 declines to participate | Qualitative retrospective case study | Religious folk therapy | Subjective experience |
| Ponticelli, 1999 | 15 | 0 | Purposive (ex-gay ministry) | None reported | Ethnography | Ex-gay ministry | None |
| Quinn, Harbison, & McAllister, 1970 | 1 | 100 | Clinical | None reported | Case study | Desensitization and hydration deprivation | Penile circumference |
| Rehm & Rozensky, 1974 | 1 | 100 | Clinical | None reported | Case study | Therapy and orgasmic reconditioning | Sexual behavior |
| Sandford, Tustin, & Priest, 1975 | 2 | 100% | Clinical | 1 withdrawal reported | Case study | Differential reinforcement and punishment | Penile circumference |
| Schaeffer, Hyde, Kroencke, McCormick, & Nottebaum, 2000 | 248 | 74 | Convenience (Exodus International conference attendees) | None reported | Retrospective pretest | Varied counseling and conversion therapies | Sexual behavior; sexual feelings; sexual orientation identity |
| Schroeder & Shidlo, 2001 | 150 | 91 | Convenience | None reported | Qualitative retrospective case study | Varied, including behavior therapy; psychoanalysis; aversive therapies; hypnosis; spiritual counseling; psychotropic medication; in-patient treatment. | Perceived harmfulness or helpfulness of SOCE |

PBC 007629

| Study | N | % Males | Sample | Retention & treatment withdrawals | Research design | Treatment | Outcome measure |
|---|---|---|---|---|---|---|---|
| Segal & Sims, 1972 | 1 | 100 | Clinical | None reported | Case study | Covert sensitization | Self-report of continued need for treatment |
| Shidlo & Schroeder, 2002 | 202 | 90 | Convenience | None reported | Qualitative retrospective case study | Varied including behavior therapy; psychoanalysis; aversive therapies; hypnosis; spiritual counseling; psychotropic medication; in-patient treatment. | Sexual orientation; sexual orientation identity |
| Solyom & Miller, 1965 | 6 | 100 | Clinical | None reported | Case study | Aversive shock therapy | Galvanic skin responses; penile circumference |
| Spitzer, 2003 | 200 | 71 | Convenience (Ex-gay ministry members) | None reported; 74 not eligible | Retrospective pretest | Varied including ex-gay and religious support groups and therapy. | Sexual attraction; sexual orientation identity; sexual behavior; |
| Thorpe, Schmidt, & Castell, 1963 | 1 | 100 | Clinical | None reported | Case study | Classical conditioning | Sexual fantasy; ability to orgasm in response to female stimuli |
| Thorpe, Schmidt, Brown, & Castell, 1964 | 8 | 75 | Clinical (referred for variety of mental health concerns) | 2 withdrawals | Case study | Aversion relief | Anxiety; personality |
| Wolkomir, 2001 | n/a | | Purposive | None reported | Ethnography | 2 Bible study support groups | Subjective experience |


130   Report of the American Psychological Association Task Force on Appropriate Therapeutic Responses to Sexual Orientation

PBC 007630

PBC 007631

PBC 007632

85-11



AMERICAN
SCHOOL
COUNSELOR
ASSOCIATION

# The Professional School Counselor and LGBTQ Youth
(Adopted 1995, Revised 2000, 2005, 2007, 2013, 2014)

**American School Counselor Association (ASCA) Position**
Professional school counselors promote equal opportunity and respect for all individuals regardless of sexual orientation, gender identity or gender expression. Professional school counselors work to eliminate barriers that impede student development and achievement and are committed to the academic, personal/social and career development of all students.

**The Rationale**
Lesbian, gay, bisexual, transgender and questioning (LGBTQ) youth often experience challenges to their academic and personal/social development related to a negative school climate. Students report feeling unsafe in school due to their sexual orientation, perceived orientation, gender identity or gender expression and report experiencing homophobic remarks, harassment and bullying (GLSEN, 2011). LGBTQ individuals often face multiple risk factors that may place them at greater risk for suicidal behavior (SPRC, 2008). Professional school counselors realize these issues impact healthy student development and psychological well-being.

