# In the United States Court of Appeals for the Eleventh Circuit

---

ROBERT W. OTTO, PH.D, LMFT, individually and on behalf of his patients, and JULIE H. HAMILTON, PH.D, LMFT, individually and on behalf of her patients,

*Plaintiffs-Appellants*,

v.

CITY OF BOCA RATON, FLORIDA and COUNTY OF PALM BEACH, FLORIDA,

*Defendants-Appellees*.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF FLORIDA CIV. NO. 18-80771 (HON. ROBIN L. ROSENBERG)

---

**BRIEF FOR DEFENDANT-APPELLEE CITY OF BOCA RATON, FLORIDA**

---

EDWARD G. GUEDES
ERIC S. KAY
WEISS SEROTA HELFMAN
  COLE & BIERMAN, P.L.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
(305) 854-0800

JAMIE A. COLE
DANIEL L. ABBOTT
ANNE R. FLANIGAN
WEISS SEROTA HELFMAN
  COLE & BIERMAN, P.L.
200 East Broward Blvd., Suite 1900
Fort Lauderdale, FL 33301
(954) 763-4242

*Counsel for Defendant-Appellee
City of Boca Raton, Florida*

## CERTIFICATE OF INTERESTED PERSONS
## AND CORPORATE DISCLOSURE STATEMENT

**A.    Certificate of Interested Persons**

Pursuant to Federal Rule of Appellate Procedure 26.1 and Eleventh Circuit Rule 26.1-1, counsel for Defendant-Appellee, City of Boca Raton, Florida, certifies that the following persons and entities may have an interest in the outcome of this case or appeal:

Abbott, Daniel L.

Alliance for Therapeutic Choice

Carlton Fields Jorden Burt, P.A.

City of Boca Raton, Florida

Cole, Jamie A.

Dreier, Douglas C.

Dunlap, Aaron C.

Equality Florida Institute, Inc.,

Fahey, Rachel Marie

Flanigan, Anne R.

Gannam, Roger K.

Gibson, Dunn & Crutcher LLP

Guedes, Edward G.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Hamilton, Julie H., Ph.D., LMF

Hoch, Rand

Hvizd, Helene C.

Kay, Eric S.

Liberty Counsel, Inc.

Mihet, Horatio G.

Otto, Robert W., Ph.D., LMFT

Palm Beach County, Florida

Palm Beach County Human Rights Council

Phan, Kim

Price, Max Richard

Reinhart, Hon. Bruce E. (Magistrate Judge, Southern District of Florida)

Rosenberg, Hon. Robin L. (District Judge, Southern District of Florida)

SDG Counseling, LLC

Staver, Mathew D.

Sutton, Stacey K.

The Trevor Project

Walbolt, Sylvia H.

Weiss Serota Helfman Cole & Bierman, P.L.

Yasko, Jennifer A.

**B.** **Corporate Disclosure Statement**

This appeal involves two governmental entities, the City of Boca Raton, which is a municipal corporation of the State of Florida, and Palm Beach County, a political subdivision of the State. No publicly traded company or corporation has an interest in the outcome of this case or appeal.

Respectfully submitted,

*/s/ Daniel L. Abbott*
Jamie A. Cole
Daniel L. Abbott
Anne R. Flanigan
Weiss Serota Helfman
  Cole & Bierman, P.L.
200 East Broward Blvd., Suite 1900
Fort Lauderdale, FL 33301
(954) 763-4242
dabbott@wsh-law.com

Edward G. Guedes
Eric S. Kay
Weiss Serota Helfman
  Cole & Bierman, P.L.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
(305) 854-0800

*Counsel for Defendant-Appellee*
*City of Boca Raton, Florida*

Dated: June 10, 2019

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee, City of Boca Raton, Florida ("City"), respectfully submits that the issues presented by this appeal are straightforward and do not present novel or difficult questions of law. Accordingly, the City does not believe that oral argument would assist this Court.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

# TABLE OF CONTENTS

**Page**

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

TABLE OF CITATIONS ...........................................................................v

STATEMENT OF THE ISSUES.................................................................1

INTRODUCTION ...................................................................................2

STATEMENT OF THE CASE....................................................................3

    I.     FACTUAL BACKGROUND ......................................................3

        A.    The City's Ordinance. ...................................................3

        B.    Evidence of Conversion Therapy's Harm. ..................4

        C.    Plaintiffs' Practice of Conversion Therapy ...............9

    II.    PROCEDURAL HISTORY .....................................................11

STANDARD OF REVIEW .....................................................................12

SUMMARY OF ARGUMENT .................................................................14

ARGUMENT ......................................................................................16

    I.     THE DISTRICT COURT CORRECTLY CONCLUDED
          THAT PLAINTIFFS ARE NOT SUBSTANTIALLY
          LIKELY TO SUCCEED ON THE MERITS OF THEIR
          FIRST AMENDMENT FREE SPEECH CLAIM. ...........................16

        A.    The Ordinance is a regulation of professional
            conduct that, at most, has only an incidental burden
            on Plaintiffs' speech...............................................16

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

1. Precedent from the Supreme Court and this Court does not require, much less support, Plaintiffs' argument that their talk therapy should receive the highest level of constitutional protection. ................................................17

2. The Ordinance is a regulation of professional conduct that is tied directly to the performance of a medical procedure. ............................21

A. If heightened scrutiny applies, the Ordinance should be subject only to intermediate scrutiny. ..................................24

1. The Ordinance is content neutral..................................24

2. The Ordinance is viewpoint neutral. ............................25

C. The Ordinance is constitutional under any standard of First Amendment scrutiny. ..................................27

1. The Ordinance furthers the City's compelling interest in safeguarding the physical and psychological well-being of minors. ............................28

2. The Ordinance is the least restrictive means of furthering the City's compelling interest in safeguarding the physical and psychological well-being of minors.......................................33

D. Plaintiffs cannot satisfy the remaining preliminary injunction factors......................................................36

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

II.     THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT PRIOR RESTRAINT CLAIM. ...................37

III.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT VAGUENESS CLAIM. ...............................39

IV.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM ON THEIR STATE LAW *ULTRA VIRES* CLAIM. ......................................................................43

CONCLUSION ................................................................................46

CERTIFICATE OF COMPLIANCE ........................................................47

CERTIFICATE OF SERVICE ...............................................................48

# TABLE OF CITATIONS

**Page(s)**

## CASES

*ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177
(11th Cir. 2009) ............................................................................13

*ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348
(11th Cir. 2017) ............................................................................13

*Alexander v. United States*, 509 U.S. 544 (1993) ....................................37

*Am. Column & Lumber Co. v. United States*, 257 U.S. 377 (1921) ........................19

*Ashcroft v. ACLU*, 542 U.S. 656 (2004) ................................................28

*Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209 (11th Cir. 2017) ................. 37, 38

*Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*,
565 U.S. 171 (2012)........................................................................35

*Collins v. Texas*, 223 U.S. 288 (1912) ................................................32

*Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002) ....................................20

*EMW Women's Surgical Ctr., P.S.C. v. Beshear*, 920 F.3d 421
(6th Cir. 2019) ............................................................... 22, 23, 24

*Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144 (2017)......................18

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ....................................32

*FCC v. Pacifica Found.*, 438 U.S. 726 (1978) ........................................29

*Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441 (11th Cir. 1991)......................45

*FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290
(11th Cir. 2017) ............................................................................13

*Flanigan's Enters., Inc. of Ga. v. Fulton Cty.*, 596 F.3d 1265
(11th Cir. 2010) ............................................................................13

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

*Frejlach v. Butler*, 573 F.2d 1026 (8th Cir. 1978)..................................44

*Friedenberg v. Sch. Bd. of Palm Beach Cty.*, 911 F.3d 1084
    (11th Cir. 2018) ............................................................................13

*Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490 (1949) ...............19

*Ginsburg v. New York*, 390 U.S. 629 (1968) ........................................29

*Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) ..............................41

*Globe Newspaper Co. v. Superior Court*, 457 U.S. 596 (1982)...........28

*Hill v. Colorado*, 530 U.S. 703 (2000) ................................................39

*Hodgson v. Minnesota*, 497 U.S. 417 (1990).......................................34

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ...................24

*Keister v. Bell*, 879 F.3d 1282 (11th Cir. 2018) ..................................14

*King v. Governor of N.J.*, 767 F.3d 216 (3d Cir. 2014)............... 18, 31, 43

*Kothmann v. Rosario*, 558 F. App'x 907 (11th Cir. 2014)...................41

*Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011)...................... 20, 23

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525 (2001) .........................31

*Maryland v. King*, 567 U.S. 1301 (2012) .............................................36

*Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*,
    138 S. Ct. 1719 (2018).................................................................41

*Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970)...............................19

*Nat'l Inst. of Family & Life Advocates v. Becerra*,
    138 S. Ct. 2361 (2018)......................................................... *passim*

*Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283 (11th Cir. 1990) ...............................................43

*Neb. Press Ass'n v. Stuart*, 427 U.S. 539 (1976) .....................................38

*New York v. Ferber*, 458 U.S. 747 (1982) ....................................... 28, 29

*NLRB v. Gissel Packing Co.*, 395 U.S. 575 (1969) ................................19

*Obergefell v. Hodges*, 135 S. Ct. 2584 (2015).................................. 32, 41

*Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447 (1978) .........................18

*Parker v. Schmiede Mach. & Tool Corp.*, 445 F. App'x 231 (11th Cir. 2011) ...............................................................................14

*Pickup v. Brown*, 740 F.3d 1208 (9th Cir. 2014)....................... 18, 20, 43

*Planned Parenthood of Minn., Inc. v. Citizens for Cmty. Action*, 558 F.2d 861 (8th Cir. 1977) .................................................. 44, 45

*Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 844 (1992) ....................... 18, 21

*Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)................................41

*Prince v. Massachusetts*, 321 U.S. 158 (1944).................................. 28, 29

*R.R. & G.R. Harris Funeral Homes, Inc. v. EEOC*, 139 S. Ct. 1599 (2019).................................................................41

*Reed v. Town of Gilbert*, 135 S. Ct. 2218 (2015) ............................ 24, 27

*Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819 (1995).................25

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006).........................................................................19

*Sampson v. Murray*, 415 U.S. 61 (1974) .............................................43

*SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc) ..................19

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

*Siegel v. LePore*, 234 F.3d 1163 (11th Cir. 2000) (en banc)...........................13, 36

*Sorrell v. IMS Health Inc.*, 564 U.S. 552 (2011) ............................................ 16, 18

*Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164
   (11th Cir. 2018) ........................................................................................39

*Cooper v. Dillon*, 403 F.3d 1208 (11th Cir. 2005) ........................................38

*Town of Greece v. Galloway*, 572 U.S. 565 (2014)........................................35

*Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180 (1997) ..........................................24

*United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803 (2000)..........................31

*United States v. Stevens*, 559 U.S. 460 (2010) ..............................................17

*United States v. Weitzenhoff*, 35 F.3d 1275 (9th Cir. 1993) ..................................40

*Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
   455 U.S. 489 (1982)................................................................................ 39, 40

*Ward v. Rock Against Racism*, 491 U.S. 781 (1989)..............................................39

*Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656 (2015) ........................................36

*Wilson v. State Bar of Ga.*, 132 F.3d 1422 (11th Cir. 1988) ...................................39

*Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293
   (11th Cir. 2017) (en banc) ................................................................... *passim*

*Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244 (11th Cir. 2016)........................36

## STATUTES

2019 Colo. Legis. Serv. S.B. 19-193 (West) ...........................................................30

2019 Me. Legis. Serv. Ch. 165 (H.P. 755) (L.D. 1025) (West) ..............................30

23 R.I. Gen. Laws Ann. § 23-94-3.........................................................................30

24 Del. Admin. Code § 3514 ..................................................30

405 Ill. Comp. Stat. Ann. 48/20 ............................................30

Cal. Bus. & Prof. Code § 865.2 ............................................30

Conn. Gen. Stat. Ann. § 19a-907a .......................................30

D.C. Code § 7-1231.14a ......................................................30

Haw. Rev. Stat. § 453J-1 .....................................................30

Md. Code Ann., Health Occ. § 1-212.1 ...............................30

N.H. Rev. Stat. § 332-L:2 ....................................................30

N.J. Stat. Ann. § 45:1-55 .....................................................30

N.M. Stat. Ann. § 61-1-3.3 ..................................................30

N.Y. Educ. Law § 6531-a .....................................................30

Nev. Rev. Stat. § 629.600 .....................................................30

Or. Rev. Stat. § 675.850 .......................................................30

Vt. Stat. Ann. Tit. 18, § 8352 ..............................................30

Wash. Rev. Code Ann. § 18.130.180....................................30

## OTHER AUTHORITIES

Alexander M. Bickel, *The Morality of Consent* (1975)...........................................39

*Conversion Therapy Laws*, Movement Advancement Project,
   http://www.lgbtmap.org/equality-maps/conversion_therapy
   (last visited June 10, 2019) ..............................................................30

*The American Heritage Dictionary of the English Language*
   (5th ed. 2019)....................................................................................41

## STATEMENT OF THE ISSUES

1.      Whether the district court correctly concluded that plaintiffs, Robert W. Otto, Ph.D., LMFT ("Otto") and Julie H. Hamilton, Ph.D., LMFT ("Hamilton") (collectively, "Plaintiffs"), are not substantially likely to succeed on the merits of their First Amendment free speech claim.

2.      Whether the district court correctly concluded that Plaintiffs are not substantially likely to succeed on the merits of their First Amendment prior restraint claim.

3.      Whether the district court correctly concluded that Plaintiffs are not substantially likely to succeed on the merits of their First Amendment vagueness claim.

4.      Whether the district court correctly concluded that Plaintiffs cannot demonstrate irreparable harm on their Florida law *ultra vires* claim.

# INTRODUCTION

In recent years, eighteen states and dozens of cities and counties across the country have passed laws prohibiting licensed professionals from performing a medical treatment known as "conversion therapy" on minors. For the last few decades, a number of well-known, reputable professional and scientific organizations have publicly condemned the practice of conversion therapy, expressing serious concerns about its potential to inflict harm on minors. Relying on this broad and uniform professional consensus, in October 2017, the City of Boca Raton joined the nationwide group of jurisdictions that proscribe this dangerous practice.

Plaintiffs in this case are two licensed counselors who wish to perform conversion therapy on their minor patients. They claim that the City's law violates the First Amendment and Florida law. After holding a day-long evidentiary hearing, the district court issued a comprehensive order explaining that nothing in the decisions of the Supreme Court or this Court supports Plaintiffs' claims. In so doing, the district court joined the Third and Ninth Circuits in holding that laws prohibiting to performance of conversion therapy on minors are constitutional. This Court should follow the lead of its sister Circuits and uphold the City's prohibition of this harmful medical treatment. Accordingly, the district court's order denying preliminary injunctive relief should be affirmed.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

I.  **F**ACTUAL **B**ACKGROUND

**A. The City's Ordinance.**

On October 10, 2017, the City enacted Ordinance No. 5407 ("Ordinance"), which prohibits the practice of "conversion therapy" or sexual orientation change efforts ("SOCE")[2] on minors.  App.-Vol:VIII-Tab:126-27.[3]  The Ordinance defines conversion therapy as follows:

> Any counseling, practice or treatment performed with the goal of changing an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behaviors, gender identity or gender expression, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex.

*Id.* at 6:10-14.  The Ordinance does not restrict, in any way, conduct or speech outside of a formal therapy session.  *Id.* at 4:21-22 ("[The Ordinance] does not intend to prevent mental health providers from speaking to the public about SOCE . . . .").  Moreover, the Ordinance only prohibits treatment with the goal of changing an

---

[1]  Plaintiffs' Initial Brief is cited herein as "I.B. ___."

[2]  The Ordinance sometimes refers to "conversion therapy" as "sexual orientation change efforts," or "SOCE."  The district court did so as well.  The City uses the terms interchangeably in this brief.

[3]  Defendant-Appellant, Palm Beach County, Florida ("County"), passed a substantially similar ordinance on December 19, 2017, which is also the subject of Plaintiffs' action.

individual's sexual orientation or gender identity. *Id.* at 6:5-7. Thus, even within a therapy session, the Ordinance does not prevent licensed therapists from "expressing their views to patients; recommending SOCE to patients; . . . or referring minors to unlicensed counselors, such as religious leaders." *Id.* at 4:21-5:2.

**B. Evidence of Conversion Therapy's Harm.**

The Ordinance identifies the City's "compelling interest in protecting the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and questioning youth, and in protecting its minors against exposure to serious harms caused by sexual orientation and gender identity change efforts." *Id.* at 5:3-6. The following are examples of the conclusions of studies and position papers regarding the harms of conversion therapy (including therapy relating to both same-sex attractions and gender identity on both minors and adults), relied upon by the City in enacting the Ordinance:

1.     According to the American Academy of Pediatrics, "Therapy directed at specifically changing sexual orientation is contraindicated, since it can provoke guilt and anxiety while having little or no potential for achieving changes in orientation." Supp.App.-Tab:128-2 at 633.

2.     The American Psychiatric Association concluded, "The potential risks of 'reparative therapy' are great and include depression, anxiety, and self-destructive behavior, since therapist alignment with societal prejudices against homosexuality

may reinforce self-hatred already experienced by the patient." Supp.App.-Tab:128-3.

3.      The American Psychological Association ("APA") created a task force ("APA Task Force") to conduct a "systematic review of peer-review journal literature on sexual orientation change efforts (SOCE) and concluded that efforts to change sexual orientation are unlikely to be successful and involve some risk of harm, contrary to the claims of SOCE practitioners and advocates." App.-Vol:I-Tab:85-5 at v.

4.      The APA Task Force found,

[S]ome recent studies document that there are people who perceive that they have been harmed though SOCE . . . .  Among those studies reporting on the perceptions of harm, the reported negative social and emotional consequences include self-reports of anger, anxiety, confusion, depression, grief, guilt, hopelessness, deteriorated relationships with family, loss of social support, loss of faith, poor self-image, social isolation, intimacy difficulties, intrusive imagery, suicidal ideation, self-hatred, and sexual dysfunction.

*Id.* at 42.

5.      Addressing concerns regarding conversion therapy specific to minors, the APA Task Force further determined,

Children and adolescents are often unable to anticipate the future consequences of a course of action and are emotionally and financially dependent on adults.  Further, they are in the midst of developmental processes in which the ultimate outcome is unknown.  Efforts to alter that developmental path may have unanticipated consequences.

*Id.* at 77.

5

6.     The APA Task Force also concluded,

[T]here is a dearth of scientifically sound research on the safety of SOCE.  Early and recent research studies provide no clear indication of the prevalence of harmful outcomes among people who have undergone efforts to change their sexual orientation or the frequency of occurrence of harm because no study to date of adequate scientific rigor has been explicitly designed to do so.  Thus, we cannot conclude how likely it is that harm will occur from SOCE.  However, studies from both periods indicate that attempts to change sexual orientation may cause or exacerbate distress and poor mental health in some individuals, including depression and suicidal thoughts.  The lack of rigorous research on the safety of SOCE represents a serious concern, as do studies that report perceptions of harm.

*Id.* at v.