**The Professional School Counselor's Role**
The professional school counselor works with all students through the stages of identity development and understands this may be more difficult for LGBTQ youth. It is not the role of the professional school counselor to attempt to change a student's sexual orientation or gender identity. Professional school counselors do not support efforts by licensed mental health professionals to change a student's sexual orientation or gender as these practices have been proven ineffective and harmful (APA, 2009). School counselors provide support to LGBTQ students to promote academic achievement and personal/social development. Professional school counselors are committed to the affirmation of all youth regardless of sexual orientation, gender identity and gender expression and work to create safe and affirming schools. School counselors:
- assist students with feelings about their sexual orientation and gender identity as well as the identity of others in an accepting and nonjudgmental manner
- advocate for equitable educational and extracurricular opportunities for all students regardless of sexual orientation, gender identity or gender expression
- promote policies that denounce the use of offensive language, harassment, and bullying that lead to a hostile school environment
- address absenteeism, lowered educational aspirations and academic achievement, and low psychological well-being as a result of victimization and feeling unsafe at school (GLSEN, 2012)
- provide a safe space for LGBTQ students and allies such as Gay and Straight Alliance Clubs
- promote sensitivity and acceptance of diversity among all students and staff to include LGBTQ students and diverse family systems
- advocate for the rights of families to access and participate in their student's education and school activities without discrimination (GLSEN, 2001)
- support an inclusive curriculum at all grade levels
- model language that is inclusive of sexual orientation and gender identity
- advocate for adoption of school policies that address discrimination and promote safe and supportive school environments (Robinson & Espelage, 2012)
- promote violence-prevention programs to create a safe school environment
- encourage staff training on inclusive practices, creating an affirming school environment, accurate information and risk factors for LGBTQ students (Russell, et.al. 2010)
- identify LGBTQ community resources for students and families

**Summary**

Professional school counselors promote affirmation, respect and equal opportunity for all individuals regardless of sexual orientation, gender identity, or gender expression. Professional school counselors promote awareness of and education on issues related to LGBTQ students and encourage a safe and affirming school environment. Professional school counselors work to eliminate barriers that impede student development and achievement and are committed to the academic, career and personal/social development of all students.

**References**

APA Task Force on Appropriate Therapeutic Responses to Sexual Orientation. (2009). *Report of the task force on appropriate therapeutic responses to sexual orientation.* Washington, DC: American Psychological Association.

Gay, Lesbian and Straight Education Network. (2012). *Playgrounds and prejudice: Elementary school climate in the United States.* New York, NY: GLESN and Harris Interactive, Inc.

Gay, Lesbian and Straight Education Network. (2001). *The GLESN public policy platform.* Retrieved from http://glsen.org/sites/default/files/GLSEN%20model%20district%20policy.pdf

Hatzenbuehler, M. L. (2011). The social environment and suicide attempts in lesbian, gay, and bisexual youth. *Pediatrics.* Published online April 18, 2011.

Kosciw, J. G., Greytak, E. A., Bartkiewicz, M. j., Boesen, M. J., & Palmer, N. A. (2012). *The 2011 National School Climate Survey: The experiences of lesbian, gay, bisexual and transgender youth in our nation's schools.* New York, NY: GLSEN.

Movement Advancement Project. (2012). *An ally's guide to issues facing LGBT Americans.* Denver, CO: Author.

Robinson, J. P., & Espeiage, D. L. (2012). Bullying explains only part of LGBTQ heterosexual risk disparities: Implications for policy and practice. *Educational Researcher, 41*(8), 309-319.

Russel, S., Koslow, J., Horn, S., & Saewyc, E. (2010). Social policy report, safe schools policy for LGTBQ students. *Sharing Child and Youth Development Knowledge. 24*(4). Retrieved from http://srcd.org/sites/default/files/documents/spr_24_4_final.pdf

Suicide Prevention Resource Center. (2008). *Suicide risk and prevention for lesbian, gay, bisexual and transgender youth.* Newton, MA: Education Development Center.