7.     The American Psychological Association Council of Representatives has adopted a policy statement against SOCE, which noted that "[d]istress and depression were exacerbated" in individuals subjected to such therapy.  Supp.App.-Tab:128-5 at 30.

8.     The Pan American Health Organization, an office of the World Health Organization, has stated, "'Reparative' or 'conversion therapies' have no medical indication and represent a severe threat to the health and human rights of the affected persons.  They constitute unjustifiable practices that should be denounced and subject to adequate sanctions and penalties."  Supp.App.-Tab:121-19 at 2.

9.     According to the American Psychoanalytic Association "Psychoanalytic technique does not encompass purposeful attempts to 'convert,' 'repair,' change or shift an individual's sexual orientation, gender identity or gender

6

expression. Such directed efforts are against fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by reinforcing damaging internalized attitudes." Supp.App.-Tab:128-6.

10. The American Academy of Child & Adolescent Psychiatry's Practice Parameter states, "Just as family rejection is associated with problems such as depression, suicidality, and substance abuse in gay youth, the proposed benefits of treatment to eliminate gender discordance in youth must be carefully weighed against such possible deleterious effects." App.-Vol:VII-Tab:121-17 at 969. "Given that there is no evidence that efforts to alter sexual orientation are effective, beneficial or necessary, and the possibility that they carry the risk of significant harm, such interventions are contraindicated." *Id.* at 968.

11. According to the American School Counselor Association, "School counselors recognize the profound harm intrinsic to therapies alleging to change an individual's sexual orientation or gender identity and advocate to protect LGBTQ students from this harm." App.-Vol:I-Tab:85-11 at 37.

12. The report prepared by the U.S. Department of Health and Human Services' Substance Abuse and Mental Health Services Administration found as follows: "Conversion therapy perpetuates outdated views of gender roles and identities as well as the negative stereotype that being a sexual or gender minority or identifying as LGBTQ is an abnormal aspect of human development. Most

7

importantly, it may put young people at risk of serious harm." App.-Vol:II-Tab:85-12 at 1.

Based on the supporting sources set forth above, among others, the City found that the research about the dangers of conversion therapy, particularly for minors, was "overwhelming." App.-Vol:VIII-Tab:126-27 at 5:11.

In the district court, Plaintiffs pointed to an isolated statement in the APA Task Force's report stating that perceptions of "harm" from conversion therapy "may" specifically correlate to "aversive" conversion therapy techniques.[4] I.B. 15-16. However, the above-referenced authorities, published by the leading psychological, psychiatric, and mental health organizations, do not limit their recommendations against conversion therapy only to "aversive" techniques, but to *all* methods of conversion therapy. *See, e.g.*, Supp.App.-Tab:128-6 ("Psychoanalytic technique does not encompass purposeful attempts to 'convert,' 'repair,' change or shift an individual's sexual orientation, gender identity or gender expression. Such directed efforts are against fundamental principles of psychoanalytic treatment and often result in substantial psychological pain by

---

[4] There are two different conversion therapy techniques—aversive and non-aversive. App.-Vol:I-Tab:85-5 at 22. Aversive techniques, which Plaintiffs admit are unethical (Supp.App.-Tab:121-26 at 6; Supp.App.-Tab:121-30 at 6) involve "inducing nausea, vomiting, or paralysis, providing electronic shocks, or having the individual snap an elastic band around the wrist." App.-Vol:I-Tab:85-5 at 22. Non-aversive techniques, on the other hand, employ mental health counseling techniques such as talk therapy. Supp.App.-Tab:121-6 at 9; Supp.App.-Tab:121-30 at 8-9.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

reinforcing internalized attitudes."); App.-Vol:II-Tab:85-12 at 1 ("[C]onversion therapy—efforts to change an individual's sexual orientation, gender identity, or gender expression—is a practice that is not supported by credible evidence and has been disavowed by behavioral experts and associations . . . . Most importantly, it may put young people at risk of serious harm."); App.-Vol:I-Tab:85-5 at 79 ("Finally, we were asked to report on the appropriate application of affirmative therapeutic interventions for children and adolescents who present a desire to change their sexual orientation or their behavioral expression of their sexual orientation, or both, or whose guardian expresses a desire for the minor to change. We recommend that [Licensed Mental Health Professionals] provide multiculturally competent and client-centered therapies to children, adolescents, and their families rather than SOCE."). Accordingly, the City's authorities relied upon for the Ordinance encompass the type of "talk therapy" performed by Plaintiffs on minors.

### C. Plaintiffs' Practice of Conversion Therapy

Plaintiffs are both marriage and family therapists, licensed by the State of Florida. App.-Vol:III-Tab:121-7 at 9:10-20; App.-Vol:IV-Tab:121-8 at 25:23-26:1. Each Plaintiff states that they abide by the code of ethics issued by the American Association for Marriage and Family Therapy ("AAMFT"). App.-Vol:I-Tab 1 ¶ 89; App.-Vol:V-Tab:121-8 at 237:2-7. Pursuant to the AAMFT's Code of Ethics, counselors must obtain informed consent from their clients and, if the individual is

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

legally incapable of giving informed consent, therapists must obtain informed permission from a legally authorized person. Supp.App.-Tab:128-21 § 1.2. Additionally, the informed consent requires the therapist to adequately inform the client of significant information concerning treatment processes and procedures and "of potential risks and benefits of treatments for which generally recognized standards do not yet exist." *Id.*

Regarding the efficacy of conversion therapy, Hamilton's Consent-to-Treat Form only includes a warning that there is "no guarantee that by pursuing psychotherapy the client will be happier, and no particular treatment can be guaranteed to be effective." Supp.App.-Tab:128-18 at 1. Hamilton does not, however, advise her minor clients that "none of the existing research supports the premise that mental or behavioral health interventions can alter gender identity or sexual orientation." App.-Vol:II-Tab:85-12 at 1. With regard to the potential dangers of SOCE, Hamilton's Consent-to-Treat form only advises generally that "[s]ometimes the psychotherapeutic process can bring up uncomfortable feelings such as anxiety, sadness, anger and so on; please be aware that this is a normal response to talking about unresolved life experiences." Supp.App.-Tab:128-18 at 1.

Otto provides even less "informed consent." With regard to the efficacy of SOCE, Otto advises his minor clients that "some people believe that such counseling is unlikely to assist you. As noted above, your therapist disagrees with such

conclusions . . . ." App.-Vol:VII-Tab:121-33 at 7. With regard to the potential dangers from SOCE, Otto advises his minor clients only that "the therapeutic process can evoke stressful feelings or emotions that are difficult to deal with during the process." *Id.*

Both Plaintiffs know what "conversion therapy" is and what it means to "seek to change" a minor's sexual orientation or gender identity. *See, e.g.*, App.-Vol:III-Tab:121-7 at 43:19-25, 44:1-20, 45:5-12, 176:8-23; App.-Vol:IV-Tab:121-8 at 94:25-95:9, 137:10-138:18, 141:10-142:1. Plaintiffs also concede that the Ordinance applies equally to conversion therapy seeking to change a minor's sexuality from homosexual to heterosexual and vice versa, as well as therapy with the goal of changing a minor's gender identity from one's sex assignment to the opposite sex and those seeking to change back to their sex-aligned gender identity. App.-Vol:X-Tab:129-1 at 28:6-25.

## II.    PROCEDURAL HISTORY

Plaintiffs commenced this action in the United States District Court for the Southern District of Florida on June 13, 2018, by filing their verified complaint. *See* App.-Vol:I-Tab:1. Plaintiffs filed a motion for preliminary injunction on June 14, 2018, which the district court denied without prejudice pursuant to Fed. R. Civ. P. 65(a)(1) because neither the County nor the City had been served with the complaint.

App.-Vol:I-Tab:A at 3 (D.E. 5).  After serving the City and County,[5] Plaintiffs renewed their motion for preliminary injunction on June 22, 2018.  App.-Vol:I-Tab:8.  The court entered an order setting forth a limited discovery plan for the purpose of considering the renewed preliminary injunction motion.  App.-Vol:I-Tab:A at 5 (D.E. 25).

The district court held an evidentiary hearing on the renewed preliminary injunction motion on October 18, 2018, and directed the parties to submit proposed findings of fact and conclusions of law.  App.-Vol:I-Tab:A at 15 (D.E. 123).  On February 13, 2019, the district court entered an order denying Plaintiffs' renewed preliminary injunction motion.  App.-Vol:XI-Tab:141.  Plaintiffs filed their notice of interlocutory appeal that same day (App-Vol:XI-Tab:142), and the district court stayed the proceedings, pending the resolution of Plaintiffs' appeal.  App.-Vol:I-Tab:A (D.E. 145).

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must show that: (1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if

---

[5]     Both the City and the County moved to dismiss the complaint, which the parties fully briefed.  The district court did not rule on these motions, and they are not at issue in this appeal.

issued, the injunction would not be adverse to the public interest. *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam). "A preliminary injunction is an extraordinary and drastic remedy and should not be granted unless the movant clearly establishes the burden of persuasion as to each of the four prerequisites." *FF Cosmetics FL, Inc. v. City of Miami Beach*, 866 F.3d 1290, 1298 (11th Cir. 2017) (internal quotation marks and brackets omitted).

This Court reviews a district court's denial of a preliminary injunction for abuse of discretion. *Friedenberg v. Sch. Bd. of Palm Beach Cty.*, 911 F.3d 1084, 1090 (11th Cir. 2018). The district court's underlying factual findings are reviewed for clear error and its conclusions of law *de novo*. *ADT LLC v. NorthStar Alarm Servs., LLC*, 853 F.3d 1348, 1351 (11th Cir. 2017). With respect to Plaintiffs' First Amendment free speech claim, this Court's "review of the district court's findings of 'constitutional facts,' as distinguished from ordinary historical facts, is *de novo*." *ACLU of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1203 (11th Cir. 2009). "Historical facts 'are facts about the who, what, where, when, and how of the controversy,'" and they are reviewed for clear error. *Flanigan's Enters., Inc. of Ga. v. Fulton Cty.*, 596 F.3d 1265, 1276 (11th Cir. 2010) (quoting *ACLU of Fla.*, 557 F.3d at 1206). Core constitutional facts, by contrast, are the "why" facts that

involve the reasons why the defendant took the challenged action. *Keister v. Bell*, 879 F.3d 1282, 1287 (11th Cir. 2018).[6]

## SUMMARY OF ARGUMENT

The district court's order denying Plaintiffs' motion for preliminary injunction should be affirmed.

I.     The district court correctly concluded that Plaintiffs are not substantially likely to succeed on the merits of their claim that the Ordinance violates their First Amendment free speech rights.  It is well-established that government may regulate professional conduct, even though that conduct incidentally involves speech.  Contrary to Plaintiffs' assertions, nothing in the decisions of the Supreme Court or this Court requires, much less supports, the proposition that their talk therapy should receive the highest level of constitutional protection.  Indeed, this Court and its sister Circuits have recognized that, for First Amendment purposes, there is a meaningful difference between laws—like the Ordinance—that *do not restrict* what medical professionals can say or recommend to their patients and laws that *do restrict* what medical professionals can say or recommend to their patients.

---

[6]     To the extent Plaintiffs dispute that certain facts are "constitutional" facts meriting *de novo* review, rather than "historical" facts calling for deferential clear error review, Plaintiffs have waived the issue by failing to include a standard of review section in their brief.  *See Parker v. Schmiede Mach. & Tool Corp.*, 445 F. App'x 231, 234 n.4 (11th Cir. 2011) (per curiam).

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Moreover, the Supreme Court's recent decision in *National Institute of Family and Life Advocates v. Becerra*, 138 S. Ct. 2361 (2018) ("*NIFLA*"), establishes that, when a regulation of professional conduct is tied to a medical procedure, the First Amendment has a limited role to play. The Ordinance is that kind of regulation. It proscribes licensed counselors from doing just one thing, namely, performing SOCE on their minor patients. And the Ordinance's prohibition is not only tied directly to a medical procedure—the performance of SOCE—the prohibition is of the medical procedure itself.

II.     Plaintiffs also cannot demonstrate a substantial likelihood of success on their prior restraint claim because the Ordinance does not prospectively ban speech; rather, the Ordinance creates a subsequent penalty for those who perform the prohibited medical procedure—conversion therapy—on minors.

III.     Plaintiffs similarly cannot show that their vagueness claim is substantially likely to succeed on the merits because the Ordinance clearly identifies the prohibited conduct, namely, the performance of SOCE on minors. The Ordinance also applies to a specialized group of individuals, banning a practice that Plaintiffs admit they perform. And the Ordinance uses terms that have been routinely used by the Supreme Court and this Court.

IV.     Finally, Plaintiffs cannot demonstrate irreparable harm on their state law *ultra vires* claim. Plaintiffs' basis for irreparable harm is their alleged loss of

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

revenue, which is not an injury meriting the extraordinary remedy of a preliminary injunction.  To the extent Plaintiffs claim that their clients are suffering irreparable harm, such a claim is not an injury attributable to Plaintiffs, but rather non-parties to this action.  The Ordinance, moreover, does not prevent Plaintiffs from speaking publicly or privately (to their clients or otherwise) regarding their views on conversion therapy, gender identity, or homosexuality.

## ARGUMENT

I.    **THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT FREE SPEECH CLAIM.**

### A. The Ordinance is a regulation of professional conduct that, at most, has only an incidental burden on Plaintiffs' speech.

Just last year, the Supreme Court reaffirmed the long-established precept that "States may regulate professional conduct, even though that conduct incidentally involves speech." *NIFLA*, 138 S. Ct. at 2372.  Simply because speech is at issue, the highest level of First Amendment protection is not automatically triggered.  "[T]he First Amendment does not prevent restrictions directed at commerce or conduct from imposing incidental burdens on speech." *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  "[P]rofessionals are no exception to this rule." *NIFLA*, 138 S. Ct. at 2373.  "While drawing the line between speech and conduct can be difficult, [the Supreme Court's] precedents have long drawn it, and the line is 'long familiar to the bar.'" *Id.* (citations omitted; quoting *United States v. Stevens*, 559 U.S. 460, 468

16

(2010)).  The City's Ordinance, which regulates a specific, dangerous, and ineffective medical treatment involving verbal communication, fits comfortably on the constitutional side of the line.

### 1. *Precedent from the Supreme Court and this Court does not require, much less support, Plaintiffs' argument that their talk therapy should receive the highest level of constitutional protection.*

Plaintiffs argue (I.B. 34-36) that *NIFLA* and *Wollschlaeger v. Governor of Florida*, 848 F.3d 1293 (11th Cir. 2017) (en banc), compel the conclusion that their talk therapy must be endowed with the same level of constitutional protection as core political speech or a peaceful demonstration in a traditional public forum. Plaintiffs are mistaken.

In *NIFLA*, the Supreme Court held that a California law that required "crisis pregnancy centers" to provide certain notices to women seeking pregnancy-related services violated the First Amendment.  138 S. Ct. at 2368-70, 2377.  In striking down the California law, the Court declined to mark off "professional speech"—as defined by some Courts of Appeals—as a separate category of speech excepted "from the rule that content-based regulations of speech are subject to strict scrutiny." *Id.* at 2371.[7]  Plaintiffs make much of the fact that, in reaching this conclusion, the

---

[7]  *NIFLA* "d[id] not foreclose the possibility" that "a persuasive reason" exists "for treating professional speech as a unique category that is exempt from ordinary First Amendment principles."  138 S. Ct. at 2375.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Court declined to adopt the definition of professional speech set forth in decisions of the Third and Ninth Circuits upholding SOCE prohibitions similar to the Ordinance. *See id.* (citing *King v. Governor of N.J.*, 767 F.3d 216, 232 (3d Cir. 2014); *Pickup v. Brown*, 740 F.3d 1208, 1227-29 (9th Cir. 2014)).

In Plaintiffs' telling, *NIFLA*'s disapproval of *King* and *Pickup*'s definition of professional speech means that those two decisions were "expressly abrogated" such that *NIFLA* requires this Court to subject the Ordinance to strict scrutiny. I.B. 38 & n.38. Not so. *NIFLA* reaffirmed a venerable and unbroken line of precedent that has "afforded less protection for professional speech" when the government is "regulat[ing] professional conduct, even though that conduct incidentally involves speech." 138 S. Ct. at 2371; *see Expressions Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1151 (2017) ("[I]t has never been deemed an abridgment of freedom of speech or press to make a course of conduct illegal merely because the conduct was in part initiated, evidenced, or carried out by means of language, either spoken, written, or printed." (internal quotation marks omitted)); *see also, e.g.*, *Sorrell*, 564 U.S. at 567; *Planned Parenthood of Se. Pa. v. Casey*; 505 U.S. 844, 884 (1992) (joint opinion of O'Connor, Kennedy, & Souter, JJ.); *Ohralik v. Ohio State Bar Ass'n*, 436 U.S. 447, 456 (1978); *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502

(1949)).[8] So *NIFLA* does not stand for the categorical proposition that *all* instances of professional speech must be afforded the highest level of constitutional protection.

This Court's decision in *Wollschlaeger* is not to the contrary. If anything, *Wollschlaeger* lends support to the government's ability to regulate medical procedures, like the City's SOCE prohibition, that do not limit what medical practitioners can say or recommend to their clients. *Wollschlaeger* invalidated provisions of Florida's Firearm Owners' Privacy Act ("FOPA") that forbade doctors from keeping records of their patients' firearm ownership, inquiring about their patients' firearm ownership, or harassing their patients for owning firearms. 848 F.3d at 1300-01. In rejecting Florida's argument that FOPA fit within the nation's constitutional tradition of permitting state and local governments to regulate professional conduct with an incidental impact on speech, the Court explicitly distinguished FOPA from cases—including the Ninth Circuit's decision in *Pickup*,

---

[8]     Examples illustrating that the government does not lose its power to regulate commercial activity deemed harmful to the public whenever speech is a component of that activity include: a ban on race-based hiring even if it may require employers to remove "'White Applicants Only'" signs, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 62 (2006); corporate proxy statements, *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970); employers' threats of retaliation for the labor activities of employees, *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 618 (1969); the exchange of information about securities, *SEC v. Tex. Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir. 1968) (en banc); antitrust laws that prohibit "agreements in restraint of trade," *Giboney*, 336 U.S. at 502; and the exchange of price and production information among competitors, *Am. Column & Lumber Co. v. United States*, 257 U.S. 377 (1921).

which upheld California's SOCE ban—that "d[o] not restrict what medical professionals can say or recommend to their patients." *Id.* at 1309 (noting that the California law at issue in *Pickup* "did not prevent mental health providers 'from expressing their views to patients, whether children or adults, about SOCE, homosexuality, or any other topic' or from 'recommending SOCE to patients, whether children or adults'" (quoting *Pickup*, 740 F.3d at 1223)).

For similar reasons, *Wollschlaeger* distinguished this Court's previous decision in *Locke v. Shore*, 634 F.3d 1185 (11th Cir. 2011), from of FOPA. *Wollschlaeger*, 848 F.3d at 1309. *Locke* rejected a First Amendment challenge to a Florida law requiring interior designers to obtain a license to practice their trade. 634 F.3d at 1189-92. In holding that *Locke* provided no support to Florida's defense of FOPA, *Wollschlaeger* noted that *Locke*, like the SOCE law upheld in *Pickup*, "did not restrict what the practitioner could say or recommend to a patient or client." *Wollschlaeger*, 848 F.3d at 1309.[9] So *Wollschlaeger*, like *NIFLA*, does not—and cannot—sustain Plaintiffs' bold assertion that this Court must review the Ordinance

---

[9] In a similar vein, the Ninth Circuit's decision in *Conant v. Walters*, 309 F.3d 629 (9th Cir. 2002), is inapposite. *Conant* struck down, on First Amendment grounds, a federal policy that threatened doctors with revocation of their DEA prescription authority if they recommended the medical use of marijuana to their patients. *Id.* at 637-39. But unlike the federal policy at issue in *Conant*, the City's Ordinance does not prohibit practitioners from recommending SOCE to their patients.

under strict scrutiny. This Court should therefore decline Plaintiffs' invitation to subject basic government regulation of the medical profession to strict scrutiny.

**2.** ***The Ordinance is a regulation of professional conduct that is tied directly to the performance of a medical procedure.***

*NIFLA* undermines Plaintiffs' constitutional attack against the Ordinance for another critical reason. As noted, *NIFLA* clarified that First Amendment heightened scrutiny does not apply when "the law regulate[s] speech only 'as part of the *practice of medicine, subject to reasonable licensing and regulation by the State.'*" 138 S. Ct. at 2373 (quoting *Casey*, 505 U.S. at 884). And when the regulation at issue is "an informed-consent requirement or . . . regulation of professional conduct" that is "tied to a [medical] procedure," the First Amendment has a limited role to play. *Id.*

The Ordinance falls squarely within this exception. The Ordinance permits licensed counselors to do everything from publicly advocate for SOCE, discuss homosexuality with their patients, preform SOCE on their adult patients, and even recommend SOCE to their minor patients. The Ordinance proscribes licensed counselors from doing just one thing, namely, perform SOCE on patients who are minors. App.-Vol:VIII-Tab:126-27 at 4. And the Ordinance's prohibition is directly tied to a medical procedure—namely, performing SOCE. In fact, the Ordinance's prohibition is of the medical procedure itself.

The Sixth Circuit's recent decision in *EMW Women's Surgical Center, P.S.C. v. Beshear*, 920 F.3d 421 (6th Cir. 2019), illustrates how this Court should apply

*NIFLA*'s framework for identifying incidental regulations of professional speech. In *EMW*, the Sixth Circuit upheld a Kentucky law that directed doctors, before performing an abortion, to make audible a fetal heartbeat, perform an ultrasound, and display and describe the ultrasound images to their patient. *Id.* at 423. Adopting Kentucky's argument that heightened scrutiny did not apply to the informed-consent law at issue, the Sixth Circuit applied the framework set forth in *NIFLA*. *See EMW*, 920 F.3d at 428-29.[10] The Kentucky informed-consent law, *EMW* held, was a truthful and non-misleading disclosure directly tied to a medical procedure—there, abortion. *Id.* at 429-32.

In reaching its conclusion that the Kentucky law fell within *NIFLA*'s framework, the Sixth Circuit rejected any analogy between the Kentucky law and the Florida law struck down by this Court in *Wollschlaeger*. *See EMW*, 920 F.3d at 436 n.15 ("[U]nlike the statute in *Wollschlaeger*, [the Kentucky law] restricts no speech that the doctor wishes to impart to the patient."). Indeed, *EMW* not only distinguished the Kentucky informed-consent law from FOPA, it *explicitly relied* on *Wollschlaeger*'s observation, for First Amendment purposes, there is a meaningful difference between laws (like the Ordinance) that *do not restrict* what professionals

---

[10] Although *NIFLA* and *EMW* involved informed-consent requirements, *NIFLA* did not hold that its framework for identifying incidental regulations of professional speech applied only to informed-consent laws. *NIFLA* spoke to both informed-consent requirements and regulations of professional conduct that related to medical procedures. *See* 138 S. Ct. at 2373-74.

22

can say or recommend to their patients and laws (like FOPA) that *do restrict* what medical professionals can discuss with their patients. The Sixth Circuit explained that the Kentucky law was not an unconstitutional intrusion into doctor-patient communications because the law

> restricts no doctor from advising the patient to keep or abort the unborn life displayed or from providing any other opinion, medical or otherwise, that the doctor wishes to convey. *See generally Wollschlaeger v. Governor of Fla.*, 848 F.3d 1293, 1309 (11th Cir. 2017) (en banc) ("Importantly, however, the law [at issue in other cases] *did not restrict what the practitioner could say or recommend to a patient or client*." (emphasis added)). Indeed, the statute contains nothing that would prevent a doctor in her or his discretion from advocating to the patient in favor of an abortion.

*EMW*, 920 F.3d at 440 (alterations and emphasis added by *EMW*).[11]

So too here. Like the Kentucky law in *EMW*, the Ordinance restricts no licensed counselor from advising a minor patient to choose or reject SOCE or from providing any other opinions, medical or otherwise, that the licensed counselor wishes to convey. Like the Kentucky law in *EMW*, nothing in the Ordinance prevents a licensed counselor in his or her discretion from advocating to the minor patient in favor of or against SOCE. And like the Sixth Circuit in *EMW*, this Court

---

[11]     The sentence from *Wollschlaeger* quoted in *EMW* reads, without the alterations and emphasis added by *EMW*: "Importantly, however, the law in *Pickup*—like the law in *Locke*—did not restrict what the practitioner could say or recommend to a patient or client." *Wollschlaeger*, 848 F.3d at 1309.

should hold that reasonable regulations of the medical profession that are tied to a medical procedure are not subject to First Amendment heightened scrutiny.[12]

## B. If heightened scrutiny applies, the Ordinance should be subject only to intermediate scrutiny.

Should this Court conclude that the Ordinance does not fit within one of the exceptions to First Amendment heightened scrutiny set forth in *NIFLA*, the proper standard of review is intermediate scrutiny. Because the Ordinance does not discriminate on the basis of content or viewpoint, intermediate scrutiny is called for. Accordingly, if heightened scrutiny applies, the Ordinance should be "sustained under the First Amendment if it advances important governmental interests unrelated to the suppression of free speech and does not burden substantially more speech than necessary to further those interests." *Turner Broad. Sys., Inc. v. FCC*, 520 U.S. 180, 189 (1997).

### 1. *The Ordinance is content neutral.*

A law is content-based if it "applies to particular speech because of the topic discussed or the idea or message expressed." *Reed v. Town of Gilbert*, 135 S. Ct.

---

[12]    Because the Ordinance fits within one of the exceptions to First Amendment heightened scrutiny set forth in *NIFLA*, Plaintiffs' extensive reliance on *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), is misplaced. As an initial matter, *Humanitarian Law Project* did not deal with the regulation of a medical procedure. *Humanitarian Law Project* also involved a content-based regulation of speech. *See id.* at 27. As will be explained, *see infra* at 24, the Ordinance does not discriminate on the basis of content.

2218, 2227 (2015).  The Ordinance does not stifle Plaintiffs' expression; nor does it restrain Plaintiffs' minor patients from being exposed to descriptions of SOCE, a licensed counselor's recommendations for or against SOCE, or even the option to obtain SOCE in another jurisdiction.[13]  As the district court put it:

> The ordinances do not limit or change in any way advocacy for SOCE.  Plaintiffs retain their right and prerogative to seek greater acceptance of SOCE, to lobby Defendants to repeal the ordinances, and to lobby the State of Florida to explicitly preempt the ordinances.  The public marketplace of ideas is not limited in any way.  What *is* limited, is the therapy (delivered through speech and/or conduct) by a licensed practitioner to his or her minor patient, within the confines of a therapeutic relationship.  In the context of the relationship between a minor and his or her therapist, there is *no* competitive marketplace of ideas to infringe upon.

App.-Vol:XI-Tab:141 at 32 (emphasis in original).

Because the Ordinance does not "restrict [Plaintiffs'] ability to communicate and/or convey a message," *Wollschlaeger*, 848 F.3d at 1307, it does not discriminate on the basis of content and intermediate scrutiny is in order.

### 2. *The Ordinance is viewpoint neutral.*

For similar reasons, the Ordinance is also viewpoint neutral.  Viewpoint-based regulations of speech "[d]iscriminate against speech because of its message." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

---

[13]    Indeed, as noted *infra* at 34-35, 43, the Ordinance does not prohibit a licensed provider from recommending that a minor patient receive SOCE from a religious figure such as a member of the clergy or a pastoral counselor.

Plaintiffs argue that the Ordinance is viewpoint based because part of its definition of "conversion therapy" includes a prohibition of "efforts . . . to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex." App.-Vol:VIII-Tab:126-27 at 6:12-14. According to Plaintiffs, the Ordinance prohibits efforts to change same-sex attractions or feelings, while not prohibiting efforts to change opposite-sex attractions or feelings. I.B. 60.

Plaintiffs' argument depends on a selective reading of the Ordinance's plain text. The Ordinance prohibits "*any* counseling, practice or treatment performed *with the goal of changing an individual's sexual orientation* or gender identity." App.-Vol:IX-Tab:126-27 at 6:10-13 (emphasis added). On its face, then, the Ordinance applies to *all* efforts by a licensed counselor to change a minor's sexual orientation— whether geared toward the same sex *or* the opposite sex. Indeed, the Ordinance uses the words "sexual-orientation neutral" when it excludes from the definition of "conversion therapy" "sexual-orientation neutral interventions to prevent or address unlawful conduct or unsafe sexual practices." *Id.* at 6:17-18.

Plaintiffs similarly misread the Ordinance when they contend that it permits a licensed counselor to support or assist a minor patient undergoing a gender transition, but only if the change is geared toward the patient's non-biological sex. I.B. 60. This is so, Plaintiffs say, because a minor undergoing a "gender transition" "has to be seeking to change from the minor's biological gender." *Id.* But the

Ordinance says nothing of the sort. It does not define gender transition as a process by which a minor is transitioning away from their biological gender. The Ordinance is instead worded in a neutral fashion, instructing licensed counselors that the definition of "[c]onversion therapy does not include counseling that provides support and assistance to a person undergoing gender transition or counseling that provides acceptance, support, and understanding . . . as long as such counseling does not seek to change sexual orientation or gender identity." App.-Vol:VIII-Tab:126-27 at 6:14-19.

Plaintiffs' assertions of viewpoint discrimination depend entirely on a selective and acontextual reading of the Ordinance and, accordingly, should be rejected.

## C. The Ordinance is constitutional under any standard of First Amendment scrutiny.

Regardless of which standard of review this Court applies, the Ordinance should be upheld. In order for a restriction on speech to survive strict scrutiny, the government must "prove that the restriction furthers a compelling interest and is narrowly tailored to achieve that interest." *Reed*, 135 S .Ct. at 2231 (internal quotation marks omitted). Here, the Ordinance employs the least restrictive means to achieve the government's compelling interest in safeguarding the physical and

psychological well-being of minors. The Ordinance therefore withstands strict scrutiny.[14]

1. ***The Ordinance furthers the City's compelling interest in safeguarding the physical and psychological well-being of minors.***

"It is evident beyond the need for elaboration that a State's interest in 'safeguarding the physical and psychological well-being of a minor' is 'compelling.'" *New York v. Ferber*, 458 U.S. 747, 756-57 (1982) (quoting *Globe Newspaper Co. v. Superior Court*, 457 U.S. 596, 607 (1982)). "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens." *Prince v. Massachusetts*, 321 U.S. 158, 168 (1944). For this reason, the Supreme Court has long "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *Ferber*, 458 U.S. at 757.[15]

---

[14] The City acknowledges that, if strict scrutiny applies, it "bears the burden of proof on the ultimate question of [the Ordinance's] constitutionality." *Ashcroft v. ACLU*, 542 U.S. 656, 666 (2004). Regardless, as explained *infra* at 33-36, Plaintiffs cannot "be deemed likely to prevail" because the City can "show[] that [Plaintiffs'] proposed less restrictive alternatives are less effective than [the Ordinance]." *Id.*

[15] *See, e.g.*, *FCC v. Pacifica Found.*, 438 U.S. 726 (1978) (holding that the government's interest in the "well-being of its youth" justified special treatment of indecent broadcasting received by adults as well as children.); *Ferber*, 458 U.S. 747 (upholding a law prohibiting the knowing promotion of child pornography); *Ginsburg v. New York*, 390 U.S. 629 (1968) (upholding a New York law protecting

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

The Ordinance's stated intent is to safeguard the physical and psychological well-being of minors in the City. The very first operative section of the Ordinance reads:

> The Intent of this Ordinance is to protect the physical and psychological well-being of minors, including but not limited to lesbian, gay, bisexual, transgender and/or questioning youth, from exposure to the serious harms and risks caused by conversion therapy or reparative therapy by licensed providers, including but not limited to licensed therapists.

App.-Vol:VIII-Tab:126-27 at 6:3-8.

As explained, *see supra* at 4-9, in concluding that SOCE should be prevented, the City relied on an extensive record of evidence demonstrating that over the last few decades a number of well-known, reputable professional and scientific organizations have publicly condemned the practice of SOCE, expressing serious concerns about its potential to inflict harm. Among others, the American Psychological Association, the American Psychiatric Association, the American Academy of Pediatrics, the American Psychoanalytic Association, the American School Counselor Association, the American Academy of Child and Adolescent Psychiatry, and the Pan American Health Organization have warned of the great and serious health risks accompanying SOCE counseling, including depression, anxiety,

---

children from exposure to nonobscene literature); *Prince*, 321 U.S. 168 (upholding a statute prohibiting use of a child to distribute literature on the street was valid notwithstanding the statute's effect on a First Amendment activity).

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

self-destructive behavior, and suicidality. The Ordinance also cites recent research by the U.S. Department of Health and Human Services' Substance Abuse and Mental Health Services Administration and the American College of Physicians indicating that SOCE is ineffective.

This consensus of professional opinion has been relied on by eighteen states, the District of Columbia,[16] and dozens of cities and counties[17] that have enacted SOCE prohibitions similar to the City's. Plaintiffs fault the City for not conducting an independent inquiry into the evidentiary basis of SOCE's harm and ineffectiveness. I.B. 53. But a legislature "is not constitutionally required to wait for conclusive scientific evidence before acting to protect its citizens from serious threats of harm." *King*, 767 F.3d at 239; *see United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 822 (2000) ("This is not to suggest that a 10,000-page record must be compiled in every case or that the Government must delay in acting to

---

[16] *See* Cal. Bus. & Prof. Code § 865.2; 2019 Colo. Legis. Serv. S.B. 19-193 (West); Conn. Gen. Stat. Ann. § 19a-907a; 24 Del. Admin. Code § 3514; D.C. Code § 7-1231.14a; Haw. Rev. Stat. § 453J-1; 405 Ill. Comp. Stat. Ann. 48/20; Md. Code Ann., Health Occ. § 1-212.1; 2019 Me. Legis. Serv. Ch. 165 (H.P. 755) (L.D. 1025) (West); Nev. Rev. Stat. § 629.600; N.J. Stat. Ann. § 45:1-55; N.H. Rev. Stat. § 332-L:2; N.M. Stat. Ann. § 61-1-3.3; N.Y. Educ. Law § 6531-a; Or. Rev. Stat. § 675.850; 23 R.I. Gen. Laws Ann. § 23-94-3; Vt. Stat. Ann. Tit. 18, § 8352; Wash. Rev. Code Ann. § 18.130.180.

[17] For a complete list of conversion therapy bans nationwide, see *Conversion Therapy Laws*, Movement Advancement Project, http://www.lgbtmap.org/equality-maps/conversion_therapy [https://perma.cc/UWM9-ASXY] (last visited June 5, 2019).

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

address a real problem; but the Government must present more than anecdote and suspicion."). Given the wide range of professional opinion regarding SOCE, "[i]t is not too far a leap in logic to conclude that a minor client might suffer psychological harm if repeatedly told by an authority figure that her sexual orientation—a fundamental aspect of her identity—is an undesirable condition." *King*, 767 F.3d at 239.

Finally, to the extent Plaintiffs challenge the City's reliance on the views of the professional community regarding the harms posed by SOCE, Plaintiffs overlook the fact that "[l]egislatures are entitled to rely on the empirical judgments of independent professional organizations that possess specialized knowledge and experience concerning the professional practice under review, particularly when this community has spoken with such urgency and solidarity on the subject." *Id.* at 238. And while the weight of professional opinion stands against SOCE, the First Amendment does not "require that empirical data come accompanied by a surfeit of background information." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 555 (2001) (internal quotation marks and ellipses omitted). The Supreme Court has even "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether, or even, in a case applying strict scrutiny, to justify restrictions based solely on history, consensus, and simple common sense." *Id.* (internal quotation marks omitted); *see also FCC v. Fox*

*Television Stations, Inc.*, 556 U.S. 502, 519 (2009) (noting certain recognized harms involving minors will necessarily be lacking empirical support); *Collins v. Texas*, 223 U.S. 288, 297-98 (1912) (recognizing the "right of the State to adopt a policy even upon medical matters concerning which there is difference of opinion and dispute").

SOCE laws are not the only context in which professional opinions about the nature of sexual orientation have played a significant role in the recognition of "new insights and societal understandings [that] can reveal unjustified inequality" imposed on gays and lesbians. *Obergefell v. Hodges*, 135 S. Ct. 2584, 2603 (2015). For example, in concluding that the Constitution guarantees same-sex couples a fundamental right to marry, the Supreme Court looked to the professional opinions of "psychiatrists and others [who have] recognized that sexual orientation is both a normal expression of human sexuality and immutable." *Id.* at 2596; *see id.* at 2594 (the "immutable nature" of a sexual orientation "dictates that same-sex marriage is the[] only real path to th[e] profound commitment" of marriage for gays and lesbians). Just as the Constitution grants gays and lesbians "equal dignity in the eyes of the law," *id.* at 2608, so too do laws prohibiting SOCE.

The City therefore acted well within the constitutional bounds of legislative discretion when it relied on the opinions of learned professionals in prohibiting SOCE.[18]

### 2. *The Ordinance is the least restrictive means of furthering the City's compelling interest in safeguarding the physical and psychological well-being of minors.*

For four reasons, the Ordinance is narrowly tailored to achieve the City's compelling interest in safeguarding the physical and psychological well-being of minors.

*First*, the Ordinance applies only to minors, "whose immaturity, inexperience, and lack of judgment may sometimes impair their ability to exercise their rights wisely." *Hodgson v. Minnesota*, 497 U.S. 417, 444 (1990). Because the City's

---

[18] The broad range of professional opinion regarding the harms and ineffectiveness of SOCE contrasts with the law at issue in *Wollschlaeger*, where this Court rejected the Florida Legislature's proposed interests as lacking any evidentiary basis in professional opinion. *See* 848 F.3d at 1312 ("[T]he Florida Legislature, in enacting FOPA, relied on six anecdotes and nothing more. There was no other evidence, empirical or otherwise, presented to or cited by the Florida Legislature."); *id.* at 1313 ("[T]here was no evidence whatsoever before the Florida Legislature that any doctors or medical professionals have taken away patients' firearms or otherwise infringed on patients' Second Amendment rights."); *id.* at 1314 ("[T]here is no evidence that doctors or medical professionals have been improperly disclosing patients' information about firearm ownership."); *id.* at 1316 ("There is no claim, much less any evidence, that routine questions to patients about the ownership of firearms are medically inappropriate, ethically problematic, or practically ineffective. Nor is there any contention (or, again, any evidence) that blanket questioning on the topic of firearm ownership is leading to bad, unsound, or dangerous medical advice.").

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

compelling interest is in safeguarding the physical and psychological well-being of minors, the City ensured that only minors would be covered by the Ordinance's prohibition of SOCE.

*Second*, the Ordinance applies only to licensed providers of professional counseling. The Ordinance excludes from its definition of "provider" "members of the clergy or other religious leaders who are acting in their roles as clergy or pastoral counselors, or are providing religious counseling or instruction to congregants." Vol:IX-Tab:126-27 at 6:26-7:2. In Plaintiffs' view, this careful limitation is a vice rather than a virtue. *See* I.B. 56-57.

Plaintiffs contend that, by not covering unlicensed counselors, the Ordinance is impermissibly under-inclusive. However, the authorities relied upon by the Ordinance specifically address the harms of conversion therapy, which, axiomatically, is a service provided by a therapist. *See, e.g.*, App.-Vol:I-Tab:85-5, 85-11; App.-Vol:II-Tabs:85-12, 85-13; App.-Vol:III-Tab:121-17; Supp.App.-Tabs:121-19, 128-2, 128-3, 128-5, 128-6. Indeed, the authorities are comprised of mental health care organizations who recommend against conversion therapy performed by their constituent mental health care providers.

Plaintiffs also argue that the Ordinance is under-inclusive because it does not apply to clergy and religious leaders. But that exclusion is not only eminently reasonable; it also avoids the religious liberty concerns that application of the

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

Ordinance to clergy and religious leaders might raise. *See Town of Greece v. Galloway*, 572 U.S. 565, 582 (2014) ("The First Amendment is not a majority rule, and government may not seek to define permissible categories of religious speech."). And because the Ordinance proscribes a medical treatment, it applies only to licensed professionals whose practices the government has the authority to regulate. *Cf. Hosanna-Tabor Evangelical Lutheran Church & Sch. v. EEOC*, 565 U.S. 171, 705-06 (2012) (discussing the freedom of religious groups to choose their own ministers free from government interference).

*Third*, Plaintiffs' proposed alternative means—namely, banning aversive conversion therapy techniques, but not talk therapy techniques—would require the City to ignore the vast trove of professional opinion finding that *all* forms of conversion therapy are dangerous to minors, even if one may be more harmful than the other. As the district court aptly put it, "[r]equiring [the City and County] to produce scientific evidence that engaging in SOCE through talk therapy is as harmful as aversive techniques would likely be futile when so many professional organizations have declared their opposition to SOCE." App.-Vol:XI-Tab:141 at 49.

*Fourth*, and as already noted, the Ordinance leaves licensed providers free to talk to their minor patients about SOCE and even recommend SOCE. The Ordinance merely prohibits providers from performing SOCE on minors. Even when strict

scrutiny applies, the Supreme Court has admonished that government should "not be punish[ed] . . . for leaving open more, rather than fewer, avenues of expression." *Williams-Yulee v. Florida Bar*, 135 S. Ct. 1656, 1670 (2015).

**D. Plaintiffs cannot satisfy the remaining preliminary injunction factors.**

In addition to demonstrating a likelihood of success on the merits, Plaintiffs must show that they will suffer irreparable harm in the absence of a preliminary injunction, that the balance of equities are in their favor, and that the injunction is in the public interest. *Siegel*, 234 F.3d at 1176. Because Plaintiffs cannot show a substantial likelihood of success on any of their claims, they cannot invoke the rule that irreparable harm is shown based on even a short-lived deprivation of First Amendment rights. Plaintiffs' case for irreparable harm is further undermined by the fact that they waited nearly eight months after the Ordinance's passage to bring suit. *See Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016) ("A delay in seeking a preliminary injunction of even only a few months . . . militates against a finding of irreparable harm." (internal quotation marks omitted)). Rather, it is the City that will suffer irreparable harm if it cannot enforce its Ordinance. *See Maryland v. King*, 567 U.S. 1301, 1301 (2012) (Roberts, C.J., in chambers) ("Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." (internal quotation marks and brackets omitted)). It follows as well that the balance

of equities and the public interest do not support the entry of preliminary injunctive relief.[19]

## II. THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT PRIOR RESTRAINT CLAIM.

The term prior restraint describes "administrative and judicial orders forbidding certain communications when issued in advance of the time that such communications are to occur." *Alexander v. United States*, 509 U.S. 544, 550 (1993) (emphasis deleted; internal quotation marks omitted). The classic example of a prior restraint is a requirement that a would-be speaker obtain a permit or license before speaking. *Barrett v. Walker Cty. Sch. Dist.*, 872 F.3d 1209, 1223 (11th Cir. 2017) (defining the phrase "prior restraint" as a situation where the "government can deny access to a forum for expression before the expression occurs" (internal quotation marks omitted)). "Prior restraints contrast with subsequent punishments, which regulate a given type of speech by penalizing the speech only after it occurs." *Id.* (emphasis deleted; internal quotation marks omitted).

The district court correctly found that Plaintiffs failed to demonstrate a substantial likelihood of succeeding on the merits of their prior restraint claim. App.-Vol:XI-Tab:141 at 55-56. The court recognized that the Ordinance "does not

---

[19] Plaintiffs do not argue that any of the preliminary injunction factors, other than a substantial likelihood of success on the merits, have been met as to their prior restraint and vagueness claims.

establish a permit or licensing scheme enabling the government to allow or forbid speech in advance." *Id.* at 56. Indeed, as the district court noted, the Ordinance penalizes providers only *after* they have practiced conversion therapy on minors. *See* App.-Vol:VIII-Tab:126-27 at 7. Although the Ordinance applies only to licensed providers, there is no permitting or licensing mechanism associated with the Ordinance.

Plaintiffs' rely on *Barrett* to argue that the district court's definition of "prior restraint" was too rigid. I.B. 65. The *Barrett* court, however, cited only one other example (in addition to permitting and licensing ordinances) of a prior restraint— court-ordered injunctions that forbid speech—and expressly distinguished "subsequent punishments" from prior restraints. 872 F.3d at 1223. Clearly, there is no court-ordered injunction at issue here, as the district court declined to enter a preliminary injunction. Plaintiffs' argument simply fails to acknowledge the Ordinance for what it provides—a subsequent punishment for practicing conversion therapy. *See Neb. Press Ass'n v. Stuart*, 427 U.S. 539, 559 (1976) (distinguishing between "a threat of criminal or civil sanctions after publication" which "'chills'" speech and a prior restraint which "'freezes'" speech (quoting Alexander M. Bickel, *The Morality of Consent* 61 (1975))); *Cooper v. Dillon*, 403 F.3d 1208, 1216 (11th Cir. 2005) ("A prior restraint . . . does not exist where a publisher is faced with criminal sanctions for publishing certain information."). Accordingly, the district

court correctly declined to issue a preliminary injunction based on Plaintiffs' prior restraint claim.

## III. THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS ARE NOT SUBSTANTIALLY LIKELY TO SUCCEED ON THE MERITS OF THEIR FIRST AMENDMENT VAGUENESS CLAIM.

"To succeed on a claim that an ordinance is void for vagueness, 'the complainant must demonstrate that the law is impermissibly vague in all of its applications.'" *Stardust, 3007 LLC v. City of Brookhaven*, 899 F.3d 1164, 1176 (11th Cir. 2018) (quoting *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 497 (1982)). In conducting its vagueness analysis, a court must first "'determine whether the enactment reaches a substantial amount of constitutionally protected conduct.'" *Wilson v. State Bar of Ga.*, 132 F.3d 1422, 1429 (11th Cir. 1988) (quoting *Vill. of Hoffman Estates*, 455 U.S. at 494). A law is unconstitutionally vague if it (1) "fails to provide a person of ordinary intelligence a reasonable opportunity to understand what conduct is prohibited" or (2) "authorizes or encourages arbitrary and discriminatory enforcement." *Hill v. Colorado*, 530 U.S. 703, 732 (2000) (citation omitted). However, "perfect clarity and precise guidance have never been required even of regulations that restrict expressive activity." *Ward v. Rock Against Racism*, 491 U.S. 781, 794 (1989).

Moreover, as in this case, where the Ordinance regulates a class of people with specialized knowledge of what is being regulated, the specificity required by

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

due process is measured by the common understanding of those individuals. *See, e.g.*, *Vill. of Hoffman Estates*, 455 U.S. at 501 (examining vagueness of ordinance from the perspective of a "business person of ordinary intelligence"); *United States v. Weitzenhoff*, 35 F.3d 1275, 1289 (9th Cir. 1993) ("[I]f the statutory prohibition involves conduct of a select group of persons having specialized knowledge, and the challenged phraseology is indigenous to the idiom of that class, the standard is lowered and a court may uphold a statute which uses words or phrases having a technical or other special meaning, well enough known to enable those within its reach to correctly apply them." (internal quotation marks omitted)).

Here, Plaintiffs claim that the Ordinance is unconstitutionally vague because the intent of the therapy, *i.e.*, whether the client is seeking to change his or her sexual orientation or gender identity through conversion therapy, determines whether the provider violates the Ordinance. Plaintiffs also argue that the Ordinance is unconstitutionally vague because "sexual orientation" and "gender identity" are not defined. These arguments are red herrings and were properly rejected by the district court.

First, as recognized by the district court, "sexual orientation" and "gender identity" have common, readily-ascertainable meanings. App.-Vol:XI-Tab:141 at 57 (citing *The American Heritage Dictionary of the English Language* (5th ed. 2019) (defining "gender identity" as "[a]n individual's self-identification as being male,

female, neither gender, or a blend of both genders" and defining "sexual orientation" as "[t]he direction of a person's sexual interest, as toward people of a different sex, toward people of the same sex, or without regard to sex")). The district court also correctly noted that both of these terms are frequently used without difficulty by both the Supreme Court and this Court. *Id.* at 58; *see, e.g.*, *R.R. & G.R. Harris Funeral Homes, Inc. v. EEOC*, 139 S. Ct. 1599, 1599 (2019) (mem.) (granting certiorari to determine "[w]hether Title VII prohibits discrimination against transgender people based on (1) their status as transgender or (2) sex stereotyping under *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989)"); *Masterpiece Cakeshop, Ltd. v. Colo. Civil Rights Comm'n*, 138 S. Ct. 1719 (2018) (considering a First Amendment challenge to the application of a Colorado law prohibiting discrimination on the basis of sexual orientation in places of public accommodation); *Obergefell*, 135 S. Ct. 2584 (holding that same-sex couples may exercise the fundamental right to marry); *Kothmann v. Rosario*, 558 F. App'x 907 (11th Cir. 2014) (per curiam) (concluding that a transgender prisoner pled a plausible Eighth Amendment violation by alleging that a prison denied her requests for hormone treatment); *Glenn v. Brumby*, 663 F.3d 1312 (11th Cir. 2011) (holding that discrimination on the basis of gender non-conformity constitutes sex-based discrimination under the Equal Protection Clause).

In fact, both Hamilton and Otto admit that they know what it means to seek to change sexual orientation or gender identity. App.-Vol:III-Tab:121-7 at 43:19-25,

44:1-20, 45:5-12, 176:8-23; App.-Vol:IV-Tab:121-8 at 94:25-95:9, 137:10-138:18; 141:10-142:1.  While the City does not concede that Otto's informed consent form is legally sufficient, Otto does give clients an "informed consent form [that] outlines the nature of SOCE counseling, explains the controversial nature of SOCE counseling, . . . and informs the client of the potential benefits and risks associated with SOCE counseling."  App.-Vol:I-Tab:1 ¶ 128.

Additionally, the Ordinance clearly defines "conversion therapy," which Plaintiffs admit they practice and are suing the City because they are aware the Ordinance prohibits this therapy practice on minors.[20]  App.-Vol:VIII-Tab:126-27 at 6.  Moreover, and as already noted, the Ordinance has explicit exceptions, detailing what it does not prevent:

> [It] does not intend to prevent mental health providers from speaking to the public about SOCE; expressing their views to patients; recommending SOCE to patients; administering SOCE to any person who is 18 years of age or older; or referring minors to unlicensed counselors, such as religious leaders.

App.-Vol:VIII-Tab:126-27 at 4:21-5:2.  To the extent Plaintiffs argue that they do not know how the Ordinance will be enforced (I.B. 66), the Ordinance clearly sets

---

[20]     Specifically, the Ordinance defines "conversion therapy" as "any counseling, practice or treatment performed with the goal of changing an individual's sexual orientation or gender identity, including, but not limited to, efforts to change behaviors, gender identity or gender expression, or to eliminate or reduce sexual or romantic attractions or feelings toward individuals of the same gender or sex."  App.-Vol:VIII-Tab:126-27 at 6.

forth the enforcement procedures and associated penalties, namely, a civil fine. App.-Vol:VIII-Tab:126-27 at 7.

Here, as in *King*, the proscribed conduct is defined in a sufficiently clear manner to pass constitutional muster where the therapy is a discrete practice within the profession, has been the target of public statements by professional organizations, and is familiar to Plaintiffs. 767 F.3d at 240-41; *see also Pickup*, 740 F.3d at 1233-34 (holding that California's SOCE law "is not void for vagueness"). Accordingly, the district court correctly found that Plaintiffs failed to demonstrate a substantial likelihood of succeeding on the merits of their vagueness claim.

## IV. THE DISTRICT COURT CORRECTLY CONCLUDED THAT PLAINTIFFS CANNOT DEMONSTRATE IRREPARABLE HARM ON THEIR STATE LAW *ULTRA VIRES* CLAIM.

"[T]he basis of injunctive relief in the federal courts has always been irreparable harm and inadequacy of legal remedies." *Sampson v. Murray*, 415 U.S. 61, 88 (1974) (internal quotation marks omitted). "A showing of irreparable harm is 'the *sine qua non* of injunctive relief.'" *Ne. Fla. Chapter of the Ass'n of Gen. Contractors of Am. v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) (quoting *Frejlach v. Butler*, 573 F.2d 1026, 1027 (8th Cir. 1978)). Importantly, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies.'" *Id.*

Relying on *Planned Parenthood of Minn., Inc. v. Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977), Plaintiffs argue that the district court erred by

concluding that they did not demonstrate "irreparable harm" regarding their *ultra vires* claim. I.B. 67-68. Plaintiffs assert that, because they are suffering loss of potential revenue, their client-relationships could be damaged and their clients' mental health may be affected—which, Plaintiffs say, is sufficient to demonstrate irreparable harm. *Id.* at 67-68. Plaintiffs do not address the substantial likelihood of prevailing on the merits of their *ultra vires* claim or the remaining preliminary injunction factors on appeal; they only contend that have suffered irreparable harm sufficient to merit a preliminary injunction.[21]

First, Plaintiff's reliance on *Planned Parenthood* is misplaced. In that case, a city council enacted a moratorium on constructing abortion facilities. After Planned Parenthood purchased land for a new facility, did not renew its existing lease in anticipation of the construction, and secured financing for the construction, it was denied a building permit based on the moratorium. 558 F.2d at 863-64. As a result, the Eighth Circuit determined that the council's actions effectively forestalled Planned Parenthood's operations and ability to generate income to discharge the debt already incurred by purchasing the new property. *Id.* at 863-64, 866-67.

---

[21] While the City is of the view that Plaintiffs cannot make the requisite showing as to the remaining preliminary injunction factors with respect to their *ultra vires* claim, because Plaintiffs do not address those factors, the City does not address them either. Moreover, the district court did not make a finding with regarding these additional factors.

Unlike *Planned Parenthood*, Plaintiffs' alleged loss of revenue from both current and potential clients is clearly calculable, based on the number of minor clients on whom they performed conversion therapy prior to the City's enactment of the Ordinance and the number of potential, minor clients who have solicited Plaintiffs for conversion therapy since the enactment of the Ordinance. Under the law of this Circuit, Plaintiffs' claim for monetary damages, by its very nature, belies a claim of irreparable harm. *See Ferrero v. Assoc. Materials, Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991).

The Ordinance, moreover, does not prevent Plaintiffs from speaking to the public about conversion therapy; from expressing their views on homosexuality or gender identity to their patients; from administering conversion therapy to adult clients; or from referring minor clients to religious leaders. App.-Vol:VIII-Tab:126-27 at 4-5. And, as noted, *see supra* at 36, Plaintiffs' delay of approximately eight months prior to challenging the Ordinance also supports the district court's finding regarding the absence of irreparable harm.

Additionally, Plaintiffs' alleged damages based on their *clients'* mental health is not an injury attributable to Plaintiffs, but rather their third-party clients, none of whom is a party to this action.[22] Moreover, Plaintiffs fail to explain how their alleged

---

[22]    Additionally, Plaintiffs sought to bring third-party claims before the district court. The district court, however, limited its order to consideration of the first-party

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

"irreparable harm" is distinct from any injury as a result of the alleged First Amendment violations (nor can they). Accordingly, the district court correctly ruled that Plaintiffs have failed to show any irreparable injury on their *ultra vires* claim sufficient to merit a preliminary injunction.

## CONCLUSION

For the foregoing reasons, the district court's order denying a preliminary injunction should be affirmed.

Respectfully submitted,

*/s/ Daniel L. Abbott*

JAMIE A. COLE
DANIEL L. ABBOTT
ANNE R. FLANIGAN
WEISS SEROTA HELFMAN
  COLE & BIERMAN, P.L.
200 East Broward Blvd., Suite 1900
Fort Lauderdale, FL 33301
(954) 763-4242
dabbott@wsh-law.com

EDWARD G. GUEDES
ERIC S. KAY
WEISS SEROTA HELFMAN
  COLE & BIERMAN, P.L.
2525 Ponce de Leon Blvd., Suite 700
Coral Gables, FL 33134
(305) 854-0800

*Counsel for Defendant-Appellee*
*City of Boca Raton, Florida*

Dated: June 10, 2019

---

claims only, finding Plaintiffs failed to "sufficiently demonstrate that their clients would be hindered in advancing their own litigation challenging the [O]rdinance[]." App.-Vol:XI-Tab:141 at 13.

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.

# CERTIFICATE OF COMPLIANCE

On behalf of Defendant-Appellee, City of Boca Raton, Florida, I hereby certify pursuant to Federal Rule of Appellate Procedure 32(g)(1) that the foregoing brief is proportionally spaced, has a typeface of 14 points or more, is set in Times New Roman, and contains 10,589 words.

/s/ *Daniel L. Abbott*
Daniel L. Abbott

## CERTIFICATE OF SERVICE

I, Daniel L. Abbott, counsel for Defendant-Appellee, City of Boca Raton, Florida, and a member of the Bar of this Court, certify that, on June 10, 2019, a copy of the foregoing was filed electronically through the appellate CM/ECF system with the Clerk of the Court. I further certify that all parties required to be served have been served.

/s/ *Daniel L. Abbott*
Daniel L. Abbott

WEISS SEROTA HELFMAN COLE & BIERMAN, P.L.